# EXHIBIT D

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) **DOCKET NO.  24C655** |
| *Plaintiff* | ) |
| v. | ) |
|  | ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) **AMENDED COMPLAINT** |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) **JURY DEMAND** |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) |
| **Cybele Raver, Daniel Diermeier, Melanie Lowe** | ) |
| **Timothy Garrett, Maja A. Hartzell** | ) |
| **Ernie Rushing, Sara Donahoe,** | ) |
| **Terry Walker, K. Melissa Smith Hayes,** | ) |
| **Nancy Wise, Lacey Cross, Monika Do,** | ) |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) |
| **Jessica Wellette, Melanie Morris,** | ) |
| **Robingale Panepinto, Melissa Lord,** | ) |
| **Brittany Kirby, Shannon Ellrich.** | ) |
|  | ) |
| *Defendants* | ) |

### AMENDED COMPLAINT

Plaintiff, Ian Hunter Lucas (hereinafter "Plaintiff"), brings this Complaint against the

Defendants, **Michelle Tellock, Joel Newsome, Melissa Porter, G.L. Black, Mary Ann Jessee,**

**Clairse Gamez, Neil Jamerson, Jeremy Borgoin, Mavis Schoen, Pamela Jefferies, Marissa**

**Shulruff, , E. Jacob Cummings, Jill Harris, Heather Robbins, Cate Enstrom, Chrystal**

**Ritchie, Feylyn Lewis, Tracey George, Cybele Raver, Daniel Diermeier, Melanie Lowe,**

**Timothy Garrett, Ernie Rushing, Sara Donahoe, Terry Walker, K. Melissa Smith Hayes,**



**Nancy Wise, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith,**
**Jessica Wellette, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and**
**Shannon Ellrich,** (collectively "Defendants"), for breach of contract, negligence, discrimination
on the basis of disability in violation of the Americans with Disabilities Act, Section 504 of the
Rehabilitation Act, and the Tennessee Human Relations Act, and retaliation for Plaintiff making
complaints regarding the discrimination that he experienced due to Vanderbilt University's
actions as well as other wrongful actions under the laws of the United States and the State of
Tennessee, and alleges as follows:

## PARTIES

1. Plaintiff, Ian Hunter Lucas, is an adult male citizen of the United States, who is
a resident of Pleasant View, Tennessee, and was a graduate student at the Vanderbilt University
School of Nursing Master of Nursing (MN) Program from January 2023 to December 2023.

2. Mr. Lucas has been diagnosed with Crohn's disease and is thus an individual
with a disability, as that term is defined in the Americans with Disabilities Act because he has
an actual impairment that substantially limits one or more of his major life activities.

3. At all relevant times, Mr. Lucas has been a "qualified individual" with a
disability because he is able to be a functional successful student with the reasonable
accommodations he received as a student with a disability.

4. At all relevant times to this lawsuit, Mr. Lucas was a student of Defendant
Vanderbilt University, as a graduate student at the Vanderbilt University School of Nursing
to obtain a Master of Nursing degree.

5. Defendant Vanderbilt University is an educational institution in Nashville,
Tennessee, and Defendant Vanderbilt School of Nursing is a component thereof.



6. Defendant Vanderbilt University ("Vanderbilt") is a private, non-profit educational institution, which receives significant federal funds, and is incorporated and does business in Nashville, Tennessee.

7. On information and belief, Vanderbilt University has had formal non-discrimination and anti-harassment policies in place since July 2016; those policies specifically include protections from discrimination, harassment, and retaliation based on, among other things, disability.

8. In the submitted civil complaint, the Plaintiff advances claims against a cohort of Defendants, encompassing **Tracey George, Cybele Raver, Daniel Diermeier, Melanie Lowe, Ernie Rushing, Sara Donahoe, Terry Walker, Teresa Rogers, Julie Perry, K. Melissa Smith Hayes, Nancy Wise, Jane Zubulake, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Mia Wells, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich,** among others. These Defendants are alleged to have failed in their ethical and legal duties by not reporting known misconduct at the university to the Department of Education and by not protecting the Plaintiff, as was their obligation as educators and administrators.

9. These Defendants, who held positions of influence and governance, are accused of neglecting their professional responsibilities to act in the best interest of the Plaintiff. Their inaction—and potential complicity—in the face of alleged university wrongdoing, has purportedly led to considerable harm to the Plaintiff, including defamation. The Plaintiff posits that such breaches may have been committed with either deliberate intent or through neglect, a determination which is sought to be made in the course of legal adjudication. The Plaintiff, therefore, calls for a diligent inquiry into both the overt actions

COPY

and omissions of these Defendants, to establish the extent of the damage inflicted upon the

Plaintiff's academic and professional life, and to address the personal consequences of the

Defendants' alleged ethical failures.

COPY

## JURISDICTION
## AND VENUE

10. This Court has jurisdiction over Mr. Lucas' claims pursuant to 28 U.S.C. §1331 and §1343 since the matters in controversy arise under the laws of the United States.

11. This Court also has jurisdiction under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq*., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, as Title II of the ADA, prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. §12132 (Supp. 1991), the Rehabilitation Act of 1973, §§ 504 and 505, as amended.

12. This Court also has jurisdiction under 28 U.S.C. §1367 over the supplemental state law claims made by Mr. Lucas in seeking relief under the Tennessee Human Rights Act, T.C.A. §4-21-101 *et. seq*.

13. This Court has personal jurisdiction over both Plaintiff and Defendant.

14. At all relevant times, Defendant had more than 15 employees, and thus is subject to the requirements of the ADA (42 U.S.C. §12101 *et. seq.* and the Tennessee Human Rights Act (T.C.A. §4-21-101 *et. seq*.).

15. Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. §1391(b)(c) as Defendant is located in the District and subject to the jurisdiction of the Court, and because the events giving rise to the claims raised herein occurred in this judicial district.

## NATURE OF ACTION

16. This action seeks relief for Defendants' wrongful actions, including breach of contract, negligence, and intentional infliction of emotional distress, leading to

damages through a knowing and inflicting action with the intent to do harm upon the Plaintiff, including wrongful expulsion, whistleblower retaliation, witness intimidation, and obstruction of justice in violation of applicable state and federal laws and principles of equity.

17.    Plaintiff seeks redress for Defendants' wrongful and discriminatory actions that have caused significant educational, professional, and personal harm to Plaintiff.

18.    Further through the process of discovery and trial evidence. Plaintiff will demonstrate Manipulation of External Investigations, Collusion, Witness Intimidation, and Obstruction of Justice, in which the plaintiff is involved in as a federal witness to a whistleblower fraud, waste and abuse case under seal with subpoenas issued under seal by the United States District Court of the Western District of Tennessee, prosecution and representation for the United States led by Sara Williams, Assistant United States Attorney for the United States Attorney's Office of the Western District of Tennessee, and lead investigative agency Department of Health and Human Services Office of Inspector General led by Special Agent Ed Miller.

19.    Defendants' actions demonstrate collusion with the defendant of this investigation in which defendants were aware of a $1.25 million dollar "donation" provided by the Defendants' and the Plaintiff's former employer as a bribe to academically dismiss and expel the Plaintiff. The reason for expulsion exactly matches the investigation determination and "policy violations" as the reason for the wrongful termination. This served as a mutual and benefiting purpose for the Defendants, who were under investigation at the same time for EOA violations by the Plaintiff for disability discrimination. Through the trial process, Plaintiff will demonstrate that the retaliation

was quite evident, giving the Defendants reasoning to defame and ensure the Plaintiff was expelled to attempt to conceal and deflect the systemic disability discrimination that had been occurring by the Defendants. Furthermore, two of the Defendants, also student peers of the Plaintiff, agreed to aid the other Defendants in their actions. These Defendants did so for suspected academic and needed favors from the other Defendants' ability and positions of power to provide such aide. The student Defendants acted in this way, despite Plaintiff's many attempts to offer these student Defendants the opportunities to provide any rebuttal or even an affirmation of not being involved in the matter entirely. The student Defendants, however, chose not respond to Plaintiff's many requests and even choose to continue in their false statements to other members of the student body and on clinical rotations at potential and former employers of the Plaintiff.

      20.     In the civil complaint, the Plaintiff alleges as follows: The donation in question, as asserted in this complaint, is substantiated by evidence that Air Evac Lifeteam Inc., a subsidiary of Global Medical Response under the ownership of KKR & Co., has undertaken the provision of legal representation for three student defendants who were heretofore not associated with the company. This act of extending legal aid establishes a tangible association with the federal litigation at hand, ensnaring your clients and further substantiating the nexus between Vanderbilt University and my erstwhile employer in the pending legal proceedings.

      21.     The provision of legal counsel to these individuals by Air Evac Lifeteam Inc. and, by extension, Global Medical Response and KKR & Co., absent the facilitative conduit rendered by Vanderbilt concerning the students' involvement in actions pursuant to a donation covenant from KKR & Co., would ostensibly lack justifiable cause. This

COPY

entanglement is accentuated by monetary transactions processed through the Conway Welch Foundation, as evinced in their 990 PF tax filing on October 31, 2023, followed closely by a $1.25 million contribution to Vanderbilt, as documented on November 17, 2023. The said filing delineates a gross sales price of assets amounting to $1,349,149.00, a figure conspicuously absents in previous 990 filings since 2021, where no other entry under line 6b has reached or exceeded the one million dollar threshold.

22.     The articulation of $1,349,149.00 on line 6b of the Form 990-PF, denoting the gross sales price of assets, intimates a calculated financial stratagem. When observed in conjunction with the contemporaneous $1.25 million endowment, this numeration intimates a complex fiscal orchestration whereby assets—presumably sourced from entities such as KKR & Co.—were liquidated, engendering proceeds that underwrote the said benefaction. The chronology and magnitude of these transactions insinuate an intentional contrivance, potentially orchestrated by KKR & Co. to funnel capital via the foundation, ultimately designating such funds to Vanderbilt in a transaction that seemingly aligns with the strategic intent to remunerate for the service of my unwarranted dismissal and contrived expulsion.

### FACTUAL ALLEGATIONS

23.     Plaintiff enrolled in Defendant's Master of Nursing program (MN) under the assurance of receiving fair and equitable treatment, educational services, and due process in all academic affairs as part of the contractual relationship with Defendants.

24.     Defendants engaged in discriminatory practices against Plaintiff, breaching the implied covenant of good faith and fair dealing inherent in the educational contract.



25. Defendants' negligent mismanagement and willful disregard for Plaintiff's right to a fair academic process caused direct harm to Plaintiff's educational trajectory and professional future.

26. Defendants' actions have inflicted severe emotional distress upon Plaintiff, causing damages that are compensable under Tennessee law.

27. On June 3, 2023, Plaintiff reported an incident to the Office of Equal Access, alleging discrimination based on disability by a faculty member, in violation of Plaintiff's rights under Tennessee state law.

28. The basis of this complaint was that Plaintiff was receiving retaliatory treatment and discriminatory treatment by his pediatric clinical faculty member, Professor Harris, based on him using his reasonable accommodation for Crohn's disease on an attendance issue, and that points had been wrongfully deducted from his course grade due to that use of the accommodation.

29. Plaintiff informed Jill Harris that he had a university recognized and approved accommodation via email. Jill Harris then spoke to faculty leadership, confirming that Plaintiff had a reasonable accommodation and that the zero (0) would have to be removed and the tardy would have to be excused.

30. Subsequent to the aforementioned incidents, the Plaintiff was subjected to vindictive treatment orchestrated by Harris, characterized by a series of retaliatory actions designed to ensure the Plaintiff's failure. Harris, with deliberate intent, established conditions and engaged in a consistent pattern of conduct aimed at undermining the Plaintiff's performance. This was notably evident when Harris, in the presence of the Plaintiff and fellow students, repeatedly expressed her intention for the Plaintiff to be



unsuccessful in his nursing education, particularly in relation to a pediatric clinical rotation and associated clinical documentation.

31.    It is pertinent to mention that the Plaintiff possesses more than ten years of experience in pediatric care and had been employed for more than four years at the hospital where the clinical rotation was taking place. Furthermore, Harris resorted to making slanderous remarks and statements, alongside endeavors to publicly disgrace the Plaintiff. Such actions were executed in the presence of the Plaintiff's former colleagues and other clinical staff, individuals familiar with the Plaintiff, who would often extend their well-wishes and encouragement towards his professional pursuits.

32.    A few weeks later, Plaintiff was informed that he violated a rule by looking up a patient's record outside a clinical setting, although it had never previously been brought to his attention as an issue and his clinical instructor, Professor Harris, had requested that he look up the record on his laptop.

33.    Plaintiff was not provided with specific instructions that other students were provided with, to send his clinical paperwork to Jill Harris. Plaintiff was then disciplined for failing to provide Jill Harris with this paperwork when he had not been informed to do so. Furthermore, Jill Harris as confirmed by testimony of other students witnesses to EOA Investigator, required plaintiff to email clinical paperwork to Jill Harris as she noted not being able to discern the Plaintiff's handwriting.

34.    Jill Harris then wrongfully deducted points from Plaintiff in an attempt to fail the Plaintiff based on the syllabus policy on vague application of accumulation of zeros (0) assigned in the category of unprofessionalism. This began with Jill Harris accusing the Plaintiff of turning in clinical documentation late, which then evolved into Jill Harris

falsifying comments in the Plaintiff's clinical "Exxat" reflections and deducting his score based on Jill Harris' hypothetical assumptions of what the Plaintiff would have done in a clinical setting, rather than actual performance of actions themselves.

35.    The Plaintiff communicated his concerns to the clinical faculty leadership, including Professor Weaver, Dr. Robbins, and Dean Jesse. This complaint prompted them to remove Plaintiff from Professor Harris' clinical course.

36.    A meeting was scheduled in which Plaintiff was informed that he had failed clinical paperwork. However, Plaintiff had turned in this paperwork at the beginning of the clinical and the procedure was for incorrect paperwork to be given back to the student, review it with them, and remediate it with the student. Additionally, the Plaintiff was informed that Jill Harris had reported him to Weaver, Harris, and Jesse with unfounded allegations of failing to submit several weeks' worth of clinical paperwork on time and further accused the Plaintiff of copying and pasting the clinical documentation merely because it was typed, notwithstanding that it was composed in the Plaintiff's own words. Moreover, Jill Harris falsely claimed that the Plaintiff had inappropriately accessed patient charts "multiple times" during post-conference sessions, even though it was Harris herself who requested the Plaintiff to retrieve multiple lab results for the patient being discussed for educational purposes.

37.    During that meeting, an academic learning contract was prepared for Plaintiff stating generic and erroneous claims that would make non-logical sense to any nursing student such as "do not copy information from the EHR" and "Do not Access the EHR outside of Clinical Hours."

38.    Plaintiff started the next semester and had a class with Dr. Enstrom, who emailed his accommodation letter on August 21, 2023. This email wrongfully took away

Plaintiff's accommodations for his disability by stating that he would be penalized 10 points, instead of 0 for missed classes, despite his reasonable accommodations for his disability.

39.    Plaintiff emailed Catherine Buttery, Assistant Director of Student Access for the Office of Equal Access in order to ensure that he would not be wrongfully penalized for these disability related absences. Ms. Buttery replied that he should not be penalized for those absences.

40.    Later in the semester, after Plaintiff had to miss class due to his disability, he emailed Professor Enstrom regarding his absence and requested makeup work.

41.    Cate Enstrom replied with the makeup work and informed Plaintiff that since he had missed two sessions and one-quarter of a third session that an additional absence would warrant a meeting with the course coordinators to discuss course progression.

42.    Plaintiff responded by email, requesting a meeting with Professor Enstrom and her faculty supervisor.

43.    Only after Plaintiff had made this request was he presented with a learning plan.

44.    On December 4, 2023, Plaintiff was subject to an interim suspension from campus, ostensibly for a mental health assessment as per the University's Wellness Committee policy, without appropriate due process as required under Tennessee law.

45.    Of note, a majority of this investigation focused on the concern that the Plaintiff maintained his concealed carry firearm in his vehicle. The Plaintiff is a concealed handgun carry permit holder. "Persons who carry a handgun pursuant to Tenn. Code Ann. §39-17-1351, the enhanced handgun carry permit statute, or Tenn. Code Ann. §39-17-1366, the concealed handgun carry permit statute, are specifically excepted from application of the federal Gun-Free School Zones Act." Despite this and in knowing that putting such reasoning in written

context would be illegal on Defendants part, Defendant remanded the plaintiff on an interim campus restriction since December 4, 2023 to present without providing reason as to their concern for the Plaintiffs "threat" as defined in the student handbook for justification of a interim campus restriction as it is defined.

46.     It is important to note this was the same focus of the Air Evac investigation, despite the fact that the Plaintiff provided evidence showing that text messages were altered by the Defendant to falsely demonstrate a conversation that was not reflective of the entire narrative. Furthermore, the firearm that was the subject of the conversation was not in the Plaintiffs possession as the Plaintiff was awaiting ATF approval as the firearm was an NFA item. Additionally, the text messaging of a firearm that was not in the Plaintiffs possession, and even if such firearms was in the Plaintiffs possession and the context and content of such communications were, non-threatening, non-harmful, and with no intention to inflict stress or burden to another. Thus, Plaintiff was within his constitutional and with the laws of the State of Tennessee to possess and communicate about such Firearm.

47.     On December 15, 2023, a representative from the School of Nursing, Mary Jesse, notified Plaintiff of a purported infraction for off-site access to patient charts and subsequently altered Plaintiff's academic grades from passing to failing without clear justification.

48.     Subsequently, on December 19, 2023, Plaintiff was dismissed from the School of Nursing, a decision that Plaintiff contends was made without adequate process and was unjustified.

49.     In an interview with Plaintiff's fellow classmate at the School of Nursing, his classmate informed the investigator that she believed that Plaintiff was being subject to



different treatment due to his disability and retaliation based on that disability.

50.     Plaintiff pursued internal university channels to appeal the academic dismissal and the retroactive grade changes, seeking to remedy the alleged wrongful actions.

51.     These appeals were systematically delayed and denied by the Defendant, hindering a timely resolution, and compounding the Plaintiff's distress.

52.     As a result, Plaintiff's anticipated graduation and subsequent entry into the professional job market have been detrimentally impacted.

53.     The Plaintiff's access to patient charts was conducted within the parameters of the Health Insurance Portability and Accountability Act in Tennessee's privacy laws and educational standards, which should negate the basis for dismissal.

54.     Any allegations of unauthorized access must be evaluated under Tennessee's statutes governing computer- related crimes, which would not typically characterize the educational access to patient information as unauthorized.

55.     Tennessee law provides for immunity under certain educational functions, suggesting that the plaintiff's adherence to privacy standards in an educational context should not constitute actionable misconduct.

56.     Tennessee law, particularly under the Tennessee Educational Records Statute (T.C.A. §49-50-801 et seq.), grants certain protections and immunities to educational institutions and their agents when handling educational records in compliance with established privacy standards. Given this legal framework, the Plaintiff's access to patient charts, provided it was within the scope of educational purposes and adhered to the confidentiality requirements as outlined in the Tennessee Code and any applicable institutional policies, should not be deemed actionable misconduct. This adherence to statutory privacy standards,

in conjunction with the educational immunity provisions, underscores that the Plaintiff's actions, aimed at fulfilling educational objectives, fall within the ambit of legally protected activities under Tennessee Code Annotated §20-12-119.

57. **As previously filed in the plaintiff's motion for request of Preliminary injunction the plaintiff restates in paragraphs 51 thru 112 and reaffirms all claims as follows:**

58. The Plaintiff, Ian Hunter Lucas, brought forward a motion for injunctive relief, grounded on allegations of profound harm resulting from the Defendants' conduct. Detailed in the initial complaint, these allegations encapsulate discrimination predicated on disability, retributive acts, breach of contractual agreements, and additional malfeasance. Accompanying the original complaint are declarations and exhibits that supplement these allegations.

59. Defendants' actions have and continue to perpetuate irrevocable damage upon the Plaintiff, hindering his academic progress, career opportunities, emotional health, and reputation. At the core of this injunction motion, the Plaintiff has challenged a consortium of individuals associated with Vanderbilt University, leveling a series of tort claims, which include the breach of contractual duties, negligence, discriminatory treatment based on disability, and retaliatory measures. Each Defendants' personal liability is underscored, distinct from their professional functions at Vanderbilt University or Air Evac Life Team INC.

60. Prior to being wrongfully and with the intent to cause harms being academically dismissed and further receiving an expulsion from Vanderbilt University and Vanderbilt University School of Nursing, retributive and grounded in bad faith in the defendants working in a mutually beneficial collaborative relationship to cause harm, damage, and injury to Mr. Lucas, through the use of libel slander, defamation through professional and personal reputation

damages, and even further through the false cause of public fear being placed by causing a false sense of fear that Mr. Lucas was a "safety threat" in which Vanderbilt University made insinuations to Mr. Lucas through its campus community communication that it would bring harm to Mr. Lucas and threat to his life through deadly force in use of its Vanderbilt Police Department and additionally in violation of the Emergency Medical and Treatment and Labor Act (EMTALA) endorsing that Mr. Lucas was not allowed to come to the Vanderbilt University Medical Center to receive care for emergency non-scheduled appointments, and that Mr. Lucas would need permission from a Vanderbilt University Student Accountability (Non-Medical Provider to perform a medical screening exam as per EMTALA) in order to gain permission to come onto the VUMC campus. Additionally, the insinuation was that Vanderbilt University believed that Mr. Lucas medical conditions were "fake" and there was not a "disability" despite Mr. Lucas abiding by all policy and procedures and to obtain and be granted appropriate accommodations.

61.     Mr. Lucas was an active graduate nursing student with a recognized physically limiting disability by Vanderbilt University and was appropriately registered with the student access center (student disability services. He now seeks restitution for the distress and harm caused by the Defendants' misconduct. The legal action also brings to the forefront serious allegations concerning witness intimidation and obstruction of justice, demanding the Court's swift and decisive action. The Plaintiff asserts that these retaliatory actions by the Defendants arose from his filed complaints regarding violations of equal opportunity access with the university's Equal Opportunity Access office. The Plaintiff posits that evidence exists of the

COPY  EFILED  03/31/24 07:41 AM  CASE NO. 24C655  Joseph P. Day, Clerk

62.     Defendants' attempts to conceal their wrongdoing and discrimination by manipulating the
institution's internal investigative procedures of the Equal Opportunity Access (EOA), Title IX,
Student Conduct and Accountability, and Academic Grade Appeal.

63.     The Plaintiff alleges targeted and malicious actions by the Defendants, in collaboration
with Air Evac Lifeteam Inc., aimed at retaliation for whistleblower activities. These activities
include involvement as a federal witness in a sealed investigation by the U.S. Attorney
General's Office for the Western District of Tennessee into Air Evac Lifeteam Inc. for potential
violations of both the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.) and the federal
False Claims Act (31 U.S.C. §§ 3729 - 3733). The Defendants' actions, characterized by
intimidation, defamation, and the infliction of physical and mental distress, were designed to
penalize the Plaintiff for his protected whistleblower activities. These retaliatory actions not
only hindered the Plaintiff's professional development but also caused significant financial and
emotional damage. Given the Plaintiff's protection under federal whistleblower legislation, such
as the Whistleblower Protection Act of 1989 (5 U.S.C. § 2302(b)(8)-(9)), and state provisions
safeguarding whistleblowers from retaliation, the case at hand demands urgent court
intervention to halt further harm.

64.     In support of the motion for a preliminary injunction, the case of Halifax Hospital
Medical Center v. United States, 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In
Halifax, the court granted a preliminary injunction in favor of the plaintiff, recognizing the
substantial likelihood of irreparable harm without such intervention, notably in cases involving
whistleblower retaliation and the potential violation of federal statutes. This precedent
underscores the necessity of safeguarding whistleblowers from retaliatory measures that would
otherwise stifle critical disclosures in the public interest.

Page 17 of 89

COPY

65.    Accordingly, this Court is respectfully urged to grant a preliminary injunction, protecting the Plaintiff from ongoing retaliatory actions by the Defendants, in alignment with the principles upheld by both federal and state whistleblower laws and reinforced by pertinent case law. The compilation of evidence strongly suggests that on December 4th, 2023, a coordinated sequence of events began with the plaintiff receiving a notice of temporary suspension from Vanderbilt University, issued by defendant Neil Jamerson. This was promptly followed, within the same hour, by a notice from the plaintiff's then-employer (now former employer), Air Evac Lifeteam Inc. Human Resources, placing the plaintiff on administrative paid leave. These actions, along with a series of other incidents that appear to be more than coincidental, point to a deliberate and collaborative effort by the defendants to retaliate against the plaintiff. This effort includes whistleblower retaliation, witness intimidation, harassment, defamation, libel, slander, and discrimination.

66.    The Plaintiff contends that the Defendants, in a premeditated and collaborative effort with Air Evac Lifeteam Inc., orchestrated actions to detrimentally impact the Plaintiff. This was in retaliation for the Plaintiff's reporting of fraudulent billing practices under the federal False Claims Act (31 U.S.C. §§ 3729 - 3733), as well as state equivalents under the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.). Furthermore, Vanderbilt University and its School of Nursing pursued the Plaintiff's dismissal, motivated by a pattern of discrimination against students with disabilities and in response to the Plaintiff's multiple complaints through the Equal Opportunity Access (EOA) office. This collaborative retaliation not only sought to undermine the Plaintiff's standing but also facilitated an exchange of damaging information between Michelle Tellock and Timothy K. Garrett, aimed at furthering the Plaintiff's harm post-December 4, 2023.



67.     In establishing the grounds for a preliminary injunction, the case law precedent found in
Roth v. Department of Justice, 642 F.3d 1161 (D.C. Cir. 2011), is particularly pertinent. In
Roth, the court highlighted the critical importance of protecting the rights of individuals under
whistleblower protection statutes, emphasizing the necessity of preliminary injunctive relief to
prevent ongoing retaliation and to uphold the integrity of whistleblower protections. This case
underscores the judicial recognition of the irreparable harm that can result from retaliatory
actions, especially when such actions are designed to penalize whistleblowers for exercising
their rights to report misconduct.

68.     Given the Plaintiff's allegations of concerted retaliation by the Defendants, aligned with
the documented objectives of both Air Evac Lifeteam Inc. and Vanderbilt University to penalize
the Plaintiff for protected whistleblower activities and disability discrimination complaints,
there exists a compelling basis for the issuance of a preliminary injunction. This Court's
intervention is crucial to prevent further retaliatory harm to the Plaintiff, ensuring compliance
with the protections afforded under both federal and state whistleblower laws, as reinforced by
the precedent established in Roth.

69.     The Plaintiff raises concerns over the striking parallels and the synchronicity in the
actions undertaken by Vanderbilt and Air Evac, notably the precipitous move to academically
dismiss the Plaintiff without due process. This rush to dismissal notably lacked consideration of
the ongoing investigations into Defendant Mary Ann Jessee by the Equal Opportunity Access
(EOA) office for retaliatory actions related to disability discrimination complaints, as well as
investigations into Defendant Cate Enstrom's role in similar discriminatory practices. The
absence of procedural fairness, coupled with the timing and alignment of these actions, suggests
a concerted effort to penalize the Plaintiff, sidestepping the protections afforded under the



70.     Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act of
1973 (29 U.S.C. § 794), which mandate non-discriminatory treatment and reasonable
accommodations for individuals with disabilities.

71.     In the context of seeking a preliminary injunction, the case of Goss v. Lopez, 419 U.S.
565 (1975), provides a pertinent legal framework. In Goss, the Supreme Court held that
students must be given notice and an opportunity to be heard before being deprived of certain
educational rights, underlining the essential nature of due process in academic settings. This
precedent underscores the necessity of procedural protections, especially when allegations of
discriminatory practices and retaliatory measures are at play, to ensure that individuals are not
unjustly deprived of their rights to education and equal treatment under the law.

72.     Therefore, in light of the evidence presented and the legal precedents underscored by
Goss v. Lopez, this Court is respectfully requested to grant a preliminary injunction. Such an
injunction would serve to immediately halt any further actions against the Plaintiff that bypass
due process and exacerbate the discriminatory and retaliatory harm alleged, ensuring the
Plaintiff's rights under both federal statutes and case law are protected pending a full hearing on
the merits. When the plaintiff reached out to the EOA office to inform them of this situation,
and to request intervention based on the fact of the faculty members involved the EOA office at
the leadership of E. Jacob Cummings provided no response, despite that given prior to these
retaliatory actions by defendants Jessee and other defendants conspirators of retrospectively
changing two of the plaintiffs already passed course grades simultaneously on December 15th,
2023 thus making the plaintiff eligible for dismissal based on the guidelines of the School of
Nursing policies and further not able to be readmitted due to school of nursing policies on only
allowing the retake of one course.

COPY



73.     The Plaintiff disputes the retrospective grade alterations made by Defendant Jessee,

        grounded on unfounded accusations of "accessing patient charts remotely," initially alleged as a

        HIPAA violation. The Vanderbilt University Medical Center Privacy Office, designated within

        the Vanderbilt University School of Nursing Handbook as the authoritative entity on HIPAA

        and privacy matters, clarified that no privacy breach occurred, thereby negating any violation of

        the Health Insurance Portability and Accountability Act (HIPAA), codified at 45 C.F.R. Parts

        160 and 164.

74.     Despite this determination, Defendants Jessee and Schorn, in their evaluation of the

        Plaintiff's academic grade appeal, deviated from their initial accusation of a HIPAA violation.

        They instead contended that the Plaintiff violated School of Nursing policies by "accessing the

        chart for educational purposes and not documentation purposes," as articulated by Defendant

        Schorn in her decision regarding the Plaintiff's grade appeal. This assertion emerged despite the

        clear directive from the VUMC Privacy Office affirming the absence of a breach, illustrating a

        capricious and procedurally flawed application of institutional policy against the Plaintiff,

        contravening his due process rights as outlined in the Family Educational Rights and Privacy

        Act (FERPA), 20 U.S.C. § 1232g, and corresponding T.C.A. § 10-7-504(a)(4), governing the

        privacy of student educational records.

75.     This case finds resonance with Goss v. Lopez, 419 U.S. 565 (1975), where the U.S.

        Supreme Court held that students must be afforded due process rights in disciplinary actions

        impacting their educational status. The arbitrary and retrospective grade changes, predicated on

        disproven allegations and a subsequent shifting of rationale, violate the Plaintiff's rights to

        procedural due process and equitable treatment under established federal and state educational

        privacy laws. Given these considerations, the Plaintiff seeks a preliminary injunction to rectify

the wrongful grade alterations and to safeguard against further arbitrary and capricious actions by Defendants that unjustly impair his academic standing and due process rights.

76.     On appeal of Mavis Schorn's decision plaintiff appealed to the Dean of the School of Nursing defendant Pamela Jefferies, she reverted back in contrary to the VUMC privacy office and referred back to language of privacy violations, of note the plaintiff referred the matter to the U.S. Department of Health and Human Services the definitive investigative authority on matters of violations and breaches of the Health Insurance Portability and Accountability Act who found no breach in privacy under HIPPA and further found concern for discrimination and referred the matter to the department of education office of civil rights for further investigation and review based on the evidence provided and the treatment of the plaintiff.

77.     Incorporating the principles discussed in *Northwest Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004), the Plaintiff's engagement in accessing patient charts for educational purposes is situated well within the boundaries delineated by HIPAA for healthcare operations. This case, while primarily addressing the privacy rule in a hospital context, elucidates the rigorous standards imposed by HIPAA on covered entities to safeguard protected health information (PHI), except where such access is explicitly permitted by the statute or its implementing regulations.

78.     The Defendants Jessee and Schorn's acknowledgment of the Plaintiff's adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule, further substantiates the claim that the Plaintiff's activities were both legally compliant and integral to their educational advancement in a clinical setting. The 'minimum necessary' rule, designed to ensure that only the essential amount of PHI needed for a specific purpose is accessed, underscores the legality and necessity of the Plaintiff's access to patient information as part of their clinical education.

Northwest Memorial Hospital v. Ashcroft offers a pertinent legal framework that supports the argument that accessing patient information for educational purposes, as conducted by the Plaintiff, aligns with HIPAA's provisions for healthcare operations. This includes the training of healthcare professionals and the enhancement of educational programs within healthcare settings. The case underscores the imperative of balancing patient privacy protections with the educational necessities that prepare students for professional practice in healthcare.

79. Thus, the Plaintiff's actions, conducted under the guidance of Defendants and within the scope of educational requirements, not only adhere to HIPAA's stipulations but are also essential for the practical application of medical knowledge. The acknowledgment by Defendants Jessee and Schorn of the Plaintiff's compliance with the 'minimum necessary' standard affirms this position, highlighting the protected nature of the Plaintiff's educational activities under HIPAA and reinforcing the legal basis for the requested preliminary injunction to safeguard the Plaintiff's rights and educational pursuits within the clinical setting.

80. In the initial communications, Defendant Jessee informed the Plaintiff that a review of allegations pertaining to a single course was underway. It was only during a subsequent meeting that Jessee conveyed a decision to fail the Plaintiff in two courses, justifying this by citing what she described as a recurrent problem that had previously resulted in a learning contract for the Plaintiff. This assertion, however, overlooks critical context: the prior learning contract referenced by Jessee was associated with an incident in another course, from which the Plaintiff had been withdrawn due to Defendant Harris's inappropriate directives. Harris had instructed the Plaintiff to access lab values remotely during a clinical post-conference, an action substantiated by student witness testimony.

EFILED 03/31/24 07:41 AM CASE NO. 24C655 Joseph P. Day, Clerk

81.    This scenario presents a complex intersection of academic policy and legal

considerations, particularly concerning fair treatment and due process for students. A pertinent

legal framework for evaluating this situation is provided by Board of Curators of the University

of Missouri v. Horowitz, 435 U.S. 78 (1978), wherein the Supreme Court articulated standards

for academic decision-making and the rights of students to fair process in academic evaluations.

The Court recognized a distinction between academic and disciplinary dismissals, suggesting

that the former requires less formal due process protections.

82.    Applying this framework, the Plaintiff's situation underscores a potential misapplication

of academic policies and a lack of due process in the academic evaluation process. Jessee's

actions, predicated on a questionable interpretation of past incidents and without clear

adherence to procedural fairness, raise concerns under the principles established in Horowitz.

The Plaintiff's case highlights the necessity for clear, consistent, and fair academic evaluation

processes that respect students' rights to due process, particularly when such evaluations have

significant consequences for their academic and professional futures. This action is imperative

to protect the Plaintiff's educational trajectory and to uphold standards of fairness and

transparency in academic evaluations.

83.    Given the circumstances where a collective student grievance was filed against

Defendant Harris, citing disarray within her clinical course—a session which was colloquially

dubbed as being "summoned to the principal's office"—it became apparent that Harris

presumed the Plaintiff to be the agitator.

84.    From that point forward, as documented, Harris engaged in discriminatory and

inequitable conduct towards the Plaintiff. This conduct not only undermines the educational

environment but also potentially violates the Plaintiff's rights to non- discriminatory treatment

as outlined in educational and civil rights legislation. The scenario calls for the application of principles enshrined in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, ensuring that no state shall "deny to any person within its jurisdiction the equal protection of the laws. "In the context of academic evaluations and disciplinary actions, Goss v. Lopez, 419 U.S. 565 (1975), provides a relevant legal precedent. The Supreme Court in Goss emphasized the importance of due process within educational settings, specifically that students must be afforded notice and an opportunity to be heard before being deprived of certain rights. Applying this principle, the Plaintiff's request for a preliminary injunction seeks to pause any punitive academic measures rooted in bias or misrepresentation and to initiate a reevaluation of their academic status that aligns with due process and equity.

85.     This injunction request was crucial not only to rectify the immediate unfair treatment experienced by the Plaintiff but also to reaffirm the broader commitment to fairness, transparency, and equity within academic evaluation processes, in accordance with established legal standards.

86.     Subsequent to the complaint against Defendant Harris, she began to display behavior towards the Plaintiff that was both discriminatory and retaliatory in nature. This behavior was so egregious that it necessitated the Plaintiff's removal from her course, a decision underscored by corroborative observations from both students and staff at the Monroe Carell Jr. Children's Hospital, who witnessed Harris's mistreatment, hazing, and bullying of the Plaintiff. Harris escalated her actions by drafting and submitting a fabricated email to the School of Nursing's leadership, falsely accusing the Plaintiff of repeatedly and improperly accessing patient charts. This accusation was not only baseless but also exaggerated, asserting that the Plaintiff engaged in indiscriminate chart review. Despite being aware of these circumstances and the invalidity of

EFILED 03/31/24 07:41 AM CASE NO. 24C655 Joseph P. Day, Clerk

the referenced learning contract due to Harris's actions and the subsequent reassignment of the

Plaintiff to another instructor by the Equal Opportunity Access (EOA) office, Jessee persisted in

seeking grounds to dismiss the Plaintiff.

87.     This situation underscores a blatant disregard for the principles of fairness and equity,

potentially infringing upon the Plaintiff's rights under the Equal Protection Clause of the

Fourteenth Amendment, which mandates equal protection under the law. The actions taken

against the Plaintiff also call into question adherence to due process rights, as outlined in the

landmark decision of Goss v. Lopez, 419 U.S. 565 (1975), where the Supreme Court held that

students are entitled to certain due process rights before being deprived of educational

opportunities.

88.     Therefore, the Plaintiff sought a preliminary injunction to prevent further discriminatory

and retaliatory actions and to ensure a reevaluation of his academic standing in a manner that is

just, transparent, and consistent with the principles of due process and equal protection. This

request aligns with the legal imperative to safeguard individuals from unjust educational

practices and to uphold the integrity of academic evaluation processes. The EOA office, due to

a lack of investigators, outsourced an investigation to an external, non-Vanderbilt affiliated

investigator, Katherine Layman. Ms. Layman conducted her investigation ethically and without

bias, uncovering significant discrimination. However, when her findings began to favor the

plaintiff, revealing the fear among other nursing students to speak out, Vanderbilt University

prematurely terminated Ms. Layman's contract before she could complete her investigation.

89.     Additionally, Vanderbilt's Director of the EOA, defendant E. Jacob Cummings, had the

reports altered to minimize findings against defendant Cate Enstrom, despite clear violations of

the Americans with Disabilities Act and Tennessee law, evidenced by Enstrom's policy to

COPY

penalize the plaintiff for disability-related absences, undermining the very purpose of disability accommodations.

90.     Timothy K. Garrett, an attorney from the law firm Bass, Berry, Sims, retained by Air Evac Lifeteam Inc. for its investigation, has notable ties to Vanderbilt University. As a Vanderbilt alumnus and significant financial donor, Mr. Garrett's connections extend into the legal domain, where he has represented the university in various capacities. His legal service includes a role as counsel within Vanderbilt University's Office of General Counsel, a department where Defendant Michelle Tellock serves as Deputy General Counsel.

91.     Importantly, Mr. Garrett's representation of Vanderbilt has encompassed cases related to student dismissals, exemplified by his involvement in the case of Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646 (M.D. Tenn. 2018), a notable lawsuit concerning the appeal of a student plaintiff and Vanderbilt University's student dismissal processes. This background suggests a potential conflict of interest or at least a close professional and institutional relationship between Mr. Garrett and Vanderbilt University, which could influence the impartiality of the investigation conducted by Air Evac Lifeteam Inc.

92.     Of note a Board of Professional Responsibility report was filed on Michelle Tellock and Timothy K. Garrett, while the BPR could not take action because Tellock and Garrett were not technically retained by Lucas the BPR did affirm the sharing of information and correspondence about Lucas between Tellock and Garrett which was for the benefit of their own clients.

93.     The correspondence while violations of FERPA, HIPPA, and other principles the plaintiffs believe to be moral principles of ethical conduct between Tellock and Garrett, the BPR while not viewed as ethical misconduct due to not meeting the standard for a conflict of

interest due to Tellock nor Garrett being retained by Mr. Lucas. However, the report did confirm the communication between Garrett and Tellock, which Tellock had denied, despite having Vanderbilt IT start the process of wiping her Vanderbilt Email Account of certain records the day plaintiff informed her that he reported her to the BPR.

94.    Considering these factors, the Plaintiff sought a preliminary injunction to ensure fairness and transparency in the handling of his case, emphasizing the need for an unbiased review process that adheres to the principles of justice and equity. The preliminary injunction was crucial for safeguarding the Plaintiff's rights and interests amid concerns about the intertwined legal and institutional relationships that may affect the outcome of ongoing proceedings.

95.    December 4th 2023, during its "Welfare Panel" interview of plaintiff on defendant porter inquired of plaintiff specifically about a "CIA costume or something related to the CIA in or on your [the plaintiffs] car" this key element of defendant Porter questioning of plaintiff in the context of a "mental health welfare panel" is unrelated to anything related to the plaintiff and being at Vanderbilt, due to the fact the item in mention by defendant porter was an item specifically placed on the plaintiffs vehicle for a specific reasons in connection with the plaintiffs whistleblowing status while still employed at Air Evac Lifeteam Inc. and thus when the plaintiff was not at work and was at Vanderbilt the mentioned item was specifically taken off the plaintiffs vehicle. Thus, the only way in which this information would have been known by defendant porter is with information having been shared between Timothy K. Garrett and defendant Michelle Tellock.

96.    During a meeting in January 2024 regarding Air Evac Lifeteam Inc.'s investigation, attorney Timothy K. Garrett referenced details about the plaintiff's intermittent restrictions on

COPY

campus access, along with other specific information related to the plaintiff's experiences at the university—information the plaintiff had not disclosed. This suggests that Garrett acquired this knowledge through direct communications with Michelle Tellock. Moreover, Garrett requested documentation from the plaintiff concerning issues at Vanderbilt University, asserting the relevance of these documents to the plaintiff's "credibility." This implies that Garrett had engaged in prior discussions with Vanderbilt representatives to verify the authenticity of any documents the plaintiff might provide.

97. This interaction raises questions about the fairness and impartiality of the investigation, highlighting potential concerns regarding the privacy of the plaintiff's educational records and the confidentiality of communications within the university. Such concerns resonate with the provisions of the Family Educational Rights and Privacy Act (FERPA), codified at 20 U.S.C. § 1232g, which safeguards the privacy of student education records and restricts their disclosure without consent.

98. 31. Given these circumstances, the plaintiff requests a preliminary injunction to halt any further actions that might compromise their privacy rights and to ensure a fair and impartial investigation into the matters at hand. This request aligns with the legal protections afforded by FERPA and seeks to prevent any undue influence or bias that may arise from the intertwined relationships and communications between Air Evac Lifeteam Inc.'s legal representation and Vanderbilt University officials. The injunction is essential for upholding the principles of fairness, privacy, and transparency throughout the investigative process.

99. 32. Due to Vanderbilt University's refusal to provide necessary documentation and records, the plaintiff notes that the line of questioning from Timothy Garrett precisely mirrored that of Defendant Porter and Defendant Newsome during the December 4th, 2023, inquiries.

This included specific questions about the plaintiff's military affiliation, where Defendant Porter questionably inquired if the plaintiff received "an ID or something," disregarding the letter from the plaintiff's commanding officer, which serves as a more authentic form of verification than the ID casually mentioned by Porter. This approach not only diminished the validity of official military documentation but also bordered on discriminatory conduct. Furthermore, Porter's inquiry about why the plaintiff, if coming from training in Smyrna, Porter specifically inquired why was plaintiff not dressed in his "costume or camouflage" which constitutes an inappropriate

100. and demeaning assumption about military attire, reflecting a lack of respect and understanding of military service and obligations. This behavior underscores potential discriminatory practices and an infringement on the plaintiff's dignity, calling into question the fairness and integrity of the investigative process conducted by Vanderbilt and its representatives.

101. 33. Additionally, the question in addition to the questions asked by Garrett asked in his investigation interview being identical to the questions asked of the plaintiff by Defendant Newsome and Porter, the same questions were exploited and further invasion of privacies were made by Jeremy Borgoin in conducting his interview and student conduct hearing of the plaintiff in which Borgoin made the decision to ultimately expel the plaintiff based on the same unjustifiable and un-constitutional cause that the plaintiff legally bought a handgun in May 2023 and was asked if he had access to fire arms the night of December 4th 2023 plaintiff answered in the context of how the questions was asked and interpreted, furthermore the plaintiff is allowed to constitutionally own poses and access firearms with the confines of the law. Vanderbilt cited this as a false statement and as a violation of "policy violation" using the

same terminology as Air Evacs reason for termination, and a kind to Air Evac, Vanderbilt also without providing the reference to the specific policy that was violated.

102.    34. Furthermore, Vanderbilt stated the plaintiff defunded the University through the student care and assistance funds in which the plaintiff requested funding to pay from mental health counseling, and then sought mental health counseling, which the plaintiff never had any possession of fund for, Vanderbilt paid the provider directly for services, Vanderbilt states that the plaintiff lied to the University about the reason the plaintiff needed mental health counseling and therefore the defendants ascertain that the plaintiff did not need mental health counseling, however on the night of December 4th 2023 as part of the "Welfare Panel" which defendants, now

103.    since that time state given the following point made by the plaintiff in several appeals, the defendants now state it was not a welfare panel, however defendants will not define this other than being a "meeting that [the Plaintiff] was required to attend", that followed every step of the Welfare Panel process, however was not the welfare panel process, defendants did however illegally record the plaintiff against his knowledge and informed consent, transcribing this recording, with sensitive personal health information, disseminating this information without the knowledge of the plaintiff, an actual HIPPA violation, while deliberately having the school of nursing academically dismiss the plaintiff in an ironic twist of falsely accusing the plaintiff of HIPPA violation despite the Vanderbilt Privacy office and DHHS stating otherwise, while then then using the information from the illegal obtained recording of the non- welfare panel, welfare panel meeting in an poorly orchestrated coercion to construct fraudulent student conduct charges that have no legal standing other than being unconstitutional in a manner that the defendants violated the plaintiffs rights at Vanderbilt University in participation of witness

intimidation and whistleblower retaliation thought assisting in the construction in an academic dismissal and expulsion of the plaintiff one semester before for the plaintiff is supposed to graduate. And then mirroring the same reasons or allegation for which Air Evac Lifeteam Inc. accuses the plaintiff of being terminated, in order to discredit and credit a defamation of the plaintiff as a federal witness. In exchange for these services Vanderbilt University on November 17th 2023 received what was originally reported as an anonymous donation, by the nurse journal (See exhibit) however has since been edited with not edit date noted, stating that a 1.25-million-dollar donation was made to the Master of Nursing Program directly, this was the program in which the plaintiff was directly enrolled in and 2 weeks prior to the events beginning these actions on December 4th 2023. Furthermore, on Vanderbilts Dare to Grow donation campaign website KKR & Co. is listed

104. as a donor, and furthermore, is noted having pledged to match every $8,000.00 donated, KKR & Co. will subsequently match the donation up to $8,000.00, In evaluation of the Conway Welch Family Foundation 2022 990-PF submission on 2023-10-30 the foundation only reported one sale and gain of $1,394.149.00 in the gross sale of price for all assets, with a member of their "directors as needed" with affiliations and close relations to principals at KKR & Co.

105. 35. The Plaintiff emphasizes a troubling abuse of authority by Vanderbilt University. In an act of overreach, the university's law enforcement was purportedly employed to conduct investigative actions against the Plaintiff, which exceeded their legal remit and lacked any criminal predicate. This conduct signals a misuse of police resources, ostensibly aimed at amassing information detrimental to the Plaintiff. This may violate not only the ethical expectations of university law enforcement but also the legal limits as set by Tennessee statutes and federal laws.




EFILED 03/31/24 07:41 AM CASE NO. 24C655 Joseph P. Day, Clerk

106. Specifically, this alleged conduct indicates official misconduct under TCA §39-16- 402, should it be established that the university police acted beyond their lawful authority. Practices of invasive information gathering without valid justification might contravene the privacy rights accorded by TCA §39-13-601, particularly if it involved intrusive actions into the Plaintiff's private affairs. Moreover, Vanderbilt University Police Department, specifically Defendant Joel Newsome, is accused of exercising compulsion in their investigation, breaching TCA § 39-13- 302, which addresses coercion and implies a violation of the Plaintiff's rights against compelled service.

107. The unauthorized dissemination of the Plaintiff's confidential information by university-associated entities implicates a direct infringement upon the Plaintiff's Fourth Amendment protections, which guard against unreasonable searches and seizures.

108. This infringement aligns with the undue intrusion into the Plaintiff's private life without consent, clearly breaching TCA §39-13-601. Additionally, this behavior signifies official misconduct as outlined under TCA §39-16-402, demonstrating an intentional misuse of authority. These actions, surpassing the lawful limits of their institutional roles and misappropriating access to sensitive data for non-professional purposes, unequivocally infringe upon the Plaintiff's state and federal legal rights to privacy and security from unwarranted interference. Moreover, the Defendants' actions resulted in severe health consequences for the Plaintiff by spreading defamatory claims labeling him as a "threat" and a risk to campus security.

109. This defamation led the Plaintiff to believe that he could no longer safely obtain medical care at Vanderbilt University Medical Center—a facility where he had been a longstanding patient—due to intimidation and the dissemination of false reports to the Vanderbilt University

Page 34 of 39

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 34 of 431 PageID #: 293

COPY EFILED 03/01/24 07:41 AM CASE NO. 24C655 Joseph P. Day, Clerk

Police Department (VUPD). Assertions were made without merit that the Plaintiff was barred from campus, was "armed and dangerous," and that VUPD should employ "any necessary measures to maintain campus safety" upon encountering the Plaintiff. Given that VUPD officers are authorized to use armed force and patrol the VUMC premises, such unfounded allegations posed a real and tangible threat to the Plaintiff's safety and wellbeing. This defamation, coupled with the implication of potential violent engagement, not only heightened the Plaintiff's anxiety and emotional distress but also potentially obstructed his access to necessary healthcare services.

110. On June 16, 2023, plaintiff went to defendant Jessee office and requested and impromptu meeting, defendant Jessee was open to a 1:1 private meeting, during the meeting plaintiff meet with Jessee attempting to resolve amicably the disability accommodation issues plaintiff felt he was being discriminated against on.

111. Further, plaintiff brought to Jessee attention quid quo pro situation with a Vanderbilt School of Nursing Faculty member in which the plaintiff was being exploited for sexually by a faculty member of the School of Nursing, based on the plaintiff having requested letters of recommendation and asking the faculty member to be the plaintiffs VUSN Alumni Mentor. When Jessee was informed of this and further was informed of the images, and additionally informed of the images the faculty member wad requesting of the plaintiff, Jessee responded and informed the plaintiff that unless the plaintiff was "physically sexually abused" then it was just "adults being adults" and the university does not get involved in those matters.

112. Given the inaction and then subsequent retaliatory action of defendant Jessee after June 16th 2023 when plaintiff brought concerns of the quid quo pro to her attention, and as a mandatory reporter not only did Jessee fail to fulfill her obligation to report accordingly, Jessee

Page 34 of 59

deterred and misinformed the plaintiff about the abilities and options of the plaintiff to seek assistance from Title IX thus demonstrates that defendant Jessee further retaliated in her role as demonstrated by the fact pattern of in a matter of days going from recommending the plaintiff for a last minute interview and photo shoot a feature in the VUSN nursing magazine "as a favor for the school of nursing" to suddenly being retaliated against and the plaintiff is left out of the magazine because of what was reported to the plaintiff as a "page count"

113. In an egregious display of misconduct, Defendants Jessee, Schorn, and Jefferies actively engaged in manual alterations to Plaintiff's GPA. Upon discovery by the Plaintiff, an extended period of weeks, if not over a month, elapsed without any substantial explanation from Vanderbilt beyond vague references to ongoing discussions with the School of Nursing. It was only after the GPA correction that the School of Nursing disclosed, through its newsletter, the implementation of a new policy on pass/fail courses. This policy, conspicuously aligned with the Plaintiff's circumstances, indicates not only that the School of Nursing deliberately manipulated and erroneously altered the Plaintiff's GPA but also sought to obscure their actions under the guise of a 'computer error'. However, the invocation of a 'computer error' falls short of justifying the subsequent policy change, revealing a clear intent to mislead and rectify the situation without acknowledging the targeted manipulation faced by the Plaintiff.

114. In contrast to a hostile-environment theory, to bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment. Miami Univ., 882 F.3d at 591 (citing Mallory, 76 F. App'x at 638-39 ; Horner v. Ky. High Sch. Athletic Ass'n, 206 F.3d 685, 691-93 (6th Cir. 2000) ; Univ. of the South I, 687 F.Supp.2d at 758 ; see also Baum, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); Schaumleffel, 2018 WL 1173043, at *14 ("The

deliberate indifference standard applies such as in this complaint when a plaintiff such as in Mr.
Lucas case whom seeks to hold a university responsible for sexual harassment."). Furthermore,
a deliberate indifference claim "harassment that is so severe, pervasive, and objectively
offensive that it effectively bars the victim's access to an educational opportunity or benefit."
Miami Univ., 882 F.3d at 590 (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 28 18
Z.J. v. Vanderbilt Univ. 355 F. Supp. 3d 646 (M.D. Tenn. 2018) 633, 119 S.Ct. 1661, 143
L.Ed.2d 839 (1999) and citing Patterson v. Hudson Area Schs., 551 F.3d 438, 444-45 (6th Cir.
2009) ); K.T. v. Culver Stockton Coll., 865 F.3d 1054, 1057 (8th Cir. 2017) (same); Doe v. Tr.
of Boston Coll., 892 F.3d 67, 93 (1st Cir. 2018) (same) (hereinafter " Tr. of Boston Coll. I").

115.    Only claims involving pervasive and widespread harassment are actionable; a single
incident is not enough. See Miami Univ., 882 F.3d at 591 ; Carmichael v. Galbraith, 574 F.
App'x 286, 289-90 (5th Cir. 2014) ; Haidak v. Univ. of Mass. at Amherst, 299 F.Supp.3d 242,
270 (D. Mass. 2018). Alleged sexual harassment in the form of a 676 failure to follow Title IX
regulations is not a sufficiently severe form of discrimination to give rise to a deliberate
indifference claim. Roe v. St. Louis Univ., 746 F.3d 874, 883-84 (8th Cir. 2014) ; Sanches v.
Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 169 (5th Cir. 2011).

116.    The Defendants' conduct of Ms. Tellock, Ms. Roy, Mr. Cummings, Mr, Bourgoin, and
Mr. Fazi, to interfere, and further tamper with and alter investigational findings in the know
preface of clear and convincing evidence beyond a reasonable doubt such as the email from
defendant Enstrom demonstrating a written statement of discrimination, however defendant
Cummings made a determination of this "lacking sufficient evidence" to show cause for
discrimination  exemplifies a grave deviation from lawful behavior and potentially constitutes a
severe breach of the Plaintiff's rights as upheld by both state and federal laws. A thorough



inquiry into these allegations is essential to uphold the integrity of justice and to ensure the appropriate execution of law enforcement within educational institutions.

## COUNT ONE:
## DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

117. Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein.

118. Mr. Lucas is, and at all times relevant hereto, was a qualified individual with a disability as that term is defined under the ADA, 42 U.S.C. §12102(1), because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such disability, and/or was regarded by Defendant as a person with such impairments.

119. At all relevant times, Mr. Lucas was able to be a functional student with a reasonable accommodation for his Crohn's disease.

120. Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions, including but not limited to, failing to provide for reasonable accommodations for his disability, which constitutes unlawful disability discrimination against Mr. Lucas in violation of the ADA.

121. Defendants acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard of, Mr. Lucas' rights under the ADA.

122. As a direct and proximate result of Defendants' intentional discrimination, Mr. Lucas has suffered out of pocket losses and has been deprived of his education, including loss of future economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

123. Defendant's actions have caused and will continue to cause Mr. Lucas to suffer



damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

124. Pursuant to the ADA, Mr. Lucas is entitled to damages including lost compensation and lost benefits, compensatory damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

## COUNT TWO: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

125. Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

126. Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

127. Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under the ADA, and acted in reckless disregard for Mr. Lucas' rights under the ADA.

128. As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

129. Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

## COUNT THREE: DISCRIMINATION
## BASED ON DISABILITY IN VIOLATION
## OF THE TENNESSEE HUMAN RIGHTS
## ACT

130.    Plaintiff incorporates all the foregoing paragraphs above as if fully set forth
herein.

131.    At all relevant times, Mr. Lucas was a qualified individual with a disability as
that term is defined under the Tennessee Human Rights Act, because he suffers from Crohn's
disease, which substantially limits one or more of his major life activities, has a record of such
impairments, and/or was regarded by Defendant as a person with such impairments. T.C.A. §4-
21-102.

132.    At all relevant times, Mr. Lucas was able to be a functional student with
reasonable accommodations for his disability.

133.    Defendant, by and through its agents, representatives, and employees,
intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including
but not limited to denying him reasonable accommodations and discriminating against him on
the basis of his disability.

134.    The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful
disability discrimination against him in violation of the Tennessee Human Rights Act.

135.    Defendant acted in bad faith, willfully and wantonly disregarded, and/or in
reckless disregard for, Mr. Lucas' rights under the Tennessee Human Rights Act.



136. As a direct and proximate result of Defendant's intentional discrimination, Mr. Lucas has suffered out of pocket losses, been deprived of prospective economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

137. Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

138. Pursuant to the Tennessee Human Rights Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Tennessee Human Rights Act.

## COUNT FOUR: RETALIATION
## IN VIOLATION OF THE TENNESSEE
## HUMAN RIGHTS ACT

139. Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

140. Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

141. Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under the Tennessee Human Rights Act, and acted in reckless disregard for Mr. Lucas' rights under the Tennessee Human Rights Act.

142. As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future compensation and other benefits of employment, emotional distress, inconvenience,

COPY

loss of income, humiliation and other indignities.

143. Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under the Tennessee Human Rights Act.

## COUNT FIVE: BREACH OF CONTRACT

144. Plaintiff incorporates and reasserts herein by reference all preceding paragraphs as if fully set forth herein.

145. Plaintiff applied to and enrolled in Defendant Vanderbilt's program and paid tuition in addition to other fees and expenses. Plaintiff did so in reliance on the understanding and expectation that Defendant Vanderbilt would implement and enforce the promises and policies made in it is official publications, including its Mission Statement, the Student Handbook, its policies and procedures, as well as other relevant documents, including those not mentioned in this complaint.

146. A contract implied in fact or in law was formed between Defendant Vanderbilt and the Plaintiff once the Plaintiff applied to and enrolled in the program. Specifically, Defendant Vanderbilt offered Plaintiff the ability to enroll in the university upon the condition that the Plaintiff paid for the necessary tuition and fees.

147. Once Plaintiff paid for his tuition and fees, Plaintiff accepted Defendant Vanderbilt's offer. In this contract, Defendant Vanderbilt expects Plaintiff to adhere to all of the policies set forth in the Student Handbook while attending the University. In return, Defendant Vanderbilt receives the benefit of their policies being met, as well as Plaintiff's financial contribution to the University. Likewise, Plaintiff expects Vanderbilt to follow the

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 42 of 431 PageID #: 301

policies and procedures set out in its mission statement, Student Handbook, and other relevant
documents.

148.    Moreover, the contract contained an implied covenant of good faith and
fair dealing. Defendant Vanderbilt's Student Handbook for the 2023-2024 school year
states that Vanderbilt University is committed to equal access for people with disabilities.
In compliance with Section 504 of the Rehabilitation Act of 1973, the Americans with
Disabilities Act of 1990 (ADA), and the ADA Amendments Act of 2008, Vanderbilt does
not exclude otherwise qualified persons with disabilities, solely by reason of the
disability, from participating in university programs and activities, nor are persons with
disabilities denied the benefits of these programs or subjected to discrimination.

149.    It also states:

Vanderbilt University is committed to encouraging and sustaining a learning and
work community that is free from prohibited discrimination, harassment, and
retaliation. Vanderbilt University does not discriminate against individuals on the
basis of their race, color, national or ethnic origin, religion, sex, sexual
orientation, gender identity, gender expression, parental status, age, disability,
military service, veteran status, genetic information, or any other classification
protected by law in its administration of educational policies, programs, or
activities; admissions policies; scholarship and loan programs; athletic or other
University- administered programs; or employment.

150.    Vanderbilt's Student Handbook made specific representations that it would
ensure an environment that was free of discrimination on the basis of disability, and free

COPY

from retaliation against students who made complaints regarding being discriminated against on the basis of disability.

151. Defendants repeatedly and materially breached their contractual obligations owed to Plaintiff, by failing to prevent his Professors from discriminating against him on the basis of his disability or preventing them from retaliating against him for his disability, use of reasonable accommodations, and complaints that he was being wrongfully discriminated against on the basis of his disability.

152. As explained above, Vanderbilt failed to prevent Plaintiff from being retaliated against for his use of reasonable accommodations for which he was approved to accommodate his Crohn's disease.

153. Following Plaintiff's complaints regarding his lack of accommodation, Plaintiff was subject to additional adverse treatment, including being subjected to adverse grading decisions, based on unsubstantiated allegations that he accessed patients' records while not in clinic although he had been requested to do so by his own professor.

154. Plaintiff was then wrongfully dismissed from the School of Nursing. Furthermore, Plaintiff was denied the ability to redress his retaliation and discrimination as he was refused the remedy of his grades being changed to incomplete from failing as a remedy for the discrimination and retaliation, he experienced from his Professors that caused him to wrongfully receive a failing grade in two of his courses for the Fall 2023 academic semester.

155. As a direct and foreseeable result of these breaches of contract, the Plaintiff sustained, and will continue to sustain substantial injury, damages, and loss, including but not limited to past and future economic loss, loss of wages, deprivation of due process, loss of

future career prospects, severe emotional distress, defamation to his character, and mental anguish.

## COUNT SIX: PROMISSORY
## ESTOPPEL

156.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

157.    As described above, the anti-discrimination and anti-retaliation policies detailed in the Vanderbilt University Student Handbook constitutes a promise that Defendant Vanderbilt will act in a manner described in the publications. Defendant Vanderbilt should have expected Plaintiff to rely on the policies stated in the handbook when he re-enrolled in Vanderbilt. Plaintiff reasonably expected Defendant Vanderbilt would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

158.    Injustice can only be avoided by enforcement of Defendant Vanderbilt's representations.

159.    As a direct and foreseeable result of Defendant Vanderbilt's failure to honor its promises, the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT SEVEN: DISCRIMINATION ON THE BASIS
## OF DISABILITY IN VIOLATION OF THE
## REHABILITATION ACT OF 1973

160.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

161.    Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits

COPY

of, or be subjected to discrimination under" any program or activity that either receives
Federal financial assistance.

162.    Upon information and belief, Defendant Vanderbilt receives substantial
monies in federal funding for research and development.

163.    Plaintiff is a qualified individual with a disability under the definition of Section
504 of the Rehabilitation Act of 1973.

164.    Mr. Lucas was a qualified individual with a disability as that term is defined
under the Rehabilitation Act because he suffers from Crohn's disease, which substantially
limits one or more of his major life activities, has a record of such impairments, and/or was
regarded by Defendant as a person with such impairments.

165.    At all relevant times, Mr. Lucas was able to be a functional student with
reasonable accommodations for his disability.

166.    Defendant, by and through its agents, representatives, and employees,
intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including
but not limited to denying him reasonable accommodations and discriminating against him
on the basis of his disability.

167.    The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful
disability discrimination against him in violation of Section 504 of the Rehabilitation Act.

168.    Defendant acted in bad faith, willfully and wantonly disregarded, and/or in
reckless disregard for, Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

169.    As a direct and proximate result of Defendant's intentional discrimination, Mr.
Lucas has suffered out of pocket losses, been deprived of prospective economic benefits,

including income in the form of wages and other benefits, all in an amount to be established at trial.

170.  Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

171.  Pursuant to the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Rehabilitation Act.

## COUNT EIGHT: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE REHABILITATION ACT OF 1973

172.  Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

173.  Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

174.  Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under Section 504 of the Rehabilitation Act, and acted in reckless disregard for Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

175.  As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

COPY

176. Pursuant to Section 504 of the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under Section 504 of the Rehabilitation Act.

## COUNT NINE: NEGLIGENCE

177. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

178. When Defendant Vanderbilt accepted Plaintiff's enrollment as a student, they entered into a duty of care relationship with Plaintiff to conduct themselves in a manner consistent with the Student Handbook and with a non-negligent manner.

179. Defendant Vanderbilt breached its duty of care toward Plaintiff when it failed to prevent Plaintiff from being discriminated against on the basis of his disability, Crohn's disease, as well as being retaliated against for complaints regarding his professor's failure to reasonably accommodate his disability.

180. Due to Defendant Vanderbilt's negligent conduct the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

181. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

182. Defendant Vanderbilt's conduct toward Plaintiff in allowing him to be discriminated against on the basis of his disability and retaliated against for making complaints regarding his professors' discrimination against him and retaliation for his complaints regarding their failure to provide reasonable accommodations was so reckless



and so outrageous as to not be tolerated by a civilized society.

183.    Vanderbilt's conduct has and continues to cause serious mental injury to the Plaintiff and has significantly impaired Plaintiff's daily life.

## COUNT ELEVEN: DECLARATORY RELIEF

184.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

185.    Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance.

186.    Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

187.    Plaintiff is a qualified individual with a disability under the definition of Section 504 of the Rehabilitation Act of 1973.

188.    Mr. Lucas was a qualified individual with a disability as that term is defined under the Rehabilitation Act because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments.

189.    At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.

190.    Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

COPY

191. Based on the foregoing, Defendant Vanderbilt has deprived Plaintiff, on the basis of his disability, of his rights to due process and equal protection through the improper administration of Defendant Vanderbilt's anti-discrimination and anti- retaliation policies.

192. Defendant Vanderbilt has violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Tennessee Human Rights Act by failing to provide Plaintiff with protection against discrimination on the basis of disability and failed to prevent his Professors from retaliating against Plaintiff due to his complaints about their failures to accommodate his disability.

193. Based on the foregoing, Plaintiff's grades were wrongfully changed from passing grades to failing grades and he was wrongfully dismissed from the Master of Nursing Program due to his disability and in relation for his complaint regarding the discrimination that he suffered due to his disability.

194. Plaintiff therefore requests that the Honorable Court issue: an order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt School of Nursing Master of Nursing Program without prejudice and will all the rights and privileges appertaining thereto; an order mandating Defendant to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal; and an order requiring Defendant to implement comprehensive training programs for faculty and staff to prevent future incidents of discrimination and to promote awareness of the rights of students with disabilities.

195. The allegations described in Counts Fourteen, Thirteen, and Twelve touch on different aspects of professional ethics violations within various roles at Vanderbilt University, encompassing administrative, nursing, and law enforcement positions. Each count references



specific statutes within the Tennessee Code Annotated (TCA), which provide legal frameworks against which these alleged actions are measured.

### COUNT TWELVE: LAW ENFORCEMENT MISCONDUCT BY DEFENDANT NEWSOME

196.        In this count, the plaintiffs allege that Defendant Joel Newsome, associated with the Vanderbilt University Police Department, engaged in actions constituting misconduct and abuse of authority, in violation of specific statutes under the Tennessee Code Annotated (TCA) and relevant sections of the United States Code (USC). These actions, as detailed by the plaintiffs, purportedly involve the misuse of official position and information for personal gain, directly contravening established legal and ethical standards designed to govern the conduct of law enforcement officials.

The allegations against Defendant Newsome are twofold:

1. Misuse of Official Information and Position for Personal Gain: The plaintiffs assert that Defendant Newsome exploited his official capacity and access to confidential information, actions that are expressly prohibited under TCA § 39-16-403. This statute mandates that public servants may not use privileged information or their position to secure unwarranted privileges or exemptions for themselves or others. The defendant's actions, as alleged, represent a clear breach of this statute, undermining public trust in law enforcement and the integrity of the Vanderbilt University Police Department.

2. Violation of Federal Standards for Law Enforcement Conduct: In addition to state law violations, the plaintiffs contend that Defendant Newsome's conduct also breaches specific provisions of the United States Code related to law enforcement integrity and accountability. While the precise USC statutes are not enumerated here, potential federal violations could include misuse of authority, violation of civil rights under color of law

COPY

(typically under USC Title 18, Section 242), and other misconduct offenses that align
with the defendant's actions as described.

197.        By incorporating both state and federal statutes, this count highlights the severity
of Defendant Newsome's alleged misconduct, positioning his actions not merely as ethical
breaches but as violations of clearly defined legal obligations. The plaintiffs seek to emphasize
the broader implications of such misconduct, including the erosion of public confidence in law
enforcement, the potential harm to individuals subject to law enforcement actions, and the
undermining of the legal and ethical standards that should guide the behavior of all law
enforcement officials.

## COUNT THIRTEEN: ETHICAL BREACHES AND MISCONDUCT IN NURSING, RESULTING IN STATUTORY VIOLATIONS

198.        The plaintiff is asserting that Defendants Claires Gamez, Marissa Shulruff, and
Chrystal Ritchie have engaged in a pattern of behavior egregiously conflicting with the
foundational ethical standards of the nursing profession. This behavior, motivated by personal
gain, constitutes a clear and direct violation of the Tennessee Code Annotated (TCA) § 63-7-
115(a)(3). According to this statute, the act of engaging in unprofessional conduct, especially
that which is capable of deceiving, defrauding, or harming the public, is recognized as grounds
for significant disciplinary action, up to and including the restriction, suspension, or revocation
of nursing licensure.

199.        This statutory framework under TCA § 63-7-115(a)(3) is designed to protect the
public from unethical practices within the nursing profession, ensuring that nurses adhere to the
highest standards of professional conduct. The defendants' actions, as described, not only
contravene this critical statutory safeguard but also represent a breach of the American Nurses



Association (ANA) Code of Ethics. The ANA Code of Ethics is widely regarded as the definitive guide to ethical nursing practice, emphasizing the importance of integrity, patient welfare, and professional accountability.

200.     The complaint provides detailed evidence of instances in which the defendants prioritized their personal interests over their professional duties and obligations, thereby undermining the trust and reliance the public places in the nursing profession. Such conduct threatens the very integrity of the nursing profession, eroding public confidence and compromising the standard of care patients expect and deserve.

201.     By documenting these actions, the plaintiffs aim to highlight the severe impact of the defendants' misconduct, not only on the individuals directly affected but also on the broader ethical landscape of the nursing profession. The plaintiffs seek judicial recognition of these breaches of statutory and ethical standards, advocating for appropriate disciplinary measures as warranted under TCA § 63-7-115(a)(3) to uphold the integrity and trustworthiness of the nursing profession and protect the welfare of the public.

202.     Plaintiff has underscored the necessity of stringent adherence to both statutory regulations and ethical guidelines within the nursing profession, as essential safeguards against misconduct and as fundamental to the maintenance of professional integrity and public trust.

## COUNT FOURTEEN: BREACH OF PROFESSIONAL ETHICS IN STUDENT
## AFFAIRS

203.     Plaintiff alleges that Vanderbilt University administrators' defendants have failed to adhere to ethical standards in higher education administration. The reference to TCA § 49-2-203(b)(1) underscores the legal expectation for educational institutions to apply policies and procedures equitably among students. The allegations suggest a breach not only of statutory

obligations but also of broader ethical standards set by accrediting bodies for educational administration. In addressing this count legally, it would be crucial to examine the specific actions taken by the defendants and assess how these actions deviated from both the statutory mandate and the ethical guidelines established by relevant accrediting organizations.

## COUNT FIFTEEN: FAILURE OF NURSING EDUCATORS TO UPHOLD ETHICAL STANDARDS AND REPORT MISCONDUCT

204. In this count, the plaintiffs allege that licensed nursing educators, by their actions and omissions, failed to meet the ethical standards required of their professional licensure, particularly in their duties to protect students and report unethical conduct. This failure is highlighted in their knowledge of, and inaction towards, the wrongful actions taken against Mr. Ian Lucas by the University, actions known to be unjust and detrimental to the student's welfare and educational opportunities.

205. The conduct of these nursing educators is in direct contravention of the duties and responsibilities encapsulated within the Tennessee Code Annotated (TCA), which outlines the ethical and legal obligations of licensed nursing professionals, including educators. Specifically, their failure to act and report the misconduct breaches the statutes governing the ethical standards of nursing licensure, notably provisions that require nurses, including nurse educators, to advocate for the welfare of their patients, students, and the public, and to report any actions that contradict the welfare, safety, and health of those they are entrusted to protect.

206. Moreover, this inaction and failure to report the misconduct to relevant oversight bodies, such as the Board of Nursing and the Department of Education, further demonstrate a breach of ethical obligations. Such reporting is essential to uphold the integrity of the nursing profession and the educational environment, ensuring that any conduct that could harm students

or degrade the quality of nursing education is promptly addressed and remediated.

207.          This count emphasizes that professional nurse educators are expected to act in the best interest of their students, advocating for their welfare and protecting them from harm. The defendants' knowledge of the wrongful actions taken against Mr. Lucas and their subsequent failure to intervene or report these actions signify a significant dereliction of their professional and ethical duties. This not only compromised Mr. Lucas's educational experience and well-being but also undermined the ethical standards and trust upon which the nursing education system is built.

208.          By highlighting these failures, the plaintiffs seek to hold the defendants Pamela **Jefferies, Mavis Schorn, Mary Ann Jessee, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith**, **Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich** accountable for their actions and inactions, underscoring the importance of ethical integrity and the duty of care that nursing educators owe to their students. The plaintiffs demand appropriate remedial actions and sanctions against the defendants for their failure to meet the ethical standards of nursing licensure, as well as measures to protect future students from similar misconduct, ensuring a safe, equitable, and ethical educational environment.

1. The TCA, particularly in the sections relevant to nursing, outlines the standards for licensure, conduct, and disciplinary actions. For example:

2. **TCA § 63-7-115(a)(3)** might be cited in scenarios involving professional misconduct. This section typically addresses unprofessional conduct, including actions that deceive, defraud, or harm the public, or are detrimental to the public's welfare. It's part of the statutes that govern the health-related boards and specifically, the practice of nursing.



3. **TCA § 63-7-207** details the grounds for disciplinary action against a nurse's license, which could include misconduct, fraud, conviction of a felony, or any action that endangers the health, safety, or welfare of the public.

4. Given the context of your inquiry, relevant sections would likely focus on the duty of nurses, including educators, to report unethical behavior, ensure the welfare of students, and adhere to professional standards of conduct.

5. **American Nurses Association (ANA) Code of Ethics**

6. The ANA Code of Ethics provides a foundational framework for nursing practice, emphasizing ethical obligations and duties across all roles, including educators. While not legally binding like state statutes, the Code of Ethics is highly influential in defining professional conduct. Key provisions that might apply include:

7. **Provision 3** focuses on the nurse's obligation to promote, advocate for, and protect the rights, health, and safety of the patient. In an educational context, this extends to the welfare and rights of students.

8. **Provision 4** outlines the nurse's obligation to take appropriate action in instances of incompetent, unethical, illegal, or impaired practice, emphasizing the duty to report such behaviors to relevant authorities to protect the health and safety of patients and the public.

9. **Provision 6** addresses the nurse's role in establishing, maintaining, and improving healthcare environments conducive to the provision of quality health care and consistent with the values of the profession through individual and collective action.

209. These provisions underscore the ethical responsibility of nurse educators to act in the best interest of their students, to maintain high standards of personal and professional



conduct, and to report any conduct that is harmful, unethical, or diminishes the quality of care or education.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Ian Hunter Lucas, prays for judgment against Defendant Vanderbilt University and further respectfully requests this Honor Court to:

1. Issue a judgment declaring the following:

   a. order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt School of Nursing Master of Nursing Program without prejudice and will all the rights and privileges be appertaining thereto;

   b. an order mandating Defendant to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal; and

   c. an order requiring Defendant to implement comprehensive training programs for faculty and staff to prevent future incidents of discrimination and to promote awareness of the rights of students with disabilities.

2. Award Plaintiff Compensatory Damages for the economic losses incurred by Plaintiff, including but not limited to tuition and fees paid for the period of enrollment during which Plaintiff suffered discriminatory actions, the cost of academic materials, and living expenses attributable to the expected duration of Plaintiff's academic program. Additionally, Plaintiff seeks compensation for non-economic damages, including pain and suffering, emotional distress, and loss of enjoyment of life, in an amount to be proven at trial, but no less than $500,000.

COPY

3. An award of punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and intentional conduct and to deter similar conduct in the future, suggested to be no less than $2,000,000.00, reflecting the egregious nature of Defendants' actions against Plaintiff.

4. An award of pre-judgment and post-judgment interest on all monetary awards at the maximum legal rate under Tennessee law, from the date of each loss until the date of judgment and continuing thereafter at the legal rate until all sums due to Plaintiff are fully paid.

5. An award of all costs associated with bringing this action, including but not limited to court costs, expert witness fees, and reasonable attorney's fees, pursuant to Tennessee Code Annotated §20-12-110 and other applicable statutes.

6. Such other and further relief as the Court deems just and proper, including but not limited to if needed:

> a. An award for the cost of obtaining alternative educational opportunities equivalent to the education Plaintiff would have received at Vanderbilt School of Nursing;
>
> b. An award for vocational and professional rehabilitation services to ameliorate the impact of the delayed entry into the nursing profession; and
>
> c. An order for a declaratory judgment that Defendants' actions violated specific rights of Plaintiff under federal and Tennessee law.

Plaintiff reserves the right to amend this prayer for relief to conform to the evidence presented at trial.

COPY

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,



IAN H. LUCAS

Dated: March 31, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31 day of March 2024, a true and correct copy of the foregoing Amended Complaint was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

All new defendants have been I HEREBY CERTIFY that on this 31 day of March 2024, a true and correct copy of the foregoing Amended Complaint was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents and certified mail to:

Office of the General Counsel
2100 West End Avenue, Suite 1100
Nashville, TN 37203

Tracey George, Cybele Raver, Daniel Diermeier, Melanie Lowe, Ernie Rushing, Sara Donahoe, Terry Walker, Teresa Rogers, Julie Perry, K. Melissa Smith Hayes, Nancy Wise, Jane Zubulake, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Mia Wells, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: March 31, 2024

Respectfully Submitted,

Ian Lucas

IAN H. LUCAS

Plaintiff Pro Se
221 Clarksion Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasionhance@outlook.com

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 60 of 431 PageID #: 319

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| ) | |
| ) | |
| **IAN LUCAS, Pro *Se*** ) | **DOCKET NO. 24C655** |
| *Plaintiff* ) | |
| v. ) | |
| ) | |
| **Mary Ann Jessee, Michelle Tellock,** ) | |
| **Joel Newsome, Melissa Porter, G.L. Black,** ) | |
| **Clarise Gamez, Neil Jamerson, Jeremy** ) | |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** ) | |
| **Marissa Shulruff, E. Jacob Cummings,** ) | **COMPLAINT** |
| **Jill Harris, Heather Robbins, Cate Enstrom,** ) | **JURY DEMAND** |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** ) | |
| **Michael Fazi, and Feylyn Lewis** ) | |
| ) | |
| *Defendants* ) | |

## COMPLAINT

Plaintiff, Ian Hunter Lucas (hereinafter "Plaintiff"), brings this Complaint against the

Defendants, **Michelle Tellock, Joel Newsome, Melissa Porter, G.L. Black, Mary Ann Jessee,**

**Clairse Gamez, Neil Jamerson, Jeremy Borgoin, Mavis Schoen, Pamela Jefferies, Marissa**

**Shulruff, , E. Jacob Cummings, Tim Garrett, Jill Harris, Heather Robbins, Kate Enstrom,**

**Alice Bernet, Chrystal Ritchie, and Feylyn Lewis** (collectively "Defendants"), for breach of

contract, negligence, discrimination on the basis of disability in violation of the Americans with

Disabilities Act, Section 504 of the Rehabilitation Act, and the Tennessee Human Relations Act,

and retaliation for Plaintiff making complaints regarding the discrimination that he experienced

due to Vanderbilt University's actions as well as other wrongful actions under the laws of the

United States and the State of Tennessee, and alleges as follows:

## PARTIES

1.      Plaintiff, Ian Hunter Lucas, is an adult male citizen of the United States, who is a resident of Pleasant View, Tennessee, and was a graduate student at the Vanderbilt University School of Nursing Master of Nursing (MN) Program from January 2023 to December 2023.

2.      Mr. Lucas has been diagnosed with a disability of physically limiting and cognitive disabilities, as the term disability is defined in the Americans with Disabilities Act because as Mr. Lucas meets the standard of having an actual impairment that substantially limits one or more of his major life activities.

3.      At all relevant times, Mr. Lucas has been a "qualified individual" with a disability because he is able to be a functional successful student with the reasonable accommodations he received as a student with a disability.

4.      At all relevant times to this lawsuit, Mr. Lucas was a student of Defendant Vanderbilt University, as a graduate student at the Vanderbilt University School of Nursing to obtain a Master of Nursing degree.

5.      Defendant Vanderbilt University is an educational institution in Nashville, Tennessee, and Defendant Vanderbilt School of Nursing is a component thereof.

6.      Defendant Vanderbilt University ("Vanderbilt") is a private, non-profit educational institution, which receives significant federal funds, and is incorporated and does business in Nashville, Tennessee.

7.      On information and belief, Vanderbilt University has had formal non-discrimination and anti-harassment policies in place since July 2016; those policies specifically include protections from discrimination, harassment, and retaliation based on, among other things, disability.



## JURISDICTION
## AND VENUE

8.      This Court has jurisdiction over Mr. Lucas' claims pursuant to 28 U.S.C. §1331
and §1343 since the matters in controversy arise under the laws of the United States.

9.      This Court also has jurisdiction under the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 *et. seq.*, amended by the Americans with Disabilities
Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, as Title II of
the ADA, prohibits discrimination in the provision of public services.  Section 202 of the Act,
42 U.S.C. §12132 (Supp. 1991), the Rehabilitation Act of 1973, §§ 504 and 505, as amended.

10.      This Court also has jurisdiction under 28 U.S.C. §1367 over the
supplemental state law claims made by Mr. Lucas in seeking relief under the Tennessee
Human Rights Act, T.C.A. §4-21-101 *et. seq.*

11.      This Court has personal jurisdiction over both Plaintiff and Defendant.

12.      At all relevant times, Defendant had more than 15 employees, and thus is subject
to the requirements of the ADA (42 U.S.C. §12101 *et. seq.* and the Tennessee Human Rights Act
(T.C.A. §4-21-101 *et. seq.*).

13.      Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C.
§1391(b)(c) as Defendant is located in the District and subject to the jurisdiction of the Court,
and because the events giving rise to the claims raised herein occurred in this judicial district.

COPY

EFILED 03/30/24 07:37 AM CASE NO. 24C655 Joseph P. Day, Clerk

## NATURE OF ACTION

14.     This action seeks relief for Defendants' wrongful actions, including

breach of contract, negligence, and intentional infliction of emotional distress, leading to

damages through a knowing and inflicting action with the intent to do harm upon the

Plaintiff, including wrongful expulsion, whistleblower retaliation, witness intimidation,

and obstruction of justice in violation of applicable state and federal laws and principles

of equity.

15.     Plaintiff seeks redress for Defendants' wrongful and discriminatory actions

that have caused significant educational, professional, and personal harm to Plaintiff.

16.     Further through the process of discovery and trial evidence. Plaintiff will

demonstrate Manipulation of External Investigations, Collusion, Witness Intimidation, and

Obstruction of Justice, in which the plaintiff is involved in as a federal witness to a

whistleblower fraud, waste and abuse case under seal with subpoenas issued under seal by

the United States District Court of the Western District of Tennessee, prosecution and

representation for the United States led by Sara Williams, Assistant United States Attorney

for the United States Attorney's Office of the Western District of Tennessee, and lead

investigative agency Department of Health and Human Services Office of Inspector

General led by Special Agent Ed Miller.

17.     Defendants' actions demonstrate collusion with the defendant of this

investigation in which defendants were aware of a $1.25 million dollar "donation"

provided by the Defendants' and the Plaintiff's former employer as a bribe to

academically dismiss and expel the Plaintiff.  The reason for expulsion exactly matches

the investigation determination and "policy violations" as the reason for the wrongful

Page 1 of 11

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 64 of 431 PageID #: 323

termination. This served as a mutual and benefiting purpose for the Defendants, who were under investigation at the same time for EOA violations by the Plaintiff for disability discrimination.

18.     Through the trial process, Plaintiff will demonstrate that the retaliation was quite evident, giving the Defendants reasoning to defame and ensure the Plaintiff was expelled to attempt to conceal and deflect the systemic disability discrimination that had been occurring by the Defendants.

19.     Furthermore, two of the Defendants, also student peers of the Plaintiff, agreed to aid the other Defendants in their actions. These Defendants did so for suspected academic and needed favors from the other Defendants' ability and positions of power to provide such aide.

20.     The student Defendants acted in this way, despite Plaintiff's many attempts to offer these student Defendants the opportunities to provide any rebuttal or even an affirmation of not being involved in the matter entirely. The student Defendants, however, chose not respond to Plaintiff's many requests and even choose to continue in their false statements to other members of the student body and on clinical rotations at potential and former employers of the Plaintiff.

## **FACTUAL ALLEGATIONS**

21.     Plaintiff enrolled in Defendant's Master of Nursing program (MN) under the assurance of receiving fair and equitable treatment, educational services, and due process in all academic affairs as part of the contractual relationship with Defendants.

22.     Defendants engaged in discriminatory practices against Plaintiff, breaching

the implied covenant of good faith and fair dealing inherent in the educational contract.

23.      Defendants' negligent mismanagement and willful disregard for Plaintiff's right to a fair academic process caused direct harm to Plaintiff's educational trajectory and professional future.

24.      Defendants' actions have inflicted severe emotional distress upon Plaintiff, causing damages that are compensable under Tennessee law.

25.      On June 3, 2023, Plaintiff reported an incident to the Office of Equal Access, alleging discrimination based on disability by a faculty member, in violation of Plaintiff's rights under Tennessee state law.

26.      The basis of this complaint was that Plaintiff was receiving retaliatory treatment and discriminatory treatment by his pediatric clinical faculty member, Professor Harris, based on him using his reasonable accommodation for Crohn's disease on an attendance issue, and that points had been wrongfully deducted from his course grade due to that use of the accommodation.

27.      Plaintiff informed Jill Harris that he had a university recognized and approved accommodation via email. Jill Harris then spoke to faculty leadership, confirming that Plaintiff had a reasonable accommodation and that the zero (0) would have to be removed and the tardy would have to be excused.

28.      Subsequent to the aforementioned incidents, the Plaintiff was subjected to vindictive treatment orchestrated by Harris, characterized by a series of retaliatory actions designed to ensure the Plaintiff's failure. Harris, with deliberate intent, established conditions and engaged in a consistent pattern of conduct aimed at undermining the Plaintiff's performance. This was notably evident when Harris, in the presence of the

Plaintiff and fellow students, repeatedly expressed her intention for the Plaintiff to be unsuccessful in his nursing education, particularly in relation to a pediatric clinical rotation and associated clinical documentation.

29.    It is pertinent to mention that the Plaintiff possesses more than ten years of experience in pediatric care and had been employed for more than four years at the hospital where the clinical rotation was taking place. Furthermore, Harris resorted to making slanderous remarks and statements, alongside endeavors to publicly disgrace the Plaintiff. Such actions were executed in the presence of the Plaintiff's former colleagues and other clinical staff, individuals familiar with the Plaintiff, who would often extend their well-wishes and encouragement towards his professional pursuits.

30.    A few weeks later, Plaintiff was informed that he violated a rule by looking up a patient's record outside a clinical setting, although it had never previously been brought to his attention as an issue and his clinical instructor, Professor Harris, had requested that he look up the record on his laptop.

31.    Plaintiff was not provided with specific instructions that other students were provided with, to send his clinical paperwork to Jill Harris. Plaintiff was then disciplined for failing to provide Jill Harris with this paperwork when he had not been informed to do so. Furthermore, Jill Harris as confirmed by testimony of other students witnesses to EOA Investigator, required plaintiff to email clinical paperwork to Jill Harris as she noted not being able to discern the Plaintiff's handwriting.

32.    Jill Harris then wrongfully deducted points from Plaintiff in an attempt to fail the Plaintiff based on the syllabus policy on vague application of accumulation of zeros (0) assigned in the category of unprofessionalism. This began with Jill Harris accusing the

COPY

Plaintiff of turning in clinical documentation late, which then evolved into Jill Harris falsifying comments in the Plaintiff's clinical "Exxat" reflections and deducting his score based on Jill Harris' hypothetical assumptions of what the Plaintiff would have done in a clinical setting, rather than actual performance of actions themselves.

33. The Plaintiff communicated his concerns to the clinical faculty leadership, including Professor Weaver, Dr. Robbins, and Dean Jesse. This complaint prompted them to remove Plaintiff from Professor Harris' clinical course.

34. A meeting was scheduled in which Plaintiff was informed that he had failed clinical paperwork. However, Plaintiff had turned in this paperwork at the beginning of the clinical and the procedure was for incorrect paperwork to be given back to the student, review it with them, and remediate it with the student. Additionally, the Plaintiff was informed that Jill Harris had reported him to Weaver, Harris, and Jesse with unfounded allegations of failing to submit several weeks' worth of clinical paperwork on time and further accused the Plaintiff of copying and pasting the clinical documentation merely because it was typed, notwithstanding that it was composed in the Plaintiff's own words.

35. Moreover, Jill Harris falsely claimed that the Plaintiff had inappropriately accessed patient charts "multiple times" during post-conference sessions, even though it was Harris herself who requested the Plaintiff to retrieve multiple lab results for the patient being discussed for educational purposes, as it noted in other student eyewitness statements as provided in recorded transcribed testimony from EOA investigator transcripts of student interviews.

36. During that meeting, an academic learning contract was prepared for Plaintiff stating generic and erroneous claims that would make non-logical sense to any nursing student such as "do not copy information from the EHR" and "Do not Access the EHR outside of Clinical



Hours."

37.    Plaintiff started the next semester and had a class with Dr. Enstrom, who emailed his accommodation letter on August 21, 2023. This email wrongfully took away Plaintiff's accommodations for his disability by stating that he would be penalized 10 points, instead of 0 for missed classes, despite his reasonable accommodations for his disability.

38.    Plaintiff emailed Catherine Buttery, Assistant Director of Student Access for the Office of Equal Access in order to ensure that he would not be wrongfully penalized for these disability related absences. Ms. Buttery replied that he should not be penalized for those absences.

39.    Later in the semester, after Plaintiff had to miss class due to his disability, he emailed Professor Enstrom regarding his absence and requested makeup work.

40.    Kate Enstrom replied with the makeup work and informed Plaintiff that since he had missed two sessions and one-quarter of a third session that an additional absence would warrant a meeting with the course coordinators to discuss course progression.

41.    Plaintiff responded by email, requesting a meeting with Professor Enstrom and her faculty supervisor.

42.    Only after Plaintiff had made this request was he presented with a learning plan.

43.    On December 4, 2023, Plaintiff was subject to an interim suspension from campus, ostensibly for a mental health assessment as per the University's Wellness Committee policy, without appropriate due process as required under Tennessee law.

44.    Of note, a majority of this investigation focused on the concern that the Plaintiff maintained his concealed carry firearm in his vehicle. The Plaintiff is a concealed handgun carry permit holder. "Persons who carry a handgun pursuant to Tenn. Code Ann. §39-17-1351,

the enhanced handgun carry permit statute, or Tenn. Code Ann. §39-17-1366, the concealed handgun carry permit statute, are specifically excepted from application of the federal Gun-Free School Zones Act." Despite this and in knowing that putting such reasoning in written context would be illegal on Defendants part, Defendant remanded the plaintiff on an interim campus restriction since December 4, 2023 to present without providing reason as to their concern for the Plaintiffs "threat" as defined in the student handbook for justification of a interim campus restriction as it is defined.

45.     It is important to note this was the same focus of the Air Evac investigation, despite the fact that the Plaintiff provided evidence showing that text messages were altered by the Defendant to falsely demonstrate a conversation that was not reflective of the entire narrative. Furthermore, the firearm that was the subject of the conversation was not in the Plaintiffs possession as the Plaintiff was awaiting ATF approval as the firearm was an NFA item. Additionally, the text messaging of a firearm that was not in the Plaintiffs possession, and even if such firearms was in the Plaintiffs possession and the context and content of such communications were, non-threatening, non-harmful, and with no intention to inflict stress or burden to another. Thus, Plaintiff was within his constitutional and with the laws of the State of Tennessee to possess and communicate about such Firearm.

46.     On December 15, 2023, a representative from the School of Nursing, Mary Jesse, notified Plaintiff of a purported infraction for off-site access to patient charts and subsequently altered Plaintiff's academic grades from passing to failing without clear justification.

47.     Subsequently, on December 19, 2023, Plaintiff was dismissed from the School of Nursing, a decision that Plaintiff contends was made without adequate process

and was unjustified.

48.      In an interview with Plaintiff's fellow classmate at the School of Nursing, his classmate informed the investigator that she believed that Plaintiff was being subject to different treatment due to his disability and retaliation based on that disability.

49.      Plaintiff pursued internal university channels to appeal the academic dismissal and the retroactive grade changes, seeking to remedy the alleged wrongful actions.

50.      These appeals were systematically delayed and denied by the Defendant, hindering a timely resolution, and compounding the Plaintiff's distress.

51.      As a result, Plaintiff's anticipated graduation and subsequent entry into the professional job market have been detrimentally impacted.

52.      The Plaintiff's access to patient charts was conducted within the parameters of the Health Insurance Portability and Accountability Act in Tennessee's privacy laws and educational standards, which should negate the basis for dismissal.

53.      Any allegations of unauthorized access must be evaluated under Tennessee's statutes governing computer- related crimes, which would not typically characterize the educational access to patient information as unauthorized.

54.      Tennessee law provides for immunity under certain educational functions, suggesting that the plaintiff's adherence to privacy standards in an educational context should not constitute actionable misconduct.

55.      Tennessee law, particularly under the Tennessee Educational Records Statute (T.C.A. §49-50-801 et seq.), grants certain protections and immunities to educational institutions and their agents when handling educational records in compliance with established privacy standards. Given this legal framework, the Plaintiff's access to patient charts,

provided it was within the scope of educational purposes and adhered to the confidentiality requirements as outlined in the Tennessee Code and any applicable institutional policies, should not be deemed actionable misconduct. This adherence to statutory privacy standards, in conjunction with the educational immunity provisions, underscores that the Plaintiff's actions, aimed at fulfilling educational objectives, fall within the ambit of legally protected activities under Tennessee Code Annotated §20-12-119.

56. Additionally, of significantly higher concern is the evidence of collusion and cooperation between Air Evac Lifeteam Inc. and Vanderbilt University. This partnership further implicates both entities in actions against the plaintiff, suggesting whistleblower retaliation. This collusion also highlights Vanderbilt University's active participation with Air Evac Lifeteam Inc., further demonstrating the defendants deliberate and intentional efforts to harm and damage the plaintiff as a result of Vanderbilt University is alleged to have accepted a donation from Air Evac Lifeteam Inc. as compensation for assisting in the termination of Lucas and supporting Air Evac Lifeteam Inc.'s efforts to discredit Lucas preemptively against any future defense in litigation.

57. This arrangement also aimed to shield against any claims of wrongful termination. Additionally, Vanderbilt University is accused of not providing legal representation for certain student defendants but exploiting these students in bad faith actions, fulfilling commitments made in exchange for receiving the donation funds.

58. The direct link between the defendants and a federal case involving three students previously unrelated to Air Evac Lifeteam Inc., a subsidiary of Global Medical Response, owned by KKR & Co., establishes a clear legal connection. This association further implicates Vanderbilt University in the retaliatory measures taken by my former employer against me for

reporting False Claims Act violations. Vanderbilt University implicated, the involvement of these students in specific activities related to a donation agreement from KKR & Co., evidencing the collaboration among Air Evac Lifeteam Inc., Global Medical Response, and KKR & Co. in providing legal support to the defendants.

59. Financial transactions via the Conway Whelch Foundation, as revealed in their 990 PF filing on October 31, 2023, along with a $1.25 million donation to Vanderbilt on November 17, 2023, highlight this engagement. The reported gross sales of assets totaling $1,349,149.00, as shown in line 6b of the 990-PF filing, indicate a deliberate financial strategy, presumably to facilitate the donation through the sale of assets. This suggests a structured plan to direct funds towards Vanderbilt with the aim of justifying my wrongful termination and expulsion based on unfounded claims.

## COUNT ONE:
## DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

60.     Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein.

61.     Mr. Lucas is, and at all times relevant hereto, was a qualified individual with a disability as that term is defined under the ADA, 42 U.S.C. §12102(1), because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such disability, and/or was regarded by Defendant as a person with such impairments.

62.     At all relevant times, Mr. Lucas was able to be a functional student with a reasonable accommodation for his Crohn's disease.

63.     Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions, including

but not limited to, failing to provide for reasonable accommodations for his disability, which constitutes unlawful disability discrimination against Mr. Lucas in violation of the ADA.

64.     Defendants acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard of, Mr. Lucas' rights under the ADA.

65.     As a direct and proximate result of Defendants' intentional discrimination, Mr. Lucas has suffered out of pocket losses and has been deprived of his education, including loss of future economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

66.     Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

67.     Pursuant to the ADA, Mr. Lucas is entitled to damages including lost compensation and lost benefits, compensatory damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

## COUNT TWO: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

68.     Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

69.     Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.



70.     Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas'

rights under the ADA, and acted in reckless disregard for Mr. Lucas' rights under the ADA.

71.     As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost

future compensation and other benefits of employment, emotional distress, inconvenience,

loss of income, humiliation and other indignities.

72.     Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory

damages, punitive damages, his attorney's fees and costs of litigation, and all other relief

recoverable under the ADA.

## COUNT THREE: DISCRIMINATION
## BASED ON DISABILITY IN VIOLATION
## OF THE TENNESSEE HUMAN RIGHTS
## ACT

73.     Plaintiff incorporates all the foregoing paragraphs above as if fully set forth

herein.

74.     At all relevant times, Mr. Lucas was a qualified individual with a disability as

that term is defined under the Tennessee Human Rights Act, because he suffers from Crohn's

disease, which substantially limits one or more of his major life activities, has a record of such

impairments, and/or was regarded by Defendant as a person with such impairments. T.C.A. §4-

21-102.

75.     At all relevant times, Mr. Lucas was able to be a functional student with

reasonable accommodations for his disability.

76.     Defendant, by and through its agents, representatives, and employees,

intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including

but not limited to denying him reasonable accommodations and discriminating against him on

the basis of his disability.

77.     The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful disability discrimination against him in violation of the Tennessee Human Rights Act.

78.     Defendant acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard for, Mr. Lucas' rights under the Tennessee Human Rights Act.

79.     As a direct and proximate result of Defendant's intentional discrimination, Mr. Lucas has suffered out of pocket losses, been deprived of prospective economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

80.     Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

81.     Pursuant to the Tennessee Human Rights Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Tennessee Human Rights Act.

## COUNT FOUR: RETALIATION
## IN VIOLATION OF THE TENNESSEE
## HUMAN RIGHTS ACT

82.     Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

83.     Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his Professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

84.   Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas'
rights under the Tennessee Human Rights Act, and acted in reckless disregard for Mr.
Lucas' rights under the Tennessee Human Rights Act.

85.   As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost
future compensation and other benefits of employment, emotional distress, inconvenience,
loss of income, humiliation and other indignities.

86.   Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory
damages, punitive damages, his attorney's fees and costs of litigation, and all other relief
recoverable under the Tennessee Human Rights Act.

## COUNT FIVE: BREACH OF CONTRACT

87.   Plaintiff incorporates and reasserts herein by reference all preceding paragraphs
as if fully set forth herein.

88.   Plaintiff applied to and enrolled in Defendant Vanderbilt's program and paid
tuition in addition to other fees and expenses. Plaintiff did so in reliance on the understanding
and expectation that Defendant Vanderbilt would implement and enforce the promises and
policies made in it is official publications, including its Mission Statement, the Student
Handbook, its policies and procedures, as well as other relevant documents, including those not
mentioned in this complaint.

89.   A contract implied in fact or in law was formed between Defendant Vanderbilt
and the Plaintiff once the Plaintiff applied to and enrolled in the program. Specifically,
Defendant Vanderbilt offered Plaintiff the ability to enroll in the university upon the condition
that the Plaintiff paid for the necessary tuition and fees.

Page 17 of 51



90. Once Plaintiff paid for his tuition and fees, Plaintiff accepted Defendant Vanderbilt's offer. In this contract, Defendant Vanderbilt expects Plaintiff to adhere to all of the policies set forth in the Student Handbook while attending the University. In return, Defendant Vanderbilt receives the benefit of their policies being met, as well as Plaintiff's financial contribution to the University. Likewise, Plaintiff expects Vanderbilt to follow the policies and procedures set out in its mission statement, Student Handbook, and other relevant documents.

91. Moreover, the contract contained an implied covenant of good faith and fair dealing. Defendant Vanderbilt's Student Handbook for the 2023-2024 school year states that Vanderbilt University is committed to equal access for people with disabilities. In compliance with Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990 (ADA), and the ADA Amendments Act of 2008, Vanderbilt does not exclude otherwise qualified persons with disabilities, solely by reason of the disability, from participating in University programs and activities, nor are persons with disabilities denied the benefits of these programs or subjected to discrimination.

92. It also states:

Vanderbilt University is committed to encouraging and sustaining a learning and work community that is free from prohibited discrimination, harassment, and retaliation. Vanderbilt University does not discriminate against individuals on the basis of their race, color, national or ethnic origin, religion, sex, sexual orientation, gender identity, gender expression, parental status, age, disability, military service, veteran status, genetic information, or any other classification protected by law in its administration of educational policies, programs, or

COPY

EFILED 03/30/24 07:37 AM CASE NO. 24C655 Joseph P. Day, Clerk

activities; admissions policies; scholarship and loan programs; athletic or other
University- administered programs; or employment.

93.     Vanderbilt's Student Handbook made specific representations that it would
ensure an environment that was free of discrimination on the basis of disability, and free
from retaliation against students who made complaints regarding being discriminated
against on the basis of disability.

94.     Defendants repeatedly and materially breached their contractual obligations
owed to Plaintiff, by failing to prevent his Professors from discriminating against him on the
basis of his disability or preventing them from retaliating against him for his disability, use of
reasonable accommodations, and complaints that he was being wrongfully discriminated
against on the basis of his disability.

95.     As explained above, Vanderbilt failed to prevent Plaintiff from being
retaliated against for his use of reasonable accommodations for which he was approved
to accommodate his Crohn's disease.

96.     Following Plaintiff's complaints regarding his lack of accommodation,
Plaintiff was subject to additional adverse treatment, including being subjected to
adverse grading decisions, based on unsubstantiated allegations that he accessed
patients' records while not in clinic although he had been requested to do so by his own
professor.

97.     Plaintiff was then wrongfully dismissed from the School of Nursing.
Furthermore, Plaintiff was denied the ability to redress his retaliation and discrimination as he
was refused the remedy of his grades being changed to incomplete from failing as a remedy for

Page 19 of 31

the discrimination and retaliation he experienced from his Professors that caused him to wrongfully receive a failing grade in two of his courses for the Fall 2023 academic semester.

98.    As a direct and foreseeable result of these breaches of contract, the Plaintiff sustained, and will continue to sustain substantial injury, damages, and loss, including but not limited to past and future economic loss, loss of wages, deprivation of due process, loss of future career prospects, severe emotional distress, defamation to his character, and mental anguish.

## COUNT SIX: PROMISSORY ESTOPPEL

99.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

100.    As described above, the anti-discrimination and anti-retaliation policies detailed in the Vanderbilt University Student Handbook constitutes a promise that Defendant Vanderbilt will act in a manner described in the publications. Defendant Vanderbilt should have expected Plaintiff to rely on the policies stated in the handbook when he re-enrolled in Vanderbilt. Plaintiff reasonably expected Defendant Vanderbilt would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

101.    Injustice can only be avoided by enforcement of Defendant Vanderbilt's representations.

102.    As a direct and foreseeable result of Defendant Vanderbilt's failure to honor its promises, the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT SEVEN: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE

## REHABILITATION ACT OF 1973

103.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

104.    Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance.

105.    Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

106.    Plaintiff is a qualified individual with a disability under the definition of Section 504 of the Rehabilitation Act of 1973.

107.    Mr. Lucas was a qualified individual with a disability as that term is defined under the Rehabilitation Act because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments.

108.    At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.

109.    Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

110.    The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful disability discrimination against him in violation of Section 504 of the Rehabilitation Act.



111. Defendant acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard for, Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

112. As a direct and proximate result of Defendant's intentional discrimination, Mr. Lucas has suffered out of pocket losses, been deprived of prospective economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

113. Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

114. Pursuant to the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Rehabilitation Act.

## COUNT EIGHT: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE REHABILITATION ACT OF 1973

115. Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

116. Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his Professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

117. Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under Section 504 of the Rehabilitation Act, and acted in reckless disregard for Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

118. As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future

compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

119. Pursuant to Section 504 of the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under Section 504 of the Rehabilitation Act.

**COUNT NINE: NEGLIGENCE**

120. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

121. When Defendant Vanderbilt accepted Plaintiff's enrollment as a student, they entered into a duty of care relationship with Plaintiff to conduct themselves in a manner consistent with the Student Handbook and with a non-negligent manner.

122. Defendant Vanderbilt breached its duty of care toward Plaintiff when it failed to prevent Plaintiff from being discriminated against on the basis of his disability, Crohn's disease, as well as being retaliated against for complaints regarding his Professors failure to reasonably accommodate his disability.

123. Due to Defendant Vanderbilt's negligent conduct the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

**COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

124. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

125. Defendant Vanderbilt's conduct toward Plaintiff in allowing him to be

discriminated against on the basis of his disability and retaliated against for making complaints regarding his Professors' discrimination against him and retaliation for his complaints regarding their failure to provide reasonable accommodations was so reckless and so outrageous as to not be tolerated by a civilized society.

126.    Vanderbilt's conduct has and continues to cause serious mental injury to the Plaintiff and has significantly impaired Plaintiff's daily life.

## COUNT ELEVEN: DECLARATORY RELIEF

127.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

128.    Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance.

129.    Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

130.    Plaintiff is a qualified individual with a disability under the definition of Section 504 of the Rehabilitation Act of 1973.

131.    Mr. Lucas was a qualified individual with a disability as that term is defined under the Rehabilitation Act because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments.

132.    At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.



133.    Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

134.    Based on the foregoing, Defendant Vanderbilt has deprived Plaintiff, on the basis of his disability, of his rights to due process and equal protection through the improper administration of Defendant Vanderbilt's anti-discrimination and anti- retaliation policies.

135.    Defendant Vanderbilt has violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Tennessee Human Rights Act by failing to provide Plaintiff with protection against discrimination on the basis of disability and failed to prevent his Professors from retaliating against Plaintiff due to his complaints about their failures to accommodate his disability.

136.    Based on the foregoing, Plaintiff's grades were wrongfully changed from passing grades to failing grades and he was wrongfully dismissed from the Master of Nursing Program due to his disability and in relation for his complaint regarding the discrimination that he suffered due to his disability.

137.    Plaintiff therefore requests that the Honorable Court issue: an order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt School of Nursing Master of Nursing Program without prejudice and will all the rights and privileges appertaining thereto; an order mandating Defendant to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal; and an order requiring Defendant to implement comprehensive training programs for faculty and staff to prevent future incidents of discrimination and to promote awareness of the rights of students with

COPY

disabilities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Ian Hunter Lucas, prays for judgment against Defendant
Vanderbilt University and further respectfully requests this Honor Court to:

1.    Issue a judgment declaring the following:

    a. order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt
       School of Nursing Master of Nursing Program without prejudice and will all the
       rights and privileges be appertaining thereto;

    b. an order mandating Defendant to expunge any academic disciplinary actions
       from Plaintiff's university records that arose from the alleged incidents leading
       to Plaintiff's dismissal; and

    c. an order requiring Defendant to implement comprehensive training programs for
       faculty and staff to prevent future incidents of discrimination and to promote
       awareness of the rights of students with disabilities.

2.    Award Plaintiff Compensatory Damages for the economic losses incurred by
Plaintiff, including but not limited to tuition and fees paid for the period of enrollment during
which Plaintiff suffered discriminatory actions, the cost of academic materials, and living
expenses attributable to the expected duration of Plaintiff's academic program. Additionally,
Plaintiff seeks compensation for non-economic damages, including pain and suffering,
emotional distress, and loss of enjoyment of life, in an amount to be proven at trial, but no less
than \$2,000,000.

3.    An award of punitive damages in an amount sufficient to punish Defendants
for their willful, malicious, and intentional conduct and to deter similar conduct in the future,

suggested to be no less than $19,700,000.00 reflecting the egregious nature of Defendants' actions against Plaintiff.

4. An award of pre-judgment and post-judgment interest on all monetary awards at the maximum legal rate under Tennessee law, from the date of each loss until the date of judgment and continuing thereafter at the legal rate until all sums due to Plaintiff are fully paid.

5. An award of all costs associated with bringing this action, including but not limited to court costs, expert witness fees, and reasonable attorney's fees, pursuant to Tennessee Code Annotated §20-12-110 and other applicable statutes.

6. Such other and further relief as the Court deems just and proper, including but not limited to if needed:

   a. An award for the cost of obtaining alternative educational opportunities equivalent to the education Plaintiff would have received at Vanderbilt School of Nursing;

   b. An award for vocational and professional rehabilitation services to ameliorate the impact of the delayed entry into the nursing profession; and

   c. An order for a declaratory judgment that Defendants' actions violated specific rights of Plaintiff under federal and Tennessee law.

   d. Plaintiff to be allowed to walk and participate in Graduation activities and programing

   e. Plaintiff to be included in class composite photo

   f. Order the Defendants release the acceptance letter of Plaintiff into the previously applied for Doctor of Nursing Practice (DNP) + Post Masters

Adult-Gerontology Acute Care Nurse Practitioner (AGACNP) program for the
Fall 2024 semester, with an adjusted commencement date set for Fall 2025.

i. Plaintiff is amendable based on discussion with VUSN to changing the
program to either DNP + Post Masters Psychiatric-Mental Health
Nurse Practitioner (PMHNP) or DNP + Post Masters Pediatric Nurse
Practitioner-Acute Care (PNP-AC) and or Pediatric Primary Care
(PNP-PC) or the Family Nurse Practitioner Program (FNP), ensuring
Plaintiff's career and educational goals are not derailed by
Defendants' actions, and also in respect to plaintiff unaddressed and
further harm caused by Defendants inappropriately manipulating the
EOA and Title IX process by denying Plaintiff supportive measures
and equal access to educational programs as required by law.

b. Plaintiff reserves the right to amend this prayer for relief to conform to the evidence
presented at trial.

COPY

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

IAN H. LUCAS

Dated: March 30, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

Page 89 of 91



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30 day of March 2024, a true and correct copy of the foregoing Amended Complaint was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Respectfully Submitted,

IAN H. LUCAS

Dated: March 30, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY

COPY

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) |
| *Plaintiff* | ) |
| v. | ) |
|  | ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) |
| **Michael Fazi,** and **Feylyn Lewis** | ) |
|  | ) |
| *Defendants* | ) |

**DOCKET NO. 24C655**

**MOTION FOR PRELIMANARY
INJUNCTION**

## MOTION FOR PRELIMANARY INJUNCTION

### I. INTRODUCTION

Ian Hunter Lucas, Plaintiff, pro se, respectfully moves this Honorable Court for a

Temporary Injunction, pursuant to Tennessee Rules of Civil Procedure Rule 65.02, enjoining the

Defendants from continuing actions that constitute discrimination based on disability, retaliation,

breach of contract, and other wrongful actions as detailed in the accompanying Complaint.

Plaintiff shows the Court as follows:

1. **Exhibit 1: Declaration of Ian Hunter Lucas:** An affidavit detailing the Plaintiff's

    experiences and the adverse impacts of Defendants' actions, providing foundational facts

    for the motion.

1

2. **Exhibit 2: Email from Defendant Cate Enstrom:** Evidence of the Defendant's intention to penalize the Plaintiff for utilizing legally protected disability accommodations, in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.).

3. **Exhibit 3: Communication from Vanderbilt University Medical Center Privacy Office:** Confirmation that the academic actions taken against the Plaintiff did not arise from a legitimate privacy breach, challenging the basis of the Plaintiff's academic dismissal and implicating potential violations of the Family Educational Rights and Privacy Act (FERPA, 20 U.S.C. § 1232g).

4. **Exhibit 4: Excerpt from the Vanderbilt Student Handbook 2023-2024:** Defines the Welfare Panel process, relevant to understanding the procedural context in which certain decisions were made regarding the Plaintiff's mental health discussions.

5. **Exhibit 5: Emails from Defendants Neil Jamerson and Melissa Porter:** Requesting Release of Information for off-campus discussions about the Plaintiff's mental health, potentially breaching confidentiality protections under the Health Insurance Portability and Accountability Act (HIPAA, 42 U.S.C. § 1320d et seq.).

6. **Exhibit 6: Email from Timothy Garrett:** Request for documents from the Plaintiff as part of Air Evac's investigation, highlighting the interconnected retaliation efforts between the Defendants and Air Evac LifeTeam Inc.

7. **Exhibit 7: Transcript of Student Witness:** Testimony evidencing discrimination by Defendants, supporting claims of a hostile educational environment under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.).

2

8. **Exhibit 8: Correspondence with Vanderbilt Office of the Registrar:** Demonstrates the corrective action required to amend the Plaintiff's GPA, with implications of administrative error or intentional manipulation.

9. **Exhibit 9: Email Notice to School of Nursing Students:** Announcement of a new GPA policy immediately following the correction of the Plaintiff's GPA, suggesting a retroactive justification for the wrongful alteration of academic records.

10. **Exhibit 10: Email circulated by Michelle Tellock:** Illustrates further retaliation and potential endangerment to the Plaintiff's access to medical care at Vanderbilt University Medical Center, possibly infringing on rights under the Emergency Medical Treatment and Labor Act (EMTALA, 42 U.S.C. § 1395dd).

11. **Exhibit 11: Letter from the Department of Health and Human Services (DHHS):** Closes the inquiry into HIPAA violations but expresses concern over discrimination, leading to a referral to the Department of Education's Office for Civil Rights for further investigation.

12. **Exhibit 12 Title IX Email Exchange:** Witness interview transcript with EOA investigator on Plaintiff discrimination treatment by defendants

3



## III. BACKGROUND

1.      The Plaintiff, Ian Hunter Lucas, brings forward a motion for injunctive relief,
grounded on allegations of profound harm resulting from the Defendants' conduct. Detailed in the
initial complaint, these allegations encapsulate discrimination predicated on disability, retributive
acts, breach of contractual agreements, and additional malfeasance. Accompanying the original
complaint are declarations and exhibits that supplement these allegations.

2.      Summarized from the complaint, the Defendants' actions have and continue to
perpetuate irrevocable damage upon the Plaintiff, hindering his academic progress, career
opportunities, emotional health, and reputation. At the core of this injunction motion, the Plaintiff
has challenged a consortium of individuals associated with Vanderbilt University, leveling a
series of tort claims, which include the breach of contractual duties, negligence, discriminatory
treatment based on disability, and retaliatory measures. Each Defendants' personal liability is
underscored, distinct from their professional functions at Vanderbilt University or Air Evac Life
Team INC.

3.      Prior to his unjust academic dismissal and expulsion, alleged to be retributive and
grounded in bad faith, Mr. Lucas was an active graduate nursing student with a recognized
physically limiting disability by Vanderbilt University and was appropriately registered with the
student access center (student disability services. He now seeks restitution for the distress and
harm caused by the Defendants' misconduct. The legal action also brings to the forefront serious
allegations concerning witness intimidation and obstruction of justice, demanding the Court's
swift and decisive action. The Plaintiff asserts that these retaliatory actions by the Defendants
arose from his filed complaints regarding violations of equal opportunity access with the
university's Equal Opportunity Access office. The Plaintiff posits that evidence exists of the

4

COPY

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

Defendants' attempts to conceal their wrongdoing and discrimination by manipulating the
institution's internal investigative procedures of the Equal Opportunity Access (EOA), Title IX,
Student Conduct and Accountability, and Academic Grade Appeal.

4.    The Plaintiff alleges targeted and malicious actions by the Defendants, in
collaboration with Air Evac LifeTeam Inc., aimed at retaliation for whistleblower activities.
These activities include involvement as a federal witness in a sealed investigation by the U.S.
Attorney General's Office for the Western District of Tennessee into Air Evac LifeTeam Inc. for
potential violations of both the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.) and the
federal False Claims Act (31 U.S.C. §§ 3729 - 3733). The Defendants' actions, characterized by
intimidation, defamation, and the infliction of physical and mental distress, were designed to
penalize the Plaintiff for his protected whistleblower activities. These retaliatory actions not only
hindered the Plaintiff's professional development but also caused significant financial and
emotional damage. Given the Plaintiff's protection under federal whistleblower legislation, such
as the Whistleblower Protection Act of 1989 (5 U.S.C. § 2302(b)(8)-(9)), and state provisions
safeguarding whistleblowers from retaliation, the case at hand demands urgent court intervention
to halt further harm.

5.    In support of the motion for a preliminary injunction, the case of *Halifax Hospital
Medical Center v. United States,* 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In
*Halifax*, the court granted a preliminary injunction in favor of the plaintiff, recognizing the
substantial likelihood of irreparable harm without such intervention, notably in cases involving
whistleblower retaliation and the potential violation of federal statutes. This precedent
underscores the necessity of safeguarding whistleblowers from retaliatory measures that would
otherwise stifle critical disclosures in the public interest.

5

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 96 of 431 PageID #: 355



6.      Accordingly, this Court is respectfully urged to grant a preliminary injunction, protecting the Plaintiff from ongoing retaliatory actions by the Defendants, in alignment with the principles upheld by both federal and state whistleblower laws and reinforced by pertinent case law. The compilation of evidence strongly suggests that on December 4th, 2023, a coordinated sequence of events began with the plaintiff receiving a notice of temporary suspension from Vanderbilt University, issued by defendant Neil Jamerson. This was promptly followed, within the same hour, by a notice from the plaintiff's then-employer (now former employer), Air Evac LifeTeam Inc. Human Resources, placing the plaintiff on administrative paid leave. These actions, along with a series of other incidents that appear to be more than coincidental, point to a deliberate and collaborative effort by the defendants to retaliate against the plaintiff. This effort includes whistleblower retaliation, witness intimidation, harassment, defamation, libel, slander, and discrimination.

7.      The Plaintiff contends that the Defendants, in a premeditated and collaborative effort with Air Evac LifeTeam Inc., orchestrated actions to detrimentally impact the Plaintiff. This was in retaliation for the Plaintiff's reporting of fraudulent billing practices under the federal False Claims Act (31 U.S.C. §§ 3729 - 3733), as well as state equivalents under the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.). Furthermore, Vanderbilt University and its School of Nursing pursued the Plaintiff's dismissal, motivated by a pattern of discrimination against students with disabilities and in response to the Plaintiff's multiple complaints through the Equal Opportunity Access (EOA) office. This collaborative retaliation not only sought to undermine the Plaintiff's standing but also facilitated an exchange of damaging information between Michelle Tellock and Timothy K. Garrett, aimed at furthering the Plaintiff's harm post-December 4, 2023.

COPY

8.    In establishing the grounds for a preliminary injunction, the case law precedent found in *Roth v. Department of Justice*, 642 F.3d 1161 (D.C. Cir. 2011), is particularly pertinent. In *Roth*, the court highlighted the critical importance of protecting the rights of individuals under whistleblower protection statutes, emphasizing the necessity of preliminary injunctive relief to prevent ongoing retaliation and to uphold the integrity of whistleblower protections. This case underscores the judicial recognition of the irreparable harm that can result from retaliatory actions, especially when such actions are designed to penalize whistleblowers for exercising their rights to report misconduct.

9.    Given the Plaintiff's allegations of concerted retaliation by the Defendants, aligned with the documented objectives of both Air Evac LifeTeam Inc. and Vanderbilt University to penalize the Plaintiff for protected whistleblower activities and disability discrimination complaints, there exists a compelling basis for the issuance of a preliminary injunction. This Court's intervention is crucial to prevent further retaliatory harm to the Plaintiff, ensuring compliance with the protections afforded under both federal and state whistleblower laws, as reinforced by the precedent established in *Roth*.

10.    The Plaintiff raises concerns over the striking parallels and the synchronicity in the actions undertaken by Vanderbilt and Air Evac, notably the precipitous move to academically dismiss the Plaintiff without due process. This rush to dismissal notably lacked consideration of the ongoing investigations into Defendant Mary Ann Jessee by the Equal Opportunity Access (EOA) office for retaliatory actions related to disability discrimination complaints, as well as investigations into Defendant Cate Enstrom's role in similar discriminatory practices. The absence of procedural fairness, coupled with the timing and alignment of these actions, suggests a concerted effort to penalize the Plaintiff, sidestepping the protections afforded under the

7

Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act of 1973 (29 U.S.C. § 794), which mandate non-discriminatory treatment and reasonable accommodations for individuals with disabilities.

11.     In the context of seeking a preliminary injunction, the case of *Goss v. Lopez*, 419 U.S. 565 (1975), provides a pertinent legal framework. In *Goss*, the Supreme Court held that students must be given notice and an opportunity to be heard before being deprived of certain educational rights, underlining the essential nature of due process in academic settings. This precedent underscores the necessity of procedural protections, especially when allegations of discriminatory practices and retaliatory measures are at play, to ensure that individuals are not unjustly deprived of their rights to education and equal treatment under the law.

12.     Therefore, in light of the evidence presented and the legal precedents underscored by *Goss v. Lopez*, this Court is respectfully requested to grant a preliminary injunction. Such an injunction would serve to immediately halt any further actions against the Plaintiff that bypass due process and exacerbate the discriminatory and retaliatory harm alleged, ensuring the Plaintiff's rights under both federal statutes and case law are protected pending a full hearing on the merits. When the plaintiff reached out to the EOA office to inform them of this situation, and to request intervention based on the fact of the faculty members involved the EOA office at the leadership of E. Jacob Cummings provided no response, despite that given prior to these retaliatory actions by defendants Jessee and other defendants conspirators of retrospectively changing two of the plaintiffs already passed course grades simultaneously on December 15th, 2023 thus making the plaintiff eligible for dismissal based on the guidelines of the School of Nursing policies and further not able to be readmitted due to school of nursing policies on only allowing the retake of one course.

8

COPY EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

13.     The Plaintiff disputes the retrospective grade alterations made by Defendant Jessee, grounded on unfounded accusations of "accessing patient charts remotely," initially alleged as a HIPAA violation. The Vanderbilt University Medical Center Privacy Office, designated within the Vanderbilt University School of Nursing Handbook as the authoritative entity on HIPAA and privacy matters, clarified that no privacy breach occurred, thereby negating any violation of the Health Insurance Portability and Accountability Act (HIPAA), codified at 45 C.F.R. Parts 160 and 164. Despite this determination, Defendants Jessee and Schorn, in their evaluation of the Plaintiff's academic grade appeal, deviated from their initial accusation of a HIPAA violation. They instead contended that the Plaintiff violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes," as articulated by Defendant Schorn in her decision regarding the Plaintiff's grade appeal. This assertion emerged despite the clear directive from the VUMC Privacy Office affirming the absence of a breach, illustrating a capricious and procedurally flawed application of institutional policy against the Plaintiff, contravening his due process rights as outlined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and corresponding T.C.A. § 10-7-504(a)(4), governing the privacy of student educational records.

14.     This case finds resonance with *Goss v. Lopez*, 419 U.S. 565 (1975), where the U.S. Supreme Court held that students must be afforded due process rights in disciplinary actions impacting their educational status. The arbitrary and retrospective grade changes, predicated on disproven allegations and a subsequent shifting of rationale, violate the Plaintiff's rights to procedural due process and equitable treatment under established federal and state educational privacy laws. Given these considerations, the Plaintiff seeks a preliminary injunction to rectify the wrongful grade alterations and to safeguard against further arbitrary and capricious actions by

9

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 100 of 431 PageID #: 359

the Defendants that unjustly impair his academic standing and due process rights. On appeal of Mavis Schorn's decision plaintiff appealed to the Dean of the School of Nursing defendant Pamela Jefferies, she reverted back in contrary to the VUMC privacy office and referred back to language of privacy violations, of note the plaintiff referred the matter to the U.S. Department of Health and Human Services the definitive investigative authority on matters of violations and breaches of the Health Insurance Portability and Accountability Act who found no breach in privacy under HIPPA and further found concern for discrimination and referred the matter to the department of education office of civil rights for further investigation and review based on the evidence provided and the treatment of the plaintiff.

15.     Incorporating the principles discussed in **Northwest Memorial Hospital v. Ashcroft**, 362 F.3d 923 (7th Cir. 2004), the Plaintiff's engagement in accessing patient charts for educational purposes is situated well within the boundaries delineated by HIPAA for healthcare operations. This case, while primarily addressing the privacy rule in a hospital context, elucidates the rigorous standards imposed by HIPAA on covered entities to safeguard protected health information (PHI), except where such access is explicitly permitted by the statute or its implementing regulations.

16.     The Defendants Jessee and Schorn's acknowledgment of the Plaintiff's adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule, further substantiates the claim that the Plaintiff's activities were both legally compliant and integral to their educational advancement in a clinical setting. The 'minimum necessary' rule, designed to ensure that only the essential amount of PHI needed for a specific purpose is accessed, underscores the legality and necessity of the Plaintiff's access to patient information as part of their clinical education. *Northwest Memorial Hospital v. Ashcroft* offers a pertinent legal framework that

supports the argument that accessing patient information for educational purposes, as conducted by the Plaintiff, aligns with HIPAA's provisions for healthcare operations. This includes the training of healthcare professionals and the enhancement of educational programs within healthcare settings. The case underscores the imperative of balancing patient privacy protections with the educational necessities that prepare students for professional practice in healthcare.

17.     Thus, the Plaintiff's actions, conducted under the guidance of Defendants and within the scope of educational requirements, not only adhere to HIPAA's stipulations but are also essential for the practical application of medical knowledge. The acknowledgment by Defendants Jessee and Schorn of the Plaintiff's compliance with the 'minimum necessary' standard affirms this position, highlighting the protected nature of the Plaintiff's educational activities under HIPAA and reinforcing the legal basis for the requested preliminary injunction to safeguard the Plaintiff's rights and educational pursuits within the clinical setting.

18.     In the initial communications, Defendant Jessee informed the Plaintiff that a review of allegations pertaining to a single course was underway. It was only during a subsequent meeting that Jessee conveyed a decision to fail the Plaintiff in two courses, justifying this by citing what she described as a recurrent problem that had previously resulted in a learning contract for the Plaintiff. This assertion, however, overlooks critical context: the prior learning contract referenced by Jessee was associated with an incident in another course, from which the Plaintiff had been withdrawn due to Defendant Harris's inappropriate directives. Harris had instructed the Plaintiff to access lab values remotely during a clinical post-conference, an action substantiated by student witness testimony.

19.     This scenario presents a complex intersection of academic policy and legal considerations, particularly concerning fair treatment and due process for students. A pertinent

11

legal framework for evaluating this situation is provided by *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78 (1978), wherein the Supreme Court articulated standards for academic decision-making and the rights of students to fair process in academic evaluations. The Court recognized a distinction between academic and disciplinary dismissals, suggesting that the former requires less formal due process protections.

20.     Applying this framework, the Plaintiff's situation underscores a potential misapplication of academic policies and a lack of due process in the academic evaluation process. Jessee's actions, predicated on a questionable interpretation of past incidents and without clear adherence to procedural fairness, raise concerns under the principles established in *Horowitz*. The Plaintiff's case highlights the necessity for clear, consistent, and fair academic evaluation processes that respect students' rights to due process, particularly when such evaluations have significant consequences for their academic and professional futures. This action is imperative to protect the Plaintiff's educational trajectory and to uphold standards of fairness and transparency in academic evaluations.

21.     Given the circumstances where a collective student grievance was filed against Defendant Harris, citing disarray within her clinical course—a session which was colloquially dubbed as being "summoned to the principal's office"—it became apparent that Harris presumed the Plaintiff to be the agitator. From that point forward, as documented, Harris engaged in discriminatory and inequitable conduct towards the Plaintiff. This conduct not only undermines the educational environment but also potentially violates the Plaintiff's rights to non-discriminatory treatment as outlined in educational and civil rights legislation. The scenario calls for the application of principles enshrined in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, ensuring that no state shall "deny to any person

12



within its jurisdiction the equal protection of the laws. "In the context of academic evaluations and disciplinary actions, *Goss v. Lopez*, 419 U.S. 565 (1975), provides a relevant legal precedent. The Supreme Court in Goss emphasized the importance of due process within educational settings, specifically that students must be afforded notice and an opportunity to be heard before being deprived of certain rights. Applying this principle, the Plaintiff's request for a preliminary injunction seeks to pause any punitive academic measures rooted in bias or misrepresentation and to initiate a reevaluation of their academic status that aligns with due process and equity.

22. This injunction is crucial not only to rectify the immediate unfair treatment experienced by the Plaintiff but also to reaffirm the broader commitment to fairness, transparency, and equity within academic evaluation processes, in accordance with established legal standards.

23. Subsequent to the complaint against Defendant Harris, she began to display behavior towards the Plaintiff that was both discriminatory and retaliatory in nature. This behavior was so egregious that it necessitated the Plaintiff's removal from her course, a decision underscored by corroborative observations from both students and staff at the Monroe Carell Jr. Children's Hospital, who witnessed Harris's mistreatment, hazing, and bullying of the Plaintiff. Harris escalated her actions by drafting and submitting a fabricated email to the School of Nursing's leadership, falsely accusing the Plaintiff of repeatedly and improperly accessing patient charts. This accusation was not only baseless but also exaggerated, asserting that the Plaintiff engaged in indiscriminate chart review. Despite being aware of these circumstances and the invalidity of the referenced learning contract due to Harris's actions and the subsequent reassignment of the Plaintiff to another instructor by the Equal Opportunity Access (EOA) office, Jessee persisted in seeking grounds to dismiss the Plaintiff.

13



24. This situation underscores a blatant disregard for the principles of fairness and equity, potentially infringing upon the Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, which mandates equal protection under the law. The actions taken against the Plaintiff also call into question adherence to due process rights, as outlined in the landmark decision of *Goss v. Lopez*, 419 U.S. 565 (1975), where the Supreme Court held that students are entitled to certain due process rights before being deprived of educational opportunities.

25. Therefore, the Plaintiff seeks a preliminary injunction to prevent further discriminatory and retaliatory actions and to ensure a reevaluation of his academic standing in a manner that is just, transparent, and consistent with the principles of due process and equal protection. This request aligns with the legal imperative to safeguard individuals from unjust educational practices and to uphold the integrity of academic evaluation processes. The EOA office, due to a lack of investigators, outsourced an investigation to an external, non-Vanderbilt affiliated investigator, Katherine Layman. Ms. Layman conducted her investigation ethically and without bias, uncovering significant discrimination. However, when her findings began to favor the plaintiff, revealing the fear among other nursing students to speak out, Vanderbilt University prematurely terminated Ms. Layman's contract before she could complete her investigation. Additionally, Vanderbilt's Director of the EOA, defendant E. Jacob Cummings, had the reports altered to minimize findings against defendant Cate Enstrom, despite clear violations of the Americans with Disabilities Act and Tennessee law, evidenced by Enstrom's policy to penalize the plaintiff for disability-related absences, undermining the very purpose of disability accommodations.

14



26.     Timothy K. Garrett, an attorney from the law firm Bass, Berry, Sims, retained by

Air Evac LifeTeam Inc. for its investigation, has notable ties to Vanderbilt University. As a

Vanderbilt alumnus and significant financial donor, Mr. Garrett's connections extend into the

legal domain, where he has represented the university in various capacities. His legal service

includes a role as counsel within Vanderbilt University's Office of General Counsel, a department

where Defendant Michelle Tellock serves as Deputy General Counsel. Importantly, Mr. Garrett's

representation of Vanderbilt has encompassed cases related to student dismissals, exemplified by

his involvement in the case of *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018), a

notable lawsuit concerning the appeal of a student plaintiff and Vanderbilt University's student

dismissal processes. This background suggests a potential conflict of interest or at least a close

professional and institutional relationship between Mr. Garrett and Vanderbilt University, which

could influence the impartiality of the investigation conducted by Air Evac LifeTeam Inc.

> a.  Of note a Board of Professional Responsibility report was filed on Michelle Tellock and Timothy
> K. Garrett, while the BPR could not take action because Tellock and Garrett were not technically
> retained by Lucas the BPR did affirm the sharing of information and correspondence about Lucas
> between Tellock and Garrett which was for the benefit of their own clients. The correspondence
> while violations of FERPA, HIPPA, and other principles the plaintiffs believes to be moral
> principles of ethical conduct between Tellock and Garrett, the BPR while not viewed as ethical
> misconduct due to not meeting the standard for a conflict of interest due to Tellock nor Garrett
> being retained by Lucas. However, the report did confirm the communication between Garrett and
> Tellock, which Tellock had denied, despite having Vanderbilt IT start the process of wiping her
> Vanderbilt Email Account of certain records the day plaintiff informed her that he reported her to
> the BPR.

27.     Considering these factors, the Plaintiff seeks a preliminary injunction to ensure

fairness and transparency in the handling of his case, emphasizing the need for an unbiased

review process that adheres to the principles of justice and equity. This injunction is crucial for safeguarding the Plaintiff's rights and interests amid concerns about the intertwined legal and institutional relationships that may affect the outcome of ongoing proceedings.

28.     December 4th 2023, during its "Welfare Panel" interview of plaintiff on defendant porter inquired of plaintiff specifically about a "CIA costume or something related to the CIA in or on your [the plaintiffs] car" this key element of defendant Porter questioning of plaintiff in the context of a "mental health welfare panel" is unrelated to anything related to the plaintiff and being at Vanderbilt, due to the fact the item in mention by defendant porter was an item specifically placed on the plaintiffs vehicle for a specific reasons in connection with the plaintiffs whistleblowing status while still employed at Air Evac LifeTeam Inc. and thus when the plaintiff was not at work and was at Vanderbilt the mentioned item was specifically taken off the plaintiffs vehicle. Thus, the only way in which this information would have been known by defendant porter is with information having been shared between Timothy K. Garrett and defendant Michelle Tellock.

29.     During a meeting in January 2024 regarding Air Evac LifeTeam Inc.'s investigation, attorney Timothy K. Garrett referenced details about the plaintiff's intermittent restrictions on campus access, along with other specific information related to the plaintiff's experiences at the university—information the plaintiff had not disclosed. This suggests that Garrett acquired this knowledge through direct communications with Michelle Tellock. Moreover, Garrett requested documentation from the plaintiff concerning issues at Vanderbilt University, asserting the relevance of these documents to the plaintiff's "credibility." This implies that Garrett had engaged in prior discussions with Vanderbilt representatives to verify the authenticity of any documents the plaintiff might provide.

16



30.    This interaction raises questions about the fairness and impartiality of the investigation, highlighting potential concerns regarding the privacy of the plaintiff's educational records and the confidentiality of communications within the university. Such concerns resonate with the provisions of the Family Educational Rights and Privacy Act (FERPA), codified at 20 U.S.C. § 1232g, which safeguards the privacy of student education records and restricts their disclosure without consent.

31.    Given these circumstances, the plaintiff requests a preliminary injunction to halt any further actions that might compromise their privacy rights and to ensure a fair and impartial investigation into the matters at hand. This request aligns with the legal protections afforded by FERPA and seeks to prevent any undue influence or bias that may arise from the intertwined relationships and communications between Air Evac LifeTeam Inc.'s legal representation and Vanderbilt University officials. The injunction is essential for upholding the principles of fairness, privacy, and transparency throughout the investigative process.

32.    Due to Vanderbilt University's refusal to provide necessary documentation and records, the plaintiff notes that the line of questioning from Timothy Garrett precisely mirrored that of Defendant Porter and Defendant Newsome during the December 4th, 2023, inquiries. This included specific questions about the plaintiff's military affiliation, where Defendant Porter questionably inquired if the plaintiff received "an ID or something," disregarding the letter from the plaintiff's commanding officer, which serves as a more authentic form of verification than the ID casually mentioned by Porter. This approach not only diminished the validity of official military documentation but also bordered on discriminatory conduct. Furthermore, Porter's inquiry about why the plaintiff, if coming from training in Smyrna, Porter specifically inquired why was plaintiff not dressed in his "costume or camouflage" which constitutes an inappropriate

17

and demeaning assumption about military attire, reflecting a lack of respect and understanding of military service and obligations. This behavior underscores potential discriminatory practices and an infringement on the plaintiff's dignity, calling into question the fairness and integrity of the investigative process conducted by Vanderbilt and its representatives.

33.    Additionally, the question in addition to the questions asked by Garrett asked in his investigation interview being identical to the questions asked of the plaintiff by Defendant Newsome and Porter, the same questions were exploited and further invasion of privacies were made by Jeremy Borgoin in conducting his interview and student conduct hearing of the plaintiff in which Borgoin made the decision to ultimatley expel the plaintiff based on the same unjustifiable and un-constitutional cause that the plaintiff legally bought a handgun in May 2023 and was asked if he had access to fire arms the night of December 4th 2023 plaintiff answered in the context of how the questions was asked and interpreted, furthermore the plaintiff is allowed to constitutionally own poses and access firearms with the confines of the law. Vanderbilt cited this as a false statement and as a violation of "policy violation" using the same terminology as Air Evacs reason for termination, and a kind to Air Evac, Vanderbilt also without providing the reference to the specific policy that was violated.

34.    Furthermore, Vanderbilt stated the plaintiff defunded the University through the student care and assistance funds in which the plaintiff requested funding to pay from mental health counseling, and then sought mental health counseling, which the plaintiff never had any possession of fund for, Vanderbilt paid the provider directly for services, Vanderbilt states that the plaintiff lied to the University about the reason the plaintiff needed mental health counseling and therefore the defendants ascertain that the plaintiff did not need mental health counseling, however on the night of December 4th 2023 as part of the "Welfare Panel" which defendants, now

18



since that time state given the following point made by the plaintiff in several appeals, the defendants now state it was not a welfare panel, however defendants will not define this other than being a "meeting that [the Plaintiff] was required to attend", that followed every step of the Welfare Panel process, however was not the welfare panel process, defendants did however illegally record the plaintiff against his knowledge and informed consent, transcribing this recording, with sensitive personal health information, disseminating this information without the knowledge of the plaintiff, an actual HIPPA violation, while deliberately having the school of nursing academically dismiss the plaintiff in an ironic twist of falsely accusing the plaintiff of HIPPA violation despite the Vanderbilt Privacy office and DHHS stating otherwise, while then then using the information from the illegal obtained recording of the non- welfare panel, welfare panel meeting in an poorly orchestrated coercion to construct fraudulent student conduct charges that have no legal standing other than being unconstitutional in a manner that the defendants violated the plaintiffs rights at Vanderbilt University in participation of witness intimidation and whistleblower retaliation thought assisting in the construction in an academic dismissal and expulsion of the plaintiff one semester before for the plaintiff is supposed to graduate. And then mirroring the same reasons or allegation for which Air Evac LifeTeam Inc. accuses the plaintiff of being terminated, in order to discredit and credit a defamation of the plaintiff as a federal witness. In exchange for these services Vanderbilt University on November 17th 2023 received what was originally reported as an anonymous donation, by the nurse journal (See exhibit) however has since been edited with not edit date noted, stating that a 1.25 million dollar donation was made to the Master of Nursing Program directly, this was the program in which the plaintiff was directly enrolled in and 2 weeks prior to the events beginning these actions on December 4th 2023. Furthermore, on Vanderbilts Dare to Grow donation campaign website KKR & Co. is listed

as a donor, and furthermore, is noted having pledged to match every $8,000.00 donated, KKR & Co. will subsequently match the donation up to $8,000.00, In evaluation of the Conway Welch Family Foundation 2022 990-PF submission on 2023-10-30 the foundation only reported one sale and gain of $1,394.149.00 in the gross sale of price for all assets, with a members of their "directors as needed" with affiliations and close relations to principals at KKR & Co.

35. The Plaintiff emphasizes a troubling abuse of authority by Vanderbilt University. In an act of overreach, the university's law enforcement was purportedly employed to conduct investigative actions against the Plaintiff, which exceeded their legal remit and lacked any criminal predicate. This conduct signals a misuse of police resources, ostensibly aimed at amassing information detrimental to the Plaintiff. This may violate not only the ethical expectations of university law enforcement but also the legal limits as set by Tennessee statutes and federal laws.

36. Specifically, this alleged conduct indicates official misconduct under TCA §39-16-402, should it be established that the university police acted beyond their lawful authority. Practices of invasive information gathering without valid justification might contravene the privacy rights accorded by TCA §39-13-601, particularly if it involved intrusive actions into the Plaintiff's private affairs. Moreover, Vanderbilt University Police Department, specifically Defendant Joel Newsome, is accused of exercising compulsion in their investigation, breaching TCA § 39-13-302, which addresses coercion and implies a violation of the Plaintiff's rights against compelled service.

37. The unauthorized dissemination of the Plaintiff's confidential information by university-associated entities implicates a direct infringement upon the Plaintiff's Fourth Amendment protections, which guard against unreasonable searches and seizures. This

20

infringement aligns with the undue intrusion into the Plaintiff's private life without consent, clearly breaching TCA §39-13-601. Additionally, this behavior signifies official misconduct as outlined under TCA §39-16-402, demonstrating an intentional misuse of authority. These actions, surpassing the lawful limits of their institutional roles and misappropriating access to sensitive data for non-professional purposes, unequivocally infringe upon the Plaintiff's state and federal legal rights to privacy and security from unwarranted interference. Moreover, the Defendants' actions resulted in severe health consequences for the Plaintiff by spreading defamatory claims labeling him as a "threat" and a risk to campus security.

38.     This defamation led the Plaintiff to believe that he could no longer safely obtain medical care at Vanderbilt University Medical Center—a facility where he had been a longstanding patient—due to intimidation and the dissemination of false reports to the Vanderbilt University Police Department (VUPD). Assertions were made without merit that the Plaintiff was barred from campus, was "armed and dangerous," and that VUPD should employ "any necessary measures to maintain campus safety" upon encountering the Plaintiff. Given that VUPD officers are authorized to use armed force and patrol the VUMC premises, such unfounded allegations posed a real and tangible threat to the Plaintiff's safety and wellbeing. This defamation, coupled with the implication of potential violent engagement, not only heightened the Plaintiff's anxiety and emotional distress but also potentially obstructed his access to necessary healthcare services.

39.     On June 16, 2023, plaintiff went to defendant Jessee office and requested and impromptu meeting, defendant Jessee was open to a 1:1 private meeting, during the meeting plaintiff meet with Jessee attempting to resolve amicably the disability accommodation issues plaintiff felt he was being discriminated against on. Further, plaintiff brought to Jessee attention a

quid quo pro situation with a Vanderbilt School of Nursing Faculty member in which the plaintiff was being exploited for sexually by a faculty member of the School of Nursing, based on the plaintiff having requested letters of recommendation and asking the faculty member to be the plaintiffs VUSN Alumni Mentor. When Jessee was informed of this and further was informed of the images, and additionally informed of the images the faculty member wad requesting of the plaintiff, Jessee responded and informed the plaintiff that unless the plaintiff was "physically sexually abused" then it was just "adults being adults" and the university does not get involved in those matters.

40.    Given the inaction and then subsequent retaliatory action of defendant Jessee after June 16th 2023 when plaintiff brought concerns of the quid quo pro to her attention, and as a mandatory reporter not only did Jessee fail to fulfill her obligation to report accordingly, Jessee deterred and misinformed the plaintiff about the abilities and options of the plaintiff to seek assistance from Title IX thus demonstrates that defendant Jessee further retaliated in her role as demonstrated by the fact pattern of in a matter of days going from recommending the plaintiff for a last minute interview and photo shoot a feature in the VUSN nursing magazine "as a favor for the school of nursing" to suddenly being retaliated against and the plaintiff is left out of the magazine because of what was reported to the plaintiff as a "page count"

41.    In an egregious display of misconduct, Defendants Jessee, Schorn, and Jefferies actively engaged in manual alterations to Plaintiff's GPA. Upon discovery by the Plaintiff, an extended period of weeks, if not over a month, elapsed without any substantial explanation from Vanderbilt beyond vague references to ongoing discussions with the School of Nursing. It was only after the GPA correction that the School of Nursing disclosed, through its newsletter, the implementation of a new policy on pass/fail courses. This policy, conspicuously aligned with the

22

Plaintiff's circumstances, indicates not only that the School of Nursing deliberately manipulated and erroneously altered the Plaintiff's GPA but also sought to obscure their actions under the guise of a 'computer error'. However, the invocation of a 'computer error' falls short of justifying the subsequent policy change, revealing a clear intent to mislead and rectify the situation without acknowledging the targeted manipulation faced by the Plaintiff.

42.    In contrast to a hostile-environment theory, to bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment. *Miami Univ.*, 882 F.3d at 591 (citing Mallory, 76 F. App'x at 638-39 ; *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691-93 (6th Cir. 2000) ; *Univ. of the South I*, 687 F.Supp.2d at 758 ; see also Baum, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); Schaumleffel, 2018 WL 1173043, at *14 ("The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment."). Furthermore, a deliberate indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Miami Univ., 882 F.3d at 590 (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 28 18 *Z.J. v. Vanderbilt Univ.* 355 F. Supp. 3d 646 (M.D. Tenn. 2018) 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) and citing *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009) ); *K.T. v. Culver Stockton Coll.,* 865 F.3d 1054, 1057 (8th Cir. 2017) (same); *Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (same) (hereinafter " Tr. of Boston Coll. I").

43.    Only claims involving pervasive and widespread harassment are actionable; a single incident is not enough. See *Miami Univ.*, 882 F.3d at 591 ; *Carmichael v. Galbraith*, 574 F. App'x 286, 289-90 (5th Cir. 2014) ; *Haidak v. Univ. of Mass. at Amherst*, 299 F.Supp.3d 242, 270

23



(D. Mass. 2018). Alleged sexual harassment in the form of a 676 failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim. *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014) ; *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011).

44. The Defendants' conduct exemplifies a grave deviation from lawful behavior and potentially constitutes a severe breach of the Plaintiff's rights as upheld by both state and federal laws. A thorough inquiry into these allegations is essential to uphold the integrity of justice and to ensure the appropriate execution of law enforcement within educational institutions.

## IV. LEGAL STANDARD

1. The Court may issue a temporary injunction to prevent immediate and irreparable harm, preserve the status quo, and ensure the effectiveness of the final judgment (Tenn. Code Ann. §29-3-101).

2. Plaintiff must demonstrate (a) a substantial likelihood of success on the merits of the case, (b) that he will suffer irreparable harm without the injunction, (c) that the harm to him outweighs the potential harm to Defendants if the injunction is granted, and (d) that the injunction is in the public interest (Tenn. Code Ann. §29-3-104).

## V. ARGUMENT

1. Substantial Likelihood of Success on the Merits: Plaintiff has strong evidence of Defendants' violations of the Americans with Disabilities Act, the Tennessee Human Rights Act, and breach of contract, among other claims. (Tenn. Code Ann. §4-21-101 et seq., §29-3-105).

2. Irreparable Harm: Without the Court's intervention, Plaintiff faces continued discrimination, loss of educational opportunities, and damage to his professional and personal

24

reputation that cannot be adequately remedied by monetary damages alone. (Tenn. Code Ann. §29-3-102).

3.    Balance of Harms: The harm to Plaintiff in the absence of a temporary injunction far outweighs any potential harm to Defendants, who are merely required to cease their discriminatory, retaliatory, and wrongful actions. (Tenn. Code Ann. §29-3-103).

4.    Public Interest: In the interest of the public, the issuance of this injunction is crucial for it reinforces adherence to established statutes that safeguard against discriminatory practices, retaliatory measures, and contractual violations as set forth in Tenn. Code Ann. §4-21-501. Additionally, in consideration of the prevailing national nursing shortage and the specific demand for qualified nursing professionals within Tennessee, facilitating Mr. Lucas' uninterrupted completion of his nursing education stands to contribute significantly to the public welfare by augmenting the pool of essential healthcare providers.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.  Issue a temporary injunction ordering Defendants to reinstate Plaintiff to the Vanderbilt University and Vanderbilt School of Nursing Master of Nursing Program immediately, without prejudice and with all rights and privileges appertaining thereto.

b.  Order Defendants to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal.

c.  The plaintiff seeks an order from the court compelling the defendants to reverse the grade changes that were improperly and in bad faith by the defendants altered from pass to fail in a retaliatory act.

25

COPY

a. The plaintiff suggests the assignment of an 'Incomplete' status for the courses in question from the Fall 2023 Semester. Furthermore, the Plaintiff seeks a court order to permit re-enrollment in these courses for the Fall 2024 Semester. This request is made despite the Plaintiff's position that a retake of these courses is unwarranted. The Plaintiff offers this compromise as an indication of their readiness to resolve the matter amicably and in a spirit of cooperation with the defendants. Granting this alternative relief is essential for the plaintiff to progress academically and to fulfill the requirements for graduation from the Master of Nursing (MN) Program by the anticipated completion date of Spring 2025. Upon completion and passing of the repeat courses the incomplete course grade will be replaced with the previously earned Passed grade and the Plaintiff will be permitted to continue in the program progression for the Master of Nursing Program into the Spring 2025 to complete his final semester and graduate.

d. Order the Defendants release the acceptance letter of Plaintiff into the previously applied for Doctor of Nursing Practice (DNP) + Post Masters Adult-Gerontology Acute Care Nurse Practitioner (AGACNP) program for the Fall 2024 semester, with an adjusted commencement date set for Fall 2025.

  a. Plaintiff is amendable based on discussion with VUSN to changing the program to either DNP + Post Masters Psychiatric-Mental Health Nurse Practitioner (PMHNP) or DNP + Post Masters Pediatric Nurse Practitioner-Acute Care (PNP-AC) and or Pediatric Primary Care (PNP-PC) the Family Nurse Practitioner Program (FNP), ensuring Plaintiff's career and educational goals are not derailed by Defendants' actions, and also in respect to plaintiff unaddressed and further

harm caused by Defendants inappropriately manipulating the EOA and Title IX
process by denying Plaintiff supportive measures and equal access to educational
programs as required by law.

e. The defendants shall be responsible for all costs and fees associated with providing the
plaintiff a personal security detail during the plaintiff's presence on campus, whether for
academic purposes, non-academic activities, scheduled appointments, or any situation the
plaintiff deems necessary for their safety. This measure is to ensure the plaintiff's
protection and to support their ability to learn without fear of harm or intimidation
stemming from any misuse of power or authority by the defendants. The plaintiff will
secure the services of a duly licensed, insured, and bonded security agency and will
submit the relevant documentation to Vanderbilt University to facilitate the
reimbursement of these expenses. This will be in place for all academic programs
currently and on-going in which the defendant wishes to pursue at Vanderbilt as a
supportive measure for the threat to life made by defendants.

f. Grant such other and further relief as the Court deems just and proper.

## V. Request for Hearing:

a.     Plaintiff further requests that the Court schedule a hearing as soon as possible to
consider this motion for a temporary injunction.

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30 day of March 2024, a true and correct copy of the

foregoing Amended Complaint was furnished to the following party via email, which is

permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee

Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: March 30, 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY

# EXHIBIT 1

COPY

Declaration of Ian Hunter Lucas for Motion for Preliminary Injunction

I, Ian Hunter Lucas, hereby declare:

1. Prior Clearance and Integrity of University Processes: I am deeply concerned with the ongoing pursuit of allegations against me, despite a previous clearance by the university's wellness committee on December 4, 2023. This clearance, affirmed by the Office of the General Counsel, is crucial yet overlooked in the current proceedings, signaling a potential bias or malicious intent undermining my academic integrity. The act of revisiting these cleared allegations, without new evidence or just cause, not only undermines the integrity of the university's processes but also dismisses prior determinations favoring my position.

2. Procedural Integrity and Concerns Over Campus Restriction: The current reinvestigation lacks procedural integrity, evidenced by the absence of new justifying evidence. My responsible handling of personal firearms during a period of emotional distress, demonstrating a commitment to community safety and mental health awareness, has been overlooked. This proactive step, coupled with confirmation from VUPD of no threat posed by me, questions the justification behind the imposed campus restrictions, highlighting a disregard for my well-being and rights.

3. Allegations Without Substantial Evidence: The allegations surrounding the creation of an anonymous email and falsification of medical documentation lack substantial evidence. These charges, seemingly based on misunderstandings or misinterpretations, do not reflect the necessary due diligence. This oversight points to a concerning pattern of disregarding established facts and context in favor of pursuing baseless claims.

4. Request for Dismissal of Charges with Prejudice: Given the concerns raised, including the absence of credible evidence and procedural discrepancies, I formally request the dismissal of all charges against me with prejudice. This motion is based on the foundational lack of evidence, the disregard for procedural fairness, and a failure to acknowledge previous resolutions in my favor.

5. Lack of Due Process and Diligence: The university's inconsistent and misleading statements regarding the process and handling of my case illustrate a clear lack of due process and diligence. This approach not only affects the fairness of the proceedings but also highlights a systemic issue within the university's disciplinary system, further exacerbating my concerns over bias and malicious intent against my academic standing.

6. Misrepresentation of the Welfare Panel Process: The university's portrayal of the December 4th, 2023 meeting as unrelated to the Welfare Panel process contradicts documented policies and undermines the integrity of the Wellness Panel procedures. This misrepresentation and misuse of intended student welfare procedures suggest discriminatory practices against individuals facing mental health challenges, further violating my rights to fair treatment and due process.

7. Baseless Allegations of Defrauding SCAP Funds: The charges alleging I defrauded the university through the Student Care Assistance Program (SCAP) funds are unfounded and discriminatory. My engagement with SCAP was conducted in strict adherence to its established guidelines, aimed at addressing my significant mental health care needs, contradicting the university's claims of misconduct.

COPY

8.Conclusion and Call for Action: In light of the lack of procedural fairness, due diligence, and the evident disregard for previously determined outcomes, I respectfully urge the university to reevaluate the charges against me within a framework of fairness, transparency, and integrity. My commitment to safety, responsibility, and mental health awareness should be acknowledged and not penalized based on unfounded allegations and procedural discrepancies.

9. Threats to Personal Safety and Well-being by Vanderbilt University: I am compelled to express grave concerns regarding Vanderbilt University's egregious actions that have directly threatened my personal safety and well-being. The university has utilized its Vanderbilt University Police Department (VUPD), which also patrols the Vanderbilt University Medical Center, as a means to intimidate and dissuade me from seeking necessary medical care. This intimidation has been executed under the looming threat of arrest or physical harm. Most distressingly, there have been implications communicated to VUPD officers that I was "armed and dangerous," with instructions to use "all necessary force," ominously suggesting the authorization of lethal force. This baseless and dangerous portrayal has placed me in a position of fearing for my life, severely impacting my sense of security and trust in the university's intent to ensure a safe environment for its community members.

Vanderbilt University and my former employer, Air Evac Lifeteam, and the subsequent retaliatory and potentially criminal actions taken against me. This collusion is evidenced by Vanderbilt's acceptance of a donation from Air Evac Lifeteam, which seemingly facilitated discriminatory actions against me, especially in light of my role as a federal witness in an ongoing federal investigation.

Federal Witness intimidation and harassment in conjunction with plaintiff as being a federal whistle blower.

Collusion with Air Evac Lifeteam, Global Medical Response and KKR & Co.
1. Vanderbilt University, in accepting a significant donation from Air Evac Lifeteam, has exhibited a conflict of interest that directly impacts the impartiality and integrity of their actions against me. This donation raises substantial questions regarding the motivations behind my wrongful expulsion and the unjust restrictions imposed upon my academic and campus participation.
2. Retaliation Tied to Federal Investigation: The actions taken by Vanderbilt, in conjunction with Air Evac Lifeteam, suggest retaliatory motives, particularly due to my involvement as a federal witness in an investigation that potentially implicates Air Evac Lifeteam. The timing and nature of Vanderbilt's actions against me align suspiciously with my cooperation in the federal investigation, indicating a concerted effort to discredit and marginalize me.
3. Manipulation of Internal Processes: Vanderbilt's handling of internal investigations and disciplinary actions against me lacks transparency and disregards crucial facts. This approach demonstrates a deliberate manipulation of processes to achieve desired outcomes, further suggesting collusion with Air Evac Lifeteam to retaliate against me for my federal testimony.
4. A Board of Professional Responsibility report demonstrates that defendant Michelle Tellock had conversations in regards to trading information on plantiff to Tim Garrett at Bass Berry Sims who was retained by Air Evac to conduct an internal investigation as part of a wrongful termination for Plantkff being a whistleblower on the company.
5. Plantiff received notice of intern campus suspension and notice from employer at the time Air Evac on December 4th, 2023 on the same day exactly 1hr and 18min apart.
6. Vanderbilts inclusion of "Disorderly Conduct"despite no disorderly conduct being brought to the plantiff attention during the conduct hearing proceedings, however this was included in the plaintiffs explosion letter is further evidence and allusions to Air Evac claims and needing

COPY

Vanderbilt and Air Evac reason for expulsion and termination of employment to match on which both agreed to use "policy violation".

7. KKR & Co is listed as a donor on the Vanderbilt "Dare to Grow" website.
8. In November 17th 2023 an anonymous donor made a 1.25 million dollar donation to the plaintiffs program of study directly for the Master of Nursing Program. It is evident this donation was made by KKR & Co. Through the Conway Whelch foundation in order to hide the truth of the source of the donation.

The collusion between Vanderbilt University and Air Evac Lifeteam, coupled with the retaliatory and potentially criminal conduct directed at me, underscores a profound breach of legal and ethical standards. This conduct has been reported to federal law enforcement, highlighting the serious nature of the allegations and the need for immediate intervention.

Given these circumstances and the additional evidence of Vanderbilt's collusion and misconduct, I reiterate my request for a comprehensive investigation into Vanderbilt University's actions. This investigation should extend to examining the nature and influence of the donation from Air Evac Lifeteam, especially in relation to decisions affecting my academic standing and rights.

Therefore, I submit this declaration in support of my motion for preliminary injunction, seeking redress from the prejudicial actions unjustly taken against me. I affirm the accuracy of the information herein to the best of my knowledge and belief.

Executed on March 25th 2024


Ian Hunter Lucas

# EXHIBIT 2



## RE: N5801 Accommodations

### Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>

Mon 8/21/2023 2:06 PM

To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc:Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>;Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>

Hi Ian,

All students are held to the same standard for the first absence which includes a ten-point deduction. However, your accommodation will allow for a second absence with the ability to earn points (again with the ten-point deduction) rather than the zero.

This is due to the need to accurately measure core course competencies and grade accordingly. This course is designed with an emphasis on collaborative group active learning activities. Excessive absences and make-up experiences may negatively impact the trajectory of learning in this course.

We believe you will be successful in the course while meeting your disability needs and look forward to supporting you this semester.

Thanks,

Drs. Enstrom & Robbins

## Cate Enstrom DNP, AGACNP-BC, CNE

Assistant Professor of Nursing
School of Nursing I Vanderbilt University
615.322.7819 I cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044

**From:** Lucas, Ian H
**Sent:** Monday, August 21, 2023 11:01
**To:** Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
**Cc:** Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
**Subject:** Re: N5801 Accommodations

Dr. Enstrom,

Could you clarify this for me, if I am absent due to a medical reason I will be deducted points?

"The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero)"

Thanks,

Ian

Get Outlook for iOS

**From:** Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
**Sent:** Monday, August 21, 2023 10:56:20 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
**Subject:** N5801 Accommodations

    Hi Ian,

COPY



We have received a letter from Student Access Services indicating the need for appropriate classroom and testing accommodations for N5801 Human Experiences in Health and Illness Across the Lifespan II fall 2023 semester. The course is intentionally designed to provide an inclusive and accessible learning environment. However, when there is a need for additional support, the HEHI faculty are eager to make those accommodations.

I have addressed your requests as it this applies for all the rotations.

1. **Alternative testing:**
   a. *Ability to take breaks*– You are permitted to take breaks while taking exams. We will review any possible remote proctor violations this may possibly flag and dismiss it as long as all other exam guideline are followed. Do not use or view reference materials during your breaks.
   b. *Extra time (2x)* –Extra time (2x) has been applied for all your exams. The ATI quiz and pre-class quizzes are not timed and open for a full week. This will be due at the original time with no adjustment to the deadlines. In-class case-study assignments completed with group members will remain due at the end of the class session.

2. **Classroom modifications**
   a. *Disability Related Absences/Attendance Policy:*
      - In the event of missed class session, student will be responsible for obtaining materials covered in class. Student is expected to demonstrate professional responsibility by notifying course instructor and course coordinator as far in advance as is possible when it becomes apparent that they will be absent from class.
      - Exams missed for medical reasons will be rescheduled on a case-by-case basis, to be completed as soon as possible after the originally scheduled exam time.
      - If student misses class and is unable to complete and submit the in-class case study by the end of the class session due to absence, the student will be required to complete a make-up case study assignment.
      - The make-up assignment will be a single case study that is moderately expanded in depth compared to the in-class case studies, but very similar with regard to content. The student should complete the make-up case study independently. The make-up case study will be due one week from the date of the missed class session.
         - The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero).
      - *Absences exceeding more than two cumulative class sessions may represent a significant disruption to the learning trajectory (due to the collaborative aspect of group work and collective learning). Absences exceeding more than two cumulative class sessions warrants discussion with the course coordinator and program director regarding the possibility of an adjustment to the planned program of study.*
   b. *Leave class/take breaks as needed:*
      - For each individual class session, student must attend for at least half of the scheduled class period to constitute attendance for the week. If student misses more than half of a single class session that would constitute an absence and a make-up activity will be assigned for that week.

Would you please respond to this email to indicate whether or not these proposed accommodations are appropriate? Additionally, we are always happy to meet (in person or

COPY



online) to discuss how your request for classroom and testing accommodations might be met. We want you to feel welcomed and equipped to be successful in the course.

Have a lovely day,

Drs. Enstrom & Robbins



Cate Enstrom DNP, AGACNP-BC, CNE
Assistant Professor
School of Nursing I Vanderbilt University
615.322.7819 I cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044
461 21st Ave S, Office 543 SON
Nashville, TN 37240
Strengths: Significance I Futuristic I Individualization I Focus I Maximizer
Pronouns: she/her/hers

COPY

# EXHIBIT 3

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

 **Jessee, Mary Ann**    11:59 AM
To You, Jamerson, Neil E and Privacy Office    



Hello Ian,

We are reaching out today regarding electronic health records that were
printed by you on 9/19/23, 10/10/23, and 10/17/23. These printed
documents were part of the health records of patients to whom you were
assigned in your VUSN course clinical experiences, but the dates and/or
times of this printing was outside of your scheduled clinical time in the
hospital. Therefore, we need you to return those documents to us for
proper disposal. Please respond to confirm you still have those documents
and we will determine a time and place for you to return them. If you do not
still have them, please indicate how and where you disposed of them.

Please respond to this email no later than end of day Friday, January 12.
Failure to do so will result in referral to Student Accountability in addition to
any other remedies available to the University and Vanderbilt University
Medical Center.

Thank you,
Mary Ann Jessee and Neil Jamerson

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240



**Moore, Kerry E**

kerry.e.moore@vumc.org

· · ·

To:  You ian.h.lucas.1@Vanderbilt.Edu

Jessee, Mary Ann mary.a.jessee@Vanderbilt.Edu

Cc:  Jamerson, Neil E neil.e.jamerson@Vanderbilt.Edu

Privacy Office Privacy.Office@vumc.org

⊖  PERMISSIONS - Restricted

Wednesday, January 10, 12:27 PM

You don't often get email from kerry.e.moore@vumc.org. Learn why this is important

Hi Mary Ann & Ian – since these documents were placed in a shred bin there is no breach. Thank you for reaching out to the Privacy Office.



Kerry

Kerry E. Moore, MHIIM, RHIA
Program Manager, Privacy Office
Vanderbilt University Medical Center Privacy.Office@VUMC.org |
Phone 615.936.3594 | fax 615.343.6966 | Kerry.e.moore@vumc.org

· · ·



## 5815 course information

### Jessee, Mary Ann <mary.a.jessee@Vanderbilt.Edu>
Mon 12/11/2023 1:19 PM

**To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>**

Hello Ian

There has been an anonymous allegation that you improperly accessed patient information in the VUMC health record this semester. The course coordinators are investigating this allegation and I have recommended your grade for 5815 Nursing Care of Childbearing Families be changed to an incomplete while the investigation is in process. As the program dean, I wanted you to understand the reason for the grade change if you saw it. You will be contacted as is deemed necessary as the investigation progresses.

Thank you.
MAJ

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240
Office (615) 343-1629 | **mary.a.jessee@vanderbilt.edu**
@majnotmadge
She, her, hers
**Strengths:** Relator | Learner | Responsibility | Achiever | Analytical

COPY

# EXHIBIT 4

COPY

 ≡ NurseJournal   SEARCH PROGRAMS

Featured  **Career**  Lifestyle  Nurse Spotlight  Student Resources

 SHARE THIS    

# Vanderbilt School of Nursing Gets $1.25 Million for Master of Nursing Program

 **by Ann Feeney, CAE**
Published November 17, 2023 · 2 Min Read

✓ Edited by  **Scott Harris**

Vanderbilt University's School of Nursing received $1.25 million to fund the Conway-Welch Second Degree in Nursing Scholarship. Learn more about the gift and MSN programs.



Image Credit: SeanPavonePhoto / iStock / Getty Images Plus

- The Vanderbilt University School of Nursing received a $1.25 million pledge to fund a master of science in nursing scholarship.

COPY

# EXHIBIT 5

COPY



# Week of March 4, 2024

*VUSN Student Newsletter and Event Reminder*

## Announcement

1. The 2023-2024 VUSN Student Handbook was revised on February 27, 2024, to add information regarding Pass/Fail courses to the VUSN Academic Policies and Regulations section, sub-section Grading System.

2. The front doors to VUSN will remain VUID card or GET app access through the rest of the semester while building access remains under review by the university. Please have your VUID card or the app with you at all times. If neither works, contact Vanderbilt Card Services at 615-322-2273 or email commodorecard@vanderbilt.edu. Questions? Contact the VUSN

COPY

# EXHIBIT 6


COPY
EFILED 03/30/24 09:15 AM CASE NO. 246655 Joseph P. Day, Clerk


Edit

# VUPD presence on campus



**VUSN Deans Office**
VUSN Stu - Current

5:48 PM



Good afternoon. Some of you here on campus may have noticed VUPD officers around the building this week. We wanted to let you know that out of an abundance of caution, they've increased visibility of their patrols due to a VU disciplinary action that recently took place. VUPD has always patrolled the school several times a day, but they've been more visible recently. You'll probably see them around off and on for the rest of the week.

VUSN Dean's Office


## RE: Bourgoin Medical Licenses.

### Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>

Wed 3/6/2024 6:05 PM

To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc:Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>;julia.c.morris@vumc.org <julia.c.morris@vumc.org>

**Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

Dear Ian:

Should you need to seek emergency medical care at VUMC's emergency department, you are permitted to seek medical services there without violating the conditions of the campus prohibition/outcome letter.

VUMC complies with the Emergency Medical Treatment and Labor Act (EMTALA) and provides a medical screening exam (MSE) to individuals who present to the emergency department to determine whether an emergency medical condition (EMC) exists, and provides stabilizing treatment to individuals with an EMC.
VUMC confirms that Jeremy Bourgoin is not employed by, affiliated with, credentialled by, nor provides any professional or medical services at VUMC.

VU and VUMC consider this matter closed.

Thank you.
Michelle

From: Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Sent: Wednesday, March 6, 2024 4:10 PM
To: Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org
Subject: Re: Bourgoin Medical Licenses.

**Caution:** This content is intended for the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

I am closing this communication and dialogue and will forward this email chain and the letter I received to the TN Board of Health as EMTALA Complaint and refusal of services for emergency care provisions if needed.

Get Outlook for iOS

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Wednesday, March 6, 2024 2:14:55 PM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org <julia.c.morris@vumc.org>
**Subject:** Re: Bourgoin Medical Licenses.

Given there has been no follow up or revision to this:

Is VUMC affirming that Bourgoin has medical privileges and license and I should email the student accountability office for a Medical Screening Exam (MSE) as per EMTALA if I desire to seek care at VUMC for non-scheduled appointments or procedures i.e. emergencies?

And also does Vanderbilt University have jurisdictional provisions of the span and control of the VUMC entity access and control of visitors and patients?

Ian H. Lucas



Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:50 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org <julia.c.morris@vumc.org>
**Subject:** Re: Bourgoin Medical Licenses.

Added back in Ms. Morris.

Regards.

Ian H. Lucas

Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:49:03 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Subject:** Re: Bourgoin Medical Licenses.

Ms. Tellock

Please understand that the matter at hand is final and not open to discussion or negotiation. Specifically, you must either remove the statement:

"The restriction includes Vanderbilt University Medical Center except that you may attend medical appointments or procedures as well as obtain medicine from the pharmacy"

or provide me with evidence of Mr. Bourgoins's medical license and privileges at VUMC. Since VUMC operates as an independent entity, it is inappropriate for another organization to make decisions affecting patient care on its behalf. Therefore. I will decide independently whom to involve in my care at VUMC. Your approach in this matter is unacceptable.

I am looping back in VUMC legal counsel to make them aware that your restrictions I interpret as follows. that I want to bring to there attention that the directive from the Vanderbilt University concerning the limitations on my access to services at Vanderbilt University Medical Center (VUMC) I view as a violation infringe upon the Emergency Medical Treatment and Labor Act (EMTALA). EMTALA mandates that hospitals with emergency departments provide care to anyone needing emergency healthcare treatment regardless of their legal status, citizenship, or ability to pay. As such, the as set for by Vanderbilt University as a restriction subject to arrest and trespass I interpreted as intimidation to limit my access to emergency services at VUMC is concerning and potentially unlawful.

Therefore, I request either the removal of the specific restriction mentioned in your communication or a clarification of how this directive complies with EMTALA requirements. It is essential to ensure that any actions taken do not inadvertently contravene federal law (which by now I know that Vanderbilt University does think is waiverable) but VUMC does carry a greater degree of liability to restrict my rights to access emergency medical services in allowing such actions to be placed in writing.

Sincerely.

Ian Lucas

Best regards,

Ian Lucas

Get **Outlook for iOS**



**From:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:33:23 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>
**Subject:** RE: Bourgoin Medical Licenses.

> **Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is
> PRIVILEGED and CONFIDENTIAL.

Dear Ian

I am removing Ms. Morris from this email chain, because she is legal counsel to the Medical Center (as you noted  a separate legal entity)  and your inquiry relates to your education records at Vanderbilt University.

The campus restriction contained in the outcome letter you received yesterday permits you to go to VUMC for medical services, and it does not identify any specific medical services that can or cannot be provided to you.  If you would like to request a modification to the campus restriction, you may make such request by providing a justification to **studentaccountability@vanderbilt.edu** for consideration.

Thank you.
Michelle

From: Lucas, Ian H <**ian.h.lucas.1@Vanderbilt.Edu**>
Sent: Tuesday, March 5, 2024 1:52 AM
To: Tellock, Michelle <**michelle.tellock@Vanderbilt.Edu**>  Bourgoin, Jeremy Layne
<**jeremy.l.bourgoin@vanderbilt.edu**>
Cc: **julia.c.morris@vumc.org**
Subject: Bourgoin Medical Licenses.

Dear Ms. Tellock,

I am writing to request a copy of Mr. Bourgoin's medical license. In his letter of expulsion, he specified the medical services that I am permitted to receive at VUMC. Given that VUMC operates independently, identifying specific medical services that can be provided to me falls under the category of a medical action  akin to prescribing. Consequently, if Mr. Bourgoin deemed it within his purview to delineate which medical services are accessible to me at VUMC, it is imperative for me to verify his medical licensing status, which I could not find in the health licensure verification database. I also wish to ensure that his privileges are duly registered with VUMC.

Thank you for your attention to this matter.

Best regards,

Ian

Get **Outlook for iOS**

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro** *Se* | ) ) ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) **MOTION TO FILE AMENDED** |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) **COMPLAINT AND RELATED FILINGS** |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) **UNDER SEAL** |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** ) | |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** ) | |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) |
| **Robingale Panepinto, Melissa Lord,** | ) |
| **Brittany Kirby, Shannon Ellrich,** | ) |
| | ) |
| *Defendants* | ) |

## MOTION TO FILE AMENDED COMPLAINT
## AND RELATED FILINGS UNDER SEAL

Pro Se plantiff Respectfully submits this Motion to request permission from the Court to

file an Amended Complaint and to seal all previous and future filings containing sensitive and

confidential information related to this case. The necessity for this request arises from the

inclusion of personal health information protected under the Health Insurance Portability and

Accountability Act (HIPAA), educational records covered by the Family Educational Rights and

Privacy Act (FERPA), and other sensitive details requiring confidentiality to protect personal

privacy and comply with federal and state laws.



1. Basis for the Motion

As a pro se plaintiff, I seek to amend my complaint to add critical facts and assertions that involve confidential information. Public disclosure of these details could contravene privacy rights safeguarded by HIPAA and FERPA, risk personal privacy, and potentially impact the fairness of the legal proceedings.

2. Legal Foundation for Sealing Documents

This Motion calls upon the Court's authority, as granted by Tennessee law and the Tennessee Code Annotated (TCA), to seal records in circumstances where privacy must be preserved. Tennessee's legal framework and precedents acknowledge the Court's discretion to protect sensitive information from public exposure.

•       TCA Considerations: This Motion is supported by relevant provisions within the TCA, emphasizing the confidentiality of health and educational records and the judiciary's role in safeguarding such information during legal disputes.

3. Requested Court Action

I, Ian Lucas, respectfully request the Court to:

a. Grant permission to file my Amended Complaint under seal.

b. Seal all prior filings in this case that contain sensitive and confidential information, as specified by me, the pro se plaintiff.

c. Issue any other orders deemed necessary by the Court to maintain the confidentiality of the information involved in this case.

4. Conclusion

Considering the sensitive nature of the disclosed information and its potential impact on privacy rights and the integrity of the legal process, sealing the specified documents serves the interests of justice by protecting the privacy of all parties involved. I, therefore, kindly ask this Court to approve my Motion to File an Amended Complaint and Related Filings Under Seal and to seal all relevant previous filings.

Submitted respectfully,

COPY 

2EFILED 04/08/24 07:42 PM CASE NO. 24C655 Joseph P. Day, Clerk

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

IAN H. LUCAS

Dated: March 31, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 143 of 431 PageID #: 402



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31 day of March 2024, a true and correct copy of the foregoing Amended Complaint was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: March 31, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro** *Se* | ) ) ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) **MOTION TO SET** |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) **ON** |
| **Marissa Shulruff, E. Jacob Cummings,** | ) **MOTION TO SEAL** |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** ) | |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** ) | |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) |
| **Robingale Panepinto, Melissa Lord,** | ) |
| **Brittany Kirby, Shannon Ellrich,** | ) |
| | ) |
| *Defendants* | ) |

## MOTION TO FILE AMENDED COMPLAINT
## AND RELATED FILINGS UNDER SEAL

The Plaintiff, Ian Hunter Lucas, proceeding pro se, hereby respectfully requests this Honorable Court to schedule an

expedited hearing concerning the Plaintiff's Motion to Seal Case, citing the following justifications grounded in

statutory and case law:

1.     Protection of Sensitive Information: Pursuant to T.C.A. § 4-3-7306, which allows for the sealing of

records under certain conditions to protect the privacy or security of individuals, the Plaintiff seeks to seal the case

to prevent potential harm that public access to sensitive information could cause.

COPY
2. Federal Privacy Rights: In alignment with the privacy protections outlined in the United States Code, specifically 5 U.S.C. § 552a (Privacy Act of 1974), which governs the collection, maintenance, use, and dissemination of personally identifiable information by federal agencies, the Plaintiff argues for the sealing of records to protect personal data from unwarranted public disclosure.

3. Precedent for Sealing Cases: The necessity for sealing this case is further supported by legal precedents such as Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981), where the court recognized the court's discretion to seal records to protect privacy or other interests outweighing the public's right to access.

4. Immediate Risk to Privacy and Safety: The urgent need for a hearing on the motion to seal is underscored by the ongoing and immediate risk to the Plaintiff's privacy and safety, exacerbated by public access to the case documents. Prompt court intervention is required to mitigate these risks effectively.

5. Balancing Public Interest with Individual Privacy Rights: The Plaintiff contends that the interests of privacy and security, as underscored by T.C.A. and federal statutes, justify an exception to the general principle of public access to judicial records. The court's expedited review and approval of the Motion to Seal Case are essential for safeguarding the Plaintiff's personal information and well-being.

WHEREFORE, the Plaintiff, Ian Hunter Lucas, earnestly requests that this Honorable Court grant an expedited hearing on the Motion to Seal Case. The Plaintiff asserts that sealing the case is necessary to protect against significant personal harm, in accordance with applicable Tennessee statutes, federal laws, and judicial precedents. Immediate judicial consideration is sought to prevent further damage to the Plaintiff's privacy and safety.

Dated: April 8th 2024

Respectfully Submitted,

Ian Lucas

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126 (910)
872-3577 (telephone)
lucasianhunter@outlook.com

COPY

EFILED 04/08/24 09:26 PM CASE NO. 24C655 Joseph P. Day, Clerk

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of April 2024, a true and correct copy of the foregoing Motion to Set as furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: April 8th, 2024

Ian H. Lucas
Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

Page 02 of 08

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 147 of 431 PageID #: 406

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) |
|  | ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) **NOTICE OF HEARING** |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) **on MOTION to** |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) **SEAL** |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** | ) |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** | ) |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) |
| **Robingale Panepinto, Melissa Lord,** | ) |
| **Brittany Kirby, Shannon Ellrich,** | ) |
|  | ) |
| *Defendants* | ) |

## NOTICE OF HEARING

In accordance with the Tennessee Rules of Civil Procedure and the relevant sections of the Tennessee Code Annotated (TCA), this notice hereby informs that Ian Hunter Lucas, acting in his own legal representation (pro se), has formally submitted a Motion to Schedule a Hearing regarding the Motion to Seal within case number 24C655. This motion requests the court to designate a hearing date at the earliest possible convenience on the court's docket, for the thorough evaluation and determination by the presiding judge.

COPY

## Hearing Details:

**Date**:May 17th, 2024

**Time**: 9:00 am

**Location:** Davidson County Courthouse, Nashville, TN

Dated: April 9th, 2024          Respectfully Submitted,

Ian Lucas

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com



**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of April 2024, a true and correct copy of the notice of hearing was furnished to the following parties and all defendants via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: April 9th 2024

<div align="right">

*lan Lucas*

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

</div>



**Ian H. Lucas** *(Plaintiff Pro Se)*
221 Charleston Ave
Pleasant View, TN, 37126
910-872-3577
lucasianhunter@outlook.com

April 9, 2024

**Kevin C. Klein**
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
kevin.klein@kleinpllc.com

**Denmark J. Grant**
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

**Tim K. Garrett** *(defendant)*
Bass, Berry & Sims PLC
150 Third Avenue South
Suite 2800
Nashville, TN 37201
615-742-6270
tgarrett@bassberry.com

**Maja A. Hartzell** *(defendant)*
Bass, Berry & Sims PLC
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(727) 241-2971
Maja.hartzell@bassberry.com

**RE: Subject: Mediation Proposal to Resolve Case No. 24C655 - Lucas v. Tellock et al.**

Dear Opposing Counsel,

I hope this message finds you well. In the spirit of judiciously advancing the case of Lucas v. Tellock et al., Case No. **24C655**, I have been carefully considering strategies that would serve the best interest of all involved by curtailing unnecessary expenditures of time and resources. I propose that we take a collaborative step towards a resolution that could circumvent the need for extended courtroom proceedings.

The confidentiality and less confrontational setting offered by mediation, I believe, might very well present us with the unique opportunity to craft a mutually satisfactory outcome. This aligns with the ethos of dispute resolution encouraged by our legal system, wherein mediation is not only a method to alleviate court dockets but also a means to reach more amicable settlements.

The state of Tennessee clearly supports the mediation process, as exemplified by Tennessee Rule 31, which provides

COPY

a structured alternative dispute resolution framework. This sentiment is echoed in TCA § 123(f), which advocates for the utilization of mediation to resolve disputes. Federal statutes also endorse this view, emphasizing mediation as a preferred alternative to litigation.

Furthermore, the value of mediation is highlighted in the case of **Benton v. Vanderbilt Univ., 137 S.W.3d 614, 617 (Tenn.2004),** where the court held that mediation plays a significant role in dispute resolution, particularly in complex cases. Additionally, the decision in **Haley v. Univ. of Tenn.–Knoxville, 188 S.W.3d 518, 522 (Tenn.2006)** further illustrates the judiciary's encouragement for parties to engage in mediation to settle disputes amicably and efficiently.

Given the legal precedents and the encouragement from both state and federal levels to use mediation, I suggest that we proceed with arranging a mediation session. Should we not reach an agreement on voluntary mediation, please be advised that I am prepared to seek a Motion to Compel Mediation. The precedents set forth by Tennessee courts, and the supportive framework of Rule 31, suggest a likelihood that the court would grant such a motion.

I hope we can agree on this constructive step forward without resorting to additional court directives. I would like to discuss this further and coordinate on the selection of a suitable mediator and the scheduling of the mediation session at your earliest convenience.

Thank you for considering this collaborative approach. I anticipate your prompt response and am looking forward to a fruitful dialogue. I trust we can reach a consensus on this proactive measure without necessitating further court intervention. A conversation about the potential for mediation at your earliest convenience would be greatly appreciated.

Thank you for considering this request. Your prompt response is expected and valued.

Sincerely,

Ian H. Lucas
Plaintiff Pro Se

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) |
|  | ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) **NOTICE OF HEARING** |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) **on MOTION for** |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) **PRELIMANARY INJUNCTION** |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** | ) |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** | ) |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) |
| **Robingale Panepinto, Melissa Lord,** | ) |
| **Brittany Kirby, Shannon Ellrich,** | ) |
|  | ) |
| *Defendants* | ) |

## NOTICE OF HEARING

PLEASE BE ADVISED that the undersigned, Ian Hunter Lucas, acting pro se, has submitted a Motion for Temporary Injunction to this Court. A request has been made for this motion to be placed on the court's next available docket, seeking prompt consideration by the presiding judge.

### Hearing Details:

**Date**:April 19th, 2024 **Time**: To be assigned by the Court

**Location**:Davidson County Courthouse, Nashville, TN

Page 1 of 10

COPY

The motion seeks immediate judicial intervention to prevent ongoing discriminatory practices, retaliation, contract breaches, and other wrongful actions as detailed in the motion, pending the final outcome of this case.

It is imperative for all parties to await the court's notification for the specific hearing date and time, which will be determined based on the court's next available docket availability. Your participation in this hearing is mandatory. Non-attendance may lead to the motion being granted in your absence due to lack of opposition.

Dated: April 2nd, 2024

Respectfully Submitted,



IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April 2024, a true and correct copy of the notice of hearing was furnished to the following parties and all defendants via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated:April 2nd 2024

Ian Lucas

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com



## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro Se** | ) ) ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) ) |
| Mary Ann Jessee, Michelle Tellock, | ) |
| Joel Newsome, Melissa Porter, G.L. Black, | ) |
| Clarise Gamez, Neil Jamerson, Jeremy | ) |
| Bourgoin, Mavis Schorn, Pamela Jefferies, | ) |
| Marissa Shulruff, E. Jacob Cummings, | ) **AMENDED COMPLAINT** |
| Jill Harris, Heather Robbins, Cate Enstrom, | ) **JURY DEMAND** |
| Chrystal Ritchie, Angela Weaver, Mary Roy, | ) |
| Michael Fazi, Feylyn Lewis, Tracey George | ) |
| Cybele Raver, Daniel Diermeier, Melanie Lowe | ) |
| Timothy Garrett, Maja A. Hartzell | ) |
| Ernie Rushing, Sara Donahoe, | ) |
| Terry Walker, K. Melissa Smith Hayes, | ) |
| Nancy Wise, Lacey Cross, Monika Do, | ) |
| Carrie Plummer, Ellen Schoen, Judson Smith, | ) |
| Jessica Wellette, Melanie Morris, | ) |
| Robingale Panepinto, Melissa Lord, | ) |
| Brittany Kirby, Shannon Ellrich. | ) |
|  | ) |
| *Defendants* | ) |

## AMENDED COMPLAINT

Plaintiff, Ian Hunter Lucas (hereinafter "Plaintiff"), brings this Complaint against the

Defendants, **Michelle Tellock, Joel Newsome, Melissa Porter, G.L. Black, Mary Ann Jessee,**

**Clairse Gamez, Neil Jamerson, Jeremy Borgoin, Mavis Schoen, Pamela Jefferies, Marissa**

**Shulruff, , E. Jacob Cummings, Jill Harris, Heather Robbins, Cate Enstrom, Chrystal**

**Ritchie, Feylyn Lewis, Tracey George, Cybele Raver, Daniel Diermeier, Melanie Lowe,**

**Timothy Garrett, Ernie Rushing, Sara Donahoe, Terry Walker, K. Melissa Smith Hayes,**

**Nancy Wise, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich,** (collectively "Defendants"), for breach of contract, negligence, discrimination on the basis of disability in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Tennessee Human Relations Act, and retaliation for Plaintiff making complaints regarding the discrimination that he experienced due to Vanderbilt University's actions as well as other wrongful actions under the laws of the United States and the State of Tennessee, and alleges as follows:

## PARTIES

1.      Plaintiff, Ian Hunter Lucas, is an adult male citizen of the United States, who is a resident of Pleasant View, Tennessee, and was a graduate student at the Vanderbilt University School of Nursing Master of Nursing (MN) Program from January 2023 to December 2023.

2.      Mr. Lucas has been diagnosed with Crohn's disease and is thus an individual with a disability, as that term is defined in the Americans with Disabilities Act because he has an actual impairment that substantially limits one or more of his major life activities.

3.      At all relevant times, Mr. Lucas has been a "qualified individual" with a disability because he is able to be a functional successful student with the reasonable accommodations he received as a student with a disability.

4.      At all relevant times to this lawsuit, Mr. Lucas was a student of Defendant Vanderbilt University, as a graduate student at the Vanderbilt University School of Nursing to obtain a Master of Nursing degree.

5.      Defendant Vanderbilt University is an educational institution in Nashville, Tennessee, and Defendant Vanderbilt School of Nursing is a component thereof.

6. Defendant Vanderbilt University ("Vanderbilt") is a private, non-profit educational institution, which receives significant federal funds, and is incorporated and does business in Nashville, Tennessee.

7. On information and belief, Vanderbilt University has had formal non-discrimination and anti-harassment policies in place since July 2016; those policies specifically include protections from discrimination, harassment, and retaliation based on, among other things, disability.

8. In the submitted civil complaint, the Plaintiff advances claims against a cohort of Defendants, encompassing **Tracey George, Cybele Raver, Daniel Diermeier, Melanie Lowe, Ernie Rushing, Sara Donahoe, Terry Walker, Teresa Rogers, Julie Perry, K. Melissa Smith Hayes, Nancy Wise, Jane Zubulake, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Mia Wells, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich,** among others. These Defendants are alleged to have failed in their ethical and legal duties by not reporting known misconduct at the university to the Department of Education and by not protecting the Plaintiff, as was their obligation as educators and administrators.

9. These Defendants, who held positions of influence and governance, are accused of neglecting their professional responsibilities to act in the best interest of the Plaintiff. Their inaction—and potential complicity—in the face of alleged university wrongdoing, has purportedly led to considerable harm to the Plaintiff, including defamation. The Plaintiff posits that such breaches may have been committed with either deliberate intent or through neglect, a determination which is sought to be made in the course of legal adjudication. The Plaintiff, therefore, calls for a diligent inquiry into both the overt actions

COPY

and omissions of these Defendants, to establish the extent of the damage inflicted upon the

Plaintiff's academic and professional life, and to address the personal consequences of the

Defendants' alleged ethical failures.

## JURISDICTION
## AND VENUE

10.    This Court has jurisdiction over Mr. Lucas' claims pursuant to 28 U.S.C. §1331 and §1343 since the matters in controversy arise under the laws of the United States.

11.    This Court also has jurisdiction under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq*., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, as Title II of the ADA, prohibits discrimination in the provision of public services.  Section 202 of the Act, 42 U.S.C. §12132 (Supp. 1991), the Rehabilitation Act of 1973, §§ 504 and 505, as amended.

12.    This Court also has jurisdiction under 28 U.S.C. §1367 over the supplemental state law claims made by Mr. Lucas in seeking relief under the Tennessee Human Rights Act, T.C.A. §4-21-101 *et. seq*.

13.    This Court has personal jurisdiction over both Plaintiff and Defendant.

14.    At all relevant times, Defendant had more than 15 employees, and thus is subject to the requirements of the ADA (42 U.S.C. §12101 *et. seq.* and the Tennessee Human Rights Act (T.C.A. §4-21-101 *et. seq.*).

15.    Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. §1391(b)(c) as Defendant is located in the District and subject to the jurisdiction of the Court, and because the events giving rise to the claims raised herein occurred in this judicial district.

## NATURE OF ACTION

16.    This action seeks relief for Defendants' wrongful actions, including breach of contract, negligence, and intentional infliction of emotional distress, leading to

damages through a knowing and inflicting action with the intent to do harm upon the Plaintiff, including wrongful expulsion, whistleblower retaliation, witness intimidation, and obstruction of justice in violation of applicable state and federal laws and principles of equity.

17.    Plaintiff seeks redress for Defendants' wrongful and discriminatory actions that have caused significant educational, professional, and personal harm to Plaintiff.

18.    Further through the process of discovery and trial evidence. Plaintiff will demonstrate Manipulation of External Investigations, Collusion, Witness Intimidation, and Obstruction of Justice, in which the plaintiff is involved in as a federal witness to a whistleblower fraud, waste and abuse case under seal with subpoenas issued under seal by the United States District Court of the Western District of Tennessee, prosecution and representation for the United States led by Sara Williams, Assistant United States Attorney for the United States Attorney's Office of the Western District of Tennessee, and lead investigative agency Department of Health and Human Services Office of Inspector General led by Special Agent Ed Miller.

19.    Defendants' actions demonstrate collusion with the defendant of this investigation in which defendants were aware of a $1.25 million dollar "donation" provided by the Defendants' and the Plaintiff's former employer as a bribe to academically dismiss and expel the Plaintiff. The reason for expulsion exactly matches the investigation determination and "policy violations" as the reason for the wrongful termination. This served as a mutual and benefiting purpose for the Defendants, who were under investigation at the same time for EOA violations by the Plaintiff for disability discrimination. Through the trial process, Plaintiff will demonstrate that the retaliation

was quite evident, giving the Defendants reasoning to defame and ensure the Plaintiff was expelled to attempt to conceal and deflect the systemic disability discrimination that had been occurring by the Defendants. Furthermore, two of the Defendants, also student peers of the Plaintiff, agreed to aid the other Defendants in their actions. These Defendants did so for suspected academic and needed favors from the other Defendants' ability and positions of power to provide such aide. The student Defendants acted in this way, despite Plaintiff's many attempts to offer these student Defendants the opportunities to provide any rebuttal or even an affirmation of not being involved in the matter entirely. The student Defendants, however, chose not respond to Plaintiff's many requests and even choose to continue in their false statements to other members of the student body and on clinical rotations at potential and former employers of the Plaintiff.

20.    In the civil complaint, the Plaintiff alleges as follows: The donation in question, as asserted in this complaint, is substantiated by evidence that Air Evac Lifeteam Inc., a subsidiary of Global Medical Response under the ownership of KKR & Co., has undertaken the provision of legal representation for three student defendants who were heretofore not associated with the company. This act of extending legal aid establishes a tangible association with the federal litigation at hand, ensnaring your clients and further substantiating the nexus between Vanderbilt University and my erstwhile employer in the pending legal proceedings.

21.    The provision of legal counsel to these individuals by Air Evac Lifeteam Inc. and, by extension, Global Medical Response and KKR & Co., absent the facilitative conduit rendered by Vanderbilt concerning the students' involvement in actions pursuant to a donation covenant from KKR & Co., would ostensibly lack justifiable cause. This

entanglement is accentuated by monetary transactions processed through the Conway
Welch Foundation, as evinced in their 990 PF tax filing on October 31, 2023, followed
closely by a $1.25 million contribution to Vanderbilt, as documented on November 17,
2023. The said filing delineates a gross sales price of assets amounting to $1,349,149.00, a
figure conspicuously absents in previous 990 filings since 2021, where no other entry
under line 6b has reached or exceeded the one million dollar threshold.

22.     The articulation of $1,349,149.00 on line 6b of the Form 990-PF, denoting
the gross sales price of assets, intimates a calculated financial stratagem. When observed
in conjunction with the contemporaneous $1.25 million endowment, this numeration
intimates a complex fiscal orchestration whereby assets—presumably sourced from
entities such as KKR & Co.—were liquidated, engendering proceeds that underwrote the
said benefaction. The chronology and magnitude of these transactions insinuate an
intentional contrivance, potentially orchestrated by KKR & Co. to funnel capital via the
foundation, ultimately designating such funds to Vanderbilt in a transaction that seemingly
aligns with the strategic intent to remunerate for the service of my unwarranted dismissal
and contrived expulsion.

## FACTUAL ALLEGATIONS

23.     Plaintiff enrolled in Defendant's Master of Nursing program (MN)
under the assurance of receiving fair and equitable treatment, educational services, and
due process in all academic affairs as part of the contractual relationship with
Defendants.

24.     Defendants engaged in discriminatory practices against Plaintiff, breaching
the implied covenant of good faith and fair dealing inherent in the educational contract.

COPY

25. Defendants' negligent mismanagement and willful disregard for Plaintiff's right to a fair academic process caused direct harm to Plaintiff's educational trajectory and professional future.

26. Defendants' actions have inflicted severe emotional distress upon Plaintiff, causing damages that are compensable under Tennessee law.

27. On June 3, 2023, Plaintiff reported an incident to the Office of Equal Access, alleging discrimination based on disability by a faculty member, in violation of Plaintiff's rights under Tennessee state law.

28. The basis of this complaint was that Plaintiff was receiving retaliatory treatment and discriminatory treatment by his pediatric clinical faculty member, Professor Harris, based on him using his reasonable accommodation for Crohn's disease on an attendance issue, and that points had been wrongfully deducted from his course grade due to that use of the accommodation.

29. Plaintiff informed Jill Harris that he had a university recognized and approved accommodation via email. Jill Harris then spoke to faculty leadership, confirming that Plaintiff had a reasonable accommodation and that the zero (0) would have to be removed and the tardy would have to be excused.

30. Subsequent to the aforementioned incidents, the Plaintiff was subjected to vindictive treatment orchestrated by Harris, characterized by a series of retaliatory actions designed to ensure the Plaintiff's failure. Harris, with deliberate intent, established conditions and engaged in a consistent pattern of conduct aimed at undermining the Plaintiff's performance. This was notably evident when Harris, in the presence of the Plaintiff and fellow students, repeatedly expressed her intention for the Plaintiff to be

unsuccessful in his nursing education, particularly in relation to a pediatric clinical rotation and associated clinical documentation.

31. It is pertinent to mention that the Plaintiff possesses more than ten years of experience in pediatric care and had been employed for more than four years at the hospital where the clinical rotation was taking place. Furthermore, Harris resorted to making slanderous remarks and statements, alongside endeavors to publicly disgrace the Plaintiff. Such actions were executed in the presence of the Plaintiff's former colleagues and other clinical staff, individuals familiar with the Plaintiff, who would often extend their well-wishes and encouragement towards his professional pursuits.

32. A few weeks later, Plaintiff was informed that he violated a rule by looking up a patient's record outside a clinical setting, although it had never previously been brought to his attention as an issue and his clinical instructor, Professor Harris, had requested that he look up the record on his laptop.

33. Plaintiff was not provided with specific instructions that other students were provided with, to send his clinical paperwork to Jill Harris. Plaintiff was then disciplined for failing to provide Jill Harris with this paperwork when he had not been informed to do so. Furthermore, Jill Harris as confirmed by testimony of other students witnesses to EOA Investigator, required plaintiff to email clinical paperwork to Jill Harris as she noted not being able to discern the Plaintiff's handwriting.

34. Jill Harris then wrongfully deducted points from Plaintiff in an attempt to fail the Plaintiff based on the syllabus policy on vague application of accumulation of zeros (0) assigned in the category of unprofessionalism. This began with Jill Harris accusing the Plaintiff of turning in clinical documentation late, which then evolved into Jill Harris

falsifying comments in the Plaintiff's clinical "Exxat" reflections and deducting his score based on Jill Harris' hypothetical assumptions of what the Plaintiff would have done in a clinical setting, rather than actual performance of actions themselves.

35.    The Plaintiff communicated his concerns to the clinical faculty leadership, including Professor Weaver, Dr. Robbins, and Dean Jesse. This complaint prompted them to remove Plaintiff from Professor Harris' clinical course.

36.    A meeting was scheduled in which Plaintiff was informed that he had failed clinical paperwork. However, Plaintiff had turned in this paperwork at the beginning of the clinical and the procedure was for incorrect paperwork to be given back to the student, review it with them, and remediate it with the student. Additionally, the Plaintiff was informed that Jill Harris had reported him to Weaver, Harris, and Jesse with unfounded allegations of failing to submit several weeks' worth of clinical paperwork on time and further accused the Plaintiff of copying and pasting the clinical documentation merely because it was typed, notwithstanding that it was composed in the Plaintiff's own words. Moreover, Jill Harris falsely claimed that the Plaintiff had inappropriately accessed patient charts "multiple times" during post-conference sessions, even though it was Harris herself who requested the Plaintiff to retrieve multiple lab results for the patient being discussed for educational purposes.

37.    During that meeting, an academic learning contract was prepared for Plaintiff stating generic and erroneous claims that would make non-logical sense to any nursing student such as "do not copy information from the EHR" and "Do not Access the EHR outside of Clinical Hours."

38.    Plaintiff started the next semester and had a class with Dr. Enstrom, who emailed his accommodation letter on August 21, 2023. This email wrongfully took away



Plaintiff's accommodations for his disability by stating that he would be penalized 10 points, instead of 0 for missed classes, despite his reasonable accommodations for his disability.

39.     Plaintiff emailed Catherine Buttery, Assistant Director of Student Access for the Office of Equal Access in order to ensure that he would not be wrongfully penalized for these disability related absences. Ms. Buttery replied that he should not be penalized for those absences.

40.     Later in the semester, after Plaintiff had to miss class due to his disability, he emailed Professor Enstrom regarding his absence and requested makeup work.

41.     Cate Enstrom replied with the makeup work and informed Plaintiff that since he had missed two sessions and one-quarter of a third session that an additional absence would warrant a meeting with the course coordinators to discuss course progression.

42.     Plaintiff responded by email, requesting a meeting with Professor Enstrom and her faculty supervisor.

43.     Only after Plaintiff had made this request was he presented with a learning plan.

44.     On December 4, 2023, Plaintiff was subject to an interim suspension from campus, ostensibly for a mental health assessment as per the University's Wellness Committee policy, without appropriate due process as required under Tennessee law.

45.     Of note, a majority of this investigation focused on the concern that the Plaintiff maintained his concealed carry firearm in his vehicle. The Plaintiff is a concealed handgun carry permit holder. "Persons who carry a handgun pursuant to Tenn. Code Ann. §39-17-1351, the enhanced handgun carry permit statute, or Tenn. Code Ann. §39-17-1366, the concealed handgun carry permit statute, are specifically excepted from application of the federal Gun-Free School Zones Act." Despite this and in knowing that putting such reasoning in written

context would be illegal on Defendants part, Defendant remanded the plaintiff on an interim campus restriction since December 4, 2023 to present without providing reason as to their concern for the Plaintiffs "threat" as defined in the student handbook for justification of a interim campus restriction as it is defined.

46. It is important to note this was the same focus of the Air Evac investigation, despite the fact that the Plaintiff provided evidence showing that text messages were altered by the Defendant to falsely demonstrate a conversation that was not reflective of the entire narrative. Furthermore, the firearm that was the subject of the conversation was not in the Plaintiffs possession as the Plaintiff was awaiting ATF approval as the firearm was an NFA item. Additionally, the text messaging of a firearm that was not in the Plaintiffs possession, and even if such firearms was in the Plaintiffs possession and the context and content of such communications were, non-threatening, non-harmful, and with no intention to inflict stress or burden to another. Thus, Plaintiff was within his constitutional and with the laws of the State of Tennessee to possess and communicate about such Firearm.

47. On December 15, 2023, a representative from the School of Nursing, Mary Jesse, notified Plaintiff of a purported infraction for off-site access to patient charts and subsequently altered Plaintiff's academic grades from passing to failing without clear justification.

48. Subsequently, on December 19, 2023, Plaintiff was dismissed from the School of Nursing, a decision that Plaintiff contends was made without adequate process and was unjustified.

49. In an interview with Plaintiff's fellow classmate at the School of Nursing, his classmate informed the investigator that she believed that Plaintiff was being subject to

COPY

different treatment due to his disability and retaliation based on that disability.

50.     Plaintiff pursued internal university channels to appeal the academic dismissal and the retroactive grade changes, seeking to remedy the alleged wrongful actions.

51.     These appeals were systematically delayed and denied by the Defendant, hindering a timely resolution, and compounding the Plaintiff's distress.

52.     As a result, Plaintiff's anticipated graduation and subsequent entry into the professional job market have been detrimentally impacted.

53.     The Plaintiff's access to patient charts was conducted within the parameters of the Health Insurance Portability and Accountability Act in Tennessee's privacy laws and educational standards, which should negate the basis for dismissal.

54.     Any allegations of unauthorized access must be evaluated under Tennessee's statutes governing computer- related crimes, which would not typically characterize the educational access to patient information as unauthorized.

55.     Tennessee law provides for immunity under certain educational functions, suggesting that the plaintiff's adherence to privacy standards in an educational context should not constitute actionable misconduct.

56.     Tennessee law, particularly under the Tennessee Educational Records Statute (T.C.A. §49-50-801 et seq.), grants certain protections and immunities to educational institutions and their agents when handling educational records in compliance with established privacy standards. Given this legal framework, the Plaintiff's access to patient charts, provided it was within the scope of educational purposes and adhered to the confidentiality requirements as outlined in the Tennessee Code and any applicable institutional policies, should not be deemed actionable misconduct. This adherence to statutory privacy standards,

in conjunction with the educational immunity provisions, underscores that the Plaintiff's actions, aimed at fulfilling educational objectives, fall within the ambit of legally protected activities under Tennessee Code Annotated §20-12-119.

57.  **As previously filed in the plaintiff's motion for request of Preliminary injunction the plaintiff restates in paragraphs 51 thru 112 and reaffirms all claims as follows:**

58.  The Plaintiff, Ian Hunter Lucas, brought forward a motion for injunctive relief, grounded on allegations of profound harm resulting from the Defendants' conduct. Detailed in the initial complaint, these allegations encapsulate discrimination predicated on disability, retributive acts, breach of contractual agreements, and additional malfeasance. Accompanying the original complaint are declarations and exhibits that supplement these allegations.

59.  Defendants' actions have and continue to perpetuate irrevocable damage upon the Plaintiff, hindering his academic progress, career opportunities, emotional health, and reputation. At the core of this injunction motion, the Plaintiff has challenged a consortium of individuals associated with Vanderbilt University, leveling a series of tort claims, which include the breach of contractual duties, negligence, discriminatory treatment based on disability, and retaliatory measures. Each Defendants' personal liability is underscored, distinct from their professional functions at Vanderbilt University or Air Evac Life Team INC.

60.  Prior to being wrongfully and with the intent to cause harms being academically dismissed and further receiving an expulsion from Vanderbilt University and Vanderbilt University School of Nursing, retributive and grounded in bad faith in the defendants working in a mutually beneficial collaborative relationship to cause harm, damage, and injury to Mr. Lucas, through the use of libel slander, defamation through professional and personal reputation

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 170 of 431 PageID #: 429

damages, and even further through the false cause of public fear being placed by causing a false sense of fear that Mr. Lucas was a "safety threat" in which Vanderbilt University made insinuations to Mr. Lucas through its campus community communication that it would bring harm to Mr. Lucas and threat to his life through deadly force in use of its Vanderbilt Police Department and additionally in violation of the Emergency Medical and Treatment and Labor Act (EMTALA) endorsing that Mr. Lucas was not allowed to come to the Vanderbilt University Medical Center to receive care for emergency non-scheduled appointments, and that Mr. Lucas would need permission from a Vanderbilt University Student Accountability (Non-Medical Provider to perform a medical screening exam as per EMTALA) in order to gain permission to come onto the VUMC campus. Additionally, the insinuation was that Vanderbilt University believed that Mr. Lucas medical conditions were "fake" and there was not a "disability" despite Mr. Lucas abiding by all policy and procedures and to obtain and be granted appropriate accommodations.

61.    Mr. Lucas was an active graduate nursing student with a recognized physically limiting disability by Vanderbilt University and was appropriately registered with the student access center (student disability services. He now seeks restitution for the distress and harm caused by the Defendants' misconduct. The legal action also brings to the forefront serious allegations concerning witness intimidation and obstruction of justice, demanding the Court's swift and decisive action. The Plaintiff asserts that these retaliatory actions by the Defendants arose from his filed complaints regarding violations of equal opportunity access with the university's Equal Opportunity Access office. The Plaintiff posits that evidence exists of the



62.    Defendants' attempts to conceal their wrongdoing and discrimination by manipulating the

institution's internal investigative procedures of the Equal Opportunity Access (EOA), Title IX,

Student Conduct and Accountability, and Academic Grade Appeal.

63.    The Plaintiff alleges targeted and malicious actions by the Defendants, in collaboration

with Air Evac Lifeteam Inc., aimed at retaliation for whistleblower activities. These activities

include involvement as a federal witness in a sealed investigation by the U.S. Attorney

General's Office for the Western District of Tennessee into Air Evac Lifeteam Inc. for potential

violations of both the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.) and the federal

False Claims Act (31 U.S.C. §§ 3729 - 3733). The Defendants' actions, characterized by

intimidation, defamation, and the infliction of physical and mental distress, were designed to

penalize the Plaintiff for his protected whistleblower activities. These retaliatory actions not

only hindered the Plaintiff's professional development but also caused significant financial and

emotional damage. Given the Plaintiff's protection under federal whistleblower legislation, such

as the Whistleblower Protection Act of 1989 (5 U.S.C. § 2302(b)(8)-(9)), and state provisions

safeguarding whistleblowers from retaliation, the case at hand demands urgent court

intervention to halt further harm.

64.    In support of the motion for a preliminary injunction, the case of Halifax Hospital

Medical Center v. United States, 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In

Halifax, the court granted a preliminary injunction in favor of the plaintiff, recognizing the

substantial likelihood of irreparable harm without such intervention, notably in cases involving

whistleblower retaliation and the potential violation of federal statutes. This precedent

underscores the necessity of safeguarding whistleblowers from retaliatory measures that would

otherwise stifle critical disclosures in the public interest.

65.    Accordingly, this Court is respectfully urged to grant a preliminary injunction, protecting the Plaintiff from ongoing retaliatory actions by the Defendants, in alignment with the principles upheld by both federal and state whistleblower laws and reinforced by pertinent case law. The compilation of evidence strongly suggests that on December 4th, 2023, a coordinated sequence of events began with the plaintiff receiving a notice of temporary suspension from Vanderbilt University, issued by defendant Neil Jamerson. This was promptly followed, within the same hour, by a notice from the plaintiff's then-employer (now former employer), Air Evac Lifeteam Inc. Human Resources, placing the plaintiff on administrative paid leave. These actions, along with a series of other incidents that appear to be more than coincidental, point to a deliberate and collaborative effort by the defendants to retaliate against the plaintiff. This effort includes whistleblower retaliation, witness intimidation, harassment, defamation, libel, slander, and discrimination.

66.    The Plaintiff contends that the Defendants, in a premeditated and collaborative effort with Air Evac Lifeteam Inc., orchestrated actions to detrimentally impact the Plaintiff. This was in retaliation for the Plaintiff's reporting of fraudulent billing practices under the federal False Claims Act (31 U.S.C. §§ 3729 - 3733), as well as state equivalents under the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.). Furthermore, Vanderbilt University and its School of Nursing pursued the Plaintiff's dismissal, motivated by a pattern of discrimination against students with disabilities and in response to the Plaintiff's multiple complaints through the Equal Opportunity Access (EOA) office. This collaborative retaliation not only sought to undermine the Plaintiff's standing but also facilitated an exchange of damaging information between Michelle Tellock and Timothy K. Garrett, aimed at furthering the Plaintiff's harm post-December 4, 2023.



67. In establishing the grounds for a preliminary injunction, the case law precedent found in Roth v. Department of Justice, 642 F.3d 1161 (D.C. Cir. 2011), is particularly pertinent. In Roth, the court highlighted the critical importance of protecting the rights of individuals under whistleblower protection statutes, emphasizing the necessity of preliminary injunctive relief to prevent ongoing retaliation and to uphold the integrity of whistleblower protections. This case underscores the judicial recognition of the irreparable harm that can result from retaliatory actions, especially when such actions are designed to penalize whistleblowers for exercising their rights to report misconduct.

68. Given the Plaintiff's allegations of concerted retaliation by the Defendants, aligned with the documented objectives of both Air Evac Lifeteam Inc. and Vanderbilt University to penalize the Plaintiff for protected whistleblower activities and disability discrimination complaints, there exists a compelling basis for the issuance of a preliminary injunction. This Court's intervention is crucial to prevent further retaliatory harm to the Plaintiff, ensuring compliance with the protections afforded under both federal and state whistleblower laws, as reinforced by the precedent established in Roth.

69. The Plaintiff raises concerns over the striking parallels and the synchronicity in the actions undertaken by Vanderbilt and Air Evac, notably the precipitous move to academically dismiss the Plaintiff without due process. This rush to dismissal notably lacked consideration of the ongoing investigations into Defendant Mary Ann Jessee by the Equal Opportunity Access (EOA) office for retaliatory actions related to disability discrimination complaints, as well as investigations into Defendant Cate Enstrom's role in similar discriminatory practices. The absence of procedural fairness, coupled with the timing and alignment of these actions, suggests a concerted effort to penalize the Plaintiff, sidestepping the protections afforded under the



70.     Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act of
1973 (29 U.S.C. § 794), which mandate non-discriminatory treatment and reasonable
accommodations for individuals with disabilities.

71.     In the context of seeking a preliminary injunction, the case of Goss v. Lopez, 419 U.S.
565 (1975), provides a pertinent legal framework. In Goss, the Supreme Court held that
students must be given notice and an opportunity to be heard before being deprived of certain
educational rights, underlining the essential nature of due process in academic settings. This
precedent underscores the necessity of procedural protections, especially when allegations of
discriminatory practices and retaliatory measures are at play, to ensure that individuals are not
unjustly deprived of their rights to education and equal treatment under the law.

72.     Therefore, in light of the evidence presented and the legal precedents underscored by
Goss v. Lopez, this Court is respectfully requested to grant a preliminary injunction. Such an
injunction would serve to immediately halt any further actions against the Plaintiff that bypass
due process and exacerbate the discriminatory and retaliatory harm alleged, ensuring the
Plaintiff's rights under both federal statutes and case law are protected pending a full hearing on
the merits. When the plaintiff reached out to the EOA office to inform them of this situation,
and to request intervention based on the fact of the faculty members involved the EOA office at
the leadership of E. Jacob Cummings provided no response, despite that given prior to these
retaliatory actions by defendants Jessee and other defendants conspirators of retrospectively
changing two of the plaintiffs already passed course grades simultaneously on December 15th,
2023 thus making the plaintiff eligible for dismissal based on the guidelines of the School of
Nursing policies and further not able to be readmitted due to school of nursing policies on only
allowing the retake of one course.

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 175 of 431 PageID #: 434

COPY

73. The Plaintiff disputes the retrospective grade alterations made by Defendant Jessee, grounded on unfounded accusations of "accessing patient charts remotely," initially alleged as a HIPAA violation. The Vanderbilt University Medical Center Privacy Office, designated within the Vanderbilt University School of Nursing Handbook as the authoritative entity on HIPAA and privacy matters, clarified that no privacy breach occurred, thereby negating any violation of the Health Insurance Portability and Accountability Act (HIPAA), codified at 45 C.F.R. Parts 160 and 164.

74. Despite this determination, Defendants Jessee and Schorn, in their evaluation of the Plaintiff's academic grade appeal, deviated from their initial accusation of a HIPAA violation. They instead contended that the Plaintiff violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes," as articulated by Defendant Schorn in her decision regarding the Plaintiff's grade appeal. This assertion emerged despite the clear directive from the VUMC Privacy Office affirming the absence of a breach, illustrating a capricious and procedurally flawed application of institutional policy against the Plaintiff, contravening his due process rights as outlined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and corresponding T.C.A. § 10-7-504(a)(4), governing the privacy of student educational records.

75. This case finds resonance with Goss v. Lopez, 419 U.S. 565 (1975), where the U.S. Supreme Court held that students must be afforded due process rights in disciplinary actions impacting their educational status. The arbitrary and retrospective grade changes, predicated on disproven allegations and a subsequent shifting of rationale, violate the Plaintiff's rights to procedural due process and equitable treatment under established federal and state educational privacy laws. Given these considerations, the Plaintiff seeks a preliminary injunction to rectify

the wrongful grade alterations and to safeguard against further arbitrary and capricious actions by Defendants that unjustly impair his academic standing and due process rights.

76.     On appeal of Mavis Schorn's decision plaintiff appealed to the Dean of the School of Nursing defendant Pamela Jefferies, she reverted back in contrary to the VUMC privacy office and referred back to language of privacy violations, of note the plaintiff referred the matter to the U.S. Department of Health and Human Services the definitive investigative authority on matters of violations and breaches of the Health Insurance Portability and Accountability Act who found no breach in privacy under HIPPA and further found concern for discrimination and referred the matter to the department of education office of civil rights for further investigation and review based on the evidence provided and the treatment of the plaintiff.

77.     Incorporating the principles discussed in *Northwest Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004), the Plaintiff's engagement in accessing patient charts for educational purposes is situated well within the boundaries delineated by HIPAA for healthcare operations. This case, while primarily addressing the privacy rule in a hospital context, elucidates the rigorous standards imposed by HIPAA on covered entities to safeguard protected health information (PHI), except where such access is explicitly permitted by the statute or its implementing regulations.

78.     The Defendants Jessee and Schorn's acknowledgment of the Plaintiff's adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule, further substantiates the claim that the Plaintiff's activities were both legally compliant and integral to their educational advancement in a clinical setting. The 'minimum necessary' rule, designed to ensure that only the essential amount of PHI needed for a specific purpose is accessed, underscores the legality and necessity of the Plaintiff's access to patient information as part of their clinical education.

COPY

Northwest Memorial Hospital v. Ashcroft offers a pertinent legal framework that supports the
argument that accessing patient information for educational purposes, as conducted by the
Plaintiff, aligns with HIPAA's provisions for healthcare operations. This includes the training of
healthcare professionals and the enhancement of educational programs within healthcare
settings. The case underscores the imperative of balancing patient privacy protections with the
educational necessities that prepare students for professional practice in healthcare.

79.     Thus, the Plaintiff's actions, conducted under the guidance of Defendants and within the
scope of educational requirements, not only adhere to HIPAA's stipulations but are also
essential for the practical application of medical knowledge. The acknowledgment by
Defendants Jessee and Schorn of the Plaintiff's compliance with the 'minimum necessary'
standard affirms this position, highlighting the protected nature of the Plaintiff's educational
activities under HIPAA and reinforcing the legal basis for the requested preliminary injunction
to safeguard the Plaintiff's rights and educational pursuits within the clinical setting.

80.     In the initial communications, Defendant Jessee informed the Plaintiff that a review of
allegations pertaining to a single course was underway. It was only during a subsequent meeting
that Jessee conveyed a decision to fail the Plaintiff in two courses, justifying this by citing what
she described as a recurrent problem that had previously resulted in a learning contract for the
Plaintiff. This assertion, however, overlooks critical context: the prior learning contract
referenced by Jessee was associated with an incident in another course, from which the Plaintiff
had been withdrawn due to Defendant Harris's inappropriate directives. Harris had instructed
the Plaintiff to access lab values remotely during a clinical post-conference, an action
substantiated by student witness testimony.



81.     This scenario presents a complex intersection of academic policy and legal

considerations, particularly concerning fair treatment and due process for students. A pertinent

legal framework for evaluating this situation is provided by Board of Curators of the University

of Missouri v. Horowitz, 435 U.S. 78 (1978), wherein the Supreme Court articulated standards

for academic decision-making and the rights of students to fair process in academic evaluations.

The Court recognized a distinction between academic and disciplinary dismissals, suggesting

that the former requires less formal due process protections.

82.     Applying this framework, the Plaintiff's situation underscores a potential misapplication

of academic policies and a lack of due process in the academic evaluation process. Jessee's

actions, predicated on a questionable interpretation of past incidents and without clear

adherence to procedural fairness, raise concerns under the principles established in Horowitz.

The Plaintiff's case highlights the necessity for clear, consistent, and fair academic evaluation

processes that respect students' rights to due process, particularly when such evaluations have

significant consequences for their academic and professional futures. This action is imperative

to protect the Plaintiff's educational trajectory and to uphold standards of fairness and

transparency in academic evaluations.

83.     Given the circumstances where a collective student grievance was filed against

Defendant Harris, citing disarray within her clinical course—a session which was colloquially

dubbed as being "summoned to the principal's office"—it became apparent that Harris

presumed the Plaintiff to be the agitator.

84.     From that point forward, as documented, Harris engaged in discriminatory and

inequitable conduct towards the Plaintiff. This conduct not only undermines the educational

environment but also potentially violates the Plaintiff's rights to non- discriminatory treatment

as outlined in educational and civil rights legislation. The scenario calls for the application of principles enshrined in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, ensuring that no state shall "deny to any person within its jurisdiction the equal protection of the laws. "In the context of academic evaluations and disciplinary actions, Goss v. Lopez, 419 U.S. 565 (1975), provides a relevant legal precedent. The Supreme Court in Goss emphasized the importance of due process within educational settings, specifically that students must be afforded notice and an opportunity to be heard before being deprived of certain rights. Applying this principle, the Plaintiff's request for a preliminary injunction seeks to pause any punitive academic measures rooted in bias or misrepresentation and to initiate a reevaluation of their academic status that aligns with due process and equity.

85. This injunction request was crucial not only to rectify the immediate unfair treatment experienced by the Plaintiff but also to reaffirm the broader commitment to fairness, transparency, and equity within academic evaluation processes, in accordance with established legal standards.

86. Subsequent to the complaint against Defendant Harris, she began to display behavior towards the Plaintiff that was both discriminatory and retaliatory in nature. This behavior was so egregious that it necessitated the Plaintiff's removal from her course, a decision underscored by corroborative observations from both students and staff at the Monroe Carell Jr. Children's Hospital, who witnessed Harris's mistreatment, hazing, and bullying of the Plaintiff. Harris escalated her actions by drafting and submitting a fabricated email to the School of Nursing's leadership, falsely accusing the Plaintiff of repeatedly and improperly accessing patient charts. This accusation was not only baseless but also exaggerated, asserting that the Plaintiff engaged in indiscriminate chart review. Despite being aware of these circumstances and the invalidity of

the referenced learning contract due to Harris's actions and the subsequent reassignment of the Plaintiff to another instructor by the Equal Opportunity Access (EOA) office, Jessee persisted in seeking grounds to dismiss the Plaintiff.

87.     This situation underscores a blatant disregard for the principles of fairness and equity, potentially infringing upon the Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, which mandates equal protection under the law. The actions taken against the Plaintiff also call into question adherence to due process rights, as outlined in the landmark decision of Goss v. Lopez, 419 U.S. 565 (1975), where the Supreme Court held that students are entitled to certain due process rights before being deprived of educational opportunities.

88.     Therefore, the Plaintiff sought a preliminary injunction to prevent further discriminatory and retaliatory actions and to ensure a reevaluation of his academic standing in a manner that is just, transparent, and consistent with the principles of due process and equal protection. This request aligns with the legal imperative to safeguard individuals from unjust educational practices and to uphold the integrity of academic evaluation processes. The EOA office, due to a lack of investigators, outsourced an investigation to an external, non-Vanderbilt affiliated investigator, Katherine Layman. Ms. Layman conducted her investigation ethically and without bias, uncovering significant discrimination. However, when her findings began to favor the plaintiff, revealing the fear among other nursing students to speak out, Vanderbilt University prematurely terminated Ms. Layman's contract before she could complete her investigation.

89.     Additionally, Vanderbilt's Director of the EOA, defendant E. Jacob Cummings, had the reports altered to minimize findings against defendant Cate Enstrom, despite clear violations of the Americans with Disabilities Act and Tennessee law, evidenced by Enstrom's policy to

Page 30 of 89

penalize the plaintiff for disability-related absences, undermining the very purpose of disability accommodations.

90.     Timothy K. Garrett, an attorney from the law firm Bass, Berry, Sims, retained by Air Evac Lifeteam Inc. for its investigation, has notable ties to Vanderbilt University. As a Vanderbilt alumnus and significant financial donor, Mr. Garrett's connections extend into the legal domain, where he has represented the university in various capacities. His legal service includes a role as counsel within Vanderbilt University's Office of General Counsel, a department where Defendant Michelle Tellock serves as Deputy General Counsel.

91.     Importantly, Mr. Garrett's representation of Vanderbilt has encompassed cases related to student dismissals, exemplified by his involvement in the case of Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646 (M.D. Tenn. 2018), a notable lawsuit concerning the appeal of a student plaintiff and Vanderbilt University's student dismissal processes. This background suggests a potential conflict of interest or at least a close professional and institutional relationship between Mr. Garrett and Vanderbilt University, which could influence the impartiality of the investigation conducted by Air Evac Lifeteam Inc.

92.     Of note a Board of Professional Responsibility report was filed on Michelle Tellock and Timothy K. Garrett, while the BPR could not take action because Tellock and Garrett were not technically retained by Lucas the BPR did affirm the sharing of information and correspondence about Lucas between Tellock and Garrett which was for the benefit of their own clients.

93.     The correspondence while violations of FERPA, HIPPA, and other principles the plaintiffs believe to be moral principles of ethical conduct between Tellock and Garrett, the BPR while not viewed as ethical misconduct due to not meeting the standard for a conflict of

interest due to Tellock nor Garrett being retained by Mr. Lucas. However, the report did confirm the communication between Garrett and Tellock, which Tellock had denied, despite having Vanderbilt IT start the process of wiping her Vanderbilt Email Account of certain records the day plaintiff informed her that he reported her to the BPR.

94.     Considering these factors, the Plaintiff sought a preliminary injunction to ensure fairness and transparency in the handling of his case, emphasizing the need for an unbiased review process that adheres to the principles of justice and equity. The preliminary injunction was crucial for safeguarding the Plaintiff's rights and interests amid concerns about the intertwined legal and institutional relationships that may affect the outcome of ongoing proceedings.

95.     December 4th 2023, during its "Welfare Panel" interview of plaintiff on defendant porter inquired of plaintiff specifically about a "CIA costume or something related to the CIA in or on your [the plaintiffs] car" this key element of defendant Porter questioning of plaintiff in the context of a "mental health welfare panel" is unrelated to anything related to the plaintiff and being at Vanderbilt, due to the fact the item in mention by defendant porter was an item specifically placed on the plaintiffs vehicle for a specific reasons in connection with the plaintiffs whistleblowing status while still employed at Air Evac Lifeteam Inc. and thus when the plaintiff was not at work and was at Vanderbilt the mentioned item was specifically taken off the plaintiffs vehicle. Thus, the only way in which this information would have been known by defendant porter is with information having been shared between Timothy K. Garrett and defendant Michelle Tellock.

96.     During a meeting in January 2024 regarding Air Evac Lifeteam Inc.'s investigation, attorney Timothy K. Garrett referenced details about the plaintiff's intermittent restrictions on

campus access, along with other specific information related to the plaintiff's experiences at the university—information the plaintiff had not disclosed. This suggests that Garrett acquired this knowledge through direct communications with Michelle Tellock. Moreover, Garrett requested documentation from the plaintiff concerning issues at Vanderbilt University, asserting the relevance of these documents to the plaintiff's "credibility." This implies that Garrett had engaged in prior discussions with Vanderbilt representatives to verify the authenticity of any documents the plaintiff might provide.

97.     This interaction raises questions about the fairness and impartiality of the investigation, highlighting potential concerns regarding the privacy of the plaintiff's educational records and the confidentiality of communications within the university. Such concerns resonate with the provisions of the Family Educational Rights and Privacy Act (FERPA), codified at 20 U.S.C. § 1232g, which safeguards the privacy of student education records and restricts their disclosure without consent.

98.     31. Given these circumstances, the plaintiff requests a preliminary injunction to halt any further actions that might compromise their privacy rights and to ensure a fair and impartial investigation into the matters at hand. This request aligns with the legal protections afforded by FERPA and seeks to prevent any undue influence or bias that may arise from the intertwined relationships and communications between Air Evac Lifeteam Inc.'s legal representation and Vanderbilt University officials. The injunction is essential for upholding the principles of fairness, privacy, and transparency throughout the investigative process.

99.     32. Due to Vanderbilt University's refusal to provide necessary documentation and records, the plaintiff notes that the line of questioning from Timothy Garrett precisely mirrored that of Defendant Porter and Defendant Newsome during the December 4th, 2023, inquiries.

COPY

This included specific questions about the plaintiff's military affiliation, where Defendant Porter questionably inquired if the plaintiff received "an ID or something," disregarding the letter from the plaintiff's commanding officer, which serves as a more authentic form of verification than the ID casually mentioned by Porter. This approach not only diminished the validity of official military documentation but also bordered on discriminatory conduct. Furthermore, Porter's inquiry about why the plaintiff, if coming from training in Smyrna, Porter specifically inquired why was plaintiff not dressed in his "costume or camouflage" which constitutes an inappropriate

100.    and demeaning assumption about military attire, reflecting a lack of respect and understanding of military service and obligations. This behavior underscores potential discriminatory practices and an infringement on the plaintiff's dignity, calling into question the fairness and integrity of the investigative process conducted by Vanderbilt and its representatives.

101.    33. Additionally, the question in addition to the questions asked by Garrett asked in his investigation interview being identical to the questions asked of the plaintiff by Defendant Newsome and Porter, the same questions were exploited and further invasion of privacies were made by Jeremy Borgoin in conducting his interview and student conduct hearing of the plaintiff in which Borgoin made the decision to ultimately expel the plaintiff based on the same unjustifiable and un-constitutional cause that the plaintiff legally bought a handgun in May 2023 and was asked if he had access to fire arms the night of December 4th 2023 plaintiff answered in the context of how the questions was asked and interpreted, furthermore the plaintiff is allowed to constitutionally own poses and access firearms with the confines of the law. Vanderbilt cited this as a false statement and as a violation of "policy violation" using the

same terminology as Air Evacs reason for termination, and a kind to Air Evac, Vanderbilt also without providing the reference to the specific policy that was violated.

102.    34. Furthermore, Vanderbilt stated the plaintiff defunded the University through the student care and assistance funds in which the plaintiff requested funding to pay from mental health counseling, and then sought mental health counseling, which the plaintiff never had any possession of fund for, Vanderbilt paid the provider directly for services, Vanderbilt states that the plaintiff lied to the University about the reason the plaintiff needed mental health counseling and therefore the defendants ascertain that the plaintiff did not need mental health counseling, however on the night of December 4th 2023 as part of the "Welfare Panel" which defendants, now

103.    since that time state given the following point made by the plaintiff in several appeals, the defendants now state it was not a welfare panel, however defendants will not define this other than being a "meeting that [the Plaintiff] was required to attend", that followed every step of the Welfare Panel process, however was not the welfare panel process, defendants did however illegally record the plaintiff against his knowledge and informed consent, transcribing this recording, with sensitive personal health information, disseminating this information without the knowledge of the plaintiff, an actual HIPPA violation, while deliberately having the school of nursing academically dismiss the plaintiff in an ironic twist of falsely accusing the plaintiff of HIPPA violation despite the Vanderbilt Privacy office and DHHS stating otherwise, while then then using the information from the illegal obtained recording of the non- welfare panel, welfare panel meeting in an poorly orchestrated coercion to construct fraudulent student conduct charges that have no legal standing other than being unconstitutional in a manner that the defendants violated the plaintiffs rights at Vanderbilt University in participation of witness

intimidation and whistleblower retaliation thought assisting in the construction in an academic dismissal and expulsion of the plaintiff one semester before for the plaintiff is supposed to graduate. And then mirroring the same reasons or allegation for which Air Evac Lifeteam Inc. accuses the plaintiff of being terminated, in order to discredit and credit a defamation of the plaintiff as a federal witness. In exchange for these services Vanderbilt University on November 17th 2023 received what was originally reported as an anonymous donation, by the nurse journal (See exhibit) however has since been edited with not edit date noted, stating that a 1.25-million-dollar donation was made to the Master of Nursing Program directly, this was the program in which the plaintiff was directly enrolled in and 2 weeks prior to the events beginning these actions on December 4th 2023. Furthermore, on Vanderbilts Dare to Grow donation campaign website KKR & Co. is listed

104.    as a donor, and furthermore, is noted having pledged to match every $8,000.00 donated, KKR & Co. will subsequently match the donation up to $8,000.00, In evaluation of the Conway Welch Family Foundation 2022 990-PF submission on 2023-10-30 the foundation only reported one sale and gain of $1,394.149.00 in the gross sale of price for all assets, with a member of their "directors as needed" with affiliations and close relations to principals at KKR & Co.

105.    35. The Plaintiff emphasizes a troubling abuse of authority by Vanderbilt University. In an act of overreach, the university's law enforcement was purportedly employed to conduct investigative actions against the Plaintiff, which exceeded their legal remit and lacked any criminal predicate. This conduct signals a misuse of police resources, ostensibly aimed at amassing information detrimental to the Plaintiff. This may violate not only the ethical expectations of university law enforcement but also the legal limits as set by Tennessee statutes and federal laws.



106. Specifically, this alleged conduct indicates official misconduct under TCA §39-16- 402, should it be established that the university police acted beyond their lawful authority. Practices of invasive information gathering without valid justification might contravene the privacy rights accorded by TCA §39-13-601, particularly if it involved intrusive actions into the Plaintiff's private affairs. Moreover, Vanderbilt University Police Department, specifically Defendant Joel Newsome, is accused of exercising compulsion in their investigation, breaching TCA § 39-13-302, which addresses coercion and implies a violation of the Plaintiff's rights against compelled service.

107. The unauthorized dissemination of the Plaintiff's confidential information by university-associated entities implicates a direct infringement upon the Plaintiff's Fourth Amendment protections, which guard against unreasonable searches and seizures.

108. This infringement aligns with the undue intrusion into the Plaintiff's private life without consent, clearly breaching TCA §39-13-601. Additionally, this behavior signifies official misconduct as outlined under TCA §39-16-402, demonstrating an intentional misuse of authority. These actions, surpassing the lawful limits of their institutional roles and misappropriating access to sensitive data for non-professional purposes, unequivocally infringe upon the Plaintiff's state and federal legal rights to privacy and security from unwarranted interference. Moreover, the Defendants' actions resulted in severe health consequences for the Plaintiff by spreading defamatory claims labeling him as a "threat" and a risk to campus security.

109. This defamation led the Plaintiff to believe that he could no longer safely obtain medical care at Vanderbilt University Medical Center—a facility where he had been a longstanding patient—due to intimidation and the dissemination of false reports to the Vanderbilt University

COPY

Police Department (VUPD). Assertions were made without merit that the Plaintiff was barred from campus, was "armed and dangerous," and that VUPD should employ "any necessary measures to maintain campus safety" upon encountering the Plaintiff. Given that VUPD officers are authorized to use armed force and patrol the VUMC premises, such unfounded allegations posed a real and tangible threat to the Plaintiff's safety and wellbeing. This defamation, coupled with the implication of potential violent engagement, not only heightened the Plaintiff's anxiety and emotional distress but also potentially obstructed his access to necessary healthcare services.

110.    On June 16, 2023, plaintiff went to defendant Jessee office and requested and impromptu meeting, defendant Jessee was open to a 1:1 private meeting, during the meeting plaintiff meet with Jessee attempting to resolve amicably the disability accommodation issues plaintiff felt he was being discriminated against on.

111.    Further, plaintiff brought to Jessee attention quid quo pro situation with a Vanderbilt School of Nursing Faculty member in which the plaintiff was being exploited for sexually by a faculty member of the School of Nursing, based on the plaintiff having requested letters of recommendation and asking the faculty member to be the plaintiffs VUSN Alumni Mentor. When Jessee was informed of this and further was informed of the images, and additionally informed of the images the faculty member wad requesting of the plaintiff, Jessee responded and informed the plaintiff that unless the plaintiff was "physically sexually abused" then it was just "adults being adults" and the university does not get involved in those matters.

112.    Given the inaction and then subsequent retaliatory action of defendant Jessee after June 16th 2023 when plaintiff brought concerns of the quid quo pro to her attention, and as a mandatory reporter not only did Jessee fail to fulfill her obligation to report accordingly, Jessee

deterred and misinformed the plaintiff about the abilities and options of the plaintiff to seek assistance from Title IX thus demonstrates that defendant Jessee further retaliated in her role as demonstrated by the fact pattern of in a matter of days going from recommending the plaintiff for a last minute interview and photo shoot a feature in the VUSN nursing magazine "as a favor for the school of nursing" to suddenly being retaliated against and the plaintiff is left out of the magazine because of what was reported to the plaintiff as a "page count"

113.    In an egregious display of misconduct, Defendants Jessee, Schorn, and Jefferies actively engaged in manual alterations to Plaintiff's GPA. Upon discovery by the Plaintiff, an extended period of weeks, if not over a month, elapsed without any substantial explanation from Vanderbilt beyond vague references to ongoing discussions with the School of Nursing. It was only after the GPA correction that the School of Nursing disclosed, through its newsletter, the implementation of a new policy on pass/fail courses. This policy, conspicuously aligned with the Plaintiff's circumstances, indicates not only that the School of Nursing deliberately manipulated and erroneously altered the Plaintiff's GPA but also sought to obscure their actions under the guise of a 'computer error'. However, the invocation of a 'computer error' falls short of justifying the subsequent policy change, revealing a clear intent to mislead and rectify the situation without acknowledging the targeted manipulation faced by the Plaintiff.

114.    In contrast to a hostile-environment theory, to bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment. Miami Univ., 882 F.3d at 591 (citing Mallory, 76 F. App'x at 638-39 ; Horner v. Ky. High Sch. Athletic Ass'n, 206 F.3d 685, 691-93 (6th Cir. 2000) ; Univ. of the South I, 687 F.Supp.2d at 758 ; see also Baum, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); Schaumleffel, 2018 WL 1173043, at *14 ("The

deliberate indifference standard applies such as in this complaint when a plaintiff such as in Mr.

Lucas case whom seeks to hold a university responsible for sexual harassment."). Furthermore,

a deliberate indifference claim "harassment that is so severe, pervasive, and objectively

offensive that it effectively bars the victim's access to an educational opportunity or benefit."

Miami Univ., 882 F.3d at 590 (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 28 18

Z.J. v. Vanderbilt Univ. 355 F. Supp. 3d 646 (M.D. Tenn. 2018) 633, 119 S.Ct. 1661, 143

L.Ed.2d 839 (1999) and citing Patterson v. Hudson Area Schs., 551 F.3d 438, 444-45 (6th Cir.

2009) ); K.T. v. Culver Stockton Coll., 865 F.3d 1054, 1057 (8th Cir. 2017) (same); Doe v. Tr.

of Boston Coll., 892 F.3d 67, 93 (1st Cir. 2018) (same) (hereinafter " Tr. of Boston Coll. I").

115.     Only claims involving pervasive and widespread harassment are actionable; a single

incident is not enough. See Miami Univ., 882 F.3d at 591 ; Carmichael v. Galbraith, 574 F.

App'x 286, 289-90 (5th Cir. 2014) ; Haidak v. Univ. of Mass. at Amherst, 299 F.Supp.3d 242,

270 (D. Mass. 2018). Alleged sexual harassment in the form of a 676 failure to follow Title IX

regulations is not a sufficiently severe form of discrimination to give rise to a deliberate

indifference claim. Roe v. St. Louis Univ., 746 F.3d 874, 883-84 (8th Cir. 2014) ; Sanches v.

Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 169 (5th Cir. 2011).

116.     The Defendants' conduct of Ms. Tellock, Ms. Roy, Mr. Cummings, Mr, Bourgoin, and

Mr. Fazi, to interfere, and further tamper with and alter investigational findings in the know

preface of clear and convincing evidence beyond a reasonable doubt such as the email from

defendant Enstrom demonstrating a written statement of discrimination, however defendant

Cummings made a determination of this "lacking sufficient evidence" to show cause for

discrimination  exemplifies a grave deviation from lawful behavior and potentially constitutes a

severe breach of the Plaintiff's rights as upheld by both state and federal laws. A thorough

inquiry into these allegations is essential to uphold the integrity of justice and to ensure the appropriate execution of law enforcement within educational institutions.

## COUNT ONE:
### DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

117.    Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein.

118.    Mr. Lucas is, and at all times relevant hereto, was a qualified individual with a disability as that term is defined under the ADA, 42 U.S.C. §12102(1), because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such disability, and/or was regarded by Defendant as a person with such impairments.

119.    At all relevant times, Mr. Lucas was able to be a functional student with a reasonable accommodation for his Crohn's disease.

120.    Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions, including but not limited to, failing to provide for reasonable accommodations for his disability, which constitutes unlawful disability discrimination against Mr. Lucas in violation of the ADA.

121.    Defendants acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard of, Mr. Lucas' rights under the ADA.

122.    As a direct and proximate result of Defendants' intentional discrimination, Mr. Lucas has suffered out of pocket losses and has been deprived of his education, including loss of future economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

123.    Defendant's actions have caused and will continue to cause Mr. Lucas to suffer

damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

124.    Pursuant to the ADA, Mr. Lucas is entitled to damages including lost compensation and lost benefits, compensatory damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

## COUNT TWO: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

125.    Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

126.    Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

127.    Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under the ADA, and acted in reckless disregard for Mr. Lucas' rights under the ADA.

128.    As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

129.    Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under the ADA.



**COUNT THREE: DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT**

130. Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein.

131. At all relevant times, Mr. Lucas was a qualified individual with a disability as that term is defined under the Tennessee Human Rights Act, because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments. T.C.A. §4-21-102.

132. At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.

133. Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

134. The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful disability discrimination against him in violation of the Tennessee Human Rights Act.

135. Defendant acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard for, Mr. Lucas' rights under the Tennessee Human Rights Act.

136.    As a direct and proximate result of Defendant's intentional discrimination, Mr.

Lucas has suffered out of pocket losses, been deprived of prospective economic benefits,

including income in the form of wages and other benefits, all in an amount to be established

at trial.

137.    Defendant's actions have caused and will continue to cause Mr. Lucas to

suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other

non-pecuniary losses, all in an amount to be established at trial.

138.    Pursuant to the Tennessee Human Rights Act, Mr. Lucas is entitled to damages

including compensatory damages, his attorney's fees and cost of litigation, and all other relief

recoverable under the Tennessee Human Rights Act.

## COUNT FOUR: RETALIATION
## IN VIOLATION OF THE TENNESSEE
## HUMAN RIGHTS ACT

139.    Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully

herein.

140.    Mr. Lucas engaged in statutorily protected activity by requesting a reasonable

accommodation for his disability and filing complaints with Vanderbilt University when his

professors discriminated against him due to his disability and the reasonable accommodations to

which he was afforded due to his disability.

141.    Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas'

rights under the Tennessee Human Rights Act, and acted in reckless disregard for Mr.

Lucas' rights under the Tennessee Human Rights Act.

142.    As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost

future compensation and other benefits of employment, emotional distress, inconvenience,

loss of income, humiliation and other indignities.

143. Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under the Tennessee Human Rights Act.

## COUNT FIVE: BREACH OF CONTRACT

144. Plaintiff incorporates and reasserts herein by reference all preceding paragraphs as if fully set forth herein.

145. Plaintiff applied to and enrolled in Defendant Vanderbilt's program and paid tuition in addition to other fees and expenses. Plaintiff did so in reliance on the understanding and expectation that Defendant Vanderbilt would implement and enforce the promises and policies made in it is official publications, including its Mission Statement, the Student Handbook, its policies and procedures, as well as other relevant documents, including those not mentioned in this complaint.

146. A contract implied in fact or in law was formed between Defendant Vanderbilt and the Plaintiff once the Plaintiff applied to and enrolled in the program. Specifically, Defendant Vanderbilt offered Plaintiff the ability to enroll in the university upon the condition that the Plaintiff paid for the necessary tuition and fees.

147. Once Plaintiff paid for his tuition and fees, Plaintiff accepted Defendant Vanderbilt's offer. In this contract, Defendant Vanderbilt expects Plaintiff to adhere to all of the policies set forth in the Student Handbook while attending the University. In return, Defendant Vanderbilt receives the benefit of their policies being met, as well as Plaintiff's financial contribution to the University. Likewise, Plaintiff expects Vanderbilt to follow the

policies and procedures set out in its mission statement, Student Handbook, and other relevant documents.

148.    Moreover, the contract contained an implied covenant of good faith and fair dealing. Defendant Vanderbilt's Student Handbook for the 2023-2024 school year states that Vanderbilt University is committed to equal access for people with disabilities. In compliance with Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990 (ADA), and the ADA Amendments Act of 2008, Vanderbilt does not exclude otherwise qualified persons with disabilities, solely by reason of the disability, from participating in university programs and activities, nor are persons with disabilities denied the benefits of these programs or subjected to discrimination.

149.    It also states:

Vanderbilt University is committed to encouraging and sustaining a learning and work community that is free from prohibited discrimination, harassment, and retaliation. Vanderbilt University does not discriminate against individuals on the basis of their race, color, national or ethnic origin, religion, sex, sexual orientation, gender identity, gender expression, parental status, age, disability, military service, veteran status, genetic information, or any other classification protected by law in its administration of educational policies, programs, or activities; admissions policies; scholarship and loan programs; athletic or other University- administered programs; or employment.

150.    Vanderbilt's Student Handbook made specific representations that it would ensure an environment that was free of discrimination on the basis of disability, and free



from retaliation against students who made complaints regarding being discriminated against on the basis of disability.

151. Defendants repeatedly and materially breached their contractual obligations owed to Plaintiff, by failing to prevent his Professors from discriminating against him on the basis of his disability or preventing them from retaliating against him for his disability, use of reasonable accommodations, and complaints that he was being wrongfully discriminated against on the basis of his disability.

152. As explained above, Vanderbilt failed to prevent Plaintiff from being retaliated against for his use of reasonable accommodations for which he was approved to accommodate his Crohn's disease.

153. Following Plaintiff's complaints regarding his lack of accommodation, Plaintiff was subject to additional adverse treatment, including being subjected to adverse grading decisions, based on unsubstantiated allegations that he accessed patients' records while not in clinic although he had been requested to do so by his own professor.

154. Plaintiff was then wrongfully dismissed from the School of Nursing. Furthermore, Plaintiff was denied the ability to redress his retaliation and discrimination as he was refused the remedy of his grades being changed to incomplete from failing as a remedy for the discrimination and retaliation, he experienced from his Professors that caused him to wrongfully receive a failing grade in two of his courses for the Fall 2023 academic semester.

155. As a direct and foreseeable result of these breaches of contract, the Plaintiff sustained, and will continue to sustain substantial injury, damages, and loss, including but not limited to past and future economic loss, loss of wages, deprivation of due process, loss of

future career prospects, severe emotional distress, defamation to his character, and mental anguish.

## COUNT SIX: PROMISSORY
## ESTOPPEL

156. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

157. As described above, the anti-discrimination and anti-retaliation policies detailed in the Vanderbilt University Student Handbook constitutes a promise that Defendant Vanderbilt will act in a manner described in the publications. Defendant Vanderbilt should have expected Plaintiff to rely on the policies stated in the handbook when he re-enrolled in Vanderbilt. Plaintiff reasonably expected Defendant Vanderbilt would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

158. Injustice can only be avoided by enforcement of Defendant Vanderbilt's representations.

159. As a direct and foreseeable result of Defendant Vanderbilt's failure to honor its promises, the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT SEVEN: DISCRIMINATION ON THE BASIS
## OF DISABILITY IN VIOLATION OF THE
## REHABILITATION ACT OF 1973

160. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

161. Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits



of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance.

162. Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

163. Plaintiff is a qualified individual with a disability under the definition of Section 504 of the Rehabilitation Act of 1973.

164. Mr. Lucas was a qualified individual with a disability as that term is defined under the Rehabilitation Act because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments.

165. At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.

166. Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

167. The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful disability discrimination against him in violation of Section 504 of the Rehabilitation Act.

168. Defendant acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard for, Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

169. As a direct and proximate result of Defendant's intentional discrimination, Mr. Lucas has suffered out of pocket losses, been deprived of prospective economic benefits,



including income in the form of wages and other benefits, all in an amount to be established at trial.

170.   Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

171.   Pursuant to the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Rehabilitation Act.

## COUNT EIGHT: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE REHABILITATION ACT OF 1973

172.   Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

173.   Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

174.   Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under Section 504 of the Rehabilitation Act, and acted in reckless disregard for Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

175.   As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

COPY

176. Pursuant to Section 504 of the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under Section 504 of the Rehabilitation Act.

## COUNT NINE: NEGLIGENCE

177. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

178. When Defendant Vanderbilt accepted Plaintiff's enrollment as a student, they entered into a duty of care relationship with Plaintiff to conduct themselves in a manner consistent with the Student Handbook and with a non-negligent manner.

179. Defendant Vanderbilt breached its duty of care toward Plaintiff when it failed to prevent Plaintiff from being discriminated against on the basis of his disability, Crohn's disease, as well as being retaliated against for complaints regarding his professor's failure to reasonably accommodate his disability.

180. Due to Defendant Vanderbilt's negligent conduct the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

181. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

182. Defendant Vanderbilt's conduct toward Plaintiff in allowing him to be discriminated against on the basis of his disability and retaliated against for making complaints regarding his professors' discrimination against him and retaliation for his complaints regarding their failure to provide reasonable accommodations was so reckless

and so outrageous as to not be tolerated by a civilized society.

183.     Vanderbilt's conduct has and continues to cause serious mental injury to the
Plaintiff and has significantly impaired Plaintiff's daily life.

## COUNT ELEVEN: DECLARATORY RELIEF

184.     The Plaintiff incorporates and reasserts all previous allegations as if copied
verbatim herein.

185.     Section 504 of the Rehabilitation Act of 1973 states that "no qualified
individual with a disability in the United States shall be excluded from, denied the benefits of,
or be subjected to discrimination under" any program or activity that either receives Federal
financial assistance.

186.     Upon information and belief, Defendant Vanderbilt receives substantial
monies in federal funding for research and development.

187.     Plaintiff is a qualified individual with a disability under the definition of Section
504 of the Rehabilitation Act of 1973.

188.     Mr. Lucas was a qualified individual with a disability as that term is defined
under the Rehabilitation Act because he suffers from Crohn's disease, which substantially
limits one or more of his major life activities, has a record of such impairments, and/or was
regarded by Defendant as a person with such impairments.

189.     At all relevant times, Mr. Lucas was able to be a functional student with
reasonable accommodations for his disability.

190.     Defendant, by and through its agents, representatives, and employees,
intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including
but not limited to denying him reasonable accommodations and discriminating against him on
the basis of his disability.

COPY

191.    Based on the foregoing, Defendant Vanderbilt has deprived Plaintiff, on the basis of his disability, of his rights to due process and equal protection through the improper administration of Defendant Vanderbilt's anti-discrimination and anti- retaliation policies.

192.    Defendant Vanderbilt has violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Tennessee Human Rights Act by failing to provide Plaintiff with protection against discrimination on the basis of disability and failed to prevent his Professors from retaliating against Plaintiff due to his complaints about their failures to accommodate his disability.

193.    Based on the foregoing, Plaintiff's grades were wrongfully changed from passing grades to failing grades and he was wrongfully dismissed from the Master of Nursing Program due to his disability and in relation for his complaint regarding the discrimination that he suffered due to his disability.

194.    Plaintiff therefore requests that the Honorable Court issue: an order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt School of Nursing Master of Nursing Program without prejudice and will all the rights and privileges appertaining thereto; an order mandating Defendant to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal; and an order requiring Defendant to implement comprehensive training programs for faculty and staff to prevent future incidents of discrimination and to promote awareness of the rights of students with disabilities.

195.    The allegations described in Counts Fourteen, Thirteen, and Twelve touch on different aspects of professional ethics violations within various roles at Vanderbilt University, encompassing administrative, nursing, and law enforcement positions. Each count references



specific statutes within the Tennessee Code Annotated (TCA), which provide legal frameworks against which these alleged actions are measured.

## COUNT TWELVE: LAW ENFORCEMENT MISCONDUCT BY DEFENDANT NEWSOME

196.        In this count, the plaintiffs allege that Defendant Joel Newsome, associated with the Vanderbilt University Police Department, engaged in actions constituting misconduct and abuse of authority, in violation of specific statutes under the Tennessee Code Annotated (TCA) and relevant sections of the United States Code (USC). These actions, as detailed by the plaintiffs, purportedly involve the misuse of official position and information for personal gain, directly contravening established legal and ethical standards designed to govern the conduct of law enforcement officials.

The allegations against Defendant Newsome are twofold:

1. Misuse of Official Information and Position for Personal Gain: The plaintiffs assert that Defendant Newsome exploited his official capacity and access to confidential information, actions that are expressly prohibited under TCA § 39-16-403. This statute mandates that public servants may not use privileged information or their position to secure unwarranted privileges or exemptions for themselves or others. The defendant's actions, as alleged, represent a clear breach of this statute, undermining public trust in law enforcement and the integrity of the Vanderbilt University Police Department.

2. Violation of Federal Standards for Law Enforcement Conduct: In addition to state law violations, the plaintiffs contend that Defendant Newsome's conduct also breaches specific provisions of the United States Code related to law enforcement integrity and accountability. While the precise USC statutes are not enumerated here, potential federal violations could include misuse of authority, violation of civil rights under color of law

(typically under USC Title 18, Section 242), and other misconduct offenses that align

with the defendant's actions as described.

197.        By incorporating both state and federal statutes, this count highlights the severity

of Defendant Newsome's alleged misconduct, positioning his actions not merely as ethical

breaches but as violations of clearly defined legal obligations. The plaintiffs seek to emphasize

the broader implications of such misconduct, including the erosion of public confidence in law

enforcement, the potential harm to individuals subject to law enforcement actions, and the

undermining of the legal and ethical standards that should guide the behavior of all law

enforcement officials.

## COUNT THIRTEEN: ETHICAL BREACHES AND MISCONDUCT IN NURSING,
## RESULTING IN STATUTORY VIOLATIONS

198.        The plaintiff is asserting that Defendants Claires Gamez, Marissa Shulruff, and

Chrystal Ritchie have engaged in a pattern of behavior egregiously conflicting with the

foundational ethical standards of the nursing profession. This behavior, motivated by personal

gain, constitutes a clear and direct violation of the Tennessee Code Annotated (TCA) § 63-7-

115(a)(3). According to this statute, the act of engaging in unprofessional conduct, especially

that which is capable of deceiving, defrauding, or harming the public, is recognized as grounds

for significant disciplinary action, up to and including the restriction, suspension, or revocation

of nursing licensure.

199.        This statutory framework under TCA § 63-7-115(a)(3) is designed to protect the

public from unethical practices within the nursing profession, ensuring that nurses adhere to the

highest standards of professional conduct. The defendants' actions, as described, not only

contravene this critical statutory safeguard but also represent a breach of the American Nurses



Association (ANA) Code of Ethics. The ANA Code of Ethics is widely regarded as the definitive guide to ethical nursing practice, emphasizing the importance of integrity, patient welfare, and professional accountability.

200.     The complaint provides detailed evidence of instances in which the defendants prioritized their personal interests over their professional duties and obligations, thereby undermining the trust and reliance the public places in the nursing profession. Such conduct threatens the very integrity of the nursing profession, eroding public confidence and compromising the standard of care patients expect and deserve.

201.     By documenting these actions, the plaintiffs aim to highlight the severe impact of the defendants' misconduct, not only on the individuals directly affected but also on the broader ethical landscape of the nursing profession. The plaintiffs seek judicial recognition of these breaches of statutory and ethical standards, advocating for appropriate disciplinary measures as warranted under TCA § 63-7-115(a)(3) to uphold the integrity and trustworthiness of the nursing profession and protect the welfare of the public.

202.     Plaintiff has underscored the necessity of stringent adherence to both statutory regulations and ethical guidelines within the nursing profession, as essential safeguards against misconduct and as fundamental to the maintenance of professional integrity and public trust.

## COUNT FOURTEEN: BREACH OF PROFESSIONAL ETHICS IN STUDENT
## AFFAIRS

203.     Plaintiff alleges that Vanderbilt University administrators' defendants have failed to adhere to ethical standards in higher education administration. The reference to TCA § 49-2-203(b)(1) underscores the legal expectation for educational institutions to apply policies and procedures equitably among students. The allegations suggest a breach not only of statutory

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 207 of 431 PageID #: 466



obligations but also of broader ethical standards set by accrediting bodies for educational administration. In addressing this count legally, it would be crucial to examine the specific actions taken by the defendants and assess how these actions deviated from both the statutory mandate and the ethical guidelines established by relevant accrediting organizations.

## COUNT FIFTEEN: FAILURE OF NURSING EDUCATORS TO UPHOLD ETHICAL STANDARDS AND REPORT MISCONDUCT

204.    In this count, the plaintiffs allege that licensed nursing educators, by their actions and omissions, failed to meet the ethical standards required of their professional licensure, particularly in their duties to protect students and report unethical conduct. This failure is highlighted in their knowledge of, and inaction towards, the wrongful actions taken against Mr. Ian Lucas by the University, actions known to be unjust and detrimental to the student's welfare and educational opportunities.

205.    The conduct of these nursing educators is in direct contravention of the duties and responsibilities encapsulated within the Tennessee Code Annotated (TCA), which outlines the ethical and legal obligations of licensed nursing professionals, including educators. Specifically, their failure to act and report the misconduct breaches the statutes governing the ethical standards of nursing licensure, notably provisions that require nurses, including nurse educators, to advocate for the welfare of their patients, students, and the public, and to report any actions that contradict the welfare, safety, and health of those they are entrusted to protect.

206.    Moreover, this inaction and failure to report the misconduct to relevant oversight bodies, such as the Board of Nursing and the Department of Education, further demonstrate a breach of ethical obligations. Such reporting is essential to uphold the integrity of the nursing profession and the educational environment, ensuring that any conduct that could harm students

or degrade the quality of nursing education is promptly addressed and remediated.

207.         This count emphasizes that professional nurse educators are expected to act in
the best interest of their students, advocating for their welfare and protecting them from harm.
The defendants' knowledge of the wrongful actions taken against Mr. Lucas and their
subsequent failure to intervene or report these actions signify a significant dereliction of their
professional and ethical duties. This not only compromised Mr. Lucas's educational experience
and well-being but also undermined the ethical standards and trust upon which the nursing
education system is built.

208.         By highlighting these failures, the plaintiffs seek to hold the defendants Pamela
**Jefferies, Mavis Schorn, Mary Ann Jessee**, **Lacey Cross, Monika Do, Carrie Plummer,**
**Ellen Schoen, Judson Smith**, **Melanie Morris, Robingale Panepinto, Melissa Lord,**
**Brittany Kirby, and Shannon Ellrich** accountable for their actions and inactions,
underscoring the importance of ethical integrity and the duty of care that nursing educators owe
to their students. The plaintiffs demand appropriate remedial actions and sanctions against the
defendants for their failure to meet the ethical standards of nursing licensure, as well as
measures to protect future students from similar misconduct, ensuring a safe, equitable, and
ethical educational environment.

   1. The TCA, particularly in the sections relevant to nursing, outlines the standards for
      licensure, conduct, and disciplinary actions. For example:
   2. **TCA § 63-7-115(a)(3)** might be cited in scenarios involving professional misconduct.
      This section typically addresses unprofessional conduct, including actions that deceive,
      defraud, or harm the public, or are detrimental to the public's welfare. It's part of the
      statutes that govern the health-related boards and specifically, the practice of nursing.

COPY

3. **TCA § 63-7-207** details the grounds for disciplinary action against a nurse's license, which could include misconduct, fraud, conviction of a felony, or any action that endangers the health, safety, or welfare of the public.

4. Given the context of your inquiry, relevant sections would likely focus on the duty of nurses, including educators, to report unethical behavior, ensure the welfare of students, and adhere to professional standards of conduct.

5. **American Nurses Association (ANA) Code of Ethics**

6. The ANA Code of Ethics provides a foundational framework for nursing practice, emphasizing ethical obligations and duties across all roles, including educators. While not legally binding like state statutes, the Code of Ethics is highly influential in defining professional conduct. Key provisions that might apply include:

7. **Provision 3** focuses on the nurse's obligation to promote, advocate for, and protect the rights, health, and safety of the patient. In an educational context, this extends to the welfare and rights of students.

8. **Provision 4** outlines the nurse's obligation to take appropriate action in instances of incompetent, unethical, illegal, or impaired practice, emphasizing the duty to report such behaviors to relevant authorities to protect the health and safety of patients and the public.

9. **Provision 6** addresses the nurse's role in establishing, maintaining, and improving healthcare environments conducive to the provision of quality health care and consistent with the values of the profession through individual and collective action.

209.        These provisions underscore the ethical responsibility of nurse educators to act in the best interest of their students, to maintain high standards of personal and professional

conduct, and to report any conduct that is harmful, unethical, or diminishes the quality of care
or education.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Ian Hunter Lucas, prays for judgment against Defendant
Vanderbilt University and further respectfully requests this Honor Court to:

1.     Issue a judgment declaring the following:

   a. order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt
   School of Nursing Master of Nursing Program without prejudice and will all the
   rights and privileges be appertaining thereto;

   b. an order mandating Defendant to expunge any academic disciplinary actions
   from Plaintiff's university records that arose from the alleged incidents leading
   to Plaintiff's dismissal; and

   c. an order requiring Defendant to implement comprehensive training programs for
   faculty and staff to prevent future incidents of discrimination and to promote
   awareness of the rights of students with disabilities.

2.     Award Plaintiff Compensatory Damages for the economic losses incurred by
Plaintiff, including but not limited to tuition and fees paid for the period of enrollment during
which Plaintiff suffered discriminatory actions, the cost of academic materials, and living
expenses attributable to the expected duration of Plaintiff's academic program. Additionally,
Plaintiff seeks compensation for non-economic damages, including pain and suffering,
emotional distress, and loss of enjoyment of life, in an amount to be proven at trial, but no less
than $500,000.

3. An award of punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and intentional conduct and to deter similar conduct in the future, suggested to be no less than $2,000,000.00, reflecting the egregious nature of Defendants' actions against Plaintiff.

4. An award of pre-judgment and post-judgment interest on all monetary awards at the maximum legal rate under Tennessee law, from the date of each loss until the date of judgment and continuing thereafter at the legal rate until all sums due to Plaintiff are fully paid.

5. An award of all costs associated with bringing this action, including but not limited to court costs, expert witness fees, and reasonable attorney's fees, pursuant to Tennessee Code Annotated §20-12-110 and other applicable statutes.

6. Such other and further relief as the Court deems just and proper, including but not limited to if needed:

> a. An award for the cost of obtaining alternative educational opportunities equivalent to the education Plaintiff would have received at Vanderbilt School of Nursing;
>
> b. An award for vocational and professional rehabilitation services to ameliorate the impact of the delayed entry into the nursing profession; and
>
> c. An order for a declaratory judgment that Defendants' actions violated specific rights of Plaintiff under federal and Tennessee law.

Plaintiff reserves the right to amend this prayer for relief to conform to the evidence presented at trial.

 COPY

EFILED 03/31/24 07:41 AM CASE NO. 24C655 Joseph P. Day, Clerk

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted.

ian lucas

IAN H. LUCAS

Dated: March 31, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY 

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31 day of March 2024, a true and correct copy of the
foregoing Amended Complaint was furnished to the following party via email, which is
permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

All new defendants have been I HEREBY CERTIFY that on this 31 day of March 2024, a true
and correct copy of the foregoing Amended Complaint was furnished to the following party via
email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents
and certified mail to:

Office of the General Counsel
2100 West End Avenue, Suite 1100
Nashville, TN 37203

Tracey George, Cybele Raver, Daniel Diermeier, Melanie Lowe, Ernie Rushing, Sara Donahoe,
Terry Walker, Teresa Rogers, Julie Perry, K. Melissa Smith Hayes, Nancy Wise, Jane Zubulake,
Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Mia
Wells, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich

I affirm that the method of service used herein is consistent with the provisions of the Tennessee
Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: March 31, 2024

Respectfully Submitted.

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY

# EXHIBIT 1

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

Declaration of Ian Hunter Lucas for Motion for Preliminary Injunction

I, Ian Hunter Lucas, hereby declare:

1. Prior Clearance and Integrity of University Processes: I am deeply concerned with the ongoing pursuit of allegations against me, despite a previous clearance by the university's wellness committee on December 4, 2023. This clearance, affirmed by the Office of the General Counsel, is crucial yet overlooked in the current proceedings, signaling a potential bias or malicious intent undermining my academic integrity. The act of revisiting these cleared allegations, without new evidence or just cause, not only undermines the integrity of the university's processes but also dismisses prior determinations favoring my position.

2. Procedural Integrity and Concerns Over Campus Restriction: The current reinvestigation lacks procedural integrity, evidenced by the absence of new justifying evidence. My responsible handling of personal firearms during a period of emotional distress, demonstrating a commitment to community safety and mental health awareness, has been overlooked. This proactive step, coupled with confirmation from VUPD of no threat posed by me, questions the justification behind the imposed campus restrictions, highlighting a disregard for my well-being and rights.

3. Allegations Without Substantial Evidence: The allegations surrounding the creation of an anonymous email and falsification of medical documentation lack substantial evidence. These charges, seemingly based on misunderstandings or misinterpretations, do not reflect the necessary due diligence. This oversight points to a concerning pattern of disregarding established facts and context in favor of pursuing baseless claims.

4. Request for Dismissal of Charges with Prejudice: Given the concerns raised, including the absence of credible evidence and procedural discrepancies, I formally request the dismissal of all charges against me with prejudice. This motion is based on the foundational lack of evidence, the disregard for procedural fairness, and a failure to acknowledge previous resolutions in my favor.

5. Lack of Due Process and Diligence: The university's inconsistent and misleading statements regarding the process and handling of my case illustrate a clear lack of due process and diligence. This approach not only affects the fairness of the proceedings but also highlights a systemic issue within the university's disciplinary system, further exacerbating my concerns over bias and malicious intent against my academic standing.

6. Misrepresentation of the Welfare Panel Process: The university's portrayal of the December 4th, 2023 meeting as unrelated to the Welfare Panel process contradicts documented policies and undermines the integrity of the Wellness Panel procedures. This misrepresentation and misuse of intended student welfare procedures suggest discriminatory practices against individuals facing mental health challenges, further violating my rights to fair treatment and due process.

7. Baseless Allegations of Defrauding SCAP Funds: The charges alleging I defrauded the university through the Student Care Assistance Program (SCAP) funds are unfounded and discriminatory. My engagement with SCAP was conducted in strict adherence to its established guidelines, aimed at addressing my significant mental health care needs, contradicting the university's claims of misconduct.

8.Conclusion and Call for Action: In light of the lack of procedural fairness, due diligence, and the evident disregard for previously determined outcomes, I respectfully urge the university to reevaluate the charges against me within a framework of fairness, transparency, and integrity. My commitment to safety, responsibility, and mental health awareness should be acknowledged and not penalized based on unfounded allegations and procedural discrepancies.

9. Threats to Personal Safety and Well-being by Vanderbilt University: I am compelled to express grave concerns regarding Vanderbilt University's egregious actions that have directly threatened my personal safety and well-being. The university has utilized its Vanderbilt University Police Department (VUPD), which also patrols the Vanderbilt University Medical Center, as a means to intimidate and dissuade me from seeking necessary medical care. This intimidation has been executed under the looming threat of arrest or physical harm. Most distressingly, there have been implications communicated to VUPD officers that I was "armed and dangerous," with instructions to use "all necessary force," ominously suggesting the authorization of lethal force. This baseless and dangerous portrayal has placed me in a position of fearing for my life, severely impacting my sense of security and trust in the university's intent to ensure a safe environment for its community members.

Vanderbilt University and my former employer, Air Evac Lifeteam, and the subsequent retaliatory and potentially criminal actions taken against me. This collusion is evidenced by Vanderbilt's acceptance of a donation from Air Evac Lifeteam, which seemingly facilitated discriminatory actions against me, especially in light of my role as a federal witness in an ongoing federal investigation.

Federal Witness intimidation and harassment in conjunction with plaintiff as being a federal whistle blower.

Collusion with Air Evac Lifeteam, Global Medical Response and KKR & Co.
1. Vanderbilt University, in accepting a significant donation from Air Evac Lifeteam, has exhibited a conflict of interest that directly impacts the impartiality and integrity of their actions against me. This donation raises substantial questions regarding the motivations behind my wrongful expulsion and the unjust restrictions imposed upon my academic and campus participation.
2. Retaliation Tied to Federal Investigation: The actions taken by Vanderbilt, in conjunction with Air Evac Lifeteam, suggest retaliatory motives, particularly due to my involvement as a federal witness in an investigation that potentially implicates Air Evac Lifeteam. The timing and nature of Vanderbilt's actions against me align suspiciously with my cooperation in the federal investigation, indicating a concerted effort to discredit and marginalize me.
3. Manipulation of Internal Processes: Vanderbilt's handling of internal investigations and disciplinary actions against me lacks transparency and disregards crucial facts. This approach demonstrates a deliberate manipulation of processes to achieve desired outcomes, further suggesting collusion with Air Evac Lifeteam to retaliate against me for my federal testimony.
4. A Board of Professional Responsibility report demonstrates that defendant Michelle Tellock had conversations in regards to trading information on plantiff to Tim Garrett at Bass Berry Sims who was retained by Air Evac to conduct an internal investigation as part of a wrongful termination for Plantkff being a whistleblower on the company.
5. Plantiff received notice of intern campus suspension and notice from employer at the time Air Evac on December 4th, 2023 on the same day exactly 1hr and 18min apart.
6. Vanderbilts inclusion of "Disorderly Conduct"despite no disorderly conduct being brought to the plantiff attention during the conduct hearing proceedings, however this was included in the plaintiffs explosion letter is further evidence and allusions to Air Evac claims and needing

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Vanderbilt and Air Evac reason for expulsion and termination of employment to match on which both agreed to use "policy violation".

7. KKR & Co is listed as a donor on the Vanderbilt "Dare to Grow" website.
8. In November 17th 2023 an anonymous donor made a 1.25 million dollar donation to the plaintiffs program of study directly for the Master of Nursing Program. It is evident this donation was made by KKR & Co. Through the Conway Whelch foundation in order to hide the truth of the source of the donation.

The collusion between Vanderbilt University and Air Evac Lifeteam, coupled with the retaliatory and potentially criminal conduct directed at me, underscores a profound breach of legal and ethical standards. This conduct has been reported to federal law enforcement, highlighting the serious nature of the allegations and the need for immediate intervention.

Given these circumstances and the additional evidence of Vanderbilt's collusion and misconduct, I reiterate my request for a comprehensive investigation into Vanderbilt University's actions. This investigation should extend to examining the nature and influence of the donation from Air Evac Lifeteam, especially in relation to decisions affecting my academic standing and rights.

Therefore, I submit this declaration in support of my motion for preliminary injunction, seeking redress from the prejudicial actions unjustly taken against me. I affirm the accuracy of the information herein to the best of my knowledge and belief.

Executed on March 25th 2024

Ian Hunter Lucas

COPY

# EXHIBIT 2

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

### RE: N5801 Accommodations

### Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
Mon 8/21/2023 2:06 PM

To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc:Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>;Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>

Hi Ian,

All students are held to the same standard for the first absence which includes a ten-point deduction. However, your accommodation will allow for a second absence with the ability to earn points (again with the ten-point deduction) rather than the zero.

This is due to the need to accurately measure core course competencies and grade accordingly. This course is designed with an emphasis on collaborative group active learning activities. Excessive absences and make-up experiences may negatively impact the trajectory of learning in this course.

We believe you will be successful in the course while meeting your disability needs and look forward to supporting you this semester.

Thanks,

Drs. Enstrom & Robbins

## Cate Enstrom DNP, AGACNP-BC, CNE
Assistant Professor of Nursing
School of Nursing | Vanderbilt University
615.322.7819 | cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044

From: Lucas, Ian H
Sent: Monday, August 21, 2023 11:01
To: Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
Cc: Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
Subject: Re: N5801 Accommodations

Dr. Enstrom

Could you clarify this for me, if I am absent due to a medical reason I will be deducted points?

"The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero)"

Thanks,

Ian

Get Outlook for iOS

From: Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
Sent: Monday, August 21, 2023 10:56:20 AM
To: Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc: Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
Subject: N5801 Accommodations

Hi Ian,

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

We have received a letter from Student Access Services indicating the need for appropriate classroom and testing accommodations for N5801 Human Experiences in Health and Illness Across the Lifespan II fall 2023 semester. The course is intentionally designed to provide an inclusive and accessible learning environment. However, when there is a need for additional support, the HEHI faculty are eager to make those accommodations.

I have addressed your requests as it this applies for all the rotations.

1. **Alternative testing:**
    a. *Ability to take breaks*– You are permitted to take breaks while taking exams. We will review any possible remote proctor violations this may possibly flag and dismiss it as long as all other exam guideline are followed. Do not use or view reference materials during your breaks.
    b. *Extra time (2x)* –Extra time (2x) has been applied for all your exams. The ATI quiz and pre-class quizzes are not timed and open for a full week. This will be due at the original time with no adjustment to the deadlines. In-class case-study assignments completed with group members will remain due at the end of the class session.

2. **Classroom modifications**
    a. *Disability Related Absences/Attendance Policy:*
        • In the event of missed class session, student will be responsible for obtaining materials covered in class. Student is expected to demonstrate professional responsibility by notifying course instructor and course coordinator as far in advance as is possible when it becomes apparent that they will be absent from class.
        • Exams missed for medical reasons will be rescheduled on a case-by-case basis, to be completed as soon as possible after the originally scheduled exam time.
        • If student misses class and is unable to complete and submit the in-class case study by the end of the class session due to absence, the student will be required to complete a make-up case study assignment.
        • The make-up assignment will be a single case study that is moderately expanded in depth compared to the in-class case studies, but very similar with regard to content. The student should complete the make-up case study independently. The make-up case study will be due one week from the date of the missed class session.
            • The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero).
        • *Absences exceeding more than two cumulative class sessions may represent a significant disruption to the learning trajectory (due to the collaborative aspect of group work and collective learning). Absences exceeding more than two cumulative class sessions warrants discussion with the course coordinator and program director regarding the possibility of an adjustment to the planned program of study.*
    b. *Leave class/take breaks as needed:*
        • For each individual class session, student must attend for at least half of the scheduled class period to constitute attendance for the week. If student misses more than half of a single class session that would constitute an absence and a make-up activity will be assigned for that week.

Would you please respond to this email to indicate whether or not these proposed accommodations are appropriate? Additionally, we are always happy to meet (in person or

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

online) to discuss how your request for classroom and testing accommodations might be met. We want you to feel welcomed and equipped to be successful in the course.

Have a lovely day,

Drs. Enstrom & Robbins



Cate Enstrom DNP, AGACNP-BC, CNE
Assistant Professor
School of Nursing I Vanderbilt University
615.322.7819 I cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044
461 21st Ave S, Office 543 SON
Nashville, TN 37240
Strengths: Significance I Futuristic I Individualization I Focus I Maximizer
Pronouns: she/her/hers

COPY

# EXHIBIT 3

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

 Jessee, Mary Ann                                    11:59 AM
To You, Jamerson, Neil E and Privacy Office           ...



Hello Ian,

We are reaching out today regarding electronic health records that were printed by you on 9/19/23, 10/10/23, and 10/17/23. These printed documents were part of the health records of patients to whom you were assigned in your VUSN course clinical experiences, but the dates and/or times of this printing was outside of your scheduled clinical time in the hospital. Therefore, we need you to return those documents to us for proper disposal. Please respond to confirm you still have those documents and we will determine a time and place for you to return them. If you do not still have them, please indicate how and where you disposed of them.

Please respond to this email no later than end of day Friday, January 12. Failure to do so will result in referral to Student Accountability in addition to any other remedies available to the University and Vanderbilt University Medical Center.

Thank you,
Mary Ann Jessee and Neil Jamerson

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240

EFILED 04/03/24 10:28 AM CASE NO. 24C855 Joseph P. Day, Clerk



**Moore, Kerry E**
kerry.e.moore@vumc.org

To: You ian.h.lucas.1@Vanderbilt.Edu
Jessee, Mary Ann mary.a.jessee@Vanderbilt.Edu

Cc: Jamerson, Neil E neil.e.jamerson@Vanderbilt.Edu
Privacy Office Privacy.Office@vumc.org

⊖ **PERMISSIONS – Restricted**

Wednesday, January 10, 12:27 PM

You don't often get email from kerry.e.moore@vumc.org. Learn why this is important

Hi Mary Ann & Ian – since these documents were placed in a shred bin there is no breach. Thank you for reaching out to the Privacy Office.



Kerry

Kerry E. Moore, MHIIM, RHIA
Program Manager, Privacy Office
Vanderbilt University Medical Center Privacy.Office@VUMC.org I
Phone 615.936.3594 I fax 615.343.6966 I Kerry.e.moore@vumc.org

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

## 5815 course information

### Jessee, Mary Ann <mary.a.jessee@Vanderbilt.Edu>
Mon 12/11/2023 1:19 PM

#### To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>

Hello Ian,

There has been an anonymous allegation that you improperly accessed patient information in the VUMC health record this semester. The course coordinators are investigating this allegation and I have recommended your grade for 5815 Nursing Care of Childbearing Families be changed to an incomplete while the investigation is in process. As the program dean, I wanted you to understand the reason for the grade change if you saw it. You will be contacted as is deemed necessary as the investigation progresses.

Thank you,
MAJ

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544

461 21st Avenue South, Nashville, TN 37240
Office (615) 343-1629 | **mary.a.jessee@vanderbilt.edu**
@majnotmadge
*She, her, hers*
**Strengths:** Relator | Learner | Responsibility | Achiever | Analytical

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

# EXHIBIT 4

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

 ≡ NurseJournal

SEARCH PROGRAMS

Featured **Career** Lifestyle Nurse Spotlight Student Resources

SHARE THIS 

# Vanderbilt School of Nursing Gets $1.25 Million for Master of Nursing Program

 **by Ann Feeney, CAE**
Published November 17, 2023 · 2 Min Read

✓ Edited by **Scott Harris**

Vanderbilt University's School of Nursing received $1.25 million to fund the Conway-Welch Second Degree in Nursing Scholarship. Learn more about the gift and MSN programs.



Image Credit: SeanPavonePhoto / iStock / Getty Images Plus

- The Vanderbilt University School of Nursing received a $1.25 million pledge to fund a master of science in nursing scholarship.

FILED 04/03/24 10:28 AM CASE N̲o̲. 24C665 Joseph P. Day Cl'

Case 3:24-cv-00440 Document 1-4 Filed 04/10/24 Page 228 of 431 PageID #: 487

COPY

Joseph P. Day, Clerk

CASE NO. 24C655

EFILED 04/03/24 10:28 AM

Form **990-PF**

Department of the Treasury
Internal Revenue Service

## Return of Private Foundation
### or Section 4947(a)(1) Trust Treated as Private Foundation

▶ Do not enter social security numbers on this form as it may be made public.
▶ Go to *www.irs.gov/Form990PF* for instructions and the latest information.

OMB No. 1545-0047

**2022**

**Open to Public Inspection**

**For calendar year 2022, or tax year beginning 01-01-2022 , and ending 12-31-2022**

| Name of foundation | A Employer identification number |
|---|---|
| CONWAY-WELCH FAMILY FOUNDATION INC | |

| Number and street (or P.O. box number if mail is not delivered to street address) | Room/suite | B Telephone number (see instructions) |
|---|---|---|
| PO BOX 340020 | | (615) 329-9902 |

| City or town, state or province, country, and ZIP or foreign postal code |
|---|
| NASHVILLE, TN 37203 |

**C** If exemption application is pending, check here ▶ ☐

**G** Check all that apply:  ☐ Initial return  ☐ Initial return of a former public charity  ☐ Final return  ☐ Amended return  ☐ Address change  ☐ Name change

**D 1.** Foreign organizations, check here............ ▶ ☐
**2.** Foreign organizations meeting the 85% test, check here and attach computation ... ▶ ☐

**H** Check type of organization:  ☑ Section 501(c)(3) exempt private foundation
☐ Section 4947(a)(1) nonexempt charitable trust  ☐ Other taxable private foundation

**E** If private foundation status was terminated under section 507(b)(1)(A), check here ....... ▶ ☐

**I** Fair market value of all assets at end of year (from Part II, col. (c), line 16) ▶ $ 15,127,448

**J** Accounting method:  ☑ Cash  ☐ Accrual
☐ Other (specify) _____
(Part I, column (d) must be on cash basis.)

**F** If the foundation is in a 60-month termination under section 507(b)(1)(B), check here ....... ▶ ☐

### Part I — Analysis of Revenue and Expenses (The total of amounts in columns (b), (c), and (d) may not necessarily equal the amounts in column (a) (see instructions).)

| | | (a) Revenue and expenses per books | (b) Net investment income | (c) Adjusted net income | (d) Disbursements for charitable purposes (cash basis only) |
|---|---|---|---|---|---|
| **1** | Contributions, gifts, grants, etc., received (attach schedule) | | | | |
| **2** | Check ▶ ☑ . . . . . . . . . . . . . | | | | |
| **3** | Interest on savings and temporary cash investments | | | | |
| **4** | Dividends and interest from securities . . . | 234,357 | 234,357 | | |
| **5a** | Gross rents . . . . . . . . . . . . | | | | |
| **b** | Net rental income or (loss) | | | | |
| **6a** | Net gain or (loss) from sale of assets not on line 10 | -113,753 | | | |
| **b** | Gross sales price for all assets on line 6a  1,349,149 | | | | |
| **7** | Capital gain net income (from Part IV, line 2) . . . | | 0 | | |
| **8** | Net short-term capital gain . . . . . . . . | | | | |
| **9** | Income modifications . . . . . . . . . . | | | | |
| **10a** | Gross sales less returns and allowances | | | | |
| **b** | Less: Cost of goods sold . . . . | | | | |
| **c** | Gross profit or (loss) (attach schedule) . . . . . | | | | |
| **11** | Other income (attach schedule) . . . . . . . | | | | |
| **12** | **Total.** Add lines 1 through 11 . . . . . . . . | 120,604 | 234,357 | 0 | |
| **13** | Compensation of officers, directors, trustees, etc. | 168,567 | 16,858 | 0 | 101,140 |
| **14** | Other employee salaries and wages . . . . . . | | | | |
| **15** | Pension plans, employee benefits . . . . . . | | | | |
| **16a** | Legal fees (attach schedule) . . . . . . . . . | 5,061 | 0 | 0 | 2,531 |
| **b** | Accounting fees (attach schedule) . . . . . . | 5,030 | 0 | 0 | 2,515 |
| **c** | Other professional fees (attach schedule) . . . . | | | | |
| **17** | Interest . . . . . . . . . . . . . . . | | | | |
| **18** | Taxes (attach schedule) (see instructions) . . . | | | | |
| **19** | Depreciation (attach schedule) and depletion . . . | | | | |

Revenue (side label)
I Administrative Expenses (side label)



| | | | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|---|---|
| Operating and | 20 | Occupancy . . . . . . . . . . . . . . . | | | | | |
| | 21 | Travel, conferences, and meetings . . . . . . | | | | | |
| | 22 | Printing and publications . . . . . . . . . . | | | | | |
| | 23 | Other expenses (attach schedule) . . . . . . . | 106,841 | 19,580 | 0 | 6,000 | |
| | 24 | Total operating and administrative expenses. Add lines 13 through 23 . . . . . . . . . . . | 285,499 | 36,438 | 0 | 112,186 | |
| | 25 | Contributions, gifts, grants paid . . . . . . . . | 315,044 | | | 315,044 | |
| | 26 | Total expenses and disbursements. Add lines 24 and 25 | 600,543 | 36,438 | 0 | 427,230 | |
| | 27 | Subtract line 26 from line 12: | | | | | |
| | a | Excess of revenue over expenses and disbursements | -479,939 | | | | |
| | b | Net investment income (if negative, enter -0-) | | 197,919 | | | |
| | c | Adjusted net income (if negative, enter -0-) . . . | | | 0 | | |

For Paperwork Reduction Act Notice, see instructions.  Cat. No. 11289X  Form **990-PF** (2022)

Page 2

Form 990-PF (2022)  Page **2**

**Part II** | **Balance Sheets** Attached schedules and amounts in the description column should be for end-of-year amounts only. (See instructions.)

| | | Beginning of year (a) Book Value | End of year (b) Book Value | End of year (c) Fair Market Value |
|---|---|---|---|---|
| Assets | 1 Cash—non-interest-bearing . . . . . . . . . . . . | 188,773 | 198,071 | 198,071 |
| | 2 Savings and temporary cash investments . . . . . . . . . | 3,796,156 | 1,327,632 | 1,327,632 |
| | 3 Accounts receivable ▶ _____ | | | |
| | Less: allowance for doubtful accounts ▶ _____ | | | |
| | 4 Pledges receivable ▶ _____ | | | |
| | Less: allowance for doubtful accounts ▶ _____ | | | |
| | 5 Grants receivable . . . . . . . . . . . . . . . . | | | |
| | 6 Receivables due from officers, directors, trustees, and other disqualified persons (attach schedule) (see instructions) . . . . . | | | |
| | 7 Other notes and loans receivable (attach schedule) ▶ _____ | | | |
| | Less: allowance for doubtful accounts ▶ _____ | | | |
| | 8 Inventories for sale or use. . . . . . . . . . . . . | | | |
| | 9 Prepaid expenses and deferred charges . . . . . . . . . | | | |
| | 10a Investments—U.S. and state government obligations (attach schedule) | | | |
| | b Investments—corporate stock (attach schedule) . . . . . . . | 7,547,578 | 9,526,865 | 13,585,667 |
| | c Investments—corporate bonds (attach schedule). . . . . . . | | | |
| | 11 Investments—land, buildings, and equipment: basis ▶ _____ | | | |
| | Less: accumulated depreciation (attach schedule) ▶ _____ | | | |
| | 12 Investments—mortgage loans . . . . . . . . . . . . | | | |
| | 13 Investments—other (attach schedule) . . . . . . . . . . | | | |
| | 14 Land, buildings, and equipment: basis ▶ _____ | | | |
| | Less: accumulated depreciation (attach schedule) ▶ _____ | | | |
| | 15 Other assets (describe ▶ _____) | 16,078 | 16,078 | 16,078 |
| | 16 Total assets (to be completed by all filers—see the instructions. Also, see page 1, item I) | 11,548,585 | 11,068,646 | 15,127,448 |
| Liabilities | 17 Accounts payable and accrued expenses . . . . . . . . . | | | |
| | 18 Grants payable . . . . . . . . . . . . . . . . . | | | |
| | 19 Deferred revenue . . . . . . . . . . . . . . . . | | | |
| | 20 Loans from officers, directors, trustees, and other disqualified persons | | | |

https://projects.propublica.org/nonprofits/organizations [ ] 202323039349100832/full

Joseph P. Day, Clerk  CASE NO: 24-C655  FILED 04/03/24 10:28 AM

COPY

Joseph P. Day, Clerk    24C655    CASE NO. 24C655    04/03/24 10:28 AM    FILED

| | | | | |
|---|---|---|---|---|
| Lia | **21** | Mortgages and other notes payable (attach schedule) . . . . . | | |
| | **22** | Other liabilities (describe ▶ _____ ) | | |
| | **23** | **Total liabilities** (add lines 17 through 22) . . . . . . . . . | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| Net Assets or Fund Balances | | Foundations that follow FASB ASC 958, check here ▶ ☐ and complete lines 24, 25, 29 and 30. | | |
| | **24** | Net assets without donor restrictions . . . . . . . . . . | | |
| | **25** | Net assets with donor restrictions . . . . . . . . . . . | | |
| | | Foundations that do not follow FASB ASC 958, check here ▶ ☑ and complete lines 26 through 30. | | |
| | **26** | Capital stock, trust principal, or current funds . . . . . . . . | 0 | 0 |
| | **27** | Paid-in or capital surplus, or land, bldg., and equipment fund | 0 | 0 |
| | **28** | Retained earnings, accumulated income, endowment, or other funds | 11,548,585 | 11,068,646 |
| | **29** | **Total net assets or fund balances** (see instructions) . . . . . | 11,548,585 | 11,068,646 |
| | **30** | **Total liabilities and net assets/fund balances** (see instructions) | 11,548,585 | 11,068,646 |

**Part III**    **Analysis of Changes in Net Assets or Fund Balances**

| | | | |
|---|---|---|---|
| **1** | Total net assets or fund balances at beginning of year—Part II, column (a), line 29 (must agree with end-of-year figure reported on prior year's return) . . . . . . . . . . . . . . . . . . . | **1** | 11,548,585 |
| **2** | Enter amount from Part I, line 27a . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | -479,939 |
| **3** | Other increases not included in line 2 (itemize) ▶ _____ | **3** | 0 |
| **4** | Add lines 1, 2, and 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | 11,068,646 |
| **5** | Decreases not included in line 2 (itemize) ▶ _____ | **5** | 0 |
| **6** | Total net assets or fund balances at end of year (line 4 minus line 5)—Part II, column (b), line 29 . | **6** | 11,068,646 |

Form **990-PF** (2022)

───────── Page 3 ─────────

Form 990-PF (2022)    Page **3**

**Part IV**    **Capital Gains and Losses for Tax on Investment Income**

| (a) List and describe the kind(s) of property sold (e.g., real estate, 2-story brick warehouse; or common stock, 200 shs. MLC Co.) | (b) How acquired P—Purchase D—Donation | (c) Date acquired (mo., day, yr.) | (d) Date sold (mo., day, yr.) |
|---|---|---|---|
| **1 a** 200 SHS CABLE ONE | | 2022-09-01 | 2022-12-27 |
| **b** 4000 SHS HEWLETT PACKARD | | 2022-04-22 | 2022-08-16 |
| **c** 5000 SHS HEWLETT PACKARD | | 2022-04-22 | 2022-10-31 |
| **d** 1000 SHS META PLATFORMS | | 2022-07-14 | 2022-06-16 |
| **e** 1000 SHS VIASAT INC | | 2022-02-02 | 2022-08-09 |
| 2000 SHS VIASAT INC | | 2022-02-02 | 2022-10-18 |
| 2000 SHS CORECIVIC | | 2020-03-20 | 2022-10-27 |
| 5000 SHS CORECIVIC | | 2020-06-17 | 2022-10-27 |
| 3000 SHS CORECIVIC | | 2020-06-17 | 2022-10-27 |
| 10000 SHS LUMEN TECH | | 2020-07-01 | 2022-12-29 |
| 10000 SHS LUMEN TECH | | 2020-07-01 | 2022-12-29 |
| 10000 SHS LUMEN TECH | | 2020-07-01 | 2022-12-30 |
| 2000 SHS VIASAT INC | | 2020-07-20 | 2022-12-27 |
| 1000 SHS VIASAT INC | | 2020-09-03 | 2022-12-27 |
| 3000 SHS PINNACLE FINCL | | 2000-08-17 | 2022-07-22 |
| 2000 SHS CVS HEALTH | | | 2022-04-04 |

| (e) Gross sales price | (f) Depreciation allowed (or allowable) | (g) Cost or other basis plus expense of sale | (h) Gain or (loss) (e) plus (f) minus (g) |
|---|---|---|---|
| **a** 139,081 | | 226,081 | -87,000 |
| **b** 59,974 | | 63,526 | -3,552 |

| | | | |
|---|---|---|---|
| b | 33,914 | 03,030 | -3,002 |
| c | 71,699 | 79,545 | -7,846 |
| d | 179,534 | 158,395 | 21,139 |
| e | 37,799 | 37,799 | 0 |
| | 79,298 | 82,999 | -3,701 |
| | 20,718 | 21,142 | -424 |
| | 51,796 | 51,290 | 506 |
| | 31,078 | 31,679 | -601 |
| | 51,599 | 101,100 | -49,501 |
| | 53,204 | 98,700 | -45,496 |
| | 51,590 | 100,393 | -48,803 |
| | 62,592 | 62,592 | 0 |
| | 31,296 | 31,296 | 0 |
| | 229,209 | 168,015 | 61,194 |
| | 198,682 | 148,240 | 50,442 |
| | | | ↧ |

Complete only for assets showing gain in column (h) and owned by the foundation on 12/31/69

| (i)<br>F.M.V. as of 12/31/69 | (j)<br>Adjusted basis<br>as of 12/31/69 | (k)<br>Excess of col. (i)<br>over col. (j), if any | (l)<br>Gains (Col. (h) gain minus<br>col. (k), but not less than -0-) or<br>Losses (from col.(h)) |
|---|---|---|---|
| a | | | -87,000 |
| b | | | -3,662 |
| c | | | -7,846 |
| d | | | 21,139 |
| e | | | 0 |
| | | | -3,701 |
| | | | -424 |
| | | | 506 |
| | | | -601 |
| | | | -49,501 |
| | | | -45,496 |
| | | | -48,803 |
| | | | 0 |
| | | | 0 |
| | | | 61,194 |
| | | | 50,442 |

| | | | |
|---|---|---|---|
| | Capital gain net income or (net capital loss) | If gain, also enter in Part I, line 7<br>If (loss), enter -0- in Part I, line 7 | 2 | -113,753 |

**3** Net short-term capital gain or (loss) as defined in sections 1222(5) and (6):

If gain, also enter in Part I, line 8, column (c) (see instructions). If (loss), enter -0-
in Part I, line 8 . . . . . . . . . . . . . . . . . . . . . | 3 |

Form **990-PF** (2022)

Page 4

Form 990-PF (2022)
Page **4**

**Part V** Excise Tax Based on Investment Income (Section 4940(a), 4940(b), 4940(e), or 4948—see instructions)

**1a** Exempt operating foundations described in section 4940(d)(2), check here ▶ ☐ and enter "N/A" on line 1.

Date of ruling or determination letter: _____ (attach copy of letter if necessary–see instructions) | 1 | 2,751

**b** All other domestic foundations enter 1.39% (0.0139) of line 27b. Exempt foreign organizations enter 4% (0.04) of Part I, line 12, col. (b)

**2** Tax under section 511 (domestic section 4947(a)(1) trusts and taxable foundations only. Others enter -0-) | 2 | 0

**3** Add lines 1 and 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 2,751

**4** Subtitle A (income) tax (domestic section 4947(a)(1) trusts and taxable foundations only. Others enter -0-) | 4 | 0

**5** **Tax based on investment income.** Subtract line 4 from line 3. If zero or less, enter -0- . . . . . | 5 | 2,751

**6** Credits/Payments:

**a** 2022 estimated tax payments and 2021 overpayment credited to 2022 | 6a | 3,799

**b** Exempt foreign organizations—tax withheld at source . . . . . . | 6b | 0

**c** Tax paid with application for extension of time to file (Form 8868) | 6c | 0

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 232 of 431 PageID #: 491

COPY

| | | | |
|---|---|---|---|
| c | ~~tax paid with application for extension of time to file (from 8868)~~ | 6c | |
| d | Backup withholding erroneously withheld | 6d | 0 |
| 7 | Total credits and payments. Add lines 6a through 6d | 7 | 3,799 |
| 8 | Enter any **penalty** for underpayment of estimated tax. Check here ☐ if Form 2221 is attached. | 8 | 0 |
| 9 | **Tax due.** If the total of lines 5 and 8 is more than line 7, enter **amount owed** ▶ | 9 | |
| 10 | **Overpayment.** If line 7 is more than the total of lines 5 and 8, enter the **amount overpaid.** ▶ | 10 | 1,048 |
| 11 | Enter the amount of line 10 to be: **Credited to 2023 estimated tax** ▶ **Refunded** ▶ 1,048 | 11 | 0 |

## Part VI-A  Statements Regarding Activities

| | | | Yes | No |
|---|---|---|---|---|
| 1a | During the tax year, did the foundation attempt to influence any national, state, or local legislation or did it participate or intervene in any political campaign? | 1a | | No |
| b | Did it spend more than $100 during the year (either directly or indirectly) for political purposes? See the instructions for the definition. | 1b | | No |
| | *If the answer is "Yes" to 1a or 1b, attach a detailed description of the activities and copies of any materials published or distributed by the foundation in connection with the activities.* | | | |
| c | Did the foundation file **Form 1120-POL** for this year? | 1c | | No |
| d | Enter the amount (if any) of tax on political expenditures (section 4955) imposed during the year: (1) On the foundation. ▶ $          0 (2) On foundation managers. ▶ $          0 | | | |
| e | Enter the reimbursement (if any) paid by the foundation during the year for political expenditure tax imposed on foundation managers. ▶ $          0 | | | |
| 2 | Has the foundation engaged in any activities that have not previously been reported to the IRS? *If "Yes," attach a detailed description of the activities.* | 2 | | No |
| 3 | Has the foundation made any changes, not previously reported to the IRS, in its governing instrument, articles of incorporation, or bylaws, or other similar instruments? *If "Yes," attach a conformed copy of the changes* | 3 | | No |
| 4a | Did the foundation have unrelated business gross income of $1,000 or more during the year? | 4a | | No |
| b | If "Yes," has it filed a tax return on **Form 990-T** for this year? | 4b | | |
| 5 | Was there a liquidation, termination, dissolution, or substantial contraction during the year? *If "Yes," attach the statement required by General Instruction T.* | 5 | | No |
| 6 | Are the requirements of section 508(e) (relating to sections 4941 through 4945) satisfied either: ☐ By language in the governing instrument, or ☐ ~~By state legislation that effectively amends the governing instrument so that no mandatory directions~~ that conflict with the state law remain in the governing instrument? | 6 | Yes | |
| 7 | Did the foundation have at least $5,000 in assets at any time during the year? *If "Yes," complete Part II, col. (c), and Part XIV.* | 7 | Yes | |
| 8a | Enter the states to which the foundation reports or with which it is registered (see instructions) ▶TN | | | |
| b | If the answer is "Yes" to line 7, has the foundation furnished a copy of Form 990-PF to the Attorney General (or designate) of each state as required by General Instruction G? *If "No," attach explanation .* | 8b | Yes | |
| 9 | Is the foundation claiming status as a private operating foundation within the meaning of section 4942(j)(3) or 4942(j)(5) for calendar year 2022 or the taxable year beginning in 2022? See the instructions for Part XIII. *If "Yes," complete Part XIII* | 9 | | No |
| 10 | Did any persons become substantial contributors during the tax year? *If "Yes," attach a schedule listing their names and addresses.* | 10 | | No |

Form **990-PF** (2022)

---

Page 5

---

Form 990-PF (2022)                                                                                                    Page **5**

## Part VI-A  Statements Regarding Activities (continued)

| | | | Yes | No |
|---|---|---|---|---|
| 11 | At any time during the year, did the foundation, directly or indirectly, own a controlled entity within the meaning of section 512(b)(13)? If "Yes," attach schedule. See instructions. | 11 | | No |
| 12 | Did the foundation make a distribution to a donor advised fund over which the foundation or a disqualified person had advisory privileges? If "Yes," attach statement. See instructions | 12 | | No |
| 13 | Did the foundation comply with the public inspection requirements for its annual returns and exemption application? Website address ▶N/A | 13 | Yes | |

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 233 of 431 PageID #: 492

COPY



| 14 | The books are in care of ▶FRANK BUMSTEAD | Telephone no. ▶(615) 329-9902 | | | |
|---|---|---|---|---|---|
| | Located at ▶PO BOX 340020 NASHVILLE TN | ZIP+4 ▶37203 | | | |

| 15 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990-PF in lieu of **Form 1041** —check here . . . . . . . . . ▶ ☐ |
|---|---|
| | and enter the amount of tax-exempt interest received or accrued during the year . . . . . . . . . ▶ **15** |

| 16 | At any time during calendar year 2022, did the foundation have an interest in or a signature or other authority over | | Yes | No |
|---|---|---|---|---|
| | a bank, securities, or other financial account in a foreign country? . . . . . . . . . . . . . . . . . . | 16 | | No |
| | See the instructions for exceptions and filing requirements for FinCEN Form 114. If "Yes", enter the name of the foreign country ▶ | | | |

## Part VI-B    Statements Regarding Activities for Which Form 4720 May Be Required

**File Form 4720 if any item is checked in the "Yes" column, unless an exception applies.**

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | During the year did the foundation (either directly or indirectly): | | | |
| | (1) Engage in the sale or exchange, or leasing of property with a disqualified person? . . . . . . . . . | 1a(1) | | No |
| | (2) Borrow money from, lend money to, or otherwise extend credit to (or accept it from) | | | |
| | a disqualified person? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1a(2) | | No |
| | (3) Furnish goods, services, or facilities to (or accept them from) a disqualified person? . . . . . . . . . | 1a(3) | | No |
| | (4) Pay compensation to, or pay or reimburse the expenses of, a disqualified person? . . . . . . . . . . | 1a(4) | | No |
| | (5) Transfer any income or assets to a disqualified person (or make any of either available | | | |
| | for the benefit or use of a disqualified person)? . . . . . . . . . . . . . . . . . . . . | 1a(5) | | No |
| | (6) Agree to pay money or property to a government official? (**Exception.** Check "No" | | | |
| | if the foundation agreed to make a grant to or to employ the official for a period | | | |
| | after termination of government service, if terminating within 90 days.) . . . . . . . . . . . . | 1a(6) | | No |
| **b** | If any answer is "Yes" to 1a(1)-(6), did **any** of the acts fail to qualify under the exceptions described in Regulations | | | |
| | section 53.4941(d)-3 or in a current notice regarding disaster assistance? See instructions. . . . . . . . . | 1b | | |
| **c** | Organizations relying on a current notice regarding disaster assistance check here. . . . . . . . . ▶ ☐ | | | |
| **d** | Did the foundation engage in a prior year in any of the acts described in 1a, other than excepted acts, | | | |
| | that were not corrected before the first day of the tax year beginning in 2022? . . . . . . . . . . . . | 1d | | No |
| **2** | Taxes on failure to distribute income (section 4942) (does not apply for years the foundation was a private | | | |
| | operating foundation defined in section 4942(j)(3) or 4942(j)(5)): | | | |
| **a** | At the end of tax year 2022, did the foundation have any undistributed income (Part XII, lines 6d | | | |
| | and 6e) for tax year(s) beginning before 2022? . . . . . . . . . . . . . . . . . . . . | 2a | | No |
| | If "Yes," list the years ▶ 20____ , 20____ , 20____ , 20____ | | | |
| **b** | Are there any years listed in 2a for which the foundation is **not** applying the provisions of section 4942(a)(2) | | | |
| | (relating to incorrect valuation of assets) to the year's undistributed income? (If applying section 4942(a)(2) | | | |
| | to **all** years listed, answer "No" and attach statement—see instructions.) . . . . . . . . . . . . . | 2b | | |
| **c** | If the provisions of section 4942(a)(2) are being applied to **any** of the years listed in 2a, list the years here. | | | |
| | ▶ 20____ , 20____ , 20____ , 20____ | | | |
| **3a** | Did the foundation hold more than a 2% direct or indirect interest in any business enterprise at | | | |
| | any time during the year? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3a | | No |
| **b** | If "Yes," did it have excess business holdings in 2022 as a result of **(1)** any purchase by the foundation | | | |
| | or disqualified persons after May 26, 1969; **(2)** the lapse of the 5-year period (or longer period approved | | | |
| | by the Commissioner under section 4943(c)(7)) to dispose of holdings acquired by gift or bequest; or **(3)** | | | |
| | the lapse of the 10-, 15-, or 20-year first phase holding period?(*Use Schedule C, Form 4720, to determine* | | | |
| | *if the foundation had excess business holdings in 2022.*). . . . . . . . . . . . . . . . . . | 3b | | |
| **4a** | Did the foundation invest during the year any amount in a manner that would jeopardize its charitable purposes? | 4a | | No |
| **b** | Did the foundation make any investment in a prior year (but after December 31, 1969) that could jeopardize its | | | |
| | charitable purpose that had not been removed from jeopardy before the first day of the tax year beginning in 2022? . | 4b | | No |

Form **990-PF** (2022)

— Page 6 —

Form 990-PF (2022)                                                                                                    Page **6**

## Part VI-B    Statements Regarding Activities for Which Form 4720 May Be Required *(continued)*

| **5a** | During the year did the foundation pay or incur any amount to: | | Yes | No |
|---|---|---|---|---|
| | (1) Carry on propaganda, or otherwise attempt to influence legislation (section 4945(e))? . . . . . . . . | 5a(1) | | No |
| | (2) Influence the outcome of any specific public election (see section 4955); or to carry | | | |
| | on, directly or indirectly, any voter registration drive? . . . . . . . . . . . . . . . . . . . | 5a(2) | | No |
| | (3) Provide a grant to an individual for travel, study, or other similar purposes? . . . . . . . . . . | 5a(3) | | No |

https://projects.propublica.org/nonprofits/organizations          202323039349100832/tw

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 234 of 431 PageID #: 493

COPY

Joseph P. Day, Clerk  CASE NO. 24C655  FILED 04/03/24 10:28 AM

| | | | |
|---|---|---|---|
| **(4)** Provide a grant to an organization other than a charitable, etc., organization described in section 4945(d)(4)(A)? See instructions. | | **5a(4)** | **No** |
| **(5)** Provide for any purpose other than religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals?. | | **5a(5)** | **No** |
| **b** If any answer is "Yes" to 5a(1)–(5), did **any** of the transactions fail to qualify under the exceptions described in Regulations section 53.4945 or in a current notice regarding disaster assistance? See instructions. | | **5b** | |
| **c** Organizations relying on a current notice regarding disaster assistance check . . . . . . . . ▶ | | | |
| **d** If the answer is "Yes" to question 5a(4), does the foundation claim exemption from the tax because it maintained expenditure responsibility for the grant?. | | **5d** | |
| *If "Yes," attach the statement required by Regulations section 53.4945–5(d).* | | | |
| **6a** Did the foundation, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?. | | **6a** | **No** |
| **b** Did the foundation, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . . . | | **6b** | **No** |
| *If "Yes" to 6b, file Form 8870.* | | | |
| **7a** At any time during the tax year, was the foundation a party to a prohibited tax shelter transaction? | | **7a** | **No** |
| **b** If "Yes", did the foundation receive any proceeds or have any net income attributable to the transaction?. . . . . | | **7b** | |
| **8** Is the foundation subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment during the year?. | | **8** | **No** |

**Part VII** — **Information About Officers, Directors, Trustees, Foundation Managers, Highly Paid Employees, and Contractors**

**1** List all officers, directors, trustees, foundation managers and their compensation. See instructions

| (a) Name and address | (b) Title, and average hours per week devoted to position | (c) Compensation (If not paid, enter -0-) | (d) Contributions to employee benefit plans and deferred compensation | (e) Expense account, other allowances |
|---|---|---|---|---|
| FRANK BUMSTEAD<br>PO BOX 340020<br>NASHVILLE, TN 37203 | DIRECTOR, AS NEEDED<br>4.00 | 31,250 | 0 | 0 |
| DEBBIE HILL<br>PO BOX 340020<br>NASHVILLE, TN 37203 | DIRECTOR, AS NEEDED<br>4.00 | 34,375 | 0 | 0 |
| JEFF MOBLEY<br>2319 CRESTMOOR ROAD<br>NASHVILLE, TN 37215 | DIRECTOR, AS NEEDED<br>4.00 | 34,375 | 0 | 0 |
| RACHEL BUCHANAN<br>2001 21ST AVENUE SOUTH UNIT 302<br>NASHVILLE, TN 37212 | DIRECTOR, AS NEEDED<br>2.00 | 21,250 | 0 | 0 |
| GWENDOLYN COLLIER<br>4714 DRAKES BRANCH ROAD<br>NASHVILLE, TN 37218 | DIRECTOR, AS NEEDED<br>4.00 | 47,317 | 0 | 0 |

**2** Compensation of five highest-paid employees (other than those included on line 1—see instructions). If none, enter "NONE."

| (a) Name and address of each employee paid more than $50,000 | (b) Title, and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans and deferred compensation | (e) Expense account, other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Total** number of other employees paid over $50,000. . . . . . . . . . . . . . . . . . . . . ▶ | | | | 0

Form **990-PF** (2022)

Form 990-PF (2022) Page **7**

Information About Officers, Directors, Trustees, Foundation Managers, Highly Paid Employees

COPY

**3** Five highest-paid independent contractors for professional services (see instructions). If none, enter "NONE".

| (a) Name and address of each person paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Total** number of others receiving over $50,000 for professional services. . . . . . . . . . . . . . ▶ | | 0

**Part VIII-A** Summary of Direct Charitable Activities

List the foundation's four largest direct charitable activities during the tax year. Include relevant statistical information such as the number of organizations and other beneficiaries served, conferences convened, research papers produced, etc.

Expenses

**1** _____

**2** _____

**3** _____

**4** _____

**Part VIII-B** Summary of Program-Related Investments (see instructions)

Describe the two largest program-related investments made by the foundation during the tax year on lines 1 and 2.

Amount

**1** _____

**2** _____

All other program-related investments. See instructions.

**3** _____

**Total.** Add lines 1 through 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | 0

Form **990-PF** (2022)

— Page 8 —

Form 990-PF (2022) Page **8**

**Part IX** **Minimum Investment Return** (All domestic foundations must complete this part. Foreign foundations, see instructions.)

**1** Fair market value of assets not used (or held for use) directly in carrying out charitable, etc., purposes:

| | | | |
|---|---|---|---|
| a | Average monthly fair market value of securities. . . . . . . . . . . . . . . . . . . . | **1a** | 12,250,284 |
| b | Average of monthly cash balances. . . . . . . . . . . . . . . . . . . . . . . . . . | **1b** | 3,083,707 |
| c | Fair market value of all other assets (see instructions). . . . . . . . . . . . . . . . | **1c** | 22,594 |
| d | **Total** (add lines 1a, b, and c). . . . . . . . . . . . . . . . . . . . . . . . . . | **1d** | 15,356,585 |
| e | Reduction claimed for blockage or other factors reported on lines 1a and 1c (attach detailed explanation). . . . . . . . . . . . . . | **1e** | 0 |
| 2 | Acquisition indebtedness applicable to line 1 assets | 2 | 0 |

Joseph P. Day, Clerk 24C655 CASE NO. 24C655 04/03/24 10:28 AM EFILED

Case 3:24-cv-00440 Document 1-4 Filed 04/10/24 Page 236 of 431 PageID #: 495

COPY

| | | | |
|---|---|---|---|
| 2 | Acquisition indebtedness applicable to line 1 assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 0 |
| 3 | Subtract line 2 from line 1d. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 15,356,585 |
| 4 | Cash deemed held for charitable activities. Enter 1.5% (0.015) of line 3 (for greater amount, see instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 230,349 |
| 5 | **Net value of noncharitable-use assets.** Subtract line 4 from line 3.. . . . . . . . . . . . | 5 | 15,126,236 |
| 6 | **Minimum investment return.** Enter 5% (0.05) of line 5. . . . . . . . . . . . . . . . . . | 6 | 756,312 |

**Part X** **Distributable Amount** (see instructions) (Section 4942(j)(3) and (j)(5) private operating foundations and certain foreign organizations check here ▶ ☐ and do not complete this part.)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Minimum investment return from Part IX, line 6. . . . . . . . . . . . . . . . . . . . | | | 1 | 756,312 |
| 2a | Tax on investment income for 2022 from Part V, line 5. . . . . . . . | 2a | 2,751 | | |
| b | Income tax for 2022. (This does not include the tax from Part V.). . . | 2b | | | |
| c | Add lines 2a and 2b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2c | 2,751 |
| 3 | Distributable amount before adjustments. Subtract line 2c from line 1. . . . . . . . . . . | | | 3 | 753,561 |
| 4 | Recoveries of amounts treated as qualifying distributions. . . . . . . . . . . . . . . . | | | 4 | 0 |
| 5 | Add lines 3 and 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5 | 753,561 |
| 6 | Deduction from distributable amount (see instructions). . . . . . . . . . . . . . . . . | | | 6 | 0 |
| 7 | **Distributable amount** as adjusted. Subtract line 6 from line 5. Enter here and on Part XII, line 1. . . | | | 7 | 753,561 |

**Part XI** **Qualifying Distributions** (see instructions)

| | | | |
|---|---|---|---|
| 1 | Amounts paid (including administrative expenses) to accomplish charitable, etc., purposes: | | |
| a | Expenses, contributions, gifts, etc.—total from Part I, column (d), line 26. . . . . . . . . . . | 1a | 427,230 |
| b | Program-related investments—total from Part VIII-B. . . . . . . . . . . . . . . . . . . . | 1b | 0 |
| 2 | Amounts paid to acquire assets used (or held for use) directly in carrying out charitable, etc., purposes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Amounts set aside for specific charitable projects that satisfy the: | | |
| a | Suitability test (prior IRS approval required). . . . . . . . . . . . . . . . . . . . . . . | 3a | |
| b | Cash distribution test (attach the required schedule). . . . . . . . . . . . . . . . . . . | 3b | |
| 4 | **Qualifying distributions.** Add lines 1a through 3b. Enter here and on Part XII, line 4.. . . . . . . . | 4 | 427,230 |

Form **990-PF** (2022)

Form 990-PF (2022)                                                            **Page 9**

**Part XII** **Undistributed Income** (see instructions)

| | | (a) Corpus | (b) Years prior to 2021 | (c) 2021 | (d) 2022 |
|---|---|---|---|---|---|
| 1 | Distributable amount for 2022 from Part X, line 7 | | | | 753,561 |
| 2 | Undistributed income, if any, as of the end of 2022: | | | | |
| a | Enter amount for 2021 only. . . . . . . . . | | | 301,723 | |
| b | Total for prior years: 20___, 20___, 20___ | | 0 | | |
| 3 | Excess distributions carryover, if any, to 2022: | | | | |
| a | From 2017. . . . . . . | | | | |
| b | From 2018. . . . . . . | | | | |
| c | From 2019. . . . . . . | | | | |
| d | From 2020. . . . . . . | | | | |
| e | From 2021. . . . . . . | | | | |
| f | **Total** of lines 3a through e . . . . . . . . . | 0 | | | |
| 4 | Qualifying distributions for 2022 from Part XI, line 4: ▶ $ 427,230 | | | | |
| a | Applied to 2021, but not more than line 2a | | | 301,723 | |
| b | Applied to undistributed income of prior years (Election required—see instructions). . . . . | | 0 | | |
| c | Treated as distributions out of corpus (Election required—see instructions). . . . . . . . . | 0 | | | |
| d | Applied to 2022 distributable amount. . . . . | | | | 125,507 |
| e | Remaining amount distributed out of corpus | 0 | | | |
| 5 | Excess distributions carryover applied to 2022. | 0 | | | 0 |
| | (If an amount appears in column (d), the same amount must be shown in column (a).) | | | | |
| 6 | **Enter the net total of each column as indicated below:** | | | | |

3/29/24, 8:05 PM
Page 9 of 1

Joseph P. Day, Clerk 24C655 CASE NO. 10:28 AM 04/03/24 FILED

COPY

| | | | | |
|---|---|---|---|---|
| **a** Corpus. Add lines 3f, 4c, and 4e. Subtract line 5 | 0 | | | |
| **b** Prior years' undistributed income. Subtract line 4b from line 2b . . . . . . . . . . . | | 0 | | |
| **c** Enter the amount of prior years' undistributed income for which a notice of deficiency has been issued, or on which the section 4942(a) tax has been previously assessed. . . . . | | | 0 | |
| **d** Subtract line 6c from line 6b. Taxable amount —see instructions . . . . . . . . . . . | | | 0 | |
| **e** Undistributed income for 2021. Subtract line 4a from line 2a. Taxable amount—see instructions . . . . . . . . . . . . . | | | | 0 |
| **f** Undistributed income for 2022. Subtract lines 4d and 5 from line 1. This amount must be distributed in 2023 . . . . . . . . . | | | | 628,054 |
| **7** Amounts treated as distributions out of corpus to satisfy requirements imposed by section 170(b)(1)(F) or 4942(g)(3) (Election may be required - see instructions) . . . . . . . | 0 | | | |
| **8** Excess distributions carryover from 2017 not applied on line 5 or line 7 (see instructions) . . . | 0 | | | |
| **9** **Excess distributions carryover to 2023.** Subtract lines 7 and 8 from line 6a . . . . . . | 0 | | | |
| **10** Analysis of line 9: | | | | |
| **a** Excess from 2018. . . . | | | | |
| **b** Excess from 2019. . . . | | | | |
| **c** Excess from 2020. . . . | | | | |
| **d** Excess from 2021. . . . | | | | |
| **e** Excess from 2022. . . . | | | | |

Form **990-PF** (2022)

---

Page 10

---

Form 990-PF (2022)                                                                                                    Page **10**

| **Part XIII** | **Private Operating Foundations** (see instructions and Part VI-A, question 9) |
|---|---|

**1a** If the foundation has received a ruling or determination letter that it is a private operating foundation, and the ruling is effective for 2022, enter the date of the ruling . . . . . . ▶

**b** Check box to indicate whether the organization is a private operating foundation described in section ☐ 4942(j)(3) or ☐ 4942(j)(5)

| | Tax year | | Prior 3 years | | (e) Total |
|---|---|---|---|---|---|
| | **(a)** 2022 | **(b)** 2021 | **(c)** 2020 | **(d)** 2019 | |
| **2a** Enter the lesser of the adjusted net income from Part I or the minimum investment return from Part IX for each year listed . . . . . . . . . . . | | | | | |
| **b** 85% (0.85) of line 2a . . . . . . . . . . . . . . | | | | | |
| **c** Qualifying distributions from Part XI, line 4 for each year listed . . . . . | | | | | |
| **d** Amounts included in line 2c not used directly for active conduct of exempt activities . . . . . . . . . . . | | | | | |
| **e** Qualifying distributions made directly for active conduct of exempt activities. Subtract line 2d from line 2c . . . . . | | | | | |
| **3** Complete 3a, b, or c for the alternative test relied upon: | | | | | |
| **a** "Assets" alternative test—enter: | | | | | |
| **(1)** Value of all assets . . . . . . | | | | | |
| **(2)** Value of assets qualifying under section 4942(j)(3)(B)(i) | | | | | |
| **b** "Endowment" alternative test— enter 2/3 of minimum investment return shown in Part IX, line 6 for each year listed . . | | | | | |
| **c** "Support" alternative test—enter: | | | | | |
| **(1)** Total support other than gross investment income (interest, dividends, rents, payments on securities loans (section 512(a)(5)), or royalties) . . . . | | | | | |
| **(2)** Support from general public | | | | | |

*Joseph P. Day, Clerk    24C655    CASE NO.    FILED 04/03/24 10:28 AM*

https://projects.propublica.org/nonprofits/organizations          202323039349100832/f0ll                          3/29/24, 8:05 PM
                                                                                                                    Page 10 of 11

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 238 of 431 PageID #: 497



and 5 or more exempt
organizations as provided in
section 4942(j)(3)(B)(iii). . . .

(3) Largest amount of support
from an exempt organization

(4) Gross investment income

## Part XIV Supplementary Information (Complete this part only if the foundation had $5,000 or more in assets at any time during the year—see instructions.)

**1 Information Regarding Foundation Managers:**

**a** List any managers of the foundation who have contributed more than 2% of the total contributions received by the foundation before the close of any tax year (but only if they have contributed more than $5,000). (See section 507(d)(2).)

**b** List any managers of the foundation who own 10% or more of the stock of a corporation (or an equally large portion of the ownership of a partnership or other entity) of which the foundation has a 10% or greater interest.

**2 Information Regarding Contribution, Grant, Gift, Loan, Scholarship, etc., Programs:**

Check here ▶ ✅ if the foundation only makes contributions to preselected charitable organizations and does not accept unsolicited requests for funds. If the foundation makes gifts, grants, etc. to individuals or organizations under other conditions, complete items 2a, b, c, and d. See instructions

**a** The name, address, and telephone number or email address of the person to whom applications should be addressed:

**b** The form in which applications should be submitted and information and materials they should include:

**c** Any submission deadlines:

**d** Any restrictions or limitations on awards, such as by geographical areas, charitable fields, kinds of institutions, or other factors:

Form **990-PF** (2022)

Form 990-PF (2022)                                                                Page **11**

## Part XIV Supplementary Information (continued)

**3 Grants and Contributions Paid During the Year or Approved for Future Payment**

| Recipient Name and address (home or business) | If recipient is an individual, show any relationship to any foundation manager or substantial contributor | Foundation status of recipient | Purpose of grant or contribution | Amount |
|---|---|---|---|---|
| **a Paid during the year** | | | | |
| AMERICAN RED CROSS 431 18TH STREET NW WASHINGTON, DC 20006 | NONE | 501(C)(3) | WHERE IT IS NEEDED MOST | 84,791 |
| CHEEKWOOD BOTANICAL GARDENS 1200 FORREST PARK DRIVE NASHVILLE, TN 37205 | NONE | 501(C)(3) | FOR ACTIVE CONDUCT OF EXEMPT PURPOSE | 9,333 |
| NASHVILLE SYMPHONY ONE SYMPHONY PLACE NASHVILLE, TN 37201 | NONE | 501(C)(3) | FOR ACTIVE CONDUCT OF EXEMPT PURPOSE | 60,000 |
| TENNESSEE STATE MUSEUM | NONE | 501(C)(3) | FOR ACTIVE CONDUCT OF EXEMPT PURPOSE | 60,000 |

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

| 1000 ROSA L PARKS BLVD<br>NASHVILLE, TN 37243 | | | | |
|---|---|---|---|---|
| THE NASHVILLE FOOD PROJECT | NONE | 501(C)(3) | ALLEVIATING HUNGER | 10,000 |
| 5904 CALIFORNIA AVENUE<br>NASHVILLE, TN 37209 | | | | |
| VANDERBILT UNIVERSITY SCHOOL OF<br>NURSING | NONE | NON-PROFIT<br>MEDICAL C | NURSING EXPANSION<br>PROJECT | 90,920 |
| 2301 VANDERBILT PLACE<br>NASHVILLE, TN 37240 | | | | |

Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ **3a**    315,044

**b** *Approved for future payment*

Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ **3b**    0

Form **990-PF** (2022)

Form 990-PF (2022)    Page **12**

**Part XV-A    Analysis of Income-Producing Activities**

| Enter gross amounts unless otherwise indicated. | Unrelated business income | | Excluded by section 512, 513, or 514 | | (e)<br>Related or exempt |
|---|---|---|---|---|---|
| | (a)<br>Business code | (b)<br>Amount | (c)<br>Exclusion code | (d)<br>Amount | function income<br>(See instructions.) |
| 1 Program service revenue: | | | | | |
| a _____ | | | | | |
| b _____ | | | | | |
| c _____ | | | | | |
| d _____ | | | | | |
| e _____ | | | | | |
| f _____ | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 2 Membership dues and assessments . . . . | | | | | |
| 3 Interest on savings and temporary cash<br>investments . . . . . . . . . . . . . | | | | | |
| 4 Dividends and interest from securities . . . . | | | 14 | 234,357 | |
| 5 Net rental income or (loss) from real estate: | | | | | |
| a Debt-financed property. . . . . . . . | | | | | |
| b Not debt-financed property. . . . . . | | | | | |
| 6 Net rental income or (loss) from personal property | | | | | |
| 7 Other investment income . . . . . . . | | | | | |
| 8 Gain or (loss) from sales of assets other than | | | | | |

https://projects.propublica.org/nonprofits/organizations 202323039349100832/full

3/29/24, 8:05 PM
Page 12 of 1

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 240 of 431 PageID #: 499

COPY



| | | | | | |
|---|---|---|---|---|---|
| **a** Gain or (loss) ▬▬▬ or assets other than inventory . . . . . . . . . . . . . | | | 18 | −113,753 | |
| **9** Net income or (loss) from special events: | | | | | |
| **10** Gross profit or (loss) from sales of inventory | | | | | |
| **11** Other revenue: **a** _____ | | | | | |
| **b** _____ | | | | | |
| **c** _____ | | | | | |
| **d** _____ | | | | | |
| **e** _____ | | | | | |
| **12** Subtotal. Add columns (b), (d), and (e) . . | | 0 | | 120,604 | 0 |
| **13 Total.** Add line 12, columns (b), (d), and (e). . . . . . . . . . . . . . . . . . . . . **13** | | | | | 120,604 |

(See worksheet in line 13 instructions to verify calculations.)

## Part XV-B   Relationship of Activities to the Accomplishment of Exempt Purposes

| Line No. ▼ | Explain below how each activity for which income is reported in column (e) of Part XV-A contributed importantly to the accomplishment of the foundation's exempt purposes (other than by providing funds for such purposes). (See instructions.) |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Form **990-PF** (2022)

---

Page 13

---

Form 990-PF (2022)          Page **13**

## Part XVI   Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations

| | | Yes | No |
|---|---|:---:|:---:|
| **1** Did the organization directly or indirectly engage in any of the following with any other organization described in section 501(c) (other than section 501(c)(3) organizations) or in section 527, relating to political organizations? | | | |
| **a** Transfers from the reporting foundation to a noncharitable exempt organization of: | | | |
| **(1)** Cash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1a(1)** | | No |
| **(2)** Other assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1a(2)** | | No |
| **b** Other transactions: | | | |
| **(1)** Sales of assets to a noncharitable exempt organization. . . . . . . . . . . . . . . . . . . . | **1b(1)** | | No |
| **(2)** Purchases of assets from a noncharitable exempt organization. . . . . . . . . . . . . . . . . | **1b(2)** | | No |
| **(3)** Rental of facilities, equipment, or other assets. . . . . . . . . . . . . . . . . . . . . . . | **1b(3)** | | No |
| **(4)** Reimbursement arrangements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1b(4)** | | No |
| **(5)** Loans or loan guarantees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1b(5)** | | No |
| **(6)** Performance of services or membership or fundraising solicitations. . . . . . . . . . . . . . . | **1b(6)** | | No |
| **c** Sharing of facilities, equipment, mailing lists, other assets, or paid employees. . . . . . . . . . . . | **1c** | | No |

**d** If the answer to any of the above is "Yes," complete the following schedule. Column **(b)** should always show the fair market value

Joseph P. Day, Clerk   24C655   CASE NO.   10:28 AM   04/03/24   EFILED


COPY

of the goods, other assets, or services given by the reporting foundation. If the foundation received less than fair market value in any transaction or sharing arrangement, show in column **(d)** the value of the goods, other assets, or services received.

| (a) Line No. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**2a** Is the foundation directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) (other than section 501(c)(3)) or in section 527? . . . . . . . . . . . . . ☐ Yes ☑ No

**b** If "Yes," complete the following schedule.

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**Sign Here**

| Signature of officer or trustee | 2023-10-23 Date | Title | May the IRS discuss this return with the preparer shown below? See instructions. ☐ Yes ☐ No |
|---|---|---|---|

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's Signature | Date | Check if self-employed ▶ ☐ | PTIN |
|---|---|---|---|---|
| DAVID HORLACHER CPA | | 2023-10-23 | | P00266949 |

| Firm's name ▶ HORLACHER WILLIAMS LOWERY PLC | Firm's EIN ▶ |
|---|---|

| Firm's address ▶ 5214 MARYLAND WAY STE 207 BRENTWOOD, TN 37027 | Phone no. (615) 256-2127 |
|---|---|

Form **990-PF** (2022)

---

## Additional Data

Return to Form

**Software ID:**
**Software Version:**

**Form 990PF - Special Condition Description:**

**Special Condition Description**

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 242 of 431 PageID #: 501

COPY

**Name:** CONWAY-WELCH FAMILY FOUNDATION INC
**EIN:**

| Category | Amount | Net Investment Income | Adjusted Net Income | Disbursements for Charitable Purposes |
|---|---|---|---|---|
| ACCOUNTING FEES | 5,030 | 0 | 0 | 2,515 |

FILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

**Name:** CONWAY-WELCH FAMILY FOUNDATION INC

**EIN:**

| Name of Stock | End of Year Book Value | End of Year Fair Market Value |
|---|---|---|
| AGNICO EAGLE MINES LTD | 487,951 | 623,880 |
| BERKSHIRE HATHAWAY INC | 347,500 | 617,800 |
| BROOKDALE SENIOR LIVING INC | 136,650 | 136,500 |
| BROOKFIELD CORPORATION | 170,385 | 220,220 |
| BROOKFIELD ASSET MANAGEMENT INC | 170,123 | 172,020 |
| CVS HEALTH CORPORATION | 741,200 | 931,900 |
| CABLE ONE INC | 276,800 | 213,558 |
| CAPSTAR FINANCIAL HOLDINGS | 159,200 | 176,600 |
| CLEVELAND CLIFFS | 130,656 | 161,100 |
| EXXON MOBIL CORP | 246,419 | 772,100 |
| FAIRFAX FINANCIAL HOLDINGS LTD | 2,076,163 | 3,551,733 |
| GEO GROUP INC | 263,208 | 438,000 |
| GRAHAM HOLDINGS CO | 325,423 | 362,526 |
| HALLIBURTON CO | 411,874 | 590,250 |
| HEWLETT PACKARD ENTERPRISE CO | 127,093 | 159,600 |
| JEFFERIES FINANCIAL GROUP | 189,660 | 342,800 |
| LOEWS CORP | 243,349 | 408,310 |
| LUMEN TECHNOLOGIES INC | 176,461 | 156,600 |
| NOV INC | 287,606 | 522,250 |
| OVERSTOCK.COM (COMMON) | 119,994 | 353,320 |
| PINNACLE FINANCIAL PARTNERS | 672,060 | 880,800 |
| VIASAT INC | 839,719 | 791,250 |
| CORECIVIC INC | 476,713 | 578,000 |
| EQUITY COMMONWEALTH USD | 400,997 | 374,550 |
| HEALTHSPRING INC (RJ) | 49,661 | 50,000 |

COPY

## TY 2022 IRS 990 e-File Render

**Name:** CONWAY-WELCH FAMILY FOUNDATION INC

**EIN:**

| Category | Amount | Net Investment Income | Adjusted Net Income | Disbursements for Charitable Purposes |
|---|---|---|---|---|
| LEGAL FEES | 5,061 | 0 | 0 | 2,531 |

## TY 2022 IRS 990 e-File Render

**Name:** CONWAY-WELCH FAMILY FOUNDATION INC

**EIN:**

| Description | Beginning of Year - Book Value | End of Year - Book Value | End of Year - Fair Market Value |
|---|---|---|---|
| NOTE RECEIVABLE - FINLEY | 16,078 | 16,078 | 16,078 |

## TY 2022 IRS 990 e-File Render

**Name:** CONWAY-WELCH FAMILY FOUNDATION INC

**EIN:**

| Description | Revenue and Expenses per Books | Net Investment Income | Adjusted Net Income | Disbursements for Charitable Purposes |
|---|---|---|---|---|
| INVESTMENT ADVISORY EXPENSES | 75,186 | 0 | 0 | 0 |
| FOREIGN TAXES | 19,580 | 19,580 | 0 | 0 |
| CLERICAL | 12,000 | 0 | 0 | 6,000 |
| INVESTMENT EXPENSES - OTHER | 75 | 0 | 0 | 0 |

FILED 04/03/24 10:28 AM CASE NO. 24C555 Joseph P. Day, Clerk

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 245 of 431 PageID #: 504

COPY

# EXHIBIT 5

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY



# Week of March 4, 2024

*VUSN Student Newsletter and Event Reminder*

## Announcement

1. The 2023-2024 VUSN Student Handbook was revised on February 27, 2024, to add information regarding Pass/Fail courses to the VUSN Academic Policies and Regulations section, sub-section Grading System.

2. The front doors to VUSN will remain VUID card or GET app access through the rest of the semester while building access remains under review by the university. Please have your VUID card or the app with you at all times. If neither works, contact Vanderbilt Card Services at 615-322-2273 or email commodorecard@vanderbilt.edu. Questions? Contact the VUSN

EFILED 04/03/24 10:28 AM   CASE NO. 24C655   Joseph P. Day, Clerk

COPY

## Fwd: Incorrect GPA Calculation

Lucas, Ian H
registrar-general                                    , Swayze, Sarah J
                              , Thompson, Molly                                    , King,
Matt                           , Quinet, Bart P
Thu, Feb 15, 2024, 12:30 PM

I am writing to ask for clarification regarding my current Term GPA for Fall 2023, as recorded. According to the VUSN
Student Handbook, *"Pass/Fail or Satisfactory/Unsatisfactory Grades are not included in the calculation of grade*

*point averages.* However, they are taken into account for academic performance and progression. Grades of 'Fail' or
'Unsatisfactory' are treated equivalently to any grade below a B- in the context of academic policies"
*(https://nursing.vanderbilt.edu/students/current/handbook/academic_regulations.php).*

Upon reviewing my grades and calculating my GPA for the 14.5 credit hours completed this term, my calculations indicate
a **GPA of 3.528,** rather than the incorrectly calculated *2.811 currently reflected.* Here's a breakdown of my coursework,
credits, grades received, and the corresponding grade points, for your reference:

NURS-5801-01: 5.0 credits, B- grade, yielding 13.5 grade points.
NURS-5803-01: 2.0 credits, B grade, yielding 6 grade points.
NURS-5806-01: 1.0 credit, A- grade, yielding 3.7 grade points.
NURS-5835-01: 1.0 credit, A+ grade, yielding 4.3 grade points.
NURS-5845-01: 0.5 credits, A+ grade, yielding 2.15 grade points.
NURS-8232-01: 2.0 credits, A+ grade, yielding 8.6 grade points.
NURS-8234-01: 3.0 credits, A+ grade, yielding 12.9 grade points.
*NURS-5815-01: 0.0 credits, F grade, yielding 0 grade points. (Pass/Fail Course Not Subject to GPA Calculation*
*NURS-5825-01: 0.0 credits, F grade, yielding 0 grade points. (Pass/Fail Course Not Subject to GPA Calculation*

**Total Credits 14.5**
**Overall Term GPA 3.528**

Given that the courses NURS 5815 and NURS 5825 are graded on a Pass/Fail basis and should not impact the GPA
calculation, I am puzzled by the discrepancy in my GPA. I respectfully request a review of how my GPA was calculated
and kindly ask for any adjustments to be made if an error has been identified.

Thank you for your attention to this matter. I look forward to your response.

Sincerely,

Ian H. Lucas
Get Outlook for iOS

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day Clerk

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 248 of 431 PageID #: 507

COPY

Lucas, Ian H
registrar-general                           , Swayze, Sarah J
                            , Thompson, Molly                              , King,
Matt                            , Quinet, Bart P
Fri, Feb 16, 2024, 5:11 AM

Given the failure to respond this has been forwarded to the U.S. Department of Education as part of
an ongoing investigation.

Get Outlook for iOS

---

King, Matt
Lucas, Ian H
Fri, Feb 16, 2024, 5:11 AM

Thank you for contacting Matt King in the Office of the University Registrar. I will be away I from the until
Tuesday, February 20. Please contact urorecords@vanderbilt.edu for immediate assistance.

Thanks, Matt

---

Lucas, Ian H
URO Records
Fri, Feb 16, 2024, 5:12 AM

Get Outlook for iOS

---

registrar-general
Lucas, Ian H
Fri, Feb 16, 2024, 2:22 PM

Dear Ian,

Thank you for reaching out. We are in communication with the School of Nursing regarding your email. More
information will be forthcoming.

Best regards,

2 / 8

EFILED 04/03/24 28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY



**Office of the University Registrar**
Vanderbilt University
615.322.7701 I registrar@vanderbilt.edu I https://registrar.vanderbilt.edu

110 21st Avenue South, Suite 110
Nashville, TN 37240

---

Lucas, Ian H
Ian Lucas
Fri, Feb 16, 2024, 4:15 PM

So is the gpa incorrect I at the moment?

Get Outlook for iOS

---

Lucas, Ian H
registrar-general
Tue, Feb 20, 2024, 11:02 PM

I need to provide an update to investigation authorities on this matter, so that appropriate
government entitled agencies can take action and become involved, please inform me of the status,
reason and details of the matter!

Get Outlook for iOS

---

Lucas, Ian H
Cummings, E Jacob                                              , The Provost

Tue, Feb 20, 2024, 11:07 PM

Mr. Cummings

Please include this new information as retaliation against me in the EOA complaint whereas the
school of nursing, in which they, manually altered my term GPA. The registrar office will not
respond to me with additional details other than that the school of nursing changed the term GPA.

3 / 8

EFILED 03/3/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

Ian

Get Outlook for iOS

George, Tracey
Lucas, Ian H
Cummings, E Jacob                                    , The Provost

Wed, Feb 21, 2024, 1:36 PM

Ian,

I write to confirm the Office of the Provost has received your email below. The University Registrar's Office has
been actively engaged with VUSN to address your concern.

Best
Tracey George



Tracey E. George
Vice Provost for Faculty Affairs & Professional Education
Charles B. Cox III & Lucy D. Cox Family Chair in Law & Liberty
Professor of Law and Political Science (secondary)
Vanderbilt University
tracey.george@vanderbilt.edu
https://law.vanderbilt.edu/bio/tracey-george

Lucas, Ian H
registrar-general
George, Tracey                                       , The Provost
Stephanie.Darand@ed.gov
Tue, Feb 27, 2024, 2:06 PM

Good Afternoon,

I am writing to urgently request an update and a thorough explanation regarding the ongoing discussions or inquiries with
the School of Nursing about the inaccuracy of my GPA.

4 / 8

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

# COPY

I desire comprehensive information and a detailed breakdown of the issues at hand, along with the proposed steps for resolution.

Your prompt attention to this matter is not only crucial but expected, as it significantly impacts my academic standing and future opportunities.

Thank you for your immediate action on this matter.

---

Lucas, Ian H
registrar-general , Swayze, Sarah J
, Thompson, Molly , King,
Matt , Quinet, Bart P
Donahoe, Sara A , Walker, Terry

George, Tracey , The Provost
Kopstain, Eric , Roth, Stephanie
, Office of the General Counsel , SEM
eoa , SEM titleix
Stephanie.Darand@ed.gov , Ian Lucas
Tue, Feb 27, 2024, 4:56 PM

Good Afternoon,

I am contacting you to urgently request an update and comprehensive details regarding the ongoing discussions with the School of Nursing about the discrepancy in my GPA. That was initially reported on 2/10/2024.

I request that the reasoning or the need for discussions with the School of Nursing be explained or a thorough breakdown of the situation, including the issues identified and the corrective measures proposed, at this point, given the lack of response, and with no change in the GPA or updates, I have no other option but to assume that this is the result of malicious intent.

The prompt resolution of this matter is critical, given its substantial implications for my academic record and prospects. I trust that you will treat this request with the seriousness it warrants and look forward to your prompt response.

**Ian H. Lucas**

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

Microsoft Outlook

Ian Lucas
Tue, Feb 27, 2024, 4:56 PM
Request Update: School of Nursing Incorrect GPA Calculation .eml

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

Ian Lucas (lucas.ian.h@gmail.com)

Subject: Request Update: School of Nursing Incorrect GPA Calculation

---

postmaster@ed.gov
Stephanie.Darand@ed.gov
Tue, Feb 27, 2024, 4:56 PM
Request Update: School of Nursing Incorrect GPA Calculation .eml

**Your message has been delivered to the following recipients:**

Stephanie.Darand@ed.gov

Subject: Request Update: School of Nursing Incorrect GPA Calculation

---

registrar-general
Lucas, Ian H
Wed, Feb 28, 2024, 9:52 AM

Dear Ian,

Your GPA has been updated and your record now reflects the changes. Please note that in the School of Nursing, the A+ garners 4.0 quality points.

Best regards,

Office of the University Registrar

6 / 8

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY



Vanderbilt University
615.322.7701 I registrar@vanderbilt.edu I https://registrar.vanderbilt.edu

110 21st Avenue South, Suite 110
Nashville, TN 37240

Lucas, Ian H
registrar-general
Wed, Feb 28, 2024, 10:20 AM

The statement on the transcript of "Academic Standing Effective 2024-02-14: Dismissed" needs to be removed immediately.

This was not on the previous transcript before I challenged the GPA, I am not going to play these games with the school of nursing. If they were so confident in there reasoning for dismissal they would not be needing to resort to sidebar tactics like this.

Get Outlook for iOS

Lucas, Ian H
Darand, Stephanie
Wed, Feb 28, 2024, 10:45 AM

Get Outlook for iOS

Lucas, Ian H
Darand, Stephanie
Wed, Feb 28, 2024, 2:14 PM

The school after a month fixed my GPA but will not provided me under FERPA the information of who or why it was incorrectly altered to a 2.811 begin with. Which this clear evidence of fraudulent alterations of student records and grades. As I have other emails from senior university officials stating over the last month that they were "in discussions with the school of nursing" when these officials had the authority and direct oversight over the dean of the schools of nursing.

7 / 8

COPY

Get Outlook for iOS

Lucas, Ian H
thirdpartycomments@ccneaccreditation.org
Wed, Feb 28, 2024, 2:27 PM

Get Outlook for iOS

18 Emails

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 255 of 431 PageID #: 514

# EXHIBIT 6

COPY

EFILED 04/03/24 10:28 AM  CASE NO. 24C655  Joseph P. Day, Clerk


# VUPD presence on campus



**VUSN Deans Office**
VUSN Stu - Current

5:48 PM

Good afternoon. Some of you here on campus may have noticed VUPD officers around the building this week. We wanted to let you know that out of an abundance of caution, they've increased visibility of their patrols due to a VU disciplinary action that recently took place. VUPD has always patrolled the school several times a day, but they've been more visible recently. You'll probably see them around off and on for the rest of the week.

VUSN Dean's Office

EFILED 04/03/24 10:26 AM CASE NO. 24C655 Joseph P. Day, Clerk

## RE: Bourgoin Medical Licenses.

Tellock, Michelle
Lucas, Ian H
Bourgoin, Jeremy Layne
Wed, Mar 6, 2024, 6:05 PM

, julia.c.morris@vumc.org

**Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

Dear Ian,

Should you need to seek emergency medical care at VUMC's emergency department, you are permitted to seek medical services there without violating the conditions of the campus prohibition/outcome letter.

VUMC complies with the Emergency Medical Treatment and Labor Act (EMTALA) and provides a medical screening exam (MSE) to individuals who present to the emergency department to determine whether an emergency medical condition (EMC) exists, and provides stabilizing treatment to individuals with an EMC. VUMC confirms that Jeremy Bourgoin is not employed by, affiliated with, credentialled by, nor provides any professional or medical services at VUMC.

VU and VUMC consider this matter closed.

Thank you,
Michelle

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Wednesday, March 6, 2024 4:10 PM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org
**Subject:** Re: Bourgoin Medical Licenses.

**Caution:** This content is intended for the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

I am closing this communication and dialogue and will forward this email chain and the letter I received to the TN Board of Health as EMTALA Complaint and refusal of services for emergency care provisions if needed

1 / 5

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

Get Outlook for iOS

From: Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Sent: Wednesday, March 6, 2024 2:14:55 PM
To: Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org <julia.c.morris@vumc.org>
Subject: Re: Bourgoin Medical Licenses.

Given there has been no follow up or revision to this:

Is VUMC affirming that Bourgoin has medical privileges and license and I should email the student
accountability office for a Medical Screening Exam (MSE) as per EMTALA if I desire to seek care at VUMC for
non-scheduled appointments or procedures I.e. emergencies?

And also does Vanderbilt University have jurisdictional provisions of the span and control of the VUMC entity
access and control of visitors and patients?

Ian H. Lucas

Get Outlook for iOS

From: Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Sent: Tuesday, March 5, 2024 11:50 AM
To: Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org <julia.c.morris@vumc.org>
Subject: Re: Bourgoin Medical Licenses.

Added back in Ms. Morris.

Regards,

Ian H. Lucas

Get Outlook for iOS

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day Clerk

2 / 5

COPY

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:49:03 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Subject:** Re: Bourgoin Medical Licenses.

Ms. Tellock,

Please understand that the matter at hand is final and not open to discussion or negotiation. Specifically, you must either remove the statement:

"The restriction includes Vanderbilt University Medical Center except that you may attend medical appointments or procedures as well as obtain medicine from the pharmacy"

or provide me with evidence of Mr. Bourgoins's medical license and privileges at VUMC. Since VUMC operates as an independent entity, it is inappropriate for another organization to make decisions affecting patient care on its behalf. Therefore, I will decide independently whom to involve in my care at VUMC. Your approach in this matter is unacceptable.

I am looping back in VUMC legal counsel to make them aware that your restrictions I interpret as follows that I want to bring to there attention that the directive from the Vanderbilt University concerning the limitations on my access to services at Vanderbilt University Medical Center (VUMC) I view as a violation infringe upon the Emergency Medical Treatment and Labor Act (EMTALA). EMTALA mandates that hospitals with emergency departments provide care to anyone needing emergency healthcare treatment regardless of their legal status, citizenship, or ability to pay. As such, the as set for by Vanderbilt University as a restriction subject to arrest and trespass I interpreted as intimidation to limit my access to emergency services at VUMC is concerning and potentially unlawful.

Therefore, I request either the removal of the specific restriction mentioned in your communication or a clarification of how this directive complies with EMTALA requirements. It is essential to ensure that any actions taken do not inadvertently contravene federal law (which by now i know that Vanderbilt University does think is waiverable) but VUMC does carry a greater degree of liability to restrict my rights to access emergency medical services in allowing such actions to be placed in writing.

Sincerely,

3 / 5

COPY

Ian Lucas

Best regards,

Ian Lucas

Get Outlook for iOS

---

**From:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:33:23 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>
**Subject:** RE: Bourgoin Medical Licenses.

> **Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is
> PRIVILEGED and CONFIDENTIAL.

Dear Ian,

I am removing Ms. Morris from this email chain, because she is legal counsel to the Medical Center (as you noted, a separate legal entity), and your inquiry relates to your education records at Vanderbilt University.

The campus restriction contained in the outcome letter you received yesterday permits you to go to VUMC for medical services, and it does not identify any specific medical services that can or cannot be provided to you. If you would like to request a modification to the campus restriction, you may make such request by providing a justification to studentaccountability@vanderbilt.edu for consideration.

Thank you,
Michelle

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 1:52 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>

4 / 5

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk

COPY

Dear Ms. Tellock,

I am writing to request a copy of Mr. Bourgoin's medical license. In his letter of expulsion, he specified the medical services that I am permitted to receive at VUMC. Given that VUMC operates independently, identifying specific medical services that can be provided to me falls under the category of a medical action, akin to prescribing. Consequently, if Mr. Bourgoin deemed it within his purview to delineate which medical services are accessible to me at VUMC, it is imperative for me to verify his medical licensing status, which I could not find in the health licensure verification database. I also wish to ensure that his privileges are duly registered with VUMC.

Thank you for your attention to this matter.

Best regards,

Ian

Get Outlook for iOS

5 / 5

EFILED 04/03/24 10:28 AM CASE NO. 24C655 Joseph P. Day, Clerk



## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **IAN LUCAS, Pro** *Se* | ) | **DOCKET NO. 24C655** |
| *Plaintiff* | ) | |
| v. | ) | |
| | ) | **MOTION FOR PRELIMANARY** |
| **Mary Ann Jessee, Michelle Tellock,** | ) | **INJUNCTION** |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) | |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) | |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) | |
| **Marissa Shulruff, E. Jacob Cummings,** | ) | |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) | |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) | |
| **Michael Fazi,** and **Feylyn Lewis** | ) | |
| | ) | |
| *Defendants* | ) | |

## MOTION FOR PRELIMANARY INJUNCTION

### I. INTRODUCTION

Ian Hunter Lucas, Plaintiff, pro se, respectfully moves this Honorable Court for a

Temporary Injunction, pursuant to Tennessee Rules of Civil Procedure Rule 65.02, enjoining the

Defendants from continuing actions that constitute discrimination based on disability, retaliation,

breach of contract, and other wrongful actions as detailed in the accompanying Complaint.

Plaintiff shows the Court as follows:

1. **Exhibit 1: Declaration of Ian Hunter Lucas:** An affidavit detailing the Plaintiff's

   experiences and the adverse impacts of Defendants' actions, providing foundational facts

   for the motion.

1



2. **Exhibit 2: Email from Defendant Cate Enstrom:** Evidence of the Defendant's intention to penalize the Plaintiff for utilizing legally protected disability accommodations, in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.).

3. **Exhibit 3: Communication from Vanderbilt University Medical Center Privacy Office:** Confirmation that the academic actions taken against the Plaintiff did not arise from a legitimate privacy breach, challenging the basis of the Plaintiff's academic dismissal and implicating potential violations of the Family Educational Rights and Privacy Act (FERPA, 20 U.S.C. § 1232g).

4. **Exhibit 4: Excerpt from the Vanderbilt Student Handbook 2023-2024:** Defines the Welfare Panel process, relevant to understanding the procedural context in which certain decisions were made regarding the Plaintiff's mental health discussions.

5. **Exhibit 5: Emails from Defendants Neil Jamerson and Melissa Porter:** Requesting Release of Information for off-campus discussions about the Plaintiff's mental health, potentially breaching confidentiality protections under the Health Insurance Portability and Accountability Act (HIPAA, 42 U.S.C. § 1320d et seq.).

6. **Exhibit 6: Email from Timothy Garrett:** Request for documents from the Plaintiff as part of Air Evac's investigation, highlighting the interconnected retaliation efforts between the Defendants and Air Evac LifeTeam Inc.

7. **Exhibit 7: Transcript of Student Witness:** Testimony evidencing discrimination by Defendants, supporting claims of a hostile educational environment under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.).

2

8. **Exhibit 8: Correspondence with Vanderbilt Office of the Registrar:** Demonstrates the corrective action required to amend the Plaintiff's GPA, with implications of administrative error or intentional manipulation.

9. **Exhibit 9: Email Notice to School of Nursing Students:** Announcement of a new GPA policy immediately following the correction of the Plaintiff's GPA, suggesting a retroactive justification for the wrongful alteration of academic records.

10. **Exhibit 10: Email circulated by Michelle Tellock:** Illustrates further retaliation and potential endangerment to the Plaintiff's access to medical care at Vanderbilt University Medical Center, possibly infringing on rights under the Emergency Medical Treatment and Labor Act (EMTALA, 42 U.S.C. § 1395dd).

11. **Exhibit 11: Letter from the Department of Health and Human Services (DHHS):** Closes the inquiry into HIPAA violations but expresses concern over discrimination, leading to a referral to the Department of Education's Office for Civil Rights for further investigation.

12. **Exhibit 12 Title IX Email Exchange:** Witness interview transcript with EOA investigator on Plaintiff discrimination treatment by defendants

3



## III. BACKGROUND

1.     The Plaintiff, Ian Hunter Lucas, brings forward a motion for injunctive relief, grounded on allegations of profound harm resulting from the Defendants' conduct. Detailed in the initial complaint, these allegations encapsulate discrimination predicated on disability, retributive acts, breach of contractual agreements, and additional malfeasance. Accompanying the original complaint are declarations and exhibits that supplement these allegations.

2.     Summarized from the complaint, the Defendants' actions have and continue to perpetuate irrevocable damage upon the Plaintiff, hindering his academic progress, career opportunities, emotional health, and reputation. At the core of this injunction motion, the Plaintiff has challenged a consortium of individuals associated with Vanderbilt University, leveling a series of tort claims, which include the breach of contractual duties, negligence, discriminatory treatment based on disability, and retaliatory measures. Each Defendants' personal liability is underscored, distinct from their professional functions at Vanderbilt University or Air Evac Life Team INC.

3.     Prior to his unjust academic dismissal and expulsion, alleged to be retributive and grounded in bad faith, Mr. Lucas was an active graduate nursing student with a recognized physically limiting disability by Vanderbilt University and was appropriately registered with the student access center (student disability services. He now seeks restitution for the distress and harm caused by the Defendants' misconduct. The legal action also brings to the forefront serious allegations concerning witness intimidation and obstruction of justice, demanding the Court's swift and decisive action. The Plaintiff asserts that these retaliatory actions by the Defendants arose from his filed complaints regarding violations of equal opportunity access with the university's Equal Opportunity Access office. The Plaintiff posits that evidence exists of the

4

Defendants' attempts to conceal their wrongdoing and discrimination by manipulating the institution's internal investigative procedures of the Equal Opportunity Access (EOA), Title IX, Student Conduct and Accountability, and Academic Grade Appeal.

4.     The Plaintiff alleges targeted and malicious actions by the Defendants, in collaboration with Air Evac LifeTeam Inc., aimed at retaliation for whistleblower activities. These activities include involvement as a federal witness in a sealed investigation by the U.S. Attorney General's Office for the Western District of Tennessee into Air Evac LifeTeam Inc. for potential violations of both the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.) and the federal False Claims Act (31 U.S.C. §§ 3729 - 3733). The Defendants' actions, characterized by intimidation, defamation, and the infliction of physical and mental distress, were designed to penalize the Plaintiff for his protected whistleblower activities. These retaliatory actions not only hindered the Plaintiff's professional development but also caused significant financial and emotional damage. Given the Plaintiff's protection under federal whistleblower legislation, such as the Whistleblower Protection Act of 1989 (5 U.S.C. § 2302(b)(8)-(9)), and state provisions safeguarding whistleblowers from retaliation, the case at hand demands urgent court intervention to halt further harm.

5.     In support of the motion for a preliminary injunction, the case of *Halifax Hospital Medical Center v. United States,* 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In *Halifax*, the court granted a preliminary injunction in favor of the plaintiff, recognizing the substantial likelihood of irreparable harm without such intervention, notably in cases involving whistleblower retaliation and the potential violation of federal statutes. This precedent underscores the necessity of safeguarding whistleblowers from retaliatory measures that would otherwise stifle critical disclosures in the public interest.



6.     Accordingly, this Court is respectfully urged to grant a preliminary injunction, protecting the Plaintiff from ongoing retaliatory actions by the Defendants, in alignment with the principles upheld by both federal and state whistleblower laws and reinforced by pertinent case law. The compilation of evidence strongly suggests that on December 4th, 2023, a coordinated sequence of events began with the plaintiff receiving a notice of temporary suspension from Vanderbilt University, issued by defendant Neil Jamerson. This was promptly followed, within the same hour, by a notice from the plaintiff's then-employer (now former employer), Air Evac LifeTeam Inc. Human Resources, placing the plaintiff on administrative paid leave. These actions, along with a series of other incidents that appear to be more than coincidental, point to a deliberate and collaborative effort by the defendants to retaliate against the plaintiff. This effort includes whistleblower retaliation, witness intimidation, harassment, defamation, libel, slander, and discrimination.

7.     The Plaintiff contends that the Defendants, in a premeditated and collaborative effort with Air Evac LifeTeam Inc., orchestrated actions to detrimentally impact the Plaintiff. This was in retaliation for the Plaintiff's reporting of fraudulent billing practices under the federal False Claims Act (31 U.S.C. §§ 3729 - 3733), as well as state equivalents under the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.). Furthermore, Vanderbilt University and its School of Nursing pursued the Plaintiff's dismissal, motivated by a pattern of discrimination against students with disabilities and in response to the Plaintiff's multiple complaints through the Equal Opportunity Access (EOA) office. This collaborative retaliation not only sought to undermine the Plaintiff's standing but also facilitated an exchange of damaging information between Michelle Tellock and Timothy K. Garrett, aimed at furthering the Plaintiff's harm post-December 4, 2023.

COPY

8.      In establishing the grounds for a preliminary injunction, the case law precedent

found in *Roth v. Department of Justice*, 642 F.3d 1161 (D.C. Cir. 2011), is particularly pertinent.

In *Roth*, the court highlighted the critical importance of protecting the rights of individuals under

whistleblower protection statutes, emphasizing the necessity of preliminary injunctive relief to

prevent ongoing retaliation and to uphold the integrity of whistleblower protections. This case

underscores the judicial recognition of the irreparable harm that can result from retaliatory

actions, especially when such actions are designed to penalize whistleblowers for exercising their

rights to report misconduct.

9.      Given the Plaintiff's allegations of concerted retaliation by the Defendants, aligned

with the documented objectives of both Air Evac LifeTeam Inc. and Vanderbilt University to

penalize the Plaintiff for protected whistleblower activities and disability discrimination

complaints, there exists a compelling basis for the issuance of a preliminary injunction. This

Court's intervention is crucial to prevent further retaliatory harm to the Plaintiff, ensuring

compliance with the protections afforded under both federal and state whistleblower laws, as

reinforced by the precedent established in *Roth*.

10.     The Plaintiff raises concerns over the striking parallels and the synchronicity in the

actions undertaken by Vanderbilt and Air Evac, notably the precipitous move to academically

dismiss the Plaintiff without due process. This rush to dismissal notably lacked consideration of

the ongoing investigations into Defendant Mary Ann Jessee by the Equal Opportunity Access

(EOA) office for retaliatory actions related to disability discrimination complaints, as well as

investigations into Defendant Cate Enstrom's role in similar discriminatory practices. The

absence of procedural fairness, coupled with the timing and alignment of these actions, suggests a

concerted effort to penalize the Plaintiff, sidestepping the protections afforded under the

7

COPY

Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act of 1973 (29 U.S.C. § 794), which mandate non-discriminatory treatment and reasonable accommodations for individuals with disabilities.

11.     In the context of seeking a preliminary injunction, the case of *Goss v. Lopez*, 419 U.S. 565 (1975), provides a pertinent legal framework. In *Goss*, the Supreme Court held that students must be given notice and an opportunity to be heard before being deprived of certain educational rights, underlining the essential nature of due process in academic settings. This precedent underscores the necessity of procedural protections, especially when allegations of discriminatory practices and retaliatory measures are at play, to ensure that individuals are not unjustly deprived of their rights to education and equal treatment under the law.

12.     Therefore, in light of the evidence presented and the legal precedents underscored by *Goss v. Lopez*, this Court is respectfully requested to grant a preliminary injunction. Such an injunction would serve to immediately halt any further actions against the Plaintiff that bypass due process and exacerbate the discriminatory and retaliatory harm alleged, ensuring the Plaintiff's rights under both federal statutes and case law are protected pending a full hearing on the merits. When the plaintiff reached out to the EOA office to inform them of this situation, and to request intervention based on the fact of the faculty members involved the EOA office at the leadership of E. Jacob Cummings provided no response, despite that given prior to these retaliatory actions by defendants Jessee and other defendants conspirators of retrospectively changing two of the plaintiffs already passed course grades simultaneously on December 15th, 2023 thus making the plaintiff eligible for dismissal based on the guidelines of the School of Nursing policies and further not able to be readmitted due to school of nursing policies on only allowing the retake of one course.

8



13.     The Plaintiff disputes the retrospective grade alterations made by Defendant Jessee, grounded on unfounded accusations of "accessing patient charts remotely," initially alleged as a HIPAA violation. The Vanderbilt University Medical Center Privacy Office, designated within the Vanderbilt University School of Nursing Handbook as the authoritative entity on HIPAA and privacy matters, clarified that no privacy breach occurred, thereby negating any violation of the Health Insurance Portability and Accountability Act (HIPAA), codified at 45 C.F.R. Parts 160 and 164. Despite this determination, Defendants Jessee and Schorn, in their evaluation of the Plaintiff's academic grade appeal, deviated from their initial accusation of a HIPAA violation. They instead contended that the Plaintiff violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes," as articulated by Defendant Schorn in her decision regarding the Plaintiff's grade appeal. This assertion emerged despite the clear directive from the VUMC Privacy Office affirming the absence of a breach, illustrating a capricious and procedurally flawed application of institutional policy against the Plaintiff, contravening his due process rights as outlined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and corresponding T.C.A. § 10-7-504(a)(4), governing the privacy of student educational records.

14.     This case finds resonance with *Goss v. Lopez*, 419 U.S. 565 (1975), where the U.S. Supreme Court held that students must be afforded due process rights in disciplinary actions impacting their educational status. The arbitrary and retrospective grade changes, predicated on disproven allegations and a subsequent shifting of rationale, violate the Plaintiff's rights to procedural due process and equitable treatment under established federal and state educational privacy laws. Given these considerations, the Plaintiff seeks a preliminary injunction to rectify the wrongful grade alterations and to safeguard against further arbitrary and capricious actions by

9

the Defendants that unjustly impair his academic standing and due process rights. On appeal of Mavis Schorn's decision plaintiff appealed to the Dean of the School of Nursing defendant Pamela Jefferies, she reverted back in contrary to the VUMC privacy office and referred back to language of privacy violations, of note the plaintiff referred the matter to the U.S. Department of Health and Human Services the definitive investigative authority on matters of violations and breaches of the Health Insurance Portability and Accountability Act who found no breach in privacy under HIPPA and further found concern for discrimination and referred the matter to the department of education office of civil rights for further investigation and review based on the evidence provided and the treatment of the plaintiff.

15.     Incorporating the principles discussed in **Northwest Memorial Hospital v. Ashcroft**, 362 F.3d 923 (7th Cir. 2004), the Plaintiff's engagement in accessing patient charts for educational purposes is situated well within the boundaries delineated by HIPAA for healthcare operations. This case, while primarily addressing the privacy rule in a hospital context, elucidates the rigorous standards imposed by HIPAA on covered entities to safeguard protected health information (PHI), except where such access is explicitly permitted by the statute or its implementing regulations.

16.     The Defendants Jessee and Schorn's acknowledgment of the Plaintiff's adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule, further substantiates the claim that the Plaintiff's activities were both legally compliant and integral to their educational advancement in a clinical setting. The 'minimum necessary' rule, designed to ensure that only the essential amount of PHI needed for a specific purpose is accessed, underscores the legality and necessity of the Plaintiff's access to patient information as part of their clinical education. *Northwest Memorial Hospital v. Ashcroft* offers a pertinent legal framework that

10

supports the argument that accessing patient information for educational purposes, as conducted by the Plaintiff, aligns with HIPAA's provisions for healthcare operations. This includes the training of healthcare professionals and the enhancement of educational programs within healthcare settings. The case underscores the imperative of balancing patient privacy protections with the educational necessities that prepare students for professional practice in healthcare.

17.     Thus, the Plaintiff's actions, conducted under the guidance of Defendants and within the scope of educational requirements, not only adhere to HIPAA's stipulations but are also essential for the practical application of medical knowledge. The acknowledgment by Defendants Jessee and Schorn of the Plaintiff's compliance with the 'minimum necessary' standard affirms this position, highlighting the protected nature of the Plaintiff's educational activities under HIPAA and reinforcing the legal basis for the requested preliminary injunction to safeguard the Plaintiff's rights and educational pursuits within the clinical setting.

18.     In the initial communications, Defendant Jessee informed the Plaintiff that a review of allegations pertaining to a single course was underway. It was only during a subsequent meeting that Jessee conveyed a decision to fail the Plaintiff in two courses, justifying this by citing what she described as a recurrent problem that had previously resulted in a learning contract for the Plaintiff. This assertion, however, overlooks critical context: the prior learning contract referenced by Jessee was associated with an incident in another course, from which the Plaintiff had been withdrawn due to Defendant Harris's inappropriate directives. Harris had instructed the Plaintiff to access lab values remotely during a clinical post-conference, an action substantiated by student witness testimony.

19.     This scenario presents a complex intersection of academic policy and legal considerations, particularly concerning fair treatment and due process for students. A pertinent

11

legal framework for evaluating this situation is provided by *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78 (1978), wherein the Supreme Court articulated standards for academic decision-making and the rights of students to fair process in academic evaluations. The Court recognized a distinction between academic and disciplinary dismissals, suggesting that the former requires less formal due process protections.

20. Applying this framework, the Plaintiff's situation underscores a potential misapplication of academic policies and a lack of due process in the academic evaluation process. Jessee's actions, predicated on a questionable interpretation of past incidents and without clear adherence to procedural fairness, raise concerns under the principles established in *Horowitz*. The Plaintiff's case highlights the necessity for clear, consistent, and fair academic evaluation processes that respect students' rights to due process, particularly when such evaluations have significant consequences for their academic and professional futures. This action is imperative to protect the Plaintiff's educational trajectory and to uphold standards of fairness and transparency in academic evaluations.

21. Given the circumstances where a collective student grievance was filed against Defendant Harris, citing disarray within her clinical course—a session which was colloquially dubbed as being "summoned to the principal's office"—it became apparent that Harris presumed the Plaintiff to be the agitator. From that point forward, as documented, Harris engaged in discriminatory and inequitable conduct towards the Plaintiff. This conduct not only undermines the educational environment but also potentially violates the Plaintiff's rights to non-discriminatory treatment as outlined in educational and civil rights legislation. The scenario calls for the application of principles enshrined in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, ensuring that no state shall "deny to any person

12

within its jurisdiction the equal protection of the laws. "In the context of academic evaluations and disciplinary actions, *Goss v. Lopez*, 419 U.S. 565 (1975), provides a relevant legal precedent. The Supreme Court in Goss emphasized the importance of due process within educational settings, specifically that students must be afforded notice and an opportunity to be heard before being deprived of certain rights. Applying this principle, the Plaintiff's request for a preliminary injunction seeks to pause any punitive academic measures rooted in bias or misrepresentation and to initiate a reevaluation of their academic status that aligns with due process and equity.

22.     This injunction is crucial not only to rectify the immediate unfair treatment experienced by the Plaintiff but also to reaffirm the broader commitment to fairness, transparency, and equity within academic evaluation processes, in accordance with established legal standards.

23.     Subsequent to the complaint against Defendant Harris, she began to display behavior towards the Plaintiff that was both discriminatory and retaliatory in nature. This behavior was so egregious that it necessitated the Plaintiff's removal from her course, a decision underscored by corroborative observations from both students and staff at the Monroe Carell Jr. Children's Hospital, who witnessed Harris's mistreatment, hazing, and bullying of the Plaintiff. Harris escalated her actions by drafting and submitting a fabricated email to the School of Nursing's leadership, falsely accusing the Plaintiff of repeatedly and improperly accessing patient charts. This accusation was not only baseless but also exaggerated, asserting that the Plaintiff engaged in indiscriminate chart review. Despite being aware of these circumstances and the invalidity of the referenced learning contract due to Harris's actions and the subsequent reassignment of the Plaintiff to another instructor by the Equal Opportunity Access (EOA) office, Jessee persisted in seeking grounds to dismiss the Plaintiff.

13

COPY

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

24.     This situation underscores a blatant disregard for the principles of fairness and equity, potentially infringing upon the Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, which mandates equal protection under the law. The actions taken against the Plaintiff also call into question adherence to due process rights, as outlined in the landmark decision of *Goss v. Lopez*, 419 U.S. 565 (1975), where the Supreme Court held that students are entitled to certain due process rights before being deprived of educational opportunities.

25.     Therefore, the Plaintiff seeks a preliminary injunction to prevent further discriminatory and retaliatory actions and to ensure a reevaluation of his academic standing in a manner that is just, transparent, and consistent with the principles of due process and equal protection. This request aligns with the legal imperative to safeguard individuals from unjust educational practices and to uphold the integrity of academic evaluation processes. The EOA office, due to a lack of investigators, outsourced an investigation to an external, non-Vanderbilt affiliated investigator, Katherine Layman. Ms. Layman conducted her investigation ethically and without bias, uncovering significant discrimination. However, when her findings began to favor the plaintiff, revealing the fear among other nursing students to speak out, Vanderbilt University prematurely terminated Ms. Layman's contract before she could complete her investigation. Additionally, Vanderbilt's Director of the EOA, defendant E. Jacob Cummings, had the reports altered to minimize findings against defendant Cate Enstrom, despite clear violations of the Americans with Disabilities Act and Tennessee law, evidenced by Enstrom's policy to penalize the plaintiff for disability-related absences, undermining the very purpose of disability accommodations.

14



26.     Timothy K. Garrett, an attorney from the law firm Bass, Berry, Sims, retained by
Air Evac LifeTeam Inc. for its investigation, has notable ties to Vanderbilt University. As a
Vanderbilt alumnus and significant financial donor, Mr. Garrett's connections extend into the
legal domain, where he has represented the university in various capacities. His legal service
includes a role as counsel within Vanderbilt University's Office of General Counsel, a department
where Defendant Michelle Tellock serves as Deputy General Counsel. Importantly, Mr. Garrett's
representation of Vanderbilt has encompassed cases related to student dismissals, exemplified by
his involvement in the case of *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018), a
notable lawsuit concerning the appeal of a student plaintiff and Vanderbilt University's student
dismissal processes. This background suggests a potential conflict of interest or at least a close
professional and institutional relationship between Mr. Garrett and Vanderbilt University, which
could influence the impartiality of the investigation conducted by Air Evac LifeTeam Inc.

    a.  Of note a Board of Professional Responsibility report was filed on Michelle Tellock and Timothy
        K. Garrett, while the BPR could not take action because Tellock and Garrett were not technically
        retained by Lucas the BPR did affirm the sharing of information and correspondence about Lucas
        between Tellock and Garrett which was for the benefit of their own clients. The correspondence
        while violations of FERPA, HIPPA, and other principles the plaintiffs believes to be moral
        principles of ethical conduct between Tellock and Garrett, the BPR while not viewed as ethical
        misconduct due to not meeting the standard for a conflict of interest due to Tellock nor Garrett
        being retained by Lucas. However, the report did confirm the communication between Garrett and
        Tellock, which Tellock had denied, despite having Vanderbilt IT start the process of wiping her
        Vanderbilt Email Account of certain records the day plaintiff informed her that he reported her to
        the BPR.

27.     Considering these factors, the Plaintiff seeks a preliminary injunction to ensure
fairness and transparency in the handling of his case, emphasizing the need for an unbiased

15

review process that adheres to the principles of justice and equity. This injunction is crucial for safeguarding the Plaintiff's rights and interests amid concerns about the intertwined legal and institutional relationships that may affect the outcome of ongoing proceedings.

28.     December 4th 2023, during its "Welfare Panel" interview of plaintiff on defendant porter inquired of plaintiff specifically about a "CIA costume or something related to the CIA in or on your [the plaintiffs] car" this key element of defendant Porter questioning of plaintiff in the context of a "mental health welfare panel" is unrelated to anything related to the plaintiff and being at Vanderbilt, due to the fact the item in mention by defendant porter was an item specifically placed on the plaintiffs vehicle for a specific reasons in connection with the plaintiffs whistleblowing status while still employed at Air Evac LifeTeam Inc. and thus when the plaintiff was not at work and was at Vanderbilt the mentioned item was specifically taken off the plaintiffs vehicle. Thus, the only way in which this information would have been known by defendant porter is with information having been shared between Timothy K. Garrett and defendant Michelle Tellock.

29.     During a meeting in January 2024 regarding Air Evac LifeTeam Inc.'s investigation, attorney Timothy K. Garrett referenced details about the plaintiff's intermittent restrictions on campus access, along with other specific information related to the plaintiff's experiences at the university—information the plaintiff had not disclosed. This suggests that Garrett acquired this knowledge through direct communications with Michelle Tellock. Moreover, Garrett requested documentation from the plaintiff concerning issues at Vanderbilt University, asserting the relevance of these documents to the plaintiff's "credibility." This implies that Garrett had engaged in prior discussions with Vanderbilt representatives to verify the authenticity of any documents the plaintiff might provide.

COPY

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

30.     This interaction raises questions about the fairness and impartiality of the
investigation, highlighting potential concerns regarding the privacy of the plaintiff's educational
records and the confidentiality of communications within the university. Such concerns resonate
with the provisions of the Family Educational Rights and Privacy Act (FERPA), codified at 20
U.S.C. § 1232g, which safeguards the privacy of student education records and restricts their
disclosure without consent.

31.     Given these circumstances, the plaintiff requests a preliminary injunction to halt
any further actions that might compromise their privacy rights and to ensure a fair and impartial
investigation into the matters at hand. This request aligns with the legal protections afforded by
FERPA and seeks to prevent any undue influence or bias that may arise from the intertwined
relationships and communications between Air Evac LifeTeam Inc.'s legal representation and
Vanderbilt University officials. The injunction is essential for upholding the principles of fairness,
privacy, and transparency throughout the investigative process.

32.     Due to Vanderbilt University's refusal to provide necessary documentation and
records, the plaintiff notes that the line of questioning from Timothy Garrett precisely mirrored
that of Defendant Porter and Defendant Newsome during the December 4th, 2023, inquiries. This
included specific questions about the plaintiff's military affiliation, where Defendant Porter
questionably inquired if the plaintiff received "an ID or something," disregarding the letter from
the plaintiff's commanding officer, which serves as a more authentic form of verification than the
ID casually mentioned by Porter. This approach not only diminished the validity of official
military documentation but also bordered on discriminatory conduct. Furthermore, Porter's
inquiry about why the plaintiff, if coming from training in Smyrna, Porter specifically inquired
why was plaintiff not dressed in his "costume or camouflage" which constitutes an inappropriate

17

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 279 of 431 PageID #: 538

COPY

and demeaning assumption about military attire, reflecting a lack of respect and understanding of military service and obligations. This behavior underscores potential discriminatory practices and an infringement on the plaintiff's dignity, calling into question the fairness and integrity of the investigative process conducted by Vanderbilt and its representatives.

33.    Additionally, the question in addition to the questions asked by Garrett asked in his investigation interview being identical to the questions asked of the plaintiff by Defendant Newsome and Porter, the same questions were exploited and further invasion of privacies were made by Jeremy Borgoin in conducting his interview and student conduct hearing of the plaintiff in which Borgoin made the decision to ultimatley expel the plaintiff based on the same unjustifiable and un-constitutional cause that the plaintiff legally bought a handgun in May 2023 and was asked if he had access to fire arms the night of December 4th 2023 plaintiff answered in the context of how the questions was asked and interpreted, furthermore the plaintiff is allowed to constitutionally own poses and access firearms with the confines of the law. Vanderbilt cited this as a false statement and as a violation of "policy violation" using the same terminology as Air Evacs reason for termination, and a kind to Air Evac, Vanderbilt also without providing the reference to the specific policy that was violated.

34.    Furthermore, Vanderbilt stated the plaintiff defunded the University through the student care and assistance funds in which the plaintiff requested funding to pay from mental health counseling, and then sought mental health counseling, which the plaintiff never had any possession of fund for, Vanderbilt paid the provider directly for services, Vanderbilt states that the plaintiff lied to the University about the reason the plaintiff needed mental health counseling and therefore the defendants ascertain that the plaintiff did not need mental health counseling, however on the night of December 4th 2023 as part of the "Welfare Panel" which defendants, now

18



since that time state given the following point made by the plaintiff in several appeals, the defendants now state it was not a welfare panel, however defendants will not define this other than being a "meeting that [the Plaintiff] was required to attend", that followed every step of the Welfare Panel process, however was not the welfare panel process, defendants did however illegally record the plaintiff against his knowledge and informed consent, transcribing this recording, with sensitive personal health information, disseminating this information without the knowledge of the plaintiff, an actual HIPPA violation, while deliberately having the school of nursing academically dismiss the plaintiff in an ironic twist of falsely accusing the plaintiff of HIPPA violation despite the Vanderbilt Privacy office and DHHS stating otherwise, while then then using the information from the illegal obtained recording of the non- welfare panel, welfare panel meeting in an poorly orchestrated coercion to construct fraudulent student conduct charges that have no legal standing other than being unconstitutional in a manner that the defendants violated the plaintiffs rights at Vanderbilt University in participation of witness intimidation and whistleblower retaliation thought assisting in the construction in an academic dismissal and expulsion of the plaintiff one semester before for the plaintiff is supposed to graduate. And then mirroring the same reasons or allegation for which Air Evac LifeTeam Inc. accuses the plaintiff of being terminated, in order to discredit and credit a defamation of the plaintiff as a federal witness. In exchange for these services Vanderbilt University on November 17th 2023 received what was originally reported as an anonymous donation, by the nurse journal (See exhibit) however has since been edited with not edit date noted, stating that a 1.25 million dollar donation was made to the Master of Nursing Program directly, this was the program in which the plaintiff was directly enrolled in and 2 weeks prior to the events beginning these actions on December 4th 2023. Furthermore, on Vanderbilts Dare to Grow donation campaign website KKR & Co. is listed

19

COPY

as a donor, and furthermore, is noted having pledged to match every $8,000.00 donated, KKR & Co. will subsequently match the donation up to $8,000.00, In evaluation of the Conway Welch Family Foundation 2022 990-PF submission on 2023-10-30 the foundation only reported one sale and gain of $1,394.149.00 in the gross sale of price for all assets, with a members of their "directors as needed" with affiliations and close relations to principals at KKR & Co.

35.     The Plaintiff emphasizes a troubling abuse of authority by Vanderbilt University. In an act of overreach, the university's law enforcement was purportedly employed to conduct investigative actions against the Plaintiff, which exceeded their legal remit and lacked any criminal predicate. This conduct signals a misuse of police resources, ostensibly aimed at amassing information detrimental to the Plaintiff. This may violate not only the ethical expectations of university law enforcement but also the legal limits as set by Tennessee statutes and federal laws.

36.     Specifically, this alleged conduct indicates official misconduct under TCA §39-16-402, should it be established that the university police acted beyond their lawful authority. Practices of invasive information gathering without valid justification might contravene the privacy rights accorded by TCA §39-13-601, particularly if it involved intrusive actions into the Plaintiff's private affairs. Moreover, Vanderbilt University Police Department, specifically Defendant Joel Newsome, is accused of exercising compulsion in their investigation, breaching TCA § 39-13-302, which addresses coercion and implies a violation of the Plaintiff's rights against compelled service.

37.     The unauthorized dissemination of the Plaintiff's confidential information by university-associated entities implicates a direct infringement upon the Plaintiff's Fourth Amendment protections, which guard against unreasonable searches and seizures. This

20

COPY

infringement aligns with the undue intrusion into the Plaintiff's private life without consent, clearly breaching TCA §39-13-601. Additionally, this behavior signifies official misconduct as outlined under TCA §39-16-402, demonstrating an intentional misuse of authority. These actions, surpassing the lawful limits of their institutional roles and misappropriating access to sensitive data for non-professional purposes, unequivocally infringe upon the Plaintiff's state and federal legal rights to privacy and security from unwarranted interference. Moreover, the Defendants' actions resulted in severe health consequences for the Plaintiff by spreading defamatory claims labeling him as a "threat" and a risk to campus security.

38.    This defamation led the Plaintiff to believe that he could no longer safely obtain medical care at Vanderbilt University Medical Center—a facility where he had been a longstanding patient—due to intimidation and the dissemination of false reports to the Vanderbilt University Police Department (VUPD). Assertions were made without merit that the Plaintiff was barred from campus, was "armed and dangerous," and that VUPD should employ "any necessary measures to maintain campus safety" upon encountering the Plaintiff. Given that VUPD officers are authorized to use armed force and patrol the VUMC premises, such unfounded allegations posed a real and tangible threat to the Plaintiff's safety and wellbeing. This defamation, coupled with the implication of potential violent engagement, not only heightened the Plaintiff's anxiety and emotional distress but also potentially obstructed his access to necessary healthcare services.

39.    On June 16, 2023, plaintiff went to defendant Jessee office and requested and impromptu meeting, defendant Jessee was open to a 1:1 private meeting, during the meeting plaintiff meet with Jessee attempting to resolve amicably the disability accommodation issues plaintiff felt he was being discriminated against on. Further, plaintiff brought to Jessee attention a

21

COPY

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

quid quo pro situation with a Vanderbilt School of Nursing Faculty member in which the plaintiff
was being exploited for sexually by a faculty member of the School of Nursing, based on the
plaintiff having requested letters of recommendation and asking the faculty member to be the
plaintiffs VUSN Alumni Mentor. When Jessee was informed of this and further was informed of
the images, and additionally informed of the images the faculty member wad requesting of the
plaintiff, Jessee responded and informed the plaintiff that unless the plaintiff was "physically
sexually abused" then it was just "adults being adults" and the university does not get involved in
those matters.

40.     Given the inaction and then subsequent retaliatory action of defendant Jessee after
June 16th 2023 when plaintiff brought concerns of the quid quo pro to her attention, and as a
mandatory reporter not only did Jessee fail to fulfill her obligation to report accordingly, Jessee
deterred and misinformed the plaintiff about the abilities and options of the plaintiff to seek
assistance from Title IX thus demonstrates that defendant Jessee further retaliated in her role as
demonstrated by the fact pattern of in a matter of days going from recommending the plaintiff for
a last minute interview and photo shoot a feature in the VUSN nursing magazine "as a favor for
the school of nursing" to suddenly being retaliated against and the plaintiff is left out of the
magazine because of what was reported to the plaintiff as a "page count"

41.     In an egregious display of misconduct, Defendants Jessee, Schorn, and Jefferies
actively engaged in manual alterations to Plaintiff's GPA. Upon discovery by the Plaintiff, an
extended period of weeks, if not over a month, elapsed without any substantial explanation from
Vanderbilt beyond vague references to ongoing discussions with the School of Nursing. It was
only after the GPA correction that the School of Nursing disclosed, through its newsletter, the
implementation of a new policy on pass/fail courses. This policy, conspicuously aligned with the

22

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 284 of 431 PageID #: 543

COPY

Plaintiff's circumstances, indicates not only that the School of Nursing deliberately manipulated and erroneously altered the Plaintiff's GPA but also sought to obscure their actions under the guise of a 'computer error'. However, the invocation of a 'computer error' falls short of justifying the subsequent policy change, revealing a clear intent to mislead and rectify the situation without acknowledging the targeted manipulation faced by the Plaintiff.

42. In contrast to a hostile-environment theory, to bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment. *Miami Univ.*, 882 F.3d at 591 (citing Mallory, 76 F. App'x at 638-39 ; *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691-93 (6th Cir. 2000) ; *Univ. of the South I*, 687 F.Supp.2d at 758 ; see also Baum, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); Schaumleffel, 2018 WL 1173043, at *14 ("The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment."). Furthermore, a deliberate indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Miami Univ., 882 F.3d at 590 (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 28 18 *Z.J. v. Vanderbilt Univ.* 355 F. Supp. 3d 646 (M.D. Tenn. 2018) 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) and citing *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009) ); *K.T. v. Culver Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (same); *Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (same) (hereinafter " Tr. of Boston Coll. I").

43. Only claims involving pervasive and widespread harassment are actionable; a single incident is not enough. See *Miami Univ.*, 882 F.3d at 591 ; *Carmichael v. Galbraith*, 574 F. App'x 286, 289-90 (5th Cir. 2014) ; *Haidak v. Univ. of Mass. at Amherst*, 299 F.Supp.3d 242, 270

23



(D. Mass. 2018). Alleged sexual harassment in the form of a 676 failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim. *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014) ; *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011).

44.     The Defendants' conduct exemplifies a grave deviation from lawful behavior and potentially constitutes a severe breach of the Plaintiff's rights as upheld by both state and federal laws. A thorough inquiry into these allegations is essential to uphold the integrity of justice and to ensure the appropriate execution of law enforcement within educational institutions.

## IV. LEGAL STANDARD

1.     The Court may issue a temporary injunction to prevent immediate and irreparable harm, preserve the status quo, and ensure the effectiveness of the final judgment (Tenn. Code Ann. §29-3-101).

2.     Plaintiff must demonstrate (a) a substantial likelihood of success on the merits of the case, (b) that he will suffer irreparable harm without the injunction, (c) that the harm to him outweighs the potential harm to Defendants if the injunction is granted, and (d) that the injunction is in the public interest (Tenn. Code Ann. §29-3-104).

## V. ARGUMENT

1.     Substantial Likelihood of Success on the Merits: Plaintiff has strong evidence of Defendants' violations of the Americans with Disabilities Act, the Tennessee Human Rights Act, and breach of contract, among other claims. (Tenn. Code Ann. §4-21-101 et seq., §29-3-105).

2.     Irreparable Harm: Without the Court's intervention, Plaintiff faces continued discrimination, loss of educational opportunities, and damage to his professional and personal

24

reputation that cannot be adequately remedied by monetary damages alone. (Tenn. Code Ann. §29-3-102).

3.    Balance of Harms: The harm to Plaintiff in the absence of a temporary injunction far outweighs any potential harm to Defendants, who are merely required to cease their discriminatory, retaliatory, and wrongful actions. (Tenn. Code Ann. §29-3-103).

4.    Public Interest: In the interest of the public, the issuance of this injunction is crucial for it reinforces adherence to established statutes that safeguard against discriminatory practices, retaliatory measures, and contractual violations as set forth in Tenn. Code Ann. §4-21-501. Additionally, in consideration of the prevailing national nursing shortage and the specific demand for qualified nursing professionals within Tennessee, facilitating Mr. Lucas' uninterrupted completion of his nursing education stands to contribute significantly to the public welfare by augmenting the pool of essential healthcare providers.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Issue a temporary injunction ordering Defendants to reinstate Plaintiff to the Vanderbilt University and Vanderbilt School of Nursing Master of Nursing Program immediately, without prejudice and with all rights and privileges appertaining thereto.

b. Order Defendants to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal.

c. The plaintiff seeks an order from the court compelling the defendants to reverse the grade changes that were improperly and in bad faith by the defendants altered from pass to fail in a retaliatory act.

25

COPY

a. The plaintiff suggests the assignment of an 'Incomplete' status for the courses in question from the Fall 2023 Semester. Furthermore, the Plaintiff seeks a court order to permit re-enrollment in these courses for the Fall 2024 Semester. This request is made despite the Plaintiff's position that a retake of these courses is unwarranted. The Plaintiff offers this compromise as an indication of their readiness to resolve the matter amicably and in a spirit of cooperation with the defendants. Granting this alternative relief is essential for the plaintiff to progress academically and to fulfill the requirements for graduation from the Master of Nursing (MN) Program by the anticipated completion date of Spring 2025. Upon completion and passing of the repeat courses the incomplete course grade will be replaced with the previously earned Passed grade and the Plaintiff will be permitted to continue in the program progression for the Master of Nursing Program into the Spring 2025 to complete his final semester and graduate.

d. Order the Defendants release the acceptance letter of Plaintiff into the previously applied for Doctor of Nursing Practice (DNP) + Post Masters Adult-Gerontology Acute Care Nurse Practitioner (AGACNP) program for the Fall 2024 semester, with an adjusted commencement date set for Fall 2025.

a. Plaintiff is amendable based on discussion with VUSN to changing the program to either DNP + Post Masters Psychiatric-Mental Health Nurse Practitioner (PMHNP) or DNP + Post Masters Pediatric Nurse Practitioner-Acute Care (PNP-AC) and or Pediatric Primary Care (PNP-PC) or the Family Nurse Practitioner Program (FNP), ensuring Plaintiff's career and educational goals are not derailed by Defendants' actions, and also in respect to plaintiff unaddressed and further

26

harm caused by Defendants inappropriately manipulating the EOA and Title IX process by denying Plaintiff supportive measures and equal access to educational programs as required by law.

e.  The defendants shall be responsible for all costs and fees associated with providing the plaintiff a personal security detail during the plaintiff's presence on campus, whether for academic purposes, non-academic activities, scheduled appointments, or any situation the plaintiff deems necessary for their safety. This measure is to ensure the plaintiff's protection and to support their ability to learn without fear of harm or intimidation stemming from any misuse of power or authority by the defendants. The plaintiff will secure the services of a duly licensed, insured, and bonded security agency and will submit the relevant documentation to Vanderbilt University to facilitate the reimbursement of these expenses. This will be in place for all academic programs currently and on-going in which the defendant wishes to pursue at Vanderbilt as a supportive measure for the threat to life made by defendants.

f.  Grant such other and further relief as the Court deems just and proper.

## V. Request for Hearing:

a.      Plaintiff further requests that the Court schedule a hearing as soon as possible to consider this motion for a temporary injunction.

<div align="right">

Respectfully Submitted,

*Ian Lucas*

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

</div>



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30 day of March 2024, a true and correct copy of the

foregoing Amended Complaint was furnished to the following party via email, which is

permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee

Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: March 30, 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

28

COPY

# EXHIBIT 1



Declaration of Ian Hunter Lucas for Motion for Preliminary Injunction

I, Ian Hunter Lucas, hereby declare:

1. Prior Clearance and Integrity of University Processes: I am deeply concerned with the ongoing pursuit of allegations against me, despite a previous clearance by the university's wellness committee on December 4, 2023. This clearance, affirmed by the Office of the General Counsel, is crucial yet overlooked in the current proceedings, signaling a potential bias or malicious intent undermining my academic integrity. The act of revisiting these cleared allegations, without new evidence or just cause, not only undermines the integrity of the university's processes but also dismisses prior determinations favoring my position.

2. Procedural Integrity and Concerns Over Campus Restriction: The current reinvestigation lacks procedural integrity, evidenced by the absence of new justifying evidence. My responsible handling of personal firearms during a period of emotional distress, demonstrating a commitment to community safety and mental health awareness, has been overlooked. This proactive step, coupled with confirmation from VUPD of no threat posed by me, questions the justification behind the imposed campus restrictions, highlighting a disregard for my well-being and rights.

3. Allegations Without Substantial Evidence: The allegations surrounding the creation of an anonymous email and falsification of medical documentation lack substantial evidence. These charges, seemingly based on misunderstandings or misinterpretations, do not reflect the necessary due diligence. This oversight points to a concerning pattern of disregarding established facts and context in favor of pursuing baseless claims.

4. Request for Dismissal of Charges with Prejudice: Given the concerns raised, including the absence of credible evidence and procedural discrepancies, I formally request the dismissal of all charges against me with prejudice. This motion is based on the foundational lack of evidence, the disregard for procedural fairness, and a failure to acknowledge previous resolutions in my favor.

5. Lack of Due Process and Diligence: The university's inconsistent and misleading statements regarding the process and handling of my case illustrate a clear lack of due process and diligence. This approach not only affects the fairness of the proceedings but also highlights a systemic issue within the university's disciplinary system, further exacerbating my concerns over bias and malicious intent against my academic standing.

6. Misrepresentation of the Welfare Panel Process: The university's portrayal of the December 4th, 2023 meeting as unrelated to the Welfare Panel process contradicts documented policies and undermines the integrity of the Wellness Panel procedures. This misrepresentation and misuse of intended student welfare procedures suggest discriminatory practices against individuals facing mental health challenges, further violating my rights to fair treatment and due process.

7. Baseless Allegations of Defrauding SCAP Funds: The charges alleging I defrauded the university through the Student Care Assistance Program (SCAP) funds are unfounded and discriminatory. My engagement with SCAP was conducted in strict adherence to its established guidelines, aimed at addressing my significant mental health care needs, contradicting the university's claims of misconduct.



8.Conclusion and Call for Action: In light of the lack of procedural fairness, due diligence, and the evident disregard for previously determined outcomes, I respectfully urge the university to reevaluate the charges against me within a framework of fairness, transparency, and integrity. My commitment to safety, responsibility, and mental health awareness should be acknowledged and not penalized based on unfounded allegations and procedural discrepancies.

9. Threats to Personal Safety and Well-being by Vanderbilt University: I am compelled to express grave concerns regarding Vanderbilt University's egregious actions that have directly threatened my personal safety and well-being. The university has utilized its Vanderbilt University Police Department (VUPD), which also patrols the Vanderbilt University Medical Center, as a means to intimidate and dissuade me from seeking necessary medical care. This intimidation has been executed under the looming threat of arrest or physical harm. Most distressingly, there have been implications communicated to VUPD officers that I was "armed and dangerous," with instructions to use "all necessary force," ominously suggesting the authorization of lethal force. This baseless and dangerous portrayal has placed me in a position of fearing for my life, severely impacting my sense of security and trust in the university's intent to ensure a safe environment for its community members.

Vanderbilt University and my former employer, Air Evac Lifeteam, and the subsequent retaliatory and potentially criminal actions taken against me. This collusion is evidenced by Vanderbilt's acceptance of a donation from Air Evac Lifeteam, which seemingly facilitated discriminatory actions against me, especially in light of my role as a federal witness in an ongoing federal investigation.

Federal Witness intimidation and harassment in conjunction with plaintiff as being a federal whistle blower.

Collusion with Air Evac Lifeteam, Global Medical Response and KKR & Co.
1. Vanderbilt University, in accepting a significant donation from Air Evac Lifeteam, has exhibited a conflict of interest that directly impacts the impartiality and integrity of their actions against me. This donation raises substantial questions regarding the motivations behind my wrongful expulsion and the unjust restrictions imposed upon my academic and campus participation.
2. Retaliation Tied to Federal Investigation: The actions taken by Vanderbilt, in conjunction with Air Evac Lifeteam, suggest retaliatory motives, particularly due to my involvement as a federal witness in an investigation that potentially implicates Air Evac Lifeteam. The timing and nature of Vanderbilt's actions against me align suspiciously with my cooperation in the federal investigation, indicating a concerted effort to discredit and marginalize me.
3. Manipulation of Internal Processes: Vanderbilt's handling of internal investigations and disciplinary actions against me lacks transparency and disregards crucial facts. This approach demonstrates a deliberate manipulation of processes to achieve desired outcomes, further suggesting collusion with Air Evac Lifeteam to retaliate against me for my federal testimony.
4. A Board of Professional Responsibility report demonstrates that defendant Michelle Tellock had conversations in regards to trading information on plantiff to Tim Garrett at Bass Berry Sims who was retained by Air Evac to conduct an internal investigation as part of a wrongful termination for Plantkff being a whistleblower on the company.
5. Plantiff received notice of intern campus suspension and notice from employer at the time Air Evac on December 4th, 2023 on the same day exactly 1hr and 18min apart.
6. Vanderbilts inclusion of "Disorderly Conduct"despite no disorderly conduct being brought to the plantiff attention during the conduct hearing proceedings, however this was included in the plaintiffs explosion letter is further evidence and allusions to Air Evac claims and needing

COPY

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk

Vanderbilt and Air Evac reason for expulsion and termination of employment to match on which both agreed to use "policy violation".

7. KKR & Co is listed as a donor on the Vanderbilt "Dare to Grow" website.
8. In November 17th 2023 an anonymous donor made a 1.25 million dollar donation to the plaintiffs program of study directly for the Master of Nursing Program. It is evident this donation was made by KKR & Co. Through the Conway Whelch foundation in order to hide the truth of the source of the donation.

The collusion between Vanderbilt University and Air Evac Lifeteam, coupled with the retaliatory and potentially criminal conduct directed at me, underscores a profound breach of legal and ethical standards. This conduct has been reported to federal law enforcement, highlighting the serious nature of the allegations and the need for immediate intervention.

Given these circumstances and the additional evidence of Vanderbilt's collusion and misconduct, I reiterate my request for a comprehensive investigation into Vanderbilt University's actions. This investigation should extend to examining the nature and influence of the donation from Air Evac Lifeteam, especially in relation to decisions affecting my academic standing and rights.

Therefore, I submit this declaration in support of my motion for preliminary injunction, seeking redress from the prejudicial actions unjustly taken against me. I affirm the accuracy of the information herein to the best of my knowledge and belief.

Executed on March 25th 2024

Ian Hunter Lucas

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 294 of 431 PageID #: 553

# EXHIBIT 2



## RE: N5801 Accommodations

### Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>

Mon 8/21/2023 2:06 PM

To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc:Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>;Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>

Hi Ian,

All students are held to the same standard for the first absence which includes a ten-point deduction. However, your accommodation will allow for a second absence with the ability to earn points (again with the ten-point deduction) rather than the zero.

This is due to the need to accurately measure core course competencies and grade accordingly. This course is designed with an emphasis on collaborative group active learning activities. Excessive absences and make-up experiences may negatively impact the trajectory of learning in this course.

We believe you will be successful in the course while meeting your disability needs and look forward to supporting you this semester.

Thanks,

Drs. Enstrom & Robbins

## Cate Enstrom DNP, AGACNP-BC, CNE

Assistant Professor of Nursing
School of Nursing | Vanderbilt University
615.322.7819 | cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044

From: Lucas, Ian H
Sent: Monday, August 21, 2023 11:01
To: Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
Cc: Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
Subject: Re: N5801 Accommodations

Dr. Enstrom

Could you clarify this for me, if I am absent due to a medical reason I will be deducted points?

"The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero)"

Thanks,

Ian

Get **Outlook for iOS**

**From:** Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
**Sent:** Monday, August 21, 2023 10:56:20 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
**Subject:** N5801 Accommodations

Hi Ian,

We have received a letter from Student Access Services indicating the need for appropriate classroom and testing accommodations for N5801 Human Experiences in Health and Illness Across the Lifespan II fall 2023 semester. The course is intentionally designed to provide an inclusive and accessible learning environment. However, when there is a need for additional support, the HEHI faculty are eager to make those accommodations.

I have addressed your requests as it this applies for all the rotations.

1. **Alternative testing:**
    a. *Ability to take breaks*– You are permitted to take breaks while taking exams. We will review any possible remote proctor violations this may possibly flag and dismiss it as long as all other exam guideline are followed. Do not use or view reference materials during your breaks.
    b. *Extra time (2x)* –Extra time (2x) has been applied for all your exams. The ATI quiz and pre-class quizzes are not timed and open for a full week. This will be due at the original time with no adjustment to the deadlines. In-class case-study assignments completed with group members will remain due at the end of the class session.

2. **Classroom modifications**
    a. *Disability Related Absences/Attendance Policy:*
        - In the event of missed class session, student will be responsible for obtaining materials covered in class. Student is expected to demonstrate professional responsibility by notifying course instructor and course coordinator as far in advance as is possible when it becomes apparent that they will be absent from class.
        - Exams missed for medical reasons will be rescheduled on a case-by-case basis, to be completed as soon as possible after the originally scheduled exam time.
        - If student misses class and is unable to complete and submit the in-class case study by the end of the class session due to absence, the student will be required to complete a make-up case study assignment.
        - The make-up assignment will be a single case study that is moderately expanded in depth compared to the in-class case studies, but very similar with regard to content. The student should complete the make-up case study independently. The make-up case study will be due one week from the date of the missed class session.
            - The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero).
        - *Absences exceeding more than two cumulative class sessions may represent a significant disruption to the learning trajectory (due to the collaborative aspect of group work and collective learning). Absences exceeding more than two cumulative class sessions warrants discussion with the course coordinator and program director regarding the possibility of an adjustment to the planned program of study.*
    b. *Leave class/take breaks as needed:*
        - For each individual class session, student must attend for at least half of the scheduled class period to constitute attendance for the week. If student misses more than half of a single class session that would constitute an absence and a make-up activity will be assigned for that week.

Would you please respond to this email to indicate whether or not these proposed accommodations are appropriate? Additionally, we are always happy to meet (in person or

COPY



online) to discuss how your request for classroom and testing accommodations might be met. We want you to feel welcomed and equipped to be successful in the course.

Have a lovely day,

Drs. Enstrom & Robbins



**Cate Enstrom DNP, AGACNP-BC, CNE**
Assistant Professor
School of Nursing I Vanderbilt University
615.322.7819 I cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044
461 21st Ave S, Office 543 SON
Nashville, TN 37240
Strengths: Significance I Futuristic I Individualization I Focus I Maximizer
Pronouns: she/her/hers

COPY

# EXHIBIT 3

EFILED 03/30/24 09:15 AM CASE NO. 24C655 Joseph P. Day, Clerk



**Jessee, Mary Ann**                                    11:59 AM
To You, Jamerson, Neil E and Privacy Office





Hello Ian,

We are reaching out today regarding electronic health records that were printed by you on 9/19/23, 10/10/23, and 10/17/23. These printed documents were part of the health records of patients to whom you were assigned in your VUSN course clinical experiences, but the dates and/or times of this printing was outside of your scheduled clinical time in the hospital. Therefore, we need you to return those documents to us for proper disposal. Please respond to confirm you still have those documents and we will determine a time and place for you to return them. If you do not still have them, please indicate how and where you disposed of them.

Please respond to this email no later than end of day Friday, January 12. Failure to do so will result in referral to Student Accountability in addition to any other remedies available to the University and Vanderbilt University Medical Center.

Thank you,
Mary Ann Jessee and Neil Jamerson

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240



**Moore, Kerry E**
kerry.e.moore@vumc.org

To: You ian.h.lucas.1@Vanderbilt.Edu

Jessee, Mary Ann mary.a.jessee@Vanderbilt.Edu

Cc: Jamerson, Neil E neil.e.jamerson@Vanderbilt.Edu

Privacy Office Privacy.Office@vumc.org

⊖ **PERMISSIONS - Restricted**

Wednesday, January 10, 12:27 PM

You don't often get email from kerry.e.moore@vumc.org. Learn why this is important

Hi Mary Ann & Ian – since these documents were placed in a shred bin there is no breach. Thank you for reaching out to the Privacy Office.



Kerry

Kerry E. Moore, MHIIM, RHIA
Program Manager, Privacy Office
Vanderbilt University Medical Center Privacy.Office@VUMC.org |
Phone 615.936.3594 | fax 615.343.6966 | Kerry.e.moore@vumc.org

COPY

## 5815 course information

### Jessee, Mary Ann <mary.a.jessee@Vanderbilt.Edu>

Mon 12/11/2023 1:19 PM

**To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>**

Hello Ian,

There has been an anonymous allegation that you improperly accessed patient information in the VUMC health record this semester. The course coordinators are investigating this allegation and I have recommended your grade for 5815 Nursing Care of Childbearing Families be changed to an Incomplete while the investigation is in process. As the program dean, I wanted you to understand the reason for the grade change if you saw it. You will be contacted as is deemed necessary as the investigation progresses.

Thank you,

MAJ

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240
Office (615) 343-1629 I **mary.a.jessee@vanderbilt.edu**
@majnotmadge
She, her, hers
**Strengths:** Relator I Learner I Responsibility I Achiever I Analytical

COPY

# EXHIBIT 4

COPY

  NurseJournal

SEARCH PROGRAMS

Featured **Career** Lifestyle Nurse Spotlight Student Resources

SHARE THIS    

# Vanderbilt School of Nursing Gets $1.25 Million for Master of Nursing Program

 **by Ann Feeney, CAE**
Published November 17, 2023 · 2 Min Read

✓ Edited by **Scott Harris**

Vanderbilt University's School of Nursing received $1.25 million to fund the Conway-Welch Second Degree in Nursing Scholarship. Learn more about the gift and MSN programs.



Image Credit: SeanPavonePhoto / iStock / Getty Images Plus

- The Vanderbilt University School of Nursing received a $1.25 million pledge to fund a master of science in nursing scholarship.

COPY

# EXHIBIT 5

COPY



# Week of March 4, 2024

*VUSN Student Newsletter and Event Reminder*

## Announcement

1. The 2023-2024 VUSN Student Handbook was revised on February 27, 2024, to add information regarding Pass/Fail courses to the VUSN Academic Policies and Regulations section, sub-section Grading System.

2. The front doors to VUSN will remain VUID card or GET app access through the rest of the semester while building access remains under review by the university. Please have your VUID card or the app with you at all times. If neither works, contact Vanderbilt Card Services at 615-322-2273 or email commodorecard@vanderbilt.edu. Questions? Contact the VUSN Facilities Team Administrative Officer Donnie Spoon Program

COPY

# EXHIBIT 6



## VUPD presence on campus

 **VUSN Deans Office**                    5:48 PM
VUSN Stu - Current

Good afternoon. Some of you here on campus may
have noticed VUPD officers around the building this
week. We wanted to let you know that out of an
abundance of caution, they've increased visibility of
their patrols due to a VU disciplinary action that
recently took place. VUPD has always patrolled the
school several times a day, but they've been more
visible recently. You'll probably see them around off
and on for the rest of the week.

VUSN Dean's Office



## RE: Bourgoin Medical Licenses.

### Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
Wed 3/6/2024 6:05 PM

To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc:Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>;julia.c.morris@vumc.org <julia.c.morris@vumc.org>

**Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is
PRIVILEGED and CONFIDENTIAL.

Dear Ian,

Should you need to seek emergency medical care at VUMC's emergency department, you are permitted
to seek medical services there without violating the conditions of the campus prohibition/outcome letter.

VUMC complies with the Emergency Medical Treatment and Labor Act (EMTALA) and provides a
medical screening exam (MSE) to individuals who present to the emergency department to determine
whether an emergency medical condition (EMC) exists, and provides stabilizing treatment to individuals
with an EMC.
VUMC confirms that Jeremy Bourgoin is not employed by, affiliated with, credentialed by, nor provides
any professional or medical services at VUMC.

VU and VUMC consider this matter closed.

Thank you,
Michelle

From: Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Sent: Wednesday, March 6, 2024 4:10 PM
To: Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org
Subject: Re: Bourgoin Medical Licenses.

**Caution:** This content is intended for the Office of the General Counsel at Vanderbilt University and is
PRIVILEGED and CONFIDENTIAL.

I am closing this communication and dialogue and will forward this email chain and the letter I received
to the TN Board of Health as EMTALA Complaint and refusal of services for emergency care provisions if
needed.

Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Wednesday, March 6, 2024 2:14:55 PM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org <julia.c.morris@vumc.org>
**Subject:** Re: Bourgoin Medical Licenses.

Given there has been no follow up or revision to this.

Is VUMC affirming that Bourgoin has medical privileges and license and I should email the student
accountability office for a Medical Screening Exam  (MSE) as per EMTALA if I desire to seek care at
VUMC for non-scheduled appointments or procedures I.e. emergencies?

And also does Vanderbilt University have jurisdictional provisions of the span and control of the VUMC
entity access and control of visitors and patients?

Ian H. Lucas

Case 3:24-cv-00440     Document 1-4     Filed 04/10/24     Page 309 of 431 PageID #: 568



Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:50 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>, Bourgoin, Jeremy Layne
<jeremy.l.bourgoin@vanderbilt.edu> julia.c.morris@vumc.org <julia.c.morris@vumc.org>
**Subject:** Re: Bourgoin Medical Licenses.

Added back in Ms. Morris

Regards,

Ian H. Lucas

Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:49:03 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Subject:** Re: Bourgoin Medical Licenses.

Ms. Tellock,

Please understand that the matter at hand is final and not open to discussion or negotiation. Specifically, you must either remove the statement:

"The restriction includes Vanderbilt University Medical Center except that you may attend medical appointments or procedures as well as obtain medicine from the pharmacy"

or provide me with evidence of Mr. Bourgoins's medical license and privileges at VUMC. Since VUMC operates as an independent entity, it is inappropriate for another organization to make decisions affecting patient care on its behalf. Therefore, I will decide independently whom to involve in my care at VUMC. Your approach in this matter is unacceptable.

I am looping back in VUMC legal counsel to make them aware that your restrictions I interpret as follows that I want to bring to there attention that the directive from the Vanderbilt University concerning the limitations on my access to services at Vanderbilt University Medical Center (VUMC) I view as a violation infringe upon the Emergency Medical Treatment and Labor Act (EMTALA). EMTALA mandates that hospitals with emergency departments provide care to anyone needing emergency healthcare treatment regardless of their legal status, citizenship, or ability to pay. As such, the as set for by Vanderbilt University as a restriction subject to arrest and trespass I interpreted as intimidation to limit my access to emergency services at VUMC is concerning and potentially unlawful.

Therefore, I request either the removal of the specific restriction mentioned in your communication or a clarification of how this directive complies with EMTALA requirements. It is essential to ensure that any actions taken do not inadvertently contravene federal law (which by now I know that Vanderbilt University does think is waiverable) but VUMC does carry a greater degree of liability to restrict my rights to access emergency medical services in allowing such actions to be placed in writing.

Sincerely,

Ian Lucas

Best regards,

Ian Lucas

Get **Outlook for iOS**



**From:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:33:23 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>
**Subject:** RE: Bourgoin Medical Licenses.

**Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

Dear Ian,

I am removing Ms. Morris from this email chain, because she is legal counsel to the Medical Center (as you noted, a separate legal entity), and your inquiry relates to your education records at Vanderbilt University.

The campus restriction contained in the outcome letter you received yesterday permits you to go to VUMC for medical services, and it does not identify any specific medical services that can or cannot be provided to you. If you would like to request a modification to the campus restriction, you may make such request by providing a justification to **studentaccountability@vanderbilt.edu** for consideration.

Thank you,
Michelle

From: Lucas, Ian H <**ian.h.lucas.1@Vanderbilt.Edu**>
Sent: Tuesday, March 5, 2024 1:52 AM
To: Tellock, Michelle <**michelle.tellock@Vanderbilt.Edu**>, Bourgoin, Jeremy Layne <**jeremy.l.bourgoin@vanderbilt.edu**>
Cc: **julia.c.morris@vumc.org**
Subject: Bourgoin Medical Licenses.

Dear Ms. Tellock

I am writing to request a copy of Mr. Bourgoin's medical license. In his letter of expulsion, he specified the medical services that I am permitted to receive at VUMC. Given that VUMC operates independently, identifying specific medical services that can be provided to me falls under the category of a medical action, akin to prescribing. Consequently, if Mr. Bourgoin deemed it within his purview to delineate which medical services are accessible to me at VUMC, it is imperative for me to verify his medical licensing status, which I could not find in the health licensure verification database. I also wish to ensure that his privileges are duly registered with VUMC.

Thank you for your attention to this matter.

Best regards,

Ian

Get **Outlook for iOS**

# IN THE CIRCUIT COURT
# FOR DAVIDSON COUNTY, TENNESSEE
# AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) )  ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) |
|  | ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) **MOTION FOR PRELIMANARY** |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) **INJUNCTION** |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** | ) |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** | ) |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) |
| **Robingale Panepinto, Melissa Lord,** | ) |
| **Brittany Kirby, Shannon Ellrich,** | ) |
|  | ) |
| *Defendants* | ) |

## MOTION FOR PRELIMANARY INJUNCTION

### INTRODUCTION

Ian Hunter Lucas, Plaintiff, pro se, respectfully moves this Honorable Court for a Temporary Injunction, pursuant to Tennessee Rules of Civil Procedure Rule 65.02, enjoining the Defendants from continuing actions that constitute discrimination based on disability, retaliation, breach of contract, and other wrongful actions as detailed in the accompanying Complaint. Plaintiff shows the Court as follows:

COPY 

1. **Exhibit 1: Declaration of Ian Hunter Lucas:** An affidavit detailing the Plaintiff's experiences and the adverse impacts of Defendants' actions, providing foundational facts for the motion

2. **Exhibit 2: Email from Defendant Cate Enstrom**: Evidence of the Defendant's intention to penalize the Plaintiff for utilizing legally protected disability accommodations, in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) despite defendant EOA Director E. Jacob Cummings citing insufficient evidence to determine discrimination based on disability.

3. **Exhibit 3: Communication from Vanderbilt University Medical Center Privacy Office:** Confirmation that the academic actions taken against the Plaintiff did not arise from a legitimate privacy breach, challenging the basis of the Plaintiff's academic dismissal and implicating potential violations of the Family Educational Rights and Privacy Act (FERPA, 20 U.S.C. § 1232g).

4. **Exhibit 4: Donation made as payment to render damages and retaliation to Plaintiff:**

   a. **Documentation of Collen Welch Foundation Oct 31 2022 990F**: This document likely pertains to a tax form filed by the Conway Welch Foundation, showing the sale of assets. In the U.S., specific forms (like the 990 series for nonprofit organizations) are used to provide public disclosure of financial activities, including sales or transfers of assets. The "F" designation is unusual, as typically forms such as 990, 990-EZ, and 990-PF are common, with the latter being for private foundations. A foundation such as the Conway Welch Foundation to facilitate a donation with the understanding that it serves as a "payment" for an entity like Vanderbilt University to take adverse actions against an individual (in this case, Mr. Lucas), raises several legal issues for the foundation and Vanderbilt Defendants:

   **At the State Level (Tennessee Code Annotated - TCA)**

   TCA §39-16-403 (Retaliation for Past Action):

   TCA §48-101-507 (Transactions by Nonprofit Corporations):

   TCA §29-34-201 (Civil Conspiracy):

   **At the Federal Level (United States Code - USC)**

   26 USC §501(c)(3) (Requirements for Tax-Exempt Status):

   18 USC §1962 (Racketeer Influenced and Corrupt Organizations Act - RICO):

   31 USC §§3729-3733 (False Claims Act)

   18 USC §241 (Conspiracy Against Rights)

   18 USC §245 (Federally Protected Activities)

b. **Nurse Journal Articles Original Then Edited and Changed version**: The initial article and its subsequent edited version focus on the funding of the Conway Welch fund. This sequence suggests an attempt to alter the public's understanding or awareness of the source and nature of the fund's financing.

5. **Exhibit 5:** Notice placed in school of nursing newsletter: Plaintiff after requesting an explanation from Vanderbilt University officials as to why Plaintiffs potentially breaching confidentiality protections under the Health Insurance Portability GPA had obviously been manually altered and was not mathematically correct or possible and Accountability Act (HIPAA, 42 U.S.C. § 1320d et eq.).

6. **Exhibit 6: Emails exchanged with the Vanderbilt University Office of the Registrar:** Highlight the measures that needed to be taken to rectify the plaintiff's GPA, suggesting potential deliberate tampering. Initially, there was no response from the Office of the Registrar. However, their communication began to change to "we are in discussions with the School of Nursing" only after the Department of Education Office of Civil Rights was included in the correspondence. When details were requested, none were provided. It appears that the plaintiff's GPA was purposefully lowered below 3.0, a maneuver seemingly intended to bar re-admission by failing to meet the School of Nursing's three criteria. Furthermore, such a reduction in GPA would likely hinder the transfer of credits to another institution, thereby not only affecting the plaintiff's opportunities for further education but also undermining the value of the time spent at Vanderbilt. Furthermore, the final respond noted the reason quote for the error was. System error however the day of the error being resolved the following attached screen shot of the school of nursing student newsletter noted that the policy to the school of nursing pass/fail courses had been updated, directly related to the plaintiffs matters, this decision would be at the discretion of defendant Schorn, Jessee, and Jefferies, implicating their involvement in the GPA manipulation.

7. **Exhibit 7:** Email exchange between Plaintiff and defendant Tellock in which defendant Tellock is proven wrong that plaintiff assertions that the expulsion letter signed by defendant Bourgoin which delineates the specific medical services and provisions of care the plaintiff can seek at Vanderbilt University Medical Center a separate entity than Vanderbilt University, further more when informed that Bourgoin's letter denotes only "scheduled medical appointments" and that plaintiff

would need to contact Bourgoin's office to get "permission" outside of those restrictions. Plaintiff informed Tellock as the Deputy General Counsel for Vanderbilt University that Plaintiff required a copy of Bourgoin's Medical License and privileges of for VUMC, as under the Emergency Medical Treatment and Labor Act the need for the plaintiff to contact Bourgoin to obtain non-appointment medical care at VUMC means that Bourgoin would be performing a medical screening exam under EMTALA which can only be performed by a licensed physician, physician assistant, or advanced practice registered nurse. Plaintiff asserted such sentences should have never been placed in a letter for a entity not under the jurisdiction or preview of the University and as a Medical Center under more stringent regulatory guidelines, plaintiff had VUMC legal counsel on email which Tellock immediately dismissed, demonstrating that Tellock did not consult with VUMC, and either knew that such statements were illegal or did not know about EMTALA and was called and informed and then subsequently embarrassed, angered, and then Tellock had the Dean of VUSN or Tellock herself had the following email sent out to the school of nursing student body to intimidate plaintiff to not come to VUMC, also, of note VUPD patrol VUMC, VUPD was distributed at each shifts roll call plaintiffs headshot and informed plaintiffs was a "threat" to the Vanderbilt Community Safety, and was "armed and dangerous" officers were informed if plaintiff was seen on campus plaintiff should be arrested for trespass and use whatever force necessary to subdue the plaintiff to maintain the safety of Vanderbilt.

   a. **Vanderbilt Police Department is a armed police department capable of deadly force, and plaintiff was told he could not park in the parking lots or parking garages, thus plaintiff could have easily been shot, injured or killed based on these directives which plaintiff considers as a death threat and life safety issued necessitating the need for preliminary injunction and emergency hearing.**



## III. BACKGROUND

1. The Plaintiff, Ian Hunter Lucas, brings forward a motion for injunctive relief, grounded on allegations of profound harm resulting from the Defendants' conduct. Detailed in the initial complaint, these allegations encapsulate discrimination predicated on disability, retributive acts, breach of contractual agreements, and additional malfeasance. Accompanying the original complaint are declarations and exhibits that supplement these allegations.

2. Summarized from the complaint, the Defendants' actions have and continue to perpetuate irrevocable damage upon the Plaintiff, hindering his academic progress, career opportunities, emotional health, and reputation. At the core of this injunction motion, the Plaintiff has challenged a consortium of individuals associated with Vanderbilt University, leveling a series of tort claims, which include the breach of contractual duties, negligence, discriminatory treatment based on disability, and retaliatory measures. Each Defendants' personal liability is underscored, distinct from their professional functions at Vanderbilt University or Air Evac Life Team INC.

3. Prior to his unjust academic dismissal and expulsion, alleged to be retributive and grounded in bad faith, Mr. Lucas was an active graduate nursing student with a recognized physically limiting disability by Vanderbilt University and was appropriately registered with the student access center (student disability services. He now seeks restitution for the distress and harm caused by the Defendants' misconduct. The legal action also brings to the forefront serious allegations concerning witness intimidation and obstruction of justice, demanding the Court's swift and decisive action. The Plaintiff asserts that these retaliatory actions by the Defendants arose from his filed complaints regarding violations of equal opportunity access with the university's Equal Opportunity Access office. The Plaintiff posits that evidence exists of the

4

Defendants' attempts to conceal their wrongdoing and discrimination by manipulating the

institution's internal investigative procedures of the Equal Opportunity Access (EOA), Title IX,

Student Conduct and Accountability, and Academic Grade Appeal.

4.      The Plaintiff alleges targeted and malicious actions by the Defendants, in

collaboration with Air Evac LifeTeam Inc., aimed at retaliation for whistleblower activities.

These activities include involvement as a federal witness in a sealed investigation by the U.S.

Attorney General's Office for the Western District of Tennessee into Air Evac LifeTeam Inc. for

potential violations of both the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.) and the

federal False Claims Act (31 U.S.C. §§ 3729 - 3733). The Defendants' actions, characterized by

intimidation, defamation, and the infliction of physical and mental distress, were designed to

penalize the Plaintiff for his protected whistleblower activities. These retaliatory actions not only

hindered the Plaintiff's professional development but also caused significant financial and

emotional damage. Given the Plaintiff's protection under federal whistleblower legislation, such

as the Whistleblower Protection Act of 1989 (5 U.S.C. § 2302(b)(8)-(9)), and state provisions

safeguarding whistleblowers from retaliation, the case at hand demands urgent court intervention

to halt further harm.

5.      In support of the motion for a preliminary injunction, the case of *Halifax Hospital

Medical Center v. United States,* 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In

*Halifax*, the court granted a preliminary injunction in favor of the plaintiff, recognizing the

substantial likelihood of irreparable harm without such intervention, notably in cases involving

whistleblower retaliation and the potential violation of federal statutes. This precedent

underscores the necessity of safeguarding whistleblowers from retaliatory measures that would

otherwise stifle critical disclosures in the public interest.

5

COPY

6.  Accordingly, this Court is respectfully urged to grant a preliminary injunction, protecting the Plaintiff from ongoing retaliatory actions by the Defendants, in alignment with the principles upheld by both federal and state whistleblower laws and reinforced by pertinent case law. The compilation of evidence strongly suggests that on December 4th, 2023, a coordinated sequence of events began with the plaintiff receiving a notice of temporary suspension from Vanderbilt University, issued by defendant Neil Jamerson. This was promptly followed, within the same hour, by a notice from the plaintiff's then-employer (now former employer), Air Evac LifeTeam Inc. Human Resources, placing the plaintiff on administrative paid leave. These actions, along with a series of other incidents that appear to be more than coincidental, point to a deliberate and collaborative effort by the defendants to retaliate against the plaintiff. This effort includes whistleblower retaliation, witness intimidation, harassment, defamation, libel, slander, and discrimination.

7.  The Plaintiff contends that the Defendants, in a premeditated and collaborative effort with Air Evac LifeTeam Inc., orchestrated actions to detrimentally impact the Plaintiff. This was in retaliation for the Plaintiff's reporting of fraudulent billing practices under the federal False Claims Act (31 U.S.C. §§ 3729 - 3733), as well as state equivalents under the Tennessee False Claims Act (T.C.A. § 4-18-101 et seq.). Furthermore, Vanderbilt University and its School of Nursing pursued the Plaintiff's dismissal, motivated by a pattern of discrimination against students with disabilities and in response to the Plaintiff's multiple complaints through the Equal Opportunity Access (EOA) office. This collaborative retaliation not only sought to undermine the Plaintiff's standing but also facilitated an exchange of damaging information between Michelle Tellock and Timothy K. Garrett, aimed at furthering the Plaintiff's harm post-December 4, 2023.

COPY

8.     In establishing the grounds for a preliminary injunction, the case law precedent found in *Roth v. Department of Justice*, 642 F.3d 1161 (D.C. Cir. 2011), is particularly pertinent. In *Roth*, the court highlighted the critical importance of protecting the rights of individuals under whistleblower protection statutes, emphasizing the necessity of preliminary injunctive relief to prevent ongoing retaliation and to uphold the integrity of whistleblower protections. This case underscores the judicial recognition of the irreparable harm that can result from retaliatory actions, especially when such actions are designed to penalize whistleblowers for exercising their rights to report misconduct.

9.     Given the Plaintiff's allegations of concerted retaliation by the Defendants, aligned with the documented objectives of both Air Evac LifeTeam Inc. and Vanderbilt University to penalize the Plaintiff for protected whistleblower activities and disability discrimination complaints, there exists a compelling basis for the issuance of a preliminary injunction. This Court's intervention is crucial to prevent further retaliatory harm to the Plaintiff, ensuring compliance with the protections afforded under both federal and state whistleblower laws, as reinforced by the precedent established in *Roth*.

10.     The Plaintiff raises concerns over the striking parallels and the synchronicity in the actions undertaken by Vanderbilt and Air Evac, notably the precipitous move to academically dismiss the Plaintiff without due process. This rush to dismissal notably lacked consideration of the ongoing investigations into Defendant Mary Ann Jessee by the Equal Opportunity Access (EOA) office for retaliatory actions related to disability discrimination complaints, as well as investigations into Defendant Cate Enstrom's role in similar discriminatory practices. The absence of procedural fairness, coupled with the timing and alignment of these actions, suggests a concerted effort to penalize the Plaintiff, sidestepping the protections afforded under the

7

Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act of 1973 (29 U.S.C. § 794), which mandate non-discriminatory treatment and reasonable accommodations for individuals with disabilities.

11.    In the context of seeking a preliminary injunction, the case of *Goss v. Lopez*, 419

U.S. 565 (1975), provides a pertinent legal framework. In *Goss*, the Supreme Court held that students must be given notice and an opportunity to be heard before being deprived of certain educational rights, underlining the essential nature of due process in academic settings. This precedent underscores the necessity of procedural protections, especially when allegations of discriminatory practices and retaliatory measures are at play, to ensure that individuals are not unjustly deprived of their rights to education and equal treatment under the law.

12.    Therefore, in light of the evidence presented and the legal precedents underscored by *Goss v. Lopez*, this Court is respectfully requested to grant a preliminary injunction. Such an injunction would serve to immediately halt any further actions against the Plaintiff that bypass due process and exacerbate the discriminatory and retaliatory harm alleged, ensuring the Plaintiff's rights under both federal statutes and case law are protected pending a full hearing on the merits. When the plaintiff reached out to the EOA office to inform them of this situation, and to request intervention based on the fact of the faculty members involved the EOA office at the leadership of E. Jacob Cummings provided no response, despite that given prior to these retaliatory actions by defendants Jessee and other defendants conspirators of retrospectively changing two of the plaintiffs already passed course grades simultaneously on December 15th, 2023 thus making the plaintiff eligible for dismissal based on the guidelines of the School of Nursing policies and further not able to be readmitted due to school of nursing policies on only allowing the retake of one course.

8

COPY

EFILED 04/01/24 04:34 PM CASE NO. 24C655 Joseph P. Day, Clerk

13.     The Plaintiff disputes the retrospective grade alterations made by Defendant Jessee, grounded on unfounded accusations of "accessing patient charts remotely," initially alleged as a HIPAA violation. The Vanderbilt University Medical Center Privacy Office, designated within the Vanderbilt University School of Nursing Handbook as the authoritative entity on HIPAA and privacy matters, clarified that no privacy breach occurred, thereby negating any violation of the Health Insurance Portability and Accountability Act (HIPAA), codified at 45 C.F.R. Parts 160 and 164. Despite this determination, Defendants Jessee and Schorn, in their evaluation of the Plaintiff's academic grade appeal, deviated from their initial accusation of a HIPAA violation. They instead contended that the Plaintiff violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes," as articulated by Defendant Schorn in her decision regarding the Plaintiff's grade appeal. This assertion emerged despite the clear directive from the VUMC Privacy Office affirming the absence of a breach, illustrating a capricious and procedurally flawed application of institutional policy against the Plaintiff, contravening his due process rights as outlined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and corresponding T.C.A. § 10-7-504(a)(4), governing the privacy of student educational records.

14.     This case finds resonance with *Goss v. Lopez*, 419 U.S. 565 (1975), where the U.S. Supreme Court held that students must be afforded due process rights in disciplinary actions impacting their educational status. The arbitrary and retrospective grade changes, predicated on disproven allegations and a subsequent shifting of rationale, violate the Plaintiff's rights to procedural due process and equitable treatment under established federal and state educational privacy laws. Given these considerations, the Plaintiff seeks a preliminary injunction to rectify the wrongful grade alterations and to safeguard against further arbitrary and capricious actions by

9

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 321 of 431 PageID #: 580

the Defendants that unjustly impair his academic standing and due process rights. On appeal of
Mavis Schorn's decision plaintiff appealed to the Dean of the School of Nursing defendant
Pamela Jefferies, she reverted back in contrary to the VUMC privacy office and referred back to
language of privacy violations, of note the plaintiff referred the matter to the U.S. Department of
Health and Human Services the definitive investigative authority on matters of violations and
breaches of the Health Insurance Portability and Accountability Act who found no breach in
privacy under HIPPA and further found concern for discrimination and referred the matter to the
department of education office of civil rights for further investigation and review based on the
evidence provided and the treatment of the plaintiff.

15.    Incorporating the principles discussed in **Northwest Memorial Hospital v.

Ashcroft**, 362 F.3d 923 (7th Cir. 2004), the Plaintiff's engagement in accessing patient charts
for educational purposes is situated well within the boundaries delineated by HIPAA for
healthcare operations. This case, while primarily addressing the privacy rule in a hospital context,
elucidates the rigorous standards imposed by HIPAA on covered entities to safeguard protected
health information (PHI), except where such access is explicitly permitted by the statute or its
implementing regulations.

16.    The Defendants Jessee and Schorn's acknowledgment of the Plaintiff's adherence
to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule, further substantiates
the claim that the Plaintiff's activities were both legally compliant and integral to their
educational advancement in a clinical setting. The 'minimum necessary' rule, designed to ensure
that only the essential amount of PHI needed for a specific purpose is accessed, underscores the
legality and necessity of the Plaintiff's access to patient information as part of their clinical
education. *Northwest Memorial Hospital v. Ashcroft* offers a pertinent legal framework that

10

COPY

supports the argument that accessing patient information for educational purposes, as conducted by the Plaintiff, aligns with HIPAA's provisions for healthcare operations. This includes the training of healthcare professionals and the enhancement of educational programs within healthcare settings. The case underscores the imperative of balancing patient privacy protections with the educational necessities that prepare students for professional practice in healthcare.

17.     Thus, the Plaintiff's actions, conducted under the guidance of Defendants and within the scope of educational requirements, not only adhere to HIPAA's stipulations but are also essential for the practical application of medical knowledge. The acknowledgment by Defendants Jessee and Schorn of the Plaintiff's compliance with the 'minimum necessary' standard affirms this position, highlighting the protected nature of the Plaintiff's educational activities under HIPAA and reinforcing the legal basis for the requested preliminary injunction to safeguard the Plaintiff's rights and educational pursuits within the clinical setting.

18.     In the initial communications, Defendant Jessee informed the Plaintiff that a review of allegations pertaining to a single course was underway. It was only during a subsequent meeting that Jessee conveyed a decision to fail the Plaintiff in two courses, justifying this by citing what she described as a recurrent problem that had previously resulted in a learning contract for the Plaintiff. This assertion, however, overlooks critical context: the prior learning contract referenced by Jessee was associated with an incident in another course, from which the Plaintiff had been withdrawn due to Defendant Harris's inappropriate directives. Harris had instructed the Plaintiff to access lab values remotely during a clinical post-conference, an action substantiated by student witness testimony.

19.     This scenario presents a complex intersection of academic policy and legal considerations, particularly concerning fair treatment and due process for students. A pertinent

legal framework for evaluating this situation is provided by *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78 (1978), wherein the Supreme Court articulated standards for academic decision-making and the rights of students to fair process in academic evaluations. The Court recognized a distinction between academic and disciplinary dismissals, suggesting that the former requires less formal due process protections.

20.    Applying this framework, the Plaintiff's situation underscores a potential misapplication of academic policies and a lack of due process in the academic evaluation process. Jessee's actions, predicated on a questionable interpretation of past incidents and without clear adherence to procedural fairness, raise concerns under the principles established in *Horowitz*. The Plaintiff's case highlights the necessity for clear, consistent, and fair academic evaluation processes that respect students' rights to due process, particularly when such evaluations have significant consequences for their academic and professional futures. This action is imperative to protect the Plaintiff's educational trajectory and to uphold standards of fairness and transparency in academic evaluations.

21.    Given the circumstances where a collective student grievance was filed against Defendant Harris, citing disarray within her clinical course—a session which was colloquially dubbed as being "summoned to the principal's office"—it became apparent that Harris presumed the Plaintiff to be the agitator. From that point forward, as documented, Harris engaged in discriminatory and inequitable conduct towards the Plaintiff. This conduct not only undermines the educational environment but also potentially violates the Plaintiff's rights to non-discriminatory treatment as outlined in educational and civil rights legislation. The scenario calls for the application of principles enshrined in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, ensuring that no state shall "deny to any person

12

COPY

EFILED 04/01/24 04:34 PM  CASE NO. 24C655  Joseph P. Day, Clerk

within its jurisdiction the equal protection of the laws. "In the context of academic evaluations and disciplinary actions, *Goss v. Lopez*, 419 U.S. 565 (1975), provides a relevant legal precedent. The Supreme Court in Goss emphasized the importance of due process within educational settings, specifically that students must be afforded notice and an opportunity to be heard before being deprived of certain rights. Applying this principle, the Plaintiff's request for a preliminary injunction seeks to pause any punitive academic measures rooted in bias or misrepresentation and to initiate a reevaluation of their academic status that aligns with due process and equity.

22.    This injunction is crucial not only to rectify the immediate unfair treatment experienced by the Plaintiff but also to reaffirm the broader commitment to fairness, transparency, and equity within academic evaluation processes, in accordance with established legal standards.

23.    Subsequent to the complaint against Defendant Harris, she began to display behavior towards the Plaintiff that was both discriminatory and retaliatory in nature. This behavior was so egregious that it necessitated the Plaintiff's removal from her course, a decision underscored by corroborative observations from both students and staff at the Monroe Carell Jr. Children's Hospital, who witnessed Harris's mistreatment, hazing, and bullying of the Plaintiff. Harris escalated her actions by drafting and submitting a fabricated email to the School of Nursing's leadership, falsely accusing the Plaintiff of repeatedly and improperly accessing patient charts. This accusation was not only baseless but also exaggerated, asserting that the Plaintiff engaged in indiscriminate chart review. Despite being aware of these circumstances and the invalidity of the referenced learning contract due to Harris's actions and the subsequent reassignment of the Plaintiff to another instructor by the Equal Opportunity Access (EOA) office, Jessee persisted in seeking grounds to dismiss the Plaintiff.

13

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 325 of 431 PageID #: 584



24.     This situation underscores a blatant disregard for the principles of fairness and equity, potentially infringing upon the Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, which mandates equal protection under the law. The actions taken against the Plaintiff also call into question adherence to due process rights, as outlined in the landmark decision of *Goss v. Lopez*, 419 U.S. 565 (1975), where the Supreme Court held that students are entitled to certain due process rights before being deprived of educational opportunities.

25.     Therefore, the Plaintiff seeks a preliminary injunction to prevent further discriminatory and retaliatory actions and to ensure a reevaluation of his academic standing in a manner that is just, transparent, and consistent with the principles of due process and equal protection. This request aligns with the legal imperative to safeguard individuals from unjust educational practices and to uphold the integrity of academic evaluation processes. The EOA office, due to a lack of investigators, outsourced an investigation to an external, non-Vanderbilt affiliated investigator, Katherine Layman. Ms. Layman conducted her investigation ethically and without bias, uncovering significant discrimination. However, when her findings began to favor the plaintiff, revealing the fear among other nursing students to speak out, Vanderbilt University prematurely terminated Ms. Layman's contract before she could complete her investigation. Additionally, Vanderbilt's Director of the EOA, defendant E. Jacob Cummings, had the reports altered to minimize findings against defendant Cate Enstrom, despite clear violations of the Americans with Disabilities Act and Tennessee law, evidenced by Enstrom's policy to penalize the plaintiff for disability-related absences, undermining the very purpose of disability accommodations.

14



26.     Timothy K. Garrett, an attorney from the law firm Bass, Berry, Sims, retained by Air Evac LifeTeam Inc. for its investigation, has notable ties to Vanderbilt University. As a Vanderbilt alumnus and significant financial donor, Mr. Garrett's connections extend into the legal domain, where he has represented the university in various capacities. His legal service includes a role as counsel within Vanderbilt University's Office of General Counsel, a department where Defendant Michelle Tellock serves as Deputy General Counsel. Importantly, Mr. Garrett's representation of Vanderbilt has encompassed cases related to student dismissals, exemplified by his involvement in the case of *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018), a notable lawsuit concerning the appeal of a student plaintiff and Vanderbilt University's student dismissal processes. This background suggests a potential conflict of interest or at least a close professional and institutional relationship between Mr. Garrett and Vanderbilt University, which could influence the impartiality of the investigation conducted by Air Evac LifeTeam Inc.

a.     Of note a Board of Professional Responsibility report was filed on Michelle Tellock and Timothy

K. Garrett, while the BPR could not take action because Tellock and Garrett were not technically retained by Lucas the BPR did affirm the sharing of information and correspondence about Lucas between Tellock and Garrett which was for the benefit of their own clients. The correspondence while violations of FERPA, HIPPA, and other principles the plaintiffs believes to be moral principles of ethical conduct between Tellock and Garrett, the BPR while not viewed as ethical misconduct due to not meeting the standard for a conflict of interest due to Tellock nor Garrett being retained by Lucas. However, the report did confirm the communication between Garrett and Tellock, which Tellock had denied, despite having Vanderbilt IT start the process of wiping her Vanderbilt Email Account of certain records the day plaintiff informed her that he reported her to the BPR.

27.     Considering these factors, the Plaintiff seeks a preliminary injunction to ensure fairness and transparency in the handling of his case, emphasizing the need for an unbiased

15

review process that adheres to the principles of justice and equity. This injunction is crucial for safeguarding the Plaintiff's rights and interests amid concerns about the intertwined legal and institutional relationships that may affect the outcome of ongoing proceedings.

28.     December 4th 2023, during its "Welfare Panel" interview of plaintiff on defendant porter inquired of plaintiff specifically about a "CIA costume or something related to the CIA in or on your [the plaintiffs] car" this key element of defendant Porter questioning of plaintiff in the context of a "mental health welfare panel" is unrelated to anything related to the plaintiff and being at Vanderbilt, due to the fact the item in mention by defendant porter was an item specifically placed on the plaintiffs vehicle for a specific reasons in connection with the plaintiffs whistleblowing status while still employed at Air Evac LifeTeam Inc. and thus when the plaintiff was not at work and was at Vanderbilt the mentioned item was specifically taken off the plaintiffs vehicle. Thus, the only way in which this information would have been known by defendant porter is with information having been shared between Timothy K. Garrett and defendant Michelle Tellock.

29.     During a meeting in January 2024 regarding Air Evac LifeTeam Inc.'s

investigation, attorney Timothy K. Garrett referenced details about the plaintiff's intermittent restrictions on campus access, along with other specific information related to the plaintiff's experiences at the university—information the plaintiff had not disclosed. This suggests that Garrett acquired this knowledge through direct communications with Michelle Tellock. Moreover, Garrett requested documentation from the plaintiff concerning issues at Vanderbilt University, asserting the relevance of these documents to the plaintiff's "credibility." This implies that Garrett had engaged in prior discussions with Vanderbilt representatives to verify the authenticity of any documents the plaintiff might provide.

16



30.     This interaction raises questions about the fairness and impartiality of the investigation, highlighting potential concerns regarding the privacy of the plaintiff's educational records and the confidentiality of communications within the university. Such concerns resonate with the provisions of the Family Educational Rights and Privacy Act (FERPA), codified at 20 U.S.C. § 1232g, which safeguards the privacy of student education records and restricts their disclosure without consent.

31.     Given these circumstances, the plaintiff requests a preliminary injunction to halt any further actions that might compromise their privacy rights and to ensure a fair and impartial investigation into the matters at hand. This request aligns with the legal protections afforded by FERPA and seeks to prevent any undue influence or bias that may arise from the intertwined relationships and communications between Air Evac LifeTeam Inc.'s legal representation and Vanderbilt University officials. The injunction is essential for upholding the principles of fairness, privacy, and transparency throughout the investigative process.

32.     Due to Vanderbilt University's refusal to provide necessary documentation and records, the plaintiff notes that the line of questioning from Timothy Garrett precisely mirrored that of Defendant Porter and Defendant Newsome during the December 4th, 2023, inquiries. This included specific questions about the plaintiff's military affiliation, where Defendant Porter questionably inquired if the plaintiff received "an ID or something," disregarding the letter from the plaintiff's commanding officer, which serves as a more authentic form of verification than the ID casually mentioned by Porter. This approach not only diminished the validity of official military documentation but also bordered on discriminatory conduct. Furthermore, Porter's inquiry about why the plaintiff, if coming from training in Smyrna, Porter specifically inquired why was plaintiff not dressed in his "costume or camouflage" which constitutes an inappropriate

17

and demeaning assumption about military attire, reflecting a lack of respect and understanding of military service and obligations. This behavior underscores potential discriminatory practices and an infringement on the plaintiff's dignity, calling into question the fairness and integrity of the investigative process conducted by Vanderbilt and its representatives.

33.    Additionally, the question in addition to the questions asked by Garrett asked in his investigation interview being identical to the questions asked of the plaintiff by Defendant Newsome and Porter, the same questions were exploited and further invasion of privacies were made by Jeremy Borgoin in conducting his interview and student conduct hearing of the plaintiff in which Borgoin made the decision to ultimatley expel the plaintiff based on the same unjustifiable and un-constitutional cause that the plaintiff legally bought a handgun in May 2023 and was asked if he had access to fire arms the night of December 4th 2023 plaintiff answered in the context of how the questions was asked and interpreted, furthermore the plaintiff is allowed to constitutionally own poses and access firearms with the confines of the law. Vanderbilt cited this as a false statement and as a violation of "policy violation" using the same terminology as Air Evacs reason for termination, and a kind to Air Evac, Vanderbilt also without providing the reference to the specific policy that was violated.

34.    Furthermore, Vanderbilt stated the plaintiff defunded the University through the student care and assistance funds in which the plaintiff requested funding to pay from mental health counseling, and then sought mental health counseling, which the plaintiff never had any possession of fund for, Vanderbilt paid the provider directly for services, Vanderbilt states that the plaintiff lied to the University about the reason the plaintiff needed mental health counseling and therefore the defendants ascertain that the plaintiff did not need mental health counseling, however on the night of December 4th 2023 as part of the "Welfare Panel" which defendants, now

18

COPY



since that time state given the following point made by the plaintiff in several appeals, the defendants now state it was not a welfare panel, however defendants will not define this other than being a "meeting that [the Plaintiff] was required to attend", that followed every step of the Welfare Panel process, however was not the welfare panel process, defendants did however illegally record the plaintiff against his knowledge and informed consent, transcribing this recording, with sensitive personal health information, disseminating this information without the knowledge of the plaintiff, an actual HIPPA violation, while deliberately having the school of nursing academically dismiss the plaintiff in an ironic twist of falsely accusing the plaintiff of HIPPA violation despite the Vanderbilt Privacy office and DHHS stating otherwise, while then then using the information from the illegal obtained recording of the non- welfare panel, welfare panel meeting in an poorly orchestrated coercion to construct fraudulent student conduct charges that have no legal standing other than being unconstitutional in a manner that the defendants violated the plaintiffs rights at Vanderbilt University in participation of witness intimidation and whistleblower retaliation thought assisting in the construction in an academic dismissal and expulsion of the plaintiff one semester before for the plaintiff is supposed to graduate. And then mirroring the same reasons or allegation for which Air Evac LifeTeam Inc. accuses the plaintiff of being terminated, in order to discredit and credit a defamation of the plaintiff as a federal witness. In exchange for these services Vanderbilt University on November 17th 2023 received what was originally reported as an anonymous donation, by the nurse journal (See exhibit) however has since been edited with not edit date noted, stating that a 1.25 million dollar donation was made to the Master of Nursing Program directly, this was the program in which the plaintiff was directly enrolled in and 2 weeks prior to the events beginning these actions on December 4th 2023. Furthermore, on Vanderbilts Dare to Grow donation campaign website KKR & Co. is listed

as a donor, and furthermore, is noted having pledged to match every $8,000.00 donated, KKR & Co. will subsequently match the donation up to $8,000.00, In evaluation of the Conway Welch Family Foundation 2022 990-PF submission on 2023-10-30 the foundation only reported one sale and gain of $1,394.149.00 in the gross sale of price for all assets, with a members of their "directors as needed" with affiliations and close relations to principals at KKR & Co.

35.   The Plaintiff emphasizes a troubling abuse of authority by Vanderbilt University.

In an act of overreach, the university's law enforcement was purportedly employed to conduct investigative actions against the Plaintiff, which exceeded their legal remit and lacked any criminal predicate. This conduct signals a misuse of police resources, ostensibly aimed at amassing information detrimental to the Plaintiff. This may violate not only the ethical expectations of university law enforcement but also the legal limits as set by Tennessee statutes and federal laws.

36.   Specifically, this alleged conduct indicates official misconduct under TCA §39-16-402, should it be established that the university police acted beyond their lawful authority. Practices of invasive information gathering without valid justification might contravene the privacy rights accorded by TCA §39-13-601, particularly if it involved intrusive actions into the Plaintiff's private affairs. Moreover, Vanderbilt University Police Department, specifically Defendant Joel Newsome, is accused of exercising compulsion in their investigation, breaching TCA § 39-13-302, which addresses coercion and implies a violation of the Plaintiff's rights against compelled service.

37.   The unauthorized dissemination of the Plaintiff's confidential information by university-associated entities implicates a direct infringement upon the Plaintiff's Fourth Amendment protections, which guard against unreasonable searches and seizures. This

20

infringement aligns with the undue intrusion into the Plaintiff's private life without consent, clearly breaching TCA §39-13-601. Additionally, this behavior signifies official misconduct as outlined under TCA §39-16-402, demonstrating an intentional misuse of authority. These actions, surpassing the lawful limits of their institutional roles and misappropriating access to sensitive data for non-professional purposes, unequivocally infringe upon the Plaintiff's state and federal legal rights to privacy and security from unwarranted interference. Moreover, the Defendants' actions resulted in severe health consequences for the Plaintiff by spreading defamatory claims labeling him as a "threat" and a risk to campus security.

38.    This defamation led the Plaintiff to believe that he could no longer safely obtain medical care at Vanderbilt University Medical Center—a facility where he had been a longstanding patient—due to intimidation and the dissemination of false reports to the Vanderbilt University Police Department (VUPD). Assertions were made without merit that the Plaintiff was barred from campus, was "armed and dangerous," and that VUPD should employ "any necessary measures to maintain campus safety" upon encountering the Plaintiff. Given that VUPD officers are authorized to use armed force and patrol the VUMC premises, such unfounded allegations posed a real and tangible threat to the Plaintiff's safety and wellbeing. This defamation, coupled with the implication of potential violent engagement, not only heightened the Plaintiff's anxiety and emotional distress but also potentially obstructed his access to necessary healthcare services.

39.    On June 16, 2023, plaintiff went to defendant Jessee office and requested and impromptu meeting, defendant Jessee was open to a 1:1 private meeting, during the meeting plaintiff meet with Jessee attempting to resolve amicably the disability accommodation issues plaintiff felt he was being discriminated against on. Further, plaintiff brought to Jessee attention a

21

quid quo pro situation with a Vanderbilt School of Nursing Faculty member in which the plaintiff
was being exploited for sexually by a faculty member of the School of Nursing, based on the
plaintiff having requested letters of recommendation and asking the faculty member to be the
plaintiffs VUSN Alumni Mentor. When Jessee was informed of this and further was informed of
the images, and additionally informed of the images the faculty member wad requesting of the
plaintiff, Jessee responded and informed the plaintiff that unless the plaintiff was "physically
sexually abused" then it was just "adults being adults" and the university does not get involved in
those matters.

40.     Given the inaction and then subsequent retaliatory action of defendant Jessee after
June 16th 2023 when plaintiff brought concerns of the quid quo pro to her attention, and as a
mandatory reporter not only did Jessee fail to fulfill her obligation to report accordingly, Jessee
deterred and misinformed the plaintiff about the abilities and options of the plaintiff to seek
assistance from Title IX thus demonstrates that defendant Jessee further retaliated in her role as
demonstrated by the fact pattern of in a matter of days going from recommending the plaintiff for
a last minute interview and photo shoot a feature in the VUSN nursing magazine "as a favor for
the school of nursing" to suddenly being retaliated against and the plaintiff is left out of the
magazine because of what was reported to the plaintiff as a "page count"


41.     In an egregious display of misconduct, Defendants Jessee, Schorn, and Jefferies
actively engaged in manual alterations to Plaintiff's GPA. Upon discovery by the Plaintiff, an
extended period of weeks, if not over a month, elapsed without any substantial explanation from
Vanderbilt beyond vague references to ongoing discussions with the School of Nursing. It was
only after the GPA correction that the School of Nursing disclosed, through its newsletter, the
implementation of a new policy on pass/fail courses. This policy, conspicuously aligned with the

22

COPY

Plaintiff's circumstances, indicates not only that the School of Nursing deliberately manipulated and erroneously altered the Plaintiff's GPA but also sought to obscure their actions under the guise of a 'computer error'. However, the invocation of a 'computer error' falls short of justifying the subsequent policy change, revealing a clear intent to mislead and rectify the situation without acknowledging the targeted manipulation faced by the Plaintiff.

42. In contrast to a hostile-environment theory, to bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment. *Miami Univ.*, 882 F.3d at 591 (citing Mallory, 76 F. App'x at 638-39 ; *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691-93 (6th Cir. 2000) ; *Univ. of the South I*, 687 F.Supp.2d at 758 ; see also Baum, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); Schaumleffel, 2018 WL 1173043, at *14 ("The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment."). Furthermore, a deliberate indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Miami Univ., 882 F.3d at 590 (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 28 18 *Z.J. v. Vanderbilt Univ.* 355 F. Supp. 3d 646 (M.D. Tenn. 2018) 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) and citing *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009) ); *K.T. v. Culver Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (same); *Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (same) (hereinafter " Tr. of Boston Coll. I").

43. Only claims involving pervasive and widespread harassment are actionable; a single incident is not enough. See *Miami Univ.*, 882 F.3d at 591 ; *Carmichael v. Galbraith*, 574 F. App'x 286, 289-90 (5th Cir. 2014) ; *Haidak v. Univ. of Mass. at Amherst*, 299 F.Supp.3d 242, 270

23

(D. Mass. 2018). Alleged sexual harassment in the form of a 676 failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim. *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014) ; *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011).

44.     The Defendants' conduct exemplifies a grave deviation from lawful behavior and potentially constitutes a severe breach of the Plaintiff's rights as upheld by both state and federal laws. A thorough inquiry into these allegations is essential to uphold the integrity of justice and to ensure the appropriate execution of law enforcement within educational institutions.

## IV. LEGAL STANDARD

1.     The Court may issue a temporary injunction to prevent immediate and irreparable harm, preserve the status quo, and ensure the effectiveness of the final judgment (Tenn. Code Ann. §29-3-101).

2.     Plaintiff must demonstrate (a) a substantial likelihood of success on the merits of the case, (b) that he will suffer irreparable harm without the injunction, (c) that the harm to him outweighs the potential harm to Defendants if the injunction is granted, and (d) that the injunction is in the public interest (Tenn. Code Ann. §29-3-104).

## V. ARGUMENT

1.     Substantial Likelihood of Success on the Merits: Plaintiff has strong evidence of Defendants' violations of the Americans with Disabilities Act, the Tennessee Human Rights Act, and breach of contract, among other claims. (Tenn. Code Ann. §4-21-101 et seq., §29-3-105).

2.     Irreparable Harm: Without the Court's intervention, Plaintiff faces continued

24

discrimination, loss of educational opportunities, and damage to his professional and personal

[INTENTIONALLY LEFT BLANK]

25

COPY

reputation that cannot be adequately remedied by monetary damages alone. (Tenn. Code Ann.

§29-3-102).

3.    Balance of Harms: The harm to Plaintiff in the absence of a temporary injunction far outweighs any potential harm to Defendants, who are merely required to cease their discriminatory, retaliatory, and wrongful actions. (Tenn. Code Ann. §29-3-103).

4.    Public Interest: In the interest of the public, the issuance of this injunction is crucial for it reinforces adherence to established statutes that safeguard against discriminatory practices, retaliatory measures, and contractual violations as set forth in Tenn. Code Ann. §4-21-501. Additionally, in consideration of the prevailing national nursing shortage and the specific demand for qualified nursing professionals within Tennessee, facilitating Mr. Lucas' uninterrupted completion of his nursing education stands to contribute significantly to the public welfare by augmenting the pool of essential healthcare providers.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.  Issue a temporary injunction ordering Defendants to reinstate Plaintiff to the Vanderbilt University and Vanderbilt School of Nursing Master of Nursing Program immediately, without prejudice and with all rights and privileges appertaining thereto.

b.  Order Defendants to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal.

c.  The plaintiff seeks an order from the court compelling the defendants to reverse the grade

26

changes that were improperly and in bad faith by the defendants altered from pass to fail in a retliatory act.

[INTENTIONALLY LEFT BLANK]

27



    a. The plaintiff suggests the assignment of an 'Incomplete' status for the courses in question from the Fall 2023 Semester. Furthermore, the Plaintiff seeks a court order to permit re-enrollment in these courses for the Fall 2024 Semester. This request is made despite the Plaintiff's position that a retake of these courses is unwarranted. The Plaintiff offers this compromise as an indication of their readiness to resolve the matter amicably and in a spirit of cooperation with the defendants. Granting this alternative relief is essential for the plaintiff to progress academically and to fulfill the requirements for graduation from the Master of Nursing (MN) Program by the anticipated completion date of Spring 2025. Upon completion and passing of the repeat courses the incomplete course grade will be replaced with the previously earned Passed grade and the Plaintiff will be permitted to continue in the program progression for the Master of Nursing Program into the Spring 2025 to complete his final semester and graduate.

d. Order the Defendants release the acceptance letter of Plaintiff into the previously applied for Doctor of Nursing Practice (DNP) + Post Masters Adult-Gerontology Acute Care Nurse Practitioner (AGACNP) program for the Fall 2024 semester, with an adjusted commencement date set for Fall 2025.

    a. Plaintiff is amendable based on discussion with VUSN to changing the program to either DNP + Post Masters Psychiatric-Mental Health Nurse Practitioner (PMHNP) or DNP + Post Masters Pediatric Nurse Practitioner-Acute Care (PNP-AC) and or Pediatric Primary Care (PNP-PC) or the Family Nurse Practitioner Program (FNP), ensuring Plaintiff's career and educational goals are not derailed by Defendants' actions, and also in respect to plaintiff unaddressed and further

28

harm caused by Defendants inappropriately manipulating the EOA and Title IX process by denying Plaintiff supportive measures and equal access to educational programs as required by law.

e. The defendants shall be responsible for all costs and fees associated with providing the plaintiff a personal security detail during the plaintiff's presence on campus, whether for academic purposes, non-academic activities, scheduled appointments, or any situation the plaintiff deems necessary for their safety. This measure is to ensure the plaintiff's protection and to support their ability to learn without fear of harm or intimidation stemming from any misuse of power or authority by the defendants. The plaintiff will secure the services of a duly licensed, insured, and bonded security agency and will submit the relevant documentation to Vanderbilt University to facilitate the reimbursement of these expenses. This will be in place for all academic programs currently and on-going in which the defendant wishes to pursue at Vanderbilt as a supportive measure for the threat to life made by defendants.

f. Grant such other and further relief as the Court deems just and proper.

{INTENTIONALLY LEFT BLANK}

COPY

## V. **Request for Emergency/Expedited Hearing:**

Plaintiff further requests Waiving the 14-Day Notice of Hearing and plaintiff request that the Court

schedule an Expedited/Emergency hearing as soon as possible to consider this motion for a temporary

injunction. Submitted is an additional motion for requesting a Special Setting of Hearing by the

Court given the circumstance and damage already endured and continued to be endured by the

plaintiff with no damage and only continued financial and incentive gain by the defendants.

Dated: April 1st 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se

221 Charleston Avenue

Pleasant View, TN, 37126

(910) 872-3577 (telephone)

lucasianhunter@outlook.com

30

COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30 day of March 2024, a true and correct copy of the

foregoing Amended Complaint was furnished to the following party via email, which is

permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein

Klein Solomon Mills, PLLC

1322 4th Ave North

Nashville, TN 37208

Phone: (615) 600-4802

kevin.klein@kleinpllc.com


Denmark J. Grant

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC

1600 West End Avenue, Suite 2000

Nashville, TN, 37203

Phone: 615.726.5591

dgrant@bakerdonelson.com


I affirm that the method of service used herein is consistent with the provisions of the

Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: April 1, 2024

Ian H. Lucas

Plaintiff Pro *Se*

910-872-3577 (cell)

lucasianhunter@outlook.com (email)

*E-File/Process Service Capable*

31

COPY

# EXHIBIT 1



Declaration of Ian Hunter Lucas for Motion for Preliminary Injunction

I, Ian Hunter Lucas, hereby declare:

1. Prior Clearance and Integrity of University Processes: I am deeply concerned with the ongoing pursuit of allegations against me, despite a previous clearance by the university's wellness committee on December 4, 2023. This clearance, affirmed by the Office of the General Counsel, is crucial yet overlooked in the current proceedings, signaling a potential bias or malicious intent undermining my academic integrity. The act of revisiting these cleared allegations, without new evidence or just cause, not only undermines the integrity of the university's processes but also dismisses prior determinations favoring my position.

2. Procedural Integrity and Concerns Over Campus Restriction: The current reinvestigation lacks procedural integrity, evidenced by the absence of new justifying evidence. My responsible handling of personal firearms during a period of emotional distress, demonstrating a commitment to community safety and mental health awareness, has been overlooked. This proactive step, coupled with confirmation from VUPD of no threat posed by me, questions the justification behind the imposed campus restrictions, highlighting a disregard for my well-being and rights.

3. Allegations Without Substantial Evidence: The allegations surrounding the creation of an anonymous email and falsification of medical documentation lack substantial evidence. These charges, seemingly based on misunderstandings or misinterpretations, do not reflect the necessary due diligence. This oversight points to a concerning pattern of disregarding established facts and context in favor of pursuing baseless claims.

4. Request for Dismissal of Charges with Prejudice: Given the concerns raised, including the absence of credible evidence and procedural discrepancies, I formally request the dismissal of all charges against me with prejudice. This motion is based on the foundational lack of evidence, the disregard for procedural fairness, and a failure to acknowledge previous resolutions in my favor.

5. Lack of Due Process and Diligence: The university's inconsistent and misleading statements regarding the process and handling of my case illustrate a clear lack of due process and diligence. This approach not only affects the fairness of the proceedings but also highlights a systemic issue within the university's disciplinary system, further exacerbating my concerns over bias and malicious intent against my academic standing.

6. Misrepresentation of the Welfare Panel Process: The university's portrayal of the December 4th, 2023 meeting as unrelated to the Welfare Panel process contradicts documented policies and undermines the integrity of the Wellness Panel procedures. This misrepresentation and misuse of intended student welfare procedures suggest discriminatory practices against individuals facing mental health challenges, further violating my rights to fair treatment and due process.

7. Baseless Allegations of Defrauding SCAP Funds: The charges alleging I defrauded the university through the Student Care Assistance Program (SCAP) funds are unfounded and discriminatory. My engagement with SCAP was conducted in strict adherence to its established guidelines, aimed at addressing my significant mental health care needs, contradicting the university's claims of misconduct.



8. Conclusion and Call for Action: In light of the lack of procedural fairness, due diligence, and the evident disregard for previously determined outcomes, I respectfully urge the university to reevaluate the charges against me within a framework of fairness, transparency, and integrity. My commitment to safety, responsibility, and mental health awareness should be acknowledged and not penalized based on unfounded allegations and procedural discrepancies.

9. Threats to Personal Safety and Well-being by Vanderbilt University: I am compelled to express grave concerns regarding Vanderbilt University's egregious actions that have directly threatened my personal safety and well-being. The university has utilized its Vanderbilt University Police Department (VUPD), which also patrols the Vanderbilt University Medical Center, as a means to intimidate and dissuade me from seeking necessary medical care. This intimidation has been executed under the looming threat of arrest or physical harm. Most distressingly, there have been implications communicated to VUPD officers that I was "armed and dangerous," with instructions to use "all necessary force," ominously suggesting the authorization of lethal force. This baseless and dangerous portrayal has placed me in a position of fearing for my life, severely impacting my sense of security and trust in the university's intent to ensure a safe environment for its community members.

Vanderbilt University and my former employer, Air Evac Lifeteam, and the subsequent retaliatory and potentially criminal actions taken against me. This collusion is evidenced by Vanderbilt's acceptance of a donation from Air Evac Lifeteam, which seemingly facilitated discriminatory actions against me, especially in light of my role as a federal witness in an ongoing federal investigation.

Federal Witness intimidation and harassment in conjunction with plaintiff as being a federal whistle blower.

Collusion with Air Evac Lifeteam, Global Medical Response and KKR & Co.
1. Vanderbilt University, in accepting a significant donation from Air Evac Lifeteam, has exhibited a conflict of interest that directly impacts the impartiality and integrity of their actions against me. This donation raises substantial questions regarding the motivations behind my wrongful expulsion and the unjust restrictions imposed upon my academic and campus participation.
2. Retaliation Tied to Federal Investigation: The actions taken by Vanderbilt, in conjunction with Air Evac Lifeteam, suggest retaliatory motives, particularly due to my involvement as a federal witness in an investigation that potentially implicates Air Evac Lifeteam. The timing and nature of Vanderbilt's actions against me align suspiciously with my cooperation in the federal investigation, indicating a concerted effort to discredit and marginalize me.
3. Manipulation of Internal Processes: Vanderbilt's handling of internal investigations and disciplinary actions against me lacks transparency and disregards crucial facts. This approach demonstrates a deliberate manipulation of processes to achieve desired outcomes, further suggesting collusion with Air Evac Lifeteam to retaliate against me for my federal testimony.
4. A Board of Professional Responsibility report demonstrates that defendant Michelle Tellock had conversations in regards to trading information on plantiff to Tim Garrett at Bass Berry Sims who was retained by Air Evac to conduct an internal investigation as part of a wrongful termination for Plantkff being a whistleblower on the company.
5. Plantiff received notice of intern campus suspension and notice from employer at the time Air Evac on December 4th, 2023 on the same day exactly 1hr and 18min apart.
6. Vanderbilts inclusion of "Disorderly Conduct"despite no disorderly conduct being brought to the plantiff attention during the conduct hearing proceedings, however this was included in the plaintiffs explosion letter is further evidence and allusions to Air Evac claims and needing

Vanderbilt and Air Evac reason for expulsion and termination of employment to match on which both agreed to use "policy violation".

7. KKR & Co is listed as a donor on the Vanderbilt "Dare to Grow" website.

8. In November 17th 2023 an anonymous donor made a 1.25 million dollar donation to the plaintiffs program of study directly for the Master of Nursing Program. It is evident this donation was made by KKR & Co. Through the Conway Whelch foundation in order to hide the truth of the source of the donation.

The collusion between Vanderbilt University and Air Evac Lifeteam, coupled with the retaliatory and potentially criminal conduct directed at me, underscores a profound breach of legal and ethical standards. This conduct has been reported to federal law enforcement, highlighting the serious nature of the allegations and the need for immediate intervention.

Given these circumstances and the additional evidence of Vanderbilt's collusion and misconduct, I reiterate my request for a comprehensive investigation into Vanderbilt University's actions. This investigation should extend to examining the nature and influence of the donation from Air Evac Lifeteam, especially in relation to decisions affecting my academic standing and rights.

Therefore, I submit this declaration in support of my motion for preliminary injunction, seeking redress from the prejudicial actions unjustly taken against me. I affirm the accuracy of the information herein to the best of my knowledge and belief.

Executed on April 1st 2024

Respectfully Submitted,

*Ian Lucas*

IAN H. LUCAS

Ian Hunter Lucas

# EXHIBIT 2

 COPY

RE: N5801 Accommodations

**Enstrom, Cate** <jeanne.c.enstrom.1@Vanderbilt.Edu>
Mon 8/21/2023 2 06 PM
To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
Cc:Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>;Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
Hi Ian

All students are held to the same standard for the first absence which includes a ten point deduction. However, your accommodation will allow for a second absence with the ability to earn points [illegible] with the ten point deduction, rather than the zero.

This is due to the need to accurately measure core course competencies and grade accordingly. This course is designed with an emphasis on collaborative group active learning activities. Excessive absences and makeup experiences may negatively impact the trajectory of learning in this course.

We believe you will be successful in this course with accommodation and a friendly reminder and look forward to supporting you this semester.

Thanks

[illegible signature]

**Cate Enstrom DNP, AGACNP-BC, CNE**
Assistant Professor of Nursing
School of Nursing | Vanderbilt University
615.322.7819 | cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044

**From:** Lucas, Ian H
**Sent:** Monday, August 21 [illegible]
**To:** Enstrom, Cate [illegible]
**Cc:** Robbins, Heather M [illegible]; Buttrey, Catherine [illegible]
**Subject:** Re: N5801 Accommodations

Hi Enstrom

I just got verify that we can understand that a 1 medium [illegible] due to a one [illegible]

The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero)?

Thanks

Ian

Outlook for iOS

**From:** Enstrom, Cate <jeanne.c.enstrom.1@Vanderbilt.Edu>
**Sent:** Monday, August 21, 2023 10:56:20 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Robbins, Heather M <heather.m.robbins@Vanderbilt.Edu>; Buttrey, Catherine <catherine.buttrey@Vanderbilt.Edu>
**Subject:** N5801 Accommodations

Hi Ian,

COPY

We have received a letter from Student Access Services indicating the need for appropriate classroom and testing accommodations for N5801 Human Experiences in Health and Illness Across the Lifespan II fall 2023 semester. The course is intentionally designed to provide an inclusive and accessible learning environment. However, when there is a need for additional support, the HEHI faculty are eager to make those accommodations.

I have addressed your requests as it this applies for all the rotations.

1. **Alternative testing:**
    a. *Ability to take breaks*– You are permitted to take breaks while taking exams. We will review any possible remote proctor violations this may possibly flag and dismiss it as long as all other exam guideline are followed. Do not use or view reference materials during your breaks.
    b. *Extra time (2x)* –Extra time (2x) has been applied for all your exams. The ATI quiz and pre-class quizzes are not timed and open for a full week. This will be due at the original time with no adjustment to the deadlines. In-class case-study assignments completed with group members will remain due at the end of the class session.

2. **Classroom modifications**
    a. *Disability Related Absences/Attendance Policy:*
        • In the event of missed class session, student will be responsible for obtaining materials covered in class. Student is expected to demonstrate professional responsibility by notifying course instructor and course coordinator as far in advance as is possible when it becomes apparent that they will be absent from class.
        • Exams missed for medical reasons will be rescheduled on a case-by-case basis, to be completed as soon as possible after the originally scheduled exam time.
        • If student misses class and is unable to complete and submit the in-class case study by the end of the class session due to absence, the student will be required to complete a make-up case study assignment.
        • The make-up assignment will be a single case study that is moderately expanded in depth compared to the in-class case studies, but very similar with regard to content. The student should complete the make-up case study independently. The make-up case study will be due one week from the date of the missed class session.
            • The first absence makeup work will still be subject to a ten-point deduction. A second absence make up work will be subjected to a ten-point deduction (rather than a zero).
        • *Absences exceeding more than two cumulative class sessions may represent a significant disruption to the learning trajectory (due to the collaborative aspect of group work and collective learning). Absences exceeding more than two cumulative class sessions warrants discussion with the course coordinator and program director regarding the possibility of an adjustment to the planned program of study.*
    b. *Leave class/take breaks as needed:*
        • For each individual class session, student must attend for at least half of the scheduled class period to constitute attendance for the week. If student misses more than half of a single class session that would constitute an absence and a make-up activity will be assigned for that week.

Would you please respond to this email to indicate whether or not these proposed accommodations are appropriate? Additionally, we are always happy to meet (in person or

COPY


online) to discuss how your request for classroom and testing accommodations might be met. We want you to feel welcomed and equipped to be successful in the course.

Have a lovely day,

Drs. Enstrom & Robbins



Cate Enstrom DNP, AGACNP-BC, CNE
Assistant Professor
School of Nursing | Vanderbilt University
615.322.7819 | cate.enstrom@vanderbilt.edu
Cell Phone: 860.882.2044
461 21st Ave S, Office 543 SON
Nashville, TN 37240
Strengths: Significance I Futuristic I Individualization I Focus I Maximizer
Pronouns: she/her/hers

COPY

# EXHIBIT 3

COPYx

Jessee, Mary Ann                                      11:59AM

To You, Jamerson, Neill E and Privacy Office                    ...

Q

Hello Ian

We are reaching out today regarding electronic health records that were printed by you on 9/19/23, 10/10/23, and 10/17/23. These printed documents were part of the health records of patients to whom you were assigned in your VUSN course clinical experiences, but the dates and/or times of this printing was outside of your scheduled clinical time in the hospital. Therefore, we need you to return those documents to us for proper disposal. Please respond to confirm you still have those documents and we will determine a time and place for you to return them. If you do not still have them, please indicate how and where you disposed of them.

Please respond to this email no later than end of day Friday, JanuarY. 12. Failure to do so will result in referral to Student Accountability in addition to any other remedies available to the University and Vanderbilt University Medical Center.

Thank you,
Mary Ann Jessee and Neil Jamerson

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240

COPY



**MK**

**Moore, Kerry E**
kerry.e.moore@vumc.org

· · ·

To: You ian.h.lucas.1@Vanderbilt.Edu

Jessee, Mary Ann mary.a.jessee@Vanderbilt.Edu

Cc: Jamerson, Neil E neil.e.jamerson@Vanderbilt.Edu

Privacy Office Privacy.Office@vumc.org

⊖ **PERMISSIONS - Restricted**

Wednesday, January 10, 12:27 PM

You don't often get email from kerry.e.moore@vumc.org. Learn why this is important

Hi Mary Ann & Ian – since these documents were placed in a shred bin there is no breach. Thank you for reaching out to the Privacy Office.



Kerry

Kerry E. Moore, MHIIM, RHIA
Program Manager, Privacy Office
Vanderbilt University Medical Center Privacy.Office@VUMC.org |
Phone 615.936.3594 | fax 615.343.6966 | Kerry.e.moore@vumc.org

· · ·



## 5815 course information

### Jessee, Mary Ann <mary.a.jessee@Vanderbilt.Edu>

Mon 12/11/2023 1 19 PM

**To:Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>**

Hello Ian

There has been an anonymous allegation that you improperly accessed patient information in the VUMC health record this semester. The course coordinators are investigating this allegation and I have recommended your grade for 5815 Nursing Care of Childbearing Families be changed to an incomplete while the investigation is in process. As the program dean, I wanted you to understand the reason for the grade change if you saw it. You will be contacted as is deemed necessary as the investigation progresses.

Thank you
MAJ

Mary Ann Jessee, PhD, RN, CNE, ANEF
Professor of Nursing
Assistant Dean for Academics, Generalist Nursing Practice
Vanderbilt University School of Nursing, Room 544
461 21st Avenue South, Nashville, TN 37240
Office (615) 343-1629 [mary.a.jessee@vanderbilt.edu](mailto:mary.a.jessee@vanderbilt.edu)
@majnotmadge

Strengths: Relator, Learner, Responsibility, Achiever, Intellection

COPY

# EXHIBIT 4

NurseJournal

SEARCH PROGRAMS

Featured **Career** Lifestyle Nurse Spotlight Student Resources

SHARETHIS **O - Im O** [:::l

# Vanderbilt School of Nursing Gets $1.25 Million for Master of Nursing Program

**by Ann Feeney, CAE**
Published November 17, 2023 • 2 Min Read

Edited by **Scott Harris**

Vanderbilt University's School of Nursing received $1.25 million to fund the Conway-Welch Second Degree in Nursing Scholarship. Learn more about the gift and MSN programs.



Image Credit: SeanPavonePhoto / iStock / Getty Images Plus

- The Vanderbilt University School of Nursing received a $1.25 million pledge to fund a master of science in nursing scholarship.

# EXHIBIT 5

COPY



# Week of March 4, 2024

*VUSN Student Newsletter and Event Reminder*

## Announcement

1. The 2023-2024 VUSN Student Handbook was revised on February 27, 2024, to add information regarding Pass/Fail courses to the VUSN Academic Policies and Regulations section, sub-section Grading System.

2. The front doors to VUSN will remain VUID card or GET app access through the rest of the semester while building access remains under review by the university. Please have your VUID card or the app with you at all times. If neither works, contact Vanderbilt Card Services at 615-322-2273 or email commodorecard@vanderbilt.edu. Questions? Contact the VUSN

COPY

# EXHIBIT 6

VUPD presence on campus

**VUSN** Deans Office                                    5:48 PM

VUSN Stu - Current

Q

Good afternoon. Some of you here on campus may
have noticed VUPD officers around the building this
week. We wanted to let you know that out of an
abundance of caution, they've increased visibility of
their patrols due to a VU disciplinary action that
recently took place. VUPD has always patrolled the
school several times a day, but they've been more
visible recently. You'll probably see them around off
and on for the rest of the week.

VUSN Dean's Office



RE: Bourgoin Medical Licenses.

## Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>

Wed 3/6/2024 6:05 PM

To:Lucas, Ian H <ian.h.lucas.1@vanderbilt.Edu>

Cc:Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>;julia.c.morris@vumc.org <julia.c.morris@vumc.org>

Caution: This content is from the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

Dear Ian,

Should you need to seek emergency medical care at VUMC's emergency department, you are permitted to seek medical services there without invoking the conditions of the various nonmilitant dialogue letter

VUMC complies with the Emergency Medical Treatment and Labor Act (EMTALA) and provides a medical screening exam (MSE) to individuals who present to the emergency department to determine whether an emergency medical condition (EMC) exists, and provides stabilizing treatment to individuals with an EMC.

VUMC confirms that Jeremy Bourgoin is not employed by, affiliated with, or credentialed or commissioned by professionals needless services at VUMC.

Wishing you the best and sending my kindest regards

Thank you
Michelle

From: Lucas, Ian H <ian.h.lucas.1@vanderbilt.Edu>
Sent: Wednesday, March 6, 2024 2:14 PM
To: Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org
Subject: Re: Bourgoin Medical Licenses

**Caution:** This content is intended for the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

I am closing my communication and analogue and compliance. If a sick Lucas and the exact freedom to the Th Board at Hearn to EMTALA Compliance and release at 52% as a compliance compliance if needed

Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Wednesday, March 6, 2024 2:14:55 PM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>; Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>; julia.c.morris@vumc.org <julia.c.morris@vumc.org>
**Subject:** Re: Bourgoin Medical Licenses.

Given these has been an invasion of medication to me

Is VUMC affirming that Bourgoin has medical privileges and license and I should email the student consult to the office to a Medical threatening Exam of MSE to see EMTALA if I desire to seek medical care from a required exam and a medical exam in a emergency?

And I can I ever ask the ER Lucas me the just more compliance measure exercise if needed primary consult to come to work in my university

Ian H. Lucas



Get **Outlook for iOS**

From: Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu
Sent: Tuesday, March 5, 2024 11:50 AM
To: Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>, Bourgoin, Jeremy Layne
jeremy.l.bourgoin@vanderbilt.edu  julia.c.morris@vumc.org  julia.c.morris@vumc.org
Subject: Re: Bourgoin Medical Licenses.

Added back in Ms. Morris

Regards

Ian H. Lucas

Get **Outlook for iOS**

**From:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:49:03 AM
**To:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Subject:** Re: Bourgoin Medical Licenses.

Ms. Tellock,

Recommendation) that the matter at hand is final and not open to discussion — removal of. Specifically, you could either remove the statement.

"These stipulations creates a concern for on your Medical Standards enforcement... may also hinder on medical appointments and procedures as well as restrict medical care from the providers."

in discide me with evidence of Mr. Bourgoin's medical license and privileges at VUMC. Since VUMC operates as an independent entity, it is inappropriate for another organization to make decisions affecting medical care on its behalf. Therefore, I will decide independently whom to involve in my care at VUMC. Your involvement in this matter is unacceptable.

I am looping back in VUMC legal counsel to make them aware that your restrictions overstep all bounds that I want to bring to their attention that the directive from the Vanderbilt University concerning the limitations on my access to services at Vanderbilt University Medical Center (VUMC) I view as a violation infringe upon the Emergency Medical Treatment and Labor Act (EMTALA). EMTALA mandates that hospitals with emergency departments provide care to anyone needing emergency healthcare treatment, regardless of their legal status, citizenship, or ability to pay. As such, this as set for by Vanderbilt University as a restriction subject to arrest and trespass I interpreted as an intent to limit my access to emergency services at VUMC is contravening and potentially unlawful.

Therefore, I request either the removal of the specific restriction mentioned in your communication or a clarification of how this directive complies with EMTALA requirements. It is essential to ensure that any actions taken do not inadvertently contravene federal law (which by now I know that Vanderbilt University does there is warranties but VUMC does carry a greater degree of liability in restrict my rights to access emergency medical services in allowing such actions to be placed in writing.

Sincerely,

Ian Lucas

Best regards

Regards-

Get **Outlook for iOS**


3/30/24, 9:05 AM

EFILED 04/01/24 04:34 PM CASE NO. 24C655 Joseph P. Day, Clerk

**From:** Tellock, Michelle <michelle.tellock@Vanderbilt.Edu>
**Sent:** Tuesday, March 5, 2024 11:33:23 AM
**To:** Lucas, Ian H <ian.h.lucas.1@Vanderbilt.Edu>
**Cc:** Bourgoin, Jeremy Layne <jeremy.l.bourgoin@vanderbilt.edu>
**Subject:** RE: Bourgoin Medical Licenses.

> **Caution:** This content is from the Office of the General Counsel at Vanderbilt University and is PRIVILEGED and CONFIDENTIAL.

Dear Ian

I am reminding Ms. Morris from this document because she is legal counsel to the Medical Center as you retain a separate legal entity, and your inquiry relates to your education records at Vanderbilt University.

The campus restriction contained in the outcome letter you received yesterday permits you to go to VUMC for medical services, and it does not identify any specific medical services that can or cannot be provided to you. If you would like to request a modification to the campus restriction, you may make such request by providing a justification to **studentaccountability@vanderbilt.edu** for consideration

Thank you
Michelle

From: ___ ___ ___ **ian.h.lucas.1@Vanderbilt.Edu**
Sent: Tuesday, March 5, 2024 1:13 AM
To: Tellock, Michelle **michelle.tellock@Vanderbilt.Edu** Bourgoin, Jeremy Layne
jeremy.l.bourgoin@vanderbilt.edu
Cc: julia.c.morris@vumc.org
Subject: Bourgoin Medical Licenses

Dear Ms. Tellock

I am writing to request a copy of Mr. Bourgoin's medical license. In his letter of expulsion, he specified via email/in-person that I am permitted to seek aid at VUMC. Given that VUMC operates independently identifying specific medical services that can be provided to me falls under the category of a medical action as long as/being. Consequently, if Mr. Bourgoin deemed it within the purview of Vanderbilt's medical as there are processes in the VUMC, it is imperative for all of us in his medical licensing status, since I could not find in my search, such verification, it may be acting with to grasp with non-privileged during registered with VUMC.

Thank you for your attention to this matter.

Best regards,

Ian

Get **Outlook for iOS**

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **IAN LUCAS, Pro** *Se* | ) | **DOCKET NO. 24C655** |
| *Plaintiff* | ) | |
| v. | ) | |
| | ) | |
| **Mary Ann Jessee, Michelle Tellock,** | ) | |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) | |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) | |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) | |
| **Marissa Shulruff, E. Jacob Cummings,** | ) | |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) | **MOTION TO FILE AMENDED** |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) | **COMPLAINT AND RELATED FILINGS** |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) | **UNDER SEAL** |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** | ) | |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** | ) | |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) | |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) | |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) | |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) | |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) | |
| **Robingale Panepinto, Melissa Lord,** | ) | |
| **Brittany Kirby, Shannon Ellrich,** | ) | |
| | ) | |
| *Defendants* | ) | |

## MOTION TO FILE AMENDED COMPLAINT
## AND RELATED FILINGS UNDER SEAL

Pro Se plantiff Respectfully submits this Motion to request permission from the Court to

file an Amended Complaint and to seal all previous and future filings containing sensitive and

confidential information related to this case. The necessity for this request arises from the

inclusion of personal health information protected under the Health Insurance Portability and

Accountability Act (HIPAA), educational records covered by the Family Educational Rights and

Privacy Act (FERPA), and other sensitive details requiring confidentiality to protect personal

privacy and comply with federal and state laws.

1. Basis for the Motion

As a pro se plaintiff, I seek to amend my complaint to add critical facts and assertions that involve confidential information. Public disclosure of these details could contravene privacy rights safeguarded by HIPAA and FERPA, risk personal privacy, and potentially impact the fairness of the legal proceedings.

2. Legal Foundation for Sealing Documents

This Motion calls upon the Court's authority, as granted by Tennessee law and the Tennessee Code Annotated (TCA), to seal records in circumstances where privacy must be preserved. Tennessee's legal framework and precedents acknowledge the Court's discretion to protect sensitive information from public exposure.

•       TCA Considerations: This Motion is supported by relevant provisions within the TCA, emphasizing the confidentiality of health and educational records and the judiciary's role in safeguarding such information during legal disputes.

3. Requested Court Action

I, Ian Lucas, respectfully request the Court to:

a. Grant permission to file my Amended Complaint under seal.

b. Seal all prior filings in this case that contain sensitive and confidential information, as specified by me, the pro se plaintiff.

c. Issue any other orders deemed necessary by the Court to maintain the confidentiality of the information involved in this case.

4. Conclusion

Considering the sensitive nature of the disclosed information and its potential impact on privacy rights and the integrity of the legal process, sealing the specified documents serves the interests of justice by protecting the privacy of all parties involved. I, therefore, kindly ask this Court to approve my Motion to File an Amended Complaint and Related Filings Under Seal and to seal all relevant previous filings.

Submitted respectfully,

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

IAN H. LUCAS

Dated: March 31, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31 day of March 2024, a true and correct copy of the foregoing Amended Complaint was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated: March 31, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **IAN LUCAS, Pro *Se*** | ) | **DOCKET NO. 24C655** |
| *Plaintiff* | ) | |
| v. | ) | |
| | ) | |
| **Mary Ann Jessee, Michelle Tellock,** | ) | |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) | |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) | |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) | |
| **Marissa Shulruff, E. Jacob Cummings,** | ) | |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) | |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) | **MOTION TO FILE UNDER SEAL** |
| **Michael Fazi, Feylyn Lewis, Tracey George** | ) | |
| **Cyebele Raver, Daniel Diermeier, Melanie Lowe** | ) | And |
| **Timothy Garrett, Ernie Rushing, Sara Donahoe,** | ) | **MEMORANDUM OF POINTS AND** |
| **Terry Walker, Teresa Rogers, Julie Perry,** | ) | **AUTHORITIES IN SUPPORT OF** |
| **K. Melissa Smith Hayes, Nancy Wise,** | ) | **MOTION TO SEAL DOCUMENTS** |
| **Jane Zubulake, Lacey Cross, Monika Do,** | ) | |
| **Carrie Plummer, Ellen Schoen, Judson Smith,** | ) | |
| **Jessica Wellette, Mia Wells, Melanie Morris,** | ) | |
| **Robingale Panepinto, Melissa Lord,** | ) | |
| **Brittany Kirby, Shannon Ellrich,** | ) | |
| | ) | |
| *Defendants* | ) | |

## MOTION TO FILE UNDER SEAL
AND
## MEMORANDUM OF POINTS AND
## AUTHORITIES IN SUPPORT OF MOTION TO
## SEAL DOCUMENTS

Pursuant to Tennessee Rule of Civil Procedure 26.03 and Tennessee Code Annotated ¬ß 29-26-121(f), in

conjunction with relevant Federal statutes, particularly the False Claims Act (FCA) Qui Tam provisions under 31

U.S.C. ¬ß 3729-3733, the Plaintiff, acting Pro Se, hereby respectfully requests the Court to issue an Order

authorizing the plaintiff to file an amended complaint under seal and place all previous and related fillings, and

pleadings of case number 24C655 under seal. And for this court to order all future filings in this matter to be



filed under seal. In adherence to Tennessee Rule of Civil Procedure 5.03, a complete, unredacted copy of the documents for which permission to file under seal is requested has been lodged with the court clerk electronically.

The reasons and grounds for this Motion are as follows:

1. An overriding interest exists that justifies filing the [lodged documents/portions of the lodged documents] under seal, particularly to avoid public disclosure of sensitive details related to FCA Qui Tam actions, thereby outweighing the public's right of access.

2. There is a substantial probability of prejudice to the person filing the motion, if the lodged documents/portions of documents are not filed under seal, potentially compromising ongoing or future investigations, or revealing whistleblower identities.

3. The proposed restriction on public access is tailored to be no broader than necessary to preserve the confidentiality of information protected by the overriding interest, in accordance with the FCA's seal requirements.

4. No reasonable, less restrictive alternative exists to safeguard the confidentiality of the FCA Qui Tam related information.

## MEMORANDUM OF POINTS AND AUTHORITIES

## IN SUPPORT OF MOTION TO FILE UNDER SEAL

This Motion is supported by the attached Memorandum of Points and Authorities, detailing the legal and factual basis for the sealing request, including the necessity to comply with federal FCA Qui Tam provisions as follows: Pursuant to the request of Ian Hunter Lucas, Plaintiff, Pro Se, this Memorandum of Points and Authorities is submitted in support of the Motion to Seal Documents and pleadings in case number 24C655. This request is grounded in the necessity to protect sensitive and confidential information, including but not limited to, details relevant to a Federal False Claims Act (FCA) Qui Tam action, under 31 U.S.C. §§ 3729-3733, as well as information protected under the Health Insurance Portability and Accountability Act (HIPAA) and the Family

2



Educational Rights and Privacy Act (FERPA).

## I. LEGAL BASIS FOR SEALING DOCUMENTS

### A. Tennessee Law and Procedure

Tennessee Rule of Civil Procedure 26.03 and Tennessee Code Annotated § 29-26-121(f) provide the legal framework within the state's jurisdiction for the sealing of court records. These provisions allow for the court's discretion to seal documents when the privacy of individuals or the integrity of ongoing investigations may be compromised by public disclosure.

### B. Federal False Claims Act Qui Tam Provisions

The FCA Qui Tam provisions, specifically under 31 U.S.C. §§ 3729-3733, mandate that filings in whistleblower actions be made under seal to allow the government to investigate allegations without public disclosure. This statutory requirement is crucial in preventing premature exposure that could hinder governmental investigations or lead to potential harm or prejudice to the whistleblower.

## II. FACTUAL BASIS FOR THE REQUEST TO SEAL DOCUMENTS

The Plaintiff seeks to amend the complaint to include details that are critical for the substantiation of claims but are sensitive in nature due to their relevance to a potential FCA Qui Tam action. The disclosure of such information not only risks compromising the integrity of any related government investigation but also exposes confidential health and educational records, thus violating federal privacy laws such as HIPAA and FERPA.

## III. JUSTIFICATION FOR SEALING UNDER TENNESSEE AND FEDERAL LAW

### A. Overriding Interest and Substantial Probability of Prejudice

An overriding interest exists in preserving the confidentiality of the information pertinent to the FCA Qui Tam provisions, as well as health and educational records protected under federal law. There is a substantial probability that the Plaintiff, as well as potential government investigations, could suffer prejudice from the premature disclosure of these details.

### B. Proportionality and Lack of Less Restrictive Alternatives

The request to seal documents is the narrowest restriction necessary to protect the information from public

2

disclosure while respecting the principle of open access to court records. No reasonable, less restrictive

alternative exists that would adequately protect the confidentiality of the sensitive information involved in this

case.

## IV. CONCLUSION

Given the sensitive nature of the information related to the FCA Qui Tam action and other protected data, as

well as the legal requirements under Tennessee law and federal statutes, sealing the specified documents is

justified. The Plaintiff respectfully requests that the Court grant the Motion to Seal Documents to protect the

interests of justice, privacy rights, and the integrity of potential government investigations.

Dated this 9th of April 2024

By:

Respectfully Submitted,

IAN H. LUCAS
s Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

2



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th of April 9, 2024, a true and correct copy of the foregoing Motion was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated this 9th of April 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

# IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| IAN LUCAS, Pro *Se* )<br>*Plaintiff* )<br>)<br>v. )<br>)<br>Mary Ann Jessee, Michelle Tellock, )<br>Joel Newsome, Melissa Porter, G.L. Black, )<br>Clarise Gamez, Neil Jamerson, Jeremy )<br>Bourgoin, Mavis Schorn, Pamela Jefferies, )<br>Marissa Shulruff, E. Jacob Cummings, )<br>Jill Harris, Heather Robbins, Cate Enstrom, )<br>Chrystal Ritchie, Angela Weaver, Mary Roy, )<br>Michael Fazi, Feylyn Lewis, Tracey George )<br>Cyebele Raver, Daniel Diermeier, Melanie Lowe )<br>Timothy Garrett, Ernie Rushing, Sara Donahoe, )<br>Terry Walker, Teresa Rogers, Julie Perry, )<br>K. Melissa Smith Hayes, Nancy Wise, )<br>Jane Zubulake, Lacey Cross, Monika Do, )<br>Carrie Plummer, Ellen Schoen, Judson Smith, )<br>Jessica Wellette, Mia Wells, Melanie Morris, )<br>Robingale Panepinto, Melissa Lord, )<br>Brittany Kirby, Shannon Ellrich, )<br>)<br>*Defendants* ) | **DOCKET NO. 24C655**<br><br>**NOTICE OF HEARING**<br>**on MOTION for**<br>**PRELIMANARY INJUNCTION** |

## NOTICE OF HEARING

PLEASE BE ADVISED that the undersigned, Ian Hunter Lucas, acting pro se, has submitted a Motion for

Temporary Injunction to this Court. A request has been made for this motion to be placed on the court's

next    available    docket,    seeking    prompt    consideration    by    the    presiding    judge.

### Hearing Details:

**Date**: To be assigned by the Court

**Time**: To be assigned by the Court

Page 1 of 4

**Location**: To be confirmed by the Court

COPY

The motion seeks immediate judicial intervention to prevent ongoing discriminatory practices, retaliation, contract breaches, and other wrongful actions as detailed in the motion, pending the final outcome of this case.

It is imperative for all parties to await the court's notification for the specific hearing date and time, which will be determined based on the court's next available docket availability. Your participation in this hearing is mandatory. Non-attendance may lead to the motion being granted in your absence due to lack of opposition.

Dated: April 2nd, 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April 2024, a true and correct copy of the notice of hearing was furnished to the following parties and all defendants via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated:April 2nd 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY

EFILED 04/02/24 04:48 PM CASE NO. 24C655 Joseph P. Day, Clerk

**IN THE CIRCUIT COURT**
**FOR DAVIDSON COUNTY, TENNESSEE**
**AT NASHVILLE**

**IAN LUCAS, Pro *Se***
***Plaintiff***
**v.**

**Mary Ann Jessee, Michelle Tellock, Joel Newsome, Melissa Porter, G.L. Black, Clarise Gamez, Neil Jamerson, Jeremy Bourgoin, Mavis Schorn, Pamela Jefferies, Marissa Shulruff, E. Jacob Cummings, Jill Harris, Heather Robbins, Cate Enstrom, Chrystal Ritchie, Angela Weaver, Mary Roy, Michael Fazi, Feylyn Lewis, Tracey George Cyebele Raver, Daniel Diermeier, Melanie Lowe Timothy Garrett, Ernie Rushing, Sara Donahoe, Terry Walker, Teresa Rogers, Julie Perry, K. Melissa Smith Hayes, Nancy Wise, Jane Zubulake, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Mia Wells, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, Shannon Ellrich,**

***Defendants***

**DOCKET NO. 24C655**

**NOTICE OF HEARING**
**on MOTION for**
**PRELIMANARY INJUNCTION**

**NOTICE OF HEARING**

PLEASE BE ADVISED that the undersigned, Ian Hunter Lucas, acting pro se, has submitted a Motion for Temporary Injunction to this Court. A request has been made for this motion to be placed on the court's next available docket, seeking prompt consideration by the presiding judge.

**Hearing Details:**

**Date**: To be assigned by the Court

**Time**: To be assigned by the Court

**Location**: To be confirmed by the Court

COPY

The motion seeks immediate judicial intervention to prevent ongoing discriminatory practices, retaliation, contract breaches, and other wrongful actions as detailed in the motion, pending the final outcome of this case.

It is imperative for all parties to await the court's notification for the specific hearing date and time, which will be determined based on the court's next available docket availability. Your participation in this hearing is mandatory. Non-attendance may lead to the motion being granted in your absence due to lack of opposition.

Dated: April 2nd, 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY 

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April 2024, a true and correct copy of the notice of hearing was furnished to the following parties and all defendants via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated:April 2nd 2024

Jan Lucas

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |  |
|---|---|---|
| IAN LUCAS, Pro *Se* | ) | DOCKET NO. 24C655 |
| *Plaintiff* | ) | |
| v. | ) | |
| | ) | |
| Mary Ann Jessee, Michelle Tellock, | ) | **NOTICE OF HEARING** |
| Joel Newsome, Melissa Porter, G.L. Black, | ) | **on MOTION for** |
| Clarise Gamez, Neil Jamerson, Jeremy | ) | **PRELIMANARY INJUNCTION** |
| Bourgoin, Mavis Schorn, Pamela Jefferies, | ) | |
| Marissa Shulruff, E. Jacob Cummings, | ) | |
| Jill Harris, Heather Robbins, Cate Enstrom, | ) | |
| Chrystal Ritchie, Angela Weaver, Mary Roy, | ) | |
| Michael Fazi, Feylyn Lewis, Tracey George | ) | |
| Cyebele Raver, Daniel Diermeier, Melanie Lowe ) | | |
| Timothy Garrett, Ernie Rushing, Sara Donahoe, ) | | |
| Terry Walker, Teresa Rogers, Julie Perry, | ) | |
| K. Melissa Smith Hayes, Nancy Wise, | ) | |
| Jane Zubulake, Lacey Cross, Monika Do, | ) | |
| Carrie Plummer, Ellen Schoen, Judson Smith, | ) | |
| Jessica Wellette, Mia Wells, Melanie Morris, | ) | |
| Robingale Panepinto, Melissa Lord, | ) | |
| Brittany Kirby, Shannon Ellrich, | ) | |
| | ) | |
| *Defendants* | ) | |

## NOTICE OF HEARING

PLEASE BE ADVISED that the undersigned, Ian Hunter Lucas, acting pro se, has submitted a Motion for

Temporary Injunction to this Court. A request has been made for this motion to be placed on the court's

next   available   docket,   seeking   prompt   consideration   by   the   presiding   judge.

### Hearing Details:

**Date**:April 19th, 2024 **Time**: To be assigned by the Court

**Location**:Davidson County Courthouse, Nashville, TN

COPY

The motion seeks immediate judicial intervention to prevent ongoing discriminatory practices, retaliation, contract breaches, and other wrongful actions as detailed in the motion, pending the final outcome of this case.

It is imperative for all parties to await the court's notification for the specific hearing date and time, which will be determined based on the court's next available docket availability. Your participation in this hearing is mandatory. Non-attendance may lead to the motion being granted in your absence due to lack of opposition.

Dated: April 2nd, 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April 2024, a true and correct copy of the notice of hearing was furnished to the following parties and all defendants via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Dated:April 2nd 2024

<span style="float:right">Jan Lucas</span>

<div style="text-align:right">

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com
</div>

**IN THE CIRCUIT COURT
FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE**

|  |  |
|---|---|
| **IAN LUCAS, Pro Se** | ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) |
| **Michelle Tellock et al.** | ) |
| *Defendants* | ) |
|  | ) **MOTION TO SET HEARING** |
|  | ) **ON** |
|  | ) **MOTION TO FILE UNDER SEAL** |

**MOTION TO SET HEARING
ON
MOTION TO FILE UNDER SEAL**

Pursuant to the Tennessee Rules of Civil Procedure, Tennessee Code Annotated (TCA), and

relevant sections of the United States Code (USC) pertaining to confidentiality and privacy protections,

Ian Hunter Lucas, Plaintiff, Pro Se, respectfully requests that this Honorable Court schedule a hearing on

his Motion to File Documents Under Seal. This Motion is substantiated by the need to safeguard

sensitive and confidential information, as mandated by both state and federal legal frameworks.

1.     This Motion is submitted in accordance with TCA § 29-26-121(f), which addresses the

confidentiality of certain records, and Rule 26.03 of the Tennessee Rules of Civil Procedure, concerning

the sealing of court records. Federally, the Health Insurance Portability and Accountability Act (HIPAA)

at 42 U.S.C. § 1320d et seq., and the False Claims Act (FCA) Qui Tam provisions at 31 U.S.C. §§ 3729-

3733, dictate the handling of sensitive information to prevent unwarranted public disclosure. This

1

COPY

EFILED 04/09/24 06:52 AM CASE NO. 24C655 Joseph P. Day, Clerk

Motion also aligns with Local Rule [Local Civil Rule Number], which governs the procedure for filing motions and setting hearings in this jurisdiction.

2.      The principles outlined in *Doe v. City of Memphis*, 218 S.W.3d 625 (Tenn. 2007), support the discretion of Tennessee courts to seal records in order to protect privacy and confidentiality interests. Furthermore, the federal stance on balancing public access against the need to protect sensitive information is articulated in *United States ex rel. Adrian v. Regents of the University of California*, 363 F.3d 398 (5th Cir. 2004), which acknowledges the critical importance of sealing in the context of FCA Qui Tam actions to ensure the integrity of investigations and protect the identities of individuals involved.

3.      A hearing is essential to present the merits of the Motion to File Documents Under Seal, enabling a detailed discussion on the specific nature of the information to be protected and the legal bases for its protection. It will allow for a judicious evaluation of the need to override the default presumption of public access to court records in light of the compelling interests at stake.

4.      In compliance with Local Rule [Specify Local Rule for Motion Practice], this Motion seeks the Court's accommodation to schedule a hearing at the Court's earliest possible convenience. This approach is intended to ensure the timely and appropriate consideration of the Motion to File Documents Under Seal, respecting the procedural timelines and substantive legal standards governing such matters.

2

Case 3:24-cv-00440    Document 1-4    Filed 04/10/24    Page 384 of 431 PageID #: 643

COPY

WHEREFORE, Ian Hunter Lucas, Plaintiff, Pro Se, respectfully requests that this Court grant this

Motion to Set Hearing on the Motion to File Documents Under Seal and designate a hearing date that

accommodates the Court's schedule while allowing for the comprehensive examination of the matters

herein.

Dated: This 9th Day of April 2024

Respectfully Submitted,

IAN H. LUCAS

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

3

COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th Day of April 2024, a true and correct copy of the

foregoing Motion to Set Hearing was furnished to the following party via email, which is

permissible under TCA §20-1-119(c) concerning electronic service of documents:


Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
kevin.klein@kleinpllc.com


Denmark J. Grant Baker,
Donelson, Bearman,
Caldwell & Berkowitz, PC
1600 West End Avenue,
Suite 2000 Nashville, TN,
37203 Phone: 615.726.5591
dgrant@bakerdonelson.com


I affirm that the method of service used herein is consistent with the provisions of the Tennessee

Rules of Civil Procedure for service upon an attorney in a civil case.


Respectfully Submitted,

IAN H. LUCAS

Dated: April 9, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) **DOCKET NO. 24C655** |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| **Mary Ann Jessee, Michelle Tellock,** | ) |
| **Joel Newsome, Melissa Porter, G.L. Black,** | ) |
| **Clarise Gamez, Neil Jamerson, Jeremy** | ) |
| **Bourgoin, Mavis Schorn, Pamela Jefferies,** | ) |
| **Marissa Shulruff, E. Jacob Cummings,** | ) **COMPLAINT** |
| **Jill Harris, Heather Robbins, Cate Enstrom,** | ) **JURY DEMAND** |
| **Chrystal Ritchie, Angela Weaver, Mary Roy,** | ) |
| **Michael Fazi, and Feylyn Lewis** | ) |
| | ) |
| *Defendants* | ) |

## COMPLAINT

Plaintiff, Ian Hunter Lucas (hereinafter "Plaintiff"), brings this Complaint against the

Defendants, **Michelle Tellock, Joel Newsome, Melissa Porter, G.L. Black, Mary Ann Jessee,**

**Clairse Gamez, Neil Jamerson, Jeremy Borgoin, Mavis Schoen, Pamela Jefferies, Marissa**

**Shulruff, , E. Jacob Cummings, Tim Garrett, Jill Harris, Heather Robbins, Kate Enstrom,**

**Alice Bernet, Chrystal Ritchie, and Feylyn Lewis** (collectively "Defendants"), for breach of

contract, negligence, discrimination on the basis of disability in violation of the Americans with

Disabilities Act, Section 504 of the Rehabilitation Act, and the Tennessee Human Relations Act,

and retaliation for Plaintiff making complaints regarding the discrimination that he experienced

due to Vanderbilt University's actions as well as other wrongful actions under the laws of the

United States and the State of Tennessee, and alleges as follows:

COPY

## **PARTIES**

1.      Plaintiff, Ian Hunter Lucas, is an adult male citizen of the United States, who is a resident of Pleasant View, Tennessee, and was a graduate student at the Vanderbilt University School of Nursing Master of Nursing (MN) Program from January 2023 to December 2023.

2.      Mr. Lucas has been diagnosed with a disability of physically limiting and cognitive disabilities, as the term disability is defined in the Americans with Disabilities Act because as Mr. Lucas meets the standard of having an actual impairment that substantially limits one or more of his major life activities.

3.      At all relevant times, Mr. Lucas has been a "qualified individual" with a disability because he is able to be a functional successful student with the reasonable accommodations he received as a student with a disability.

4.      At all relevant times to this lawsuit, Mr. Lucas was a student of Defendant Vanderbilt University, as a graduate student at the Vanderbilt University School of Nursing to obtain a Master of Nursing degree.

5.      Defendant Vanderbilt University is an educational institution in Nashville, Tennessee, and Defendant Vanderbilt School of Nursing is a component thereof.

6.      Defendant Vanderbilt University ("Vanderbilt") is a private, non-profit educational institution, which receives significant federal funds, and is incorporated and does business in Nashville, Tennessee.

7.      On information and belief, Vanderbilt University has had formal non-discrimination and anti-harassment policies in place since July 2016; those policies specifically include protections from discrimination, harassment, and retaliation based on, among other things, disability.

Page 3 of 31



## JURISDICTION
## AND VENUE

8. This Court has jurisdiction over Mr. Lucas' claims pursuant to 28 U.S.C. §1331 and §1343 since the matters in controversy arise under the laws of the United States.

9. This Court also has jurisdiction under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, as Title II of the ADA, prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. §12132 (Supp. 1991), the Rehabilitation Act of 1973, §§ 504 and 505, as amended.

10. This Court also has jurisdiction under 28 U.S.C. §1367 over the supplemental state law claims made by Mr. Lucas in seeking relief under the Tennessee Human Rights Act, T.C.A. §4-21-101 *et. seq.*

11. This Court has personal jurisdiction over both Plaintiff and Defendant.

12. At all relevant times, Defendant had more than 15 employees, and thus is subject to the requirements of the ADA (42 U.S.C. §12101 *et. seq.* and the Tennessee Human Rights Act (T.C.A. §4-21-101 *et. seq.*).

13. Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. §1391(b)(c) as Defendant is located in the District and subject to the jurisdiction of the Court, and because the events giving rise to the claims raised herein occurred in this judicial district.



## NATURE OF ACTION

14.     This action seeks relief for Defendants' wrongful actions, including breach of contract, negligence, and intentional infliction of emotional distress, leading to damages through a knowing and inflicting action with the intent to do harm upon the Plaintiff, including wrongful expulsion, whistleblower retaliation, witness intimidation, and obstruction of justice in violation of applicable state and federal laws and principles of equity.

15.     Plaintiff seeks redress for Defendants' wrongful and discriminatory actions that have caused significant educational, professional, and personal harm to Plaintiff.

16.     Further through the process of discovery and trial evidence. Plaintiff will demonstrate Manipulation of External Investigations, Collusion, Witness Intimidation, and Obstruction of Justice, in which the plaintiff is involved in as a federal witness to a whistleblower fraud, waste and abuse case under seal with subpoenas issued under seal by the United States District Court of the Western District of Tennessee, prosecution and representation for the United States led by Sara Williams, Assistant United States Attorney for the United States Attorney's Office of the Western District of Tennessee, and lead investigative agency Department of Health and Human Services Office of Inspector General led by Special Agent Ed Miller.

17.     Defendants' actions demonstrate collusion with the defendant of this investigation in which defendants were aware of a $1.25 million dollar "donation" provided by the Defendants' and the Plaintiff's former employer as a bribe to academically dismiss and expel the Plaintiff. The reason for expulsion exactly matches the investigation determination and "policy violations" as the reason for the wrongful



termination. This served as a mutual and benefiting purpose for the Defendants, who were under investigation at the same time for EOA violations by the Plaintiff for disability discrimination.

18.     Through the trial process, Plaintiff will demonstrate that the retaliation was quite evident, giving the Defendants reasoning to defame and ensure the Plaintiff was expelled to attempt to conceal and deflect the systemic disability discrimination that had been occurring by the Defendants.

19.     Furthermore, two of the Defendants, also student peers of the Plaintiff, agreed to aid the other Defendants in their actions. These Defendants did so for suspected academic and needed favors from the other Defendants' ability and positions of power to provide such aide.

20.     The student Defendants acted in this way, despite Plaintiff's many attempts to offer these student Defendants the opportunities to provide any rebuttal or even an affirmation of not being involved in the matter entirely. The student Defendants, however, chose not respond to Plaintiff's many requests and even choose to continue in their false statements to other members of the student body and on clinical rotations at potential and former employers of the Plaintiff.

## FACTUAL ALLEGATIONS

21.     Plaintiff enrolled in Defendant's Master of Nursing program (MN) under the assurance of receiving fair and equitable treatment, educational services, and due process in all academic affairs as part of the contractual relationship with Defendants.

22.     Defendants engaged in discriminatory practices against Plaintiff, breaching

the implied covenant of good faith and fair dealing inherent in the educational contract.

23.    Defendants' negligent mismanagement and willful disregard for Plaintiff's right to a fair academic process caused direct harm to Plaintiff's educational trajectory and professional future.

24.    Defendants' actions have inflicted severe emotional distress upon Plaintiff, causing damages that are compensable under Tennessee law.

25.    On June 3, 2023, Plaintiff reported an incident to the Office of Equal Access, alleging discrimination based on disability by a faculty member, in violation of Plaintiff's rights under Tennessee state law.

26.    The basis of this complaint was that Plaintiff was receiving retaliatory treatment and discriminatory treatment by his pediatric clinical faculty member, Professor Harris, based on him using his reasonable accommodation for Crohn's disease on an attendance issue, and that points had been wrongfully deducted from his course grade due to that use of the accommodation.

27.    Plaintiff informed Jill Harris that he had a university recognized and approved accommodation via email. Jill Harris then spoke to faculty leadership, confirming that Plaintiff had a reasonable accommodation and that the zero (0) would have to be removed and the tardy would have to be excused.

28.    Subsequent to the aforementioned incidents, the Plaintiff was subjected to vindictive treatment orchestrated by Harris, characterized by a series of retaliatory actions designed to ensure the Plaintiff's failure. Harris, with deliberate intent, established conditions and engaged in a consistent pattern of conduct aimed at undermining the Plaintiff's performance. This was notably evident when Harris, in the presence of the

Plaintiff and fellow students, repeatedly expressed her intention for the Plaintiff to be unsuccessful in his nursing education, particularly in relation to a pediatric clinical rotation and associated clinical documentation.

29. It is pertinent to mention that the Plaintiff possesses more than ten years of experience in pediatric care and had been employed for more than four years at the hospital where the clinical rotation was taking place. Furthermore, Harris resorted to making slanderous remarks and statements, alongside endeavors to publicly disgrace the Plaintiff. Such actions were executed in the presence of the Plaintiff's former colleagues and other clinical staff, individuals familiar with the Plaintiff, who would often extend their well-wishes and encouragement towards his professional pursuits.

30. A few weeks later, Plaintiff was informed that he violated a rule by looking up a patient's record outside a clinical setting, although it had never previously been brought to his attention as an issue and his clinical instructor, Professor Harris, had requested that he look up the record on his laptop.

31. Plaintiff was not provided with specific instructions that other students were provided with, to send his clinical paperwork to Jill Harris. Plaintiff was then disciplined for failing to provide Jill Harris with this paperwork when he had not been informed to do so. Furthermore, Jill Harris as confirmed by testimony of other students witnesses to EOA Investigator, required plaintiff to email clinical paperwork to Jill Harris as she noted not being able to discern the Plaintiff's handwriting.

32. Jill Harris then wrongfully deducted points from Plaintiff in an attempt to fail the Plaintiff based on the syllabus policy on vague application of accumulation of zeros (0) assigned in the category of unprofessionalism. This began with Jill Harris accusing the

Plaintiff of turning in clinical documentation late, which then evolved into Jill Harris falsifying comments in the Plaintiff's clinical "Exxat" reflections and deducting his score based on Jill Harris' hypothetical assumptions of what the Plaintiff would have done in a clinical setting, rather than actual performance of actions themselves.

33. The Plaintiff communicated his concerns to the clinical faculty leadership, including Professor Weaver, Dr. Robbins, and Dean Jesse. This complaint prompted them to remove Plaintiff from Professor Harris' clinical course.

34. A meeting was scheduled in which Plaintiff was informed that he had failed clinical paperwork. However, Plaintiff had turned in this paperwork at the beginning of the clinical and the procedure was for incorrect paperwork to be given back to the student, review it with them, and remediate it with the student. Additionally, the Plaintiff was informed that Jill Harris had reported him to Weaver, Harris, and Jesse with unfounded allegations of failing to submit several weeks' worth of clinical paperwork on time and further accused the Plaintiff of copying and pasting the clinical documentation merely because it was typed, notwithstanding that it was composed in the Plaintiff's own words.

35. Moreover, Jill Harris falsely claimed that the Plaintiff had inappropriately accessed patient charts "multiple times" during post-conference sessions, even though it was Harris herself who requested the Plaintiff to retrieve multiple lab results for the patient being discussed for educational purposes, as it noted in other student eyewitness statements as provided in recorded transcribed testimony from EOA investigator transcripts of student interviews.

36. During that meeting, an academic learning contract was prepared for Plaintiff stating generic and erroneous claims that would make non-logical sense to any nursing student such as "do not copy information from the EHR" and "Do not Access the EHR outside of Clinical

Hours."

37.     Plaintiff started the next semester and had a class with Dr. Enstrom, who emailed his accommodation letter on August 21, 2023. This email wrongfully took away Plaintiff's accommodations for his disability by stating that he would be penalized 10 points, instead of 0 for missed classes, despite his reasonable accommodations for his disability.

38.     Plaintiff emailed Catherine Buttery, Assistant Director of Student Access for the Office of Equal Access in order to ensure that he would not be wrongfully penalized for these disability related absences. Ms. Buttery replied that he should not be penalized for those absences.

39.     Later in the semester, after Plaintiff had to miss class due to his disability, he emailed Professor Enstrom regarding his absence and requested makeup work.

40.     Kate Enstrom replied with the makeup work and informed Plaintiff that since he had missed two sessions and one-quarter of a third session that an additional absence would warrant a meeting with the course coordinators to discuss course progression.

41.     Plaintiff responded by email, requesting a meeting with Professor Enstrom and her faculty supervisor.

42.     Only after Plaintiff had made this request was he presented with a learning plan.

43.     On December 4, 2023, Plaintiff was subject to an interim suspension from campus, ostensibly for a mental health assessment as per the University's Wellness Committee policy, without appropriate due process as required under Tennessee law.

44.     Of note, a majority of this investigation focused on the concern that the Plaintiff maintained his concealed carry firearm in his vehicle. The Plaintiff is a concealed handgun carry permit holder. "Persons who carry a handgun pursuant to Tenn. Code Ann. §39-17-1351,

the enhanced handgun carry permit statute, or Tenn. Code Ann. §39-17-1366, the concealed handgun carry permit statute, are specifically excepted from application of the federal Gun-Free School Zones Act." Despite this and in knowing that putting such reasoning in written context would be illegal on Defendants part, Defendant remanded the plaintiff on an interim campus restriction since December 4, 2023 to present without providing reason as to their concern for the Plaintiffs "threat" as defined in the student handbook for justification of a interim campus restriction as it is defined.

45.     It is important to note this was the same focus of the Air Evac investigation, despite the fact that the Plaintiff provided evidence showing that text messages were altered by the Defendant to falsely demonstrate a conversation that was not reflective of the entire narrative. Furthermore, the firearm that was the subject of the conversation was not in the Plaintiffs possession as the Plaintiff was awaiting ATF approval as the firearm was an NFA item. Additionally, the text messaging of a firearm that was not in the Plaintiffs possession, and even if such firearms was in the Plaintiffs possession and the context and content of such communications were, non-threatening, non-harmful, and with no intention to inflict stress or burden to another. Thus, Plaintiff was within his constitutional and with the laws of the State of Tennessee to possess and communicate about such Firearm.

46.     On December 15, 2023, a representative from the School of Nursing, Mary Jesse, notified Plaintiff of a purported infraction for off-site access to patient charts and subsequently altered Plaintiff's academic grades from passing to failing without clear justification.

47.     Subsequently, on December 19, 2023, Plaintiff was dismissed from the School of Nursing, a decision that Plaintiff contends was made without adequate process



and was unjustified.

48.     In an interview with Plaintiff's fellow classmate at the School of Nursing, his classmate informed the investigator that she believed that Plaintiff was being subject to different treatment due to his disability and retaliation based on that disability.

49.     Plaintiff pursued internal university channels to appeal the academic dismissal and the retroactive grade changes, seeking to remedy the alleged wrongful actions.

50.     These appeals were systematically delayed and denied by the Defendant, hindering a timely resolution, and compounding the Plaintiff's distress.

51.     As a result, Plaintiff's anticipated graduation and subsequent entry into the professional job market have been detrimentally impacted.

52.     The Plaintiff's access to patient charts was conducted within the parameters of the Health Insurance Portability and Accountability Act in Tennessee's privacy laws and educational standards, which should negate the basis for dismissal.

53.     Any allegations of unauthorized access must be evaluated under Tennessee's statutes governing computer- related crimes, which would not typically characterize the educational access to patient information as unauthorized.

54.     Tennessee law provides for immunity under certain educational functions, suggesting that the plaintiff's adherence to privacy standards in an educational context should not constitute actionable misconduct.

55.     Tennessee law, particularly under the Tennessee Educational Records Statute (T.C.A. §49-50-801 et seq.), grants certain protections and immunities to educational institutions and their agents when handling educational records in compliance with established privacy standards. Given this legal framework, the Plaintiff's access to patient charts,

COPY

provided it was within the scope of educational purposes and adhered to the confidentiality requirements as outlined in the Tennessee Code and any applicable institutional policies, should not be deemed actionable misconduct. This adherence to statutory privacy standards, in conjunction with the educational immunity provisions, underscores that the Plaintiff's actions, aimed at fulfilling educational objectives, fall within the ambit of legally protected activities under Tennessee Code Annotated §20-12-119.

56. Additionally, of significantly higher concern is the evidence of collusion and cooperation between Air Evac Lifeteam Inc. and Vanderbilt University. This partnership further implicates both entities in actions against the plaintiff, suggesting whistleblower retaliation. This collusion also highlights Vanderbilt University's active participation with Air Evac Lifeteam Inc., further demonstrating the defendants deliberate and intentional efforts to harm and damage the plaintiff as a result of Vanderbilt University is alleged to have accepted a donation from Air Evac Lifeteam Inc. as compensation for assisting in the termination of Lucas and supporting Air Evac Lifeteam Inc.'s efforts to discredit Lucas preemptively against any future defense in litigation.

57. This arrangement also aimed to shield against any claims of wrongful termination. Additionally, Vanderbilt University is accused of not providing legal representation for certain student defendants but exploiting these students in bad faith actions, fulfilling commitments made in exchange for receiving the donation funds.

58. The direct link between the defendants and a federal case involving three students previously unrelated to Air Evac Lifeteam Inc., a subsidiary of Global Medical Response, owned by KKR & Co., establishes a clear legal connection. This association further implicates Vanderbilt University in the retaliatory measures taken by my former employer against me for

reporting False Claims Act violations. Vanderbilt University implicated, the involvement of these students in specific activities related to a donation agreement from KKR & Co., evidencing the collaboration among Air Evac Lifeteam Inc., Global Medical Response, and KKR & Co. in providing legal support to the defendants.

59. Financial transactions via the Conway Whelch Foundation, as revealed in their 990 PF filing on October 31, 2023, along with a $1.25 million donation to Vanderbilt on November 17, 2023, highlight this engagement. The reported gross sales of assets totaling $1,349,149.00, as shown in line 6b of the 990-PF filing, indicate a deliberate financial strategy, presumably to facilitate the donation through the sale of assets. This suggests a structured plan to direct funds towards Vanderbilt with the aim of justifying my wrongful termination and expulsion based on unfounded claims.

## COUNT ONE:
## DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

60. Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein.

61. Mr. Lucas is, and at all times relevant hereto, was a qualified individual with a disability as that term is defined under the ADA, 42 U.S.C. §12102(1), because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such disability, and/or was regarded by Defendant as a person with such impairments.

62. At all relevant times, Mr. Lucas was able to be a functional student with a reasonable accommodation for his Crohn's disease.

63. Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions, including

but not limited to, failing to provide for reasonable accommodations for his disability, which constitutes unlawful disability discrimination against Mr. Lucas in violation of the ADA.

64.    Defendants acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard of, Mr. Lucas' rights under the ADA.

65.    As a direct and proximate result of Defendants' intentional discrimination, Mr. Lucas has suffered out of pocket losses and has been deprived of his education, including loss of future economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

66.    Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

67.    Pursuant to the ADA, Mr. Lucas is entitled to damages including lost compensation and lost benefits, compensatory damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

## COUNT TWO: RETALIATION IN
## VIOLATION OF THE AMERICANS
## WITH DISABILITIES ACT

68.    Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

69.    Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.



70. Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas'
rights under the ADA, and acted in reckless disregard for Mr. Lucas' rights under the ADA.

71. As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost
future compensation and other benefits of employment, emotional distress, inconvenience,
loss of income, humiliation and other indignities.

72. Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory
damages, punitive damages, his attorney's fees and costs of litigation, and all other relief
recoverable under the ADA.

## COUNT THREE: DISCRIMINATION
## BASED ON DISABILITY IN VIOLATION
## OF THE TENNESSEE HUMAN RIGHTS
## ACT

73. Plaintiff incorporates all the foregoing paragraphs above as if fully set forth
herein.

74. At all relevant times, Mr. Lucas was a qualified individual with a disability as
that term is defined under the Tennessee Human Rights Act, because he suffers from Crohn's
disease, which substantially limits one or more of his major life activities, has a record of such
impairments, and/or was regarded by Defendant as a person with such impairments. T.C.A. §4-
21-102.

75. At all relevant times, Mr. Lucas was able to be a functional student with
reasonable accommodations for his disability.

76. Defendant, by and through its agents, representatives, and employees,
intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including
but not limited to denying him reasonable accommodations and discriminating against him on



the basis of his disability.

77.     The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful disability discrimination against him in violation of the Tennessee Human Rights Act.

78.     Defendant acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard for, Mr. Lucas' rights under the Tennessee Human Rights Act.

79.     As a direct and proximate result of Defendant's intentional discrimination, Mr. Lucas has suffered out of pocket losses, been deprived of prospective economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

80.     Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

81.     Pursuant to the Tennessee Human Rights Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Tennessee Human Rights Act.

## COUNT FOUR: RETALIATION
## IN VIOLATION OF THE TENNESSEE
## HUMAN RIGHTS ACT

82.     Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

83.     Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his Professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.



84.     Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under the Tennessee Human Rights Act, and acted in reckless disregard for Mr. Lucas' rights under the Tennessee Human Rights Act.

85.     As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

86.     Pursuant to the ADA, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under the Tennessee Human Rights Act.

## COUNT FIVE: BREACH OF CONTRACT

87.     Plaintiff incorporates and reasserts herein by reference all preceding paragraphs as if fully set forth herein.

88.     Plaintiff applied to and enrolled in Defendant Vanderbilt's program and paid tuition in addition to other fees and expenses. Plaintiff did so in reliance on the understanding and expectation that Defendant Vanderbilt would implement and enforce the promises and policies made in it is official publications, including its Mission Statement, the Student Handbook, its policies and procedures, as well as other relevant documents, including those not mentioned in this complaint.

89.     A contract implied in fact or in law was formed between Defendant Vanderbilt and the Plaintiff once the Plaintiff applied to and enrolled in the program. Specifically, Defendant Vanderbilt offered Plaintiff the ability to enroll in the university upon the condition that the Plaintiff paid for the necessary tuition and fees.

90.    Once Plaintiff paid for his tuition and fees, Plaintiff accepted Defendant

Vanderbilt's offer. In this contract, Defendant Vanderbilt expects Plaintiff to adhere to all of

the policies set forth in the Student Handbook while attending the University. In return,

Defendant Vanderbilt receives the benefit of their policies being met, as well as Plaintiff's

financial contribution to the University. Likewise, Plaintiff expects Vanderbilt to follow the

policies and procedures set out in its mission statement, Student Handbook, and other relevant

documents.

91.    Moreover, the contract contained an implied covenant of good faith and

fair dealing. Defendant Vanderbilt's Student Handbook for the 2023-2024 school year

states that Vanderbilt University is committed to equal access for people with disabilities.

In compliance with Section 504 of the Rehabilitation Act of 1973, the Americans with

Disabilities Act of 1990 (ADA), and the ADA Amendments Act of 2008, Vanderbilt does

not exclude otherwise qualified persons with disabilities, solely by reason of the

disability, from participating in University programs and activities, nor are persons with

disabilities denied the benefits of these programs or subjected to discrimination.

92.    It also states:

Vanderbilt University is committed to encouraging and sustaining a learning and

work community that is free from prohibited discrimination, harassment, and

retaliation. Vanderbilt University does not discriminate against individuals on the

basis of their race, color, national or ethnic origin, religion, sex, sexual

orientation, gender identity, gender expression, parental status, age, disability,

military service, veteran status, genetic information, or any other classification

protected by law in its administration of educational policies, programs, or

activities; admissions policies; scholarship and loan programs; athletic or other
University- administered programs; or employment.

93.     Vanderbilt's Student Handbook made specific representations that it would
ensure an environment that was free of discrimination on the basis of disability, and free
from retaliation against students who made complaints regarding being discriminated
against on the basis of disability.

94.     Defendants repeatedly and materially breached their contractual obligations
owed to Plaintiff, by failing to prevent his Professors from discriminating against him on the
basis of his disability or preventing them from retaliating against him for his disability, use of
reasonable accommodations, and complaints that he was being wrongfully discriminated
against on the basis of his disability.

95.     As explained above, Vanderbilt failed to prevent Plaintiff from being
retaliated against for his use of reasonable accommodations for which he was approved
to accommodate his Crohn's disease.

96.     Following Plaintiff's complaints regarding his lack of accommodation,
Plaintiff was subject to additional adverse treatment, including being subjected to
adverse grading decisions, based on unsubstantiated allegations that he accessed
patients' records while not in clinic although he had been requested to do so by his own
professor.

97.     Plaintiff was then wrongfully dismissed from the School of Nursing.
Furthermore, Plaintiff was denied the ability to redress his retaliation and discrimination as he
was refused the remedy of his grades being changed to incomplete from failing as a remedy for

the discrimination and retaliation he experienced from his Professors that caused him to wrongfully receive a failing grade in two of his courses for the Fall 2023 academic semester.

98.    As a direct and foreseeable result of these breaches of contract, the Plaintiff sustained, and will continue to sustain substantial injury, damages, and loss, including but not limited to past and future economic loss, loss of wages, deprivation of due process, loss of future career prospects, severe emotional distress, defamation to his character, and mental anguish.

## COUNT SIX: PROMISSORY ESTOPPEL

99.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

100.    As described above, the anti-discrimination and anti-retaliation policies detailed in the Vanderbilt University Student Handbook constitutes a promise that Defendant Vanderbilt will act in a manner described in the publications. Defendant Vanderbilt should have expected Plaintiff to rely on the policies stated in the handbook when he re-enrolled in Vanderbilt. Plaintiff reasonably expected Defendant Vanderbilt would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

101.    Injustice can only be avoided by enforcement of Defendant Vanderbilt's representations.

102.    As a direct and foreseeable result of Defendant Vanderbilt's failure to honor its promises, the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT SEVEN: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE



## REHABILITATION ACT OF 1973

103. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

104. Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance.

105. Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

106. Plaintiff is a qualified individual with a disability under the definition of Section 504 of the Rehabilitation Act of 1973.

107. Mr. Lucas was a qualified individual with a disability as that term is defined under the Rehabilitation Act because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments.

108. At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.

109. Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

110. The above-pled discriminatory conduct toward Mr. Lucas constitutes unlawful disability discrimination against him in violation of Section 504 of the Rehabilitation Act.

111. Defendant acted in bad faith, willfully and wantonly disregarded, and/or in reckless disregard for, Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

112. As a direct and proximate result of Defendant's intentional discrimination, Mr. Lucas has suffered out of pocket losses, been deprived of prospective economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

113. Defendant's actions have caused and will continue to cause Mr. Lucas to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

114. Pursuant to the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, his attorney's fees and cost of litigation, and all other relief recoverable under the Rehabilitation Act.

## COUNT EIGHT: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE REHABILITATION ACT OF 1973

115. Plaintiff incorporates all of the foregoing paragraphs above as if set forth fully herein.

116. Mr. Lucas engaged in statutorily protected activity by requesting a reasonable accommodation for his disability and filing complaints with Vanderbilt University when his Professors discriminated against him due to his disability and the reasonable accommodations to which he was afforded due to his disability.

117. Defendant acted in bad faith, willfully and wantonly disregarded Mr. Lucas' rights under Section 504 of the Rehabilitation Act, and acted in reckless disregard for Mr. Lucas' rights under Section 504 of the Rehabilitation Act.

118. As a result of Defendant's retaliatory conduct, Mr. Lucas has suffered lost future



compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

119. Pursuant to Section 504 of the Rehabilitation Act, Mr. Lucas is entitled to damages including compensatory damages, punitive damages, his attorney's fees and costs of litigation, and all other relief recoverable under Section 504 of the Rehabilitation Act.

## COUNT NINE: NEGLIGENCE

120. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

121. When Defendant Vanderbilt accepted Plaintiff's enrollment as a student, they entered into a duty of care relationship with Plaintiff to conduct themselves in a manner consistent with the Student Handbook and with a non-negligent manner.

122. Defendant Vanderbilt breached its duty of care toward Plaintiff when it failed to prevent Plaintiff from being discriminated against on the basis of his disability, Crohn's disease, as well as being retaliated against for complaints regarding his Professors failure to reasonably accommodate his disability.

123. Due to Defendant Vanderbilt's negligent conduct the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

124. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

125. Defendant Vanderbilt's conduct toward Plaintiff in allowing him to be

COPY

discriminated against on the basis of his disability and retaliated against for making complaints regarding his Professors' discrimination against him and retaliation for his complaints regarding their failure to provide reasonable accommodations was so reckless and so outrageous as to not be tolerated by a civilized society.

126.    Vanderbilt's conduct has and continues to cause serious mental injury to the Plaintiff and has significantly impaired Plaintiff's daily life.

## COUNT ELEVEN: DECLARATORY RELIEF

127.    The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

128.    Section 504 of the Rehabilitation Act of 1973 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance.

129.    Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

130.    Plaintiff is a qualified individual with a disability under the definition of Section 504 of the Rehabilitation Act of 1973.

131.    Mr. Lucas was a qualified individual with a disability as that term is defined under the Rehabilitation Act because he suffers from Crohn's disease, which substantially limits one or more of his major life activities, has a record of such impairments, and/or was regarded by Defendant as a person with such impairments.

132.    At all relevant times, Mr. Lucas was able to be a functional student with reasonable accommodations for his disability.

133.    Defendant, by and through its agents, representatives, and employees, intentionally discriminated against Mr. Lucas by subjecting him to adverse actions including but not limited to denying him reasonable accommodations and discriminating against him on the basis of his disability.

134.    Based on the foregoing, Defendant Vanderbilt has deprived Plaintiff, on the basis of his disability, of his rights to due process and equal protection through the improper administration of Defendant Vanderbilt's anti-discrimination and anti- retaliation policies.

135.    Defendant Vanderbilt has violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Tennessee Human Rights Act by failing to provide Plaintiff with protection against discrimination on the basis of disability and failed to prevent his Professors from retaliating against Plaintiff due to his complaints about their failures to accommodate his disability.

136.    Based on the foregoing, Plaintiff's grades were wrongfully changed from passing grades to failing grades and he was wrongfully dismissed from the Master of Nursing Program due to his disability and in relation for his complaint regarding the discrimination that he suffered due to his disability.

137.    Plaintiff therefore requests that the Honorable Court issue: an order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt School of Nursing Master of Nursing Program without prejudice and will all the rights and privileges appertaining thereto; an order mandating Defendant to expunge any academic disciplinary actions from Plaintiff's university records that arose from the alleged incidents leading to Plaintiff's dismissal; and an order requiring Defendant to implement comprehensive training programs for faculty and staff to prevent future incidents of discrimination and to promote awareness of the rights of students with



disabilities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Ian Hunter Lucas, prays for judgment against Defendant
Vanderbilt University and further respectfully requests this Honor Court to:

1. Issue a judgment declaring the following:

   a. order directing Defendant to immediately reinstate Plaintiff to the Vanderbilt
   School of Nursing Master of Nursing Program without prejudice and will all the
   rights and privileges be appertaining thereto;

   b. an order mandating Defendant to expunge any academic disciplinary actions
   from Plaintiff's university records that arose from the alleged incidents leading
   to Plaintiff's dismissal; and

   c. an order requiring Defendant to implement comprehensive training programs for
   faculty and staff to prevent future incidents of discrimination and to promote
   awareness of the rights of students with disabilities.

2. Award Plaintiff Compensatory Damages for the economic losses incurred by
Plaintiff, including but not limited to tuition and fees paid for the period of enrollment during
which Plaintiff suffered discriminatory actions, the cost of academic materials, and living
expenses attributable to the expected duration of Plaintiff's academic program. Additionally,
Plaintiff seeks compensation for non-economic damages, including pain and suffering,
emotional distress, and loss of enjoyment of life, in an amount to be proven at trial, but no less
than \$2,000,000.

3. An award of punitive damages in an amount sufficient to punish Defendants
for their willful, malicious, and intentional conduct and to deter similar conduct in the future,

COPY

suggested to be no less than $19,700,000.00 reflecting the egregious nature of Defendants'
actions against Plaintiff.

4.    An award of pre-judgment and post-judgment interest on all monetary awards
at the maximum legal rate under Tennessee law, from the date of each loss until the date of
judgment and continuing thereafter at the legal rate until all sums due to Plaintiff are fully
paid.

5.    An award of all costs associated with bringing this action, including but not
limited to court costs, expert witness fees, and reasonable attorney's fees, pursuant to
Tennessee Code Annotated §20-12-110 and other applicable statutes.

6.    Such other and further relief as the Court deems just and proper, including but
not limited to if needed:

       a. An award for the cost of obtaining alternative educational opportunities
          equivalent to the education Plaintiff would have received at Vanderbilt School of
          Nursing;

       b. An award for vocational and professional rehabilitation services to ameliorate the
          impact of the delayed entry into the nursing profession; and

       c. An order for a declaratory judgment that Defendants' actions violated specific
          rights of Plaintiff under federal and Tennessee law.

       d. Plaintiff to be allowed to walk and participate in Graduation activities and
          programing

       e. Plaintiff to be included in class composite photo

       f. Order the Defendants release the acceptance letter of Plaintiff into the
          previously applied for Doctor of Nursing Practice (DNP) + Post Masters

Adult-Gerontology Acute Care Nurse Practitioner (AGACNP) program for the

Fall 2024 semester, with an adjusted commencement date set for Fall 2025.

    i. Plaintiff is amendable based on discussion with VUSN to changing the

       program to either DNP + Post Masters Psychiatric-Mental Health

       Nurse Practitioner (PMHNP) or DNP + Post Masters Pediatric Nurse

       Practitioner-Acute Care (PNP-AC) and or Pediatric Primary Care

       (PNP-PC) or the Family Nurse Practitioner Program (FNP), ensuring

       Plaintiff's career and educational goals are not derailed by

       Defendants' actions, and also in respect to plaintiff unaddressed and

       further harm caused by Defendants inappropriately manipulating the

       EOA and Title IX process by denying Plaintiff supportive measures

       and equal access to educational programs as required by law.

b. Plaintiff reserves the right to amend this prayer for relief to conform to the evidence

   presented at trial.

COPY

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

Ian Lucas

IAN H. LUCAS

Dated: March 30, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30 day of March 2024, a true and correct copy of the foregoing Amended Complaint was furnished to the following party via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents:

Kevin C. Klein
Klein Solomon Mills, PLLC
1322 4th Ave North
Nashville, TN 37208
Phone: (615) 600-4802
kevin.klein@kleinpllc.com

Denmark J. Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN, 37203
Phone: 615.726.5591
dgrant@bakerdonelson.com

I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Respectfully Submitted,

Ian Lucas

IAN H. LUCAS

Dated: March 30, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

COPY



**United States Department of Justice**
**Civil Rights Division**
civilrights.justice.gov

Thank you for submitting a report to the Civil Rights Division.

**Report successfully submitted**



Your record number is:

**Save report**

COPY

## IN THE CIRCUIT COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

|  |  |
|---|---|
| **IAN LUCAS, Pro *Se*** | ) |
| | ) |
| | ) **DOCKET NO.  24C655** |
| *Plaintiff* | ) |
| **v.** | ) |
| | ) |
| **Michelle Tellock et al.** | ) |
| | ) |
| *Defendants* | ) |
| | ) |
| | ) |
| | ) **MOTION TO SET AN** |
| | ) **EXPEDITED HEARING ON** |
| | ) **MOTION FOR INJUNCTIVE** |
| | ) **RELIEF** |
| | ) |
| | ) |

## MOTION TO SET AN EXPEDITED HEARING ON
## MOTION FOR INJUNCTIVE RELIEF

The Plaintiff, Ian Hunter Lucas, proceeding pro se, respectfully moves this Honorable

Court to set an expedited hearing on Plaintiff's Motion for Injunctive Relief and in support

thereof respectfully shows the Court the following:

1.    The Plaintiff has filed a substantive Motion for Injunctive Relief that requires

urgent adjudication due to ongoing irreparable harm being suffered by the Plaintiff, as more fully

described in the accompanying Complaint and Motion for Injunctive Relief.

2.    Plaintiff respectfully submits that due to the nature of the irreparable harm, which

includes, but is not limited to, the violation of his rights under the Americans with Disabilities

Act (42 U.S.C. § 12101 et seq.), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794), an

expedited hearing is necessary.

3.     The harm being suffered by the Plaintiff includes discrimination and retaliation in violation of the Tennessee Human Rights Act (T.C.A. § 4-21-101 et seq.), as well as significant emotional distress and damage to the Plaintiff's educational trajectory and professional reputation.

4.     The urgency of the hearing is further compelled by the need to uphold the statutes designed to protect the rights of individuals with disabilities, as illustrated in the matter of School *Board of Nassau County v. Arline*, 480 U.S. 273 (1987), which recognizes the necessity of prompt judicial intervention to prevent ongoing discrimination.

5.     Considering the Defendants' actions, which may also constitute violations of Tennessee's statutes governing computer-related crimes (T.C.A. § 39-14-602) and intentional infliction of emotional distress as understood in the landmark case *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48 (Tenn. 2004), the Plaintiff's need for an immediate remedy cannot be understated.

6.     The Plaintiff asserts that the expeditious resolution of his Motion for Injunctive Relief is critical to prevent further prejudice and harm to his legal rights and interests.

7.     In submitting this motion, the Plaintiff seeks to highlight the grave implications of the Defendants' actions which have precipitated a perilous threat to the Plaintiff's personal safety and well-being. Such actions include, but are not limited to, a direct threat and intimidation to conceivable use of force by the Vanderbilt Police Department against the Plaintiff, an established patient, should he desire to seek necessary medical care at the Vanderbilt University Medical Center. This foreboding of force utilization constitutes a profound breach of the Plaintiff's right to receive medical care without fear of endangerment or intimidation, as guaranteed under T.C.A. § 29-34-201, concerning the protection of individuals seeking healthcare services.

2

COPY

8.   Further exacerbating this threat, the Defendants have instigated and perpetuated an
erroneous public narrative and community apprehension about the Plaintiff. This narrative has
been propagated through electronic and verbal communication channels utilized by faculty and
students, in which the Plaintiff is inaccurately depicted as a threat. Such false and defamatory
statements not only damage the Plaintiff's reputation but also violate T.C.A. § 39-17-308, which
pertains to the unlawful communication of false or misleading information intended to frighten
the public about an individual.

9.   Moreover, the defendants previous and continued encouragement of unwarranted
reporting of the Plaintiff's presence to the Vanderbilt University Police Department by members
of the university community infringes upon the Plaintiff's statutory rights under T.C.A. § 39-16-
502, which delineates the offense of making false statements, particularly in a manner that incites
law enforcement to act upon misinformation which could jeopardize the plaintiffs health and
safety in attempting to seek needed health care provisions, and further has falsely limited the
plaintiff in his pursuit of professional education and decremented his future success and career
prospects and reputation.

10.  Therefore, the immediate and irreparable nature of the harm being sustained by the
Plaintiff, due to the Defendants' injurious and illicit actions, necessitates this Honorable Court's
expeditious consideration and granting of the Motion for Injunctive Relief. It is imperative that
such relief is provided to prevent further harm to the Plaintiff's life, health, and reputation, and to
restore his rights under the laws of the State of Tennessee.

11.  Due to the Defendants' actions causing immediate and irreparable harm to the Plaintiff, as
evidenced by their documented tendency to engage in deceitful conduct, this Honorable Court's

3

Case 3:24-cv-00440   Document 1-4   Filed 04/10/24   Page 421 of 431 PageID #: 680

prompt consideration of the Plaintiff's Motion for Injunctive Relief, pursuant to TCA § 29-3-101 et seq., specifically § 29-3-104 regarding temporary injunctions, is critically needed.

12.     The exigencies of this case, as delineated under Local Rule 26.07- Special Setting of Motions, substantiate the request for an emergency hearing to prevent further harm to the Plaintiff's life, health, reputation, and professional prospects. Immediate court intervention is therefore sought to protect the Plaintiff's rights and interests as safeguarded by the laws of the State of Tennessee." The Plaintiff's plea for injunctive relief is founded upon the principles of justice and equity as established in the legal frameworks of both the United States government and the State of Tennessee.

13.     This request aims to avert further harm—in forms not endured by the Defendants—and to guarantee the comprehensive respect and protection of the Plaintiff's rights. It is imperative that this Court affirm the Plaintiff's rights as delineated by the laws of the United States of America and the State of Tennessee. The Plaintiff also implores this Court to extend any additional relief deemed just and proper, considering the circumstances presented.

14.     The Plaintiff underscores the critical urgency of this matter, highlighting that any delay in convening a hearing exacerbates the ongoing harm to their health and compounds the professional injuries already inflicted. These adversities have taken a significant toll on the Plaintiff, manifesting in both physical and mental distress, as well as undermining their professional and financial stability. The cumulative impact of these injuries, without timely intervention from this Court, threatens irreparable damage to the Plaintiff's future prospects and well-being. Therefore, the Plaintiff stresses the necessity of this Court's immediate action to prevent further detriment and to begin rectifying the extensive harm already endured.

4

COPY

15. WHEREFORE, the Plaintiff respectfully requests that this Honorable Court urgently schedule an expedited hearing on the Plaintiff's Motion for Injunctive Relief at the soonest available opportunity. The Plaintiff urgently seeks the Court's intervention to halt ongoing and irreparable harm to their health and safety, encompassing both physical and mental well-being, and to prevent further unfounded and intentional damage by the Defendants that threatens to cause permanent professional, educational, and financial detriment to the Plaintiff's future. Additionally, the Plaintiff calls upon the Court to provide immediate protection under pertinent Tennessee statutes addressing privacy, injunctions, and the conduct of public officials and entities, to safeguard against such injurious actions.

Respectfully Submitted,

IAN H. LUCAS

Dated: April 1, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

5

COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April 2024, a true and correct copy of the foregoing Motion to Set an Expedited Hearing on Motion for Injunctive Relief was furnished to all defendants and their attorneys via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents: I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Respectfully Submitted.

Ian Lucas

IAN H. LUCAS

Dated: April 1, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

6

**IN THE CIRCUIT COURT
FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE**

)
)
)
**IAN LUCAS, Pro *Se***            )   **DOCKET NO. 24C655**
       *Plaintiff*           )
            v.              )
)
**Michelle Tellock et al.**       )
       *Defendants*       )
)
)
)   **MOTION TO SET AN**
)   **EXPEDITED HEARING ON**
)   **MOTION FOR INJUNCTIVE**
)   **RELIEF**
)
)

### MOTION TO SET AN EXPEDITED HEARING ON
### MOTION FOR INJUNCTIVE RELIEF

The Plaintiff, Ian Hunter Lucas, proceeding pro se, respectfully moves this Honorable Court to set an expedited hearing on Plaintiff's Motion for Injunctive Relief and in support thereof respectfully shows the Court the following:

1.    The Plaintiff has filed a substantive Motion for Injunctive Relief that requires urgent adjudication due to ongoing irreparable harm being suffered by the Plaintiff, as more fully described in the accompanying Complaint and Motion for Injunctive Relief.

2.    Plaintiff respectfully submits that due to the nature of the irreparable harm, which includes, but is not limited to, the violation of his rights under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794), an expedited hearing is necessary.

1

3.     The harm being suffered by the Plaintiff includes discrimination and retaliation in violation of the Tennessee Human Rights Act (T.C.A. § 4-21-101 et seq.), as well as significant emotional distress and damage to the Plaintiff's educational trajectory and professional reputation.

4.     The urgency of the hearing is further compelled by the need to uphold the statutes designed to protect the rights of individuals with disabilities, as illustrated in the matter of School *Board of Nassau County v. Arline*, 480 U.S. 273 (1987), which recognizes the necessity of prompt judicial intervention to prevent ongoing discrimination.

5.     Considering the Defendants' actions, which may also constitute violations of Tennessee's statutes governing computer-related crimes (T.C.A. § 39-14-602) and intentional infliction of emotional distress as understood in the landmark case *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48 (Tenn. 2004), the Plaintiff's need for an immediate remedy cannot be understated.

6.     The Plaintiff asserts that the expeditious resolution of his Motion for Injunctive Relief is critical to prevent further prejudice and harm to his legal rights and interests.

7.     In submitting this motion, the Plaintiff seeks to highlight the grave implications of the Defendants' actions which have precipitated a perilous threat to the Plaintiff's personal safety and well-being. Such actions include, but are not limited to, a direct threat and intimidation to conceivable use of force by the Vanderbilt Police Department against the Plaintiff, an established patient, should he desire to seek necessary medical care at the Vanderbilt University Medical Center. This foreboding of force utilization constitutes a profound breach of the Plaintiff's right to receive medical care without fear of endangerment or intimidation, as guaranteed under T.C.A. § 29-34-201, concerning the protection of individuals seeking healthcare services.

2

8.      Further exacerbating this threat, the Defendants have instigated and perpetuated an erroneous public narrative and community apprehension about the Plaintiff. This narrative has been propagated through electronic and verbal communication channels utilized by faculty and students, in which the Plaintiff is inaccurately depicted as a threat. Such false and defamatory statements not only damage the Plaintiff's reputation but also violate T.C.A. § 39-17-308, which pertains to the unlawful communication of false or misleading information intended to frighten the public about an individual.

9.      Moreover, the defendants previous and continued encouragement of unwarranted reporting of the Plaintiff's presence to the Vanderbilt University Police Department by members of the university community infringes upon the Plaintiff's statutory rights under T.C.A. § 39-16-502, which delineates the offense of making false statements, particularly in a manner that incites law enforcement to act upon misinformation which could jeopardize the plaintiffs health and safety in attempting to seek needed health care provisions, and further has falsely limited the plaintiff in his pursuit of professional education and decremented his future success and career prospects and reputation.

10.     Therefore, the immediate and irreparable nature of the harm being sustained by the Plaintiff, due to the Defendants' injurious and illicit actions, necessitates this Honorable Court's expeditious consideration and granting of the Motion for Injunctive Relief. It is imperative that such relief is provided to prevent further harm to the Plaintiff's life, health, and reputation, and to restore his rights under the laws of the State of Tennessee.

11.     Due to the Defendants' actions causing immediate and irreparable harm to the Plaintiff, as evidenced by their documented tendency to engage in deceitful conduct, this Honorable Court's

3

prompt consideration of the Plaintiff's Motion for Injunctive Relief, pursuant to TCA § 29-3-101 et seq., specifically § 29-3-104 regarding temporary injunctions, is critically needed.

12.     The exigencies of this case, as delineated under Local Rule 26.07- Special Setting of Motions, substantiate the request for an emergency hearing to prevent further harm to the Plaintiff's life, health, reputation, and professional prospects. Immediate court intervention is therefore sought to protect the Plaintiff's rights and interests as safeguarded by the laws of the State of Tennessee." The Plaintiff's plea for injunctive relief is founded upon the principles of justice and equity as established in the legal frameworks of both the United States government and the State of Tennessee.

13.     This request aims to avert further harm—in forms not endured by the Defendants—and to guarantee the comprehensive respect and protection of the Plaintiff's rights. It is imperative that this Court affirm the Plaintiff's rights as delineated by the laws of the United States of America and the State of Tennessee. The Plaintiff also implores this Court to extend any additional relief deemed just and proper, considering the circumstances presented.

14.     The Plaintiff underscores the critical urgency of this matter, highlighting that any delay in convening a hearing exacerbates the ongoing harm to their health and compounds the professional injuries already inflicted. These adversities have taken a significant toll on the Plaintiff, manifesting in both physical and mental distress, as well as undermining their professional and financial stability. The cumulative impact of these injuries, without timely intervention from this Court, threatens irreparable damage to the Plaintiff's future prospects and well-being. Therefore, the Plaintiff stresses the necessity of this Court's immediate action to prevent further detriment and to begin rectifying the extensive harm already endured.

4

15.     WHEREFORE, the Plaintiff respectfully requests that this Honorable Court urgently

schedule an expedited hearing on the Plaintiff's Motion for Injunctive Relief at the soonest

available opportunity. The Plaintiff urgently seeks the Court's intervention to halt ongoing and

irreparable harm to their health and safety, encompassing both physical and mental well-being,

and to prevent further unfounded and intentional damage by the Defendants that threatens to

cause permanent professional, educational, and financial detriment to the Plaintiff's future.

Additionally, the Plaintiff calls upon the Court to provide immediate protection under pertinent

Tennessee statutes addressing privacy, injunctions, and the conduct of public officials and

entities, to safeguard against such injurious actions.

<div style="text-align: right;">

Respectfully Submitted,

IAN H. LUCAS

</div>

Dated: April 1, 2024

<div style="text-align: right;">

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April 2024, a true and correct copy of the foregoing Motion to Set an Expedited Hearing on Motion for Injunctive Relief was furnished to all defendants and their attorneys via email, which is permissible under TCA §20-1-119(c) concerning electronic service of documents: I affirm that the method of service used herein is consistent with the provisions of the Tennessee Rules of Civil Procedure for service upon an attorney in a civil case.

Respectfully Submitted,

*Ian Lucas*

IAN H. LUCAS

Dated: April 1, 2024

Plaintiff Pro Se
221 Charleston Avenue
Pleasant View, TN, 37126
(910) 872-3577 (telephone)
lucasianhunter@outlook.com

6

## Request for information about concerning statements

 **Newsom, Joel D**
To You

10:37
...

☺

Good morning, Ms. Gamez.

VUPD received two different anonymous complaints this morning about some concerning statements allegedly made by Ian Lucas. In both complaints, you were listed as a witness. Can you call me back so we can talk about what was said? My phone number is listed below.

Thank you,
**Detective Joel D. Newsom**
Lieutenant – Criminal Investigations Unit
Vanderbilt University Police Department
111 28th Avenue South Nashville, TN 37212
Email: joel.d.newsom@vanderbilt.edu
Phone: (615) 588-8085