UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IAN LUCAS, Pro Se | |
| Plaintiff(s), | Case No. 3:24-cv-00440 |
| v. | Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| MARY ANN JESSEE et al, | |
| Defendant(s). | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Ian Hunter Lucas, respectfully submits this Memorandum of Law in support of his

Motion for Preliminary Injunction against Defendants Mary Ann Jessee et al. This motion seeks

immediate judicial intervention to halt ongoing and irreparable harm to Plaintiff due to Defendants'

actions, which are alleged to include whistleblower retaliation, witness intimidation, harassment,

defamation, libel, slander, and discrimination. These actions purportedly violate federal whistleblower

protection statutes, including the False Claims Act (31 U.S.C. §§ 3729-3733), as well as applicable state

whistleblower laws and disability discrimination statutes.

## I. INTRODUCTION

Plaintiff initiates this action by presenting evidence that he was improperly expelled and

dismissed from Vanderbilt University due to intentional harm by Defendants, who are agents, employees,

and act on behalf of Vanderbilt University as faculty, staff, and administrators. Through this motion,

Plaintiff outlines a series of alleged wrongful acts by Defendants in response to his protected activities as

a whistleblower under the False Claims Act, as well as his status as an individual with recognized

disabilities.

Plaintiff asserts that his academic dismissal from the Vanderbilt University School of Nursing

and subsequent expulsion from Vanderbilt University were actions taken in conjunction with his wrongful

termination from employment at Air Evac Lifeteam Inc. These actions, Plaintiff contends, are part of a

broader pattern of retaliatory, discriminatory, and baseless behavior. The detailed account within the Motion delineates a sequence of events indicating alleged complicity and collaborative efforts among the Defendants, leading to significant damage to Plaintiff's educational career, employment, reputation, and personal well-being. Plaintiff convincingly demonstrates a pressing need for this Court's intervention through its equitable powers to prevent further harm.

Furthermore, Plaintiff asserts that the Defendants, in collusion and association with Plaintiff's former employer, engaged in retaliatory acts as a third party, including a conspiracy to retaliate against Plaintiff. During Plaintiff's tenure as a student, it is also alleged that Defendants committed multiple independent violations of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) against Plaintiff and then when Plaintiff sought assistance and reported such acts to campus officials, campus authorities then acted against Plaintiff in an effort to 'cover up' what was found to be 'systemic disability accommodation. Discrimination' occurring at the Vanderbilt School of Nursing and of which a culture of fear had been created among the student body of speaking out or reporting faculty for such discrimination as exampled by the treatment and outcomes of Plaintiff in this case,

This request for a preliminary injunction is founded on allegations of serious and continuing violations under the False Claims Act's anti-retaliation provisions (31 U.S.C. § 3730(h)), which protect whistleblowers who lawfully report fraud against the federal government. The urgency and severity of the alleged harms necessitate the Court's immediate and decisive action to protect Plaintiff's legal rights and personal well-being.

## II. LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

A court may grant preliminary injunctive relief when the movant establishes: (1) a likelihood of success on the merits; (2) that he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). In the Sixth Circuit, the four considerations applicable to preliminary injunctions are factors to be balanced, not prerequisites that must be met. *Jones v. City of*

*Monroe*, 341 F.3d 474, 476 (6th Cir. 2003). Nevertheless, a failure to show a likelihood of success or irreparable harm can be fatal to a preliminary injunction motion. *McPherson v. Michigan High Sch. Athletic Assn, Inc*., 119 F.3d 453, 459 (6th Cir. 1997). In support of the motion for a preliminary injunction, the case of *Halifax Hospital Medical Center v. United States,* 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In *Halifax*, the court granted a preliminary injunction in favor of the plaintiff, recognizing the substantial likelihood of irreparable harm without such intervention, notably in cases involving whistleblower retaliation and the potential violation of federal statutes. This precedent underscores the necessity of safeguarding whistleblowers from retaliatory measures that would otherwise stifle critical disclosures in the public interest.

Plaintiff herein focuses on the likelihood of success on the merits and the public interest criteria, without prejudice to the two remaining factors, which are extensively addressed in the accompanying declarations and evidence submitted herewith.

## III. ARGUMENT

Plaintiff is Likely to Succeed on the Merits: The Plaintiff has a strong likelihood of success on the merits of his claims for whistleblower retaliation and disability discrimination. The evidence, including the timing of the donation from Air Evac Lifeteam Inc. and the coordinated actions of Defendants, strongly suggests a deliberate effort to retaliate against the Plaintiff. Federal and state whistleblower protection laws, as well as disability discrimination statutes, provide a solid legal basis for the Plaintiff's claims.

Plaintiff Meets the Criteria for Whistleblower Protection:

The Whistleblower Protection Act and the False Claims Act's anti-retaliation provisions confer robust rights upon employees to report abuse and misuse of government funds without facing retribution from their employers, to include third parties such as the defendants acting as agents of Vanderbilt University. In accordance with these statutes, Plaintiff must show engagement in protected activity, employer knowledge of this activity, a reprisal or adverse employment decision, and a causal connection between the protected conduct and the reprisal. The Plaintiff has provided substantial evidence

3

demonstrating a coordinated effort by Defendants to retaliate against him for his whistleblower activities and for raising concerns about disability discrimination. This includes a $1.25 million donation from Air Evac Lifeteam Inc. to Vanderbilt University, purportedly as a bribe for facilitating the Plaintiff's wrongful academic dismissal and expulsion, closely following his whistleblower activities. The Plaintiff's dismissal and the subsequent retaliatory actions have caused significant harm to his academic progress, career opportunities, emotional health, and reputation.

In this case, Plaintiff notified federal authorities of potential violations of both the Tennessee and Federal False Claims Acts, unequivocally constituting protected whistleblower activity. Defendant's knowledge of Plaintiff's disclosures and the adverse employment actions that ensued, which included [describe specific retaliatory measures taken by Defendant, satisfies the requirement of establishing employer awareness and suffering a reprisal. The direct causal link is manifest in the immediacy and severity of the retaliatory measures, strongly paralleling the facts and findings in Lachance v. White, where the court vindicated the whistleblower's rights, establishing a prima facie nexus between the protected conduct and the retaliation. Thus, the Plaintiff has demonstrated a persuasive likelihood of success on the merits regarding the whistleblower claims.

The concept of vicarious liability in the context of Vanderbilt University's potential liability: Vicarious Liability Framework: Vicarious liability typically applies in situations where an entity can be held responsible for the actions of another party, usually in an employer-employee relationship. In this case, for Vanderbilt to be held vicariously liable for whistleblower retaliation, it would need to be established that Vanderbilt had a significant control over the employment conditions of Plaintiff, or that there was a relationship akin to employer-employee between Vanderbilt and Plaintiff. Seeing as Plaintiff had signed a contract with Vanderbilt University Medical Center to be employed as a Nurse Resident upon completion of the Master of Nursing Program, and additionally had accepted funds in the amount of $22,500.00 for this position in which the position was contingent upon remaining enrolled and completing the program, such vicariously liability existed for the defendants in control of the Plaintiffs future employment which was arranged by the Defendants.

4

Evidence of Coordination and Control: The evidence suggesting coordination between Defendants as agents of Vanderbilt University and Air Evac Lifeteam Inc., including the timing of the donation closely following Lucas's whistleblower activities and the alignment of reasons for Lucas's expulsion and termination, are indicative of Vanderbilt's involvement in the retaliatory actions against Lucas. This coordination demonstrates Vanderbilt's control and influence over the conditions leading to Plaintiffs dismissal, which is a critical element in establishing vicarious liability.

The evidence presented by Plaintiff to demonstrate collusion between Air Evac Lifeteam Inc. and Defendants as agents of Vanderbilt University is multifaceted and includes a series of events and communications that suggest a coordinated effort to retaliate against him for his protected activities whistleblower activities and disability discrimination complaints. The key points of evidence are: 1.

Coordinated Sequence of Events: On December 4th, 2023, Lucas received a notice of temporary suspension from Vanderbilt University, which was closely followed within the same hour by a notice from Air Evac Lifeteam Inc. placing him on administrative paid leave. This synchronicity points to a deliberate and collaborative effort to retaliate against Lucas.

Exchange of Falsified Information: There was an orchestrated exchange of falsified and fabricated information between Michelle Tellock of Vanderbilt University and Timothy K. Garrett of Air Evac Lifeteam Inc., aimed at furthering harm against plaintiff on and beyond December 4, 2023. This exchange supports the claim of a collaborative effort to retaliate against Lucas.

Allegations of Concerted Retaliation: Lucas's allegations of concerted retaliation by the Defendants are aligned with the documented objectives of both Air Evac Lifeteam Inc. and Defendants as agents of Vanderbilt University to penalize him for protected whistleblower activities and disability discrimination complaints, providing a basis for the issuance of a preliminary injunction.

Lack of Procedural Fairness and Due Process: The precipitous move to academically dismiss Lucas without due process, coupled with the timing and alignment of actions by Defendants as agents of

Vanderbilt and Air Evac, suggests a concerted effort to penalize Lucas, sidestepping protections afforded under whistleblower protection laws and disability rights statutes.

The academic grade decision by Defendant Schorn demonstrates that Plaintiff did not violate HIPAA and furthermore shows that Lucas was wrongfully academically dismissed through several key points:

No HIPAA Violation: The Vanderbilt University Medical Center Privacy Office, designated as the authoritative entity on HIPAA matters within the Vanderbilt University School of Nursing Handbook, clarified that no privacy breach occurred in Lucas's case. This negation of a HIPAA violation was based on the accusation of "accessing patient charts remotely," which was initially alleged as a HIPAA violation. Despite this determination, the academic grade appeal evaluation by Defendants Jessee and Schorn deviated from the initial accusation, shifting the rationale to a violation of School of Nursing policies, unrelated to HIPAA.

Shift in Accusation: After the HIPAA violation claim was negated, Defendants Jessee and Schorn contended that Lucas violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes." This shift in rationale, despite the Vanderbilt University Medical Center Privacy Office's directive affirming the absence of a breach, illustrates a capricious application of institutional policy against Lucas, contravening his due process rights.

Legal and Policy Framework: Plaintiffs engagement in accessing patient charts for educational purposes is situated well within the boundaries delineated by HIPAA for healthcare operations, as supported by the principles discussed in *Northwest Memorial Hospital v. Ashcroft*. This legal framework supports the argument that accessing patient information for educational purposes aligns with HIPAA's provisions for healthcare operations, including the training of healthcare professionals and the enhancement of educational programs within healthcare settings.

Wrongful Academic Dismissal: The arbitrary and retrospective grade changes, predicated on disproven allegations and a subsequent shifting of rationale, violate Lucas's rights to procedural due

process and equitable treatment under established federal and state educational privacy laws. This wrongful application of policy and deviation from established privacy determinations contributed to Lucas's wrongful academic dismissal.

U.S. Department of Health and Human Services Determination: On appeal of Defendant Schorn's decision, Plaintiff referred the matter to the U.S. Department of Health and Human Services, the definitive investigative authority on matters of violations and breaches of HIPAA, who found no breach in privacy under HIPAA. This finding further substantiates Plaintiffs position that no HIPAA violation occurred, and the academic dismissal based on such allegations was wrongful. These points collectively demonstrate that Plaintiff did not violate HIPAA as initially alleged and that the academic dismissal, predicated on shifting and unfounded rationales, was wrongful. The appeal decision and subsequent findings by authoritative entities underscore the lack of basis for the academic penalties imposed on Plaintiff, highlighting the need for rectification of his academic standing and due process rights.

After the negation of the HIPAA violation claim, Lucas was alleged to have violated specific School of Nursing policies as follows:

Accessing the Chart for Educational Purposes: It was contended that Lucas violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes." This rationale was articulated by Defendant Schorn in her decision regarding Lucas's grade appeal, indicating a deviation from the initial accusation related to HIPAA and shifting the focus to a violation of internal School of Nursing policies.

Pattern of Conduct and Professional Conduct Requirements: The severity of action toward Plaintiff by Defendants Jessee, Schorn, and Jefferies was justified by their allegations of Plaintiffs alleged pattern of conduct rather than a single inadvertent policy violation. This included continuous accessing of records outside of the clinical setting and an ongoing lack of professional conduct consistent with course requirements, the ANA Code of Ethics, and the clinical setting's training module. This rationale suggests

that Plaintiff actions were seen as part of a broader pattern of behavior that violated the expectations set forth by the School of Nursing.

Violation of a Learning Contract: Plaintiffs actions were also interpreted as a violation of a "learning contract", which Plaintiff had previously received for "accessing records outside of the clinical setting." Despite Lucas's assertion that the learning contract was under a different context and that his engagement with the Electronic Health Record (EHR) at Shade Tree in his capacity was necessary for his role, the language of the learning contract was deemed to have been breached. This interpretation contributed to the rationale for his academic dismissal.

Educational Requirements and HIPAA Compliance: Despite Lucas's argument that educational requirements are considered services to patients under HIPAA as healthcare operations, and that students may access the EHR of a patient in their care for educational purposes, the School of Nursing's application of its policies led to the conclusion that Lucas's actions were in violation of the expected professional conduct and privacy standards. These allegations indicate a shift from a specific legal violation (HIPAA) to broader concerns about adherence to School of Nursing policies, professional conduct, and the terms of a learning contract.

Plaintiff defended himself against the allegations of violating the School of Nursing policies by presenting several arguments and pieces of evidence:

Clarification of No HIPAA Violation: Plaintiff highlighted that the Vanderbilt University Medical Center Privacy Office, the quoted and recognized authoritative entity on HIPAA matters within the School of Nursing as per the administration of the School of Nursing, clarified that no privacy breach occurred, negating any violation of HIPAA. This was in response to the initial allegations of "accessing patient charts remotely" in its entirety and thus why all School of Nursing Students and School of Medicine students can access charts remotely, this was not a special privilege that was specific to the Plaintiff. Dr. Schorn's statements regarding Lucas's alleged violations of School of Nursing policies and

HIPAA regulations present contradictions that ultimately undermine the basis for the alleged violations, rendering them void. These contradictions are evident in the following ways:

Shift in Accusation: Initially, Lucas was accused of a HIPAA violation for "accessing patient charts remotely." However, after the Vanderbilt University Medical Center (VUMC) Privacy Office determined that no privacy breach occurred, Dr. Schorn and Defendant Jessee shifted the rationale to allege that Lucas violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes." This shift, despite the VUMC Privacy Office's directive affirming the absence of a breach, illustrates a capricious application of institutional policy against Lucas, contravening his due process rights.

Acknowledgment of Compliance with HIPAA's 'Minimum Necessary' Rule: Defendants Jessee and Schorn acknowledged Lucas's adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule. This acknowledgment further substantiates the claim that Lucas's activities were both legally compliant and integral to their educational advancement in a clinical setting. The 'minimum necessary' rule is designed to ensure that only the essential amount of Protected Health Information (PHI) needed for a specific purpose is accessed, underscoring the legality and necessity of Lucas's access to patient information as part of his clinical education.

Confirmation of Policy Alignment with VUMC Regulations: In her decision letter, Dr. Schorn confirmed that, per the Vanderbilt School of Nursing privacy policy, the VUMC Compliance and Privacy Office maintains the primary guiding principle and authority over the Vanderbilt School of Nursing privacy policy and is the autorotative resource. Schorn stated that "Accessing records to participate in or document care away from the clinical setting aligns with VUMC regulations, meets the VUMC requirements, and does not violate HIPAA." This statement directly contradicts the later allegations of policy violations, as it affirms that Lucas's actions were in alignment with VUMC regulations and did not constitute a HIPAA violation. These contradictions in Dr. Schorn's statements and the subsequent actions taken against Lucas highlight a procedural flaw in the application of institutional policies and HIPAA

regulations. The initial determination by the VUMC Privacy Office that no HIPAA violation occurred, coupled with the acknowledgment of Lucas's compliance with the 'minimum necessary' rule and the confirmation that his actions aligned with VUMC regulations, invalidate the basis for the alleged violations of School of Nursing policies. Consequently, these contradictions render the allegations against Plaintiff void, challenging the justification for his academic dismissal.

Dispute of Retrospective Grade Alterations: He disputed the retrospective grade alterations made by Defendant Jessee, which were grounded on the unfounded accusations that had been negated by the Privacy Office, additionally Defendant Jessee retrospectively changed Plaintiffs grades in two courses when her findings and facts of contention were limited to one, thus showing Defendant Jessee purposeful intent to find cause to dismiss Plaintiff by failing Plaintiff in a course without cause in order for Plaintiff to meet the School of Nursing standard for Dismissal of having failed two courses. Additionally, Defendant Jesses made claims that Plaintiff accessed the patients charts offsite on 10/17/2023 and 11/01/2023 however this would have been impossible for Plaintiff as Plaintiff car and laptop was stolen on 10/13/2023 from the Wesley Place Garage in which a police report with both the Vanderbilt University Police Department and Metro Nashville Police Department were filed, therefore the Plaintiff was relegated to using on campus/in the hospital computers. Additionally, the dates of 10/17/2023 and 11/01/2023 are only associated with the course of NURS5815 and not NURS5825, therefore Defendants had no grounds for the course change of NURS5825, and upon review of the Plaintiffs records there is no course change record request found for NURS5825 in the office of the registrar record.

1. Engagement in Educational Activities: Plaintiff affirmed that his engagement in accessing patient charts for educational purposes was well within the boundaries delineated by HIPAA for healthcare operations, as supported by the principles discussed in *Northwest Memorial Hospital v. Ashcroft*. He also noted that Defendants Jessee and Schorn acknowledged his adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule.

2. Context of Prior Learning Contract: Plaintiff contended that the prior learning contract referenced by Defendant Jessee was null and void due to Plaintiff being removed from that course due to discrimination being found by the EOA office and an informal resolution being determined to be for Plaintiff to be removed and assigned to a different course. Additionally, testimony that was obtained by EOA demonstrates that students witnessed the defendant Jill Harris aske the defendant to look up the patient information regarding the "learning contract" being referenced. Additionally, learning contracts, are course specific and do no carry continuity between courses or throughout the students' academic career in the program, in fact the term learning contract is not found in the School of Nursing Student Handbook or in the Vanderbilt University Handbook. Thus, additional as mentioned Plaintiff's access to the EHR was only ever associated with engagement with the Electronic Health Record (EHR) at Shade Tree Clinic in his capacity as the Director of Nursing Student Engagement was necessary for his role in working as the clinic Sub-Director during clinic operating hours. He argued that the learning contract was not facilitated in good faith or within appropriate terms.

3. Explanation of Clinical Performance: Plaintiff affirmed his clinical performance and proficiency as not warranting failing grades and asserted that the failing grades were disproportionate to the situation, and that the actual clinical faculty of the course had assessed and graded Lucas performance had passed the Plaintiff in the courses, and had never raised any complaints, furthermore the plaintiffs' grades had already been posted for several weeks and were on the Plaintiffs transcripts. Lucas also raised concerns about the credibility and reliability what was reported as "anonymous tips" that led to the allegations, which was from the same person under investigation for his EOA complaint of retaliation. However, it has since been determined there was no such anonymous tip, this was just a cover story to give cause to Defendant Jessee's reason to initiate the change in grades and dismissal, no anonymous tip has ever been produced or provided.

4. Educational Requirements and HIPAA Compliance: Plaintiff further explained that educational requirements are considered services to patients under HIPAA as healthcare operations. Additionally, the defendant Schorn written appeal decision and written argument demonstrating a shift in inconsistency in defendant's storyline is that Plaintiff did not violate HIPPA but violated school policy by accessing the patient charts for educational reason and not documentation reasons is mute, as anything done in the capacity as a student is for educational reasons.

5. Rebuttal of Retaliation Claims: He rebutted the claim of retaliation, stating that his approved accommodations did not excuse ignorance of, or noncompliance with, any school policies or course requirements. Lucas emphasized that he never claimed his accommodations in his appeal or sought an appeal based on his disability accommodations, thus this was another jab and discriminatory insult taken by defendants at Plaintiff, as Plaintiff confirmed with the Office of Student Access that such information requested by a any faculty member or outside member would require the student to sign a release of information, which the plantiff had not provided, thus information in such a manner would never be released or fulfilled in such a request as falsely noted by the defendant.

Through these points, Lucas sought to demonstrate that the actions taken against him were not justified by the defendants as agents of the Vanderbilt School of Nursing whom were asserting policies that were nonexistent and of which defendants were not willing to show plaintiff the actual accusations of such complaints or allegations being made, and thus with this Plaintiff asserted that his academic dismissal was wrongful. The School of Nursing alleged that Lucas violated policies by "accessing the chart for educational purposes and not documentation purposes." Additionally, Dr. Schorn noted "that the severity of action taken upon [Plaintiff] was resulted from an alleged pattern of conduct and not a single mistake or inadvertent policy violation." However Lucas affirmed and questioned that all actions performed by a student in the setting of academics are for an educational purpose to which there was no response or rebuttal.

<u>Wrongful and unjustified expulsion from Vanderbilt University:</u>

1.  *Ex-Partee* Communication and FERPA Violations: Defendant Jeremy Bourgoin reaching out to leadership and other members of the Nashville Fire Department in discussing Lucas's employment involvement at Nashville Fire Department and disclosing Plaintiffs educational disciplinary expulsion process underway to Nashville Fire Department Leadership and other staff was without question a violation of FERP based on Bourgoin not having obtained Plaintiff's consent does constitute a FERPA violation because FERPA protects the privacy of student education records and restricts their disclosure without consent. The information shared by Bourgoin was part of Lucas's educational record and was disclosed to a third party without Lucas's consent, this is a breach of FERPA's provisions. Educational records can include a broad range of information, however very specifically mentioned under FERPA are a student's disciplinary records which are considered part of a student's education record under FERPA. The fact that this information was provided to outside sources without Plaintiffs consent and knowledge, especially to a former employer, and an employer that Plaintiff was seeking reemployment with, that Bourgoin through falsification of information and fabrication, defamation, and libel slander caused harm to Plaintiff and professional reputation damage and loss, as indicated in the references, further it indicated that the information was used in a way that affected Plaintiff standing as part of further retaliation and collusion to do harm by Defendants as agents of Vanderbilt University had upheld as part of there agreement for receiving the donation funds from Plaintiffs former employer due to the large amount of private equity donation funds that were promised in exchange.

2.  The use of such information without consent for disciplinary purposes could nonetheless is as a violation of Plaintiff's rights under FERPA, which aims to ensure the confidentiality of student records and the right of students to have control over the disclosure of their information A university official discussing a student's disciplinary process with a current or

former employer is a violation of the Family Educational Rights and Privacy Act (FERPA), as outlined in 20 U.S.C. § 1232g. FERPA is designed to protect the privacy of student education records and restricts their disclosure without consent. The act specifically safeguards students' rights by limiting the unauthorized dissemination of their educational records and information, which includes disciplinary actions taken against a student. In the context provided, Defendant Bourgoin as a university official disclosed information about Plaintiffs disciplinary process to a Plaintiffs employer without the Plaintiffs explicit consent, constitutes a violation of FERPA. This is because this disclosure by the defendant involved the sharing of private educational information with a third party not entitled to access it under the law, without the requisite permission from the Plaintiff student. FERPA violations can have significant implications for both the student and the institution. For the student, unauthorized disclosure of disciplinary actions could negatively impact their reputation, employment opportunities, and future academic pursuits as in this case of the Plaintiff. For the institution, violating FERPA can lead to a loss of federal funding and legal challenges, among other consequences. Therefore, the act of a university official discussing the Plaintiffs disciplinary process with a former employer, as described, is indeed seen as a violation of FERPA, given that it involves the unauthorized sharing of protected educational records.

3. Third-party Retaliation Claims: There is precedent for third-party retaliation claims which apply to the Defendants and their relation as agents Vanderbilt University, as a third party, and being found to have participated in retaliatory actions against Plaintiff, as a whistleblower. Defendant Tellock of Vanderbilt had knowledge of Plaintiffs whistleblower disclosure under the False Claims Act after exchanging information with counsel retained by Air Evac Lifeteam Defendant Tim Garrett and both defendants took affirmative steps to exchange information on Plaintiff to aide in each other's efforts to participate in the retaliation as noted in a reported by the Board of Professional Responsibility which noted that

while information exchange between Tellock and Garrett occurred would not be a conflict of interest or violation in the eyes of the Board of Professional Responsibility due to neither Tellock or Garrett being retained by Plaintiff for representation.

4. Conspiracy to Aiding and Abetting Claims: Additionally, Vanderbilt University by and thru the acts of the Defendants as its agents can be held accountable as evidence shows that they conspired with and aided and abetted with Air Evac Lifeteam Inc, a Global Medical Response Company owned by KKR & Co of which made the contributions in question to Vanderbilt University in retaliating against Plaintiff. The Defendants, acting on behalf of Vanderbilt University, are implicated in retaliatory acts against the Plaintiff for his whistleblowing activities and his role as a federal witness, potentially violating 18 U.S. Code §§ 1512 and 1513 due to the extreme and disrespectful treatment of the Plaintiff. The Defendants' conduct during these events was devoid of any consideration for the Plaintiff's dignity and rights.

Title IX

Even when the Plaintiff disclosed a quid pro quo Title IX situation to the University — where is educational opportunities or benefits were being improperly conditioned upon the Plaintiff's acceptance or rejection of sexual advances — the Title IX office at Vanderbilt University failed to provide the Plaintiff with the required support. The office offered only generic information on local resources, ignoring the severe implications of a failure to adhere to mandatory reporting obligations under Title IX. Despite Title IX's explicit requirements to treat quid pro quo harassment with the utmost severity, Defendants Fazi and Roy hesitated to permit the Plaintiff to file a formal complaint. It was only after the Plaintiff had pursued legal action that the Defendants issued a notice of allegation, which had previously been directed to Defendant Jessee.

A hostile environment is recognized when discrimination — through intimidation, ridicule, or insult — is so severe that it substantially disrupts the victim's educational experience, creating an abusive setting. This concept, as determined in *Harris v. Forklift Systems, Inc.*, contrasts with the deliberate indifference framework, which requires the harassment to be so significant and obstructive that it bars the

victim's access to educational benefits. Under this framework, isolated incidents are insufficient; the harassment must be pervasive. Notably, in cases of quid pro quo harassment, even a single incident can be significant enough to constitute a violation, as the very nature of quid pro quo implies a substantial impact due to the power dynamics involved.

Second Amendment Violations

Plaintiff was expelled based on his legal right to own a possess a firearm: Part of the December 4th 2023 Welfare Panel meeting which was recorded and transcribed against the Plaintiffs consent, and further the transcription which included sensitive health information was disseminated to unknow amount of individuals which constitutes a HIPPA violation, nonetheless, The allegations surrounding Plaintiff purchase of a firearm and the subsequent use of this fact by Defendants in a disciplinary proceedings at Vanderbilt University raise several legal questions, including potential implications for his Second Amendment rights. The Second Amendment to the U.S. Constitution protects an individual's right to keep and bear arms. The key issues in Lucas's case involve the process by which the information about his firearm purchase was used constituted a violation of his rights under university policies and broader constitutional protections.

Plaintiff Lucas is a valid handgun carry permit in the state of Tennessee under TCA § 39-17-1351 According to TCA § 39-17-1309, a person with a valid handgun carry permit is allowed to keep a firearm or ammunition in their privately-owned vehicle while on school property, provided the firearm or ammunition is stored in a manner that prevents access by individuals other than the permit holder and the vehicle is locked. The firearm must be stored out of plain view, and the vehicle must be locked to ensure security.

This law allows permit holders to have firearms in their cars even while parked in areas generally sensitive to the presence of weapons, such as school parking lots. The plaintiff asserts that he never brought his handgun on to school property and furthermore that even when transporting his handgun his vehicle has a built in safe in the glove compartment that would secure the firearm. Of note when the Plaintiff's vehicle was stolen on 10/13/2023 the vehicle was found and recovered by Metro Nashville

Police department. Once the Plaintiffs vehicle had been located and taken to the impound lot for evidence processing, The Plaintiff consented for Vanderbilt Police to fingerprint and search the Plaintiffs vehicle for evidence in order to help locate the care thief, of note there was no weapon in the vehicle and furthermore the handgun registered to the Plaintiff was not reported stolen as it was not in the car, a testament to the fact the Plaintiff does not bring his handgun to school and furthermore, even if the Plaintiff were have his handgun in his vehicle locked away and, as noted stored out of plain view and with the vehicle locked to ensure security, the Plaintiff would still have been in compliance with under TCA § 39-17-1351 According to TCA § 39-17-1309.

Furthermore, part of the reasoning for expulsion was that during the December 4th 2023 welfare panel[1] interview with Defendant Newsome and Defendant Porter, Defendant Porter a Clinical Psychologist performing an assessment, thus relating back to the reasoning for this being a HIPPA violation, as a recorded medical assessment against the Plaintiffs knowledge and without the Plaintiffs consent asked the plaintiff if "he had access to any firearms" plaintiff responded that he "was in the process of moving so he did not have any immediate access of firearms that his [plaintiffs] firearms were at his parents' house in Clarksville, and he [Plaintiff] was in the process of moving to Pleasant View, so it would depend on how she [defendant porter] defined access. Plaintiff also stated and acknowledged that Defendant Newsome was a law enforcement officer and had run Plaintiffs information in NCIC and knew Plaintiff had a Handgun carry permit and had a handgun registered to Plaintiff name, so Plaintiff did not understand the point of the questions.

In the March 4th Meeting with Defendant Bourgoin, Plaintiff was informed that Defendant Newsome had reported that Plaintiff had provided a "False information" stating that when asked if he [Plaintiff] had access to firearms that [Plaintiff] stated he did not and that when Defendant Newsome obtained Plaintiffs firearm purchase history from the ATF, despite that Defendant Newsome stated during the December 4th 2023 welfare panel meeting which is defined by the Vanderbilt Student handbook as:

A Welfare Panel will be convened by the Vice Provost for Student Affairs and Dean of Students or Designee (Dean), when the Dean, through an individualized assessment, determines that a student (1) is a danger to the health and safety of themselves or others or (2) is otherwise unable to function as a student and (3) the inclusion of treatment recommendations or evaluations may be beneficial to stop the concern and prevent its reoccurrence in addition to outlining behavioral expectations or actions. The Dean may place a student on an interim restriction(s) effective until the Welfare Panel has made a final decision on the Intervention Plan or determined reasons for imposing the interim restriction(s) no longer exist. A Welfare Panel is comprised of individuals who would provide for an individualized assessment of the situation and the student. The composition of the Welfare Panel in any individual case is set by the Dean. The Welfare Panel may consult with the Office of the General Counsel.

Determination: After a Welfare Panel has been convened, the Welfare Panel may make additional requests for information, which can include, but are not limited to, requesting the student be assessed by the UCC or another health provider. Using well-reasoned judgment and considering the individual circumstances, the Welfare Panel will enact an individualized assessment and plan (Intervention Plan) that addresses whether a student (1) may remain enrolled without conditions, (2) may remain enrolled with conditions that are to be described in writing, or (3) should or must take a leave. In deciding about the contents of an Intervention Plan, the Welfare Panel will consider available relevant information. When appropriate, the student may be asked to sign a health records release to authorize direct communication between and among the Welfare Panel and the student's healthcare provider(s). If a student declines to provide requested information and/or authorizations, the Welfare Panel will make their determination after considering the available relevant information.

Notice of and Response to Intervention Plan: When the Welfare Panel has determined the expectations for the Intervention Plan, the Dean will provide prompt notice to the student in

writing and may attempt to meet with the student to outline the Welfare Panel's expectations. If the student agrees to the Intervention Plan, the process is deemed concluded and SCC will monitor compliance. If the student does not comply with expectations, the process may be reopened. If the student disagrees with the Intervention Plan, the student will have three (3) calendar days to propose an alternative plan, which should be supported and endorsed by a licensed medical professional unaffiliated with Vanderbilt University (Note: Vanderbilt University Medical Center providers will be considered unaffiliated for purposes of this policy but should not be faculty within the School of Medicine who currently have or have had a role in evaluating the student's academic assessment or promotion). The student may request an extension in writing within the three-day window for good cause, which the Dean will review to determine if the extension is appropriate.

If the student submits an alternative plan, the Welfare Panel will weigh the additional information before finalizing its Intervention Plan. Greater weight will be given to an alternative plan supported and endorsed by a licensed medical professional unaffiliated with Vanderbilt University (as defined above) with such an understanding of the student's collateral information as to provide an individualized assessment. If no alternative plan is submitted, the original Intervention Plan will be considered agreeable, the process is deemed concluded, and SCC will monitor compliance. The Welfare Panel has final discretion on the Intervention Plan and may, in its discretion, reject all portions of an alternative plan supported and endorsed by a licensed medical professional unaffiliated with Vanderbilt University.

Medical Leaves of Absence as Part of Intervention Plan: If a medical leave of absence (MLOA) is indicated by the Intervention Plan, the student will typically be given the opportunity to take the leave voluntarily. If the student declines to take a voluntary leave, the Welfare Panel, in its discretion, has the authority to place the student on an immediate mandatory leave. When a student takes a voluntary or mandatory MLOA under this policy, the Welfare Panel will

determine any conditions for reinstatement on an individualized basis and communicate this

information to the student in writing in addition to requiring the student to complete the MLOA

return process outlined in this section. If a student begins a voluntary or mandatory MLOA after

an academic semester has begun, the student's registration will be canceled. The student's tuition

will be refunded as provided in the Tuition Refund Schedule. A student on a voluntary

or mandatory leave may register for classes for the semester they anticipate they will return to,

however, registration may be cancelled if return from leave is not approved. MLOAs

are approved by the Welfare Panel through Student Care Coordination. A student's transcript

does not denote a leave of any type (voluntary or mandatory).

Thus per Defendant Newman and Porter if the meeting being conducted was as reported to me as

a welfare panel "mental health check" for concerns of plaintiffs "mental state" given the above

description, it would seem contradictory for such a meeting to lead to biased student conduct charges, and

also for such a health care, and medically centered meeting to be recorded and transcribed without the

consent of the Plaintiff and then for such recording and transcription to be used against the plaintiff in a

student conduct and disciplinary expulsion hearing, especially seeing as the Plaintiff was informed on the

transcript of this improperly obtained transcript that the plaintiff was not under investigation or being

interviewed based on VUPD conducting a criminal or student conduct investigation but a mental health

welfare check, nonetheless, that the ATF showed that the Plaintiff had purchased a Handgun in May 2023

(7 months prior to the December 4th 2023 meeting). Plaintiff stated the question was regarding access, and

Plaintiff re-stated the conversation, and furthermore, stated that a question on access to a firearm and a

question on purchase and ownership of a firearm are separate questions. Additionally, when questioned,

Defendant Newsome explicitly denied, in the presence of Plaintiff's counsel, any allegations of

Plaintiff being observed—either in possession of, or verbally claiming possession of—a firearm at any

time during his tenure as a student. Furthermore, Defendant Newsome refuted any allegations that the

Plaintiff had made threats, demonstrated threatening behavior, or even implied making threats with or

concerning a firearm, this was also documented and signed and provided however, by the witnessed

counsel, however with the lack of due process and unjust and additionally with the clear agenda against

plaintiff, the

## IV. CONCLUSION

In summary, the application of vicarious liability to Defendants actions as a relation to agency of

Vanderbilt Universities liability of retaliatory damages of Plaintiff is based on the significant control or

influence over the employment conditions or actions leading to Plaintiffs dismissal, and Defendants

knowledge of the harm and humiliation this would cause Plaintiff and the bonus of participation in the

retaliatory actions would earn the Master of Nursing program the much needed scholarship funds it

desires as part of the Vanderbilt "Dare to Grow" campaign, this control demonstrates the existence of a

relationship that is akin to employer-employee between Vanderbilt and Plaintiff in which defendants as

agents of Vanderbilt used as a form of retaliation as third party retaliator to the Plaintiff.

Legal Framework for Third-party Retaliation Claims: The U.S. Supreme Court in *Thompson v.*

*North American Stainless, LP* established that third parties could bring retaliation claims if they were

adversely affected by an employer's retaliatory actions. This precedent supports the possibility of Plaintiff

bringing a claim against Defendants and Vanderbilt for its alleged involvement in retaliatory actions, even

if the direct employer was Air Evac Lifeteam Inc. While the case of *Thompson v. North American*

*Stainless, LP* primarily addressed employment relationships, its principles regarding the broad

interpretation of "aggrieved persons" could indeed be extended to other contexts where retaliatory actions

undermine the objectives of Title VII. One such context is the educational setting of a university,

particularly when the retaliation is indirectly connected to employment discrimination.

In the case at hand, this interpretation is applicable because Plaintiff, Ian Hunter Lucas, was

contractually bound to commence employment with Vanderbilt University Medical Center (VUMC) upon

successful completion of the Master of Nursing Program at Vanderbilt University. The Defendants were

fully aware of this arrangement, as they had established the "Nurse Scholars" program, of which Plaintiff

was a participant. This program essentially created an employment relationship between Plaintiff and the

university. Consequently, the protections against retaliation under Title VII should extend to this educational context, given the direct linkage between Plaintiff's academic progression and his already hired employment status at Vanderbilt University Medical Center for Nurse Residency Placement, thus under *Thompson v. North American Stainless, LP* there is an employment relationship and a direct link to prospective employment as part of the educational experience—as program leading directly to employment—Title VII's protections extend to cover discriminatory or retaliatory actions that impact this path from education to employment. This sufficiently intersects with the employment aspects that Title VII aims to regulate.

Plaintiff Demonstrates Claims for Disability Discrimination Protections

The ADA and the Rehabilitation Act require Universities to provide reasonable accommodations to students with disabilities and oblige non-discriminatory treatment. Plaintiff, who legitimately required time off due to a disability, alleges and demonstrates evidence that is in exceedances of the burden of proof that Defendants not only failed to provide reasonable accommodations as mandated by these statutes but retaliated against him for exercising his right to such accommodations. The punitive nature of the Defendants' response, together with the failure to engage in an interactive process to ascertain appropriate accommodations, signify that Plaintiff has substantial grounds for success on the merits concerning his ADA and Rehabilitation Act claims. This is evident by Plaintiffs email exchange between Plaintiff and Defendant Enstrom, in which Defendant Enstrom is reviewing Plaintiffs accommodations letter from the Student Access Office and emails Plaintiff stating for any disability related absence 10 points will be deducted from the Plaintiffs grade effectible penalizing the plaintiff for use of his disability accommodations. This was reported to the Student Access Office who reported having to get the "School Administration" involved to effect defendant Enstrom to change the accommodation penalty. Throughout the semester as noted in student witnesses' testimony, Defendant Enstrom particularly retaliated on Plaintiff by keeping his attendance and being very exaggerated when Plaintiff entered class to make know she was keeping his attendance and no other students, despite Plaintiff passing Defendant Enstrom's

class, Defendant Enstrom still found reason to give Plaintiff a learning contract despite Plaintiff having not violated any attendance polices.

Granting a Preliminary Injunction Serves the Public Interest Upholding Statutory Protections for Whistleblowers and Individuals with Disabilities. It is a cornerstone of the public interest to ensure that laws designed to protect whistleblowers and individuals with disabilities are faithfully executed. Granting a preliminary injunction is consistent with the public interest as it signals a commitment to upholding the integrity of legal protections for those courageous enough to report misuse of government funds, as well as those requiring necessary accommodations due to disabilities. Case law, including Halifax Hospital Medical Center v. United States and Roth v. Department of Justice, has consistently recognized the irreparable harm and chilling effect that can result from condoning retaliation and discrimination.

A preliminary injunction in this instance will not only provide immediate protection to the Plaintiff but will also serve as a deterrent against similar unlawful actions by Defendants and other parties. Upholding the rule of law and deterring misconduct is a fundamentally important public interest that is advanced by the assertion of statutory remedies in cases such as the present one.

For the reasons stated herein, Plaintiff has shown a compelling likelihood of success on the merits of his whistleblower protection and disability discrimination claims, and the issuance of a preliminary injunction is aligned with the public interest in preserving the integrity and enforcement of federal workforce protections. Accordingly, Plaintiff respectfully requests that this Honorable Court grant the motion for a preliminary injunction, restraining Defendant from engaging in further retaliatory or discriminatory practices.

Respectfully Submitted, this 7th day of May 2024,

_____
Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
Lucasianhunter@outlook.com

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR

PRELIMINARY INJUNCTION on the Court's CM/ECF system on this 25th day of April 2024, which

forwarded a copy to:

Mark A. Baugh (#015779)
Denmark J. Grant (#036808)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone (615) 726-5600
Facsimile (615) 744-5760

*Attorneys for Defendants Clairise Gamez, Crystal Ritchie, and Marissa Shulruff*

Kevin C. Klein (#23301)
Jeffrey W. Sheehan (#33534)
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, Tennessee 37208
(615) 600-4780
kevin.klein@kleinpllc.com
jeff.sheehan@kleinpllc.com

*Attorneys for Defendants: Mary Ann Jessee, Michelle*
*Tellock, Joel Newsome, Melissa Porter, G.L. Black,*
*Neil Jamerson, Jeremy Bourgoin, Mavis Schorn,*
*Pamela Jefferies, E. Jacob Cummings, Jill Harris,*
*Heather Robbins, Cate Enstrom, Angela Weaver,*
*Mary Roy, Michael Fazi, and Feylyn Lewis*

Type text here

Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
Lucasianhunter@outlook.com

Date: May 7th, 2024