RECEIVED
05/28/2024
KELLY L. STEPHENS, Clerk

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

Case Number: _____

Case Name: <u>Ian Hunter Lucas, pro se v. United States District Court for the Middle District of Tennessee,</u>

Name: <u>Ian H. Lucas</u>

Address: <u>221 Charleston Ave</u>

City: <u>Pleasant View</u>                    State: <u>TN</u>        Zip Code: <u>37146</u>

## PRO SE PETITIONER'S BRIEF

**<u>Directions</u>:**  Answer the following questions about the appeal to the best of your ability. Use additional sheets of paper, if necessary.  You need not limit your brief solely to this form, but you should be certain that the document you file contains answers to the questions below.  Please print or write legibly, or type your answers double-spaced.  If you are asking for specific relief such as the appointment of counsel, the provision of transcript at government expense, or leave to proceed without prepayment of filing fees, please make that request at the conclusion of the brief.  The Court prefers short and direct statements.  Within 28 days you should return your completed brief to:

**United States Court of Appeals For The Sixth Circuit**
540 Potter Stewart U.S. Courthouse
100 East Fifth Street
Cincinnati, Ohio   45202-3988

1.  Did the Agency fail to consider important grounds for relief?  ☑Yes        ☐No
    If so, what grounds?

> Irreparable Harm: The court's interpretation of irreparable harm seems to have been narrowly construed, dismissing the ongoing impact of past actions. The petitioner argued for a broader understanding of irreparable harm that includes non-economic damages and the prospective nature of the harm that a TRO aims to prevent. This perspective suggests that the court did not fully engage with the multifaceted nature of irreparable harm as presented bpetitioner,

2.  Do you think the Agency incorrectly decided the facts?  ☑Yes        ☐No
    If so, what law do you want applied?

> Invocation of Federal Rule of Civil Procedure 65: This rule, which guides the issuance of injunctions and temporary restraining orders (TROs), is foundational to our argument. It is designed to offer relief in situations where traditional legal remedies, such as monetary damages, fall short in addressing the harm suffered. The rule's provision for TROs inherently acknowledges the existence of harms that are not merely economic but also non-economic and anticipatory in nature

3.  Do you think the Agency applied the wrong law?    ☑Yes        ☐No
    If so, what law do you want applied?

In the decision regarding irreparable harm, the court appeared to adopt a restrictive
interpretation, focusing predominantly on immediate and tangible injuries while giving
inadequate attention to the broader scope of harm that encompasses ongoing, non-economic
damages and the potential for future detriment. This approach contrasts sharply with the legal
standards and principles that should guide the assessment of irreparable harm precedents

4.  Do you feel that there are any other reasons why the    ☑Yes        ☐No
    Agency's judgment was wrong?
    If so, what are they?

procedural missteps, such as not fully respecting the parties' procedural rights or providing
insufficient justification for rulings, could also mar the judgment. Additionally, if the court failed
to account for the cumulative impact of past actions on the plaintiff's situation or showed any
bias or lack of impartiality, these factors could further undermine the decision's validity. Lastly,
if the plaintiff was self-represented and the court did not extend the doctrine of leniency

5.  What action do you want the Court to take in this case?

The petitioner respectfully urges the higher court to instruct the lower court to reconsider its
judgment, particularly to adopt a wider interpretation of irreparable harm, meticulously review
all evidence, and correct procedural errors. The request includes an appeal for the issuance
of the Temporary Restraining Order (TRO) to prevent further harm to the plaintiff. The lower
court is also asked to explicitly justify its decisions, especially if it decides against

6.  What specific issues do you wish to raise on appeal?

In the Petition for Writ of Mandanus, The petitioner seeks the higher court's intervention to
compel the lower court to conduct a hearing, broaden its harm assessment, uphold
procedural rights, recognize the challenges of pro se representation, and reconsider the TRO
issuance based on a full evaluation of the harm presented.  Accordingly, I respectfully request
that the Court grant this motion to proceed in forma pauperis,prepayment of filing fees.

I certify that a copy of this brief was sent to opposing counsel via U.S. Mail on the  17  day of
_____ May , 20 24  .


Signature (Notary not required)


_____

**No.**

In the United States Court of Appeals for the Sixth Circuit

IAN HUNTER LUCAS, PETITIONER *pro se*

*v.*

UNITED STATES DISTRICT COURT OF MIDDLE
TENNESSEE NASHVILLE

*ON PETITION FOR A WRIT OF MANDAMUS
TO THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT*

**PETITION FOR A WRIT OF MANDAMUS**

# In the United States Court of Appeals for the Sixth Circuit

No.

IAN HUNTER LUCAS, PETITIONER *PRO SE*

*v.*

UNITED STATES DISTRICT COURT OF MIDDLE
TENNESSEE NASHVILLE

---

*ON PETITION FOR A WRIT OF MANDAMUS*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SIXTH CIRCUIT*

---

**PETITION FOR A WRIT OF MANDAMUS**

---

The petitioner, pro se, respectfully petitions for a writ of mandamus from the United States Court of Appeals for the Sixth Circuit in this case humbly submits this Writ of Mandamus pursuant to 28 U.S.C. § 1651(a) (All Writs Act) seeking an extraordinary legal remedy from this Court due to the failure of the United States District Court for the Middle District of Tennessee to provide a hearing on the Plaintiff's Motion for an Emergency Temporary Restraining Order despite multiple timely and properly filed motions and requests..

### JURISDICTION

The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

**TABLE OF AUTHORITIES**

**Cases:**

*Cheney v. United States Dist. Court for the*
*Dist. Of Columbia, 542 U.S. 367 (2004)*

*Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982)*

*Nken v. Holder, 556 U.S. 418 (2009)*

*Sampson v. Murray, 415 U.S. 61 (1974)*

*Winter v. Natural Resources*
*Defense Council, Inc., 555 U.S. 7 (2008)*

**Statutes:**

*U.S. Const. amend. V*

*U.S. Const. amend. XIV*

**Rules:**

*Federal Rules of Civil Procedure, Rule 65(b)*

## PARTIES TO THE PROCEEDING

Petitioner: Ian Hunter Lucas, *Pro Se*

Respondents: United States District Court for the Middle District of Tennessee Nashville

## RELATED PROCEEDINGS

United States District Court (M.D. Tenn.):

Lucas v. Jessee et al, Docket No. 3:24-cv-004

7

T

To the Honorable Judges of the United States Court of Appeals for the Sixth Circuit:

Ian Hunter Lucas, the petitioner pro se herein, with due respect, submits the following for consideration:

## I.    *Statement of Facts:*

Ian Hunter Lucas, in his capacity as petitioner pro se, has encountered an indefensible refusal by the United States District Court for the Middle District of Tennessee to adjudicate his pressing Motion for an Emergency Temporary Restraining Order. Despite adhering to procedural requisites for the timely and proper submission of multiple motions requesting emergency hearing on the matters of temporary restraining order, reconsideration of temporary restraining order and preliminary injunction, the District Court has, without any rational justification, neglected to appoint a hearing date. And summative denied the temporary restraining order based on the court's interpretation of a narrow view on what constitutes irreparable harm and its dismissal of the continuing impact of past actions.

In advocating for the court to adopt a more lenient approach towards pro se litigants, particularly in the context of evaluating irreparable harm for the issuance of a Temporary Restraining Order (TRO), the following argument grounded in legal doctrine may be presented: The jurisprudential tenets that guide our courts underscore the imperative to extend a degree of leniency towards pro se litigants, particularly in matters as critical as the assessment of irreparable harm in applications for emergency judicial relief. This principle is not merely a courtesy, but a recognition of the inherent challenges The challenges faced by individuals navigating the legal system without formal legal representation, especially when such navigation is not by choice, underscore the critical need for the judiciary to extend leniency and understanding

8

T

the inherent disadvantages and obstacles encountered by those who, due to various circumstances, find themselves without legal counsel in complex legal proceedings.

The legal system, with its intricate rules and procedures, can be particularly daunting for laypersons. This situation is exacerbated when individuals are compelled into pro se representation not out of preference but because of economic constraints, lack of available legal assistance, or other prohibitive factors such as the lack of local counsel due to conflict of interest with the defendant's employer. The doctrine of affording leniency to pro se litigants is especially pertinent when considering the multifaceted concept of irreparable harm, which encompasses not only immediate and tangible injuries but also ongoing, non-economic damages that a TRO aims to prevent.

A more expansive interpretation of irreparable harm, inclusive of non-economic damages and the prospective nature of TROs, warrants a different evaluative approach when the petitioner is a pro se litigant. Given the pro se litigant's potential limitations in articulating the complexities of their harm in written motions, the necessity for a hearing where oral arguments can be presented becomes even more critical. Such a hearing offers the court a comprehensive view of the irreparable harm argued, beyond what may be captured in the written submissions of a pro se litigant.

This is not to diminish the importance of written pleadings but to acknowledge that oral argument can elucidate the nuances of a pro se litigant's claim, particularly regarding the ongoing impact of past actions and the broader implications of non-economic harm. Therefore, in alignment with the legal doctrine advocating for leniency towards pro se litigants, it is both prudent and just for the court to grant such individuals the opportunity to present oral argument. This approach not only adheres to the spirit of equity and fairness that underpins our legal system but also ensures that the court's assessment of irreparable harm is informed by a full spectrum of considerations, including those

9

T

struggle to convey in writing. By adopting this approach, the court affirms its commitment to justice, recognizing that the essence of irreparable harm extends beyond the immediate and tangible, to include ongoing and non-economic damages whose prevention is at the heart of the TRO's purpose. This procrastination aggravates the immediate and irreparable harm[12] faced by the Plaintiff with each day that elapses.

## II.     *Denial of Rights and Relief Sought:*

This petition addresses the egregious denial by the District Court of a hearing regarding the Plaintiff's Motion for an Emergency Temporary Restraining Order, a clear abrogation of Plaintiff's unequivocal legal entitlements as definitively enshrined within Rule 65(b) of the Federal Rules of Civil Procedure and robustly reinforced by a plethora of judicial precedents. Rule 65(b) categorically mandates the provision of a temporary restraining order in the absence of the adverse party's notification, exclusively under circumstances where postponing to hear the opposition precipitates immediate and irreparable detriment to the applicant. This mandate, and its implied urgency, accentuates the

---

[1] Irreparable harm is defined as "a type of injury that cannot be adequately remedied by money damages and requires immediate court intervention to prevent damage that could not be undone."^1 This encompasses situations where the harm affects interests that are difficult to quantify financially, such as the loss of reputation, potential violation of constitutional rights, or the loss of a unique asset. See, e.g., Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008), where the Supreme Court emphasized that to qualify for a preliminary injunction, a party must establish that it is likely to suffer irreparable harm in the absence of preliminary relief.

[2] Irreparable harm is identified as damage for which monetary compensation is insufficient and that necessitates immediate judicial intervention to prevent consequences that are irreversible. ^1 This definition captures damages to interests that are not easily quantifiable in terms of money, such as reputational harm, potential infringements upon constitutional rights, or the loss of unique properties. The Supreme Court, in Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008), highlighted the necessity for a party seeking a preliminary injunction to prove the likelihood of incurring irreparable harm in the absence of such injunction, illustrating the emphasis on preventing ongoing or future harm rather than rectifying past injuries. The Court's assessment that there was no immediate and irreparable harm warranting a Temporary Restraining Order (TRO) without a full evidentiary hearing on the preliminary injunction motion fails to appropriately consider the potential for ongoing or future harm. The Court's reasoning, based on Mr. Lucas's no longer having an-affiliation with Vanderbilt University and thereby assuming a cessation of any potential for discrimination, retaliation, or adverse actions by Vanderbilt, its employees, or students, overlooks the essence of irreparable harm as encompassing ongoing or future damages that cannot be undone. The argument that past incidents alleged by Mr. Lucas prior to his expulsion on March 4, 2024, are irrelevant to the analysis of irreparable harm, disregards the potential for these past actions to cause continuing or impending damage that is precisely the concern of irreparable harm analysis. Contrary to the Court's interpretation, the concept of irreparable harm fundamentally includes the prevention of ongoing or imminent

harm, not merely addressing those that have already occurred. See, e.g., Lucas v. Ian Jessee, et al., No. 3:24-CV-00440, 2024 WL 2097234, at 2 (M.D. Tenn. May 9, 2024).

T

paramount necessity for swift judicial intervention to forestall irreparable harm.

The imperative for courts to expeditiously entertain motions for emergency relief, particularly when faced with the specter of irreparable harm, transcends procedural codification to embody a well-established juridical precedent. Jurisprudence reinforces this obligation, underscoring the judiciary's acknowledgment of the criticality of timely action. For instance, <u>Sampson v. Murray</u>, 415 U.S. 61 (1974), while delineating the stringent criteria for granting a temporary restraining order, implicitly affirms the judiciary's duty to promptly respond to such appeals when the statutory prerequisites are met. Concurrently, <u>Winter v. Natural Resources Defense Council, Inc</u>., 555 U.S. 7 (2008), in establishing standards for preliminary injunction issuance, elucidates the judiciary's pivotal role in averting harm via expedited judicial measures. Such precedents, inter alia, articulate a broader legal doctrine: judicial dalliance in proceedings equates to a contravention of the quintessential right to a fair and swift trial, a cornerstone of due process as enshrined in the Constitution.

The reluctance to accelerate hearings on urgent motions not only breaches procedural norms but also repudiates the core principles of justice ingrained within our legal framework. This reticence erodes the Plaintiff's right to a timely adjudication, an essential element of justice access and due process, thereby necessitating the prompt issuance of a Writ of Mandamus to rectify this violation. The sought relief is the promulgation of a Writ of Mandamus compelling the District Court to forthwith schedule and convene a hearing on the Plaintiff's previously lodged motions, notably Doc. Nos. [26] and [42], concerning the Emergency Temporary Restraining Order.

## III.    Reasons for Issuance of the Writ

The imperative issuance of the writ stems from the Plaintiff's lack of any alternative legal remedy to address the ongoing and severe harm endured. The District Court's dereliction in affording a hearing on

T

the urgent motions infringes upon the Plaintiff's constitutional right to due process and unimpeded access to prompt justice. Such a failure not only flouts the Plaintiff's due process rights but also impedes the Plaintiff's pursuit of swift justice, in clear violation of the Fifth and Fourteenth Amendments to the United States Constitution.

The Fifth Amendment unequivocally stipulates that no individual shall be deprived of life, liberty, or property without due process of law, whereas the Fourteenth Amendment extends this safeguard, ensuring that no state shall deprive any person within its jurisdiction of the equal protection of the laws. This foundational axiom is buttressed by jurisprudence, notably <u>Cheney v. United States Dist. Court for the District of Columbia</u>, 542 U.S. 367 (2004), which clarifies the conditions for issuing a writ of mandamus, especially when a litigant possesses no alternative adequate means to secure the relief sought.

Furthermore, the Supreme Court's ruling in <u>Nken v. Holder</u>, 556 U.S. 418 (2009), accentuates the criticality of averting irreparable harm via timely judicial review, thus spotlighting the essential nature of due process rights in the ambit of emergency relief. Additionally, <u>Logan v. Zimmerman Brush Co</u>., 455 U.S. 422 (1982), reiterates the prerequisite of a hearing prior to the deprivation of any significant property interest, affirming it as a fundamental tenet of due process. Collectively, these constitutional tenets and judicial precedents illuminate the egregiousness of the District Court's hearing omission, thereby denuding the Plaintiff of the constitutional right to due process and the fundamental precept of timely justice access.

## IV.   *Supporting Documents*

Enclosed are exhibits comprising copies of the motions and appeals lodged with the District Court (Doc. Nos. [26] and [42]), together with the Court's

12

T

motion for reconsideration. These documents, beyond evidencing the Plaintiff's diligent quest for judicial redress, accentuate the District Court's indefensible and unjustifiable denial of a hearing.

## V.    *Request for Judicial Intervention and Issuance of a Writ of Mandamus*

The petitioner, with due respect for the judiciary's commitment to fairness and impartiality, earnestly requests that this court exercise its supervisory authority to instruct the Honorable Judges of the United States District Court for the Middle District of Tennessee to issue a response to this petition within an established period.

This appeal is grounded in the principle that the judiciary, especially in its interaction with pro se litigants, should act with the utmost judicial impartiality and consideration. The necessity for this court to issue a writ of mandamus, compelling the lower court to promptly arrange and proceed with a hearing on the Plaintiff's Motion for an Emergency Temporary Restraining Order and its related documents, stems from a profound concern. It appears there exists a judicial precedent that suggests an inadvertent disregard by the court towards pro se litigants, which the petitioner believes has materially affected his case.

In seeking this extraordinary relief, the petitioner aims not only to address the immediate needs of his case but also to highlight the broader imperative for judicial systems to afford pro se litigants the equitable consideration and impartiality they are duly owed.

Dated: May 16th, 2024

Ian Hunter Lucas, Petitioner *pro se*
221 Charleston Avenue
Pleasant View, TN, 37146
(910) 872-3577
lucasianhunter@outlook.com

T

## Certificate of Service

I hereby certify that on this 16th day of May 2024, I have duly served a copy of the foregoing **Petition for Writ of Mandamus** and all accompanying documents to the following parties including: A copy of this petition and all accompanying documents have also been filed with the Clerk of the United States Court of Appeals for the Sixth Circuit and Filing with Clerk of the United States District Court for the Middle District of Tennessee, Nashville consistent with the court's filing requirements.

United States Court of Appeals for the Sixth Circuit:
*Potter Stewart U.S. Courthouse Clerk's Office*
*100 East Fifth Street Cincinnati, Ohio 45202*

United States District Court for the Middle District of Tennessee, Nashville:
*Estes Kefauver Federal Building & Courthouse Clerk's Office*
*801 Broadway Nashville, TN 37203*

Mark A. Baugh, BPR No. 015779
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone (615) 726-5600
Facsimile (615) 744-5760
*Attorneys for Defendants Clairise Gamez, Crystal Ritchie, and Marissa Shulruff*

Mark A. Baugh, BPR No. 015779
*(See above for Address and Contact Information)*
*Attorney to be Noticed1: Daniel Diermeier, Tracey George, Cybele Raver, Melanie Lowe, Timothy Garrett, Maja A. Hartzell, Ernie Rushing, Sara Donahoe, Terry Walker, K. Melissa Smith Hayes, Nancy Wise, Lacey Cross, Monika Do, Carrie Plummer, Ellen Schoen, Judson Smith, Jessica Wellette, Melanie Morris, Robingale Panepinto, Melissa Lord, Brittany Kirby, and Shannon Ellrich*

Kevin C. Klein (#23301)
Jeffrey W. Sheehan (#33534)
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, Tennessee 37208
(615) 600-4780
*Attorneys for Defendants: Mary Ann Jessee, Michelle Tellock, Joel Newsome, Melissa Porter, G.L. Black, Neil Jamerson, Jeremy Bourgoin, Mavis Schorn, Pamela Jefferies, E. Jacob Cummings, Jill Harris, Heather Robbins, Cate Enstrom, Angela Weaver, Mary Roy, Michael Fazi, and Feylyn Lewis*

Dated: May 17, 2024

Ian Hunter Lucas, Petitioner *pro se*
221 Charleston Avenue
Pleasant View, TN, 37146
(910) 872-3557
lucasianhunter@outlook.com

# EXHIBIT A
# Supporting Documents

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **IAN HUNTER LUCAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-00440** |
| | ) | |
| **MARY ANN JESSEE, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

On May 7, 2024, Ian Hunter Lucas proceeding *pro se* filed a Motion to Withdraw Documents No. 21 (Emergency Motion for Temporary Restraining Order); No. 22 (Memorandum in Support of Emergency Motion for Temporary Restraining Order); No. 23 (Affidavit of Ian Hunter Lucas in Support of Plaintiff's Motion for Temporary Restraining Order); and No. 24 (Affidavit of Ian Hunter Lucas in Support of Plaintiff's Temporary Restraining Order). (Doc. No. 25). Mr. Lucas states that these documents contain "discrepancies and errors" that could "give rise to confusion." (Doc. No. 25 at 1). His motion is **GRANTED.** The Clerk shall **STRIKE** Document Nos. 21, 22, 23 and 24 as Mr. Lucas request.

On the very same day, before the Court could rule on his Motion to Withdraw Doc. Nos. 21, 22, 23, and 24, (Doc. No. 25), Mr. Lucas filed a new Emergency Motion for Temporary Restraining Order (Doc. No. 26), Memorandum in Support of Emergency Motion for Temporary Restraining Order (Doc. No. 27), and Affidavit of Ian Hunter Lucas in Support of Plaintiff's Motion for Temporary Restraining Order (Doc. No. 28). On May 8, 2024, the Defendants responded in opposition (Doc. No. 29), and Mr. Lucas filed a reply. (Doc. No. 34).

As a preliminary matter, the Court notes that the record contains several iterations of the complaint (Doc. No. 1-1 at 175, Doc. No. 1-4 and Doc. No. 4). It appears that the Amended Complaint (Doc. No. 1-4) dated March 31, 2024, is the most recent version. Mr. Lucas shall file a notice on or before May 16, 2024, confirming that Doc. No. 1-4 is the operative controlling complaint and if not, he shall identify what is the operative controlling complaint.

The Court recognizes that Mr. Lucas is a *pro se* litigant entitled to liberal or lenient consideration of his pleadings, Haines v. Kerner, 404 U.S. 519, 520–21 (1972). For example, a *pro se* litigant is entitled to generous consideration of his or her complaint to determine if it states a claim upon which relief can be granted. Jourdan v. Jabe, 951 F.2d 108, 110 (6th Cir. 1991). Nevertheless, Mr. Lucas, even as a *pro se* litigant, must comply with the Federal Rules of Civil Procedure, including the pleading standards set forth in Rule (8)(a)(2). See Frame v. Superior Fireplace, 74 Fed.Appx. 601, 603 (6th Cir. 2003) ("[T]hose who proceed without counsel must still comply with the procedural rules that govern civil cases."). Rule 8(a)(2) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Failure to comply with Rule 8(a)(2) may result in a dismissal. Kensu v. Corizon, Inc., 5 F.4th 646, 653 (6th Cir. 2021) (dismissing case for *pro se* litigants failure to comply with the Federal Rules).

The Complaint falls short of a short and plain statement of Mr. Lucas' claims. The Court observes that Doc. No. 1-4 consists of 58 pages. It identifies forty-two defendants in the caption but not in the document (Doc. No. 1-4 at 417). It contains legal arguments, typographical errors, incomplete sentences, reiterations and uses language that is difficult to comprehend, some courts give such allegations little weight or consideration. See Hessmer v. Bad Gov't, No. 3:12-cv-590, 2012 WL 3945315, at *1 (M.D. Tenn. Sept. 10, 2012) ("Legal arguments and citations are

2

improper in a complaint and do nothing to support the plausibility of a plaintiff's claims."); see also Brown v. Cracker Barrel Restaurant, 22 Fed.App'x 577, 578 (6th Cir. 2001) ("Although pleadings are to be liberally construed, courts are not required to conjure up unpleaded allegations or guess at the nature of an argument."). To assist Mr. Lucas, the Court strongly encourages him to read and follow the **Pro Se Handbook for Nonprisoner Federal Civil Actions**. He can access the handbook at the following link:

https://www.tnmd.uscourts.gov/sites/tnmd/files/Pro%20Se%20Nonprisoner%20Handbook.pdf.

According to the Amended Compliant, Mr. Lucas was a student in the Master of Nursing Program at Vanderbilt's School of Nursing. Because he suffers from Crohn's Disease, he requested a reasonable accommodation for his physical disability. As a result, Mr. Lucas alleges that he was subjected to discrimination, retaliation and other forms of mistreatment in violation of federal and state laws. He identifies a host of incidents: when his grades were changed, when he accessed a patient's healthcare records, when he possessed a firearm in his vehicle on campus, when he was dismissed from the School of Nursing and when he was expelled from Vanderbilt University. He has appealed the dismissal and expulsion decisions. Even more odd is that Mr. Lucas argues that his rights under the Family Educational Rights and Privacy Act have been violated but he does not allege any such violations in the Amended Complaint. This represents some, but not all of Mr. Lucas' allegations in the Amended Complaint

The Court will now turn to Mr. Lucas' Emergency Motion for Temporary Restraining Order. (Doc. No. 26). The unverified Amended Complaint (Doc. No. 1-4) and Affidavits (Doc. Nos. 23, 24, 28) do not justify a temporary restraining order ("TRO"). The decision to issue a TRO is committed to the sound discretion of the Court. Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 102 (6th Cir. 1982). The purpose of a TRO is to maintain the status quo

3

position of the parties until the Court can hold an adversarial evidentiary hearing on the motion for preliminary injunction. Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty., 415 U.S. 423, 439 (1974). Federal Rule of Civil Procedure 65(b) allows a TRO only when the Plaintiff presents evidence that the Plaintiff will be subject to immediate and irreparable injury, loss or damage before the adverse party can be heard in opposition. It is only extraordinary circumstances that justify a TRO. Overstreet v. Lexington–Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002).

While issuance of a TRO is based upon multiple factors, many courts have recognized that when irreparable harm is lacking, injunctive relief is not warranted. D.T. v. Sumner County Schools, 942 F.3d 324, 327 (6th Cir. 2019) (when irreparable harm is missing there is no need to consider the other two injunctive factors); In re Deloran Company, 755 F.2d 1223, 1228 (6th Cir. 1985) (noting that the district court may decline to analyze all factors when fewer factors are dispositive). Many courts have emphasized that the single most important prerequisite for injunctive relief is demonstrating that without injunctive relief the party is likely to suffer irreparable harm. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Winter v. National Resources Defense Counsel, Inc., 555 U.S. 7, 22, (2008). Only when the threatened harm would impact the Court's ability to grant an effective remedy is there a real need for injunctive relief. Friendship Materials, Inc., 679 F.2d at 102 (6th Cir. 1982) ("This court has never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief.").

The Court finds no immediate and irreparable harm to justify a TRO before a full evidentiary hearing on the motion for preliminary injunction. As Mr. Lucas admits, he is no longer a student at Vanderbilt University. As a result, Vanderbilt and its employees and students are no

4

longer in a position to discriminate, retaliate or take any adverse action against him.  In short, neither Vanderbilt nor any of its agents, employees, officers, or attorneys presently have any authority to do anything to Mr. Lucas.  What Mr. Lucas alleges as discriminatory, retaliatory, or mistreatment are events and incidents that allegedly occurred <u>before</u> March 4, 2024, the date he was expelled from Vanderbilt.  What occurred in the past is legally irrelevant to the irreparable harm analysis.  <u>Sharpe v. Cureton</u>, 319 F.3d 259, 274 (6th Cir. 2003) (past harm is not an adequate basis for injunctive relief); <u>Stone v. Ohio Parole Board</u>, 2021 WL 1222141 at, *4 (S.D. Ohio April 1, 2021) ("preliminary injunction cannot be issued based on past harm.  The purpose of a preliminary injunction is to prevent future harm.").  At bottom, based upon the record, the Court discerns no factual basis that he will be irreparably harmed before the Court considers his preliminary injunction motion.

In preparation for the preliminary injunction hearing, the parties shall meet with the Magistrate Judge to determine, among other things, whether Mr. Lucas seeks to amend the complaint, whether any discovery is necessary, deadlines for the parties' briefs, and target dates for a preliminary injunction hearing.

For the foregoing reasons, Mr. Lucas' Emergency Motion for Temporary Restraining Order (Doc. No. 26) is **DENIED**.  The Motion to Compel Mediation (Doc. No. 31), Motion to Seal (Doc. No. 35), and Motion for Extension of Time to File Response (Doc. No. 36) are referred to the Magistrate Judge.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

5

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IAN HUNTER LUCAS, Pro Se | |
| Plaintiff(s), | Case No. 3:24-cv-00440 |
| v. | Judge Waverly D. Crenshaw, Jr |
| MARY ANN JESSEE et al., | Magistrate Judge Alistair E. Newbern |
| Defendant(s). | |

## MOTION FOR EMERGENCY HEARING
## ON THE
## MOTION FOR RECONSIDERATION
## OF MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER

The pro se Plaintiff, Ian Hunter Lucas, hereby urgently requests for an emergency hearing on the

pro se Plaintiff's Motion for Reconsideration of Memorandum Opinion of the Court (Doc. No. [42]) and

Motion for Reconsideration of Emergency Temporary Restraining Order (Doc. No. [26]) based upon his

Pro se status, this notice of motion, the accompanying memorandum of points and authorities, the records

and files herein, and any oral argument that may be entertained by the Court at the hearing on this motion.

Previous Motions for Hearings have been made and heard by this Court on related matters, indicating the

ongoing and persistent nature of the subject litigation and the continuing need for judicial intervention

and resolution.

This Emergency Hearing is necessitated by the alarming and imminent risk of irreparable harm

that the Plaintiff will suffer without the relief requested in the Motions for Reconsideration and the

pressing necessity for swift judicial consideration of the litigant's impasse presently at hand to circumvent

further detriment to Plaintiff's significant interests.

## I. PRELIMINARY STATEMENT AND GROUNDS FOR REQUESTING AN URGENT HEARING

1.      The timely administration of justice is a bedrock principle within the legal framework of this Court and is indispensable in averting irretrievable prejudice to a litigant's cause. In accordance with Rule 7(b)(1) of the Federal Rules of Civil Procedure, a motion, as the procedural vehicle for requesting a court order, must be couched in the written form, save for those instances arising within the context of a hearing or trial, and must articulate with particularity the rationale underpinning the quest for the sought order, in addition to clearly delineating the precise relief sought.

2.      The capacity for this Court to convene an emergency hearing is nestled within its broad discretionary powers, particularly when to forego such an assembly might culminate in instant and irreparable harm, as elucidated in the controlling precedence set forth in Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 439 [1974].

3.      The exigency of the instant Motion for an Emergency Hearing is underscored by the Plaintiff's demonstration that the denial of the relief sought within the Motion for Reconsideration will result in immediate and irreparable harm of such a nature that it is beyond the palliative reach of pecuniary damages, and the Emergency Hearing is thus essential for the timely and appropriate adjudication of such substantive issues.

## II. LEGAL GROUNDS, JUDICIAL PRECEDENTS, AND RATIONALE SUPPORTING THE MOTION FOR RECONSIDERATION

A.   The Plaintiff reasserts his Demand for Reconsideration pursuant to Rule 59(e) and Rule 60(b) of the Federal Rules of Civil Procedure, a legal entreaty that is thoroughly substantiated in the accompanying Motion for Reconsideration. Further, it is reiterated by Plaintiff, the necessity for an oral forum to adequately address the potential errors of either law or fact that may undergird the prior decision and to effectuate a comprehensive and effective conveyance of Plaintiff's legal posture.

### III. ARGUMENT IN SUPPORT OF THE MOTION

4.      Plaintiffs postulate that the immediacy of the Emergency Hearing is predicated on the continuing specter of ongoing harm and the potential for such harm to inflict unalterable prejudice should Plaintiff's claims and arguments be denied a platform for timely discourse and consideration.

5.      The criticality imbued within this petition is rendered ever more potent by the dismissal of the Motion for Temporary Restraining Order and the subsequent denial of hearings, a course of action which has, and if left unremedied, will proceed to impose injurious impact on Plaintiff's rights in

> a manner such that equitable redress, if not granted posthaste, may be entirely nullified by the inevitable march of time and the attendant evolution of circumstances.

### IV. CONCLUDING REMARKS AND PRAYER FOR RELIEF

6.      An Emergency Hearing, given the considerations afforestated, is unequivocally merited in the context of the emergent nature of Plaintiff's predicament and the looming harm that Plaintiff will sustain should his Motions for Reconsideration fail to be expeditiously entertained and ruled upon by this venerable Court.

WHEREFORE, Ian Hunter Lucas, Pro se Plaintiff, most respectfully implores the Court for the immediate and necessary reliefs:

1. Issue an order granting an Emergency Hearing on the Plaintiff's Motion for Reconsideration of Memorandum Opinion of the Court (Doc. No. [42]) and Motion for Reconsideration of Emergency Temporary Restraining Order (Doc. No. [26]);

2. Designate said Emergency Hearing for the earliest convenient date in the Court's calendar to contemplate the substantive issues heralded herein by Plaintiff; and

3. Dispense such other, additional, or alternative relief as may seem just, equitable, and appropriate in the exercise of this Court's sound discretion and in alignment with the demands of justice.

Thus, Plaintiff beseeches this Court to promptly schedule this matter for an emergency hearing at the closest feasible opportunity the Court's docket may permit, and within such timeframe that would bestow upon Plaintiff the substantive right to the Court's prompt and comprehensive contemplation

3

before the harm which is the subject of this Motion materializes to an extent that can no longer be remediated or reversed.

Respectfully Submitted this 13th of May 2024, for Urgent and Prompt consideration by this honorable court,

_(signature)_

_____

Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
lucasianhunter@outlook.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing **MOTION** on the Court's CM/ECF system on this 13th of MAY 2024

which forwarded a copy to:


Mark A. Baugh, BPR No. 015779
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone (615) 726-5600
Facsimile (615) 744-5760
*Attorneys for Defendants Clairise Gamez, Crystal Ritchie, and Marissa Shulruff*

Kevin C. Klein (#23301)
Jeffrey W. Sheehan (#33534)
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, Tennessee 37208
(615) 600-4780
*Attorneys for Defendants: Mary Ann Jessee, Michelle
Tellock, Joel Newsome, Melissa Porter, G.L. Black,
Neil Jamerson, Jeremy Bourgoin, Mavis Schorn,
Pamela Jefferies, E. Jacob Cummings, Jill Harris,
Heather Robbins, Cate Enstrom, Angela Weaver,
Mary Roy, Michael Fazi, and Feylyn Lewis*

Submitted May 13, 2024

_____

Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
lucasianhunter@outlook.com

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IAN HUNTER LUCAS, Pro Se | |
| Plaintiff(s), | Case No. 3:24-cv-00440 |
| v. | Judge Waverly D. Crenshaw, Jr |
| | Magistrate Judge Alistair E. Newbern |
| MARY ANN JESSEE et al., | |
| Defendant(s). | |

## PLAINTIFF'S ASSERTIVE REQUEST FOR RECONSIDERATION OF MEMORANDUM OPINION AND ORDER THAT DENIED THE EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

Ian Hunter Lucas ("Plaintiff"), proceeding pro se, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and Local Rule 7.01(g) of the United States District Court for the Middle District of Tennessee, respectfully moves this Honorable Court to reconsider its Memorandum Opinion and Order dated May 9, 2024, denying Plaintiff's Emergency Motion for Temporary Restraining Order (the "Order," Docket No. 26). Plaintiff respectfully submits to this Court that the prior Order should be vacated and reconsidered, owing to a significant error of law that fundamentally influenced the Court's decision and denied the Plaintiff the protection he reasonably sought. In support of this motion for reconsideration, Plaintiff submits the following arguments and authorities.

I. BACKGROUND

We shall now provide a comprehensive overview of the factual and procedural background that is pertinent to this motion, in order to better illustrate the solid foundations upon which this motion is built.

On May 8, 2024, Plaintiff urgently filed an Emergency Motion for Temporary Restraining Order, necessitated by the continuous harm he was enduring because of the egregious actions of Defendants, who were acting as representatives and agents of Vanderbilt University and its associated entities

(collectively referred to as "Defendants"). This Court, after due consideration, issued a Memorandum Opinion and Order on May 9, 2024, in which the Court denied the Plaintiff's motion. The Court concluded, among other things, that Plaintiff had not sufficiently demonstrated a likelihood of irreparable harm in the absence of such injunctive relief.

Suspension or expulsion from a university or other institution of higher learning can have far-reaching consequences on a student's life. Students suspended or expelled from state schools of higher learning, or facing suspension or expulsion, have sought to enforce their asserted constitutional right to continued enrollment in federal actions brought under 42 U.S.C.A. § 1983, claiming violations of due process under U.S. Const. Amend. XIV, as well as allegations of other forms of discrimination or retaliation. 85 A.L.R. Fed. 3d Art. 4 (Originally published in 2023).

Success in a college or university program can significantly impact a student's life, such as access to more advanced learning or certain occupations. Thus, expulsion or suspension of a student is a serious matter. Students of higher education may be expelled or suspended on disciplinary grounds for misconduct or for failing to satisfy academic requirements. A student facing suspension or expelled, or a student already suspended or expelled, may bring an action under 42 U.S.C.A. § 1983 seeking to enforce an asserted right to continued enrollment.

Such actions typically allege violations of procedural or substantive due process rights under U.S. Const. Amend. XIV. Martinson v. Regents of the University of Michigan, 2011 WL 13124122 (E.D. Mich. 2011), affirmed on other grounds, 562 Fed. Appx. 365, 306 Ed. Law Rep. 46 (6th Cir. 2014) (applying federal and Michigan law). In this landmark case, the court firmly established that an expelled nursing student possessed a protected property interest in their education, thus creating a bedrock for a procedural due process claim under U.S. Const. Amend. XIV. This observation is noteworthy as it confirms that state courts, such as those in Michigan, have recognized the constitutional protection warranted to the right to continue a course of higher education. noting that the Michigan courts rely on Goss v. Lopez, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975) , in recognizing that university students have a property interest in their continued education.

The federal courts in the following cases hold that a student has a constitutionally protected generalized property interest in continued enrollment at a university or other institution of higher education. Sixth Circuit:

i.    <u>J. Endres v. Northeast Ohio Medical University,</u> 938 F.3d 281, 369 Ed. Law Rep. 617 (6th Cir. 2019)

ii.    <u>Doe v. Miami University,</u> 882 F.3d 579, 351 Ed. Law Rep. 704 (6th Cir. 2018)

iii.    <u>Doe v. University of Cincinnati,</u> 872 F.3d 393, 347 Ed. Law Rep. 705 (6th Cir. 2017)

iv.    <u>Doe v. Cummins,</u> 662 Fed. Appx. 437, 339 Ed. Law Rep. 84 (6th Cir. 2016)

v.    <u>Averett v. Hardy,</u> 2023 WL 2471361 (W.D. Ky. 2023)

vi.    <u>Clark v. University of Louisville,</u> 2022 WL 16756390 (W.D. Ky. 2022), *summarily aff'd, 2023 WL 4747477 (6th Cir. 2023)*

vii.    <u>Doe v. Baum,</u> 227 F. Supp. 3d 784, 344 Ed. Law Rep. 281 (E.D. Mich. 2017) *, rev'd and remanded on other grounds, 903 F.3d 575, 358 Ed. Law Rep. 50 (6th Cir. 2018)*

viii.    <u>Doe v. Northern Michigan University,</u> 393 F. Supp. 3d 683, 369 Ed. Law Rep. 790 (W.D. Mich. 2019)

ix.    <u>Hart v. Ferris State College,</u> 557 F. Supp. 1379, 9 Ed. Law Rep. 1256 (W.D. Mich. 1983)

x.    <u>Mares v. Miami Valley Hospital,</u> 2023 WL 3204678 (S.D. Ohio 2023)

xi.    <u>Junhe Qiu v. University of Cincinnati,</u> 2019 WL 2396664 (S.D. Ohio 2019), *aff'd on other grounds, 803 Fed. Appx. 831, 376 Ed. Law Rep. 1017 (6th Cir. 2020)*

xii.    <u>Roe v. Director, Miami University, Office of Community Standards,</u> 2019 WL 1439585 (S.D. Ohio 2019)

xiii.    <u>Roe v. University of Cincinnati,</u> 2018 WL 9944938 (S.D. Ohio 2018)

xiv.    <u>Roe v. Adams-Gaston,</u> 2018 WL 5306768 (S.D. Ohio 2018)

xv.    <u>Gischel v. University of Cincinnati,</u> 302 F. Supp. 3d 961, 355 Ed. Law Rep. 232 (S.D. Ohio 2018) *, on reconsideration in part on other grounds, 2018 WL 9944971 (S.D. Ohio 2018)*

xvi.    <u>Doe v. Wright State University,</u> 2017 WL 3671240 (S.D. Ohio 2017)

<u>Doe v. The Ohio State University</u>, 136 F. Supp. 3d 854, 329 Ed. Law Rep. 406 (S.D. Ohio 2016)

The Plaintiff, now, assertively moves for a reconsideration of the Order, fundamentally on the grounds of rectifying a significant and clear legal error in the application of the irreparable harm standard in this matter.

## II. STANDARD FOR RECONSIDERATION

The Federal Rules of Civil Procedure permit a court to alter or amend a judgment upon motion and just terms, filed no later than 28 days after the entry of judgment. Fed. R. Civ. P. 59(e). A motion for reconsideration can be granted for several reasons, including the availability of new evidence that was previously unavailable, an intervening change in controlling law, or the need to correct a clear error or prevent manifest injustice. <u>GenCorp, Inc. v. American Intern. Underwriters</u>, 178 F.3d 804, 834 (6th Cir. 1999).

Moreover, there is persuasive evidence that satisfies the burden of proof by a preponderance of the evidence, insinuating that the Defendants, in collusion with the Plaintiff's former employer, executed retaliatory actions against the Plaintiff, who is identified as a whistleblower under the False Claims Act. These retaliatory actions are alleged to have been coordinated in exchange for substantial donations from Plaintiff's former employer to Vanderbilt's School of Nursing, including a significant donation of 1.25 million dollars to the exact program in which Plaintiff was enrolled prior to his unwarranted dismissal. It is well-established by federal courts that an employer could face liability under the False Claims Act for whistleblower retaliation when it terminates an employee at the behest of a third party due to the employee's protected conduct affecting that third party. 31 U.S.C.A. § 3730(h), this extension to a third party does not specify another employer and does not exempt Vanderbilt University.

Furthermore, even as such, Plaintiff was technically employed by Vanderbilt University as a Student thus even if the provision was understood to mean another employer the Plaintiff would still fall under this provision of the law. <u>Nguyen v. City of Cleveland</u>, 121 F. Supp. 2d 643 (N.D. Ohio 2000)

In adherence with these provisions and out of respect for the judicial process, The Plaintiff respectfully submits this Motion for Reconsideration, asserting in good faith that the grounds for reconsideration, as recognized by the Court and the relevant legal authorities, are wholly applicable to the present circumstances.

III. ARGUMENT

<u>There Has Been a Clear Error in the Application of the Law Regarding Irreparable Harm Analysis</u>

The mere occurrence of harm does not, in isolation, constitute the requisite legal standard for the issuance of the extraordinary relief of a temporary restraining order or preliminary injunction. Rather, the harm must be of such a character that it is irreparable; that it cannot be adequately remedied or compensated in damages. We firmly contend that the harm suffered by the Plaintiff, both tangible and intangible, cannot be adequately compensated in damages and thus fulfills this requirement. - <u>Berridge v. Heiser</u>, 993 F.2d 517, 519 (6th Cir. 1993).

Despite the comprehensiveness of the Court's Memorandum Opinion, it overlooked the ongoing effects of discrimination and retaliation the Plaintiff has been subjected to, as a result of the actions of the Defendants. The Plaintiff contends that the Court's analysis was heavily concentrated on past, isolated incidents, thereby overlooking the ongoing and cumulative harm being endured by the Plaintiff, especially concerning his reputation and future career prospects.

Existing precedent within the jurisdiction of the Sixth Circuit acknowledges that certain types of injuries, such as damage to reputation and the chilling effect on future employment opportunities, are categorically irreparable in nature. <u>Kallstrom v. City of Columbus</u>, 136 F.3d 1055, 1060 (6th Cir. 1998). Where a party can show that its reputation is being tarnished, and such tarnishment is likely to dissuade future employers or associates, relief may be warranted even if some time has elapsed since the initiation of the harmful conduct. In other words, continuing harm of this nature inherently extends beyond past actions and requires urgent judicial redress to prevent ongoing and future injury. Since December 4th, 2024, the Plaintiff has faced continuing and immediate injury, loss, or damage that is likely to ensue before the Defendants can adequately be heard in opposition. Such extraordinary circumstances

unequivocally mandate the issuance of a Temporary Restraining Order (TRO). While it is an indisputable requirement of the law for the Plaintiff to exhaust all internal administrative appeals, if such processes are being fraudulently influenced or manipulated by the Defendants, the perpetuation of these irreparable harms cannot be overlooked.

The Plaintiff has indubitably sustained an irreparable injury by being forced to repay student loans exceeding $200,000, along with accruing interest, for an education unjustifiably denied and abruptly terminated — a scenario orchestrated by the Defendants. During his final semester, the Plaintiff was devoid of the expected educational outcome and the subsequent financial income necessary to repay these debts. This situation not only intensifies the severity of the inflicted harms but also underlines the crucial need for swift legal intervention.

Critical to the reconsideration of this matter is Exhibits, extracted from metadata, which unveils a communication from the Vanderbilt University Medical Center Privacy Office. This correspondence unmistakably attests that the academic measures wielded against Plaintiff were not engendered by any legitimate privacy breach, thus undermining the basis for Plaintiff's academic expulsion.

Moreover, transcripts from the interview with Defendant Newsome and the Plaintiff reveal that the Plaintiff did not make a false statement about firearms, and that the Student Accountability allegations were fabricated to orchestrate an expulsion. Notably, Defendant Neil Jamerson, who is an overseeing Dean of such process, submitted an "allegation" *ex parte* after Lucas requested Jamerson be recused from the process due to Jamerson's failure to provide Lucas with a reason for the ongoing campus restriction, a reason which has not been provided to Lucas to this date. This revelation strikes at the heart of Plaintiff's likelihood to prevail on the merits, demanding a rigorous reappraisal of the Court's prior judgment.

In the previous judgment rendered by this esteemed Court, there seems to have been an oversight in fully considering the widespread retaliatory strategies employed by the Defendants, notably characterized by whistleblower retaliatory behavior, intimidation of witnesses, and the spreading of defamatory statements. The complex scheme of retaliation pursued by the Defendants began immediately on December 4th, 2023, with successive acts maintaining these questionable tactics, including an instance

amounting to a purported violation of not only the refusal to permit the Plaintiff to access his educational records as mandated by the Family Educational Rights and Privacy Act (FERPA) but also the Defendants' refusal to provide the Plaintiff with mandated provisions as required under Title III and Title IX. These orchestrated reprisals, as evidenced by a detailed timeline of events, underscore the gravity of the Plaintiff's case, and necessitate a thorough examination by the Court, an aspect which was seemingly absent in the previous ruling.

It is on this pivotal point that Plaintiff urges the Court to reconsider its application of the irreparable harm analysis. The Plaintiff asserts that the Respondent Court, in issuing the Order, did not fully consider the ongoing and potential harm being imposed on him as a likely consequence of the Defendants' actions. The Plaintiff firmly submits that this constitutes a material error of law, which, in the interest of justice and equity, necessitates a comprehensive reassessment of the circumstances under the correct legal standard.

WHEREFORE, for the foregoing reasons, The Plaintiff respectfully requests the Court to grant this Motion for Reconsideration, rescind the previous order, and issue a fresh order providing relief that is commensurate with the Plaintiff's present circumstances and founded on both law and equity.


Respectfully submitted, this 13th day of May 2024


Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
lucasianhunter@outlook.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing MOTION on the Court's CM/ECF system on this 13th of MAY 2024

which forwarded a copy to:

Mark A. Baugh, BPR No. 015779
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone (615) 726-5600
Facsimile (615) 744-5760
*Attorneys for Defendants Clairise Gamez, Crystal Ritchie, and Marissa Shulruff*

Kevin C. Klein (#23301)
Jeffrey W. Sheehan (#33534)
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, Tennessee 37208
(615) 600-4780
*Attorneys for Defendants: Mary Ann Jessee, Michelle
Tellock, Joel Newsome, Melissa Porter, G.L. Black,
Neil Jamerson, Jeremy Bourgoin, Mavis Schorn,
Pamela Jefferies, E. Jacob Cummings, Jill Harris,
Heather Robbins, Cate Enstrom, Angela Weaver,
Mary Roy, Michael Fazi, and Feylyn Lewis*

Submitted May 13, 2024

Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
lucasianhunter@outlook.com

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IAN HUNTER LUCAS, Pro Se<br>    Plaintiff(s),<br><br>v.<br><br>MARY ANN JESSEE et al.<br>    Defendant(s). | Case No. 3:24-cv-00440<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

**AFFIDAVIT OF IAN HUNTER LUCAS IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER**

Under penalty of perjury and pursuant to 28 U.S.C. § 1746, I, Ian Hunter Lucas, do hereby declare that the following is true and correct: The statements set forth in this Declaration are based on my personal knowledge, I am the plaintiff in the above captioned matter, and I am of sound mind and competent to testify about these matters if called upon to do so.

I am giving this Declaration to provide the Court with information related to the efforts undertaken in this case. As the Plaintiff, I respectfully request that the United States District Court for the Middle District of Tennessee issue an order for a Temporary Restraining Order ("TRO") against the Defendants, Mary Ann Jessee et al., pursuant to Federal Rule of Civil Procedure 65, to be enforced within the jurisdiction of this Court.

This motion is made on the grounds that Defendants' actions have caused and continue to cause me immediate and irreparable harm, including but not limited to, denial of access to student records protected under the Family Educational Rights and Privacy Act (FERPA), emotional, economic, professional, and longstanding harm.

I request that the TRO, under 28 U.S.C. § 1651, restrains Defendants from further denying me access to my student records and from taking any retaliatory or discriminatory actions against me. Furthermore, I request an emergency hearing for this matter due to the urgency and ongoing nature of the harm.

1

My claims are supported by substantial evidence of retaliatory and discriminatory actions by the Defendants, invoking protections under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, with precedents such as *Olmstead v. L.C.,* 527 U.S. 581 (1999) and *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987), demonstrating a clear violation of these laws. Given the evidence, I have a strong likelihood of success on the merits. The requested TRO should prohibit Defendants from retaliating against me for asserting my rights under ADA and require Defendants to provide me with access to my student records, as mandated by FERPA.

I seek immediate judicial intervention to halt Defendants' unlawful retaliatory actions, which egregiously violate whistleblower protections under state and federal law and infringe upon my rights due to my recognized disability. These actions have inflicted severe, ongoing, and potentially irreversible harm to my academic progress, career opportunities, mental well-being, personal dignity, and professional reputation.

Substantial evidence presented includes documentation and emails detailing the adverse impacts of the defendants' actions on me, evidence of GPA tampering, and infringement of my rights due to disability by denial of reasonable accommodations, breaching the ADA and the Rehabilitation Act. I contend that the Defendants failed to provide such accommodations and retaliated against me for requesting them, acting not just in bad faith, but with blatant disregard and utter disrespect for my rights under the ADA and the Rehabilitation Act, resulting in severe damages, including emotional distress, mental anguish, loss of enjoyment of life, and substantial financial losses.

Given the detailed allegations of legal violations, this document meticulously outlines the reasons for requesting an emergency hearing, the nature of the irreparable harm suffered, the evidence of violations, and the infringement on my rights due to my disability. This detailed approach not only bolsters my request for a Temporary Restraining Order but also emphasizes the necessity of an emergency hearing to address these urgent concerns.

2

This action arises from a series of ongoing and egregious violations of my rights under the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the Family Educational Rights and Privacy Act (FERPA) by the Defendants. As a student with recognized disabilities, I have been subjected to discriminatory practices, denial of reasonable accommodations, and retaliation for advocating for my rights, leading to significant harm to my academic standing, mental health, and future career prospects.

The dispute began in the fall semester of 2023 when I requested reasonable accommodations for my disabilities. Despite clear documentation and repeated requests, the Defendants failed to provide the necessary support, directly impacting my academic performance and well-being. Furthermore, I discovered unauthorized alterations to my academic records, including changes to grades and comments that significantly affected my GPA. When I raised these issues, not only were my concerns dismissed, but I also faced retaliatory actions, including further denial of access to my educational records, exclusion from academic programs, and targeted harassment.

These actions have not only infringed upon my rights under federal law but have also caused immediate and irreparable harm to my academic progress, mental health, and career opportunities. The denial of accommodations and retaliatory behaviors have placed undue stress and anxiety on me, exacerbating my disabilities and obstructing my right to a fair and accessible education.

Given the severity of these actions and the ongoing harm they have caused, I seek the Court's intervention to obtain a Temporary Restraining Order to halt these unlawful practices and to protect my rights under the ADA, the Rehabilitation Act, and FERPA. This request is supported by substantial evidence, including documentation of denied accommodations, evidence of grade tampering, and correspondence demonstrating the Defendants' disregard for my rights and well-being.

This factual background underscores the urgent need for judicial intervention to prevent further harm and to address the Defendants' blatant violations of federal law and my rights as a student with disabilities. As Ian Hunter Lucas, I'm amid a legal battle that has both shaken my foundations and shattered my trust in what I once viewed as a respectable institution. I'm pursuing a Temporary

Restraining Order (TRO) against Mary Ann Jessee and others, under Federal Rule of Civil Procedure 65, in the United States District Court for the Middle District of Tennessee. This is more than a plea; it's a desperate fight for my rights, my dignity, and my future.

Every day, I grapple with the immediate and ongoing damage inflicted by the defendants' actions—a denial of access to my own student records, severe emotional turmoil, and hindrances to my professional and economic well-being. Their refusal to accommodate my disability, despite my repeated requests and clear federal mandates under the ADA and the Rehabilitation Act, has left me feeling not only marginalized but openly persecuted.

Their actions have included tampering with my grades, blocking my access to necessary accommodations, and a chilling pattern of retaliation that began when I dared to stand up for my rights. I've navigated through layers of bureaucracy, only to be met with more discrimination and retaliation, pushing me to the brink both academically and mentally. The need for a TRO has become painfully clear. It's not just about getting back into the classroom or correcting my academic records—it's about halting the relentless discriminatory onslaught that threatens to derail my entire future. I am fighting not only for myself but to set a precedent that this type of behavior is unacceptable and will be challenged.

I'm not just a case number or a faceless plaintiff. I am a person who has endured profound injustice and suffering at the hands of those who were supposed to be guardians of education and inclusivity. As I press on with this legal action, armed with substantial evidence and a strong case under federal laws, I'm not only seeking justice for myself but also aiming to ensure that no one else must endure such blatant disregard for their rights and dignity.

This isn't just a legal battle; it's a fight for my life and livelihood, and I'm determined to see it through to the end. The path has been anything but easy, filled with obstacles and opposition at every turn, but I remain steadfast. This fight is bigger than me—it's about standing up against injustice and ensuring a fair, equitable treatment for everyone, no matter their disability or the challenges they face.

4

As I navigate this harrowing legal battle, it's become painfully clear that the defendants are not merely content with expelling me from the university—they are determined to ostracize me from the community and banish me from the medical profession entirely. The lengths they have gone to are not just punitive; they are ruthlessly comprehensive, attacking me from all angles to ensure their mission is accomplished.

The most chilling aspect of their tactics has been the exploitation of my mental health. It feels as if they are deliberately using this against me, perhaps in hopes of pushing me to a mental breakdown. This strategy is not only cruel but also deeply unethical, reminiscent of the grave injustices uncovered in *Adams v. Vanderbilt Univ.*, No. 3:23-cv-00001, 2024 U.S. Dist. LEXIS 48210 (M.D. Tenn. Mar. 19, 2024). In that case, the defendants disgracefully covered up the suicide of an undergraduate in their dorms, a dark shadow that lingers over the institution's past.

This parallel with my own experience reveals a disturbing pattern of behavior at Vanderbilt, where the well-being of individuals is sacrificed for the sake of reputation and liability management. Such actions not only exacerbate my personal suffering but also betray a profound disrespect for human dignity and psychological welfare, as also seen in another ongoing matter *Poe v. Lowe et al*., No. 3:24-cv-00368 (M.D. Tenn.). In my motion for a Temporary Restraining Order, I find it crucial to point out the alarming similarities between my case and *Poe v. Lowe et al.*, No. 3:24-cv-00368 (M.D. Tenn.). In both situations, the Defendants have displayed a disturbing pattern of conduct that severely infringes upon the rights of students, especially those protections afforded under laws like the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

This behavior includes, but is not limited to, the denial of reasonable accommodations, manipulation of student records, and punitive measures against students who assert their rights. A particularly distressing aspect of the Defendants' tactics, as detailed in my affidavit and reflected in "Poe v. Lowe et al.," is their manipulation of mental health conditions. Such actions not only intensify the suffering of affected students but also betray a deep-seated disregard for their dignity and psychological well-being. This strategy, aimed at inducing a mental breakdown in my case, shares troubling parallels

5

with the unethical behavior documented in *Poe v. Lowe et al.* Both instances reveal a systemic problem within the institution represented by the Defendants, where the welfare and legal entitlements of students are compromised for the sake of protecting the institution's reputation or for other wrongful reasons. The parallels between these cases are not coincidental but rather indicative of a standard operating procedure that the Court must urgently address to halt further injustices. The need for immediate judicial intervention cannot be overstated. Highlighting the documented pattern of misconduct and the severe consequences faced by plaintiffs in both my case and *Poe v. Lowe et al.*, underscores the imperative for swift judicial action. The granting of a Temporary Restraining Order in my case would not only safeguard my rights and well-being but would also serve as a judicial acknowledgment and remedy to the Defendants' unacceptable practices.

Throughout this legal journey, I have endured the profound impact of the Defendants' continuous onslaught against my character, professional aspirations, and psychological resilience. This litigation transcends mere academic reinstatement or the relief of damages; it represents a crucial battle for the preservation of my identity and my rightful place within my chosen profession, and the right to obtain what I worked hard to achieve, furthermore the profession of Nursing is a profession dedicated to advocacy of patients, how can defendants treat students as offensively as they have towards me for advocating for patients in my workplace for filing a FCA claim on my employer, and further while in school standing up for my rights and accommodations under the ADA as afforded under law. Defendants have used the full weight of their power, reputation and institutional force and ability to destroy the plaintiff in what it saw as a challenge of egos or in the culture of the Vanderbilt School of Nursing, a Nursing Student challenging the status quo, or effecting "the way things are done" by "enforcing there accommodations"  The actions of the Defendants have inflicted lasting damage, exacerbating the burden of their perceived betrayal with each passing day.

My resolve to persevere through this legal ordeal is steadfast, fueled by a resolve to restore my rights and academic standing, as well as to unveil and correct actions that starkly contrast with the principles of any esteemed educational institution. This battle is a potent testament to the unyielding

6

spirit of individuals who face injustice directly, undeterred by the prospect of silence, and it highlights the essential need to safeguard... "In the end, we will remember not the words of our enemies, but the silence of our friends." - Martin Luther King Jr. This journey is not just about confronting those who have wronged me; it's a reminder to all that standing up for justice, especially in the face of adversity, is a noble pursuit that echoes through the ages, as the late Congressman John Lewis said "Do not get lost in a sea of despair. Be hopeful, be optimistic. Our struggle is not the struggle of a day, a week, a month, or a year, it is the struggle of a lifetime. Never, ever be afraid to make some noise and get in good trouble, necessary trouble."

## **DECLEREATION UNDER PENALTY OF PREJURY**

Pursuant to 28 U.S.C. § 1746, I, Ian Hunter Lucas, declare under penalty of perjury that the foregoing statements and facts set forth in this affidavit in support of the Plaintiffs' Motion for a Temporary Restraining Order against Mary Ann Jessee et al. collectively the Defendants are true and correct to the best of my knowledge, information, and belief.

Executed on this day 05/02/2024, in PLEASANT VIEW State of TENNESSEE, in the UNITED STATES OF AMERICA

Declaration Signature

Declaration Signature Date: 05/02/2024

Respectfully and Urgently Submitted,

Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
(910) 872-3577
lucasianhunter@outlook.com

7

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I have served a copy of this <u>Motion for Temporary Restraining Order</u> on

Defendants and their counsel of record via CE/EFS in accordance with the Federal Rules of Civil

Procedure.


Mark A. Baugh, BPR No. 015779
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone (615) 726-5600
Facsimile (615) 744-5760

*Attorneys for All Other Defendants*


Kevin C. Klein (#23301)
Jeffrey W. Sheehan (#33534)
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, Tennessee 37208
(615) 600-4780
kevin.klein@kleinpllc.com
jeff.sheehan@kleinpllc.com

*Attorneys for Defendants: Mary Ann Jessee, Michelle*
*Tellock, Joel Newsome, Melissa Porter, G.L. Black,*
*Neil Jamerson, Jeremy Bourgoin, Mavis Schorn,*
*Pamela Jefferies, E. Jacob Cummings, Jill Harris,*
*Heather Robbins, Cate Enstrom, Angela Weaver,*
*Mary Roy, Michael Fazi, and Feylyn Lewis*


Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
(910) 872-3577
lucasianhunter@outlook.com


Date: 05/02/2024

8

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IAN LUCAS, Pro Se

     Plaintiff(s),

v.

MARY ANN JESSEE et al,

     Defendant(s).

Case No. 3:24-cv-00440

Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Alistair E. Newbern

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

     Plaintiff, Ian Hunter Lucas, respectfully submits this Memorandum of Law in support of his Motion for Preliminary Injunction against Defendants Mary Ann Jessee et al. This motion seeks immediate judicial intervention to halt ongoing and irreparable harm to Plaintiff due to Defendants' actions, which are alleged to include whistleblower retaliation, witness intimidation, harassment, defamation, libel, slander, and discrimination. These actions purportedly violate federal whistleblower protection statutes, including the False Claims Act (31 U.S.C. §§ 3729-3733), as well as applicable state whistleblower laws and disability discrimination statutes.

I. INTRODUCTION

     Plaintiff initiates this action by presenting evidence that he was improperly expelled and dismissed from Vanderbilt University due to intentional harm by Defendants, who are agents, employees, and act on behalf of Vanderbilt University as faculty, staff, and administrators. Through this motion, Plaintiff outlines a series of alleged wrongful acts by Defendants in response to his protected activities as a whistleblower under the False Claims Act, as well as his status as an individual with recognized disabilities.

     Plaintiff asserts that his academic dismissal from the Vanderbilt University School of Nursing and subsequent expulsion from Vanderbilt University were actions taken in conjunction with his wrongful termination from employment at Air Evac Lifeteam Inc. These actions, Plaintiff contends, are part of a

broader pattern of retaliatory, discriminatory, and baseless behavior. The detailed account within the Motion delineates a sequence of events indicating alleged complicity and collaborative efforts among the Defendants, leading to significant damage to Plaintiff's educational career, employment, reputation, and personal well-being. Plaintiff convincingly demonstrates a pressing need for this Court's intervention through its equitable powers to prevent further harm.

Furthermore, Plaintiff asserts that the Defendants, in collusion and association with Plaintiff's former employer, engaged in retaliatory acts as a third party, including a conspiracy to retaliate against Plaintiff. During Plaintiff's tenure as a student, it is also alleged that Defendants committed multiple independent violations of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) against Plaintiff and then when Plaintiff sought assistance and reported such acts to campus officials, campus authorities then acted against Plaintiff in an effort to 'cover up' what was found to be 'systemic disability accommodation. Discrimination' occurring at the Vanderbilt School of Nursing and of which a culture of fear had been created among the student body of speaking out or reporting faculty for such discrimination as exampled by the treatment and outcomes of Plaintiff in this case,

This request for a preliminary injunction is founded on allegations of serious and continuing violations under the False Claims Act's anti-retaliation provisions (31 U.S.C. § 3730(h)), which protect whistleblowers who lawfully report fraud against the federal government. The urgency and severity of the alleged harms necessitate the Court's immediate and decisive action to protect Plaintiff's legal rights and personal well-being.

## II. LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

A court may grant preliminary injunctive relief when the movant establishes: (1) a likelihood of success on the merits; (2) that he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). In the Sixth Circuit, the four considerations applicable to preliminary injunctions are factors to be balanced, not prerequisites that must be met. *Jones v. City of*

2

*Monroe*, 341 F.3d 474, 476 (6th Cir. 2003). Nevertheless, a failure to show a likelihood of success or irreparable harm can be fatal to a preliminary injunction motion. *McPherson v. Michigan High Sch. Athletic Assn, Inc*., 119 F.3d 453, 459 (6th Cir. 1997). In support of the motion for a preliminary injunction, the case of *Halifax Hospital Medical Center v. United States,* 2014 WL 1152916 (M.D. Fla. Mar. 20, 2014), is instructive. In *Halifax*, the court granted a preliminary injunction in favor of the plaintiff, recognizing the substantial likelihood of irreparable harm without such intervention, notably in cases involving whistleblower retaliation and the potential violation of federal statutes. This precedent underscores the necessity of safeguarding whistleblowers from retaliatory measures that would otherwise stifle critical disclosures in the public interest.

Plaintiff herein focuses on the likelihood of success on the merits and the public interest criteria, without prejudice to the two remaining factors, which are extensively addressed in the accompanying declarations and evidence submitted herewith.

### III. ARGUMENT

Plaintiff is Likely to Succeed on the Merits: The Plaintiff has a strong likelihood of success on the merits of his claims for whistleblower retaliation and disability discrimination. The evidence, including the timing of the donation from Air Evac Lifeteam Inc. and the coordinated actions of Defendants, strongly suggests a deliberate effort to retaliate against the Plaintiff. Federal and state whistleblower protection laws, as well as disability discrimination statutes, provide a solid legal basis for the Plaintiff's claims.

Plaintiff Meets the Criteria for Whistleblower Protection:

The Whistleblower Protection Act and the False Claims Act's anti-retaliation provisions confer robust rights upon employees to report abuse and misuse of government funds without facing retribution from their employers, to include third parties such as the defendants acting as agents of Vanderbilt University. In accordance with these statutes, Plaintiff must show engagement in protected activity, employer knowledge of this activity, a reprisal or adverse employment decision, and a causal connection between the protected conduct and the reprisal. The Plaintiff has provided substantial evidence

3

demonstrating a coordinated effort by Defendants to retaliate against him for his whistleblower activities and for raising concerns about disability discrimination. This includes a $1.25 million donation from Air Evac Lifeteam Inc. to Vanderbilt University, purportedly as a bribe for facilitating the Plaintiff's wrongful academic dismissal and expulsion, closely following his whistleblower activities. The Plaintiff's dismissal and the subsequent retaliatory actions have caused significant harm to his academic progress, career opportunities, emotional health, and reputation.

In this case, Plaintiff notified federal authorities of potential violations of both the Tennessee and Federal False Claims Acts, unequivocally constituting protected whistleblower activity. Defendant's knowledge of Plaintiff's disclosures and the adverse employment actions that ensued, which included [describe specific retaliatory measures taken by Defendant, satisfies the requirement of establishing employer awareness and suffering a reprisal. The direct causal link is manifest in the immediacy and severity of the retaliatory measures, strongly paralleling the facts and findings in Lachance v. White, where the court vindicated the whistleblower's rights, establishing a prima facie nexus between the protected conduct and the retaliation. Thus, the Plaintiff has demonstrated a persuasive likelihood of success on the merits regarding the whistleblower claims.

The concept of vicarious liability in the context of Vanderbilt University's potential liability: Vicarious Liability Framework: Vicarious liability typically applies in situations where an entity can be held responsible for the actions of another party, usually in an employer-employee relationship. In this case, for Vanderbilt to be held vicariously liable for whistleblower retaliation, it would need to be established that Vanderbilt had a significant control over the employment conditions of Plaintiff, or that there was a relationship akin to employer-employee between Vanderbilt and Plaintiff. Seeing as Plaintiff had signed a contract with Vanderbilt University Medical Center to be employed as a Nurse Resident upon completion of the Master of Nursing Program, and additionally had accepted funds in the amount of $22,500.00 for this position in which the position was contingent upon remaining enrolled and completing the program, such vicariously liability existed for the defendants in control of the Plaintiffs future employment which was arranged by the Defendants.

4

Evidence of Coordination and Control: The evidence suggesting coordination between Defendants as agents of Vanderbilt University and Air Evac Lifeteam Inc., including the timing of the donation closely following Lucas's whistleblower activities and the alignment of reasons for Lucas's expulsion and termination, are indicative of Vanderbilt's involvement in the retaliatory actions against Lucas. This coordination demonstrates Vanderbilt's control and influence over the conditions leading to Plaintiffs dismissal, which is a critical element in establishing vicarious liability.

The evidence presented by Plaintiff to demonstrate collusion between Air Evac Lifeteam Inc. and Defendants as agents of Vanderbilt University is multifaceted and includes a series of events and communications that suggest a coordinated effort to retaliate against him for his protected activities whistleblower activities and disability discrimination complaints. The key points of evidence are: 1.

Coordinated Sequence of Events: On December 4th, 2023, Lucas received a notice of temporary suspension from Vanderbilt University, which was closely followed within the same hour by a notice from Air Evac Lifeteam Inc. placing him on administrative paid leave. This synchronicity points to a deliberate and collaborative effort to retaliate against Lucas.

Exchange of Falsified Information: There was an orchestrated exchange of falsified and fabricated information between Michelle Tellock of Vanderbilt University and Timothy K. Garrett of Air Evac Lifeteam Inc., aimed at furthering harm against plaintiff on and beyond December 4, 2023. This exchange supports the claim of a collaborative effort to retaliate against Lucas.

Allegations of Concerted Retaliation: Lucas's allegations of concerted retaliation by the Defendants are aligned with the documented objectives of both Air Evac Lifeteam Inc. and Defendants as agents of Vanderbilt University to penalize him for protected whistleblower activities and disability discrimination complaints, providing a basis for the issuance of a preliminary injunction.

Lack of Procedural Fairness and Due Process: The precipitous move to academically dismiss Lucas without due process, coupled with the timing and alignment of actions by Defendants as agents of

5

Vanderbilt and Air Evac, suggests a concerted effort to penalize Lucas, sidestepping protections afforded under whistleblower protection laws and disability rights statutes.

The academic grade decision by Defendant Schorn demonstrates that Plaintiff did not violate HIPAA and furthermore shows that Lucas was wrongfully academically dismissed through several key points:

No HIPAA Violation: The Vanderbilt University Medical Center Privacy Office, designated as the authoritative entity on HIPAA matters within the Vanderbilt University School of Nursing Handbook, clarified that no privacy breach occurred in Lucas's case. This negation of a HIPAA violation was based on the accusation of "accessing patient charts remotely," which was initially alleged as a HIPAA violation. Despite this determination, the academic grade appeal evaluation by Defendants Jessee and Schorn deviated from the initial accusation, shifting the rationale to a violation of School of Nursing policies, unrelated to HIPAA.

Shift in Accusation: After the HIPAA violation claim was negated, Defendants Jessee and Schorn contended that Lucas violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes." This shift in rationale, despite the Vanderbilt University Medical Center Privacy Office's directive affirming the absence of a breach, illustrates a capricious application of institutional policy against Lucas, contravening his due process rights.

Legal and Policy Framework: Plaintiffs engagement in accessing patient charts for educational purposes is situated well within the boundaries delineated by HIPAA for healthcare operations, as supported by the principles discussed in *Northwest Memorial Hospital v. Ashcroft*. This legal framework supports the argument that accessing patient information for educational purposes aligns with HIPAA's provisions for healthcare operations, including the training of healthcare professionals and the enhancement of educational programs within healthcare settings.

Wrongful Academic Dismissal: The arbitrary and retrospective grade changes, predicated on disproven allegations and a subsequent shifting of rationale, violate Lucas's rights to procedural due

process and equitable treatment under established federal and state educational privacy laws. This wrongful application of policy and deviation from established privacy determinations contributed to Lucas's wrongful academic dismissal.

U.S. Department of Health and Human Services Determination: On appeal of Defendant Schorn's decision, Plaintiff referred the matter to the U.S. Department of Health and Human Services, the definitive investigative authority on matters of violations and breaches of HIPAA, who found no breach in privacy under HIPAA. This finding further substantiates Plaintiffs position that no HIPAA violation occurred, and the academic dismissal based on such allegations was wrongful. These points collectively demonstrate that Plaintiff did not violate HIPAA as initially alleged and that the academic dismissal, predicated on shifting and unfounded rationales, was wrongful. The appeal decision and subsequent findings by authoritative entities underscore the lack of basis for the academic penalties imposed on Plaintiff, highlighting the need for rectification of his academic standing and due process rights.

After the negation of the HIPAA violation claim, Lucas was alleged to have violated specific School of Nursing policies as follows:

Accessing the Chart for Educational Purposes: It was contended that Lucas violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes." This rationale was articulated by Defendant Schorn in her decision regarding Lucas's grade appeal, indicating a deviation from the initial accusation related to HIPAA and shifting the focus to a violation of internal School of Nursing policies.

Pattern of Conduct and Professional Conduct Requirements: The severity of action toward Plaintiff by Defendants Jessee, Schorn, and Jefferies was justified by their allegations of Plaintiffs alleged pattern of conduct rather than a single inadvertent policy violation. This included continuous accessing of records outside of the clinical setting and an ongoing lack of professional conduct consistent with course requirements, the ANA Code of Ethics, and the clinical setting's training module. This rationale suggests

7

that Plaintiff actions were seen as part of a broader pattern of behavior that violated the expectations set forth by the School of Nursing.

Violation of a Learning Contract: Plaintiffs actions were also interpreted as a violation of a "learning contract", which Plaintiff had previously received for "accessing records outside of the clinical setting." Despite Lucas's assertion that the learning contract was under a different context and that his engagement with the Electronic Health Record (EHR) at Shade Tree in his capacity was necessary for his role, the language of the learning contract was deemed to have been breached. This interpretation contributed to the rationale for his academic dismissal.

Educational Requirements and HIPAA Compliance: Despite Lucas's argument that educational requirements are considered services to patients under HIPAA as healthcare operations, and that students may access the EHR of a patient in their care for educational purposes, the School of Nursing's application of its policies led to the conclusion that Lucas's actions were in violation of the expected professional conduct and privacy standards. These allegations indicate a shift from a specific legal violation (HIPAA) to broader concerns about adherence to School of Nursing policies, professional conduct, and the terms of a learning contract.

Plaintiff defended himself against the allegations of violating the School of Nursing policies by presenting several arguments and pieces of evidence:

Clarification of No HIPAA Violation: Plaintiff highlighted that the Vanderbilt University Medical Center Privacy Office, the quoted and recognized authoritative entity on HIPAA matters within the School of Nursing as per the administration of the School of Nursing, clarified that no privacy breach occurred, negating any violation of HIPAA. This was in response to the initial allegations of "accessing patient charts remotely" in its entirety and thus why all School of Nursing Students and School of Medicine students can access charts remotely, this was not a special privilege that was specific to the Plaintiff. Dr. Schorn's statements regarding Lucas's alleged violations of School of Nursing policies and

8

HIPAA regulations present contradictions that ultimately undermine the basis for the alleged violations, rendering them void. These contradictions are evident in the following ways:

Shift in Accusation: Initially, Lucas was accused of a HIPAA violation for "accessing patient charts remotely." However, after the Vanderbilt University Medical Center (VUMC) Privacy Office determined that no privacy breach occurred, Dr. Schorn and Defendant Jessee shifted the rationale to allege that Lucas violated School of Nursing policies by "accessing the chart for educational purposes and not documentation purposes." This shift, despite the VUMC Privacy Office's directive affirming the absence of a breach, illustrates a capricious application of institutional policy against Lucas, contravening his due process rights.

Acknowledgment of Compliance with HIPAA's 'Minimum Necessary' Rule: Defendants Jessee and Schorn acknowledged Lucas's adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule. This acknowledgment further substantiates the claim that Lucas's activities were both legally compliant and integral to their educational advancement in a clinical setting. The 'minimum necessary' rule is designed to ensure that only the essential amount of Protected Health Information (PHI) needed for a specific purpose is accessed, underscoring the legality and necessity of Lucas's access to patient information as part of his clinical education.

Confirmation of Policy Alignment with VUMC Regulations: In her decision letter, Dr. Schorn confirmed that, per the Vanderbilt School of Nursing privacy policy, the VUMC Compliance and Privacy Office maintains the primary guiding principle and authority over the Vanderbilt School of Nursing privacy policy and is the autorotative resource. Schorn stated that "Accessing records to participate in or document care away from the clinical setting aligns with VUMC regulations, meets the VUMC requirements, and does not violate HIPAA." This statement directly contradicts the later allegations of policy violations, as it affirms that Lucas's actions were in alignment with VUMC regulations and did not constitute a HIPAA violation. These contradictions in Dr. Schorn's statements and the subsequent actions taken against Lucas highlight a procedural flaw in the application of institutional policies and HIPAA

9

regulations. The initial determination by the VUMC Privacy Office that no HIPAA violation occurred, coupled with the acknowledgment of Lucas's compliance with the 'minimum necessary' rule and the confirmation that his actions aligned with VUMC regulations, invalidate the basis for the alleged violations of School of Nursing policies. Consequently, these contradictions render the allegations against Plaintiff void, challenging the justification for his academic dismissal.

Dispute of Retrospective Grade Alterations: He disputed the retrospective grade alterations made by Defendant Jessee, which were grounded on the unfounded accusations that had been negated by the Privacy Office, additionally Defendant Jessee retrospectively changed Plaintiffs grades in two courses when her findings and facts of contention were limited to one, thus showing Defendant Jessee purposeful intent to find cause to dismiss Plaintiff by failing Plaintiff in a course without cause in order for Plaintiff to meet the School of Nursing standard for Dismissal of having failed two courses. Additionally, Defendant Jesses made claims that Plaintiff accessed the patients charts offsite on 10/17/2023 and 11/01/2023 however this would have been impossible for Plaintiff as Plaintiff car and laptop was stolen on 10/13/2023 from the Wesley Place Garage in which a police report with both the Vanderbilt University Police Department and Metro Nashville Police Department were filed, therefore the Plaintiff was relegated to using on campus/in the hospital computers. Additionally, the dates of 10/17/2023 and 11/01/2023 are only associated with the course of NURS5815 and not NURS5825, therefore Defendants had no grounds for the course change of NURS5825, and upon review of the Plaintiffs records there is no course change record request found for NURS5825 in the office of the registrar record.

1. Engagement in Educational Activities: Plaintiff affirmed that his engagement in accessing patient charts for educational purposes was well within the boundaries delineated by HIPAA for healthcare operations, as supported by the principles discussed in *Northwest Memorial Hospital v. Ashcroft*. He also noted that Defendants Jessee and Schorn acknowledged his adherence to the 'minimum necessary' rule, a cornerstone of the HIPAA Privacy Rule.

2.  Context of Prior Learning Contract: Plaintiff contended that the prior learning contract referenced by Defendant Jessee was null and void due to Plaintiff being removed from that course due to discrimination being found by the EOA office and an informal resolution being determined to be for Plaintiff to be removed and assigned to a different course. Additionally, testimony that was obtained by EOA demonstrates that students witnessed the defendant Jill Harris aske the defendant to look up the patient information regarding the "learning contract" being referenced. Additionally, learning contracts, are course specific and do no carry continuity between courses or throughout the students' academic career in the program, in fact the term learning contract is not found in the School of Nursing Student Handbook or in the Vanderbilt University Handbook. Thus, additional as mentioned Plaintiff's access to the EHR was only ever associated with engagement with the Electronic Health Record (EHR) at Shade Tree Clinic in his capacity as the Director of Nursing Student Engagement was necessary for his role in working as the clinic Sub-Director during clinic operating hours. He argued that the learning contract was not facilitated in good faith or within appropriate terms.

3.  Explanation of Clinical Performance: Plaintiff affirmed his clinical performance and proficiency as not warranting failing grades and asserted that the failing grades were disproportionate to the situation, and that the actual clinical faculty of the course had assessed and graded Lucas performance had passed the Plaintiff in the courses, and had never raised any complaints, furthermore the plaintiffs' grades had already been posted for several weeks and were on the Plaintiffs transcripts. Lucas also raised concerns about the credibility and reliability what was reported as "anonymous tips" that led to the allegations, which was from the same person under investigation for his EOA complaint of retaliation. However, it has since been determined there was no such anonymous tip, this was just a cover story to give cause to Defendant Jessee's reason to initiate the change in grades and dismissal, no anonymous tip has ever been produced or provided.

4.   Educational Requirements and HIPAA Compliance: Plaintiff further explained that educational requirements are considered services to patients under HIPAA as healthcare operations. Additionally, the defendant Schorn written appeal decision and written argument demonstrating a shift in inconsistency in defendant's storyline is that Plaintiff did not violate HIPPA but violated school policy by accessing the patient charts for educational reason and not documentation reasons is mute, as anything done in the capacity as a student is for educational reasons.

5.   Rebuttal of Retaliation Claims: He rebutted the claim of retaliation, stating that his approved accommodations did not excuse ignorance of, or noncompliance with, any school policies or course requirements. Lucas emphasized that he never claimed his accommodations in his appeal or sought an appeal based on his disability accommodations, thus this was another jab and discriminatory insult taken by defendants at Plaintiff, as Plaintiff confirmed with the Office of Student Access that such information requested by a any faculty member or outside member would require the student to sign a release of information, which the plantiff had not provided, thus information in such a manner would never be released or fulfilled in such a request as falsely noted by the defendant.

Through these points, Lucas sought to demonstrate that the actions taken against him were not justified by the defendants as agents of the Vanderbilt School of Nursing whom were asserting policies that were nonexistent and of which defendants were not willing to show plaintiff the actual accusations of such complaints or allegations being made, and thus with this Plaintiff asserted that his academic dismissal was wrongful. The School of Nursing alleged that Lucas violated policies by "accessing the chart for educational purposes and not documentation purposes." Additionally, Dr. Schorn noted "that the severity of action taken upon [Plaintiff] was resulted from an alleged pattern of conduct and not a single mistake or inadvertent policy violation." However Lucas affirmed and questioned that all actions performed by a student in the setting of academics are for an educational purpose to which there was no response or rebuttal.

12

Wrongful and unjustified expulsion from Vanderbilt University:

1.   *Ex-Partee* Communication and FERPA Violations: Defendant Jeremy Bourgoin reaching out
     to leadership and other members of the Nashville Fire Department in discussing Lucas's
     employment involvement at Nashville Fire Department and disclosing Plaintiffs educational
     disciplinary expulsion process underway to Nashville Fire Department Leadership and other
     staff was without question a violation of FERP based on Bourgoin not having obtained
     Plaintiff's consent does constitute a FERPA violation because FERPA protects the privacy of
     student education records and restricts their disclosure without consent. The information
     shared by Bourgoin was part of Lucas's educational record and was disclosed to a third party
     without Lucas's consent, this is a breach of FERPA's provisions. Educational records can
     include a broad range of information, however very specifically mentioned under FERPA are
     a student's disciplinary records which are considered part of a student's education record
     under FERPA. The fact that this information was provided to outside sources without
     Plaintiffs consent and knowledge, especially to a former employer, and an employer that
     Plaintiff was seeking reemployment with, that Bourgoin through falsification of information
     and fabrication, defamation, and libel slander caused harm to Plaintiff and professional
     reputation damage and loss, as indicated in the references, further it indicated that the
     information was used in a way that affected Plaintiff standing as part of further retaliation and
     collusion to do harm by Defendants as agents of Vanderbilt University had upheld as part of
     there agreement for receiving the donation funds from Plaintiffs former employer due to the
     large amount of private equity donation funds that were promised in exchange.

2.   The use of such information without consent for disciplinary purposes could nonetheless is as
     a violation of Plaintiff's rights under FERPA, which aims to ensure the confidentiality of
     student records and the right of students to have control over the disclosure of their
     information A university official discussing a student's disciplinary process with a current or

13

former employer is a violation of the Family Educational Rights and Privacy Act (FERPA), as outlined in 20 U.S.C. § 1232g. FERPA is designed to protect the privacy of student education records and restricts their disclosure without consent. The act specifically safeguards students' rights by limiting the unauthorized dissemination of their educational records and information, which includes disciplinary actions taken against a student. In the context provided, Defendant Bourgoin as a university official disclosed information about Plaintiffs disciplinary process to a Plaintiffs employer without the Plaintiffs explicit consent, constitutes a violation of FERPA. This is because this disclosure by the defendant involved the sharing of private educational information with a third party not entitled to access it under the law, without the requisite permission from the Plaintiff student. FERPA violations can have significant implications for both the student and the institution. For the student, unauthorized disclosure of disciplinary actions could negatively impact their reputation, employment opportunities, and future academic pursuits as in this case of the Plaintiff. For the institution, violating FERPA can lead to a loss of federal funding and legal challenges, among other consequences. Therefore, the act of a university official discussing the Plaintiffs disciplinary process with a former employer, as described, is indeed seen as a violation of FERPA, given that it involves the unauthorized sharing of protected educational records.

3. Third-party Retaliation Claims: There is precedent for third-party retaliation claims which apply to the Defendants and their relation as agents Vanderbilt University, as a third party, and being found to have participated in retaliatory actions against Plaintiff, as a whistleblower. Defendant Tellock of Vanderbilt had knowledge of Plaintiffs whistleblower disclosure under the False Claims Act after exchanging information with counsel retained by Air Evac Lifeteam Defendant Tim Garrett and both defendants took affirmative steps to exchange information on Plaintiff to aide in each other's efforts to participate in the retaliation as noted in a reported by the Board of Professional Responsibility which noted that

while information exchange between Tellock and Garrett occurred would not be a conflict of interest or violation in the eyes of the Board of Professional Responsibility due to neither Tellock or Garrett being retained by Plaintiff for representation.

4.    Conspiracy to Aiding and Abetting Claims: Additionally, Vanderbilt University by and thru the acts of the Defendants as its agents can be held accountable as evidence shows that they conspired with and aided and abetted with Air Evac Lifeteam Inc, a Global Medical Response Company owned by KKR & Co of which made the contributions in question to Vanderbilt University in retaliating against Plaintiff. The Defendants, acting on behalf of Vanderbilt University, are implicated in retaliatory acts against the Plaintiff for his whistleblowing activities and his role as a federal witness, potentially violating 18 U.S. Code §§ 1512 and 1513 due to the extreme and disrespectful treatment of the Plaintiff. The Defendants' conduct during these events was devoid of any consideration for the Plaintiff's dignity and rights.

Title IX

Even when the Plaintiff disclosed a quid pro quo Title IX situation to the University — where is educational opportunities or benefits were being improperly conditioned upon the Plaintiff's acceptance or rejection of sexual advances — the Title IX office at Vanderbilt University failed to provide the Plaintiff with the required support. The office offered only generic information on local resources, ignoring the severe implications of a failure to adhere to mandatory reporting obligations under Title IX. Despite Title IX's explicit requirements to treat quid pro quo harassment with the utmost severity, Defendants Fazi and Roy hesitated to permit the Plaintiff to file a formal complaint. It was only after the Plaintiff had pursued legal action that the Defendants issued a notice of allegation, which had previously been directed to Defendant Jessee.

A hostile environment is recognized when discrimination — through intimidation, ridicule, or insult — is so severe that it substantially disrupts the victim's educational experience, creating an abusive setting. This concept, as determined in *Harris v. Forklift Systems, Inc.*, contrasts with the deliberate indifference framework, which requires the harassment to be so significant and obstructive that it bars the

victim's access to educational benefits. Under this framework, isolated incidents are insufficient; the harassment must be pervasive. Notably, in cases of quid pro quo harassment, even a single incident can be significant enough to constitute a violation, as the very nature of quid pro quo implies a substantial impact due to the power dynamics involved.

Second Amendment Violations

Plaintiff was expelled based on his legal right to own a possess a firearm: Part of the December 4th 2023 Welfare Panel meeting which was recorded and transcribed against the Plaintiffs consent, and further the transcription which included sensitive health information was disseminated to unknow amount of individuals which constitutes a HIPPA violation, nonetheless, The allegations surrounding Plaintiff purchase of a firearm and the subsequent use of this fact by Defendants in a disciplinary proceedings at Vanderbilt University raise several legal questions, including potential implications for his Second Amendment rights. The Second Amendment to the U.S. Constitution protects an individual's right to keep and bear arms. The key issues in Lucas's case involve the process by which the information about his firearm purchase was used constituted a violation of his rights under university policies and broader constitutional protections.

Plaintiff Lucas is a valid handgun carry permit in the state of Tennessee under TCA § 39-17-1351 According to TCA § 39-17-1309, a person with a valid handgun carry permit is allowed to keep a firearm or ammunition in their privately-owned vehicle while on school property, provided the firearm or ammunition is stored in a manner that prevents access by individuals other than the permit holder and the vehicle is locked. The firearm must be stored out of plain view, and the vehicle must be locked to ensure security.

This law allows permit holders to have firearms in their cars even while parked in areas generally sensitive to the presence of weapons, such as school parking lots. The plaintiff asserts that he never brought his handgun on to school property and furthermore that even when transporting his handgun his vehicle has a built in safe in the glove compartment that would secure the firearm. Of note when the Plaintiff's vehicle was stolen on 10/13/2023 the vehicle was found and recovered by Metro Nashville

Police department. Once the Plaintiffs vehicle had been located and taken to the impound lot for evidence processing, The Plaintiff consented for Vanderbilt Police to fingerprint and search the Plaintiffs vehicle for evidence in order to help locate the care thief, of note there was no weapon in the vehicle and furthermore the handgun registered to the Plaintiff was not reported stolen as it was not in the car, a testament to the fact the Plaintiff does not bring his handgun to school and furthermore, even if the Plaintiff were have his handgun in his vehicle locked away and, as noted stored out of plain view and with the vehicle locked to ensure security, the Plaintiff would still have been in compliance with under TCA § 39-17-1351 According to TCA § 39-17-1309.

Furthermore, part of the reasoning for expulsion was that during the December 4th 2023 welfare panel[1] interview with Defendant Newsome and Defendant Porter, Defendant Porter a Clinical Psychologist performing an assessment, thus relating back to the reasoning for this being a HIPPA violation, as a recorded medical assessment against the Plaintiffs knowledge and without the Plaintiffs consent asked the plaintiff if "he had access to any firearms" plaintiff responded that he "was in the process of moving so he did not have any immediate access of firearms that his [plaintiffs] firearms were at his parents' house in Clarksville, and he [Plaintiff] was in the process of moving to Pleasant View, so it would depend on how she [defendant porter] defined access. Plaintiff also stated and acknowledged that Defendant Newsome was a law enforcement officer and had run Plaintiffs information in NCIC and knew Plaintiff had a Handgun carry permit and had a handgun registered to Plaintiff name, so Plaintiff did not understand the point of the questions.

In the March 4th Meeting with Defendant Bourgoin, Plaintiff was informed that Defendant Newsome had reported that Plaintiff had provided a "False information" stating that when asked if he [Plaintiff] had access to firearms that [Plaintiff] stated he did not and that when Defendant Newsome obtained Plaintiffs firearm purchase history from the ATF, despite that Defendant Newsome stated during the December 4th 2023 welfare panel meeting which is defined by the Vanderbilt Student handbook as:

A Welfare Panel will be convened by the Vice Provost for Student Affairs and Dean of Students or Designee (Dean), when the Dean, through an individualized assessment, determines that a student (1) is a danger to the health and safety of themselves or others or (2) is otherwise unable to function as a student and (3) the inclusion of treatment recommendations or evaluations may be beneficial to stop the concern and prevent its reoccurrence in addition to outlining behavioral expectations or actions. The Dean may place a student on an interim restriction(s) effective until the Welfare Panel has made a final decision on the Intervention Plan or determined reasons for imposing the interim restriction(s) no longer exist. A Welfare Panel is comprised of individuals who would provide for an individualized assessment of the situation and the student. The composition of the Welfare Panel in any individual case is set by the Dean.   The Welfare Panel may consult with the Office of the General Counsel.

Determination: After a Welfare Panel has been convened, the Welfare Panel may make additional requests for information, which can include, but are not limited to, requesting the student be assessed by the UCC or another health provider. Using well-reasoned judgment and considering the individual circumstances, the Welfare Panel will enact an individualized assessment and plan (Intervention Plan) that addresses whether a student (1) may remain enrolled without conditions, (2) may remain enrolled with conditions that are to be described in writing, or (3) should or must take a leave. In deciding about the contents of an Intervention Plan, the Welfare Panel will consider available relevant information. When appropriate, the student may be asked to sign a health records release to authorize direct communication between and among the Welfare Panel and the student's healthcare provider(s). If a student declines to provide requested information and/or authorizations, the Welfare Panel will make their determination after considering the available relevant information.

Notice of and Response to Intervention Plan: When the Welfare Panel has determined the expectations for the Intervention Plan, the Dean will provide prompt notice to the student in

18

writing and may attempt to meet with the student to outline the Welfare Panel's expectations. If the student agrees to the Intervention Plan, the process is deemed concluded and SCC will monitor compliance. If the student does not comply with expectations, the process may be reopened. If the student disagrees with the Intervention Plan, the student will have three (3) calendar days to propose an alternative plan, which should be supported and endorsed by a licensed medical professional unaffiliated with Vanderbilt University (Note: Vanderbilt University Medical Center providers will be considered unaffiliated for purposes of this policy but should not be faculty within the School of Medicine who currently have or have had a role in evaluating the student's academic assessment or promotion). The student may request an extension in writing within the three-day window for good cause, which the Dean will review to determine if the extension is appropriate.

If the student submits an alternative plan, the Welfare Panel will weigh the additional information before finalizing its Intervention Plan. Greater weight will be given to an alternative plan supported and endorsed by a licensed medical professional unaffiliated with Vanderbilt University (as defined above) with such an understanding of the student's collateral information as to provide an individualized assessment. If no alternative plan is submitted, the original Intervention Plan will be considered agreeable, the process is deemed concluded, and SCC will monitor compliance. The Welfare Panel has final discretion on the Intervention Plan and may, in its discretion, reject all portions of an alternative plan supported and endorsed by a licensed medical professional unaffiliated with Vanderbilt University.

Medical Leaves of Absence as Part of Intervention Plan: If a medical leave of absence (MLOA) is indicated by the Intervention Plan, the student will typically be given the opportunity to take the leave voluntarily. If the student declines to take a voluntary leave, the Welfare Panel, in its discretion, has the authority to place the student on an immediate mandatory leave. When a student takes a voluntary or mandatory MLOA under this policy, the Welfare Panel will

determine any conditions for reinstatement on an individualized basis and communicate this

information to the student in writing in addition to requiring the student to complete the MLOA

return process outlined in this section. If a student begins a voluntary or mandatory MLOA after

an academic semester has begun, the student's registration will be canceled. The student's tuition

will be refunded as provided in the Tuition Refund Schedule. A student on a voluntary

or mandatory leave may register for classes for the semester they anticipate they will return to,

however, registration may be cancelled if return from leave is not approved. MLOAs

are approved by the Welfare Panel through Student Care Coordination. A student's transcript

does not denote a leave of any type (voluntary or mandatory).


Thus per Defendant Newman and Porter if the meeting being conducted was as reported to me as

a welfare panel "mental health check" for concerns of plaintiffs "mental state" given the above

description, it would seem contradictory for such a meeting to lead to biased student conduct charges, and

also for such a health care, and medically centered meeting to be recorded and transcribed without the

consent of the Plaintiff and then for such recording and transcription to be used against the plaintiff in a

student conduct and disciplinary expulsion hearing, especially seeing as the Plaintiff was informed on the

transcript of this improperly obtained transcript that the plaintiff was not under investigation or being

interviewed based on VUPD conducting a criminal or student conduct investigation but a mental health

welfare check, nonetheless, that the ATF showed that the Plaintiff had purchased a Handgun in May 2023

(7 months prior to the December 4th 2023 meeting). Plaintiff stated the question was regarding access, and

Plaintiff re-stated the conversation, and furthermore, stated that a question on access to a firearm and a

question on purchase and ownership of a firearm are separate questions. Additionally, when questioned,

Defendant Newsome explicitly denied, in the presence of Plaintiff's counsel, any allegations of

Plaintiff being observed—either in possession of, or verbally claiming possession of—a firearm at any

time during his tenure as a student. Furthermore, Defendant Newsome refuted any allegations that the

Plaintiff had made threats, demonstrated threatening behavior, or even implied making threats with or

concerning a firearm, this was also documented and signed and provided however, by the witnessed

counsel, however with the lack of due process and unjust and additionally with the clear agenda against

plaintiff, the

## IV. CONCLUSION

In summary, the application of vicarious liability to Defendants actions as a relation to agency of

Vanderbilt Universities liability of retaliatory damages of Plaintiff is based on the significant control or

influence over the employment conditions or actions leading to Plaintiffs dismissal, and Defendants

knowledge of the harm and humiliation this would cause Plaintiff and the bonus of participation in the

retaliatory actions would earn the Master of Nursing program the much needed scholarship funds it

desires as part of the Vanderbilt "Dare to Grow" campaign, this control demonstrates the existence of a

relationship that is akin to employer-employee between Vanderbilt and Plaintiff in which defendants as

agents of Vanderbilt used as a form of retaliation as third party retaliator to the Plaintiff.

Legal Framework for Third-party Retaliation Claims: The U.S. Supreme Court in *Thompson v.*

*North American Stainless, LP* established that third parties could bring retaliation claims if they were

adversely affected by an employer's retaliatory actions. This precedent supports the possibility of Plaintiff

bringing a claim against Defendants and Vanderbilt for its alleged involvement in retaliatory actions, even

if the direct employer was Air Evac Lifeteam Inc. While the case of *Thompson v. North American*

*Stainless, LP* primarily addressed employment relationships, its principles regarding the broad

interpretation of "aggrieved persons" could indeed be extended to other contexts where retaliatory actions

undermine the objectives of Title VII. One such context is the educational setting of a university,

particularly when the retaliation is indirectly connected to employment discrimination.

In the case at hand, this interpretation is applicable because Plaintiff, Ian Hunter Lucas, was

contractually bound to commence employment with Vanderbilt University Medical Center (VUMC) upon

successful completion of the Master of Nursing Program at Vanderbilt University. The Defendants were

fully aware of this arrangement, as they had established the "Nurse Scholars" program, of which Plaintiff

was a participant. This program essentially created an employment relationship between Plaintiff and the

21

university. Consequently, the protections against retaliation under Title VII should extend to this educational context, given the direct linkage between Plaintiff's academic progression and his already hired employment status at Vanderbilt University Medical Center for Nurse Residency Placement, thus under *Thompson v. North American Stainless, LP* there is an employment relationship and a direct link to prospective employment as part of the educational experience—as program leading directly to employment—Title VII's protections extend to cover discriminatory or retaliatory actions that impact this path from education to employment. This sufficiently intersects with the employment aspects that Title VII aims to regulate.

Plaintiff Demonstrates Claims for Disability Discrimination Protections

The ADA and the Rehabilitation Act require Universities to provide reasonable accommodations to students with disabilities and oblige non-discriminatory treatment. Plaintiff, who legitimately required time off due to a disability, alleges and demonstrates evidence that is in exceedances of the burden of proof that Defendants not only failed to provide reasonable accommodations as mandated by these statutes but retaliated against him for exercising his right to such accommodations. The punitive nature of the Defendants' response, together with the failure to engage in an interactive process to ascertain appropriate accommodations, signify that Plaintiff has substantial grounds for success on the merits concerning his ADA and Rehabilitation Act claims. This is evident by Plaintiffs email exchange between Plaintiff and Defendant Enstrom, in which Defendant Enstrom is reviewing Plaintiffs accommodations letter from the Student Access Office and emails Plaintiff stating for any disability related absence 10 points will be deducted from the Plaintiffs grade effectible penalizing the plaintiff for use of his disability accommodations. This was reported to the Student Access Office who reported having to get the "School Administration" involved to effect defendant Enstrom to change the accommodation penalty. Throughout the semester as noted in student witnesses' testimony, Defendant Enstrom particularly retaliated on Plaintiff by keeping his attendance and being very exaggerated when Plaintiff entered class to make know she was keeping his attendance and no other students, despite Plaintiff passing Defendant Enstrom's

class, Defendant Enstrom still found reason to give Plaintiff a learning contract despite Plaintiff having not violated any attendance polices.

Granting a Preliminary Injunction Serves the Public Interest Upholding Statutory Protections for Whistleblowers and Individuals with Disabilities. It is a cornerstone of the public interest to ensure that laws designed to protect whistleblowers and individuals with disabilities are faithfully executed. Granting a preliminary injunction is consistent with the public interest as it signals a commitment to upholding the integrity of legal protections for those courageous enough to report misuse of government funds, as well as those requiring necessary accommodations due to disabilities. Case law, including Halifax Hospital Medical Center v. United States and Roth v. Department of Justice, has consistently recognized the irreparable harm and chilling effect that can result from condoning retaliation and discrimination.

A preliminary injunction in this instance will not only provide immediate protection to the Plaintiff but will also serve as a deterrent against similar unlawful actions by Defendants and other parties. Upholding the rule of law and deterring misconduct is a fundamentally important public interest that is advanced by the assertion of statutory remedies in cases such as the present one.

For the reasons stated herein, Plaintiff has shown a compelling likelihood of success on the merits of his whistleblower protection and disability discrimination claims, and the issuance of a preliminary injunction is aligned with the public interest in preserving the integrity and enforcement of federal workforce protections. Accordingly, Plaintiff respectfully requests that this Honorable Court grant the motion for a preliminary injunction, restraining Defendant from engaging in further retaliatory or discriminatory practices.

Respectfully Submitted, this 7th day of May 2024,

_____
Ian Hunter Lucas
*Plaintiff Pro Se*
221 Charleston Avenue
Pleasant View, Tennessee, 37146
910-872-3577 (Mobile)
Lucasianhunter@outlook.com

23

# CERTIFICATE OF SERVICE

I certify that I filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR

PRELIMINARY INJUNCTION on the Court's CM/ECF system on this 25th day of April 2024, which

forwarded a copy to:

Mark A. Baugh (#015779)
Denmark J. Grant (#036808)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone (615) 726-5600
Facsimile (615) 744-5760

*Attorneys for Defendants Clairise Gamez, Crystal Ritchie, and Marissa Shulruff*

Kevin C. Klein (#23301)
Jeffrey W. Sheehan (#33534)
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, Tennessee 37208
(615) 600-4780
kevin.klein@kleinpllc.com
jeff.sheehan@kleinpllc.com

*Attorneys for Defendants: Mary Ann Jessee, Michelle
Tellock, Joel Newsome, Melissa Porter, G.L. Black,
Neil Jamerson, Jeremy Bourgoin, Mavis Schorn,
Pamela Jefferies, E. Jacob Cummings, Jill Harris,
Heather Robbins, Cate Enstrom, Angela Weaver,
Mary Roy, Michael Fazi, and Feylyn Lewis*

Type text here                                Ian Hunter Lucas
                                            *Plaintiff Pro Se*
                                        221 Charleston Avenue
                                Pleasant View, Tennessee, 37146
                                        910-872-3577 (Mobile)
                                    Lucasianhunter@outlook.com

                                        Date: May 7th, 2024

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 28, 2024

Mr. Ian Hunter Lucas
221 Charleston Avenue
Pleasant View, TN 37146

        Re:  Case No. 24-5516, *In re: Ian Lucas*
            Originating Case No. : 3:24-cv-00440

Dear Mr. Lucas,

    The petition for writ of mandamus or prohibition has been docketed as case number **24-5516** with the caption listed above.  If you have not already done so, you must mail a copy of the petition to the lower court judge and counsel for all the other parties.

    The filing fee for the petition is $600, which is payable to the Clerk, Sixth Circuit Court of Appeals.  If you wish to seek a waiver of the filing fee, a motion for pauper status with a completed financial affidavit is due by **June 27, 2024**.  The motion and financial affidavit is enclosed for your convenience.

    The district court judge to whom this petition refers has been served with this letter.

                Sincerely yours,

                s/Sharday S. Swain
                Case Manager
                Direct Dial No. 513-564-7027

cc:  Ms. Lynda M. Hill

Enclosure

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

v.                                              Case No: _____

_____

MOTION FOR PAUPER STATUS

I move to waive the payment of the appellate filing fee under Fed. R. App. P. 24 because I am a pauper.  This motion is supported by the attached financial affidavit.

**The issues which I wish to raise on appeal are:**

_____

_____

_____

_____

_____

_____

Signed: _____        Date: _____

Address: _____

_____

**INCARCERATED LITIGANTS ARE TO INCLUDE A COPY OF HIS/HER TRUST ACCOUNT FOR THE LAST SIX MONTHS.**

CERTIFICATE OF SERVICE

I certify that a copy of the motion and affidavit was sent to opposing counsel via U.S. Mail on the _____ day of _____, 20____.

Signature (Notary not required)

_____

**CONFIDENTIAL**

## FINANCIAL AFFIDAVIT

CJA 23
Rev. 6CCA 05/23

IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT OR OTHER COURT SERVICES WITHOUT PAYMENT OF FEE

**IN UNITED STATES**  ☐ MAGISTRATE  ☐ DISTRICT  ☑ APPEALS COURT or  ☐ OTHER PANEL (Specify below)

| IN THE CASE | FOR | LOCATION NUMBER |
|---|---|---|
| _____ V.S. _____ | | |
| | AT | |

| PERSON REPRESENTED (Show your full name) | | DOCKET NUMBERS |
|---|---|---|

| | | |
|---|---|---|
| | 1 ☐ Defendant—Adult | Magistrate |
| | 2 ☐ Defendant - Juvenile | |
| | 3 ☐ Appellant | District Court |
| | 4 ☐ Probation Violator | |
| CHARGE/OFFENSE (describe if applicable & check box →) ☐ Felony ☐ Misdemeanor | 5 ☐ Parole Violator | Court of Appeals |
| | 6 ☐ Habeas Petitioner | |
| | 7 ☐ 2255 Petitioner | |
| | 8 ☐ Material Witness | |
| | 9 ☐ Other | |

### ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

| | | |
|---|---|---|
| **EMPLOY-MENT** | Are you now ☐ Yes ☐ No ☐ Am Self-Employed | |
| | Name and address of employer: _____ | |
| | **IF YES,** how much do you earn per month? $ _____ | **IF NO,** give month and year of last employment How much did you earn per month? $ _____ |
| | If married is your Spouse employed? ☐ Yes ☐ No | |
| | **IF YES,** how much does your Spouse earn per month? $ _____ | If a minor under age 21, what is your Parents or Guardian's approximate monthly income? $ _____ |

**ASSETS**

| | | | |
|---|---|---|---|
| **OTHER INCOME** | Have you received within the past 12 months any income from a business, profession or other form of self-employment, or in the form of the form of rent payments, interest, dividends, retirement or annuity payments, or other sources? ☐ Yes ☐ No | | |
| | | RECEIVED | SOURCES |
| | **IF YES, GIVE THE AMOUNT RECEIVED & IDENTIFY THE SOURCES** | $ _____ | _____ |
| **CASH** | Have you any cash on hand or money in savings or checking accounts? ☐ Yes ☐ No  **IF YES,** state total amount $ _____ | | |
| **PROP-ERTY** | Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)? ☐ Yes ☐ No | | |
| | | VALUE | DESCRIPTION |
| | **IF YES, GIVE THE VALUE AND DESCRIBE IT** $ _____ | _____ | _____ |

**OBLIGATIONS & DEBTS**

| | MARITAL STATUS | Total No. of Dependents | List persons you actually support and their relationship to them |
|---|---|---|---|
| **DEPENDENTS** | ☐ SINGLE ☐ MARRIED ☐ WIDOWED ☐ SEPARATED OR ☐ DIVORCED | | |

| | | APARTMENT OR HOME: | Creditors | Total Debt | Monthly Paymt. |
|---|---|---|---|---|---|
| **DEBTS & MONTHLY BILLS** (LIST ALL CREDITORS, INCLUDING BANKS, LOAN COMPANIES, CHARGE ACCOUNTS, ETC.) | | | | $ _____ | $ _____ |
| | | | | $ _____ | $ _____ |
| | | | | $ _____ | $ _____ |
| | | | | $ _____ | $ _____ |

I certify under penalty of perjury that the foregoing is true and correct.
The information herein is protected from public disclosure by the Judicial
Conference Policy on Public Access to Electronic Criminal Case Files

Executed on (date) _____

SIGNATURE OF DEFENDANT 

(OR PERSON REPRESENTED) _____