**Appendix to the Petition for Extraordinary Writ**

**Case Name:** Re: Ian Lucas
**Case Number:** 24-5516

**Certificate of Compliance**

I, Ian H. Lucas Pro Se petitioner, hereby certify that the appendix filed herein complies with all applicable rules and regulations of the U.S. Supreme Court regarding format, binding, and length as prescribed by the Court.

I have reviewed the appendix and confirm that it is complete and conforms to the requirements set forth by the Supreme Court. This certification is made in good faith, based on a reasonable investigation of the relevant facts and a diligent review of the appendix.

Date: July 1, 2024

*/S/ Ian H. Lucas*
_____

**Ian H. Lucas**
Pro Se
221 Charleston Avenue
Pleasant View, TN, 37146
Phone: 629-210-8215
Email: lucasianhunter@outlook.com

**Attestation of Electronic Signature**

I, Ian H. Lucas, certify that the electronic signature /S/ Ian H. Lucas affixed to this document is my valid electronic signature and is intended to have the same force and effect as my handwritten signature.

Date: July 1, 2024

*/S/ Ian H. Lucas*

Ian H. Lucas
Pro Se

Part of Thomson Reuters

Case No. 2:17-cv-945

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

# Roe v. Adams-Gaston

Decided Nov 2, 2017

Case No. 2:17-cv-945

11-02-2017

JANE ROE, Plaintiff, v. JAVAUNE ADAMS-GASTON, et al., Defendants.

CHIEF JUDGE EDMUND A. SARGUS, JR.

**CHIEF JUDGE EDMUND A. SARGUS**, JR.
**Magistrate Judge Chelsey M. Vascura**
**OPINION AND ORDER**

This matter is before the Court on Plaintiff Jane Roe's Motion for Leave to Proceed Anonymously [ECF No. 4]. Defendants do not object to this request.

A complaint generally must state the names of all parties. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). However, the Court may excuse a plaintiff from identifying herself in certain circumstances. *Id*. A plaintiff can proceed anonymously only if her privacy interests substantially outweigh the presumption of open judicial proceedings. *Id*. Several considerations guide this inquiry: (1) whether the plaintiff is suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiff to disclose information "of the utmost intimacy"; (3) whether the litigation compels the plaintiff to disclose an intention to violate the law; and (4) whether the plaintiff is a child. *Id*. (quoting *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir. 1981)).

The Court has balanced Plaintiff's privacy interests against the public's right of access to court proceedings. *See Porter*, 370 F.3d at 560. That Plaintiff is challenging a governmental activity weighs in favor of her request to proceed anonymously. And, critically, given the circumstances of this case, requiring Plaintiff to proceed under her real name would disclose *2 information of the utmost intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. pt. 99. For these reasons, Plaintiff's privacy interests substantially outweigh the presumption of open judicial proceedings, and the Court **GRANTS** Plaintiff's Motion for Leave to Proceed Anonymously [ECF No. 4] as "Jane Roe."

Plaintiff shall inform the Court if her identity becomes public knowledge at any point during the litigation. The Court would, in that situation, reconsider the analysis supporting Plaintiff's request to proceed anonymously.

**IT IS SO ORDERED. 11-2-2017 DATE**

**/s/** _____

**EDMUND A. SARGUS, JR.**

**CHIEF UNITED STATES DISTRICT JUDGE**



# Sampson v. Murray

415 U.S. 61 (1974) · 94 S. Ct. 937

Decided Feb 19, 1974

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.

No. 72-403.

Argued November 14, 1973. Decided February 19, 1974.

Upon being notified that she was going to be discharged on a specific date from her position as a probationary Government employee, respondent filed this action claiming that the applicable Civil Service regulations for discharge of probationary employees had not been followed, and seeking a temporary injunction against her dismissal pending an administrative appeal to the Civil Service Commission (CSC). The District Court granted a temporary restraining order, and after an adversary hearing at which the Government

62 declined to produce the discharging official as a witness to testify as to the reasons for the dismissal, ordered the temporary injunctive relief continued. The Court of Appeals affirmed, rejecting the Government's contention that the District Court had no authority to grant temporary injunctive relief in this class of cases, and holding that the relief granted was within the permissible bounds of the District Court's discretion. *Held:* While the District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee, nevertheless under the standards that must govern the issuance of such relief the District Court's issuance of the temporary injunctive relief here cannot be sustained. Pp. 68-92.

(a) The District Court's authority to review agency action, *Service* v. *Dulles*, 354 U.S. 363, does not come into play until it may be authoritatively said that the administrative decision to discharge an employee does in fact fail to conform to the applicable regulations, and until administrative action has become final, no court is in a position to say that such action did or did not conform to the regulations. Here the District Court authorized, on an interim basis, relief that the CSC had neither considered nor authorized — the mandatory reinstatement of respondent in her Government position. *Scripps-Howard Radio* v. *FCC*, 316 U.S. 4; *FTC* v. *Dean Foods Co.*, 384 U.S. 597, distinguished. Pp. 71-78.

*62

casetext
Part of Thomson Reuters

(b) Considering the disruptive effect that the grant of temporary relief here was likely to have on the administrative process, and in view of the historical denial of all equitable relief by federal courts in disputes involving discharge of Government employees; the well-established rule that the Government be granted the widest latitude in handling its own internal affairs; and the traditional unwillingness of equity courts to enforce personal service contracts, the Court of Appeals erred in routinely applying the traditional standards governing more orthodox "stays," and respondent at the very least must show irreparable injury sufficient in kind and degree to override the foregoing factors. Pp. 78-84.

(c) Viewing the order at issue as a preliminary injunction, the Court of Appeals erred in suggesting that at this stage of the proceeding the District Court need not have concluded that there was actually irreparable injury, and in intimating that, as alleged in respondent's unverified complaint, either loss of earnings or damage to reputation might afford a basis for a finding of irreparable injury. Pp. 84-92.

149 U.S.App.D.C. 256, 462 F.2d 871, reversed.

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 92. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 97.

*Keith A. Jones* argued the cause for petitioners. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Wood, Acting Assistant Attorney General Jaffe, Samuel Huntington*, and *Walter H. Fleischer*.

*Thomas J. McGrew* argued the cause for respondent *pro hac vice*. With him on the brief was *James A. Dobkin*.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent is a probationary employee in the Public Buildings Service of the General Services Administration (GSA). In May 1971, approximately four months *63 after her employment with GSA began, she was advised in writing by the Acting Commissioner of the Public Buildings Service, W.H. Sanders, that she would be discharged from her position on May 29, 1971. She then filed this action in the United States District Court for the District of Columbia, seeking to temporarily enjoin her dismissal pending her pursuit of an administrative appeal to the Civil Service Commission. The District Court granted a temporary restraining order, and after an adversary hearing extended the interim injunctive relief in favor of respondent until the Acting Commissioner of the Public Buildings Service testified about the reasons for respondent's dismissal.

A divided Court of Appeals for the District of Columbia Circuit affirmed,[1] rejecting the Government's contention that the District Court had no authority whatever to grant temporary injunctive relief in this class of cases, and holding that the relief granted by the District Court in this particular case was within the permissible bounds of its discretion. We granted certiorari, *sub nom. Kunzig* v. *Murray*, 410 U.S. 981 (1973). We agree with the Court of Appeals that the District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee, but conclude that, judged by the standards which we hold must govern the issuance of such relief, the issuance of the temporary injunctive relief by the District Court in this case cannot be sustained.

2

1  *Murray* v. *Kunzig*, 149 U.S.App.D.C. 256,
   462 F.2d 871 (1972). For a discussion of
   the Court of Appeals' jurisdiction, and the
   jurisdiction of this Court, see *infra*, at 86-
   88.

## I

Respondent was hired as a program analyst by the Public Buildings Service after previous employment in the Defense Intelligence Agency. Under the regulations *64 of the Civil Service Commission, this career conditional appointment was subject to a one-year probationary period.[2] Applicable regulations provided that respondent, during this initial term of probation, could be dismissed without being afforded the greater procedural advantages available to permanent employees in the competitive service.[3] The underlying dispute between the parties arises over whether the more limited procedural requirements applicable to probationary employees were satisfied by petitioners in this case.

2  5 C.F.R. § 315.801.

3  Compare 5 C.F.R. § 315.801 — 5 C.F.R. §
   315.807 with 5 C.F.R. § 752.101 *et seq.*

The procedural protections which the regulations accord to most dismissed probationary employees are limited. Commonly a Government agency may dismiss a probationary employee found unqualified for continued employment simply "by notifying him in writing as to why he is being separated and the effective date of the action."[4] More elaborate procedures are specified when the ground for terminating a probationary employee is "for conditions arising before appointment."[5] In such cases the regulations require that the employee receive "an advance written notice stating the reasons, specifically and in detail, for the proposed action"; that the employee be given an opportunity to respond in writing and to furnish affidavits in support of his response; that the agency "consider" any answer filed by the employee in reaching its decision; and that the employee be notified of the agency's decision at the earliest practicable date.[6] Respondent contends that her termination *65 was based in part on her activities while in the course of her previous employment in the Defense Intelligence Agency, and that therefore she was entitled to an opportunity to file an answer under this latter provision.

4  5 C.F.R. § 315.804.

5  5 C.F.R. § 315.805.

6  Section 315.805 reads in full:

   "§ 315.805 Termination of probationers for conditions arising before appointment.

   "When an agency proposes to terminate an employee serving a probationary or trial period for reasons based in whole or in part on conditions arising before his appointment, the employee is entitled to the following:

   "(a) *Notice of proposed adverse action.* The employee is entitled to an advance written notice stating the reasons, specifically and in detail, for the proposed action.

   "(b) *Employee's answer.* The employee is entitled to a reasonable time for filing a written answer to the notice of proposed adverse action and for furnishing affidavits in support of his answer. If the employee answers, the agency shall consider the answer in reaching its decision.

   "(c) *Notice of adverse decision.* The employee is entitled to be notified of the agency's decision at the earliest practicable date. The agency shall deliver the decision to the employee at or before the time the action will be made effective. The notice shall be in writing, inform the employee of the reasons for the action, inform the employee of his right of appeal to the appropriate office of the Commission, and inform him of the time limit within which the appeal must be submitted as provided in § 315.806(d)."

The letter which respondent received from the Acting Commissioner, notifying her of the date of her discharge, stated that the reason for her discharge was her "complete unwillingness to follow office procedure and to accept direction from [her] supervisors." After receipt of the letter, respondent's counsel met with a GSA personnel officer to discuss her situation and, in the course of the meeting, was shown a memorandum prepared by an officer of the Public Buildings Service upon which Sanders apparently based his decision to terminate respondent's employment. The memorandum contained both a discussion of respondent's conduct in her job with the Public Buildings Service and a discussion of her conduct during her previous employment at the Defense

66  *66  Intelligence Agency. Relying upon the inclusion of the information concerning her previous employment, respondent's counsel requested that she be given a detailed statement of the charges against her and an opportunity to reply — the procedures to which she would be entitled under the regulations if in fact the basis of her discharge had been conduct during her previous employment. This request was denied.

Respondent then filed an administrative appeal with the Civil Service Commission pursuant to the provisions of 5 C.F.R. § 315.806 (c), alleging that her termination was subject to § 315.805 and was not effected in accordance with the procedural requirements of that section.[7] While her administrative appeal was pending undecided, she filed this action. Her complaint alleged that the agency had failed to follow the appropriate Civil Service regulations, alleged that her prospective discharge would deprive her of income and cause her to suffer the embarrassment of being wrongfully discharged, and requested a temporary restraining order and interim injunctive relief against her removal from employment pending agency determination of her appeal. The District Court granted the temporary restraining order at the time of the filing of respondent's complaint, and set a hearing on the application for a temporary injunction for the following week.

[7] Section 315.806(c) reads:

"A probationer whose termination is subject to § 315.805 may appeal on the ground that his termination was not effected in accordance with the procedural requirements of that section."

At the hearing on the temporary injunction, the District Court expressed its desire to hear the testimony of Sanders in person, and refused to resolve the controversy on the basis of his affidavit which the Government offered to furnish.

67  When the Government declined *67 to produce Sanders, the court ordered the temporary injunctive relief continued, stating that "Plaintiff may suffer immediate and irreparable injury, loss and damage before the Civil Service Commission can consider Plaintiff's claim."[8] The Government, desiring to test the authority of the District Court to enter such an order, has not produced Sanders, and the interim relief awarded respondent continues in effect at this time.

[8] The order of the District Court stated in full:

"It appearing to the Court from the affidavits and accompanying exhibits that a Temporary Restraining Order, pending the appearance before this Court of Mr. W.H. Sanders, Acting Commissioner, Public Buildings Service, should issue because, unless Defendants are restrained from terminating Plaintiff's employment, Plaintiff may suffer immediate and irreparable injury, loss and damage before the Civil Service Commission can consider Plaintiff's claim,

"NOW, THEREFORE, IT IS ORDERED, that the Temporary Restraining Order issued by this Court at twelve o'clock p. m., May 28, 1971, is continued until the appearance of the aforesaid W.H. Sanders.

4

"IT IS FURTHER ORDERED that a copy of this Order be served by the United States Marshal on Defendants forthwith."

On the Government's appeal to the Court of Appeals for the District of Columbia Circuit, the order of the District Court was affirmed. Although recognizing that "Congress presumably could remove the jurisdiction of the District Courts to grant such equitable interim relief, in light of the remedies available,"[9] the court found that the District Court had the power to grant relief in the absence of an explicit prohibition from Congress. The Court of Appeals decided that the District Court acted within the bounds of permissible discretion in requiring Sanders to appear and testify,[10] and in continuing the temporary injunctive relief until he was produced as a witness by the Government. *68

68

> [9] Page 67 149 U.S. App. D.C., at 262 n. 21, 462 F.2d, at 877 n. 21.

> [10] Id., at 263-264, 462 F.2d, at 878-879.

## II

While it would doubtless be intellectually neater to completely separate the question whether a District Court has authority to issue any temporary injunctive relief at the behest of a discharged Government employee from the question whether the relief granted in this case was proper, we do not believe the questions may be thus bifurcated into two watertight compartments. We believe the basis for our decision can best be illuminated by taking up the various arguments which the parties urge upon us.

Petitioners point out, and the Court of Appeals below apparently recognized, that Congress has given the District Courts no express statutory authorization to issue temporary "stays" in Civil Service cases. Although Congress has often specifically conferred such authority if it so desired — for example, in the enabling statutes establishing the NLRB,[11] the FTC,[12] the FPC,[13] and the SEC[14] — the statutes governing the Civil

Service Commission are silent on the question.[15] The rules and regulations *69 promulgated pursuant to a broad grant of statutory authority likewise make no provision for interlocutory judicial intervention.

69

> [11] 29 U.S.C. § 160 (j), (l).

> [12] 15 U.S.C. § 53 (a).

> [13] 16 U.S.C. § 825m (a).

> [14] 15 U.S.C. § 77t (b), 78u (e).

> [15] Respondent does suggest that 5 U.S.C. § 705 may confer authority to grant relief in this case. That section reads:
>
> "When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."
>
> The relevant legislative history of that section, however, indicates that it was primarily intended to reflect existing law under the *Scripps-Howard* doctrine, discussed *infra*, and not to fashion new rules of intervention for District Courts. See S. Rep. No. 752, 79th Cong., 1st Sess., 27, 44 (1945). Thus respondent's various contentions may be grouped under her primary theory discussed in the text.

The Court of Appeals nevertheless found that the district courts had traditional power to grant stays in such personnel cases. Commenting upon the Government's arguments for reversal below, the court stated:

"It is asserted that the Civil Service Commission has been given exclusive review jurisdiction. But, as noted initially, there is no statutory power in the Civil Service Commission to grant a temporary stay of discharge. Prior to the Civil Service Act a United States District Court would certainly have had jurisdiction and power to grant such temporary relief. The statute did not explicitly take it away, nor implicitly by conferring such jurisdiction and power on the CSC; we hold the District Court still has jurisdiction and may exercise the power under established standards in appropriate circumstances."[16]

16 Page 69 149 U.S. App. D.C., at 265, 462 F.2d, at 880 (footnotes omitted).

If the issue were to turn solely on the earlier decisions of this Court examining the authority of federal courts to intervene in disputes about governmental employment, we think this assumption of the Court of Appeals is wrong. In *Keim* v. *United States*, 177 U.S. 290 (1900), this Court held that the Court of Claims had no authority to award damages to an employee who claimed he *70 had been wrongfully discharged by his federal employer.[17] In *White* v. *Berry*, 171 U.S. 366 (1898), a Government employee had sought to enjoin his employer from dismissing him from office, alleging that the removal would violate both the Civil Service Act and the applicable regulations.[18] The Circuit Court assumed jurisdiction and issued an order prohibiting the defendant from interfering *71 with the plaintiff's discharge of his duty "`until he shall be removed therefrom by proper proceedings had under the Civil Service Act and the rules and regulations made thereunder or by judicial proceedings at law . . . .'"[19] This Court reversed. Discussing the apparently well-established principle that "`a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal

of a subordinate appointee,'"[20] the Court held that "the Circuit Court, sitting in equity, was without jurisdiction to grant the relief asked."[21]

17 The Court there expressed the traditional judicial deference to administrative processes in the following terms:

"The appointment to an official position in the Government, even if it be simply a clerical position, is not a mere ministerial act, but one involving the exercise of judgment. The appointing power must determine the fitness of the applicant; whether or not he is the proper one to discharge the duties of the position. Therefore it is one of those acts over which the courts have no general supervising power.

"In the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment. `It cannot for a moment be admitted that it was the intention of the Constitution that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision or statutory regulation it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment.' *In re Hennen*, 13 Pet. 230, 259; *Parsons* v. *United States*, 167 U.S. 324. Unless, therefore, there be some specific provision to the contrary, the action of the Secretary of the Interior in removing the petitioner from office on account of inefficiency is beyond review in the courts either by mandamus to reinstate him or by compelling payment of salary as though he had not been removed." 177 U.S., at 293-294.

18 The plaintiff in *White* protested that he was being discharged because of his political affiliation, a basis for discharge specifically prohibited under the Civil Service rules. 171 U.S., at 367-368. Such a contention

obviously went to the heart of the Civil Service legislation, since a primary purpose of that system was to remove large sectors of Government employment from the political "spoils system" which had previously played a large part in the selection and discharge of Government employees. See generally H. Kaplan, The Law of Civil Service 1-22 (1958).

19  171 U.S., at 374-375.

20  The Court quoted from *Morgan* v. *Nunn*, 84 F. 551 (CCMD Tenn. 1898), and noted that "[s]imilar decisions have been made in other Circuit Courts of the United States." 171 U.S., at 377-378.

21  *Id.,* at 378.

Respondent's case, then, must succeed, if at all, despite earlier established principles regarding equitable intervention in disputes over tenure of governmental employees, and not because of them. Much water has flowed over the dam since 1898, and cases such as *Service* v. *Dulles*, 354 U.S. 363 (1957), cited by the District Court in its memorandum opinion in this case, establish that federal courts do have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed administrative regulations.[22] In that case, however, judicial proceedings *72 were not commenced until the administrative remedy had been unsuccessfully pursued.[23] The fact that Government personnel decisions are now ultimately subject to the type of judicial review sought in *Service* v. *Dulles, supra,* does not, without more, create the authority to issue interim injunctive relief which was held lacking in cases such as *White* v. *Berry, supra.*

22  In *Service* an employee discharged under the provisions of the McCarran Rider, 65 Stat. 581, contended that the Secretary of State had not followed departmental regulations in effecting his dismissal. This Court agreed with plaintiff's position and

decided that his "dismissal cannot stand." 354 U.S., at 388. However, the employee in that case had made a full effort to secure administrative review of his discharge prior to filing suit in the District Court. These efforts, as the Court noted, *id.,* at 370, had "proved unsuccessful." In the present case respondent has petitioned the court before ascertaining whether administrative relief will be granted.

23  See n. 22, *supra.*

The Court of Appeals found support for its affirmance of the District Court's grant of injunctive relief in *Scripps-Howard Radio* v. *FCC*, 316 U.S. 4 (1942). In *Scripps-Howard* the licensee of a Cincinnati radio station petitioned the FCC to vacate an order permitting a Columbus radio station to change its frequency and to increase its broadcasting power. The licensee also requested a hearing. When the Commission denied the petition, the licensee filed a statutory appeal in the Court of Appeals for the District of Columbia and, in conjunction with the docketing of the appeal, asked the court to stay the FCC order pending its decision. The Court of Appeals, apparently departing from a longstanding policy of issuing such stays,[24] declined to do so in this case and ultimately certified the question of its power to this Court.[25] *73

24  The Court pointed out that "even though the Radio Act of 1927 contained no provisions dealing with the authority for the Court of Appeals for the District of Columbia to stay orders of the Commission on appeal, the Court had been issuing stays as a matter of course wherever they were found to be appropriate, without objection by the Commission." *Scripps-Howard Radio* v. *FCC*, 316 U.S. 4, 13 (1942).

25  The precise question certified was:

"`Where, pursuant to the provisions of Section 402(b) of the Communications Act of 1934, an appeal has been taken, to the United States Court of Appeals, from an

order of the Federal Communications Commission, does the court, in order to preserve the status quo pending appeal, have power to stay the execution of the Commission's order from which the appeal was taken, pending the determination of the appeal?'" *Id.*, at 6.

The wording of the question certified makes clear that the Court was faced only with the situation in which an appeal has been filed seeking review of completed agency action.

This Court held that the Court of Appeals had power to issue the stay, analogizing it to the traditional stay granted by an appellate court pending review of an inferior court's decision:

> "It has always been held, therefore, that as part of its traditional equipment for the administration of justice,[[*]] a federal court can stay the enforcement of a judgment pending the outcome of an appeal."[26]

> 26 *Id.*, at 9-10. In the Court's opinion a footnote, herein designated with an asterisk, referred to the All Writs Act, 28 U.S.C. § 1651 (a), which reads:
>
> "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."
>
> The reliance of the Court on this provision was noted by the Court of Appeals in its opinion in this case. 149 U.S. App. D.C., at 261 n. 17, 462 F.2d, at 876 n. 17.

But in *Scripps-Howard* the losing party before the agency sought an interim stay of final agency action pending statutory judicial review.[27] A long progression of cases in this Court had established the authority of a court, empowered by statute to exercise appellate jurisdiction, to issue appropriate writs in aid of that jurisdiction.[28] The All Writs Act, first enacted as a part of the Judiciary Act of

1789, provided statutory confirmation of this authority.[29] This Court in *Scripps-Howard* held that the same principles governed the authority of courts charged by statute with judicial review of agency decisions, and that the authority to grant a stay exists in such a court even though not expressly conferred by the statute which confers appellate jurisdiction.

> 27 See n. 25, *supra*.

> 28 For example, the two cases cited by the Court in *Scripps-Howard* involved situations in which a court accepted appeal jurisdiction and, in connection with that acceptance, issued a stay of the decision below. See *In re Claasen*, 140 U.S. 200 (1891) (writ of error to this Court); *In re McKenzie*, 180 U.S. 536 (1901) (appeal taken to the Circuit Court of Appeals). The All Writs Act, n. 26, *supra*, provided the authority in each case.

> 29 See n. 26, *supra*.

*Scripps-Howard, supra*, of course, is not the instant case. The authority of the District Court to review agency action under *Service* v. *Dulles, supra*, does not come into play until it may be authoritatively said that the administrative decision to discharge an employee does in fact fail to conform to applicable regulations.[30] Until administrative action has become final, no court is in a position to say that such action did or did not conform to applicable regulations. Here respondent had obtained no administrative determination of her appeal at the time she brought the action in the District Court. She was in effect asking that court to grant her, on an interim basis, relief which the administrative agency charged with review of her employer's action could grant her only after it had made a determination on the merits.

> 30 See n. 22, *supra*. As noted above, the employee in *Service* sought to have the Secretary's action declared invalid within the administrative system. He sought

judicial relief only after it became evident that no administrative relief would be forthcoming.

While both the District Court and the Court of Appeals characterized the District Court's intervention as a "stay," the mandatory retention of respondent in the position from which she was dismissed actually served to provide the most extensive relief which she might conceivably obtain from the agency after its review on the merits. It may well be that the Civil Service Commission, should it have agreed with respondent's version of the basis for her dismissal, *75 would prohibit the final separation of respondent unless and until proper procedures had been followed. But this is not to say that it would hold respondent to be entitled to full reinstatement with the attendant tension with her superiors that the agency intended to avoid by dismissing her. Congress has provided that a wrongfully dismissed employee shall receive full payment and benefits for any time during which the employee was wrongfully discharged from employment.[31] The Civil Service Commission could conceivably accommodate the conflicting claims in this case by directing respondent's superiors to provide her with an opportunity to reply by affidavit, and by ordering that she receive backpay for any period of her dismissal prior to the completion of the type of dismissal procedure required by the regulations.

[31] The Back Pay Act is found at 5 U.S.C. § 5596. The pertinent provisions read:

"(b) An employee of an agency who, on the basis of an administrative determination or a timely appeal, is found by appropriate authority under applicable law or regulation to have undergone an unjustified or unwarranted personnel action that has resulted in the withdrawal or reduction of all or a part of the pay, allowances, or differentials of the employee —

"(1) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in

effect an amount equal to all or any part of the pay, allowances, or differentials, as applicable, that the employee normally would have earned during that period if the personnel action had not occurred, less any amounts earned by him through other employment during that period . . . ."

The Court in *Scripps-Howard* recognized that certain forms of equitable relief could not properly be granted by federal courts. The Court specifically contrasted the stay of a license grant and the stay of a license denial, finding that the latter would have no effect:

"Of course, no court can grant an applicant an authorization which the Commission has refused. *76 No order that the Court of Appeals could make would enable an applicant to go on the air when the Commission has denied him a license to do so. A stay of an order denying an application would in the nature of things stay nothing. It could not operate as an affirmative authorization of that which the Commission has refused to authorize."[32]

[32] 316 U.S., at 14.

Surely that conclusion would not vary depending upon whether the radio station had started broadcasting on its own initiative and sought to stay a Commission order directing it to cease. Yet here the District Court did authorize, on an interim basis, relief which the Civil Service Commission had neither considered nor authorized — the mandatory reinstatement of respondent in her Government position. We are satisfied that *Scripps-Howard*, involving as it did the traditional authority of reviewing courts to grant stays, provides scant support for the injunction issued here.

The Court of Appeals also relied upon *FTC* v. *Dean Foods Co.*, 384 U.S. 597 (1966), in reaching its decision. There a closely divided Court held that a Court of Appeals having ultimate jurisdiction to review orders of the Federal Trade

77 Commission might, upon the Commission's application,[33] grant a *77 temporary injunction to preserve the controversy before the agency. The Commission's application alleged,[34] and the court accepted,[35] that refusal to grant the injunction would result in the practical disappearance of one of the entities whose merger the Commission sought to challenge. The disappearance, in turn, would mean that the agency, and the court entrusted by statute with authority to review the agency's decision, would be incapable of implementing their statutory duties by fashioning effective relief. Thus invocation of the All Writs Act, as a preservative of jurisdiction, was considered appropriate.

[33] A preliminary question of importance in *Dean Foods* was whether the Commission, in the absence of express statutory authorization, could petition the Court of Appeals for preliminary relief. This Court said:

"[T]he Commission is a governmental agency to which Congress has entrusted, *inter alia*, the enforcement of the Clayton Act, granting it the power to order divestiture in appropriate cases. At the same time, Congress has given the courts of appeals jurisdiction to review final Commission action. It would stultify congressional purpose to say that the Commission did not have the incidental power to ask the courts of appeals to exercise their authority derived from the All Writs Act." 384 U.S., at 606.

A contrary decision, the Court felt, would have made it virtually impossible for the Commission itself to undertake review of the proposed merger. The congressional grant of authority to the FTC in Clayton Act cases thus could have been frustrated.

[34] *Id.*, at 599-600. The complaint charged that one of the parties to the merger "`as an entity will no longer exist,'" *id.*, at 599, and that "consummation of the agreement would `prevent the Commission from

devising, or render it extremely difficult for the Commission to devise, any effective remedy after its decision on the merits.'" *Id.*, at 600. The Commission therefore was affirmatively asserting that the administrative remedy which it was authorized to fashion was inadequate.

[35] *Id.*, at 601.

Neither the reviewing jurisdiction of the Civil Service Commission nor that of the District Court would be similarly frustrated by a decision of the District Court remitting respondent to her administrative remedy. Certainly the Civil Service Commission will be able to weigh respondent's contentions and to order necessary relief without the aid of the District Court injunction. In direct contrast to the claim of the FTC in *Dean Foods* that its jurisdiction would be effectively defeated by *78 denial of relief, the Commission here has argued that judicial action interferes with the normal agency processes.[36] And we see nothing in the record to suggest that any judicial review available under the doctrine of *Service* v. *Dulles* would be defeated in the same manner as review in *Dean Foods*.

[36] In *Dean Foods* the Commission confessed its inability to fashion effective administrative relief. But petitioners here admit no such thing. Rather they strongly assert that the Back Pay Act, n. 31, *supra*, provides a complete remedy for any procedural irregularities which may have occurred in this case.

We are therefore unpersuaded that the temporary injunction granted by the District Court in this case was justified either by our prior decisions dealing with the availability of injunctive relief to discharged federal employees, or by those dealing with the authority of reviewing courts to grant temporary stays or injunctions pending full appellate review. If the order of the District Court in this case is to be upheld, the authority must be found elsewhere.

## III

This Court observed in *Scripps-Howard* that "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage," 316 U.S., at 11, and this observation carries particular force when a statutory scheme grants broad regulatory latitude to an administrative agency. In *Scripps-Howard* a careful review of the relevant statutory provisions and legislative history persuaded this Court that Congress had not intended to nullify the power of an appellate court,[37] having assumed jurisdiction after an agency decision, to issue stays in aid of its jurisdiction. The Court noted, in particular, that stays were allowed in other cases processed through the FCC[38] and that the Court of Appeals had routinely issued stays in similar cases before undertaking an unexpected shift in policy.[39] But, at the other end of the spectrum, in *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U.S. 658 (1963), this Court held that a specific congressional grant of power to the ICC to suspend proposed rate modifications precluded the District Court from extending the suspension by temporary injunction. This was true despite arguments that district courts traditionally had such power and that Congress did not explicitly revoke the power by statute.[40] The Court there said:

37  316 U.S., at 11-13.

38  The Court compared the provisions of §§ 402(a) and 402(b) of the Communications Act of 1934, 48 Stat. 1064. The former section specifically authorized temporary stays, through application of the Urgent Deficiencies Appropriation Act of Oct. 22, 1913, 38 Stat. 208, of orders of the Federal Communications Commission which were under review — with certain exceptions. Those exceptions, which included the order there at issue, were treated under § 402(b) which made no specific provision for such stays. The Court thus was required to consider whether Congress deliberately sought to deprive courts of a power in

those cases not governed by the Urgent Deficiencies Act which had been expressly authorized for those cases which were governed by the Act.

39  See n. 24, *supra*.

40  Although acknowledging that the legislative history did not clearly establish "a design to extinguish whatever judicial power may have existed prior to 1910 to suspend proposed rates," the Court concluded: "[W]e cannot suppose that Congress, by vesting the new suspension power in the Commission, intended to give backhanded approval to the exercise of a judicial power which had brought the whole problem to a head." 372 U.S., at 664.

"The more plausible inference is that Congress meant to foreclose a judicial power to interfere with the *timing* of rate changes which would be out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction."[41]

41  *Id.*, at 668. (Emphasis in original.)

The overall scheme governing employees of the Federal Government falls neatly within neither of these precedents. Unlike *Scripps-Howard*, traditional stay practice lends little support to the sort of relief which the District Court granted respondent here, and the precedents dealing with the availability of equitable relief to discharged Government employees are quite unfavorable to respondent. Unlike *Arrow Transportation, supra*, the administrative structure is far more a creature of agency regulations than of statute. We are thus not prepared to conclude that Congress in this class of cases has wholly divested the district courts of their customary authority to grant temporary injunctive relief, and to that extent we agree with the Court of Appeals. But merely because the factors relied upon by the Government do not establish that the district courts are wholly

bereft of the authority claimed for them here does not mean, as the Court of Appeals appeared to believe, that temporary injunctive relief in this class of cases is to be dispensed without regard to those factors. While considerations similar to those found sufficient in *Arrow Transportation* to totally deprive the district courts of equitable authority do not have that force here, they nonetheless are entitled to great weight in the equitable balancing process which attends the grant of injunctive relief.

We are dealing in this case not with a permanent Government employee, a class for which Congress has specified certain substantive and procedural protections,[42] but with a probationary employee, a

81    class which Congress *81 has specifically recognized as entitled to less comprehensive procedures. Title 5 U.S.C. § 3321, derived from the original Pendleton Act,[43] requires the creation of this classification:

> 42    See 5 U.S.C. § 7501.

> 43    22 Stat. 404.

> "The President may prescribe rules, which shall provide, as nearly as conditions of good administration warrant, that there shall be a period of probation before an appointment in the competitive service becomes absolute."

It is also clear from other provisions in the Civil Service statutory framework that Congress expected probationary employees to have fewer procedural rights than permanent employees in the competitive service. For example, preference eligibles,[44] commonly veterans, are entitled to hearing procedures extended to persons in the competitive service *only after they have completed* "a probationary or trial period."[45] Persons suspended for national security reasons are given expanded protection *provided they have completed a trial or probationary period.*[46]

> 44    See 5 U.S.C. § 2108 (3).

> 45    5 U.S.C. § 7511-7512. Section 7511 defines a "preference eligible employee" as "a permanent or indefinite preference eligible who has completed a probationary or trial period as an employee of an Executive agency or as an individual employed by the government of the District of Columbia . . .," subject to certain exceptions. Section 7512 provides that such an employee must receive written notice of the reasons for proposed adverse action, a chance to reply in writing and by affidavit, and notice of an adverse decision. A probationary employee, under the regulations, has more limited rights. See 5 C.F.R. § 315.801 *et seq.*

> 46    5 U.S.C. § 7532 (c)(2).

The Civil Service regulations are consistent with these statutes. These regulations are promulgated by the Civil Service Commission as authorized by

82    Congress in *82 5 U.S.C. § 1301-1302.[47] Part 752, the regulations governing adverse agency actions, provides certain procedural safeguards for employees but, as did the statutes cited above, exempts "employee[s] currently serving a probationary or trial period."[48] Such employees are remitted to the procedures specified in subpart H of Part 315,[49] the procedures at issue here. Under § 752.202 of the regulations permanent competitive service employees are to be retained in an active-duty status only during the required 30-day-notice period, and the Commission is given no authority to issue additional stays.[50] It cannot prevent the dismissal of an employee or order his reinstatement prior to hearing and determining his appeal on the merits. Reasonably, a probationary employee could be entitled to no more than retention on active duty for the period preceding the effective date of his discharge.

> 47    Title 5 U.S.C. § 3301 *et seq.* grants to the President authority to promulgate rules and regulations governing the Civil Service. Title 5 U.S.C. § 1301 provides that "[t]he Civil Service Commission shall aid the

President, as he may request, in preparing the rules he prescribes under this title for the administration of the competitive service." Title 5 U.S.C. § 1302 empowers the Commission to prescribe regulations, "subject to the rules prescribed by the President . . . ."

48  Page 82 5 C.F.R. § 752.103 (a)(5).

49  5 C.F.R. § 315.801 *et seq.*

50  Title 5 C.F.R. § 752.202 (d) reads in part:

   "Except as provided in paragraph (e) of this section, an employee against whom adverse action is proposed is entitled to be retained in an active duty status during the notice period."

   Section 752.202(a)(1) provides that "at least 30 full days' advance written notice" is required.

Congress has also provided a broad remedy for cases of improper suspension or dismissal. The Back Pay Act of 1948[51] supplemented the basic Lloyd-LaFollette Act *83 of 1912 and provided that any person in the competitive Civil Service who was unjustifiably discharged and later restored to his position was entitled to full backpay for the time he was out of work. The benefits of this Act were extended to additional employees, including probationary employees, in 1966.[52] Respondent was eligible for full compensation for any period of improper discharge under this section.

51  See n. 31. *supra.*

52  80 Stat. 94, 95.

As we have noted, respondent's only substantive claim, either before the District Court or in her administrative appeal, was that petitioners had violated the regulations promulgated by the Civil Service Commission. Those same regulations provided for an appeal to the agency which promulgated the regulations and further provided that until that appeal had been heard on the merits, the employer's discharge of the employee was to

remain in effect. Respondent, however, sought judicial intervention before fully utilizing the administrative scheme.

The District Court, exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of the temporary relief awarded here was likely to have on the administrative process. When we couple with this consideration the historical denial of all equitable relief by the federal courts in cases such as *White* v. *Berry,* 171 U.S. 366 (1898), the well-established rule that the Government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs," *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 896 (1961), and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee, 5A A. Corbin, Contracts § 1204 (1964), we think that the Court of Appeals was quite wrong in routinely applying to this case the traditional *84 standards governing more orthodox "stays." See *Virginia Petroleum Jobbers Assn.* v. *FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).[53] Although we do not hold that Congress has wholly foreclosed the granting of preliminary injunctive relief in such cases, we do believe that respondent at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases. We now turn to the showing made to the District Court on that issue, and to the Court of Appeals' treatment of it.

53  These considerations were set forth by the majority below as follows:

   "(1) Has the petitioner made a strong showing that he is likely to prevail on the merits of his appeal? (2) Has the petitioner shown that without such relief he will be irreparably injured? (3) Would the issuance of a stay substantially harm other parties

interested in the proceedings? (4) Where lies the public interest?" 149 U.S. App. D.C., at 263, 462 F.2d, at 878.

## IV

The Court of Appeals said in its opinion:

"Without passing on the merits of Mrs. Murray's contention that she will suffer irreparable harm if the sought-for-relief is not granted (a task for the District Court here), we note that there was a determination that such a loss of employment could be `irreparable harm' in Reeber v. Rossell (1950), a case quite similar to that at bar. We agree with the *Reeber* court that such a loss of employment *can* amount to irreparable harm, and that injunctive relief *may* be a proper remedy pending the final administrative determination of the validity of the discharge by the Civil Service Commission."[54]

85    *85

    54 *Id.*, at 262, 462 F.2d, at 877 (emphasis in original).

At another point in its opinion, the Court of Appeals said:

"As the District Court here felt that the hearing on the motion for the preliminary injunction could not be completed until Mr. Sanders was produced to testify, it was proper for him to continue the stay, in order to preserve the *status quo* pending the completion of the hearing."[55]

    55 *Id.*, at 265, 462 F.2d, at 880.

The court in its supplemental opinion filed after the Government's petition for rehearing further expanded its view of this aspect of the case:

"The court's opinion does not hold, and the trial judge has not yet held, that interim relief *is proper* in Mrs. Murray's case, but we do hold that the trial judge may consider granting such relief, as this is inherent in his historical equitable role."[56]

    56 *Id.*, at 270, 462 F.2d, at 885 (emphasis in original).

In form the order entered by the District Court now before us is a continuation of the temporary restraining order originally issued by that court.[57] It is clear from the Court of Appeals' opinion that that court so construed it. But since the order finally settled upon by the District Court was in no way limited in time, the provisions of Fed. Rule Civ. Proc. 65 come into play. That Rule states, in part:

    57 See n. 8, *supra.*

"(b) A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before *86 the adverse party or his attorney can be heard in opposition . . . . Every temporary restraining order granted without notice . . . shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period."

86

The Court of Appeals whose judgment we are reviewing has held that a temporary restraining order continued beyond the time permissible under

Case 3:24-cv-00440    Document 79    Filed 07/11/24    Page 17 of 191 PageID #: 1686

Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions. *National Mediation Board* v. *Airline Pilots Assn.*, 116 U.S.App.D.C. 300, 323 F.2d 305 (1963). We believe that this analysis is correct, at least in the type of situation presented here, and comports with general principles imposing strict limitations on the scope of temporary restraining orders.[58] A

87    district *87 court, if it were able to shield its orders from appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions, would have virtually unlimited authority over the parties in an injunctive proceeding. In this case, where an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly

88    unjustified. Therefore we *88 view the order at issue here as a preliminary injunction.

> [58] The Court of Appeals for the Second Circuit, in an opinion cited by the Court of Appeals for the District of Columbia Circuit in *National Mediation Board* v. *Airline Pilots Assn.*, 116 U.S.App.D.C. 300, 323 F.2d 305 (1963), described these principles as follows:
>
> "It is because the remedy is so drastic and may have such adverse consequences that the authority to issue temporary restraining orders is carefully hedged in Rule 65(b) by protective provisions. And the most important of these protective provisions is the limitation on the time during which such an order can continue to be effective.
>
> "It is for the same reason, the possibility of drastic consequences which cannot later be corrected, that an exception is made to the final judgment rule to permit review of preliminary injunctions. 28 U.S.C. § 1292 (a)(1). To deny review of an order that has all the potential danger of a preliminary injunction in terms of duration, because it is issued *without* a preliminary adjudication of the basic rights involved, would

completely defeat the purpose of this provision.

> "We hold, therefore, that the continuation of the temporary restraining order beyond the period of statutory authorization, having, as it does, the same practical effect as the issuance of a preliminary injunction, is appealable within the meaning and intent of 28 U.S.C. § 1292 (a)(1)." *Pan American World Airways* v. *Flight Engineers' Assn.*, 306 F.2d 840, 843 (1962). (Citations omitted; emphasis in original.)

Our Brother MARSHALL, in his dissenting opinion, nevertheless suggests that a district court can totally or partially impede review of an indefinite injunctive order by failing to make any findings of fact or conclusions of law. It would seem to be a consequence of this reasoning that an order which neglects to comply with one rule may be saved from the normal appellate review by its failure to comply with still another rule. We do not find this logic convincing. Admittedly, the District Court did not comply with Fed. Rule Civ. Proc. 52(a), but we do not think that we are thereby foreclosed from examining the record to determine if sufficient allegations or sufficient evidence supports the issuance of injunctive relief. As discussed below, nothing in the pleadings or affidavits, or in the testimony at the hearing before the District Court, demonstrates that this is an extraordinary case supporting the award of judicial relief. See n. 68, *infra*.

We believe that the Court of Appeals was quite wrong in suggesting that at this stage of the proceeding the District Court need not have concluded that there was actually irreparable injury.[59] This Court has stated that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies," *Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500, 506-507 (1959), and the Court of Appeals itself in *Virginia Petroleum Jobbers Assn.* v. *FPC*, 104 U.S.App.D.C. 106, 259 F.2d 921

(1958), has recognized as much. Yet the record before us indicates that no witnesses were heard on the issue of irreparable injury, that respondent's complaint was not verified, and that the affidavit she submitted to the District Court did not touch in any way upon considerations relevant to irreparable injury.[60] We are therefore somewhat puzzled *89 about the basis for the District Court's conclusion that respondent "may suffer immediate and irreparable injury." The Government has not specifically urged this procedural issue here, however, and the Court of Appeals in its opinion discussed the elements upon which it held that the District Court might base a conclusion of irreparable injury. Respondent's unverified complaint alleged that she might be deprived of her income for an indefinite period of time, that spurious and unrebutted charges against her might remain on the record, and that she would suffer the embarrassment of being wrongfully discharged in the presence of her coworkers.[61] The Court of Appeals intimated that either loss of earnings or damage to reputation might afford a basis for a finding of irreparable injury and provide a basis for temporary injunctive relief.[62] We disagree.[63]

90  *90

59  We note that Rule 65 requires a showing of irreparable injury for the issuance of a temporary restraining order as well. Therefore, for the purposes of this part of the discussion, it would make no difference that the order was styled a temporary restraining order, rather than a preliminary injunction.

60  The affidavit in its entirety states:

"JEANNE M. MURRAY, being first duly sworn, deposes as follows:

"1. I am presently employed by the Public Buildings Service of the General Services Administration (GSA) as a Program Analyst, GS-13.

"2. On May 20, 1971, at approximately five p. m., I was given a letter signed by Mr. W.H. Sanders, Acting Commissioner

of the Public Buildings Service, informing me that my employment was to be terminated as of Saturday, May 29, 1971.

"3. I have never been told that GSA's Personnel files contain adverse information about my service in the Defense Intelligence Agency (DIA), nor have I ever seen a memorandum dealing with my employment there.

"4. I worked for slightly over a year at the DIA, and I have been informed by the Acting Chief of Staff of the DIA, Rear Admiral D. E. Bergin, that my personnel file at DIA contains nothing derogatory to me.

"5. In recent weeks, I was informed by Mr. William Mulroney, a DIA employee, that someone from GSA had been making inquiries of DIA personnel about my term of service there."

61  Complaint, par. 12.

62  Page 89 149 U.S. App. D.C., at 262, 462 F.2d, at 877.

63  The Court of Appeals held that the Government's failure to produce witness Sanders, after the District Court chose to hear him orally, rather than to rely on his affidavit, allowed the District Court to continue the temporary restraining order until Sanders appeared. We have no doubt that a district court in appropriate circumstances may be justified in resolving against a party refusing to produce a witness under his control the relevant issues upon which that witness' testimony might have touched. But it is clear from the record that the testimony of the witness Sanders was desired to test the basis upon which respondent was discharged, testimony which, of course, would go to the issue of respondent's ultimate chances for success on the merits. While the District Court may well have been entitled to resolve *that* issue against the Government at that stage of the proceeding, this conclusion in no way

dispenses with the necessity for a conclusion that irreparable injury will occur, since that is a separate issue that must be proved to the satisfaction of the Court by the person seeking equitable relief.

Even under the traditional standards of *Virginia Petroleum Jobbers, supra*, it seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.[64] In that case the court stated:

> 64 It should be noted that *Virginia Petroleum Jobbers* dealt with a fact situation quite dissimilar to this one. There the Federal Power Commission had denied petitioner leave to intervene in proceedings before the Commission. In conjunction with appeal of that decision the petitioner had filed a "motion for a stay of further proceedings pending completion of [the Court's] review of the Commission's orders denying intervention or rehearing." 104 U.S. App. D.C., at 109, 259 F.2d, at 924. Such a fact situation was far closer to the traditional situation in which equity powers have been employed to grant a stay pending appeal than is the situation involved in the instant case.

"The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[65]

> 65 *Id.*, at 110, 259 F.2d, at 925 (emphasis in original).

This premise is fortified by the Back Pay Act discussed above.[66] This Act not only affords monetary relief which will prevent the loss of

earnings on a periodic basis from being "irreparable injury" in this type of case, but *91 its legislative history suggests that Congress contemplated that it would be the usual, if not the exclusive, remedy for wrongful discharge. The manager of the bill on the floor of the Senate, Senator Langer, commented on the bill at the time of its passage:

> 66 N. 31, *supra*.

> "[It] . . . provides that an agency or department of the Government may remove any employee at any time, but that the employee shall then have a right of appeal. When he is removed, he is of course off the pay roll. If he wins the appeal, it is provided that he shall be paid for the time during which he was suspended."[67]

> 67 Page 91 94 Cong. Rec. 6681 (1948).

Respondent's complaint also alleges, as a basis for relief, the humiliation and damage to her reputation which may ensue. As a matter of first impression it would seem that no significant loss of reputation would be inflicted by procedural irregularities in effectuating respondent's discharge, and that whatever damage might occur would be fully corrected by an administrative determination requiring the agency to conform to the applicable regulations. Respondent's claim here is not that she could not as a matter of statutory or administrative right be discharged, but only that she was entitled to additional procedural safeguards in effectuating the discharge.

Assuming for the purpose of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the *92 issuance of a temporary injunction in this type of case.[68]

We therefore reverse the decision of the Court of Appeals which approved the action of the District Court.

68  We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment — external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself — will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that situation rather than employed in the routine case. See also *Wettre* v. *Hague*, 74 F. Supp. 396 (Mass. 1947); vacated and remanded on other grounds, 168 F.2d 825 (CA1 1948).

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

I think with all respect that while the narrow isolated issue involved in this litigation is exposed in the opinion of the Court the nature of the problem is not.

Respondent, a probationary employee, claims that her discharge was not based exclusively on her work as a probationary employee. If it were based on her work as a probationary employee, the procedure is quite summary and her right of appeal to the Civil Service Commission is limited to only a few grounds such as discrimination

based on race, color, religion, sex, or national origin, 5 C.F.R. § 315.806. But her claim is that her discharge was based, at least in part, on conduct prior to her federal employment. In case that prior conduct is the basis of the discharge, the employee is entitled to advance notice of proposed

93  termination, an opportunity *93 to respond in writing with supporting affidavits, and notice of any adverse decisions on or prior to the effective date of the termination, 5 C.F.R. § 315.805.

The Congress in 1966 provided that all wrongfully discharged federal employees, including probationary employees are entitled to backpay, 5 U.S.C. § 5596, and the Court concludes that that is the employee's exclusive remedy.

But where an agency has terminated employment and the employee appeals to the Civil Service Commission, the Commission has no power to issue a stay of the agency's action. This is, therefore, not a case where the employee has gone to the courts for relief which the Commission could have granted but refused to do so. Nor is respondent challenging the Civil Service law; nor is she asking for a ruling on the merits of her claim; nor did the District Court, whose judgment was affirmed by the Court of Appeals, act in derogation of the administrative process. Rather, it protected that process by staying the discharge until the Commission had ruled on the appeal.

The power to issue a stay is inherent in judicial power and as indicated by the Court rests on the exercise of an informed discretion on a showing of irreparable injury to the applicant or to the public interest, *Scripps-Howard Radio* v. *FCC*, 316 U.S. 4, 14. That doctrine is not limited, as the Department of Justice suggests, to issuance of stays by a court only after an appeal has been taken. We held in *FTC* v. *Dean Foods Co.*, 384 U.S. 597, 603-604, that the All Writs Act, 28 U.S.C. § 1651, which empowers federal courts to "`issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law,'" extends to

94  "potential jurisdiction of the appellate court where an *94 appeal is not then pending but may be later perfected." The District Court has at least a limited review of the Commission, *Norton* v. *Macy*, 135 U.S.App.D.C. 214, 217, 417 F.2d 1161, 1164; *Dozier* v. *United States*, 473 F.2d 866. Hence the All Writs Act justified its power to grant a stay.

We have, therefore, a case where a stay supplements and does not curtail administrative power, the Commission having no authority to grant that relief. The District Court power preserves the status quo, does not pass on the merits of the controversy, and limits its stay to the date when the merits of the discharge are adjudicated by the Commission. I agree with the Court that that order was appealable.

A point is made that respondent has not shown irreparable injury. That misstates the issue. The District Court issued a stay pending a hearing on whether a temporary injunction should issue. The hearing, if held, would encompass two issues: (1) whether the grounds for respondent's discharge antedated her present employment (see 149 U.S.App.D.C. 256, 269, 462 F.2d 871, 884) and were not restricted to her record as a probationary employee;[1] and (2) whether she would suffer irreparable injury. As stated by the Court of Appeals, respondent "may show . . . irreparable damage, if the hearing before Judge Gasch is allowed to proceed to a decision." *Id.*, at 269, 462 F.2d, at 884. The stay was issued by the District 95 Court only because the federal *95 agency involved refused to produce as a witness the officer who had decided to discharge respondent. Both the District Court and the Court of Appeals were alert to the necessity to show irreparable injury before an injunction issues.

[1] Where, as here, conduct prior to appointment as a probationary employee as well as conduct during the period of employment is alleged to be the basis of the discharge, the requirements of procedural due process are obvious. We said in *Wieman* v. *Updegraff*, 344 U.S. 183,

192, "It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." And see *Schwartz* v. *Covington*, 341 F.2d 537, 538.

On that issue there is more than meets the eye.

Employability is the greatest asset most people have. Once there is a discharge from a prestigious federal agency, dismissal may be a badge that bars the employee from other federal employment. The shadow of that discharge is cast over the area where private employment may be available. And the harm is not eliminated by the possibility of reinstatement, for in many cases the ultimate absolution never catches up with the stigma of the accusation. Thus the court in *Schwartz* v. *Covington*, 341 F.2d 537, 538, issued a stay upon a finding of irreparable injury where a serviceman was to be discharged for alleged homosexual activity: "[A]ppellee has shown that he will suffer irreparable damage if the stay is not granted. Irrespective of the government's recent assurance that the appellee would be reinstated if he prevails upon review of his discharge, the injury and the stigma attached to an undesirable discharge are clear." Unlike a layoff or discharge due to fortuitous circumstances such as the so-called energy crisis, a discharge on the basis of an employee's lifetime record or on the basis of captious or discriminatory attitudes of a superior may be a cross to carry the rest of an employee's life. And we cannot denigrate the importance of one's social standing or the status of social stigma as legally recognized harm. In *Ah Kow* v. *Nuan*, 5 Sawy. 552, the Circuit Court, speaking through Mr. Justice Field, held that a Chinese prisoner could recover damages from the sheriff who cut off his queue, the injury causing great mental 96 anguish, disgrace *96 in the eyes of friends and relatives, and ostracism from association with members of his own race.

There is no frontier where the employee may go to get a new start. We live today in a society that is closely monitored. All of our important acts, our setbacks, the accusations made against us go into data banks and are instantly retrievable by the computer.[2] An arrest goes into the data bank even though it turns out to be unconstitutional or based on mistaken identity. There is no federal procedure for erasing arrests. While they arise in 50 States as well as in the federal area, only a few States have procedures for erasing them; and that entails a long and laborious procedure.[3] Moreover, *97 this generation grew up in the age where millions of people were screened for "loyalty" and "security"; and many were discharged from the federal service; many resigned rather than face the ordeal of the "witch hunt" that was laid upon them. Discharge from the federal service or resignation under fire became telltale signs of undesirability. Therefore, the case of irreparable injury for an unexplained discharge from federal employment may be plain enough on a hearing.

97

> 2  With dossiers being compiled by commercial credit bureaus, state and local law enforcement agencies, the CIA, the FBI, the IRS, the Armed Services, and the Census Bureau, we live in an Orwellian age in which the computer has become "the heart of a surveillance system that will turn society into a transparent world." Miller, Computers, Data Banks and Individual Privacy: An Overview, 4 Col. Human Rights L. Rev. 1, 2 (1972). Although the subject of congressional concern, the problem is one which has thus far avoided legislative correction. See Federal Data Banks, Computers and the Bill of Rights, Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. (1971). See also A. Miller, The Assault on Privacy (1971).

> 3  Illinois provides that photographs, fingerprints, etc., be returned to unconvicted arrestees upon acquittal or

release and further provides that the arrestee may petition a local court to have the record expunged by the arresting authorities. There is, however, no method for retrieving records which have been distributed to other law enforcement authorities or to private individuals. Ill. Rev. Stat., c. 38, § 206-5 (1973). Connecticut has a statute with similar shortcomings. Conn. Gen. Stat. Ann. § 54-90 (Supp. 1971); see Satter Kalom, False Arrest: Compensation and Deterrence, 43 Conn. B. J. 598, 612-613. New York's former Penal Law provided that all fingerprints, photographs, etc., of those acquitted of criminal charges had to be returned to the individual *if* no other criminal proceedings were pending against the individual and he had no prior convictions. N.Y. Penal Law § 516 (1909).

The District Court and the Court of Appeals were well within the limits of the law in granting a stay so that the issue of irreparable injury might be determined. It hardly comports with any standard for the expenditure of judicial energies to spend our time trying to find error in the exercise of the lower court's discretion to protect federal employees by giving them at least a chance to prove irreparable injury.

---

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN concurs, dissenting.

In my view no appealable order has been entered in this case, and both the Court of Appeals and this Court accordingly lack jurisdiction.

The orders issued by the District Court are both temporary restraining orders. The first, issued on May 28 and captioned "Temporary Restraining Order," enjoined Mrs. Murray's dismissal until the determination of her application for an injunction. The second, issued on June 4 and also captioned "Temporary Restraining Order," provides "that the Temporary Restraining Order issued by this Court at twelve o'clock p. m., May 28, 1971, is

continued until the appearance of the aforesaid W.H. Sanders." At no time did the District Court indicate it was issuing anything but a temporary restraining order. During the hearing on the application for a preliminary injunction, after the court indicated *98 it wanted to hear from Mr. Sanders in person, the Government informed the court that Mr. Sanders was then out of town on vacation. The court replied: "Let me know when he can be available." Counsel for the Government responded: "Very well." And the District Court then said: "The T. R. O. will be continued until he shows up . . . . Tell the agency I will continue the temporary restraining order until the witness appears." Tr. 10.

It is well settled that the grant or denial of a temporary restraining order is not appealable, except in extraordinary circumstances, not present here, where the denial of the temporary restraining order actually decides the merits of the case or is equivalent to a dismissal of the suit. See generally 11 C. Wright A. Miller, Federal Practice Procedure § 2962, pp. 616-617 (1973), and cases there cited.

The Court holds, however, that since the temporary restraining order was extended by the District Court beyond the time limitation imposed by Fed. Rule Civ. Proc. 65(b), it became an appealable preliminary injunction. I cannot agree. Federal Rule Civ. Proc. 52(a) expressly provides that "in granting or refusing interlocutory injunctions the court shall . . . set forth the findings of fact and conclusions of law which constitute the grounds of its action." This Rule applies to preliminary injunctions, and as no findings of fact and conclusions of law have yet been filed in this case, no valid preliminary injunction was ever issued. See *National Mediation Board* v. *Air Line Pilots Assn.*, 116 U.S.App.D.C. 300, 323 F.2d 305 (1963); *Sims* v. *Greene*, 160 F.2d 512 (CA3 1947).

Nor would it make sense for this Court to review the District Court's order in this case as the grant of a preliminary injunction. Where the District

Court has not entered findings of fact and conclusions of law under *99 Rule 52(a), meaningful review is well-nigh impossible. "It is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52(a) of the Rules of Civil Procedure." *Mayo* v. *Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940).

It is suggested that if an indefinitely extended temporary restraining order remained unappealable, the District Court would have virtually unlimited authority over the parties in an injunctive action. At the outset, this cannot justify this Court's reaching the merits of Mrs. Murray's claim for a preliminary injunction. Even if the order entered by the District Court is appealable, it should be appealable only for the purposes of holding it invalid for failure to comply with Rule 52(a). This was the precise course taken by the Court of Appeals for the District of Columbia Circuit in *National Mediation Board, supra*, on which the majority relies. See also *Sims* v. *Greene, supra*.

In addition, the Government had other courses it could have taken in this case. In view of the District Court's error in granting a restraining order of unlimited duration without complying with the requirements for a preliminary injunction, the Government could have moved the District Court to dissolve its order indefinitely continuing the temporary restraining order. Rule 65(b) expressly provides for such a motion.[1] Had the Government followed this course, the District Court could have *100 corrected its error and gone on to resolve the issues presented by the application for a preliminary injunction. The end result would have been the grant or denial of a preliminary injunction, with findings of fact and conclusions of law, which we could meaningfully review.

1  "On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require." Fed. Rule Civ. Proc. 65(b).

Here, instead, we find the Supreme Court determining that although the District Court had jurisdiction to grant injunctive relief, the equities of Mrs. Murray's case did not support a preliminary injunction, when neither the District Court nor the Court of Appeals has yet confronted the latter issue.[2] I do not believe this makes for sound law.

2  The Court of Appeals expressly stated that it was not evaluating Mrs. Murray's claim of irreparable injury because "any such finding . . . is for the trial judge, who has not yet [decided (and may never decide)] this point in favor of Mrs. Murray." 149 U.S.App.D.C. 256, 262 n. 21, 462 F.2d 871, 877 n. 21 (1972).

Since the majority persists in considering the merits of Mrs. Murray's claim for injunctive relief, some additional comment is in order. I agree with the majority's conclusion that Congress did not divest federal courts of their long-exercised authority to issue temporary injunctive relief pending the exhaustion of both administrative and judicial review of an employee's claim of wrongful dismissal. I cannot accept, however, the way in which the majority opinion then proceeds to take away with the left hand what it has just given with the right, by precluding injunctive relief in all but so-called "extraordinary cases," whatever they may be.

At the outset, I see no basis for applying any different standards for granting equitable relief in the context of a discharged probationary employee than the long-recognized principles of equity

applied in all other situations. See *Virginia Petroleum Jobbers Assn.* v. *FPC*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). Indeed, it

101  appears that the factors which the *101 majority would have courts weigh before granting injunctive relief are all encompassed within the traditional formulations. The adequacy of backpay as a remedy, for example, is relevant in determining whether the party seeking relief has shown that "without such relief, it will be irreparably injured." *Id.*, at 110, 259 F.2d, at 925. Likewise, the possible disruptive effect which temporary injunctive relief might have on the office where respondent was employed or on the administrative review process itself relates to whether "the issuance of a stay [will] substantially harm other parties interested in the proceedings." *Ibid.*

However one articulates the standards for granting temporary injunctive relief, I take it to be well settled that a prerequisite for such relief is a demonstrated likelihood of irreparable injury for which there is no adequate legal remedy. But I cannot accept the majority's apparent holding, buried deep in a footnote, that because of the Back Pay Act, a temporary loss in income can never support a finding of irreparable injury, no matter how severely it may affect a particular individual. See *ante*, at 92 n. 68. Many employees may lack substantial savings, and a loss of income for more than a few weeks' time might seriously impair their ability to provide themselves with the essentials of life — *e. g.*, to buy food, meet mortgage or rent payments, or procure medical services. Cf. *Goldberg* v. *Kelly*, 397 U.S. 254, 264 (1970). Government employees might have skills not readily marketable outside the Government, making it difficult for them to find temporary employment elsewhere to tide themselves over until the lawfulness of their dismissal is finally determined. In some instances, the likelihood of finding alternative employment may be further reduced by the presence on the employee's records of the very dismissal at issue. Moreover, few

employers will be willing to hire and train a new
102 employee knowing *102 he will return to his
former Government position if his appeal is
successful. Finally, the loss of income may be
"temporary" in only the broadest sense of that
word. Not infrequently, dismissed federal
employees must wait several years before the
wrongful nature of their dismissal is finally settled
and their right to backpay established. See, *e. g.,
Paroczay* v. *United States*, 177 Ct. Cl. 754, 369
F.2d 720 (1966); *Paterson* v. *United States*, 162
Ct. Cl. 675, 319 F.2d 882 (1963).

The availability of a backpay award several years
after a dismissal is scant justice for a Government
employee who may have long since been evicted
from his home and found himself forced to resort
to public assistance in order to support his family.
And it is little solace to those who are so injured to
be told that their plight is "normal" and "routine."
Whether common or not, such consequences
amount to irreparable injury which a court of
equity has power to prevent.

Nor can I agree with the majority's analysis of
Mrs. Murray's claim of damaged reputation. It is
argued that Mrs. Murray can suffer no significant
loss of reputation by procedural irregularities in
effectuating her discharge because her claim is not
that she could not as a matter of statutory or
administrative right be discharged, but only that
she was entitled to additional procedural
safeguards in effectuating the discharge. *Ante*, at
91. In my view, this analysis not only reflects a
total misunderstanding of the gist of Mrs.
Murray's complaint, but also fails to comprehend
the purposes behind the Civil Service Commission
regulations at issue here.

The Commission provides a special
pretermination procedure where a probationary
employee is to be terminated "for conditions
arising before appointment," not as an empty
gesture, but rather because the employing agency
might be mistaken about these preappointment
conditions, and might decide not to dismiss the
103 employee *103 if he is given an opportunity to
present his side of the story. Mrs. Murray does not
seek a hearing as an end in itself, but rather to
correct what she believes is a mistaken impression
the agency had about her conduct in her prior job,
in the hope that with the record straight, the
agency would not discharge her. She seeks to save
her job and to avoid the blot on her employment
record that a dismissal entails, and it is in this
sense that she claims her dismissal would injure
her reputation.

Whether the likelihood of irreparable injury to
Mrs. Murray if she is not allowed to retain her job
pending her administrative appeal, when balanced
against the Government's interests in having her
out of the office during this period, supports
equitable relief in the present case is a question I
would leave for the District Court. Because of Mr.
Sanders' absence, the District Court cut short its
hearing on the application for a preliminary
injunction before either the Government or Mrs.
Murray had an opportunity to present witnesses or
other evidence. Mrs. Murray still has not had her
day in court to present evidence supporting her
allegation of irreparable injury, and what that
evidence would be were she given that
opportunity we can only speculate.

104 *104

casetext
Part of Thomson Reuters

# Yoder v. University of Louisville

Decided Nov 9, 2011

CIVIL ACTION NO. 3:09CV-205-S.

November 9, 2011

## MEMORANDUM OPINION

CHARLES SIMPSON III, District Judge

This matter is before the court on motion of the defendants, the University of Louisville ("U of L") , *et al.*, to dismiss the action, urging that plaintiff Nina Yoder's claims have been rendered moot.

This action arose from Yoder's dismissal from the U of L's School of Nursing for what U of L determined was a violation of its Honor Code and Course Confidentiality Agreement. Yoder posted a description on her Myspace page of a live birth she observed for a childbirth class (hereinafter the "Blog Post"). After a student services committee upheld her dismissal from the nursing program, Yoder filed this action against U of L and two of its officials alleging violation of her First and Fourteenth Amendment rights. Yoder sought both injunctive relief and damages under 42 U.S.C. § 1983.

The parties filed cross-motions for summary judgment. Yoder contended that her rights to free speech and due process were violated by U of L, that the Honor Code was unconstitutionally broad, and the Confidentiality Agreement was unconstitutionally vague. She sought summary judgment as to liability and a trial on her claim for damages. However, this court agreed with the defendants that this was not a free speech case, 2 and addressed the merits on nonconstitutional *2

grounds, in keeping with the Supreme Court's directives. *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

U of L urged that Yoder violated her obligations as a nursing student and was dismissed from the nursing program for those violations. Additionally, U of L contended that the Blog Post in question would not find protection under the First Amendment in any event.

The court found that the terms in the Honor Code and Confidentiality Agreement should be given their plain, ordinary meaning, and that, under such a reading, Yoder's Blog Post did not breach her obligations under the agreements. The court entered a permanent injunction requiring her reinstatement as a student in the U of L School of Nursing and her immediate return to classes. The court did not address Yoder's claim for damages under 42 U.S.C. § 1983, as summary judgment was granted in Yoder's favor on nonconstitutional grounds.

U of L appealed the court's ruling. The Sixth Circuit reversed this court's grant of summary judgment, concluding that the ruling exceeded the authority granted by Fed.R.Civ.P. 54(c), as the parties had not litigated the matter under contract principles. The matter was remanded to this court for further proceedings on April 8, 2011, with the mandate issuing on May 3, 2011. During the pendency of the appeal, Yoder was reinstated to the nursing program pursuant to the injunction, completed her coursework, obtained her nursing degree, and left U of L.

casetext

U of L now seeks dismissal of the action as moot, urging that there is no longer a justiciable case or controversy. It contends that there is no longer any relief which may be granted to Yoder.

If events occur during a case, including during appeal, that make it impossible for the court to grant any effectual relief whatever to a prevailing party, the matter must be dismissed as moot. *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). *3

We find that the case at bar is indistinguishable from a recent case from the United States Court of Appeals for the Sixth Circuit. *Fialka-Feldman v. Oakland University Board of Trustees*, 639 F.3d 711 (6th Cir. 2011) parallels the case before us in many respects, but it does not govern the outcome of the case at bar.[1] To briefly summarize the findings in the *Fialka-Feldman* decision,

> [1] U of L did not cite the *Fialka-Feldman* case in its original brief, as the opinion had just issued the day prior to the filing of U of L's motion to dismiss. The case was cited in U of L's reply, with a copy of the Lexis version of the case. Yoder did not request leave to file a supplemental brief in light of this newly-minted opinion from the Sixth Circuit.

1. Fialka-Feldman, an individual with "cognitive impairment," began attending classes at Oakland University through the OPTIONS program which allows mildly disabled students to continue their education in a college setting, attending regular university courses and participating in student activities.

2. Fialka-Feldman applied for and was denied on-campus housing. The university denied his housing application on the ground that he was not an admitted Oakland University student.

3. Fialka-Feldman sued the university alleging that the university discriminated against him based on his disability in violation of the Americans with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act.

4. The district court granted summary judgment in favor of Fialka-Feldman and entered a permanent injunction requiring that the university to accommodate his disability and waive its housing policy to do so. The court did not award damages, but did award attorney's fees which it held in abeyance pending the outcome of the university's appeal.

5. The university appealed while at the same time complying with the injunction. Fialka-Feldman moved into dormitory housing, completed the OPTIONS program and moved out of the dormitory, with no plan to enroll in other university programs. *4

6. The university sought to pursue its appeal, but the appeal was dismissed by the Sixth Circuit, finding that "[w]hat started as a disagreement with consequences for both parties became an abstract dispute with consequences for neither party when Fialka-Feldman left the OPTIONS program." 639 F.3d at 714. The court found that once Fialka-Feldman completed his program, the injunction meant nothing to the university and required nothing of it.

7. The court found that the case was not "capable of repetition, yet evading review," *citing FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 482, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) and *DeFunis v. Odegaard*, 416 U.S. 312, 314-17, 94 S.Ct. 1704, 40 L.Ed.2d 164 n. 2 (1974) ("[T]here is no reason to suppose that a subsequent case attacking those procedures will not come with relative speed to this Court.").

8. The court found that Fialka-Feldman's claim for money damages did not save the case as he "lost the point as a matter of law below and did not cross-appeal that aspect of the judgment."

We find nothing to distinguish the *Fialka-Feldman* case other than the procedural posture of the claim for damages. As in *Fialka-Feldman*, Yoder has

completed her educational program and been granted her degree, rendering the claim for injunctive relief ineffectual. She sought money damages under 42 U.S.C. § 1983 as Fialka-Feldman did under the Rehabilitation Act. Liability for damages under § 1983 was not addressed by this court, as Yoder's claim was resolved on the merits on nonconstitutional grounds. In *Fialka-Feldman*, the trial court issued a permanent injunction but did not award damages, and Fialka-Feldman did not appeal the ruling on his damages claim. Here, the matter of damages was never addressed. Therefore, reversal by the Court of Appeals of this court's grant of summary judgment does not bar Yoder's claim for damages under § 1983. U of L contends that Yoder failed to preserve her claim for damages. However, there can be no failure to *5 preserve a claim that was never addressed by the court below.

As explained in *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 387-88 (6th Cir. 2005), the existence of a damages claim saves the action from mootness:

Before turning to the merits, we first address the school district's argument that we no longer have Article III jurisdiction over this dispute. The school district is right that we must consider this argument before reaching the merits but wrong in asserting that our authority over this dispute has vanished. Fort Thomas argues that this challenge to the dress code became moot when Amanda Blau entered high school and freed herself from the restrictions of the Highlands Middle School dress code. But in bringing this claim, Robert Blau not only sought injunctive and declaratory relief but also sought damages as well. Thus, even if Amanda's matriculation from middle school to high school mooted the claim for injunctive and declaratory relief (a point we need not decide), the existence of a damages claim ensures that this dispute is a live one and one over which Article III gives us continuing authority. *See Boag v. MacDougall,* 454 U.S. 364, 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982) (transfer to another prison did not moot prisoner's damages claim arising from his allegedly being placed in solitary confinement without notice or hearing); *Utah Animal Rights Coalition v. Salt Lake City Corp.,* 371 F.3d 1248, 1257 (10th Cir. 2004) (injunctive relief could no longer redress the injury and the ``capable of repetition, yet evading review'' doctrine did not apply, but plaintiff's nominal damages claim saved action from mootness); *Mellen v. Bunting,* 327 F.3d 355, 364-65 (4th Cir. 2003), *cert. denied,* 541 U.S. 1019, 124 S.Ct. 1750, 158 L.Ed.2d 636 (2004) (plaintiffs' claim for injunctive relief arising from challenge to constitutionality of supper prayer at Virginia Military Institute became moot upon the plaintiffs' graduation but the damages claim continued to present a live controversy);

*Donovan v. Punxsutawney Area Sch. Bd.,* 336 F.3d 211, 218 (3d Cir. 2003) (while a student's First Amendment claims for injunctive and declaratory relief became moot upon her graduation, her damages claim continued to present a live controversy); *Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 798 (9th Cir. 1999) (en banc) (`'A student's graduation moots claims for declaratory and injunctive relief, but it does not moot claims for monetary damages.").

We conclude that, with a claim for damages remaining, the case has not be rendered moot by Yoder's graduation from nursing school. The motion of U of L to dismiss will therefore be denied.

U of L sought additional time in which to respond to Yoder's motion for summary judgment in the event that the court denied its motion to dismiss the case as moot. U of L will be granted \*6 thirty (30) days in which to file a response to Yoder's motion for summary judgment. Yoder will then be afforded thirty (30) days in which to file a reply. A separate order will be entered this date in accordance with this opinion.

November 8, 2011

casetext
Part of Thomson Reuters

No. 03-475

U.S.

# Cheney v. U.S. Dist. Court for D.C

542 U.S. 367 (2004) · 124 S. Ct. 2576

Decided Jun 24, 2004

CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT.

No. 03-475.

Argued April 27, 2004. Decided June 24, 2004.

The President established the National Energy
Policy Development Group (Group) to give him
advice and make recommendations on energy
policy, assigning a number of federal agency
heads and assistants to serve as Group members
and authorizing the Vice President, as Group
chairman, to include other federal officers as
appropriate. After the Group issued a final report
and, according to the Government, terminated all
operations, respondents filed these separate
actions, later consolidated in the District Court,
alleging that the Group had not complied with the
Federal Advisory Committee Act (FACA), which,
*inter alia*, imposes a variety of open-meeting and
disclosure requirements on entities meeting the
definition of "advisory committee." As relevant
here, such a committee is an entity or "subgroup . .
., which is . . . established or utilized by the
President, . . . exclud[ing] . . . any committee . . .
composed wholly of full-time, or permanent part-
time, [federal] officers or employees." 5 U.S.C.
App. § 2(B)(i). The complaint alleged that,
because nonfederal employees and private
lobbyists regularly attended and fully participated
in the Group's nonpublic meetings as *de facto*
Group members, the Group could not benefit from
the § 2(B) exemption and was therefore subject to
FACA's requirements. The suit sought declaratory
relief and an injunction requiring the defendants

— including the Vice President and the
Government officials serving on the Group — to
produce all materials allegedly subject to FACA's
requirements.

casetext

Among its rulings, the District Court granted the defendants' motion to dismiss as to some of them, but denied it as to others. The Court held that FACA's substantive requirements could be enforced against the Vice President and the other Government participants under the Mandamus Act, 28 U.S.C. § 1361, and against the agency defendants under the Administrative Procedure Act, 5 U.S.C. § 706. It deferred ruling on whether the FACA disclosure duty was sufficiently clear and nondiscretionary for mandamus to issue. It also deferred ruling on the Government's contention that to disregard the § 2(B) exemption and apply FACA to the Group would violate separation-of-powers principles *368 and interfere with the President's and Vice President's constitutional prerogatives. Instead, the court allowed respondents to conduct a "tightly-reined" discovery to ascertain the Group's structure and membership, and thus to determine whether the *de facto* membership doctrine applied. While acknowledging that discovery itself might raise serious constitutional questions, the court explained that the Government could assert executive privilege to protect sensitive materials from disclosure. The court noted that if, after discovery, respondents had no evidentiary support for their allegations about *de facto* members in the Group, the Government could prevail on statutory grounds. Even were it appropriate to address constitutional issues, the court explained, its discovery orders would provide the factual development necessary to determine the extent of the alleged intrusion into the Executive's constitutional authority. The court then ordered respondents to submit a discovery plan, approved that plan in due course, entered orders allowing discovery to proceed, and denied the Government's

motion for certification under 28 U.S.C. § 1292(b) with respect to the discovery orders.

Petitioners sought a writ of mandamus in the Court of Appeals to vacate the discovery orders and for other relief, but the court dismissed the mandamus petition on the ground that alternative avenues of relief remained available. Citing *United States* v. *Nixon*, 418 U.S. 683, the court held that petitioners, in order to guard against intrusion into the President's prerogatives, must first assert executive privilege with particularity in the District Court. If the lower court sustained the privilege, the appeals court observed, petitioners would be able to obtain all the relief they sought; but if the District Court rejected the claim, mandamus might well be appropriate. So long as the separation-of-powers conflict remained hypothetical, the court held, it had no authority to exercise the extraordinary remedy of mandamus. Although acknowledging that the scope of respondents' discovery requests was overly broad, the appeals court nonetheless agreed with the District Court that petitioners should bear the burden of invoking executive privilege and of objecting to the discovery orders with detailed precision.

*Held:*

Part II.A.2.d are not

1. Respondents' preliminary argument that the mandamus petition was jurisdictionally out of time is rejected. Respondents assert that, because the Government's basic argument was one of discovery immunity — *i.e.*, it need not invoke executive privilege or make particular objections to the discovery requests — the mandamus petition should have been filed within 60 days after the District Court denied the motion to *369 dismiss under Federal Rule of Appellate Procedure 4(a)(1)(B). On this theory, the last day for any filing in the appeals court was September 9, 2002, whereas the mandamus petition and notice of appeal were not filed until November 7. However, Rule 4(a), by its plain terms, applies only to the filing of a notice of appeal. It is inapplicable to the mandamus petition under the All Writs Act, 28 U.S.C. § 1651. Respondents' alternative argument that the mandamus petition was barred by the equitable doctrine of laches also fails. Laches might be a bar where the petitioner slept on his rights and especially if the delay was prejudicial. *Chapman* v. *County of Douglas*, 107 U.S. 348, 355. Here, however, the flurry of motions the Government filed after the District Court denied the dismissal motion overcomes respondents' argument. Nor does the Court accept their argument that laches should apply because those Government motions amounted to little more than dilatory tactics. Given the drastic nature of mandamus and this Court's holdings that the writ may not issue while alternative avenues of relief remain available, the Government cannot be faulted for attempting to resolve the dispute through less drastic means. Pp. 378-380.

2. The Court of Appeals erred in concluding it lacked authority to issue mandamus because the Government could protect its rights by asserting executive privilege in the District Court. Pp. 380-392.

casetext

(a) Mandamus is a "drastic and extraordinary" remedy "reserved for really extraordinary causes." *Ex parte Fahey*, 332 U.S. 258, 259-260. While the conditions for obtaining it may be demanding, they are not insuperable. This Court has issued mandamus to, *inter alia*, restrain a lower court whose actions would threaten the separation of powers by embarrassing the Executive Branch. *Ex parte Peru*, 318 U.S. 578, 588. Were the Vice President not a party, the argument that the Court of Appeals should have entertained a mandamus action might present different considerations. Here, however, the Vice President and his Group comembers are the subjects of the discovery orders. The mandamus petition alleges that the orders threaten substantial intrusions on the process by which those closest to the President advise him. These facts and allegations remove this case from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus or otherwise. A President's communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual. *Nixon*, 418 U.S., at 715. While the President is not above the law, the Judiciary must afford Presidential confidentiality the greatest possible protection, *ibid.*, recognizing the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties. These separation-of-powers considerations *370 should inform a court of appeals' evaluation of a mandamus petition involving the President or the Vice President. Accepted mandamus standards are broad enough to allow a court to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities. See *Ex parte Peru, supra*, at 587. Pp. 380-382.

370

4

(b) The Court of Appeals labored under the mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections. In its view, the requirement that the Vice President and his Group colleagues bear the burden of invoking executive privilege with narrow specificity and objecting to the discovery requests with detailed precision was mandated by *Nixon*'s rejection of an "absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances," 418 U.S., at 706. The appeals court's analysis overlooks fundamental differences between this case and *Nixon*, which cannot bear the weight the court put on it. Unlike this case, which concerns requests for information for use in a civil suit, *Nixon* involved the proper balance between the Executive's interest in the confidentiality of its communications and the "constitutional need for production of relevant evidence in a criminal proceeding." *Id.*, at 713. The distinction between criminal and civil proceedings is not just a matter of formalism in this context. The right to production of relevant evidence in civil proceedings does not have the same "constitutional dimensions" as it does in the criminal context. *Id.*, at 711. Withholding necessary materials in an ongoing criminal case constitutes an impermissible impairment of another branch's "essential functions." *Ibid.* Withholding the information in this case does not hamper such "essential functions" in quite the same way. The District Court ordered discovery here, not to remedy known statutory violations, but to ascertain whether FACA's disclosure requirements apply to the Group at all. This situation cannot, in fairness, be compared to *Nixon*, where a court's ability to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction hinged on the availability of certain indispensable information. Another important factor here is the burden imposed by the discovery orders. This is not a routine discovery dispute. The discovery requests are directed to the Vice President and other senior Government officials who served on the Group to give advice and make recommendations to the President. Special considerations control when the Executive's interests in maintaining its autonomy and safeguarding its communications' confidentiality are implicated. See, *e.g., Clinton* v. *Jones*, 520 U.S. 681, 707. Even when compared against *Nixon*'s criminal subpoenas involving the President, the civil discovery here militates against respondents' position. *371 There are no checks in civil discovery analogous to the constraints imposed in the criminal justice system to filter out insubstantial legal claims. Federal Rule of Civil Procedure 11 sanctions and private attorneys' obligation of candor to the judicial tribunal have proved insufficient to discourage the filing of meritless claims against the Executive Branch. Finally, the narrowly tailored subpoena orders in *Nixon*, which "precisely identified" and "specific[ally] . . . enumerated" the relevant materials, 418 U.S., at 688, and n. 5, stand in marked contrast to the overly broad discovery requests approved by the District Court. Given that disparity, this Court's precedents provide no support for the appeals court's requirement that the Executive Branch bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections. Indeed, those precedents suggest just the opposite. See, *e.g., Clinton, supra*, at 705. Contrary to

casetext
Page 36 of 191

their conclusions, *Nixon* did not leave the lower courts the sole option of inviting the Executive Branch to invoke executive privilege. Rather, they could have narrowed the scope of the discovery orders on their own. In deciding whether to issue mandamus, the Court of Appeals must not only determine whether there are exceptional circumstances amounting to a judicial usurpation of power, *Will* v. *United States*, 389 U.S. 90, 95, or a "clear abuse of discretion," *Bankers Life Casualty Co.* v. *Holland*, 346 U.S. 379, 383, but must also ask whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties. Pp. 383-391.

(c) Absent overriding concerns such as the need to avoid piecemeal litigation, see *Schlagenhauf* v. *Holder*, 379 U.S. 104, 111, the Court declines to direct the Court of Appeals to issue mandamus against the District Court. This is not a case where, having considered the issues, the appeals court abused its discretion by failing to issue the writ. Instead, it relied on its mistaken reading of *Nixon* and prematurely terminated its inquiry without even reaching the weighty separation-of-powers objections raised in the case or exercising its discretion to determine whether mandamus is appropriate under the circumstances. Because issuance of the writ is vested in the discretion of the court to which the petition is made, this Court leaves it to the Court of Appeals to address the parties' arguments and other matters bearing on whether mandamus should issue, bearing in mind the burdens imposed on the Executive Branch in any future proceedings. Special considerations applicable to the President and the Vice President suggest that the lower courts should be sensitive to Government requests for interlocutory appeals to reexamine, *e.g.*, whether the statute embodies the *de facto* membership doctrine. Pp. 391-392.

372  334 F.3d 1096, vacated and remanded. *372

*Solicitor General Olson* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Keisler, Deputy Solicitor General Clement, Deputy Assistant Attorneys General Katsas* and *Coffin*, and *Mark B. Stern, Michael S. Raab*, and *Douglas Hallward-Driemeier. Alan B. Morrison* argued the cause for respondent Sierra Club. With him on the brief were *Scott Nelson, David Bookbinder, Patrick Gallagher, Alex Levinson*, and *Sanjay Narayan.*

*Paul J. Orfanedes* argued the cause for respondent Judicial Watch, Inc. With him on the brief was *James F. Peterson.* –

– Briefs of *amici curiae* urging affirmance were filed for the American Association of Law Libraries et al. by *David Overlook Stewart, Thomas M. Susman, Miriam M. Nisbet, Mark David Agrast, Meredith Fuchs,* and *Elliot M. Mincberg;* for Natural Resources Defense Council by *Eric R. Glitzenstein, Howard M. Crystal,* and *Sharon Buccino;* and for The Reporters Committee for Freedom of the Press et al. by *Lucy* A *Dalglish, Richard M. Schmidt, Jr.,* and *Bruce W. San ford.*

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, O'CONNOR, and BREYER, JJ., joined, and in which SCALIA and THOMAS, JJ., joined as to Parts I, II, III, and IV. STEVENS, J., filed a concurring opinion, *post,* p. 392. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, *post,* p. 393. GINSBURG, J., filed a dissenting opinion, in which SOUTER, J., joined, *post,* p. 396.

JUSTICE KENNEDY delivered the opinion of the Court.

The United States District Court for the District of Columbia entered discovery orders directing the Vice President and other senior officials in the Executive Branch to produce information about a task force established to give advice and make policy recommendations to the President. This case requires us to consider the circumstances under which a court of appeals may exercise its power to issue a writ of mandamus to modify or dissolve the orders when, by virtue of their overbreadth, enforcement might interfere with the 373 *373 officials in the discharge of their duties and impinge upon the President's constitutional prerogatives.

I

A few days after assuming office, President George W. Bush issued a memorandum establishing the National Energy Policy Development Group (NEPDG or Group). The Group was directed to "develo[p] . . . a national energy policy designed to help the private sector, and government at all levels, promote dependable, affordable, and environmentally sound production and distribution of energy for the future." App. 156-157. The President assigned a number of agency heads and assistants — all employees of the Federal Government — to serve as members of the committee. He authorized the Vice President, as chairman of the Group, to invite "other officers of the Federal Government" to participate "as appropriate." *Id.,* at 157. Five months later, the NEPDG issued a final report and, according to the Government, terminated all operations.

Following publication of the report, respondents Judicial Watch, Inc., and the Sierra Club filed these separate actions, which were later consolidated in the District Court. Respondents alleged the NEPDG had failed to comply with the procedural and disclosure requirements of the Federal Advisory Committee Act (FACA or Act), 5 U.S.C. App. § 2, p. 1.

FACA was enacted to monitor the "numerous committees, boards, commissions, councils, and similar groups [that] have been established to advise officers and agencies in the executive branch of the Federal Government," § 2(a), and to prevent the "wasteful expenditure of public funds" that may result from their proliferation, *Public Citizen* v. *Department of Justice,* 491 U.S. 440, 453 (1989). Subject to specific exemptions, FACA imposes a variety of open-meeting and disclosure requirements on groups that meet the definition of an "advisory committee." As relevant here, an 374 "advisory committee" means *374

"any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . ., which is —

"(B) established or utilized by the President, . . . except that [the definition] excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government. . . ." 5 U.S.C. App. § 3(2), p. 2.

Respondents do not dispute the President appointed only Federal Government officials to the NEPDG. They agree that the NEPDG, as established by the President in his memorandum, was "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." *Ibid.* The complaint alleges, however, that "non-federal employees," including "private lobbyists," "regularly attended and fully participated in non-public meetings." App. 21 (Judicial Watch Complaint ¶ 25). Relying on *Association of American Physicians Surgeons, Inc.* v. *Clinton*, 997 F.2d 898 (CADC 1993) ( *AAPS*), respondents contend that the regular participation of the non-Government individuals made them *de facto* members of the committee. According to the complaint, their "involvement and role are functionally indistinguishable from those of the other [formal] members." *Id.*, at 915. As a result, respondents argue, the NEPDG cannot benefit from the Act's exemption under subsection B and is subject to FACA's requirements.

Vice President Cheney, the NEPDG, the Government officials who served on the committee, and the alleged *de facto* members were named as defendants. The suit seeks declaratory relief and an injunction requiring them to produce all materials allegedly subject to FACA's requirements.

All defendants moved to dismiss. The District Court granted the motion in part and denied it in part. The court acknowledged FACA does not

create a private cause of action. On this basis, it 375 dismissed respondents' claims against *375 the non-Government defendants. Because the NEPDG had been dissolved, it could not be sued as a defendant; and the claims against it were dismissed as well. The District Court held, however, that FACA's substantive requirements could be enforced against the Vice President and other Government participants on the NEPDG under the Mandamus Act, 28 U.S.C. § 1361, and against the agency defendants under the Administrative Procedure Act (APA), 5 U.S.C. § 706. The District Court recognized the disclosure duty must be clear and nondiscretionary for mandamus to issue, and there must be, among other things, "final agency actions" for the APA to apply. According to the District Court, it was premature to decide these questions. It held only that respondents had alleged sufficient facts to keep the Vice President and the other defendants in the case.

The District Court deferred ruling on the Government's contention that to disregard the exemption and apply FACA to the NEPDG would violate principles of separation of powers and interfere with the constitutional prerogatives of the President and the Vice President. Instead, the court allowed respondents to conduct a "tightly-reined" discovery to ascertain the NEPDG's structure and membership, and thus to determine whether the *de facto* membership doctrine applies. *Judicial Watch, Inc.* v. *National Energy Policy Dev. Group*, 219 F.Supp.2d 20, 54 (DC 2002). While acknowledging that discovery itself might raise serious constitutional questions, the District Court explained that the Government could assert executive privilege to protect sensitive materials from disclosure. In the District Court's view, these "issues of executive privilege will be much more limited in scope than the broad constitutional challenge raised by the government." *Id.*, at 55. The District Court adopted this approach in an attempt to avoid constitutional questions, noting that if, after discovery, respondents have no

evidentiary support for the allegations about the regular participation by lobbyists and industry 376 executives on the NEPDG, the *376 Government can prevail on statutory grounds. Furthermore, the District Court explained, even were it appropriate to address constitutional issues, some factual development is necessary to determine the extent of the alleged intrusion into the Executive's constitutional authority. The court denied in part the motion to dismiss and ordered respondents to submit a discovery plan.

In due course the District Court approved respondents' discovery plan, entered a series of orders allowing discovery to proceed, see CADC App. 238, 263, 364 (reproducing orders entered on Sept. 9, Oct. 17, and Nov. 1, 2002), and denied the Government's motion for certification under 28 U.S.C. § 1292(b) with respect to the discovery orders. Petitioners sought a writ of mandamus in the Court of Appeals to vacate the discovery orders, to direct the District Court to rule on the basis of the administrative record, and to dismiss the Vice President from the suit. The Vice President also filed a notice of appeal from the same orders. See *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949); *United States* v. *Nixon*, 418 U.S. 683 (1974).

A divided panel of the Court of Appeals dismissed the petition for a writ of mandamus and the Vice President's attempted interlocutory appeal. *In re Cheney*, 334 F.3d 1096 (CADC 2003). With respect to mandamus, the majority declined to issue the writ on the ground that alternative avenues of relief remained available. Citing *United States* v. *Nixon, supra*, the majority held that petitioners, to guard against intrusion into the President's prerogatives, must first assert privilege. Under its reading of *Nixon*, moreover, privilege claims must be made "`with particularity.'" 334 F.3d, at 1104. In the majority's view, if the District Court sustains the privilege, petitioners will be able to obtain all the relief they seek. If the District Court rejects the claim of executive privilege and creates "an imminent risk of

disclosure of allegedly protected presidential communications," "mandamus might well be 377 appropriate to avoid letting `the *377 cat . . . out of the bag.'" *Id.*, at 1104-1105. "But so long as the separation of powers conflict that petitioners anticipate remains hypothetical," the panel held, "we have no authority to exercise the extraordinary remedy of mandamus." *Id.*, at 1105. The majority acknowledged the scope of respondents' requests is overly broad, because it seeks far more than the "limited items" to which respondents would be entitled if "the district court ultimately determines that the NEPDG is subject to FACA." *Id.*, at 1105-1106; *id.*, at 1106 ("The requests to produce also go well beyond FACA's requirements"); *ibid.* ("[Respondents'] discovery also goes well beyond what they need to prove"). It nonetheless agreed with the District Court that petitioners "`shall bear the burden'" of invoking executive privilege and filing objections to the discovery orders with "`detailed precision.'" *Id.*, at 1105 (quoting Aug. 2, 2002, Order).

For similar reasons, the majority rejected the Vice President's interlocutory appeal. In *United States* v. *Nixon*, the Court held that the President could appeal an interlocutory subpoena order without having "to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review." 418 U.S., at 691. The majority, however, found the case inapplicable because Vice President Cheney, unlike then-President Nixon, had not yet asserted privilege. In the majority's view, the Vice President was not forced to choose between disclosure and suffering contempt for failure to obey a court order. The majority held that to require the Vice President to assert privilege does not create the unnecessary confrontation between two branches of Government described in *Nixon*.

Judge Randolph filed a dissenting opinion. In his view *A APS' de facto* membership doctrine is mistaken, and the Constitution bars its application to the NEPDG. Allowing discovery to determine the applicability of the *de facto* membership

378 *378 doctrine, he concluded, is inappropriate. He would have issued the writ of mandamus directing dismissal of the complaints. 334 F.3d, at 1119.

We granted certiorari. 540 U.S. 1088 (2003). We now vacate the judgment of the Court of Appeals and remand the case for further proceedings to reconsider the Government's mandamus petition.

## II

As a preliminary matter, we address respondents' argument that the Government's petition for a writ of mandamus was jurisdictionally out of time or, alternatively, barred by the equitable doctrine of laches. According to respondents, because the Government's basic argument was one of discovery immunity — that is, it need not invoke executive privilege or make particular objections to the discovery requests — the mandamus petition should have been filed with the Court of Appeals within 60 days after the District Court denied the Government's motion to dismiss. See Fed. Rule App. Proc. 4(a)(1)(B) ("When the United States or its officer or agency is a party, the notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered"). On this theory, the last day for making any filing to the Court of Appeals was September 9, 2002. The Government, however, did not file the mandamus petition and the notice of appeal until November 7, four months after the District Court issued the order that, under respondents' view, commenced the time for appeal.

As even respondents acknowledge, however, Rule 4(a), by its plain terms, applies only to the filing of a notice of appeal. Brief for Respondent Sierra Club 23. Rule 4(a) is inapplicable to the Government's mandamus petition under the All Writs Act, 28 U.S.C. § 1651. Because we vacate the Court of Appeals' judgment and remand the case for further proceedings for the court to consider whether a writ of mandamus should have issued, we need not decide whether the Vice President also could have appealed the District

379 Court's orders *379 under *Nixon* and the collateral order doctrine. We express no opinion on whether the Vice President's notice of appeal was timely filed.

Respondents' argument that the mandamus petition was barred by laches does not withstand scrutiny. Laches might bar a petition for a writ of mandamus if the petitioner "slept upon his rights . . ., and especially if the delay has been prejudicial to the [other party], or to the rights of other persons." *Chapman* v. *County of Douglas*, 107 U.S. 348, 355 (1883). Here, the flurry of activity following the District Court's denial of the motion to dismiss overcomes respondents' argument that the Government neglected to assert its rights. The Government filed, among other papers, a motion for a protective order on September 3; a motion to stay pending appeal on October 21; and a motion for leave to appeal pursuant to 28 U.S.C. § 1292(b) on October 23. Even were we to agree that the baseline for measuring the timeliness of the Government's mandamus petition was the District Court's order denying the motion to dismiss, the Government's active litigation posture was far from the neglect or delay that would make the application of laches appropriate.

We do not accept, furthermore, respondents' argument that laches should apply because the motions filed by the Government following the District Court's denial of its motion to dismiss amounted to little more than dilatory tactics to "delay and obstruct the proceedings." Brief for Respondent Sierra Club 23. In light of the drastic nature of mandamus and our precedents holding that mandamus may not issue so long as alternative avenues of relief remain available, the Government cannot be faulted for attempting to resolve the dispute through less drastic means. The law does not put litigants in the impossible position of having to exhaust alternative remedies before petitioning for mandamus, on the one hand, and having to file the mandamus petition at the

earliest possible moment to avoid laches, on the other. The petition was properly before the Court of Appeals for its consideration.

380 *380

## III

We now come to the central issue in the case — whether the Court of Appeals was correct to conclude it "ha[d] no authority to exercise the extraordinary remedy of mandamus," 334 F.3d, at 1105, on the ground that the Government could protect its rights by asserting executive privilege in the District Court.

The common-law writ of mandamus against a lower court is codified at 28 U.S.C. § 1651(a): "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." This is a "drastic and extraordinary" remedy "reserved for really extraordinary causes." *Ex parte Fahey*, 332 U.S. 258, 259-260 (1947). "The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Roche* v. *Evaporated Milk Assn.*, 319 U.S. 21, 26 (1943). Although courts have not "confined themselves to an arbitrary and technical definition of `jurisdiction,'" *Will* v. *United States*, 389 U.S. 90, 95 (1967), "only exceptional circumstances amounting to a judicial `usurpation of power,'" *ibid.*, or a "clear abuse of discretion," *Bankers Life Casualty Co.* v. *Holland*, 346 U.S. 379, 383 (1953), "will justify the invocation of this extraordinary remedy," *Will*, 389 U.S., at 95.

As the writ is one of "the most potent weapons in the judicial arsenal," *id.*, at 107, three conditions must be satisfied before it may issue. *Kerr* v. *United States Dist. Court for Northern Dist. of Cal*, 426 U.S. 394, 403 (1976). First, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires," *ibid.* — a condition designed to ensure that the

381

writ will not be used as a substitute for the regular appeals process, *Fahey, supra*, at 260. Second, the petitioner must satisfy ``the burden of showing that [his] right to issuance of the writ is "clear and indisputable.""' *Kerr, supra*, at 403 (quoting *Bankers Life Casualty Co., supra*, at 384). Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances. *Kerr, supra*, at 403 (citing *Schlagenhauf* v. *Holder*, 379 U.S. 104, 112, n. 8 (1964)). These hurdles, however demanding, are not insuperable. This Court has issued the writ to restrain a lower court when its actions would threaten the separation of powers by "embarrass[ing] the executive arm of the Government," *Ex parte Peru*, 318 U.S. 578, 588 (1943), or result in the "intrusion by the federal judiciary on a delicate area of federal-state relations," *Will, supra*, at 95 (citing *Maryland* v. *Soper* ( *No. 1*) 270 U.S. 9 (1926)).

Were the Vice President not a party in the case, the argument that the Court of Appeals should have entertained an action in mandamus, notwithstanding the District Court's denial of the motion for certification, might present different considerations. Here, however, the Vice President and his comembers on the NEPDG are the subjects of the discovery orders. The mandamus petition alleges that the orders threaten "substantial intrusions on the process by which those in closest operational proximity to the President advise the President." App. 343. These facts and allegations remove this case from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus or otherwise. It is well established that "a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any `ordinary individual.'" *United States* v. *Nixon*, 418 U.S., at 715. Chief Justice Marshall, sitting as a trial judge, recognized the unique position of the Executive Branch when he stated that "[i]n no

382 case . . . would a court be required to *382 proceed against the president as against an ordinary individual." *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14, 694) (CC Va. 1807). See also *Clinton* v. *Jones*, 520 U.S. 681, 698-699 (1997) ("We have, in short, long recognized the `unique position in the constitutional scheme' that [the Office of the President] occupies" (quoting *Nixon* v. *Fitzgerald*, 457 U.S. 731, 749 (1982)); 520 U.S., at 710-724 (BREYER, J., concurring in judgment). As *United States* v. *Nixon* explained, these principles do not mean that the "President is above the law." 418 U.S., at 715. Rather, they simply acknowledge that the public interest requires that a coequal branch of Government "afford Presidential confidentiality the greatest protection consistent with the fair administration of justice," *ibid.*, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.

These separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President or the Vice President. Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities. See *Ex parte Peru*, *supra*, at 587 (recognizing jurisdiction to issue the writ because "the action of the political arm of the Government taken within its appropriate sphere [must] be promptly recognized, and . . . delay and inconvenience of a prolonged litigation [must] be avoided by prompt termination of the proceedings in the district court"); see also *Clinton* v. *Jones*, *supra*, at 701 ("We have recognized that `[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties'" (quoting *Loving* v.
383 *United States*, 517 U.S. 748, 757 (1996))). *383

IV

The Court of Appeals dismissed these separation-of-powers concerns. Relying on *United States* v. *Nixon*, it held that even though respondents' discovery requests are overbroad and "go well beyond FACA's requirements," the Vice President and his former colleagues on the NEPDG "`shall bear the burden'" of invoking privilege with narrow specificity and objecting to the discovery requests with "`detailed precision.'" 334 F.3d, at 1105-1106. In its view, this result was required by *Nixon*'s rejection of an "absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." 418 U.S., at 706. If *Nixon* refused to recognize broad claims of confidentiality where the President had asserted executive privilege, the majority reasoned, *Nixon* must have rejected, *a fortiori*, petitioners' claim of discovery immunity where the privilege has not even been invoked. According to the majority, because the Executive Branch can invoke executive privilege to maintain the separation of powers, mandamus relief is premature.

This analysis, however, overlooks fundamental differences in the two cases. *Nixon* cannot bear the weight the Court of Appeals puts upon it. First, unlike this case, which concerns respondents' requests for information for use in a civil suit, *Nixon* involves the proper balance between the Executive's interest in the confidentiality of its communications and the "constitutional need for production of relevant evidence in a criminal proceeding." *Id.*, at 713. The Court's decision was explicit that it was "not . . . concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation. . . . We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in
384 criminal trials." *Id.*, at 712, n. 19. *384

The distinction *Nixon* drew between criminal and civil proceedings is not just a matter of formalism. As the Court explained, the need for information in the criminal context is much weightier because

"our historical] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that `the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.'" *Id.*, at 708-709 (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)). In light of the "fundamental" and "comprehensive" need for "every man's evidence" in the criminal justice system, 418 U.S., at 709, 710, not only must the Executive Branch first assert privilege to resist disclosure, but privilege claims that shield information from a grand jury proceeding or a criminal trial are not to be "expansively construed, for they are in derogation of the search for truth," *id.*, at 710. The need for information for use in civil cases, while far from negligible, does not share the urgency or significance of the criminal subpoena requests in *Nixon*. As *Nixon* recognized, the right to production of relevant evidence in civil proceedings does not have the same "constitutional dimensions." *Id.*, at 711.

The Court also observed in *Nixon* that a "primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions." *Id.*, at 707. Withholding materials from a tribunal in an ongoing criminal case when the information is necessary to the court in carrying out its tasks "conflict[s] with the function of the courts under Art. III." *Ibid.* Such an impairment of the "essential functions of [another] branch," *ibid.*, is impermissible. Withholding the information in this case, however, does not hamper another branch's ability to perform its "essential functions" in quite the same way. *Ibid.* The District Court ordered discovery here, not to remedy known statutory violations, but to ascertain whether FACA's disclosure requirements even apply to the NEPDG in the first place. Even if FACA embodies important congressional objectives, the only consequence from respondents' *385 inability to obtain the discovery they seek is that it would be more difficult for private complainants to vindicate Congress' policy objectives under FACA. And even if, for argument's sake, the

reasoning in Judge Randolph's dissenting opinion in the end is rejected and FACA's statutory objectives would be to some extent frustrated, it does not follow that a court's Article III authority or Congress' central Article I powers would be impaired. The situation here cannot, in fairness, be compared to *Nixon*, where a court's ability to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction hinges on the availability of certain indispensable information.

A party's need for information is only one facet of the problem. An important factor weighing in the opposite direction is the burden imposed by the discovery orders. This is not a routine discovery dispute. The discovery requests are directed to the Vice President and other senior Government officials who served on the NEPDG to give advice and make recommendations to the President. The Executive Branch, at its highest level, is seeking the aid of the courts to protect its constitutional prerogatives. As we have already noted, special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated. This Court has held, on more than one occasion, that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," *Clinton*, 520 U.S., at 707, and that the Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in the conduct of litigation against it, *Nixon* v. *Fitzgerald*, 457 U.S., at 753. Respondents' reliance on cases that do not involve senior members of the Executive Branch, see, *e.g., Kerr* v. *United States Dirt. Court for Northern Dist. of Cat*, 426 U.S. 394 (1976), is altogether misplaced. *386

Even when compared against *United States* v. *Nixon*'s criminal subpoenas, which did involve the President, the civil discovery here militates against respondents' position. The observation in *Nixon*

that production of confidential information would not disrupt the functioning of the Executive Branch cannot be applied in a mechanistic fashion to civil litigation. In the criminal justice system, there are various constraints, albeit imperfect, to filter out insubstantial legal claims. The decision to prosecute a criminal case, for example, is made by a publicly accountable prosecutor subject to budgetary considerations and under an ethical obligation, not only to win and zealously to advocate for his client but also to serve the cause of justice. The rigors of the penal system are also mitigated by the responsible exercise of prosecutorial discretion. In contrast, there are no analogous checks in the civil discovery process here. Although under Federal Rule of Civil Procedure 11, sanctions are available, and private attorneys also owe an obligation of candor to the judicial tribunal, these safeguards have proved insufficient to discourage the filing of meritless claims against the Executive Branch. "In view of the visibility of" the Offices of the President and the Vice President and "the effect of [their] actions on countless people," they are "easily identifiable target[s] for suits for civil damages." *Nixon* v. *Fitzgerald, supra*, at 753.

Finally, the narrow subpoena orders in *United States* v. *Nixon* stand on an altogether different footing from the overly broad discovery requests approved by the District Court in this case. The criminal subpoenas in *Nixon* were required to satisfy exacting standards of "(1) relevancy; (2) admissibility; (3) specificity." 418 U.S., at 700 (interpreting Fed. Rule Crim. Proc. 17(c)). They were "not intended to provide a means of discovery." 418 U.S., at 698. The burden of showing these standards were met, moreover, fell on the party requesting the information. *Id.*, at 699 ("[I]n order to require production prior to trial, the 387 moving party *387 must show [that the applicable standards are met]"). In *Nixon*, the Court addressed the issue of executive privilege only after having satisfied itself that the special prosecutor had surmounted these demanding

requirements. *Id.*, at 698 ("If we sustained this [Rule 17(c)] challenge, there would be no occasion to reach the claim of privilege asserted with respect to the subpoenaed material"). The very specificity of the subpoena requests serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.

In contrast to *Nixon*'s subpoena orders that "precisely identified" and "specific[ally] . . . enumerated" the relevant materials, *id.*, at 688, and n. 5, the discovery requests here, as the panel majority acknowledged, ask for everything under the sky:

"1. All documents identifying or referring to any staff, personnel, contractors, consultants or employees of the Task Force.

"2. All documents establishing or referring to any Sub-Group.

"3. All documents identifying or referring to any staff, personnel, contractors, consultants or employees of any Sub-Group.

"4. All documents identifying or referring to any other persons participating in the preparation of the Report or in the activities of the Task Force or any Sub-Group.

"5. All documents concerning any communication relating to the activities of the Task Force, the activities of any Sub-Groups, or the preparation of the Report. . . .

"6. All documents concerning any communication relating to the activities of the Task Force, the activities of Sub-Groups, or the preparation of the Report between any person . . . and [a list of agencies]." App. 220-221.

The preceding excerpt from respondents' *"First* Request for Production of Documents," *id.*, at 215
388 (emphasis added), *388 is only the beginning. Respondents' "First Set of Interrogatories" are similarly unbounded in scope. *Id.*, at 224. Given the breadth of the discovery requests in this case compared to the narrow subpoena orders in *United States* v. *Nixon*, our precedent provides no support for the proposition that the Executive Branch "shall bear the burden" of invoking executive privilege with sufficient specificity and of making particularized objections. 334 F.3d, at 1105. To be sure, *Nixon* held that the President cannot, through the assertion of a "broad [and] undifferentiated" need for confidentiality and the invocation of an "absolute, unqualified" executive privilege, withhold information in the face of subpoena orders. 418 U.S., at 706, 707. It did so, however, only after the party requesting the information — the special prosecutor — had satisfied his burden of showing the propriety of the requests. Here, as the Court of Appeals acknowledged, the discovery requests are anything but appropriate. They provide respondents all the disclosure to which they would be entitled in the event they prevail on the merits, and much more besides. In these circumstances, *Nixon* does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line. Our precedents suggest just the opposite. See, *e.g., Clinton* v. *Jones*, 520 U.S. 681 (1997); *id.*, at 705 (holding that the Judiciary may direct "appropriate process" to the Executive); *Nixon* v. *Fitzgerald*, 457 U.S., at 753.

The Government, however, did in fact object to the scope of discovery and asked the District Court to narrow it in some way. Its arguments were ignored. See App. 167, 181-183 (arguing "this case can be resolved far short of the wide-ranging inquiries plaintiffs have proposed" and suggesting alternatives to "limi[t]" discovery); *id.*, at 232 ("Defendants object to the scope of plaintiffs' discovery requests and to the undue burden imposed by them. The scope of plaintiffs'

requests is broader than that reasonably calculated to lead to admissible evidence"); *id.*, at 232, n. 10
389 ("We state *389 our general objections here for purposes of clarity for the record and to preclude any later argument that, by not including them here, those general objections have been waived"). In addition, the Government objected to the burden that would arise from the District Court's insistence that the Vice President winnow the discovery orders by asserting specific claims of privilege and making more particular objections. *Id.*, at 201 (Tr. of Status Hearing (Aug. 2, 2002)) (noting "concerns with disrupting the effective functioning of the presidency and the vice-presidency"); *id.*, at 274 ("[C]ompliance with the order of the court imposes a burden on the Office of the Vice President. That is a real burden. If we had completed and done everything that Your Honor has asked us to do today that burden would be gone, but it would have been realized"). These arguments, too, were rejected. See *id.*, at 327, 329 (Nov. 1, 2002, Order) (noting that the court had, "on numerous occasions," rejected the Government's assertion "that court orders requiring [it] to respond in any fashion to [the] discovery requests creates an `unconstitutional burden' on the Executive Branch").

Contrary to the District Court's and the Court of Appeals' conclusions, *Nixon* does not leave them the sole option of inviting the Executive Branch to invoke executive privilege while remaining otherwise powerless to modify a party's overly broad discovery requests. Executive privilege is an extraordinary assertion of power "not to be lightly invoked." *United States* v. *Reynolds*, 345 U.S. 1, 7 (1953). Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult

questions of separation of powers and checks and balances. These "occasion[s] for constitutional confrontation between the two *390 branches" should be avoided whenever possible. *United States* v. *Nixon, supra,* at 692.

In recognition of these concerns, there is sound precedent in the District of Columbia itself for district courts to explore other avenues, short of forcing the Executive to invoke privilege, when they are asked to enforce against the Executive Branch unnecessarily broad subpoenas. In *United States* v. *Poindexter*, 727 F. Supp. 1501 (1989), defendant Poindexter, on trial for criminal charges, sought to have the District Court enforce subpoena orders against President Reagan to obtain allegedly exculpatory materials. The Executive considered the subpoenas "unreasonable and oppressive." *Id.,* at 1503. Rejecting defendant's argument that the Executive must first assert executive privilege to narrow the subpoenas, the District Court agreed with the President that "it is undesirable as a matter of constitutional and public policy to compel a President to make his decision on privilege with respect to a large array of documents." *Ibid.* The court decided to narrow, on its own, the scope of the subpoenas to allow the Executive "to consider whether to invoke executive privilege with respect to . . . a possibly smaller number of documents following the narrowing of the subpoenas." *Id.,* at 1504. This is but one example of the choices available to the District Court and the Court of Appeals in this case.

As we discussed at the outset, under principles of mandamus jurisdiction, the Court of Appeals may exercise its power to issue the writ only upon a finding of "exceptional circumstances amounting to a judicial `usurpation of power,'" *Will*, 389 U.S., at 95, or a "clear abuse of discretion," *Bankers Life*, 346 U.S., at 383. As this case implicates the separation of powers, the Court of Appeals must also ask, as part of this inquiry, whether the District Court's actions constituted an unwarranted impairment of another branch in the performance

of its constitutional duties. This is especially so here because the District Court's analysis of whether mandamus relief is appropriate should itself be constrained *391 by principles similar to those we have outlined, *supra,* at 380-382, that limit the Court of Appeals' use of the remedy. The panel majority, however, failed to ask this question. Instead, it labored under the mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections.

## V

In the absence of overriding concerns of the sort discussed in *Schlagenhauf*, 379 U.S., at 111 (discussing, among other things, the need to avoid "piecemeal litigation" and to settle important issues of first impression in areas where this Court bears special responsibility), we decline petitioners' invitation to direct the Court of Appeals to issue the writ against the District Court. Moreover, this is not a case where, after having considered the issues, the Court of Appeals abused its discretion by failing to issue the writ. Instead, the Court of Appeals, relying on its mistaken reading of *United States* v. *Nixon*, prematurely terminated its inquiry after the Government refused to assert privilege and did so without even reaching the weighty separation-of-powers objections raised in the case, much less exercised its discretion to determine whether "the writ is appropriate under the circumstances." *Supra*, at 381. Because the issuance of the writ is a matter vested in the discretion of the court to which the petition is made, and because this Court is not presented with an original writ of mandamus, see, *e.g., Ex parte Peru*, 318 U.S., at 586, we leave to the Court of Appeals to address the parties' arguments with respect to the challenge to *AAPS* and the discovery orders. Other matters bearing on whether the writ of mandamus should issue should also be addressed, in the first instance, by the Court of Appeals after considering any additional briefs and arguments as it deems appropriate. We note only that all courts should be

mindful of the burdens imposed on the Executive Branch in any future proceedings. Special considerations *392 applicable to the President and the Vice President suggest that the courts should be sensitive to requests by the Government for interlocutory appeals to reexamine, for example, whether the statute embodies the *de facto* membership doctrine.

The judgment of the Court of Appeals for the District of Columbia is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Broad discovery should be encouraged when it serves the salutary purpose of facilitating the prompt and fair resolution of concrete disputes. In the normal case, it is entirely appropriate to require the responding party to make particularized objections to discovery requests. In some circumstances, however, the requesting party should be required to assume a heavy burden of persuasion before any discovery is allowed. Two interrelated considerations support taking that approach in this case: the nature of the remedy respondents requested from the District Court, and the nature of the statute they sought to enforce.

As relevant here, respondents, Judicial Watch, Inc., and Sierra Club, sought a writ of mandamus under 28 U.S.C. § 1361. Mandamus is an extraordinary remedy, available to "a plaintiff only if . . . the defendant owes him a clear nondiscretionary duty." *Heckler* v. *Ringer*, 466 U.S. 602, 616 (1984). Thus, to persuade the District Court that they were entitled to mandamus relief, respondents had to establish that petitioners had a nondiscretionary duty to comply with the Federal Advisory Committee Act (FACA), 5 U.S.C. App. § 1 *et seq.*, p. 1, and in particular with FACA's requirement that "records related to the advisory committee's work be made public" — the only requirement still enforceable if, as respondent

Sierra Club concedes, the National Energy Policy Development Group (NEPDG) no longer exists. See *Judicial* *393 *Watch, Inc.* v. *National Energy Policy Dev. Group*, 219 F.Supp.2d 20, 42 (DC 2002). Relying on the Court of Appeals' novel *de facto* member doctrine, *ante*, at 374, respondents sought to make that showing by obtaining the very records to which they will be entitled if they win their lawsuit. In other words, respondents sought to obtain, through discovery, information about the NEPDG's work in order to establish their entitlement *to the same information.*

Thus, granting broad discovery in this case effectively pre-judged the merits of respondents' claim for mandamus relief — an outcome entirely inconsistent with the extraordinary nature of the writ. Under these circumstances, instead of requiring petitioners to object to particular discovery requests, the District Court should have required respondents to demonstrate that particular requests would tend to establish their theory of the case.– I therefore think it would have been appropriate for the Court of Appeals to vacate the District Court's discovery order. I nevertheless join the Court's opinion and judgment because, as the architect of the *de facto* member doctrine, the Court of Appeals is the appropriate forum to direct future proceedings in the case.

> – A few interrogatories or depositions might have determined, for example, whether any non-Government employees voted on NEPDG recommendations or drafted portions of the committee's report. In my view, only substantive participation of this nature would even arguably be sufficient to warrant classifying a non-Government employee as a *de facto* committee member.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I agree that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr* v. *United States Dist. Court for*

*Northern Dist. of Cal.*, 426 U.S. 394, 402 (1976). In framing our review of the Court of Appeals' judgment, the Court recognizes this hurdle, observing that "the petitioner must satisfy `the burden of showing *394 that [his] right to issuance of the writ is clear and indisputable.'" *Ante*, at 381 (quoting *Kerr, supra*, at 403 (internal quotation marks omitted)). But in reaching its disposition, the Court barely mentions the fact that respondents, Judicial Watch, Inc., and Sierra Club, face precisely the same burden to obtain relief from the District Court. The proper question presented to the Court of Appeals was not only whether it is clear and indisputable that petitioners have a right to an order "`vacat[ing] the discovery orders issued by the district court, direct[ing] the court to decide the case on the basis of the administrative record and such supplemental affidavits as it may require, and directing' that the Vice President be dismissed as a defendant.'" 334 F.3d 1096, 1101 (CADC 2003) (quoting Emergency Pet. for Writ of Mandamus in *In re Cheney*, in No. 02-5354 (CADC)). The question with which the Court of Appeals was faced also necessarily had to account for the fact that respondents sought mandamus relief in the District Court. Because they proceeded by mandamus, respondents had to demonstrate in the District Court a clear and indisputable right to the Federal Advisory Committee Act (FACA) materials. If respondents' right to the materials was not clear and indisputable, then petitioners' right to relief in the Court of Appeals was clear.

One need look no further than the District Court's opinion to conclude respondents' right to relief in the District Court was unclear and hence that mandamus would be unavailable. Indeed, the District Court acknowledged this Court's recognition "that applying FACA to meetings among Presidential advisors `present[s] formidable constitutional difficulties.'" *Judicial Watch, Inc.* v. *National Energy Policy Dev. Group*,

219 F.Supp.2d 20, 47 (DC 2002) (quoting *Public Citizen* v. *Department of Justice*, 491 U.S. 440, 466 (1989)).

Putting aside the serious constitutional questions raised by respondents' challenge, the District Court could not even *395 determine whether FACA applies to the National Energy Policy Development Group (NEPDG) as a statutory matter. 219 F.Supp.2d, at 54-55 (noting the possibility that, after discovery, petitioners might prevail on summary judgment on statutory grounds). I acknowledge that under the Court of Appeals' *de facto* member doctrine, see *Association of American Physicians Surgeons, Inc.* v. *Clinton*, 997 F.2d 898, 915 (CADC 1993), a district court is authorized to undertake broad discovery to determine whether FACA's Government employees exception, 5 U.S.C. App. § 3(2)(C)(i), p. 2, applies. But, application of the *de facto* member doctrine to authorize broad discovery into the inner workings of the NEPDG has the same potential to offend the Constitution's separation of powers as the actual application of FACA to the NEPDG itself. 334 F.3d, at 1114-1115 (Randolph, J., dissenting). Thus, the existence of this doctrine cannot support the District Court's actions here. If respondents must conduct wide-ranging discovery in order to prove that they have *any* right to relief — much less that they have a clear and indisputable right to relief — mandamus is unwarranted, and the writ should not issue.

Although the District Court might later conclude that FACA applies to the NEPDG as a statutory matter and that such application is constitutional, the mere fact that the District Court *might* rule in respondents' favor cannot establish the clear right to relief necessary for mandamus. Otherwise, the writ of mandamus could turn into a freestanding cause of action for plaintiffs seeking to enforce virtually any statute, even those that provide no such private remedy.

casetext

Because the District Court clearly exceeded its authority in this case, I would reverse the judgment of the Court of Appeals and remand the case with instruction to issue the writ.—

— I join Parts I, II, III, and IV of the Court's opinion.

396    *396

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, dissenting.

The Government, in seeking a writ of mandamus from the Court of Appeals for the District of Columbia, and on brief to this Court, urged that this case should be resolved without *any* discovery. See App. 183-184, 339; Brief for Petitioners 45; Reply Brief 18. In vacating the judgment of the Court of Appeals, however, this Court remands for consideration whether mandamus is appropriate due to the *overbreadth* of the District Court's discovery orders. See *ante*, at 372-373, 387-390. But, as the Court of Appeals observed, it appeared that the Government "never asked the district court to *narrow* discovery." *In re Cheney*, 334 F.3d 1096, 1106 (CADC 2003) (emphasis in original). Given the Government's decision to resist all discovery, mandamus relief based on the exorbitance of the discovery orders is at least "premature," *id.*, at 1104. I would therefore affirm the judgment of the Court of Appeals denying the writ,[1] and allow the District Court, in the first instance, to pursue its expressed intention "tightly [to] rei[n] [in] discovery," 219 F.Supp.2d 20, 54 (DC 2002), should the Government so request.

[1] The Court of Appeals also concluded, altogether correctly in my view, that it lacked ordinary appellate jurisdiction over the "Wee President's appeal. See 334 F.3d, at 1109; cf. *ante*, at 378-379 (leaving appellate-jurisdiction question undecided). In its order addressing the petitioners' motions to dismiss, the District Court stated "it would be premature and

inappropriate to determine whether" any relief could be obtained from the Vice President. *Judicial Watch, Inc.* v. *National Energy Policy Dev. Group*, 219 F.Supp.2d 20, 44 (DC 2002). Immediate review of an interlocutory ruling, allowed in rare cases under the collateral-order doctrine, is inappropriate when an order is, as in this case, "inherently tentative" and not "the final word on the subject." *Gulf stream Aerospace Corp.* v. *Mayacamas Corp.*, 485 U.S. 271, 277 (1988) (internal quotation marks omitted).

## I A

The discovery at issue here was sought in a civil action filed by respondents Judicial Watch, Inc., and Sierra Club.  *397  To gain information concerning the membership and operations of an energy-policy task force, the National Energy Policy Development Group (NEPDG), respondents filed suit under the Federal Advisory Committee Act (FACA), 5 U.S.C. App. § 1 *et seq.*, p. 1; respondents named among the defendants the Vice President and senior Executive Branch officials. See App. 16-40, 139-154; *ante*, at 373-374. After granting in part and denying in part the Government's motions to dismiss, see 219 F.Supp.2d 20, the District Court approved respondents' extensive discovery plan, which included detailed and far-ranging interrogatories and sweeping requests for production of documents, see App. to Pet. for Cert. 51a; App. 215-230. In a later order, the District Court directed the Government to "produce non-privileged documents and a privilege log." App. to Pet. for Cert. 47a.

The discovery plan drawn by Judicial Watch and Sierra Club was indeed "unbounded in scope." *Ante*, at 388; accord 334 F.3d, at 1106. Initial approval of that plan by the District Court, however, was not given in stunning disregard of separation-of-powers concerns. Cf. *ante*, at 387-391. In the order itself, the District Court invited "detailed and precise objections]" to any of the

discovery requests, and instructed the Government to "identify and explain . . . invocations of privilege with particularity." App. to Pet. for Cert. 51a. To avoid duplication, the District Court provided that the Government could identify "documents or information [responsive to the discovery requests] that [it] ha[d] already released to [Judicial Watch or the Sierra Club] in different fora." *Ibid.* [2] Anticipating further proceedings concerning discovery, the District Court suggested that the Government could "submit [any privileged documents] under seal for the court's consideration," or that "the court [could] appoint the equivalent of a Special Master, maybe a retired judge," to review allegedly privileged documents. App. 247. *398

398

> [2] Government agencies had produced some relevant documents in related Freedom of Information Act litigation. See 219 F.Supp.2d, at 27.

The Government did not file specific objections; nor did it supply particulars to support assertions of privilege. Instead, the Government urged the District Court to rule that Judicial Watch and the Sierra Club could have no discovery at all. See *id.*, at 192 ("the government] position is that . . . no discovery is appropriate"); *id.*, at 205 (same); 334 F.3d, at 1106 ("As far as we can tell, petitioners never asked the district court to *narrow* discovery to those matters [respondents] need to support their allegation that FACA applies to the NEPDG." (emphasis in original)). In the Government's view, "the resolution of the case ha[d] to flow from the administrative record" *sans* discovery. App. 192. Without taking up the District Court's suggestion of that court's readiness to rein in discovery, see 219 F.Supp.2d, at 54, the Government, on behalf of the Vice President, moved, unsuccessfully, for a protective order and for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). See 334 F.3d, at 1100; see App. to Pet. for Cert. 47a (District Court denial of protective order); 233 F.Supp.2d 16 (DC 2002) (District Court denial of § 1292(b)

certification).[3] At the District Court's hearing on the Government's motion for a stay pending interlocutory appeal, the Government argued that "the injury is submitting to discovery in the absence of a compelling snowing of need by the [respondents]." App. 316; see 230 F.Supp.2d 12 (DC 2002) (District Court order denying stay).

> [3] Section 1292(b) of Title 28 allows a court of appeals, "in its discretion," to entertain an appeal from an interlocutory order "[w]hen a district judge . . . shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

Despite the absence from this "flurry of activity," *ante*, at 379, of any Government motion contesting the terms of the discovery plan or proposing a scaled-down substitute plan, see 334 F.3d, at 1106, this Court states that the Government *399 "did in fact object to the scope of discovery and asked the District Court to narrow it in some way," *ante*, at 388. In support of this statement, the Court points to the Government's objections to the proposed discovery plan, its response to the interrogatories and production requests, and its contention that discovery would be unduly burdensome. See *ante*, at 388-389; App. 166-184, 201, 231-234, 274.

399

True, the Government disputed the definition of the term "meeting" in respondents' interrogatories, and stated, in passing, that "discovery should be [both] limited to written interrogatories" and "limited in scope to the issue of membership." *Id.*, at 179, 181, 233.[4] But as the Court of Appeals noted, the Government mentioned "excessive discovery" in support of its plea to be shielded from any discovery. 334 F.3d, at 1106. The Government argument that "the burden of doing a document production is an unconstitutional burden," App. 274, was similarly anchored. The

Government so urged at a District Court hearing in which its underlying "position [was] that it's not going to produce anything," *id.*, at 249.[5] *400

400

> [4] On limiting discovery to the issue of membership, the Court of Appeals indicated its agreement. See 334 F.3d, at 1106 ("[Respondents] have no need for the names of all persons who participated in [NEPDG]'s activities, nor a description of each person's role in the activities of [NEPDG]. They must discover only whether non-federal officials participated, and if so, to what extent." (internal quotation marks, ellipsis, and brackets omitted)).

> [5] According to the Government, "24 boxes of materials [are] potentially responsive to [respondents'] discovery requests. . . . The documents identified as likely to be responsive from those boxes . . . are contained in approximately twelve boxes." App. 282-283. Each box "requires one to two attorney days to review and prepare a rough privilege log. Following that review, privilege logs must be finalized. Further, once the responsive emails are identified, printed, and numbered, [petitioners] expect that the privilege review and logging process [will] be equally, if not more, time-consuming, due to the expected quantity of individual emails." *Id.*, at 284.

The Government's bottom line was firmly and consistently that "review, limited to the administrative record, should frame the resolution of this case." *Id.*, at 181; accord *id.*, at 179, 233. That administrative record would "consist of the Presidential Memorandum establishing NEPDG, NEPDG's public report, and the Office of the Vice President's response to . . . Judicial Watch's request for permission to attend NEPDG meetings"; it would not include anything respondents could gain through discovery. *Id.*, at 183. Indeed, the Government acknowledged before the District Court that its litigation strategy involved opposition to the discovery plan as a

whole in lieu of focused objections. See *id.*, at 205 (Government stated: "We did not choose to offer written objections to [the discovery plan]. . . .").

Further sounding the Government's leitmotif, in a hearing on the proposed discovery plan, the District Court stated that the Government "didn't file objections" to rein in discovery "because [in the Government's view] no discovery is appropriate." *Id.*, at 192; *id.*, at 205 (same). Without endeavoring to correct any misunderstanding on the District Court's part, the Government underscored its resistance to any and all discovery. *Id.*, at 192-194; *id.*, at 201 (asserting that respondents are "not entitled to discovery to supplement [the administrative record]"). And in its motion for a protective order, the Government similarly declared its unqualified opposition to discovery. See Memorandum in Support of Defendants' Motion for a Protective Order and for Reconsideration, C.A. Nos. 01-1530 (EGS), 02-631 (EGS), p. 21 (D.D.C., Sept. 3, 2002) (" [Petitioners] respectfully request that the Court enter a protective order relieving them of *any obligation* to respond to [respondents'] discovery [requests]." (emphasis added)); see 334 F.3d, at 1106 (same).[6] *401

401

> [6] The agency petitioners, in responses to interrogatories, gave rote and hardly illuminating responses refusing "on the basis of executive and deliberative process privileges" to be more forthcoming. See, *e.g.*, Defendant Department of Energy's Response to Plaintiffs' First Set of Interrogatories, C.A. Nos. 01-1530 (EGS), 02-631 (EGS) (D.D.C., Sept. 3, 2002); Defendant United States Office of Management and Budget's Response to Plaintiffs' First Set of Interrogatories, C.A. Nos. 01-1530 (EGS), 02-631 (EGS) (D.D.C., Sept. 3, 2002).

The District Court, in short, "ignored" no concrete pleas to "narrow" discovery. But see *ante*, at 388-390. That court did, however, voice its concern

about the Government's failure to heed the court's instructions:

> "I told the government, if you have precise constitutional objections, let me know what they are so I can determine whether or not this [discovery] plan is appropriate, and . . . you said, well, it's unconstitutional, without elaborating. You said, because Plaintiffs' proposed discovery plan has not been approved by the court, the Defendants are not submitting specific objections to Plaintiffs' proposed request My rule was, if you have objections, let me know what the objections are, and you chose not to do so." App. 205.

## B

Denied § 1292(b) certification by the District Court, the Government sought a writ of mandamus from the Court of Appeals. See *id.*, at 339-365. In its mandamus petition, the Government asked the appellate court to "vacate the discovery orders issued by the district court, direct the court to decide the case on the basis of the administrative record and such supplemental affidavits as it may require, and direct that the Vice President be dismissed as a defendant." *Id.*, at 364-365. In support of those requests, the Government again argued that the case should be adjudicated without discovery: "The Constitution and principles of comity preclude discovery of the President or Vice President, especially without a demonstration of compelling and focused countervailing interest." *Id.*, at 360.

The Court of Appeals acknowledged that the discovery plan presented by respondents and 402 approved by the District *402 Court "goes well beyond what [respondents] need." 334 F.3d, at 1106. The appellate court nevertheless denied the mandamus petition, concluding that the Government's separation-of-powers concern "remain[ed] hypothetical." *Id.*, at 1105. Far from ordering immediate "disclosure of communications between senior executive branch

officials and those with information relevant to advice that was being formulated for the President," the Court of Appeals observed, the District Court had directed the Government initially to produce only "non-privileged documents and a privilege log." *Id.*, at 1104 (citation and internal quotation marks omitted); see App. to Pet. for Cert. 47a.[7]

> [7] The Court suggests that the appeals court "labored under the mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections." *Ante*, at 391. The Court of Appeals, however, described the constitutional concern as "hypothetical," not merely because no executive privilege had been asserted, but also in light of measures the District Court could take to "narrow" and "carefully focu[s]" discovery. See 334 F.3d, at 1105, 1107.

The Court of Appeals stressed that the District Court could accommodate separation-of-powers concerns short of denying all discovery or compelling the invocation of executive privilege. See 334 F.3d, at 1105-1106. Principally, the Court of Appeals stated, discovery could be narrowed, should the Government so move, to encompass only "whether non-federal officials participated [in NEPDG], and if so, to what extent." *Id.*, at 1106. The Government could identify relevant materials produced in other litigation, thus avoiding undue reproduction. *Id.*, at 1105; see App. to Pet. for Cert. 51a; *supra*, at 397. If, after appropriate narrowing, the discovery allowed still impels "the Vice President . . . to claim privilege," the District Court could "entertain [those] privilege claims" and "review allegedly privileged documents in camera." 334 F.3d, at 1107. Mindful of "the judiciary's responsibility to police the separation of powers in litigation involving the executive," 403 the Court of Appeals *403 expressed confidence that the District Court would "respond to

petitioners' concern and narrow discovery to ensure that [respondents] obtain no more than they need to prove their case." *Id.*, at 1106.

## II

"This Court repeatedly has observed that the writ of mandamus is an extraordinary remedy, to be reserved for extraordinary situations." *Gulfstream Aerospace Corp.* v. *Mayacamas Corp.*, 485 U.S. 271, 289 (1988) (citing *Kerr* v. *United States Dist. Court for Northern Dist. of Cal.*, 426 U.S. 394, 402 (1976)); see *ante*, at 380-381 (same). As the Court reiterates, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires." *Kerr*, 426 U.S., at 403 (citing *Roche* v. *Evaporated Milk Assn.*, 319 U.S. 21, 26 (1943)); *ante*, at 380-381.

Throughout this litigation, the Government has declined to move for reduction of the District Court's discovery order to accommodate separation-of-powers concerns. See *supra*, at 398-402. The Court now remands this case so the Court of Appeals can consider whether a mandamus writ should issue ordering the District Court to "explore other avenues, short of forcing the Executive to invoke privilege," and, in particular, to "narrow, on its own, the scope of [discovery]." *Ante*, at 390. Nothing in the District Court's orders or the Court of Appeals' opinion, however, suggests that either of those courts would refuse reasonably to accommodate separation-of-powers concerns. See *supra*, at 397, 398, 401-402, and this page. When parties seeking a mandamus writ decline to avail themselves of opportunities to obtain relief from the District Court, a writ of mandamus ordering the same relief — *i. e.*, here, reined-in discovery — is surely a doubtful proposition.

The District Court, moreover, did not err in failing to narrow discovery on its own initiative. Although the Court cites *United States* v. *Poindexter*, 727 F.Supp. 1501 (DC 1989), as "sound precedent" for district-court narrowing of discovery, see *ante*, at 390, the target of the

subpoena in that case, former President Reagan, unlike petitioners in this case, affirmatively requested such narrowing, 727 F. Supp., at 1503. A district court is not subject to criticism if it awaits a party's motion before tightening the scope of discovery; certainly, that court makes no "clear and indisputable" error in adhering to the principle of party initiation, *Kerr*, 426 U.S., at 403 (internal quotation marks omitted).[8] *405

[8] The Court also questions the District Court's invocation of the federal mandamus statute, 28 U.S.C. § 1361, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." See *ante*, at 390-391; 219 F.Supp.2d, at 41-44. See also *Chandler* v. *Judicial Council of Tenth Circuit*, 398 U.S. 74, 87-89, and n. 8 (1970) (holding mandamus under the All Writs Act, 28 U.S.C. § 1651, improper, but expressing no opinion on relief under the federal mandamus statute, § 1361). On the question whether § 1361 allows enforcement of the FACA against the Vice President, the District Court concluded it "would be premature and inappropriate to determine whether the relief of mandamus will or will not issue." 219 F.Supp.2d, at 44. The Government, moreover, contested the propriety of § 1361 relief only in passing in its petition to the appeals court for § 1651 mandamus relief. See App. 363-364 (Government asserted in its mandamus petition: "The more general writ of mandamus cannot be used to circumvent . . . limits on the provision directly providing for review of administrative action."). A question not decided by the District Court, and barely raised in a petition for mandamus, hardly qualifies as grounds for "drastic and extraordinary" mandamus relief, *Ex parte Fahey*, 332 U.S. 258, 259-260 (1947).

JUSTICE THOMAS urges that

respondents cannot obtain § 1361 relief if "wide-ranging discovery [is needed] to prove that they have *any* right to relief." *Ante*, at 395 (opinion concurring in part and dissenting in part) (emphasis in original). First, as the Court of Appeals recognized, see *supra*, at 402-403; *infra*, at 405, should the Government so move, the District Court could contain discovery so that it would not be "wide-ranging." Second, all agree that an applicant seeking a § 1361 mandamus writ must show that "the [federal] defendant owes him a clear *nondiscretionary* duty." *Heckler* v. *Ringer*, 466 U.S. 602, 616 (1984) (emphasis added). No § 1361 writ may issue, in other words, when federal law grants discretion to the federal officer, rather than imposing a duty on him. When federal law imposes an obligation, however, suit under § 1361 is not precluded simply because facts must be developed to ascertain whether a federal command has been dishonored. Congress enacted § 1361 to "mak[e] it more convenient for aggrieved persons to file actions in the nature of mandamus," *Stafford* v. *Briggs*, 444 U.S. 527, 535 (1980), not to address the rare instance in which a federal defendant, upon whom the law unequivocally places an obligation, concedes his failure to measure up to that obligation.

\* \* \*

Review by mandamus at this stage of the proceedings would be at least comprehensible as a means to test the Government's position that *no* discovery is appropriate in this litigation. See Brief for Petitioners 45 ("[Petitioners' separation-of-powers arguments are . . . in the nature of a claim of immunity from discovery."). But in remanding for consideration of discovery-tailoring measures, the Court apparently rejects that no-discovery position. Otherwise, a remand based on the overbreadth of the discovery requests would make no sense. Nothing in the record, however, intimates lower court refusal to reduce discovery.

Indeed, the appeals court has already suggested tailored discovery that would avoid "effectively pre judg[ing] the merits of respondents' claim," *ante*, at 393 (STEVENS, J., concurring). See 334 F.3d, at 1106 (respondents "need only documents referring to the involvement of non-federal officials"). See also *ante*, at 393, n. (STEVENS, J., concurring) ("A few interrogatories or depositions might have determined . . . whether any non-Government employees voted on NEPDG recommendations or drafted portions of the committee's report"). In accord with the Court of Appeals, I am "confident that [were it moved to do so] the district court here [would] protect petitioners' legitimate interests and keep discovery within appropriate limits." 334 F. 3d, at 1107.[9] I would therefore affirm the judgment of the Court of Appeals.

[9] While I agree with the Court that an interlocutory appeal may become appropriate at some later juncture in this litigation, see *ante*, at 391, 1 note that the decision whether to allow such an appeal lies in the first instance in the District Court's sound discretion, see 28 U.S.C. § 1292(b); *supra*, at 398, n. 3.

406  *406

24



Case 3:24-cv-00440    Document 79    Filed 07/11/24    Page 56 of 191 PageID #: 1725

# Doe v. Ohio State University

United States District Court, S.D. Ohio, Eastern Division. |     April 24, 2018 |     311 F.Supp.3d 881 |     2018 WL 1926125

**Document Details**

standard Citation:     Doe v. Ohio State Univ., 311 F. Supp. 3d 881 (S.D. Ohio 2018)
All Citations:     311 F.Supp.3d 881, 356 Ed. Law Rep. 192

**Search Details**

Jurisdiction:     Ohio

**Delivery Details**

Date:     July 1, 2024 at 7:19 PM
Delivered By:     Ian Lucas
Client ID:     X
Status Icons:     👓

**Outline**

Synopsis (p.1)
Attorneys and Law Firms (p.1)
**OPINION & ORDER** (p.1)
All Citations (p.12)

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Doe v. Ohio State University, 311 F.Supp.3d 881 (2018)
356 Ed. Law Rep. 192

311 F.Supp.3d 881
United States District Court, S.D. Ohio, Eastern Division.

John DOE, Plaintiff,
v.
The OHIO STATE UNIVERSITY, et al., Defendants.

Case No. 2:15–cv–2830
|
Signed April 24, 2018

**Synopsis**

**Background:** Former medical student at state university brought action against university and university administrators, alleging violation of his due process rights and Title IX arising from university's expulsion of student for alleged sexual misconduct. Defendants moved for summary judgment on grounds of qualified immunity.

**Holdings:** The District Court, James L. Graham, J., held that:

fact issue existed as to whether employee knew that alleged victim misled disciplinary board;

disciplinary hearing coordinator was entitled to qualified immunity;

university Title IX coordinator and university administrator were entitled to qualified immunity; and

student sufficiently stated due process claim based on university's failure to allow student to present expert testimony.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*882** Joshua A. Engel, Engel & Martin, LLC, Mason, OH, for Plaintiff.

Christina Louise Corl, Plunkett Cooney, Reid T. Caryer, Ohio Attorney General's Office Education Section, Columbus, OH, for Defendants.

**OPINION & ORDER**

JAMES L. GRAHAM, United States District Judge

This matter is before the Court on Defendants' Motion for Summary Judgment on the issue of qualified immunity with respect to Plaintiff's due process claims. (Doc. 116).

The limited discovery permitted in the Court's order, (Doc. 82), has given the Court a much better understanding of this case. Here, John Doe, a male, fourth-year medical student on track to receive a combined MD/MBA degree was expelled after a female medical student, Jane Roe, who had twice failed the first year of medical school was able to obtain a reprieve from dismissal after reporting that John Doe engaged in non-consensual sexual activity with her while she was under the effects of alcohol. Jane Roe claimed that she suffered **\*883** a "blackout" and could not remember what happened but realized that sexual conduct had occurred between them when she woke up naked in John Doe's bed the morning after a night of partying.

Jane Roe had not reported this alleged sexual assault to the university at any time during the 10 month interval between the night in question and her receipt of a letter from the medical school that called her before a review committee and warned she could be dismissed for academic failure. In the academic review proceeding that followed, she blamed her academic failure on the emotional consequences of the alleged non-consensual sexual activity. The university granted her an academic accommodation—the opportunity to restart the first year of medical school for a third time—on the ground that her grades had suffered as a result of the non-consensual sexual activity.

A disciplinary charge was then leveled against John Doe, and a disciplinary proceeding was held. John Doe testified that the sexual encounter was consensual and that although Jane Roe had been drinking some hours before, she was not incapacitated when they had sex. Jane Roe testified that she was so intoxicated she could not remember the event.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 1

**Lucas, Ian 7/1/2024**
**For Educational Use Only**

Not surprisingly, the credibility of the two—John Doe and Jane Roe—was the pivotal issue. Jane Roe asserted that she had no motive to lie and argued that, on the contrary, it was John Doe who had a lot to lose: expulsion from the medical school before entering his final year. One of the hearing board members asked a question about this to John Doe, asking John Doe if he knew why Jane Roe would make this up? And, what would be her motivation to lie? John Doe, who knew nothing about the academic accommodation Jane Roe had received could only reply, "I can't speak for [Jane Roe]." (Disciplinary Hrg. Trans. at 269:25–270:1, Doc. 15).

Doe claims that the university denied him the ability to provide the decisionmakers with important evidence relevant to Jane Roe's credibility, including the fact that she avoided dismissal from medical school by asserting that her academic failure was caused by his alleged sexual misconduct and that she may have lied when she said that she didn't report his alleged sexual misconduct to the university until the medical school's academic committee had already decided to permit her to restart her first year of medical school for the third time.

# I. Background

## A. Procedural History

The plaintiff, proceeding under a pseudonym, John Doe, sued The Ohio State University ("OSU") and five of its administrators (collectively, "Defendants"), alleging that, among other things, they denied him due process when they expelled him from the university. John Doe, was an MD/MBA student at OSU. OSU expelled Doe after a hearing board at the university found Doe "responsible" for violating the university's sexual misconduct policy.

The Court dismissed most of Doe's First Amended Complaint but allowed one claim to proceed against four of the administrators. (Op. & Order, Doc. 82). The Court outlined a narrow scope of discovery to resolve the issue of whether the remaining Defendants were entitled to qualified immunity. (*See id.*). The Court, after an intervening, relevant Sixth Circuit decision and Motion for Reconsideration from Doe, brought back Doe's claim for injunctive relief. (Order, Doc. 104). In the meantime, the Court also granted Doe leave to amend his complaint, and he did so, adding Title IX claims, which are the subject of Defendants' Motion to Dismiss

Plaintiff's Second **\*884** Amended Complaint: Title IX Claim, (Second Am. Compl., Doc. 99; Defs.' Mot. Dismiss, Doc. 131). For relief, Doe seeks both money damages under § 1983 and injunctive relief.

## B. Factual Background

John Doe began medical school at The Ohio State University in August 2011. In May 2015, he was a fourth-year graduate student, pursuing both a medical degree and an MBA. He was in the last year of his training and expected to graduate in May of 2016. He was preparing to apply for residencies in emergency medicine. His friends described him as a hard worker who was more likely to be up late studying than out at a bar.

Jane Roe began medical school at OSU in the fall of 2013. She was failing her first-year classes. Before taking a final exam, Roe requested and was granted a leave of absence. Roe then asked to restart the first-year medical school curriculum. The medical school's Academic and Behavioral Review Committee (the "ABRC") decided to grant Roe's request to re-enroll and imposed a few stipulations, including requiring Roe to complete summer preparation courses, continue study-strategy counseling, and participate in tutoring.

Roe restarted the first year of medical school in the fall of 2014. She failed the first year of medical school again. On March 23, 2015, Dr. Douglas Danforth wrote a letter to the ABRC chairwoman referring Jane Roe to the ABRC because of her second failure of the first-year medical school curriculum. Dr. Danforth said, "[s]ince this is [Jane Roe's] second attempt at Part One, my recommendation is that the ABRC consider dismissal from the College of Medicine." (PageID 1552).

John Doe and Jane Roe met in early 2013 through a joint project that never came to fruition. The two reconnected in June 2014. John Doe reports that the two were at a bar celebrating the end of third year tests. John Doe reports that they were "talking and flirting, and we decided to hang out again sometime." (PI Hearing Trans. at 15:13–14, Doc. 67). John Doe thought Jane Roe was interested in him: he reports that she made comments about his body, playfully spanked his "glutes," and, two days later, Jane Roe texted John Doe saying she wanted to "hang out for part 2." (Disciplinary Hrg. Trans. at 220:1–3). The two exchanged text messages over the

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   2

next two weeks and ultimately met at bar where Jane Roe was with friends. That's where the stories diverge: the night that Jane Roe claims she was sexually assaulted.

Jane Roe claims that she was intoxicated, suffered a "blackout," and can't remember anything after about 12:00–12:30 a.m. of the night in question. Jane Roe's night revolved around a friend's birthday celebrations. She first went with that friend and others to dinner, then to that friend's house, then to a bar called Callahan's. In the five and a half hours before 12:30 a.m., she had six alcoholic drinks: a glass of wine with dinner from 7:00 p.m. to 9:00 p.m., then three drinks within 90 minutes from 9:00 p.m. to around 10:30 p.m. at her friend's house, then another two drinks at Callahan's from around 11:00 p.m. to 12:00 a.m. In the last 3–3.5 hours before she says she can't remember anything, Jane Roe had five liquor drinks, including three shots.

Witness testimony on whether Jane Roe was significantly impaired is conflicting. She says she was completely intoxicated and suffered a blackout. John Doe says she was aware, communicative, engaged, and didn't exhibit signs of significant impairment. The other witnesses' testimony is equivocal and conflicting.

Jane Roe claims she can't remember anything after about 12:00 a.m. at Callahan's, **\*885** so all information from this point on is from third-party witnesses and John Doe. Other witnesses recount her arriving at another bar about a block away, Gaswerks, around 12:30 a.m. Jane Roe's text messages to John Doe from around this time corroborate this. John Doe received Jane Roe's text message, informing him he was at Gaswerks, so he and two friends left to meet her there.

John Doe and two friends met up with Jane Roe at Gaswerks. In the group of friends, Doe says he only talked to Jane Roe, and eventually they removed themselves from the group conversation to talk alone on the bar's patio. One of the witnesses reported seeing them "giggling and having a good time" on the patio by themselves. (*Id.* at 48:14–19). John Doe and Jane Roe apparently talked at length, and eventually were kissing on the patio. At this point, according to Doe, the two confessed their attraction to one another, and the conversation turned sexual. Doe says he asked her if she wanted to go home with him; she declined, citing their common friend group, that she was too old for him, and the risks and consequences of being together. Some time

passed, and John Doe says he asked again, Jane Roe agreed, and the two walked to John Doe's car, which was parked some considerable distance away (John Doe says it was past two other bars and a parking lot). (*Id.* at 227:18–24). The two then went to John Doe's apartment, drank some water, watched TV on the couch, and spoke briefly with John Doe's roommate. Then, at about 3:00 a.m., the two went to John Doe's bedroom and engaged in sexual activity. John Doe recounts their encounter in detail, including specific examples of Jane Roe's active participation and awareness during the encounter. Jane Roe says she can't remember anything about her sexual encounter with John Doe.

The next morning, again, accounts diverge. John Doe says that when he and Jane Roe woke up, they were affectionate, talked about travel, and he tried to initiate sex with Jane Roe. She declined to have sex, and they didn't. They looked at pictures on John Doe's phone of his trips to Asia and discussed hobbies. Jane Roe asked to borrow some of John Doe's clothes before leaving his house. Eventually, John Doe took Jane Roe, dressed in his clothes, back to her house, where she leaned in to give him a kiss goodbye. Later that afternoon, Jane Roe sent John Doe a text message, saying "Thanks again for taking me home last night. Re-read this text this morning. Glad you can decipher bourbon talk." (*Id.* at 238:4–7).

Jane Roe's account of the next morning is quite different. She says she woke up naked, confused, and scared. She saw John Doe and was shocked. She first asked John Doe what happened, to which he replied that Jane Roe was really drunk, he took her home, and they had sex. She was disturbed to see her phone off and her clothes folded and hung up. She says that John Doe started touching her, and she reciprocated because she "felt like I had to." (*Id.* at 163:21–22). She laid "frozen" as he kissed her many times. She told him that she didn't want to have sex, and they didn't. She explains that she tried to make normal conversation "so that we wouldn't have to continue the physical contact." (*Id.* at 164:10–11). She "didn't feel comfortable enough to say, hey, don't touch me anymore." (*Id.* at 164:17–19). While it may have appeared to John Doe that nothing was amiss, this was Jane Roe's coping mechanism, a way to make "sure that I had control, that we're friends." (*Id.* at 164:22–24). She told John Doe that she wanted to go home, put on some of John Doe's clothes, and he drove her home. She said that they "kissed at the end of the encounter because I just wanted to make **\*886** everything seem rational, seem like I was in control, because I was in a

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   3

state of shock and I had no idea what was going on." (*Id.* at 165:18–22).

Jane Roe's version of the subsequent weeks is somewhat different than John Doe's. According to her, the two met at a happy hour at a restaurant to exchange clothing, so Jane Roe brought the clothing with her, but John Doe left Jane Roe's clothes at his apartment and left her undergarments in his bedroom. Jane Roe went to his apartment to retrieve her undergarments and did so, and John Doe tried to kiss her several times, with Jane Roe rebuffing each attempt. She reports texting with John Doe over the next months, but only cordially as friends, never in an attempt to initiate dates or furthering a relationship.

According to John Doe, Jane Roe texted him thanking him for taking her home and continued to text him throughout the next weeks, and they made plans to go out for food and drinks. They eventually did meet up and went out for drinks and food at two different restaurants. In the weeks that followed, the two exchanged numerous text messages. This continued, casually, for the following months. Five months after their encounter, Jane Roe was still sending John Doe unsolicited text messages, wishing him good luck on exams, wishing him happy birthday, offering to take him out for his birthday, or even a "playful text about [John Doe's] muscles." (*Id.* at 250:16–17). Nearly seven months after their encounter, the two ran into each other while walking outside of the hospital. Jane Roe noticed John Doe jogging, said hello, and gave him a hug. They exchanged pleasantries then went their separate ways. This was the last time before the disciplinary hearing that the two spoke face-to-face, in January 2015.

On March 23, 2015, Jane Roe was informed by OSU that she failed the first year of medical school again. The first-year academic program director at the medical school, Dr. Danforth, recommended her to the ABRC for a hearing, and he recommended to the ABRC that it consider dismissing her from the medical school. (March 23, 2015 Letter, Doc. 114–2 at PageID 1552).

Following up on Dr. Danforth's letter, on March 26, 2015, the ABRC notified Jane Roe that she was being referred to the committee because she failed the first-year medical school curriculum for a second time. The ABRC stated that its job was, in part, to review Roe's "performance to date in the College of Medicine and determine recommendations

regarding your continuation in the College." (March 26, 2015 Letter, Doc. 114–2 at PageID 1547).

On April 2, 2015, Jane Roe informed Natalie Spiert, the assistant director of the Sexual Civility and Empowerment Program at OSU, that she was a victim of sexual assault. (PI Hrg. Trans. at 249:15–16; 260:12–14). One of Spiert's jobs at OSU is to "provide direct one-on-one support for all students who experience any form of sexual violence." (*Id.* at 249:21–23). Jane Roe told Spiert that she was at risk of failing out of medical school. (*Id.* at 260:15–18). Spiert agreed to attend the ABRC hearing with Roe and write her a letter of support.

On April 15, 2015, Roe appeared before the ABRC. She told the ABRC that part of the reason she failed the first year of medical school for the second time was the fact that she was dealing with the fallout from being sexually assaulted over the summer. She asked the ABRC to allow her to continue in the medical school curriculum. Jane Roe outlined a plan to continue in the medical school that included a plan to officially report "the sexual assault via the university conduct board." (ABRC **\*887** Meeting Minutes, PageID 1581). Jane Roe also asked for more time to remediate an exam so she could "work with OSU on the assault reporting process." (*Id.*). Natalie Spiert was present at the ABRC hearing as one of two advocates for Jane Roe. Spiert supported Jane Roe's "wish to continue in the program." (*Id.*). Spiert also informed the ABRC about "a federal requirement for everything in the reporting process to be completed in 60 days once a formal report is given. She stated that [Jane Roe's] participation would total anywhere from 15–25 hours, including giving the initial statement and attending the hearing. She also stated the Student Conduct Board will make all necessary accommodations for [Jane Roe]'s academic commitments." (*Id.*). The ABRC minutes state that "[Jane Roe] plans to officially report the incident in the near future." (*Id.*). The ABRC minutes show the committee's decision to allow Jane Roe to re-enroll in the medical school, and the committee noted it would advise Jane Roe to "determine her course of action regarding the University process for reporting and addressing her complaint ... and try[ ] to complete any needed steps prior to restarting the curriculum." (PageID 1582).

On April 21, 2015, the ABRC informed Roe in writing that "[i]n acknowledgement of the apparent impact of the personal incident which you described as affecting your performance,

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 4

you will be granted the opportunity to restart LSI Part One, Year 1, in August, 2015." (April 21, 2015 Letter, Doc. 114–2 at PageID 1550).

On April 30, 2015, Jane Roe met with Jeff Majarian to provide him with information about the alleged assault. (Jane Roe Dep. at 90–91, Doc. 114–1). Majarian was responsible for the investigation into Jane Roe's allegations and the production of the hearing packet of information given to the disciplinary hearing board.

### C. The Disciplinary Hearing

OSU held John Doe's disciplinary hearing on July 15, 2015. The hearing was convened to determine whether John Doe was responsible for violating three sections of OSU's Code of Student Conduct: (1) endangering behavior, (2) nonconsensual sexual intercourse, and (3) nonconsensual sexual contact. (Disciplinary Hrg. Trans. at 1). John Doe and Jane Roe were both present, each with an advisor: Natalie Spiert advised Jane Roe, and an attorney, Fran Ward, advised John Doe. (*Id.* at 2). Jane Roe and John Doe both made opening and closing statements and testified at the hearing. Seven other witnesses also testified. (*Id.* at 3). Matthew Page was the hearing coordinator in charge of conducting the hearing. (*Id.* at 4). There were five hearing board members present, all of whom were employed by OSU as either faculty or staff members; they were allowed to ask questions of the witnesses. (*Id.* at 4–5).

Jane Roe presented her case to the disciplinary board first. She stated that John Doe sexually assaulted her. (*Id.* at 10:25–11:1). She said she couldn't remember the assault, but that she didn't make "a conscious choice to have sex with [John Doe]." (*Id.* at 11:18). She stated that her "goal in reporting this assault is so that no one else will experience the depression, anxiety, and hopelessness that I experienced." (*Id.* at 12:13–16). She stated that she was reporting the assault "to gain personal closure and fulfilling an ethical obligation." (*Id.* at 12:17–19).

John Doe explained to the hearing board that he would clear himself of the charges by presenting eyewitness accounts of Jane Roe's sobriety, by providing character witnesses, and by providing testimony of Jane Roe's actions before, during, and after the encounter, all of which are "inconsistent with actions

you would take with someone **\*888** that you believe ... raped you." (*Id.* at 14:14–16).

The hearing board heard from several witnesses. The witnesses are identified by name in the hearing transcript but their names won't be recounted here to preserve the anonymity granted to Jane Roe and John Doe.

Jane Roe was cross-examined at length by John Doe, pages 177 to 216 of the hearing transcript to be exact. (Doc. 15). Doe asked her how she was doing in school when she accused him of sexual assault. After Jane Roe objected to the question, Page asked John Doe what relevance the question had. John Doe explained that, according to the policy of the College of Medicine, if a person has to repeat a year twice, "it's reason for withdrawal. It's in our book. So I'm curious to know if there's any sign of failed tests, fail out, second attempt, not able to re-enroll." (*Id.* at 208:9–19). Page then restated the question to Jane Roe: "[John Doe] had asked how well you have done academically this year." (*Id.* at 209:8–9). Jane Roe said,

> I had to present this case to the Academic and Behavior Review Committee and tell them about this assault and how it affected me throughout this year. And it was extremely challenging to talk to five—or around five physicians that I have never met in my life, strangers, about something very personal to me.

> And I told them about this incident and how it affected my life. And I did not name any names. *And their decision to keep me in school and to allow me to continue next year in the fall was already decided before my decision to report this assault.*

(*Id.* at 209:8–23) (emphasis added).

Near the end of John Doe's testimony, one of the board members asked John Doe the following question: "[T]here seems to be no motivation for [Jane Roe] to make this up. Why do you think she claims she doesn't remember what happened?" (*Id.* at 269:10–270:1). John Doe replied, "I can't speak for [Jane Roe]." (*Id.*).

In her closing statement, Jane Roe made the case that it was John Doe who had motivation to lie, not her:

> And with so much for [John Doe] to lose in this situation, it's foreseeable that he may not tell the truth. Again, I'm not reporting this rape because I want him—because I—there's any malicious intent. I just want him to know that what he did was wrong. There's no ulterior motive, *and this doesn't give me any benefit other than holding him responsible and meeting an ethical obligation—or responsibility, rather.*

(*Id.* at 299:25–300:9) (emphasis added).

John Doe had retained an expert witness to testify on the issue of alcohol intoxication and blackouts, but the hearing coordinator, Matthew Page, would not permit Doe to call the witness. While Doe's expert was not permitted to testify at the hearing, Doe did discuss the expert's credentials and his opinion in Doe's closing statement. The expert was Dr. Albert Staubus, a professor of pharmacology at OSU who works as a consultant in legal cases involving alcohol. (*Id.* at 304:18–20). Dr. Staubus's opinion was based on Jane Roe's statement of her alcohol consumption, including how much she drank, of what, and when. His opinion also took into account Jane Roe's height and weight. The Court presumes that the hearing board ignored John Doe's comments about Dr. Staubus's opinion, since the hearing coordinator did not permit Dr. Staubus to testify at the hearing, did not permit Doe to introduce his report, and no mention was made of it in the board members' affidavits.

**\*889  II. Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, 'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.' " *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) ). Essentially, the

question here is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**III. Discussion**

At issue in this motion is whether Defendants are entitled to qualified immunity on Doe's procedural due process claim that he was denied the right to effectively cross-examine Jane Roe at the disciplinary hearing.

**A. Cross–Examination**

To Doe's section 1983 claim for money damages, Defendants assert the defense of qualified immunity. "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). So while "[s]ection 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law," *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 478 (6th Cir. 2014), qualified immunity shields Defendants from liability unless they "violated a clearly established constitutional right," *id.* at 485. The first step in this analysis is to determine whether Defendants violated Doe's constitutional right; the second step is to determine whether that constitutional right was clearly established. The Court can determine the order of decisionmaking in the qualified-immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 242, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Here, the Court analyzes whether Defendants violated Doe's constitutional right to procedural due process when they didn't permit Doe effective cross-examination of Jane Roe on her motive for disclosing the sexual assault when she did. Doe argues that is a genuine dispute of material fact. Specifically, Doe argues that Jane Roe made two misrepresentations that the OSU administrators knew were false and let stand unrebutted. One: that Jane Roe's decision to report the sexual assault came after OSU's decision to let her stay in school. Two: that she did not receive any benefit from her decision to report the alleged sexual assault. There's a third issue that implicates Doe's due process rights. Near the end of John

Doe's testimony, one of the board members asked John Doe the following question: "[T]here seems to be no motivation for Jane Roe to make this up. Why do you think she claims she doesn't remember what happened?" (269:10–13). John Doe replied, "I can't speak for [Jane Roe]." (*Id.* at 269:25–270:1).

Defendants argue several points: (1) Jane Roe didn't lie in the hearing because she didn't decide to "report" the sexual assault until after she knew that the medical school would permit her to stay in school, and (2) the hearing board understood that Doe was arguing that Jane Roe fabricated the sexual-assault allegation in order to stay in school, so Doe's ability to **\*890** present his case to the disciplinary board wasn't inhibited.

Jane Roe's testimony before the disciplinary board was essentially that she had no reason to lie because the ABRC had decided to let her remain in medical school before her decision to report the assault. Is that true?

The ABRC was under the impression that Roe had already decided to formally report the sexual assault when she appeared at the hearing *before* it had decided whether to let her stay in school. In large part because of the sexual assault allegation, the ABRC permitted Roe to reenroll and take a third shot at her first year of medical school. The ABRC informed Roe of its decision on April 20, 2015. Roe claims that she only formally reported the assault to Jeff Majarian on April 30, 2015. But she was merely carrying out actions she had already committed herself to doing in the ABRC hearing. (*See* ABRC Meeting Minutes, PageIDs 1580–82).

The minutes of the ABRC hearing reflect that Roe intended to, as part of her plan to continue her education, formally report the sexual assault to the university student conduct board. (PageID 1581). Roe's advocate at the ABRC hearing, Natalie Spiert, explained the reporting process to the ABRC, noting that it would impose a time requirement of 15–25 hours on Jane Roe. (*Id.*). Moreover, in a letter of support written by Kellie Brennan, OSU's Title IX Coordinator, Brennan said that "[Jane Roe] is currently working with my office to report a sexual assault that occurred in July 2014 by a fellow medical student at OSU." (PageID 1606). The ABRC Meeting Minutes state: "[Jane Roe] plans to officially report the incident in the near future." (PageID 1581). Before the ABRC had decided to let Jane Roe re-enroll, she told them that she planned to formally report the sexual assault.

Jane Roe represented to the ABRC that she was already in the process of formally reporting the sexual assault. Therefore, a reasonable jury could find that her testimony to the disciplinary board, that the ABRC's decision to permit her to re-enroll was already decided before Roe's "decision to report the assault," was not truthful.

Why does this matter? Critical to this case was a credibility determination: would the disciplinary hearing board believe Jane Roe or John Doe? Jane Roe claims she was too drunk to remember anything after midnight. John Doe claims she appeared relatively sober, able to carry on conversation, walk about ten minutes to his car, and consent to and actively participate in sex, even discussing safe sex and the need to keep their encounter discrete. Other witnesses who testified at the disciplinary hearing were equivocal on the topic of her intoxication; some said she was, others said she wasn't, others weren't sure. The issue of her intoxication is a critical one to this case because the disciplinary board found that Jane Roe was too intoxicated to consent to sexual activity, so John Doe violated OSU's sexual misconduct policy by engaging in sexual activity with her. Other than conflicting third-party testimony, the proof of her intoxication comes down to who you believe: John Doe, or Jane Roe. One might ask: what reason would Jane Roe have for making this up?

The hearing board thought this was a worthwhile question. One of its members asked it: "[T]here seems to be no motivation for Jane Roe to make this up. Why do you think she claims she doesn't remember what happened?" (Disciplinary Hrg. Trans. at 269:10–13). John Doe replied, "I can't speak for [Jane Roe]." (*Id.* at 269:25–270:1). Jane Roe did have a motive to claim she was too drunk to remember the encounter: she was threatened with expulsion from medical school and might be able to **\*891** remain in school if she claimed to be the victim of a sexual assault.

An OSU administrator present at the disciplinary hearing could have answered the question though. Natalie Spiert attended the hearing as Jane Roe's advisor. She knew (1) when the medical school informed Jane Roe that she might be dismissed from the medical school, and (2) when Roe first told someone about the sexual assault, and (3) that Jane Roe had received a significant benefit from reporting the alleged rape, to wit the opportunity to repeat the first year of medical

school for the third time. John Doe on the other hand knew none of this and had no way to answer the hearing board's question without merely speculating. Without this credibility-impeachment evidence, John Doe could only say, "I can't speak for [Jane Roe]." (*Id.*).

Defendants offer two main arguments to address these facts.

First, Defendants argue that the hearing committee's decision didn't hinge on a he-said-she-said credibility determination, but it was based, in part, on "non-party witness testimony." (*See, e.g.*, Aff. of Charles Smith at ¶ 10, Doc. 115-4). And unless this is the case, the Due Process Clause does not require cross-examination at all. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005).

Defendants provide affidavits from each hearing board member, and all state that they "understood from John Doe's questioning of Jane Roe that he was suggesting to the panel that Jane Roe may have fabricated her allegations of sexual misconduct against him so she could stay in school." (*See, e.g.*, Aff. of Charles Smith at ¶ 5).[1] But this after-the-fact statement is belied by the statement of one of the board members at the hearing. One board member said, "There seems to be no motivation for [Jane Roe] to make this up. Why do you think she claims she doesn't remember what happened?" (Disciplinary Hrg. Trans. at 269:10–13). The after-the-fact affidavit doesn't cure the problem evident at the hearing: Jane Roe appeared to have no possible motive to lie.

The Due Process Clause requires a fair procedure. What is "fair" depends on the circumstances of each case. Thus, due process "is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation." *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988); *accord Flaim*, 418 F.3d at 634. Each particular situation may demand different procedural protections. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In the Sixth Circuit, higher education disciplinary decisions implicate the Due Process Clause. *Flaim*, 418 F.3d at 633. Framing this inquiry are three factors:

> First, the private interest that will be affected by the official action;

second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893. And when a case "is a disciplinary expulsion, rather than an academic one, we conduct a more searching inquiry." *Flaim*, 418 F.3d at 634.

The Court's "more searching inquiry" leads to the conclusion that this particular **\*892** situation may demand that OSU provide John Doe with specific credibility impeachment evidence as a procedural protection as part of his right to cross-examination. But reaching this legal conclusion will require a jury to decide a dispute of material fact.

The private interest affected by OSU's action is John Doe's interest in continuing his education, which as a fourth-year medical student set to graduate and applying for residencies, was substantial. Being expelled from OSU will have (and has had) significant professional and financial impacts on John Doe. He had to enroll in an off-shore medical school to finish his degree, and he is no longer eligible for federal student loans. If he is able to secure a career in medicine in the United States, he will very likely be worse off than if he had his MBA/MD from OSU. He is unable to secure a residency in his home state because of the off-shore school where he was finishing his degree. (PI Hrg. Trans. at 12:7–14). The discipline from OSU will remain on his educational record. In short, the private interest affected here is substantial.

Without the opportunity to cross-examine Jane Roe on her motive to lie, the risk of erroneously disciplining Doe was high. Cross-examination is one of the best fact-finding tools to "flush out the whole truth." *United States v. Radford*, 14 Fed.Appx. 370, 376 (6th Cir. 2001). Here, the board had to weigh the competing credibility of Jane Roe and John Doe, and the board specifically asked, why would Jane Roe lie? That shows that the value of this critical impeachment

**Lucas, Ian 7/1/2024**
**For Educational Use Only**

evidence was high. The importance of Jane Roe telling the truth in the context of the university's obligation to provide Doe with a fair hearing was highlighted by her own advocate, OSU's Natalie Spiert, who said that if she thought Jane Roe had said something untrue at the disciplinary hearing, she "would have requested a break and consulted with legal counsel." (PI Hrg. Trans. at 255:9–13). Here, both the risk of erroneous deprivation and the probable value of the additional safeguard are high.

Finally: the government's interest at stake. Here, it wouldn't have required a significant fiscal or administrative burden to provide Doe with this information before the hearing or provide it to him during the hearing, or provide it to the hearing panel when one of them asked for it. This factor doesn't weigh heavily in Defendants' favor.

The Due Process Clause is flexible; it calls for such procedural protections as each particular situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In the context of student disciplinary hearings, "cross-examination is 'essential to due process,' ... in a case that turns on 'a choice between believing an accuser and an accused.' " (Op. & Order at 18, Doc. 82 (quoting *Flaim*, 418 F.3d at 641 (dicta) ). Here, John Doe couldn't effectively cross-examine Jane Roe on a critical issue: her credibility and, specifically, her motive to lie. This particular situation may indeed demand the procedural protection of the university either correcting a false statement or providing the accused with the necessary information to impeach a critical witness.

Sexual assault is a deplorable act of violence. Accusing someone of such an act is no small matter. "If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself...." *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 573 (D. Mass. 2016). Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake **\*893** might be eating its own tail. Joe Dryden et al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

A reasonable jury could find that Jane Roe lied when she said the academic committee had already decided to permit her to repeat the first year of medical school for the third time

and that she had nothing to gain by reporting the assault and no motive to lie. A reasonable jury could find that Natalie Spiert knew or should have known that Jane Roe lied or misled the disciplinary board. Notwithstanding the affidavits of the hearing board members, the board might have reached a different conclusion on Jane Roe's credibility if it had been presented with all the facts.

The Court can determine the order of decisionmaking in the qualified-immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 242, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Court elects to pursue the first step in the qualified-immunity analysis, which is determining what the relevant facts are. Here, that is determining what Spiert knew or should have known. If a jury finds that Spiert knew or should have known Roe lied at the disciplinary hearing, then the Court must decide as a matter of law whether her failure to disclose deprived Doe of his right to cross examination. See *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (permitting question of fact to go to a jury before court decides legal question of whether qualified immunity applies).

The motion for summary judgment is denied as to Natalie Spiert because there is a genuine issue of material fact.

As to the other individual defendants, the Court will grant the motion for summary judgment on the issue of qualified immunity regarding the cross-examination issue.

Matthew Page heard Jane Roe's testimony at the hearing, but he wasn't privy to the timing of her earlier report of the sexual assault, nor was he privy to her statements before the ABRC. As the disciplinary hearing coordinator, Page had "the ability to ask a question to clarify" testimony that he believed to be untruthful. (Page Dep. at 79:23–80:9, Doc. 114–3). He didn't do that in this case because he was not aware that the "reason she was permitted to remain in medical school was because she claimed to be the victim of sexual assault." (*Id.* at 80:14–20). He didn't know the timeline. (*Id.* at 81:22–82:1). There's no dispute of material fact about Page's knowledge; therefore, as a matter of law, he did not violate John Doe's due process rights. Page is entitled to qualified immunity on this claim.

John Doe admits that Brennan and Adams–Gaston were not at the disciplinary hearing and didn't hear Jane Roe's statements to the disciplinary board. But, Doe argues that it's a reasonable inference that Brennan and Adams–Gaston knew about the

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   9

**Lucas, Ian 7/1/2024**
**For Educational Use Only**

timing of Jane Roe's academic accommodation, the timing of her report of the sexual assault to the ABRC, and her statements to the disciplinary board because they were in a supervisory role. Doe says that "[a]s a matter of law, personal knowledge sufficient to create an issue of fact may be inferred to one in a responsible, supervisory position, where that person is required to be familiar with the practices of those he supervises."

While a supervisor may indeed be familiar with the *practices* of those she supervises, that doesn't mean that a supervisor knows the specific details of her subordinates' activities. Here, the due process inquiry is a fact-intensive one that requires showing that an individual knew the timing of Jane Roe's academic accommodation, the timing of her report of the sexual assault to the ABRC, and her statements to the disciplinary board. It's undisputed **\*894** that neither Adams–Gaston nor Brennan knew all of Jane Roe's testimony to the disciplinary board. These specific facts weren't akin to the "implementation of a program," where a court might impute knowledge to a supervisor. *See Tucker v. Dickey, 613 F.Supp. 1124, 1131 (W.D. Wis. 1985)*. Nor were all the necessary facts within the "sphere of responsibility" of either Adams–Gaston or Brennan such that the Court could reasonably infer knowledge of these specific facts to Brennan and Adams–Gaston. *See DIRECTV, Inc. v. Budden, 420 F.3d 521, 530 (5th Cir. 2005)*. Therefore, both are entitled to qualified immunity.

**B. Reconsideration of Expert–Witness Issue**

The Court earlier ruled that "there is no due process right to expert testimony in student disciplinary hearings, let alone is such a right clearly established." (Op. & Order at 15). On that basis, the Court held that Defendants were entitled to qualified immunity on Doe's claim that the Due Process Clause guarantees the right to expert testimony. (*Id.*). In light of a thorough review of the record of this case, the Court sua sponte reconsiders this earlier ruling and vacates it.

John Doe hired an expert to provide an opinion on whether or not "Jane Roe was likely to be intoxicated and/or substantially impaired when she engaged in sexual conduct with John Doe." (Ward Aff. at ¶ 11, Doc. 2–2). The hearing board coordinator, Matt Page, denied John Doe the opportunity to present either the expert's report or live testimony because OSU's procedural rules only permit fact and character witnesses, not opinion or expert witnesses. (Page Aff. at ¶ 11;

*see also* Compl. at 45 (OSU Code of Student Conduct § 3335–23–10, Hearing Procedures) ). [2]

If John Doe's expert witness, Dr. Alfred E. Staubus, were permitted to present his report and testify before the board, he would have testified that Jane Roe was likely capable of consenting to sexual activity, that she likely did not suffer a "blackout" of memory, but even if she did, she would have been capable of consent during the "blackout" period.

John Doe's expert, Dr. Alfred E. Staubus, stated in his report that it was his

> opinion, to a reasonable degree of medical and scientific certainty that based upon [Jane Roe's] calculated blood-alcohol concentrations and the supporting eyewitness observations, [Jane Roe] was not alcohol impaired to the point where she was incapable of consenting to sexual intercourse and sexual contact at the time of the incident, or that she was incapable of saying 'no' to [John Doe] if she did not want to have sexual intercourse or sexual contact with him. Further, it is more likely than not that she was aware of her choices and decisions that night.

(PageIDs 1527–28).

Dr. Staubus would have testified about Jane Roe's alleged blackout too. For example, Dr. Staubus had this to say in his initial report:

> [Jane Roe's] statements that in contrast to her previous drinking experiences of having partial memory losses (fragmentary blackouts) of events and activities during the drinking periods, on the night of July 12/13, 2014, she experienced for the first time a complete memory loss (an *en bloc*

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    10

blackout) starting **\*895** when she left Callahan's Columbus. As noted by Dr. Aaron White (see enclosed references), a blackout can occur when a person is consuming a large amount of alcohol over a short period of time, resulting in a rapid rise in blood-alcohol concentration. In such events, there is disruption in the transfer of short-term memory to long-term memory. The short-term memory during a blackout allows the individual to carry on conversations, perform tasks, and engage in (and even initiate) sexual activity. The disruption of the transfer of short-term memory to long-term memory prevents the individual from recalling the events and activities that occurred during the period of blackout. Based upon her reported subsequent interactions and text messages with [John Doe], it is questionable if [Jane Roe] actually did experience a blackout. However, even if she did experience a blackout, that does not mean she was alcohol impaired to the point of being incapacitated or unable to resist sexual advances. Impairment to the point of exhibiting apathy, general inertia, inability to stand or walk correspond to the Stupor stage of Alcohol Influence (0.27 to 0.40 g/dL)—blood-alcohol levels much greater than the amount of alcohol [Jane Roe] consumed. When the Gaswerks closed at 2:00 a.m., she was able to talk the 10–minute distance to [John Doe's] parked car. With or without a blackout condition, [Jane Roe] would have the ability to say "no" to [John Doe] if she had wanted to say that.

(PageIDs 1532–33).

The Court originally applied the *Mathews* test and determined that it "tilts away from requiring" live expert testimony at student disciplinary hearings. (Op. & Order at 15). The Court here reexamines the *Mathews* test. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

First, the private interest affected by OSU's action is substantial, as the Court has already addressed.

Second, the value of allowing live expert-witness testimony here is also substantial. Dr. Staubus's opinion went right to the heart of the case: whether Jane Roe was to be believed and whether she was too intoxicated to consent. Alcohol metabolism and the extent of impairment of human judgment and memory are not matters within the knowledge of lay persons. And the disciplinary board held Doe responsible for sexual misconduct because it found Jane Roe was significantly impaired by alcohol and could not consent. The risk of an erroneous result here was substantial given the key evidence Dr. Staubus would have provided.

Finally, the government's countervailing interest in not providing the additional procedure could be substantial. Permitting expert testimony at student disciplinary hearings would pose some fiscal and administrative burden on the university: it may have to retain experts, review reports, or prepare some form of cross-examination of an accused student's expert witness. But OSU's own rules already permit the hearing coordinator to call an expert akin to a special master; OSU calls them consultants, and the board coordinator may appoint them in "cases requiring special expertise." (*See* PageID 45). OSU's own rules contemplate part of the administrative and fiscal burden imposed by appointing an expert, and OSU's rules permit it because certain cases may require special expertise.

Here, it may be the case that due process required OSU to permit Doe's expert to testify. Doe's interest at stake is substantial. The university's countervailing interest is substantial too. But having an expert provide insight in these hearings is already a procedure within OSU's rules, so **\*896** permitting an outside expert to testify is no great departure from its current procedure. In short, it's plausible that OSU violated Doe's right to due process by failing to permit Doe's expert to testify and present his report.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 11

Doe v. Ohio State University, 311 F.Supp.3d 881 (2018)
356 Ed. Law Rep. 192

The Court therefore reconsiders its earlier ruling and vacates its dismissal of this claim. The reconsidered ruling was on a motion to dismiss, and the parties have not conducted discovery on this issue. If they wish to conduct discovery, they may, and they may submit dispositive motions on this issue upon the completion of said discovery. The Court will reexamine the issue of whether a constitutional violation occurred and whether Defendants are entitled to qualified immunity. Discovery on the expert-witness issue should include all of the elements of the *Mathews* test.

**IV. Conclusion**

Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. (Doc. 116).

The Court **GRANTS** summary judgment to individual defendants Adams–Gaston, Brennan, and Page on the cross-examination branch of Doe's due process claim. The Court **DENIES** summary judgment to individual defendant Spiert on the cross-examination branch of Doe's due process claim.

The Court sua sponte **RECONSIDERS** its earlier dismissal of Plaintiff's due process claim regarding the exclusion of his expert witness, and that claim is hereby reinstated.

IT IS SO ORDERED.

**All Citations**

311 F.Supp.3d 881, 356 Ed. Law Rep. 192

## Footnotes

1  The Court will reserve decision on the issue of the admissibility of this testimony if offered at trial.

2  The Code of Student Conduct does, however, permit the board coordinator to "appoint individuals with appropriate expertise to serve as consultants to the board. The consultants may be present and provide information as called upon during the hearing but will not vote." (*Id.*). Page did not appoint an expert consultant in this case.

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    12

# Doe v. Manhattan Coll.

Decided Mar 2, 2023

23 Civ. 1791 (PAE)

03-02-2023

JOHN DOE, Plaintiff, v. MANHATTAN COLLEGE, Defendant.

PAUL A. ENGELMAYER, UNITED STATES DISTRICT JUDGE

**ORDER**

PAUL A. ENGELMAYER, UNITED STATES DISTRICT JUDGE

On March 2, 2023, this Court was assigned this matter, in which plaintiff John Doe brings claims against defendant Manhattan College of unlawful discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* He alleges that Manhattan College, due to, *inter alia,* gender bias, failed to conduct an impartial investigation of a complaint brought against him by fellow undergraduate Jane Roe, which accused him of sexual assault. *See* Dkt. 1 ("Complaint"). The Complaint also claims a breach of various contracts by Manhattan College.

This order addresses Doe's motion for emergency relief, filed alongside his Complaint. Doe seeks a temporary restraining order and a preliminary injunction (1) enjoining Manhattan College from enforcing its February 14, 2023 decision to expel Doe, a senior at the college; and (2) permitting Doe to continue in his classes this term. Dkt. 5 at 1. Doe also seeks a protective order allowing him to proceed under a pseudonym in this litigation

and to prohibit Manhattan College from publicly identifying Doe by his true name in court filings or otherwise. *See* Dkt. 7.

The Court appreciates the need to resolve with dispatch Doe's request for emergency relief. However, the Court is also mindful that there are multiple interests at stake and that *2 Manhattan College has a different perspective on the underlying events and the legality of its disciplinary measures towards Doe. *See* Dkt, 19 at 1 (letter from Manhattan College, not consenting to entry of temporary relief). The Court accordingly will resolve the request for emergency relief on an adversarial, and not an *ex parte,* basis, but will do so with urgency.

Specifically, the Court orders the following:

1. Counsel for both parties are to appear for a hearing on the application for emergency relief before the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007, Courtroom 1305 on **Tuesday, March 7, 2023, at 2 p.m.** The Court advises counsel that it envisions the hearing as consisting substantially of arguments by counsel as to the application of the injunctive factors. For the purpose of Tuesday's hearing, the Court does not invite or anticipate hearing live testimony from witnesses. The Court will receive the facts from the written materials that accompanied Doe's submission, *see, e.g.,* Dkts. 5-1, 5-2, 5-3, 54, 5-6, 5-7, and those accompanying Manhattan College's forthcoming submission. In the event the Court determines that testimony is

necessary to reliably resolve the application for emergency relief, such will be scheduled promptly.

2. Manhattan College is directed to file a written response to Doe's motion by **Monday, March 6, 2023, at 5 p.m.** As publicly filed, this may be filed in redacted form in recognition of the privacy interests at stake. Manhattan College is directed at the same time to deliver two hard copies, unredacted, of its submission to the Court at 40 Foley Square.

3. Doe, by **Friday, March 3,2023, at 5 p.m.,** is to deliver two hard copies, unredacted, of its submission, to the Court at 40 Foley Square. *3

4. Manhattan College is to promptly notify Jane Roe and her counsel, if so retained and known to Manhattan College, of this pending matter, and to provide her with a copy of this order. The Court encourages counsel for Jane Roe to attend the March 7, 2023 hearing, insofar as the Court may have questions for Roe's counsel with respect to aspects of the application for emergency relief.

5. Doe's motion to proceed under pseudonym in this matter is granted, pending the hearing scheduled for March 7, 2023, at which point the Court will invite brief argument on this issue, if Doe's request is opposed. By **March 3, 2023, at 5 p.m.,** Doe is to file under seal, with the Court, a letter identifying him by name, so as to assure, *inter alia,* the absence of any conflicts presented by the Court's presiding over this case.

6. To assure that Doe's educational interests are not unnecessarily compromised during the period before his motion for emergency relief is resolved, the Court directs that Manhattan College, at its election, either (a) permit him to attend classes remotely, or (b) preserve in video- or audio-graphic recorded form, his classes, and arrange for the prompt provision of these recordings to him.

7. Given the expedited nature of this proceeding, the Court is emailing this order to counsel of record, It will be filed on the docket of this case forthwith.

SO ORDERED.

casetext
Part of Thomson Reuters

# Doe v. Mich. State Univ.

Decided Feb 25, 2021

No. 20-1043

02-25-2021

JOHN DOE, Plaintiff-Appellant, v. MICHIGAN STATE UNIVERSITY; ROBERT KENT, RICK SCHAFER, and ARON SOUSA, M.D., in their individual and official capacities, jointly and severally, Defendants-Appellees.

COUNSEL ARGUED: Eric J. Rosenberg, ROSENBERG & BALL CO. LPA, Granville, Ohio, for Appellant. Scott R. Eldridge, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Lansing, Michigan, for Appellees. ON BRIEF: Eric J. Rosenberg, ROSENBERG & BALL CO. LPA, Granville, Ohio, for Appellant. Scott R. Eldridge, Kamil Robakiewicz, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Lansing, Michigan, Brian M. Schwartz, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellees.

---

JULIA SMITH GIBBONS, Circuit Judge.

RECOMMENDED FOR PUBLICATION Pursuant to Sixth Circuit I.O.P. 32.1(b) File Name: 21a0049p.06 Appeal from the United States District Court for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-00226—Paul Lewis Maloney, District Judge. Before: CLAY, GIBBONS, and NALBANDIAN, Circuit Judges.

## COUNSEL

**ARGUED:** Eric J. Rosenberg, ROSENBERG & BALL CO. LPA, Granville, Ohio, for Appellant. Scott R. Eldridge, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Lansing, Michigan, for Appellees. **ON BRIEF:** Eric J. Rosenberg, ROSENBERG & BALL CO. LPA, Granville, Ohio, for Appellant. Scott R. Eldridge, Kamil Robakiewicz, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Lansing, Michigan, Brian M. Schwartz, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellees. GIBBONS, J., delivered the opinion of the court in which CLAY, J., joined, and NALBANDIAN, J., joined in the disposition. NALBANDIAN, J. (pp. 18-23), delivered a separate concurring opinion. *2

2

## OPINION

JULIA SMITH GIBBONS, Circuit Judge. This case arises from the investigation and eventual expulsion of John Doe from the Michigan State University College of Human Medicine ("CHM") for allegedly sexually assaulting two women, Roe 1 and Roe 2, on the night of the school's formal dance.

The two women reported to the university that Doe had sexually assaulted them, after which the university began an investigation led by an outside consultant. The consultant determined that the evidence supported a finding that Doe had indeed sexually assaulted the women. Then, the CHM convened a panel, which affirmed the findings without an in person hearing. While this process was ongoing, we released *Doe v. Baum*, holding that universities must offer an in person hearing with cross-examination in cases where the factfinder's determination depends on witness credibility. 903 F.3d 575, 581 (6th Cir. 2018). Accordingly, the CHM gave Doe an in person

Case 3:24-cv-00440    Document 79    Filed 07/11/24    Page 72 of 191 PageID #: 1741

hearing, conducted over the course of three days before a Resolution Officer, who was an Administrative Law Judge selected by the university to oversee the hearing. At this hearing, Doe was permitted to testify and, through his attorney, to cross-examine Roe 1 and Roe 2. The Resolution Officer did not require Roe 1 to answer every question that Doe's attorney posed to her. Both Doe and his attorney were present throughout the entire hearing.

After considering the credibility of the witnesses including Roe 1, Roe 2, and Doe, the Resolution Officer again found that the evidence supported a finding that Doe had sexually assaulted the women. After these proceedings, and several years after the alleged sexual assaults, the CHM expelled John Doe.

Doe brought this suit against the university and several individual defendants, alleging that the university's proceedings violated the Due Process Clause, the Equal Protection Clause, and Title IX. The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) *3 for failure to state a claim, and in response Doe sought to amend his complaint for a second time. The district court denied Doe's motion to amend and granted the defendants' motion to dismiss.

On appeal, Doe argues that (1) the district court erred in denying his motion to amend his complaint a second time and (2) the district court erred in dismissing his due process claim. Doe did not appeal the district court's decision as to his Title IX and Equal Protection claims. Because Doe received ample due process throughout the course of his three-day hearing, we affirm.

## I.

## A.

In April 2016, John Doe, Jane Roe 1, Jane Roe 2, and K.B. were first-year medical students at the CHM. Roe 1 was casually dating K.B., and Roe 2 was married to another man, J.M. On April 23, the

four students attended a dance known as the Med Ball together. The group consumed alcohol before and during the Med Ball.

The parties dispute the events that took place that night. In reviewing a FRCP 12(b)(6) motion to dismiss, we must draw all reasonable inferences in favor of the plaintiff and accept all well-pleaded allegations as true. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016). As dictated by this standard, we accept and present Doe's account of the night for purposes of this appeal.

At the Med Ball Roe 1 and Doe danced together, at times "sexually grinding on each other." DE32, First Am. Compl., Page ID 713. Also at the dance, Roe 2 got into a fight with her husband J.M., and he left the venue, asking Roe 2 for a divorce. After this fight, Roe 1 looked for Roe 2, hoping to comfort her, but found her kissing K.B. (whom Roe 1 had been casually dating). Roe 1 returned inside and sat on a stairway that was at least somewhat secluded from the rest of the venue. Doe found Roe 1 on the staircase and sat down next to her. There, Roe 1 told Doe that she had seen Roe 2 and K.B. kissing.

On the staircase, Doe kissed Roe 1, who "responded by kissing [him] back, using her tongue." *Id*. at Page ID 714. After kissing for some time, they moved to the second floor of the *4 venue and entered a different stairwell, where they continued to kiss. Kissing led to touching, and Roe 1 took off her dress. Roe 1 presented herself for sexual intercourse by getting down on her hands and knees, and she asked Doe whether she could use his jacket to cushion her knees. Doe was unable to achieve a full erection, so the two did not have intercourse and returned to the lobby.

Shortly after this encounter, the group moved to a bar in Grand Rapids. At this bar, Doe and Jane Roe 2 moved upstairs to the dance floor, where they danced and kissed.

Eventually, the group returned to K.B.'s house, where Roe 2 and K.B. had sex in K.B.'s kitchen. Roe 1 was sleeping in K.B.'s bed. Doe joined Roe 1 on the bed, but was unable to sleep, so he moved to the sectional couch where Roe 2 lay awake. Roe 2 began grinding her buttocks against Doe, and they kissed. After kissing and touching for some time, Doe pulled Roe 2's dress up and touched her buttocks. Roe 2 told Doe either "I'm tired" or "no." *Id.* at Page ID 718. Doe stopped, moved to another part of the couch, and the two went to sleep.

## B.

The encounters between Doe and Roe 1 and 2 took place in April 2016. In February 2018 the two women filed sexual assault claims with the university's Office of Institutional Equity ("OIE") against Doe for his conduct during the night in question. A complaint of this kind is investigated by the university to determine whether the conduct violated the university's Relationship Violence and Sexual Misconduct Policy ("RVSMP"). The university hired the external consultant, Kroll Associates, Inc., to investigate Roe 1 and Roe 2's allegations. Kroll conducted several interviews of Doe, Roe 1, Roe 2, and witnesses for Roe 1 and Roe 2. After Kroll's initial investigation, they sent Doe a letter informing him that the CHM would be moving forward with a formal investigation into whether he violated the RVSMP.

Kroll's investigation took place over the course of a year, and in February 2019 Kroll issued its Final Investigative Report, concluding that a preponderance of the evidence supported a finding that Doe had violated the RVSMP with respect to both Roe 1 and Roe 2. The CHM issued an interim suspension of John Doe on February 12, 2019. The CHM then held a three-panelist hearing with Doe on February 14, 2019, to determine whether 5 the suspension would *5 continue. The panel upheld the suspension, relying in part on Kroll's Final Investigative Report. At that point, Doe was pulled out of medical rotations.

On February 18 Doe submitted his mitigation statement to the Dean of Students' Office regarding the sanctions against him. On February 26, the Dean of Students' Office notified Doe that it would be recommending dismissal.

During these initial proceedings, the CHM was governed by a prior RVSMP. The RVSMP was updated in February 2019 in accordance with this court's decision in *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018). *Baum*, decided in September 2018, held that when the determination of a university disciplinary proceeding depends on credibility, the accused has a constitutional due process right to "some form of cross-examination" of the claimant at an in person hearing. *Baum*, 903 F.3d at 581. This was a change from the prior RVSMP, which did not require an in person hearing with the opportunity for cross-examination.

On March 8, Doe appealed the CHM's findings and sanctions through the university's internal procedure. That same day, the university notified Doe that his appeal was placed "on hold" while his case was reviewed to determine whether a hearing should have been offered pursuant to *Baum*. On March 13, the OIE confirmed that Doe was due a hearing, and gave him a 7-day window to request one. Doe did so on March 20 and also submitted a request that the university lift his interim suspension, which it denied.

On March 25, Doe filed this case in the Western District of Michigan against Michigan State University, Robert Kent (Interim Associate Vice President of the Office for Civil Rights and Title IX Education and Compliance), Rick Shafer (Associate Director of Student Conduct and Conflict Resolution), and Aron Sousa (Senior Associate Dean for the College of Human Medicine). The complaint alleged a Title IX violation and violations of his due process and equal protection rights, brought under 42 U.S.C. § 1983. Doe sought damages, a declaratory judgment, and injunctive relief reinstating him as a student.

casetext

Part Chassis Technology

Doe moved for a temporary restraining order and preliminary injunction to reinstate him as a student. The court denied his motion. *6

6

The university's internal proceedings continued, and the OIE moved forward with the *Baum* hearing. On April 12, the university provided Doe with the case files, including the Final Investigative Report with Kroll's findings redacted. The OIE appointed Administrative Law Judge Mark Eyster from the Michigan Office of Administrative Hearings and Rules to serve as the Resolution Officer ("RO") in Doe's hearing.

RO Eyster conducted a hearing from May 13 through May 15, which consisted of in person testimony and cross-examination. During the three-day hearing, RO Eyster oversaw Doe's attorney's cross-examination of Roe 1 and Roe 2. RO Eyster allowed Roe 1 to refuse to answer an unspecified number of questions on cross-examination.

On May 22, RO Eyster issued his decision, finding by a preponderance of the evidence that John Doe had violated the RVSMP with respect to his conduct towards both Jane Roe 1 and Jane Roe 2. On June 11, the Dean of Students' Office again notified Doe that it was recommending dismissal, and Doe again appealed.

In this legal action, Doe amended his complaint to include facts and allegations regarding the *Baum* hearing, including the fact that RO Eyster permitted Roe 1 to refuse to answer an unspecified number of questions, on July 23. Doe was officially dismissed from Michigan State University on July 19, 2019.

On August 22, 2019, the defendants moved to dismiss the first amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. On October 3, 2019, Doe moved for leave to file a second amended complaint adding additional facts, changing the counts, removing some allegations and counts, and removing some

parties from some allegations. On October 22, 2019, the district court denied this motion as both futile and untimely.

The district court granted the defendants' motion to dismiss on December 10, 2019 and Doe timely appealed the denial of his motion to amend and the grant of defendants' motion to dismiss. *7

7

## II.

"This court reviews a denial of leave to amend a pleading for abuse of discretion, unless the district court denied leave based 'on the legal conclusion that an amended complaint could not withstand a motion to dismiss.'" *Boulton v. Swanson*, 795 F.3d 526, 537 (6th Cir. 2015) (quoting *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002)). We therefore review for abuse of discretion the district court's denial of Doe's motion for leave to file a second amended complaint on the grounds that the motion was untimely. On the other hand, this court reviews de novo the denial on grounds that the second amended complaint was futile, as this constituted a holding that the second amended complaint "would not withstand a motion to dismiss . . . for failure to state a claim." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 782 (6th Cir. 2015); *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 671 (6th Cir. 2003).

We review "de novo a district court's dismissal of a complaint for failure to state a claim." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). In reviewing Doe's claims, the court must accept "all well-pleaded allegations in the complaint as true," *id.*, and "consider[] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief," *id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (second alteration in original)). "Dismissal of a complaint for the failure to state a claim on which relief may be granted is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

4

# III.

Doe brings two arguments on appeal; first that the district court erred in denying his motion to file a second amended complaint, and second that the district court erred in dismissing his due process claim.

## A.

We first address Doe's motion to file a second amended complaint. Doe first amended his complaint upon completion of his *Baum* hearing, adding facts and allegations arising from *8 the hearing, including allegations that Roe 1 was permitted to refuse to answer questions on cross-examination. He then requested to amend his complaint a second time, after the defendants had moved to dismiss for failure to state a claim, in part to add additional facts. Specifically, Doe sought to identify two specific categories of questions that Roe 1 refused to answer in the *Baum* hearing, one related to her attire and one related to her physical size and to "detail[] how MSU's refusal to provide him with the *Baum* hearing transcript prohibited him from provid[ing] additional examples of questions Roe 1 and 2 refused to answer." R. 22, Appellant's Br., 31-32. The district court denied his motion, holding that the proposed amendments were both futile and untimely. We affirm on both grounds, but we first address Doe's waiver of the timeliness ruling on appeal.

### 1.

As a preliminary matter, we agree with the appellees that Doe waived any appeal of the district court's decision regarding timeliness by failing to raise the issue in his initial brief. Generally, an "appellant abandons all issues not raised and argued in its initial brief on appeal." *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014) (quoting *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006)). "Furthermore, 'it is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived.'" *Johnson*, 440 F.3d at 846 (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (citation and quotation marks omitted)).

The district court held that because Doe's motion failed to argue that the additional facts were newly discovered or provide an explanation as to why the delay was warranted, there was no excuse for the failure to "include [the] facts in his first amended complaint." DE45, Order Grant. Mot. to Dismiss, Page ID 1188. On appeal, Doe does not address the court's holding that the amendments were untimely. He states one standard of review, de novo, for dismissal on the grounds that the SAC would not survive a motion to dismiss. Nowhere does Doe's brief contest the district court's finding that the motion was untimely because the facts were "at least in his possession at the time of filing his first amended complaint, if not in his possession on the night of the incident that began this case." DE45, Order Grant. Mot. to Dismiss, Page ID 1188. *9

Doe attempts to argue that he could not identify specific cross-examination questions that Roe 1 and 2 refused to answer because MSU "withheld the *Baum* hearing transcript," but does not explain (1) why he could not include the specific instances based on his own or his attorney's recollection of the hearing, as both were present, or (2) why he did not include factual allegations about MSU withholding the transcript in his initial complaint.[1] R.22, Appellant's Br., 33.

[1] The reason for the failure to include factual allegations about the university's withholding the *Baum* transcript is quite clear: Doe never requested a copy.

It is not until his reply brief that Doe argues that he did address the court's untimeliness holding, stating that his brief reference to the "spirit of FRCP 15," which "contemplates plaintiffs filing amended complaints at the time of necessary utility to the plaintiff," constitutes an argument that the motion was timely. R.26, Reply Br., 24.

However, this paragraph fails to offer any explanation as to why these facts and allegations were omitted from the first two complaints, and a party cannot sustain an argument by addressing it in merely a "perfunctory manner, unaccompanied by some effort at developed argumentation." *Johnson*, 440 F.3d at 846 (quoting *Elder*, 90 F.3d at 1118 (citation and quotation marks omitted)). As Doe's argument made at most a glancing reference to the timeliness of the motion to amend, we hold that he waived this issue on appeal.

## 2.

Regardless of his waiver, we would affirm the district court on the merits of its decision. We review the denial of Doe's motion to amend his complaint for untimeliness under abuse of discretion. *See Boulton*, 795 F.3d at 537. Abuse of discretion is a highly deferential standard, and the district court's findings "will be disturbed only if [it] relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir.1997). Federal Rule of Civil Procedure 15 allows district courts to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). "Denial may be appropriate, however, where there is 'undue delay'" in filing. *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 10 371 U.S. 178, 182 (1962)). *10

Here, the district court correctly noted that leave to amend under Rule 15 should be granted "freely." DE45, Order Grant. Mot. to Dismiss, Page ID 1186. The court went on to explain that a request may be denied for undue delay in filing. The district court applied this standard correctly, noting that the facts that Doe sought to add in his SAC were available to Doe at the time of his first amendment, and that Doe failed to offer any excuse for omitting them when he first amended his complaint. Because the district court relied on 11

accurate facts and properly applied the standard, we would affirm its decision on the merits had Doe not waived the issue on appeal.

## 3.

This court reviews the denial of the motion to amend for futility de novo. *Boulton*, 795 F.3d at 537. As noted above, leave to amend should be given "freely" and "when justice so requires." FED. R. CIV. P. 15(a)(2). However, a request may be denied if it would be futile, i.e., if the amended complaint would not withstand a motion to dismiss for failure to state a claim. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). As is relevant for purposes of this appeal, Doe attempted to amend his complaint to point to two specific categories of questions Roe 1 refused to answer and to add factual allegations that he was not permitted to record the *Baum* hearing, and without such a recording was unable to provide additional specific examples of questions Roe 1 did not answer. The specific categories of questions were "about [Roe 1's] attire on the evening in question" and about her "physical size." DE39, Second Am. Compl., Page ID 1024. The question before this court is whether the addition of these facts would lead us to conclude that Doe had stated a due process claim.

In deciding a motion to dismiss for failure to state a claim, the court must take all well-pleaded allegations in the plaintiff's complaint as true. *Iqbal*, 556 U.S. at 678-79. Doe's first amended complaint includes the following allegations:

> The Resolution Officer permitted Jane Roe 1 to refuse to answer questions on cross-examination, without penalty or negative inference as a result.

> The Resolution Officer denied John Doe the opportunity to ask relevant questions on cross-examination through his counsel.

DE32, First Am. Compl., Page ID 736. Doe's due process claim rested in relevant part on the *11

argument that allowing a complainant to refuse to answer questions on cross-examination that had been pre-approved by the RO was a violation of this court's holding in *Baum*. In taking all well-pleaded allegations as true, we accept Doe's allegations from the first amended complaint that Jane Roe 1 was allowed to refuse to answer questions. As described below, Doe received extensive process throughout a three-day hearing. *See infra* Part III.B. If the general factual allegation in the complaint properly before this court cannot survive a motion to dismiss, a more specific allegation pointing to two actual questions that Roe 1 did not answer will likewise be insufficient. The issue is not necessarily the content of the questions, but whether permitting the complainants to refuse to answer some small number of questions throughout the course of a three-day hearing is a violation of Doe's due process rights. It is not. Regardless, if we were to find that knowledge of the specific questions that Roe 1 was not forced to answer was relevant, it would not change our conclusion that there was no denial of due process in Doe's case.[2] There is no compelling argument that, with all the process that Doe received, forcing Roe 1 to answer questions about her clothes and physical size was necessary to vindicate his constitutional rights.

---

[2] While the specific unanswered questions alleged in the SAC—namely whether "Jane Roe 1 had removed her own clothing on the night in question" and "Jane Roe 1's relative size to John Doe"—may have been relevant to the issues of consent and use of force in effectuating a sexual assault respectively, any error in allowing Roe 1 to refuse to answer these questions is rendered harmless by the extensive proceedings and ability to cross-examine witnesses against him that John Doe had in this case and does not amount to a due process violation. DE39, Second Am. Compl., Page ID 1025.

Doe's SAC also added the allegation that he was not allowed to record the *Baum* hearing, and that the University was in "sole possession" of the recording of the hearing. DE39, Second Am. Compl., Page ID 1025. The SAC does not allege either Doe or his lawyer at any point requested a transcript of the hearing, or that their request was denied. At oral argument, Doe's lawyer repeatedly asserted that the university was withholding the *Baum* transcript in violation of his client's due process rights. This was a mischaracterization of the facts, which are that both Doe and his attorney were present for the entire hearing and both failed to request a transcript from the university at any point. Further, while the Constitution does require that "the student be provided the evidence against him," there is no indication that this evidence includes the transcript of a *Baum* hearing. *Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018). Far from withholding the evidence against Doe, the university provided him with the case file, including *12 the Kroll report. There is no plausible suggestion in the SAC that the university withheld evidence in violation of Doe's due process rights.

Because the SAC was both untimely and futile, we affirm the district court.

## B.

Second, Doe argues that the district court erred in granting defendants' motion to dismiss because his hearing violated his due process rights, as laid out in *Baum* and *Doe v. University of Cincinnati*, 872 F.3d 393 (6th Cir. 2017). Because Doe received extensive due process throughout his hearing, we disagree and affirm the district court.

### 1.

*Mathews v. Eldridge* provides the test for courts to determine what procedures are required when a plaintiff has interests at stake. 424 U.S. 319 (1976).

Under *Mathews*, the level of process the Fourteenth Amendment requires is determined by balancing three factors: (1) the nature of the private interest affected by the deprivation; (2) the risk of an erroneous deprivation in the current procedures used, and the probable value, if any, of additional or alternative procedures; and (3) the governmental interest involved, including the burden that additional procedures would entail.

*Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016) (citing *Mathews*, 424 U.S. at 335). This court has applied *Mathews* in the context of campus sexual assault proceedings, laying out the following framework for what is required.

In 2016, this court decided *Cummins*, 662 F. App'x at 437. The plaintiffs, Doe 1 and Doe 2, were accused of sexually assaulting fellow students at the University of Cincinnati. *Id*. at 438. One was suspended, while the other was put on disciplinary probation following a university proceeding to determine whether, by a preponderance of the evidence, the two were "responsible" for violating the university's Code of Conduct. *Id*. at 438; *id*. at 440-42. The proceedings culminated in two separate hearings, at which Doe 1 and Doe 2 were permitted to submit written questions to the panel overseeing the hearings, who then posed the questions to the claimants. *Id*. at 441. The panel refused to ask "a number of written questions that Doe 1 submitted." *Id*. The two students brought a claim in federal district court, alleging in part that

13    *13 the university's hearing had deprived them of their right to due process because it did not allow for effective cross-examination of adverse witnesses. *Id*. at 445. We applied the *Mathews v. Eldridge* balancing test to determine what procedures due process required for the students. *Id*. at 446-47. We considered the students' liberty interest and the burden on the university, and held that "due process may require a limited ability to cross-examine witnesses in school disciplinary

hearings where, like here, credibility is at issue," and that the "requirement was satisfied in this case." *Id*. at 448 (internal citations omitted).

The next year, we decided *Doe v. University of Cincinnati*, which built on *Cummins*. 872 F.3d at 393. In *University of Cincinnati*, plaintiff John Doe was accused of sexually assaulting a fellow student and was suspended for one year from school following a hearing where the claimant was not present, depriving him of any right to cross-examination. *Univ. of Cincinnati*, 872 F.3d at 398. Again applying *Mathews*, we weighed Doe's interest (the impact that a finding of responsibility for a sexual offense would have on his life) with the burdens imposed by additional procedural safeguards and the risk of erroneous deprivation of his interest in the absence of those additional safeguards. *Id*. at 400. We held that where the deprivation is severe, such as suspension from the school and the accompanying harm to Doe's reputation, and the credibility of the accuser is at issue, a denial of cross-examination is a denial of due process. *Id*. at 402. In our decision, we stressed that cross-examination is a necessary tool for the trier of fact because it "takes aim at credibility like no other procedural device." *Id*. at 401.

In *University of Cincinnati*, we also acknowledged the potential harm that unfettered cross-examination could pose to victims of sexual assault. *Id*. at 403 ("Strengthening those procedures is not without consequence for victims. 'Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating' the same hostile environment Title IX charges universities with eliminating." (quoting *Doe v. Regents of the Univ. of Cal.*, 210 Cal. Rptr. 3d 479, 505 (2016))). We therefore reaffirmed that the cross-examination required by due process was "circumscribed." *Id*.

The issue of cross-examination appeared before us again in 2018, when we decided *Doe v. Baum*, 903 F.3d at 575. In *Baum*, plaintiff John Doe was accused of sexually assaulting a fellow undergraduate student, Jane Roe, at the University of Michigan. *Id*. at 578-79. The *14 university investigator initially found for Doe, but Roe appealed. *Id*. at 580. The internal appellate panel reviewed the investigator's report over the course of two closed sessions and reversed, finding that the evidence supported Roe's allegations because her description of events was "more credible" and her witnesses "more persuasive." *Id*. Doe agreed to withdraw rather than face expulsion from the university and sued shortly afterwards, arguing that the proceedings violated his due process rights. *Id*.

We agreed with Doe, holding that when a university's decision rests on a credibility determination, it must "facilitate some form of cross-examination in order to satisfy due process." *Id*. at 581. In doing so, we considered the significance of Doe's interests, the minimal burden on the university, and the university's interest in protecting victims. *Id*. at 582-83. Doe's interests were significant. *See id*. at 582 ("Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life. The student may be forced to withdraw from his classes and move out of his university housing. His personal relationships might suffer. And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled." (internal citations omitted)). The burden on the university was minimal because "the administration already has all the resources it needs to facilitate cross-examination and knows how to oversee the process." *Id*. Finally, the university had a legitimate interest in "avoiding procedures that may subject an alleged victim to further harm or harassment." *Id*. at 583. We reasoned that these interests could be accommodated, but did not justify denying cross-examination altogether. *Id*.

In *Baum*, we did not detail exactly what form of cross-examination is required, beyond its being in person and in front of the factfinder. *Id*. at 583. We did, however, give extensive justifications that can help give definition to the constitutional minimum. First, cross-examination allows the defendant (in this case, Doe) to "take[] aim at credibility" and "probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Id*. at 582 (first quoting *Doe v. Univ. of Cincinnati*, 872 F.3d at 401). Second, it allows the factfinder to "observe the witness's demeanor under . . . questioning." *Id*. It follows, then, that the form of cross-examination required must allow for the defendant to probe the claimant's credibility and for the factfinder to observe the witness's demeanor under questioning. *15

## 2.

Throughout his complaint, Doe references the impact that the questions Roe 1 did not answer would have on "[r]easonable jurors." *See*, *e.g.*, R.22, Appellant's Br., 22. Despite Doe's characterization, the issue here is not whether answers to the questions to which Roe 1 did not respond would have impacted a reasonable juror's decision. *Univ. of Cincinnati*, 872 F.3d at 400 ("Review under *Mathews* asks only whether John Doe had an opportunity to respond, explain, and defend, not whether a jury could constitutionally convict him using the same procedures." (internal quotations omitted)). The issue is whether the University's procedures comported with the due process clause.[3] *Id*. To determine this, we examine whether the cross-examination afforded to Doe achieved the twin aims of *Baum*, and whether *Mathews* balancing supports a finding that the university was required to force Roe I to answer every question posed. We hold that the due process afforded to Doe throughout his three-day hearing, including extensive in person cross-examination of the claimants by his attorney, was more than sufficient to satisfy *Baum*, and that *Mathews* does not call for uncircumscribed cross-examination.

3 Doe also argues on appeal that the district court "disregarded *Baum*'s requirement that the court draw 'all reasonable inferences in' Doe's 'favor' and thereupon reject Appellee's motion to dismiss if Doe's claim was 'at all plausible (beyond a wing and a prayer).'" R. 22, Appellant's Br., 10. Rather than being a dictate of *Baum*, this is the standard by which the district court must review motions to dismiss under Rule 12(b)(6). FED. R. CIV. P. 12(b)(6). Because this court reviews denials of these motions de novo, we need not ask specifically whether the district court followed the correct standard and instead will look at the evidence with fresh eyes to determine whether, after drawing all inferences in Doe's favor, he plausibly stated a claim for relief. *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) ("This court reviews *de novo* a district court's dismissal of a complaint for failure to state a claim.")

Doe was given an in person hearing that took place over the course of three days. Roe 1 and Roe 2 participated in the hearing, and both sides presented evidence and testimony. Doe had the opportunity to cross-examine both women through his counsel. In his complaint,[4] Doe alleges that

4 Because the district judge did not permit Doe to amend his complaint a second time, and we affirm that ruling, the complaint properly before this court is the First Amended Complaint.

The Resolution Officer permitted Jane Roe 1 to refuse to answer questions on cross-examination, without penalty or negative inference as a result.

The Resolution Officer denied John Doe the opportunity to ask relevant questions on cross-examination through his counsel.

16  *16  DE32, First Am. Compl., Page ID 736. Nowhere in *Baum*, *University of Cincinnati*, or

*Cummins* does this court suggest that the accused in a university disciplinary proceeding is entitled to unlimited questioning of the alleged victims.[5] They are entitled to "some form of cross-examination" that allows for a fact-finder to more accurately make a determination of credibility and to witness the claimant's demeanor on the stand. *Baum*, 903 F.3d at 582. Roe 1 and Roe 2 submitted to in person cross-examination where Doe could probe their credibility; Doe's only complaint is that they were not forced to answer every single question that his attorney posed to them. Throughout the rest of the time that Roe 1 and Roe 2 were on the stand, the RO was able to watch their demeanor, both during testimony and in response to cross-examination, and Doe's attorney was able, with each witness, to "probe [her stories] to test her memory, intelligence, or potential ulterior motives." *Id.* at 582.

5 It is also worth noting that even in a full criminal trial the Supreme Court has recognized the importance of protecting victims of sexual violence from harassment on the stand. *See Michigan v. Lucas*, 500 U.S. 145, 149-50 (1991).

To follow Doe's reasoning would be an expansion of *Baum*'s mandate for a circumscribed form of cross-examination and would open up witnesses to potential harassment at the hands of their accusers or their accusers' attorneys. Doe's complaint does not plausibly suggest that the CHM's procedure fell short of the rule laid out in *Baum*.

In addition, Doe's claim fails the *Mathews* test. First, we examine Doe's interests. It is undisputed that Doe has significant interests at stake. They include the completion of his degree, protecting his reputation and personal relationships, and potential harm to future education and employment. DE32, First Am. Compl., Page ID 761-62; *see also Baum*, 903 F.3d at 582. Second, we look at the risk of an erroneous deprivation of the current procedures, and the probative value of additional procedures. *Mathews*, 424 U.S. at 335.

As discussed above, the complainants in Doe's hearing were cross-examined by Doe's attorney in front of a neutral factfinder over the course of a three-day hearing where Doe was also permitted to present evidence. Forcing the claimants to answer two additional categories of questions over the entire course of their cross-examination does not significantly add to the fact-finder's ability to test their credibility. Finally, the court must consider the governmental interests involved. *Mathews,* *17 424 U.S. at 335. Requiring claimants to answer every question posed by the accused's attorney would not pose a significant administrative burden to the university, given that the procedures for an in person hearing and cross-examination are already in place. However, this court has also discussed the university's interests in protecting victims of alleged sexual assault while on the stand. *See, e.g., University of Cincinnati,* 872 F.3d at 403; *Baum,* 903 F.3d at 583. Forcing claimants to answer all questions could go against this interest. Even in criminal trials, we do not expose victims of sexual assault to harassment in the form of unlimited cross-examination, and we will not unnecessarily do so in university proceedings. On balance, while Doe has significant interests at stake, the additional safeguards proposed would not improve the proceedings. This fact, combined with the school's strong interest in protecting the alleged victims, lead us to conclude that Doe has not met the requirements of the *Mathews* test.

Because the lengthy hearing, complete with in person cross-examination, gave the RO ample opportunity to judge credibility and view the witness's demeanor, and any probative value of forcing them to answer every question is outweighed by the university's interests, we affirm the district court's grant of the defendants' motion to dismiss.

IV.

For these reasons, we affirm both the district court's denial of Doe's motion to amend his complaint a second time and its grant of the defendants' motion to dismiss for failure to state a claim. *18

# CONCURRENCE

NALBANDIAN, Circuit Judge, concurring. I concur with the majority's disposition of this case. But I write separately to emphasize a few points of disagreement.

First, although I agree with the majority's resolution, I think this is a much closer case than the majority implies. We have, of course, decided a series of cases dealing with the procedural protections afforded to students accused of misconduct. And based on what we've said, several facts here suggest that Doe's procedural protections must be at their apex. For one thing, Doe was accused of *criminal* wrongdoing rather than mere academic underperformance. "And where the deprivation is based on disciplinary misconduct, rather than academic performance, 'we conduct a more searching inquiry.'" *Doe v. Univ. of Cincinnati,* 872 F.3d 393, 400 (6th Cir. 2017) (quoting *Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 634 (6th Cir. 2005)).

For another, the accusation wasn't just of generic criminal wrongdoing. Doe was accused of, and found by a preponderance of the evidence to have committed, sexual assault and other crimes. The nature of this particular accusation heightens Doe's private interest and thus the procedural protections to which due process entitles him. Indeed, "[t]ime and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct." *Doe v. Baum,* 903 F.3d 575, 582 (6th Cir. 2018). That's because "[b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life." *Id.* Such an accusation can have "a substantial lasting impact on appellants' personal lives, educational and employment opportunities,

and reputations in the community." *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). So it's not just that Roe I and Roe II accused Doe of a crime. They accused him of serious sex crimes. This entitled Doe to an extra layer of procedural protection. *See Univ. of Cincinnati*, 872 F.3d at 400.

And, not surprisingly, Doe faced the most serious sanction a school can impose—expulsion. And "[l]onger suspensions or expulsions . . . may require more formal procedures." *Goss v. Lopez*, 419 U.S. 565, 584 (1975). After all, "[t]he more serious the deprivation, the more *19 demanding the process." *Univ. of Cincinnati*, 872 F.3d at 400; *see also Cummins*, 662 F. App'x at 446 (student who was placed on probation had a "diminished" interest under *Mathews* compared to suspended student). This is especially so in sexual misconduct cases. In such cases, "witness questioning may be particularly relevant to disciplinary cases involving claims of alleged sexual assault or harassment" because " [p]erpetrators often act in private, leaving the decision maker little choice but to weigh the alleged victim's word against that of the accused." *Univ. of Cincinnati*, 872 F.3d at 406. In other words, Doe's case turned on the university's assessment of two witnesses' credibility. And we've called these credibility contests "the most serious of cases." *Id*. at 401 (quoting *Flaim*, 418 F.3d at 636).

In short, Doe was accused of serious sexual misconduct rising to the level of a felony, and the university's resolution of the case turned on its assessment of witness credibility. It's hard to imagine a combination of facts entitling an accused to more robust process than this one. And in circumstances like these, where due process must be at its strongest, we should take care not to let an accuser's reluctance negate an accused student's right to cross-examination.

That's not to say that's what happened here. But recall why cross-examination is so important in cases like this. We've called cross-examination the greatest legal engine ever invented for the discovery of truth. *Baum*, 903 F.3d at 581. It "allow[s] the accused to identify inconsistencies in the other side's story, [and] also gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted." *Id*. And even more than this, it enables the accused to "probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Id*. at 582.

The problem is that, at some level, an accuser in a credibility contest involving allegations of a sexual crime can defeat meaningful cross-examination by refusing to answer questions that go to the heart and substance of the allegation. An accused can't identify inconsistencies in an accuser's story or probe her memory of the events if the accuser simply refuses to answer questions. The factfinder will not be able to evaluate a witness's credibility *as she discusses the incriminating event* if she refuses in the first place *20 to discuss that event. *20

That all seems uncontroversial. If an accuser alleging a sexual crime refuses to appear at the hearing, it would violate due process for the university to sanction the student without giving him the right to cross-examine his accuser. Indeed, that's what happened in *University of Cincinnati*. 872 F.3d at 396-98. It also seems certain that a university violates due process by expelling a student for sexual misconduct in a credibility contest if his accuser appears at a *Baum* hearing but refuses to answer *any* questions on cross-examination. So the threshold for constitutionally sufficient cross-examination is somewhere between an accuser answering *no* questions and an accuser answering *every* question. Wherever that needle falls depends on the facts a specific case presents. And given the circumstances of Doe's

case here, which combine to maximize the amount of process to which Doe is entitled, the threshold is necessarily much closer to the latter end.

Of course, we've never said an accused must receive unfettered cross-examination. But we can't answer whether a university vindicates an accused student's cross-examination right simply by looking at the *number* of questions an accuser was allowed not to answer. *See Doe v. Ohio St. Univ.*, 311 F. Supp. 3d 881, 889-93 (S.D. Ohio 2018). And that's where I part ways with the majority. *See ante* at 12-13. It may be the case that only a handful of questions or "categories" of questions can adequately test the veracity of the accuser's account. Perhaps there was only a single act of offending conduct, or the episode happened quickly. In that case, it's irrelevant if the accuser answers hundreds of questions on collateral matters. If the accuser's refusal to answer questions prevents the accused from probing her memory of the incriminating event or her consistency in recounting it, the cross-examination right is denied. *See Baum*, 903 F.3d at 582-83. It doesn't matter that the accuser only refused to answer a small fraction of the accused's questions.

So whether an accuser's refusal to answer questions gives rise to a due process violation depends in part on a combination of quantity *and* quality, on type and amount. The inquiry isn't categorical. It is, as a procedural due process question, fact intensive. And in university disciplinary proceedings, it's multidimensional. So it not only depends on the nature and number of questions the accuser refused to answer. It also depends on the nature of the accusation—what kind of conduct is alleged?—the nature of the proof—is it a credibility *21 contest?—and the nature of the penalty—is the student facing expulsion? And it may also depend on the nature of the specific questions that went unanswered. For instance, one of the questions that Doe is now claiming he was not permitted to ask goes both to the substantive truth of Roe 1's allegations (if she removed her own dress, she communicated

consent) and her credibility as a witness (if she communicated consent, she either doesn't accurately remember the events or is lying about them). So it was doubly probative, Doe had a greater interest in having it answered, and it would've imposed a very small burden on the University to require Roe I to answer.[6] All that said, I struggle to imagine a scenario where the constitutional floor is higher than it is here. But regardless, I believe that the University should prevail. Despite Doe's entitlement to robust procedure, the University afforded him enough process to satisfy the Constitution (at least as Doe has pled this case). It gave him a multi-day hearing where he presented evidence and cross-examined his accusers.

---

[6] I don't mean to suggest that the only remedy available to a university when an accuser in a credibility contest refuses to answer questions on cross-examination is dismissing the charges against the accused student. It may be that the university can remedy the unanswered questions by striking the testimony of the accuser, as the criminal context sometimes allows. *See, e.g.*, *United States v. Stephens*, 492 F.2d 1367, 1375 (6th Cir. 1974) ("If the answer sought would have been so closely related to the crime for which the defendants were being tried, that the defendants may be substantially prejudiced by being deprived of their right to test the truth of the witness' direct testimony, the entire testimony of the witness should be stricken."). Likewise, the facts of a case may suggest that the university remedied a witness's silence by explicitly drawing a negative credibility inference during its factfinding. --------

But more specifically, for the reasons given by the majority, I do not think that the record plainly establishes what questions Doe wanted to ask and whether he tried to ask them and was denied. Indeed, Doe's effort to amend his complaint to include the questions to which he apparently didn't receive a response is unsuccessful for a reason

unrelated to its merits: it was untimely. And Doe's operative complaint says nothing about the form or content of the unanswered questions. It says only that "[t]he Resolution Officer permitted Jane Roe 1 to refuse to answer questions on cross-examination by John Doe's counsel, without penalty and without a negative inference as a result of her refusal to answer." But this threadbare allegation by itself doesn't suffice when the University gave Doe a lengthy hearing with extensive cross-examination. As I noted above, even a small number of unanswered questions can sometimes *22 grow into a due process violation. It depends on a combination of quality and quantity. But knowing little about the specific questions Roe I apparently didn't answer tells us nothing about whether the questions probe anything relevant, like the claim's truth or the accuser's consistency in recounting it. That matters in a due process inquiry.

And that's also why the hearing transcript would be helpful. Citing *Doe v. Miami University*, 882 F.3d 579 (6th Cir. 2018), the majority correctly says a university must provide an accused student with the evidence against him. But it then says there's "no indication" this includes a hearing transcript. I'm not so sure. And I don't think that follows from *Miami University*. In that case we said the Constitution requires "that the student be provided the evidence against him." *Id*. at 603. And we said Doe alleged a cognizable due process claim because there was certain evidence the university used "*to adjudicate John's claim*, and John was not provided this evidence." *Id*. (emphasis added). So *Miami University* holds that

the Constitution requires the university give to the accused the evidence it uses in adjudicating his claims.

It's unclear here if Michigan State relied on the *Baum* hearing transcript post-hoc to adjudicate Doe's claim. If it did, Doe likely has a due process entitlement to it. *See id*. But Doe never asked for the transcript from his hearing. So it doesn't look like Michigan State ever "refused to provide" it. *Id*. And the allegation about the missing transcript doesn't appear until Doe's second amended complaint, which isn't the operative complaint on appeal. Thus, Doe's missing transcript cannot carry him past Michigan State's motion to dismiss.

\* \* \*

Doe's case is a close one. But ultimately, on this record, Michigan State didn't violate his due process rights. That's not to say, however, that a university can never violate a student's due process rights by limiting—though not denying—cross-examination. And to be fair, I don't read the majority opinion as saying as much. Instead, I read it as saying that this particular combination of number and content of unanswered questions wasn't enough to make out a due process violation. Thus, nothing in the majority precludes such a violation just because the number of unanswered questions was small. The inquiry is fact intensive. And although Doe's *23 circumstances here entitle him to the most robust process, Doe's complaint and this record don't state a due process claim.



# Doe v. Ohio State Univ.

239 F. Supp. 3d 1048 (S.D. Ohio 2017)

Decided Mar 10, 2017

Case No.: 2:16–cv–171

03-10-2017

John DOE, Plaintiff, v. The OHIO STATE UNIVERSITY, et al., Defendants.

Eric John Rosenberg, The Rosenberg Law Office LPA, Granville, OH, Tracy L. Turner, Law Office of Tracy L. Turner, Columbus, OH, for Plaintiff. Christina Louise Corl, Plunkett Cooney, Reid T. Caryer, Ohio Attorney General's Office, Columbus, OH, for Defendants.

GEORGE C. SMITH, JUDGE, UNITED STATES DISTRICT COURT

1055*1055

Eric John Rosenberg, The Rosenberg Law Office LPA, Granville, OH, Tracy L. Turner, Law Office of Tracy L. Turner, Columbus, OH, for Plaintiff.

Christina Louise Corl, Plunkett Cooney, Reid T. Caryer, Ohio Attorney General's Office, Columbus, OH, for Defendants.

## OPINION AND ORDER

GEORGE C. SMITH, JUDGE, UNITED STATES DISTRICT COURT

Plaintiff John Doe initiated this case against Defendants The Ohio State University ("OSU"), Javaune Adams–Gaston, Kelly B. Smith, J.D., Matthew Page, and Natalie Spiert, (collectively "Individual Defendants"). Plaintiff alleges that he has been harmed by false allegations of sexual misconduct and has brought the following claims

against the Defendants: violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.* , violations of the Fifth and Fourteenth Amendments to the Ohio and United States Constitutions under 42 U.S.C. § 1983, defamation, and intentional infliction of emotional distress. (Doc. 36, Pl.'s 3rd Am. Compl. (hereinafter "Am. Compl.") ¶ 1). Plaintiff seeks a declaratory judgment, money damages, and injunctive relief. This matter is currently before the Court on Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 37). The matter is now ripe for review. For the reasons that follow, Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**. Defendants' have also moved to strike the declaration of Joshua Engel which has been fully briefed. The Motion to Strike is hereby **DENIED**.

## I. BACKGROUND

### A. The Parties

Plaintiff John Doe graduated from high school with honors, then obtained an associate degree in nursing from the University 1056*1056 of Toledo and became a registered nurse ("RN") in 2009. (Doc. 36, Am. Compl. ¶ 45). In 2011, John Doe enrolled at OSU to complete his Bachelor's degree with the goal of attending medical school after graduation. He also worked as an RN at OSU's Wexner Medical Center ("OSUWMC"). (*Id.* at ¶ 46).

Defendant OSU is a public university. OSU receives federal financial assistance and therefore is subject to Title IX. (*Id.* at ¶ 153). Defendant Dr. Javaune Adams–Gaston is OSU's Vice President

casetext

for Student Life. Defendant Kelly B. Smith is an Assistant Director of OSU's Office of Student Life. Defendant Matthew B. Page is an Assistant Director of OSU's Office of Student Life. Defendant Natalie Spiert is OSU's Student Advocacy Program Coordinator. OSU's Office of Student Life is responsible for enforcing OSU's Code of Student Conduct ("Code of Conduct"). (*Id.* at ¶ 71, Ex. Q).

## B. OSU's Code of Student Conduct

Section 3335–23–02 of the Code of Conduct (effective date June 18, 2012) defines the jurisdiction and states that it applies to:

The on-campus conduct of all students and registered student organizations, including conduct using university computing or network resources. The code also applied to the off-campus conduct of students and registered student organizations in direct connection with:

A. Academic course requirements or any credit-bearing experiences, such as internships, field trips, study abroad, or student teaching;

B. Any activity supporting pursuit of a degree, such as research at another institution or a professional practice assignment;

C. Any activity sponsored, conducted, or authorized by the university or by registered student organizations;

D. Any activity that causes substantial destruction of property belonging to the university or members of the university community, or causes or threatens serious harm to the safety or security of members of the university community; or

E. Any activity in which a police report has been filed, a summons or indictment has been issued, or an arrest has occurred for a crime of violence.

(Doc. 36–2, Am. Compl. Ex. R ("Code of Conduct") at 1).

The Code of Conduct sets forth a number of actions that constitute prohibited conduct, including sexual misconduct in section 3335–23–04. (*Id.* at 2–6). With respect to sexual misconduct the Code of Conduct states:

**C. Sexual Misconduct** Physical contact or other non-physical conduct of a sexual nature in the absence of clear, knowing and voluntary consent, including but not limited to:

1. Non-consensual sexual intercourse, defined as any sexual penetration (anal, oral, or vaginal), however slight, with any body part or object by any person upon any person without consent. Non-consensual sexual contact, defined as any intentional sexual touching, with any body part or object by any person upon any person without consent.

2. Sexual exploitation, defined as taking non-consensual, unjust or abusive sexual advantage of another. Examples include, but are not limited to, prostituting another student, non-consensual video or audio-taping of sexual activity, going beyond the boundaries of consent (such as knowingly allowing another to surreptitiously watch otherwise consensual sexual

1057*1057

activity), engaging in non-consensual voyeurism, and knowingly transmitting or exposing another person to a sexually transmitted infection (STI) without the knowledge of the person.

3. Sexual harassment, as defined in applicable university policy.

4. Indecent exposure, defined as the exposure of the private or intimate parts of the body in a lewd manner in public or in private premises when the accused may be readily observed.

For the purposes of this rule, consent shall be defined as the act of knowingly and affirmatively agreeing to engage in a sexual activity. Consent must be voluntary. An individual cannot consent who is substantially impaired by any drug or intoxicant; or who has been compelled by force, threat of force, or deception; or who is unaware that the act is being committed; or whose ability to consent is impaired because of a mental or physical condition; or who is coerced by supervisory or disciplinary authority. Consent may be withdrawn at any time. Prior sexual activity or relationship does not, in and of itself, constitute consent.

(*Id.* at 3–4).

The Code of Conduct sets forth the following with respect to filing a complaint for violation of the Code of Conduct and the hearing procedure:

3

**3335–23–06 Filing of complaint and initiation of charges**

A written complaint alleging a violation of the code of student conduct should be filed with the university as soon as practicable following the discovery of the alleged violation. Absent extraordinary circumstances, the written complaint must be filed within six (6) months for cases of non-academic misconduct (3335–23–04 (B–Q)), and one (1) month for academic misconduct (3335–23–04 (A)), from the date upon which a university official becomes aware of the alleged violation and identifies the student(s) who allegedly committed the violation. Absent extraordinary circumstances, the university must initiate charges, if any, within one (1) year of the filing of the complaint.

**3335–23–07 Notice of charges**

A. **Notification** Students shall be notified of university charges in writing, unless a more effective form of notification is deemed appropriate. Charges may be presented in person, by placement in a student's residence hall mailbox, by email to the accused student's official university email address (which may direct the student to view the notice on a secure website) or by mail to the accused student's local or permanent address on file in the office of the university registrar.

B. **Current address** All students are required to maintain an accurate and current local and permanent address with the University Registrar.

C. **Meeting with university official** Following notification of charges, students are strongly encouraged to and shall be afforded the opportunity to meet with a university official for the purpose of explaining the university student conduct process and discussion of the process.

D. **Failure to respond** Failure of the accused student to respond to the initiation of charges or schedule a preliminary meeting shall in no way prevent the university from scheduling and conducting a hearing in the absence of the accused student.

**3335–23–08 Administrative decision**

In all cases, a student charged with one or more violations of the code of student conduct has the right to a hearing. However, in a case where a charged student

1058*1058

admits to such violation(s) in writing, the student may request in writing to have a decision as to appropriate action made administratively by a hearing officer rather than have the charges referred to a hearing officer or board for a hearing. In such situations, the student waives the right to a hearing and the related procedural guarantees provided by a hearing officer or board hearing. Administrative decisions in academic misconduct cases involving graduate students are to be made in consultation with the graduate school. Following an administrative decision, the student retains the right to request an appeal of the original decision, but may do so only upon the ground that the sanction is grossly disproportionate to the violation committed.

(*Id.* at 6–7). Additionally, the Code of Conduct established the Hearing Procedures and are as follows:

**3335–23–09 Notice of hearing & request for postponement**

A. **Notice** If a hearing is to be held, written notification will be provided. The notice may be hand delivered; placed into a student's residence hall mailbox; sent by email to the accused student's official university email address, which may direct the student to view the notice on a secure website; or mailed to the last known address of the student, by first class mail, no fewer than ten (10) calendar days prior to the hearing. Unless already provided to the student, the notification will include the charge(s), date, time, and location of the hearing, the designated hearing officer or board, a statement of the student's rights, and information on the hearing procedures.

B. **Postponement** The accused student may request a postponement for reasonable cause or a separate hearing from other accused persons. A request for a postponement for reasonable cause must be made in writing, include supporting rationale, and be received by the person sending the hearing notification at least two (2) business days before the scheduled hearing.

**3335–23–10 Hearing procedures**

Although the procedural requirements are not as formal as those existing in criminal or civil courts of law, to ensure fairness, the following procedures will apply and, unless already provided to the student, be included within the hearing notice:

A. **Attendance** Attendance at hearings is limited to those directly involved or those requested by the hearing officer or board to attend. The hearing officer or board will take reasonable measures to assure an orderly hearing, including removal of persons who impede or disrupt proceedings.

B. **Advisor** The accused student may have an advisor throughout the disciplinary process. The advisor may only counsel the student and may not actively participate in the disciplinary process, unless clarification is needed as determined by the hearing officer or board.

C. **Written statements & witnesses** The accused may: submit a written statement invite relevant factual witnesses to attend, invite character witnesses to submit written statements, [sic] ask questions of witnesses called by others, and will be notified of potential witnesses to be called. The accused must submit a list of potential witnesses to the hearing officer at least two (2) business days prior to the hearing. The university may present witnesses as well as question those presented by the accused.

D. **Witness absence** The hearing officer or board coordinator may allow written statements if, for good reason, a fact witness cannot attend the hearing.

E. **Consultants** In cases requiring special expertise, the board coordinator may appoint individuals with appropriate

1059*1059

expertise to serve as consultants to the board. The consultants may be present and provide information as called upon during the hearing but will not vote.

F. **Standard of evidence** A student will only be found in violation if a preponderance of evidence supports the charges. In the event of a tie, the board will continue to deliberate. If after the board determines that exhaustive deliberations have occurred and a majority decision is not reached, the student will be found not in violation.

G. In cases where prompt review is essential (e.g., when graduation or the end of the academic year is imminent) the accused may be offered the option of an expedited administrative review consisting of an administrative decision or administrative hearing. The accused student may decline such expedited review without the expectation that the process can be completed on an expedited timeline.

(*Id.* at 8).

## C. The Alleged Misconduct

John Doe met Jane Doe on September 2, 2012, when she was admitted to the OSUWMC Emergency Room as a patient. Jane Doe was brought to the ER by ambulance because she had fallen and injured her knee as a result of being intoxicated from drinking seven to eight alcoholic beverages. John Doe was randomly assigned as her nurse. (Doc. 36, Am. Compl. ¶ 47; Doc. 36–1, Am. Compl. Ex. H, "Case Report").

Jane Doe's friend, who was also intoxicated, accompanied her to the ER. (Doc. 36, Am. Compl. at ¶ 48). Jane Doe and her friend were talkative and flirtatious with John Doe, but he remained professional at all times. (*Id.* ). Jane Doe and her friend tried to give John Doe their phone numbers,

but he told them he could not take the numbers. (*Id.* ). Jane Doe and her friend wrote their phone numbers on the white board in the hospital, but John Doe erased the numbers. (*Id.* ). When Jane Doe was released, John Doe arranged for transportation and escorted her from the ER in a wheelchair, as he typically arranged for transportation for intoxicated patients. (*Id.* at ¶ 49).

On the next day, September 3, 2012 at 3:27 pm, Jane Doe sent John Doe a "friend request" on Facebook. (*Id.* at ¶ 50, Ex. I). John Doe accepted the request. (*Id.* ). Jane Doe obtained John Doe's cell phone number from his Facebook page and texted him.[1] (*Id.* ). Jane Doe and John Doe texted with one another and eventually went on their first date on or about September 22, 2012. (*Id.* at ¶ 52). John Doe cooked dinner for Jane Doe at his apartment. (*Id.* ). Both John and Jane Doe consumed alcohol during the evening. (*Id.* ). Two of John Doe's roommates were also present at the apartment on the evening of Jane and John Doe's first date. (*Id.* ). Although John Doe has no recollection, either because he was incapacitated or because the sexual encounter never occurred, Jane Doe asserts that they engaged in physical contact, which included John Doe performing oral sex on Jane Doe. (*Id.* ). Jane Doe testified that she told John Doe that she did not want him to perform oral sex on her because she was having her period. (*Id.* ). Jane Doe testified that John Doe told her he did not care, so the oral sex continued without further objection. (*Id.* at 52 (citing Doc. 36–2, Am. Compl. Ex. K)).

[1] There is some dispute as to who contacted whom first. OSUWMC's report noted that John Doe first texted Jane Doe. (*See* Doc. 36–1, Am. Compl. Ex. H at 2).

John and Jane Doe continued dating and were involved in a sexual relationship. (*Id.* at ¶ 53). John Doe attached a Valentine's card that Jane Doe 1060 gave him in 2013 to *1060 illustrate their consensual relationship, the card read:

[John Doe],

Thank you for being there for me every single day. I appreciate you so very much. I love that I can tell you anything and know that you will understand me. You're my best friend. Happy Valentine's Day!

Love, [Jane Doe]

xoxo

(*Id.* at ¶ 55, Ex. L).

John and Jane Doe continued dating until the end of the school year, or spring of 2013, because Jane Doe was returning to New Jersey for the summer and John Doe did not want to continue the relationship. (*Id.* at ¶ 57). Even though John Doe had ended the relationship, Jane Doe continued to contact John Doe by phone, text, and Facetime. (*Id.* at ¶ 57).

When Jane Doe returned to school in the fall of 2013, she and John Doe resumed a relationship. (*Id.* at ¶ 58). They were friends who had an ongoing consensual, sexual relationship, but they were not "dating." (*Id.* ). Jane Doe testified at the hearing that she most frequently initiated contact in their relationship, as the following text messages demonstrate:

<u>September 14, 2013</u>

Jane Doe: What are you going to do for your birthday?

John Doe: Nothing:(... I'm being forced to work till 11 on Monday morning, then I have a mandatory meeting and then hit bed, wake up for a lab?, then back to bed to hopefully get up early Tuesday to study for two exams ... Not much of a birthday due to work How's your day going?

Jane Doe: What about Sunday or Tuesday? ? Please [John]

John Doe: Tomorrow I work and that's the 16+ hour shift

Tuesday should work :)

Jane Doe: Yay!!Tuesday night I'll bring you a cake and celebrate with you!

<u>November 26, 2013</u>

Jane Doe You didn't answer my snap :(

Jane Doe: /

John Doe: O yeah, the naked pictures

<u>December 17, 2013</u>

Jane Doe: You think I'm ugly so your not looking at my snaps? ? ? :(

Jane Doe: Argh

Jane Doe: What. Is. Up.

Jane Doe: Are you still working? ? ?...

Jane Doe: This is why I got mad at you last time

(*Id.*). John and Jane Doe continued to communicate and have a sexual relationship, they often met up in the evenings after one or the other or both had consumed alcohol. (*Id.* at ¶ 59). Jane Doe sent John Doe naked photographs of her vagina and breasts on May 22, 2013, November 9, 2013, and December 18, 2013. (*Id.* at ¶ 60, Ex. N). Additionally, she sent him a text message on December 26, 2013 that read:

> Jane Doe: How's it going stud
>
> John Doe Hi?
>
> Jane Doe: When do you get back? Can we get drunk and be totally freaky? Will you fuck me stupid when I go back to Ohio

(*Id.* at ¶ 60, Ex. P).[2]

> [2] Contrary to her testimony that she and John Doe had no contact in December 2013, Jane Doe was communicating with John Doe throughout the fall semester of 2013, as evidenced by the text messages. (Doc. 36, Am. Compl. ¶ 60, Ex. P).

Their consensual sexual relationship continued throughout the 2013–2014 school year, although their interactions decreased in early 2014 because Jane Doe started dating someone else. (*Id.* at ¶ 60). On April 21, 2014, John Doe invited Jane 1061 Doe to his *1061 apartment. Jane told her new boyfriend that she was going to visit John Doe. (*Id.* at ¶ 61). Upon Jane's arrival, they talked and then engaged in sexual intercourse. (*Id.* at ¶ 62). Jane Doe then napped and John Doe watched television. (*Id.*). After Jane Doe woke up, they continued to hang out most of the day, drinking alcohol and watching movies. (*Id.*). During this visit, Jane and John Doe took a shower together and had a sexual encounter in the shower. (*Id.* at ¶ 63). At varying times, Jane Doe has described the sexual encounter in the shower as "rape," "the motion of sex" and "[sex]."[3] (*Id.*). John Doe has no recollection of taking a shower with Jane Doe. (*Id.*).

> [3] The original text in the Amended Complaint reads "sExhibit" but the Court assumes that an unfortunate replace-all error turned instances of "sex." to "sExhibit" based on a similar instance of "sExhibit" in paragraph 56 of the Amended Complaint.

At the end of the day and after the effects of the alcohol wore off, Jane Doe shared with John Doe that she loved him, and did not love her boyfriend. (*Id.* at ¶ 64). Jane Doe asked John Doe why he was not doing his part to make the relationship work and why he did not want to date her. (*Id.*). John Doe responded that he cared about her, but was not in a position to have a committed relationship. (*Id.*). He then told Jane Doe that they should not see each other again. (*Id.*). She was upset and expressed regret and concern that she had been with John Doe all day without checking in with her boyfriend. (*Id.*). After Jane Doe left, she contacted John Doe to ask if they could talk the next day, but John Doe refused to communicate with her or see her again because he did not want to mislead her. (*Id.* at ¶ 65).

John Doe graduated from OSU with a Bachelor's degree in Biology in May 2014. (*Id.* at ¶ 67). After graduating, John Doe remained in Columbus, Ohio employed as a full-time RN at OSUWMC working towards his goal of attending medical school. (*Id.*). During the fall semester of 2014, John Doe took a medical terminology class at OSU, which he was eligible to take because he was an OSU employee, but he was not taking this class for credit towards a degree. (*Id.* at ¶ 68).

## D. OSU's Investigation and Discipline of John Doe

Seven months after John and Jane Doe's last date, on or about November 20, 2014, Jane Doe contacted OSUWMC to file a complaint, alleging that John Doe had sexually assaulted her during their sexual encounter in the shower at John Doe's apartment. (*Id.* at ¶ 69). John Doe was informed that a complaint had been filed against him and he

was placed on administrative leave on November 20, 2014. (*Id.* at ¶ 70). OSUWMC contacted OSU's Office of Student Life about the complaint and both organizations conducted parallel investigations into the allegations. (*Id.* ).

On December 4, 2014, John Doe received a letter from OSU's Office of Student Life that Jane Doe had filed a complaint alleging that he had violated OSU's Code of Student Conduct, specifically sexual misconduct, non-consensual sexual intercourse, endangering behavior, and non-consensual sexual contact in April 2014. (*Id.* at ¶ 71, Ex. Q). The letter directed John Doe to schedule a meeting with Defendant Smith, who was investigating the case. (*Id.* ). Defendant Smith instructed John Doe to be prepared "to discuss the incidents involving [Jane Doe] since fall semester 2014 and in particular an incident from April 2014...." (*Id.* at ¶ 71). Moreover, the December 2, 2014 letter directed John Doe to have no contact with Jane Doe, as follows: "I am directing you to 1062 have no contact of any sort with [Jane *1062 Doe]. This includes any attempted contact through third parties or electronic means (text, phone, etc.) or through social media (Facebook, Twitter, Instagram, etc.). Failure to follow this directive may result in immediate disciplinary action including interim suspension." (Doc. 36–2, Am. Compl. Ex. Q).

John Doe raised several question regarding the Office of Student Life investigation, including whether they had jurisdiction to investigate because he was no longer a student, the incident did not happen on campus and the complaint was not timely, filed seven months after the alleged incident. (Doc. 36, Am. Compl. at ¶ 74).[4]

> [4] Ohio State's Student Code of Conduct, Section 3335–23–06, provides that a written complaint must be filed as soon as practicable, but not more than six months after the alleged misconduct, unless extraordinary circumstances exist. (Doc. 36–2, Code of Conduct at 7). Jane Doe's

Complaint was filed seven months after the alleged April 2014 incident. (Doc. 36, Am. Compl. at ¶¶ 61, 74).

On December 4, 2014, Defendant Smith met with Jane Doe and her advisor, Defendant Spiert, OSU's Student Advocacy Program Coordinator. (*Id.* at 77).[5] On December 18, 2014, John Doe met with Defendant Smith and Brandon Gibbs, the Human Resources representative conducting the investigation on behalf of OSUWMC and cooperated with the investigation into Jane Doe's allegations. (*Id.* at 76, Ex. T).

> [5] Plaintiff generally asserts that Defendant Spiert is biased toward male students and considers them to be sexual predators. (Doc. 36, Am. Compl. ¶ 77). Ohio State provides female victims of sexual assault (such as Jane Doe) with trained advocates (such as Defendant Spiert) to serve as their advisors during Ohio State disciplinary proceedings while male students are not provided advisors, in particular advisors who are employed full-time by OSU to serve exclusively as Sexual Violence Support Coordinators. (*Id.* at 78 (citing http://www.titleix.osu.edu/sidebar-resources/response/resources.html; http://sce.osu.edu/about-us.)).

Defendant Smith conducted follow-up meetings with Jane Doe and Ms. Spiert on January 16, 2015, and again on February 26, 2015, as well as interviewing Jane Doe's friend on January 27, 2015. (*Id.* at ¶ 79). No other interviews were conducted during the investigation. (*Id.* ).

On Friday, February 6, 2015, Defendant Smith sent John Doe a letter via e-mail notifying him of her determination that sufficient evidence existed to charge him under the Code of Student Conduct, and included a Charge & Process Form. (*Id.* at ¶ 83, Ex. V). The Charge & Process Form formally charged John Doe with violation of OSU's Code of Student Conduct Sections 3335–23–04(C) Sexual Misconduct; 3335–23–04(C1) Non-consensual sexual intercourse; 3335–23–04(B1) Endangering

9

Behavior; and 3335–23–04(C2) Non-consensual sexual contact. (*Id.* ). The letter further stated: "Specifically, it is alleged that on two occasions, the first around the middle of September 2012 and the second on April 21, 2014, you violated OSU's Code of Student Conduct in the following manner: Had sexual contact and intercourse with [Jane Doe] with[ ]out her affirmative and knowing consent while she was substantially impaired by alcohol consumption." (Doc. 36–3, Am. Compl. Ex. V).[6]

> [6] Although not initially alleged, Jane Doe was permitted to amend her complaint and add the additional allegation of sexual assault from their first date in 2012. (Doc. 36, Am. Compl. at ¶ 82).

The Charge & Process Form gave John Doe five days to decide to accept responsibility for the charges, or not accept responsibility and request a hearing before the University Hearing Officer or the University Conduct Board. (Doc. 36–2, Am. Compl. ¶ 84). On February 9, 2015, John *1063 Doe returned the Charge & Process Form choosing not to accept responsibility for the alleged violations and requesting a hearing before the University Conduct Board. (*Id.* at ¶ 84, Ex. V).

Additionally, Brandon Gibbs concluded his investigation relating to John Doe's employment at OSUWMC and prepared a Case Report stating that OSUWMC would adopt the findings from the University Conduct Board Hearing. (*Id.* at ¶ 85; Doc. 36–1, Case Report).

On February 19, 2015, OSU notified John Doe via email that his University Conduct Board Hearing would take place on Friday, March 6, 2015 at 8:00 a.m., and that Defendant Page would be the coordinator for the hearing. (*Id.* at ¶ 92, Ex. X). He was again notified by email on February 27, 2015, that the hearing packet for his University Conduct Board Hearing was available, notified him that new evidence had been submitted since he last reviewed the file, and stated that he could schedule a time to review the file prior to the hearing. (*Id.* at ¶ 93, Ex. Y). John Doe reviewed the file and discovered that relevant text messages between Jane Doe and her friend were not in the file and Jane Doe's cell phone records were not in the file. (*Id.* at ¶ 94). On March 5, 2015, John Doe requested a one-week continuation of the hearing because of difficulty obtaining some evidence necessary for his defense, including phone and text records to demonstrate that he and Jane Doe had been in contact between late fall 2014 through spring 2015. (*Id.* at ¶ 95). Defendant Smith denied the request as being untimely under Section 3335–23–09 of the Code of Student Conduct. (*Id.* ).

On March 6, 2015, the University Conduct Board Hearing was conducted and was recorded via an audio recorder, however John Doe was not permitted to record the hearing. (*Id.* at ¶ 96). John Doe's attorney was permitted to serve as his advisor, but was not permitted to "actively participate." (*Id.* at ¶ 96, (citing Doc. 36–2, Code of Student Conduct at 8)).

John Doe raises a number of challenges regarding the hearing process including that he was not provided a summary of the testimony of the witnesses to be used against him; that Jane Doe's friends offered hearsay testimony; that Jane Doe was permitted to present character witness testimony but that John Doe could not; and that OSU refused to submit John Doe's evidence as part of the file, which included photographs, text messages, and cards demonstrating the couple's ongoing relationship. (*Id.* at ¶¶ 99–102).

On the same day of the hearing, Defendant Page sent John Doe a letter notifying him of the final outcome of the hearing. (*Id.* at ¶ 104, Ex. CC). The Board found that he violated OSU's Code of Student Conduct Sections 3335–23–04(C), (C1), (B1) & (C2); and (b) issued the following sanction: "You are permanently dismissed from the University beginning March 6, 2015, without the opportunity to reenroll in the future. Dismissal will be permanently noted on your academic transcript. You may not enter or be present on any

OSU campus or property." (*Id.* ). Additionally, on the same day, John Doe was forced to resign from his position at OSUWMC in an effort to save his career. (*Id.* at ¶ 97). Specifically, OSU notified John Doe that he could voluntarily resign or face termination and charges with the nursing board. (*Id.* , Ex. AA).

Following the hearing, John Doe repeatedly requested that OSU provide him a copy of the audio recording of the March 6, 2015 hearing, but OSU refused. (*Id.* at 98).

On March 12, 2015, John Doe sent a notice of appeal, permitted under the Code of Student Conduct, to Defendant Dr. Javaune Adams–Gaston, OSU's Vice President *1064 for Student Life. (*Id.* at ¶ 115, Ex. S). John Doe's appeal alleged a number of incidents that he claimed constituted anti-male gender bias on the part of Board. (*Id.* ). On April 7, 2015, Dr. Adams–Gaston notified John Doe that his appeal was rejected with no explanation. (*Id.* at ¶ 116, Ex. EE).

Plaintiff initiated this case on February 24, 2016, seeking declaratory judgment and damages on his claims for violations of Title IX, including hostile environment sexual harassment and/or discrimination, deliberate indifference, and erroneous outcome; violation of the procedural and substantive component of the Due Process Clause of the Fourteenth Amendment, as well as violation of the equal protection clause of the Fourteenth Amendment. Plaintiff has filed three amended complaints. (*See* Docs. 3, 20, and 36).[7]

[7] In addition to the aforementioned factual allegations, many assertions in Plaintiff's Complaint include claims of gender bias and how Plaintiff generally believes gender bias impacted the decisions of OSU.

## II. STANDARD OF REVIEW

Defendants bring this motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiff has failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly* , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC* , 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh* , 487 F.3d 471, 476 (6th Cir. 2007) ). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal* , 556 U.S. at 663, 129 S.Ct. 1937. Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint;" a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes, Inc. v. Ritz–Craft Corp of Mich., Inc.* , 491 Fed.Appx. 628, 632 (6th Cir. 2012) ; *Iqbal* , 556 U.S. at 679, 129 S.Ct. 1937.

## III. DISCUSSION

Plaintiff John Doe alleges that OSU and all the Individual Defendants violated Title IX of the Education Amendments of 1972, by allowing gender bias to motivate the hearing and disciplinary process. Plaintiff further alleges that during the disciplinary process, the Individual Plaintiffs violated his due process rights and rights under the equal protection clause. Defendants have moved to dismiss all of Plaintiff's claims under each of his theories of liability. *1065 **A. Title IX Claims**

Counts One through Three of Plaintiff's Third Amended Complaint set forth the following Title IX causes of action: (1) Violation of Title IX—Hostile Work Environment Sexual Harassment and/or Discrimination; (2) Violation of Title IX—Deliberate Indifference; (3) Violation of Title IX—Erroneous Outcome. The Court will consider each of the claims in turn.

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College* , 35 F.3d 709, 715 (2d Cir. 1994). Because OSU is an institution voluntarily participating in federal spending programs, OSU has waived its Eleventh Amendment immunity for Title IX purposes pursuant to 42 U.S.C. § 2000d–7.

Title IX was enacted to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities. Because the statutes share the same substantive goals and because Title IX mirrors the same substantive provisions of Title VII of the Civil Rights Act of 1964, courts interpret Title IX by looking to case law interpreting Title VII employment discrimination cases. *Grove City Coll. v. Bell* , 465 U.S. 555, 566, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) ; *see also Horner v. Ky. Athletic Ass'n* , 206 F.3d 685, 689–92 (6th Cir. 2000) (discussing how the United States Supreme Court has used Title VII analytical framework in cases to interpret Title IX). The Supreme Court has foreclosed disparate impact claims under Title VII. *See Alexander v. Sandoval* , 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Although Title IX prohibits intentional gender discrimination, it does not support claims of disparate impact. *Id.* (stating that "proof of intent ... is the *sine qua non* to compensatory relief for any type of Title IX violation.").

When determining whether a plaintiff was able to demonstrate that intentional gender discrimination occurred in a university disciplinary proceeding, the Sixth Circuit Court of Appeals utilizes the analytical framework provided in *Yusuf* . *See Doe v. Cummins* , 662 Fed.Appx. 437, 451–52 (6th Cir. 2016) ; *Mallory v. Ohio Univ.* , 76 Fed.Appx. 634, 638 (6th Cir. 2003). In *Yusuf* , the Second Circuit Court of Appeals found that Title IX claims arising from disciplinary hearings can generally be challenged under two categories: erroneous outcome and selective enforcement. *Yusuf* , 35 F.3d at 714–15. Under either standard, a plaintiff must show that gender bias was the source of the deprivation. *Id.* at 715 ; *Sahm v. Miami Univ.* , 110 F.Supp.3d 774, 778 (S.D. Ohio 2015) (noting Title IX's prohibition against discrimination "on the basis of sex") (Dlott, J.). The plaintiff in *Mallory* also asked the Sixth Circuit to adopt two additional standards for analyzing whether disciplinary proceedings violate Title IX's prescription against intentional discrimination: deliberate indifference and archaic assumptions. *Mallory* , 76 Fed.Appx. at 638–39. Although the *Mallory* Court did not specifically determine whether it would adopt the deliberate indifference and archaic assumptions standards, the Court

provided no analysis of Plaintiff's claims under either standard. *Id.* *1066

## 1. Hostile Work Environment Sexual Harassment and/or Discrimination

Plaintiff John Doe alleges that OSU's policies with respect to the adjudication of campus sexual assaults claims fail to meet the standards required by Title IX. He asserts that "Defendants have created an environment in which male students accused of sexual assault, such as John Doe, are fundamentally denied due process as to be virtually assured of a finding of guilty. Such biased and one-sided process deprives male OSU students like John Doe of educational opportunities on the basis of sex." (Doc. 36, Am. Compl. ¶ 161). Additionally, he states that "OSU's investigation and/or discipline of John Doe is discriminatory and based upon or motivated by John Doe's male gender." (*Id.* at ¶ 165). Further, Plaintiff alleges in this claim that OSU acted with deliberate indifference and made an erroneous outcome in violation of Title IX which will be addressed in turn. (*Id.* at ¶¶ 168–169).[8]

---

[8] To the extent Plaintiff is alleging a claim of selective enforcement pursuant to Title IX, that claim fails. "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Cummins*, 662 Fed.Appx. at 452 (citations omitted). Plaintiff, here, has failed to assert any allegations that a female student was not disciplined by OSU after a complaint was filed for violation of the Code of Conduct similar to the allegations made against Plaintiff in this case. Plaintiff's allegations that Jane Doe was treated more favorably during the disciplinary action against him are insufficient to maintain a selective enforcement claim because Jane Doe was not similarly situated to Plaintiff. *See Doe v. Case Western Reserve Univ.*, No. 1:14–CV–2044, 2015 WL 5522001, at *6 (N.D.

Ohio Sept. 16, 2015) ("Jane Roe, the complainant against Plaintiff in the disciplinary proceedings, is not a counterpart for the purposes of a selective enforcement claim." (citation omitted)). To state a selective enforcement claim, a plaintiff must "identif[y] ... a comparator of the opposite sex who was treated more favorably by the educational institution *when facing similar disciplinary charges.*" *Id.* (citing *Yusuf*, 35 F.3d at 716) (emphasis added). Plaintiff's conclusory allegations are therefore insufficient to maintain a claim for selective enforcement under Title IX.

As discussed above, "[b]ecause Title IX itself fails to provide an analytical framework for gender discrimination claims, the Sixth Circuit has opted to apply the *McDonnell Douglas* burden shifting analysis used in Title VII employment discrimination cases." *Edmunds v. Bd. of Control of E. Mich. Univ.* , No. 09–11648, 2009 WL 5171794, at *7 (E.D. Mich. Dec. 23, 2009) (citing *Ivan v. Kent State Univ.* , 92 F.3d 1185, 1996 WL 422496, at *2 (6th Cir. July 26, 1996) (table)). Therefore, in order for John Doe to maintain a gender discrimination claim under Title IX, he must sufficiently plead that: (1) he is a member of a protected class; (2) he was subjected to adverse action by OSU: (3) he was qualified for the opportunity that was denied; and (4) that a comparable non-protected person received better treatment. *Id.* With respect to the last requirement, to demonstrate that he was treated differently than a similarly situated person of the opposite gender, John Doe must demonstrate that "all relevant aspects" of his situation are "nearly identical" to those of the allegedly similarly situated person. *Humenny v. Genex Corp.* , 390 F.3d 901, 906 (6th Cir. 2004).

In the case at bar, Defendants argue that John Doe cannot satisfy all elements of the above test and, thus, cannot establish a prima facie case of gender discrimination under Title IX. Specifically, with respect to elements two and three, Defendants

casetext
Part of Thomson Reuters

argue because John Doe was not a student at OSU at the time of the hearing, he cannot claim adverse action based upon his "dismissal." And Defendants argue that the same analysis applies to the issue of *1067 whether he was "qualified" for the opportunity of being a student. Again, John Doe had already graduated and obtained a degree. He has not alleged that he was applying to take any more classes. Further, Defendants assert that John Doe has not identified a single female student whose situation was "nearly identical" to his, but who was not dismissed from OSU on a similar set of operative facts. John Doe does not identify any female who was accused of violating the Code of Student Conduct, who was accused of non-consensual sexual contact under a similar set of operative facts as him, who went through a full investigation and hearing process, and who was either adjudicated not responsible or who was not dismissed. (Doc. 37, Defs.' Mot. at 14).

Plaintiff counters that the *McDonnell Douglas* burden shifting analysis should not be applied to a motion to dismiss a Title IX claim, and even if it is applied, that he can establish the necessary elements. (Doc. 40, Pl.'s Resp. at 42). John Doe asserts that he suffered an adverse action and is qualified to bring a Title IX claim because he received a "permanent dismissal" notation on his academic transcript and has been forever prohibited from enrolling at OSU or entering "any OSU campus or property." (*Id.* (citing Doc. 36, Am. Compl. ¶ 104, Ex. CC)). Further, he argues that he has presented multiple examples of how similarly situated females are treated differently at OSU. (Doc. 40, Pl.'s Resp. at 42, (citing Doc. 36, Am. Compl. ¶¶ 20–21, 111, 129, 135, 170, and 214)).

The Court agrees with Plaintiff's contention that the *McDonnell Douglas* test should not be applied rigidly at this stage. "*McDonnell Douglas* ... is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.* , 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). The Supreme Court "has never indicated that the

requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511, 122 S.Ct. 992.

Plaintiff John Doe has sufficiently pled that he suffered an adverse action, including a permanent dismissal and prohibition from ever enrolling at OSU or entering any OSU campus or property, as well as his forced resignation from his job. And with respect to the last element, Plaintiff has generally alleged that similarly situated females at OSU are treated differently, citing many examples of cases including some cited in *Waters v. Drake* , 105 F.Supp.3d 780, 804–05 (S.D. Ohio 2015) (analyzing comparators of band director including cheerleading coach) (Graham, J.); (Doc. 36, Am. Compl. ¶¶ 20–21). He further contends that both he and Jane Doe were similarly situated "because they were both students at OSU who consumed alcohol prior to engaging in physical contact with another student who consumed alcohol." (Doc. 36, Am. Compl. ¶ 111). The Court acknowledges Plaintiff's arguments with respect to Jane Doe and they have some similarities because they were in a relationship, however, there is no allegation that Jane Doe was ever accused of violating the Code of Student Conduct and then not dismissed from OSU. Courts faced with similar circumstances have found that the "complaining student" in the disciplinary proceedings is not a comparator to the accused student for purposes of a Title IX gender discrimination claim. *Doe v. Case W. Reserve Univ.* , No. 1:14–cv–2044, 2015 WL 5522001, *6 (N.D. Ohio Sept. 16, 2015). Nonetheless, because Plaintiff has not specifically identified a female student who was accused of violating OSU's Code of Student Conduct and was not dismissed from *1068 OSU, the Court finds that Plaintiff *1068 has not sufficiently pled a claim for Title IX hostile environment/sexual harassment.

Further, as noted above, based on *Mallory* and *Cummins* , the Sixth Circuit appears to have recognized the "erroneous outcome" and

"selective enforcement" categories of Title IX claims in the disciplinary context, but not a separate "hostile environment" theory of Title IX liability in the disciplinary proceeding context absent allegations of sexual harassment. Therefore, to the extent Plaintiff is also alleging a hostile working environment sexual harassment claim, his allegations are insufficient to maintain such a claim. *See Doe v. Salisbury University.* Compare 123 F.Supp.3d 748, 764–65 (D. Md. 2015) (finding that allegations that the university investigated and disciplined the plaintiff's alleged sexual assault without proper jurisdiction, the university's employees lacked proper training to investigate and/or discipline pursuant to Title IX, the university's policies were biased against men in violation of Title IX and due process were insufficient to state a claim for "harassment" for purposes of bringing a hostile environment sexual harassment claim).

## 2. Deliberate Indifference

Plaintiff's second Title IX claim alleges that "OSU employees ... acted with deliberate indifference towards John Doe because of his male gender," and failed to remedy "OSU's violations of John Doe's rights under OSU's policies, Title IX and/or guidance promulgated by ORC" and further by "OSU's erroneous determination that John Doe violated OSU's policies which OSU adopted pursuant to federal laws and regulations related to Title IX." (Doc. 36, Am. Compl. ¶¶ 173–174).

The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment. *See Mallory* , 2003 76 Fed.Appx. at 638–39 (citing *Gebser v. Lago Vista Indep. Sch. Dist.* , 524 U.S. 274, 277, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) ). To maintain a claim for deliberate indifference under Title IX, Plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Id.* at 638. The Sixth Circuit has not determined that

these Title IX standards, which were developed in sexual harassment cases and cases involving unequal athletic opportunities, are applicable when a plaintiff like John Doe in this case claims that intentional gender discrimination occurred in a university disciplinary proceeding. *Id.* at 639–42 (providing no analysis of the plaintiff's claims under either standard). Further, the law is not clear as to what constitutes a properly plead deliberate indifference claim under Title IX. *See Sahm* , 110 F.Supp.3d at 778, n.1 ("At least one district court in the Sixth Circuit has held that [ ] sexual harassment is a 'critical component' of a Title IX deliberate indifference claim. *See Doe v. Univ. of the South* , 687 F.Supp.2d 744, 757–58 (E.D. Tenn. 2009). A sister court in the Southern District of Ohio ... did not limit the deliberate indifference theory to only sexual harassment cases." (citing *Wells v. Xavier Univ.* , 7 F.Supp.3d 746, 751–52, n.2 (S.D. Ohio 2014) (Spiegel, J.))).

In this case, John Doe alleges the "misconduct" to be a "violation of [his] rights under OSU's policies" because of his "male gender." (Doc. 36, Am. Compl. ¶¶ 173–174). Defendants argue that they complied with internal policies and procedures in investigating and adjudicating the complaint of sexual misconduct against John Doe. They contend that he is merely unhappy with their decision and is seeking review by this Court of the University's decision. *1069 In opposition to Defendants' motion, Plaintiff generally asserts that certain actions by OSU constitute gender bias, however, he has not actually provided specific facts upon which he can rely to support his Title IX claims. He generally asserts that OSU's disciplinary proceedings, including providing the female complainant with a paid university advisor, allowing the female complainant to continue to change her story, not allowing him, a male, an extension or including his evidence in the records, among other things, were influenced by gender bias and that OSU discriminated against him on the basis of gender in violation of federal law. Plaintiff has not alleged that he complained to

OSU that he was being sexually harassed, nor is there any allegation that OSU ignored his complaints of sexual harassment. As actual notice of the alleged discrimination is an essential element of a deliberate indifference claim, his claim fails. *See Gebser* , 524 U.S. at 290, 118 S.Ct. 1989 ; *see also, Williams ex rel Hart v. Paint Valley Local Sch. Dist.* , 400 F.3d 360, 366 (6th Cir. 2005).

Even without pleading an element of sexual harassment, Plaintiff has still failed to sufficiently plead a deliberate indifference claim under Title IX. He has not alleged sufficient facts demonstrating intentional discrimination against him on the basis of his gender with respect to the investigation, the hearing, or the penalty imposed by OSU. He has not alleged that he complained to an OSU official that he was being subjected to gender discrimination during the course of the investigation and hearing, nor has he alleged that any OSU official had "actual knowledge" that the investigation and hearing were discriminatory in any way or that OSU failed to take remedial action. When faced with similar facts, that a plaintiff's allegations (or lack thereof), courts have held that the plaintiff failed to state a claim for Title IX deliberate indifference. *Case W. Reserve* , 2015 WL 5522001 at *7. Allegations of deliberate indifference fail where Plaintiff fails to allege any specific facts to support a claim of deliberate indifference based upon gender discrimination, but, instead makes only conclusory allegations of gender bias. *Id.* As stated by the court:

Plaintiff points to procedural defects in the disciplinary hearings as evidence of discriminatory bias. The Complaint also alleges that CWRU's decision was 'discriminatory, presumptive and/or arbitrary and capricious' based on the hostile attitude of the UJB towards Plaintiff during proceedings. While these pleadings may call to question the outcome of the proceedings, they are not factual allegations supporting the conclusion that the procedural flaws and hostility towards Plaintiff were motivated by sexual bias.

*Id.* at *9–10.

Just as in *Case Western Reserve* , Plaintiff's pleadings may call into question the ultimate outcome of the disciplinary proceedings, however, other than conclusory allegations, Plaintiff fails to plead a claim that OSU's disciplinary process is discriminatory. Accordingly, Plaintiff's Title IX deliberate indifference claim is hereby dismissed.

### 3. Erroneous Outcome

Plaintiff John Doe's third Title IX claim alleges that OSU made an "erroneous determination that John Doe violated OSU policies" and "unlawfully disciplined John Doe because of his male gender." (Doc. 36, Am. Compl. ¶¶ 179, 182). Defendants argue that Plaintiff's Complaint contains mere conclusory allegations and he has failed to sufficiently plead a claim for erroneous outcome under Title IX.

An erroneous outcome claim exists when an "innocent" person was wrongly found to have committed an offense *1070 because of his or her gender. *Sahm* , 110 F.Supp.3d at 777–78 (citing *Yus u f* , 35 F.3d at 715 ). In order to state a claim for "erroneous outcome" under Title IX, a plaintiff must plead two elements: (1) facts sufficient to cast doubts about the accuracy of the outcome of the disciplinary hearing; and (2) a causal connection between the flawed outcome and gender bias. *Id.* Therefore, in this case, Plaintiff

Case 3:24-cv-00440    Document 79    Filed 07/11/24    Page 101 of 191 PageID #: 1770

must demonstrate that Defendants' actions were "motivated by sexual bias" and that OSU's "disciplinary hearing process constitutes a 'pattern of decision-making' whereby the ... disciplinary procedures governing sexual assault claims [are] 'discriminatorily applied or motivated by a chauvinistic view of the sexes.' " *Case W. Reserve* , 2015 WL 5522001, *5 (quoting *Univ. of the S.* , 687 F.Supp.2d at 756 ). In order to properly state a claim alleging that Defendants' actions were motivated by sexual bias, Plaintiff cannot rely on mere conclusory allegations or claims with no factual support. Instead, such allegations must include, "...*inter alia* , statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* at *6 (quoting *Yusuf* , 35 F.3d at 715 ). "However, a single case by an individual who was displeased by the result of a disciplinary proceeding cannot constitute a pattern of decision-making." *Id.*

In this case, Defendants argue that Plaintiff has not included any alleged statements made by members of the Student Conduct Disciplinary Panel, who decided his case, which would indicate any decision making was "influenced by gender." Plaintiff's only allegations in this regard are that the panel "ask [ed] questions ... downplaying facts proving Jane Doe initiated physical contact with John Doe," "coax[ed] Jane Doe to provide testimony that reinforced gender biased stereotypes," and "allowed Jane Doe to make an impact statement about the alleged misconduct before making any determination of whether a rule was violated." (Doc. 36, Am. Compl. ¶ 103).

Plaintiff counters that indirect/circumstantial evidence of gender bias can trigger Title IX liability, including that pressure from the executive branch of the Federal government motivated the discipline of John Doe. In support of this, Plaintiff offers the temporal connection between the United States Department of Education's Office of Civil Rights ("OCR")'s investigation of OSU and OSU's investigation of

John Doe. (Doc. 40, Pl.'s Resp. at 7). OSU ultimately entered into a settlement with OCR and documentation relating to this settlement states that "since 2013, OSU had permanently expelled every student found guilty of sexual assault" and that "[u]pon information and belief, all of these students were male." (*Id.* at 8, (citing Doc. 36, Am. Compl. ¶ 25). Plaintiff also references in the same document OSU's promise to continue to aggressively discipline male students accused of sexual misconduct. (*Id.* ).

Plaintiff further references in support *Doe v. Brandeis Univ.* , 177 F.Supp.3d 561, 572–73 (D. Mass. 2016), recognizing that universities across the country have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." The *Brandeis* court noted that Harvard University adopted a similar policy on sexual harassment similar to the policy at issue in *Brandeis* . *Id.* at 573. In response to the Harvard policy:

> 28 members of the Harvard Law School faculty issued a statement voicing their "strong objections" to the policy. *Id.* Among other things, the statement concluded that 'Harvard has adopted procedures for deciding cases of alleged sexual

1071*1071

misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.' *Id.* It called upon Harvard to 'begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community.' *Id.*

The goal must not be simply to go as far as possible in the direction of preventing anything that some might characterize as sexual harassment. The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom.

Like Harvard, Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process. And it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.

Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion.

*Brandeis* , 177 F.Supp.3d at 573.

Plaintiff further provides a "Tip of the Week" published by the Association of Title IX Administrators ("ATIXA") regarding alcohol-involved sexual encounters:

A common policy problem comes from failing to distinguish between intoxicated and incapacitated. Yet, the most serious issue comes from failing to implement a mens rea, if you will, within the definition. Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not an offense, there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation ... *there has to be something more than an intent to have sex to make this an offense. Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so. Without a knowledge standard, a respondent will suffer an arbitrary and capricious application of the college's rules* .

(Doc. 36, Am. Compl. ¶¶ 27–29, 117, Ex. FF) (emphasis in original).

Plaintiff argues that he has pled facts sufficient to cast doubts about the accuracy of his disciplinary hearing and a causal connection between the flawed outcome and gender bias. Plaintiff has pled conclusory allegations of gender bias.[9] Defendants <sub>1072*1072</sub> argue, and the Court agrees that Plaintiff's

Complaint fails to identify any specific statement(s) by the disciplinary panel which evidence gender bias in the decision making process. Nor are there any allegations of statements by "pertinent university officials" demonstrating gender bias in the Student Conduct process. Plaintiff generally references statements made by Defendant Natalie Spiert, who was Jane Doe's student advocate. Ms. Spiert gave a "talk about 'Sexual Assault on College Campuses,' " on TEDx, wherein she described statistics and facts regarding sexual assaults on college campuses. (Doc. 36, Am. Compl. ¶ 77). However, her comments were general and not specific to Plaintiff's case. Nor is there any allegation that she was a "pertinent university official" who had the authority to control the investigation or adjudication of Jane Doe's claim. She was merely an advisor to Jane Doe.

> [9] Plaintiff references six cases in support of his erroneous outcome claim in which courts have rejected motions to dismiss the plaintiffs' Title IX claims: (Doc. 40, Pl.'s Resp. at 36–37) (citing *Wells v. Xavier Univ.*, 7 F.Supp.3d 746 (S.D. Ohio 2014) ; *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D.R.I. 2016) ; *Marshall v. Ind. Univ.*, 170 F.Supp.3d 1201 (S.D. Ind. 2016) ; *Doe v. Washington and Lee*, No. 6:14–CV–52, 2015 U.S. Dist. LEXIS 102426 (W.D. Va. Aug. 5, 2015); *Doe v. Salisbury Univ.*, 123 F.Supp.3d 748 (D. Md. 2015) ; and *Doe v. Bd. of Regents of the Univ. Sys. of Ga.*, 215 Ga.App. 684, 452 S.E.2d 776 (Ga. Ct. App. 1994) ).

In the case at bar, Plaintiff certainly alleged facts that cast doubt on the accuracy and ultimate outcome of the disciplinary proceeding against him. John Doe has submitted significant evidence to establish that he and Jane Doe were in a relationship for over 18 months. Further, the timing of the complaint against John Doe, seven months after the alleged incident of sexual misconduct, the decision to allow the victim to amend her claims during the proceeding, and the

fact that John Doe ended the relationship all raise questions as to whether John Doe committed a violation of the Student Code of Conduct. Additionally, OSU has affirmatively stated that it promises to continue to aggressively discipline male students accused of sexual misconduct with no reassurance of ensuring fairness and due process in the disciplinary process. *Cf. Wells* , 7 F.Supp.3d at 751 (finding the plaintiff pleaded facts sufficient to cast doubts on the accuracy of a disciplinary proceeding by alleging that the defendants rushed to judgment, failed to train the disciplinary hearing panel, ignored a prosecutor's request to hold off on proceedings until a criminal investigation concluded, ignored a prosecutor's opinion that a sexual assault did not occur, denied the plaintiff access to counsel, and denied the plaintiff witnesses); *Case W. Reserve* , 2015 WL 5522001 at *5 (finding that the plaintiff pleaded facts sufficient to cast doubts on accuracy of a disciplinary proceeding outcome by alleging that the defendant pressured a student to provide evidence against the plaintiff during an appeal, did not allow the plaintiff to review that evidence, denied the plaintiff the opportunity to cross examine his accuser during the disciplinary hearing, and treated the plaintiff in a hostile manner during that hearing).

However, the second element of the erroneous outcome claim remains, i.e. has Plaintiff sufficiently pled a causal connection between the flawed outcome and gender bias? Plaintiff has made some general allegations of gender bias and cited numerous cases from across the country that faced similar issues.[10] There is little doubt that universities around the country have felt pressure to tighten the investigation and punishments in sexual misconduct cases because this is a very sensitive issue. However, there are genuine concerns raised in these cases and general publications regarding how universities are handling the investigations. The organization charged with administering Title IX, *1073 ATIXA, has stated that when college students are getting

drunk and having sex, it is the men who are being punished because their partners are having sex too and not being subject to the code of conduct for doing so, constituting gender discrimination. (*See* Doc. 36, Am. Compl. ¶¶ 27–29, 117, Ex. FF); *see also* , *Brandeis* , 177 F.Supp.3d at 573 ("The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline ..."). However, despite Plaintiff's repeated argument that Jane Doe's allegations were false and an act of revenge because John Doe ended their relationship (Doc. 40, Pl.'s Resp. at 2–5), it is not the role of this Court to make a determination as to Jane Doe's claims. *Wood v. Strickland* , 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion.")

> 10 Plaintiff has not provided specific arguments with respect to each of the Title IX claims, but instead offers in Section (B) (1)(a)–(c) of his response that the unlawful discipline against him was motivated by three separate categories of gender bias. (Doc. 40, Pl.'s Resp. at 6–27).

Plaintiff alleges in his Complaint that OSU has displayed a pattern of anti-male gender bias. Plaintiff has enumerated 20 examples of alleged anti-male gender bias in his responsive pleading including the *Waters v. Drake* decision, 105 F.Supp.3d 780, and another case before this Court brought by Attorney Josh Engel, *John Doe v. OSU* , Case No. 2:15–cv–2830 (the "*Engel* Case"), and OSU's training materials regarding consent and sexual assault which Plaintiff alleges illustrate gender bias against male students. (*See* full list in Doc. 40, Pl.'s Resp. at 16–19). Plaintiff contends that the timing of the *Waters* and *Engel* cases could have impacted the treatment of John Doe's case. The complaint in *Waters* was filed in September 2014, less than two months before OSU charged John Doe with sexual misconduct. Although *Waters* was ultimately dismissed on

summary judgment, the case and the general allegations surrounding it—that OSU and the OSU marching band tolerated a sexualized environment on campus—were highly publicized. There is a strong possibility, as alleged by Plaintiff, that these lawsuits could have impacted John Doe's disciplinary process. Therefore, based on all of the above referenced allegations, at this stage in the proceedings, Plaintiff has made sufficient general allegations of gender bias in cases similar to his to suggest there is discrimination in the investigation and hearing process of sexual misconduct cases. *See Collick v. William Paterson Univ.* , No. 16–471, 2016 WL 6824374, at *11, 2016 U.S. Dist. LEXIS 160359, at *35 (D. N.J. 2016) ("Whether such allegations are true (or can survive summary judgment) remains an open question. At the pleading stage, however, an allegation that the process was one-sided, irregular, and unsupported by evidence may give rise to an inference of bias").[11] Plaintiff has *1074* therefore sufficiently *1074* pled a claim of erroneous outcome under Title IX and put Defendant on notice of his claim.

> 11 The Court acknowledges that as recognized in *Doe v. Columb ia Univ.*, 831 F.3d 46, 57 (2nd Cir. 2016), "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias." However, it may not "necessarily relate to bias on account of sex." *Id.* Therefore, although difficult to distinguish at this stage, it is possible that OSU was biased in favor of the alleged victims of sexual assault cases and against the alleged perpetrators, but courts have held that this is not the same as demonstrating bias against male students. *See Bleiler v. Coll. of Holy Cross*, No. 11–11541, 2013 WL 4714340, 2013 U.S. Dist. LEXIS 127775 (D. Mass. Aug. 26, 2013) ; *see also King v.*

*DePauw Univ.*, No. 2:14–cv–70, 2014 WL 4197507, at *4, 2014 U.S. Dist. LEXIS 117075, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males, even if all of the students accused of assault were male); *Haley v. Va. Commonwealth Univ.*, 948 F.Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims ... indicate[s] nothing about gender discrimination").

## B. Section 1983 Claims

In Counts Four and Five of the Amended Complaint, Plaintiff alleges violations of procedural and substantive due process and equal protection, brought pursuant to 42 U.S.C. § 1983. Section 1983 confers a right of action against any person who, acting under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution or federal law. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 3, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984) ; *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir. 1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived plaintiff of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360–61 (6th Cir. 1988) ; 42 U.S.C. § 1983.

The Sixth Circuit plainly has "held that the Due Process Clause is implicated by higher education disciplinary decisions." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (citing *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) ; *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ); *see also Cummins*, 662 Fed.Appx. at 445 (recognizing that due process "protections apply to higher education disciplinary decisions"). Additionally, in the academic setting, courts have

found that due process requires that: 1) the student be informed of their academic situation; and 2) the decision must be careful and deliberate. *Bd. of Curators of Univ. of Mo. v. Horowitz* , 435 U.S. 78, 85, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Here, Plaintiff alleges that the individual defendants violated his substantive and procedural due process rights under the United States Constitution. Defendants argue that Plaintiff has failed to establish any protected life, liberty, or property interests upon which to base his claims for violation of procedural and substantive due process protections under 42 U.S.C. § 1983. And, even if he could establish a property interest, he was afforded more process than constitutionally due. The Court will address these arguments in turn.

### 1. Life, liberty, or property interest

Plaintiff must first establish the existence of a constitutionally protected life, liberty, or property interest regardless of pursuing a procedural or substantive due process claim. *See Easley. Univ. of Mich. Bd. of Regents* , 627 F.Supp. 580, 582 (E.D. Mich. 1986) (a plaintiff "cannot prevail under either theory [procedural or substantive due process] without first proving his entitlement to a property interest protected by due process."). Defendants argue that Plaintiff has no protected property interest because he was not enrolled as a student at OSU at the time of adjudication of his claim.

The United States Supreme Court has refrained from determining whether continued enrollment in school free from arbitrary state action is protected by substantive due process, and has instead assumed *arguendo* that such a substantive right exists in cases involving college students who challenge academic dismissals from state universities. *See e.g.* , *Regents of Univ. of Mich. v. Ewing* , 474 U.S. 214, 222–23, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (assuming substantive due process protected a university student's right to 1075*1075 continued enrollment but finding actions

taken by university officials were not arbitrary); *Bd. of Curators v. Horowitz* , 435 U.S. 78, 91–92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (assuming a university student could challenge an arbitrary or capricious academic decision but finding actions by university officials were not arbitrary). Moreover, although the Supreme Court has held that a high school student is entitled to procedural due process in pursuit of a free public education, the high Court has also held that a high school student's right to attend public school is not a "fundamental right" for purposes of substantive due process. *See San Antonio Indep. Sch. Dist. v. Rodriguez* , 411 U.S. 1, 33–37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The Sixth Circuit has also indicated that a public high school student's right to attendance is not a fundamental right. *See Seal v. Morgan* , 229 F.3d 567, 575 (6th Cir. 2000) (analyzing whether discipline imposed upon a high school student was not rationally related to an offense instead of strictly scrutinizing the imposition of that discipline pursuant to a substantive due process analysis). A university student may arguably have an even lesser claim to substantive due process protection than a high school student. *See Rogers v. Tenn. Bd. of Regents* , 273 Fed.Appx. 458, 462–463 (6th Cir. 2008) (affirming grant of summary judgment on a university student's claim that her academic expulsion for performance problems and inappropriate clinical behavior violated her substantive due process rights); *McGee v. Schoolcraft Cmty. Coll.* , 167 Fed.Appx. 429, 436–37 (6th Cir. 2006) ("[t]he interests [of a college student] protected by substantive due process are of course much narrower than those protected by procedural due process."); *Bell v. Ohio State Univ.* , 351 F.3d 240, 251 (6th Cir. 2003) ("[w]here ... there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical education is protected by substantive due process.").

The Court applies this reasoning here. There is no dispute that Plaintiff was not currently enrolled as a student, nor had he applied, however, he was taking an online class which formed the basis for OSU's application of the Student Code of Conduct against him. Further, John Doe has expressed his desire to reenroll at OSU in the future. (Doc. 36, Am. Compl. ¶ 215). Regardless of whether Plaintiff was a current student, or had a desire to reenroll as a student at OSU, Plaintiff's interest in continuing his education is not, as a matter of law, a fundamental right protected by due process.

Plaintiff also alleges that he has a constitutionally protected liberty interest. Specifically, Plaintiff claims that because his OSU transcript will reflect a dismissal, even though he had already graduated, his "reputation and standing" have been effected and that, because of that harm, he may lose other "educational and employment opportunities" in the future. (Doc. 36, Am. Compl. ¶¶ 204–205, 224). The United States Supreme Court in *Goss v. Lopez* , 419 U.S. at 574–75, 95 S.Ct. 729, held that an enrolled student in a public school potentially suffers a reputational injury—effecting a "liberty" interest—upon the imposition of a lengthy suspension from school. Since *Goss* , Courts have further defined the necessary elements that a Plaintiff must demonstrate in order to make a due process claim based upon a "liberty" interest in one's "reputation, good name, honor or integrity...." *Ludwig v. Bd. of Trs. of Ferris State Univ.* , 123 F.3d 404, 410 (6th Cir. 1997). In order to state a due process "liberty" claim for reputational harm, "a plaintiff must show [five factors]." *Quinn v. Shirey* , 293 F.3d 315, 320 (6th ¹⁰⁷⁶Cir. 2002) ; *see also* *1076 *Greer v. Detroit Public Schools* , 507 Fed.Appx. 567, 573 (6th Cir. 2012). First, the reputational harm or "stigmatizing statements" must occur in connection with "the loss of a governmental right, benefit, or entitlement." *Mertik v. Blalock* , 983 F.2d 1353, 1363 (6th Cir. 1993) ; *see also Med Corp., Inc. v. City of Lima* , 296 F.3d 404, 414 (6th Cir. 2002). There exists no constitutional liberty interest in

one's reputation alone. *Siegert v. Gilley* , 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Second, the plaintiff must demonstrate that the alleged reputational injury forecloses "his freedom to take advantage of other employment [or educational] opportunities." *Ludwig* , 123 F.3d at 410. Third, the statements, findings or charges alleged to have caused reputational harm "must be made public." *Id.* Fourth, "the plaintiff must claim the charges made against him were false." *Id.* Last, the public dissemination of the findings or charges "must have been voluntary." *Id.*

Plaintiffs Amended Complaint fails to state a claim which meets "all five factors." First, Plaintiff cannot demonstrate element one, which requires that the reputational harm occur in conjunction with "the loss of a government right, benefit, or entitlement." John Doe did not suffer the loss of any government right, benefit, or entitlement because he was neither an enrolled student at OSU, nor did he have an application for admission to OSU pending. In addition, even if he was an enrolled student, no court has recognized a liberty interest in this context, because, outside of governmental employment, the plaintiff must demonstrate that the governmental right of which he was "deprived" arose from a statute—and there exists no statutory right to be a student at a public university. *See Doe v. Alger* , 175 F.Supp.3d 646, 658–60 (W.D. Va. 2016) (holding that an enrolled student at a public university who is dismissed for disciplinary reasons possesses no constitutionally-protected liberty interest) (citing *Paul v. Davis* , 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ).

Second, Plaintiff does not allege that the charges against him or the adjudication of his claims have been "made public" by OSU as a result of a "voluntary" public dissemination. An essential element of a reputational harm due process claim is that the governmental entity involved voluntarily makes the charges or findings public—as opposed to the entity being compelled by law to make the information public. *Med Corp . , Inc.* ,

296 F.3d at 414–15 ; *Mertik* , 983 F.2d at 1363 (voluntary public disclosure found where employees provided unsolicited information to several members of the public that plaintiff was "banned" from skating rink because of sexual misconduct). Plaintiff's only allegations regarding this element are that a potential future employer or future educational institution could find out about the disciplinary action against Doe at some point in the future. (Doc. 36, Am. Compl. ¶¶ 136, 191, 204, 205).

Plaintiff has failed to satisfy at least four of the five required elements to maintain a claim for a liberty interest based on reputational harm, therefore, he has failed to demonstrate any protected life, liberty, or property interests upon which to base his claims for violation of procedural and substantive due process under 42 U.S.C. § 1983.

Even if Plaintiff could satisfy the requirement that he has been deprived of a life, liberty, or property interest, Defendants argue that he still fails to sufficient allege a claim for substantive or procedural due process because Plaintiff received more process than he was constitutionally due. The Court will discuss the specific claims of substantive and procedural due process in turn.

1077*1077 **2. Substantive Due Process**

The Fourteenth Amendment to the United States Constitution forbids a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Claims arising from the substantive component of the due process clause fall into one of two categories. *Harris v. City of Akron* , 20 F.3d 1396, 1405 (6th Cir. 1994) ; *Mertik v. Blalock* , 983 F.2d 1353, 1367 (6th Cir. 1993). The first type is a claim that state action has violated a fundamental right. *Harris* , 20 F.3d at 1405. The second type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. *Mertik* , 983 F.2d at 1367. "The test for substantive due process claims of this

type is whether the conduct complained of shocks the conscience of the court." *Id.* at 1367–68 (internal quotations and citations omitted).

## a. Fundamental Rights Analysis

Substantive due process protects against government interference with fundamental rights unless that interference is narrowly tailored to serve a proper public purpose. *Washington v. Glucksberg* , 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Fundamental rights and liberty interests are the type of rights that are so implicit in the concept of ordered liberty that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut* , 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (overruled on other grounds by *Benton v. Maryland* , 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) ); *Doe v. Mich. Dept. of State Police* , 490 F.3d 491, 499–500 (6th Cir. 2007). These fundamental rights, which are deeply rooted in this nation's history and tradition, include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Glucksberg* , 521 U.S. at 720, 117 S.Ct. 2258 (citations omitted); *see also Doe* , 490 F.3d at 499–500. "The Supreme Court has cautioned, however, that it has 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' " *Doe* , 490 F.3d at 500, (quoting *Glucksberg* , 521 U.S. at 720, 117 S.Ct. 2258 ).

Because Plaintiff John Doe's right to continue his education is not a fundamental right protected by substantive due process, as a matter of law, OSU's decision to permanently dismiss him from OSU and bar him from ever entering the university or any campus property in the future, is not subject to strict scrutiny. *Glucksberg* , 521 U.S. at 728, 117 S.Ct. 2258. Instead, that decision will be upheld if it is rationally related to a proper public purpose. *Valot v. S.E. Local Sch. Dist. Bd. of Educ.* , 107

F.3d 1220, 1228 (6th Cir. 1997) ; *H.M. v. Bd. of Educ. of King's Local Sch. Dist.* , No. 1:14–cv–64, 2015 WL 4624629, at *3 (S.D. Ohio Aug. 3, 2015) (Barrett, J.). Here, Plaintiff alleges that his suspension was motivated by OSU's duty to prove to the Department of Education that it is taking the hardline with respect to allegations of sexual assault/misconduct on campus. Further, Plaintiff generally alleges throughout the complaint that OSU's disciplinary process was motivated by gender bias against men accused of committing these alleged sexual assaults. Given that universities have an obligation to provide safe campuses and investigate these serious allegations, the Court cannot conclude that this constitutes an allegedly improper purpose.

## b. Conduct Shocking to the Conscience

On the other hand, a crackdown or a punishment can be so excessive and *1078 extreme that it shocks the conscience. Action by an executive government official that is conscience shocking or arbitrary violates the substantive due process clause. *Cty. of Sacramento v. Lewis* , 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Collins v. Harker Heights* , 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ). Nevertheless, "only the most egregious official conduct" violates substantive due process under this standard. *Id.* at 846, 118 S.Ct. 1708.

The facts alleged by Plaintiff against the individual defendants simply do not meet this "shocks the conscience" test, even when all inferences are drawn in his favor. There is no evidence that OSU's conduct was "inspired by malice or sadism" nor does it amount to a "brutal and inhumane abuse of official power." *Webb v. McCullough* , 828 F.2d 1151, 1158 (6th Cir. 1987) (finding that student alleged that a high school principal's actions shocked the conscience when she alleged that the principal pushed down her hotel room door, maliciously threw her against a wall in anger, and slapped her during a field trip);

*Rochin v. California* , 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (overturning drug conviction where evidence was obtained by involuntarily pumping a suspect's stomach because such police conduct shocked the conscience); *Weyant v. Okst* , 101 F.3d 845, 856 (2nd Cir. 1996) (explaining that the behavior of prison guards who deliberately ignore the medical needs of pretrial detainees might shock the conscience in violation of substantive due process).

After concluding that Plaintiff has not established infringement on a fundamental right, the Court assesses John Doe's substantive-due-process claim under the rational-basis standard. "In the context of school discipline, a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense." *Seal* , 229 F.3d at 575 (quoting *Rosa R. v. Connelly* , 889 F.2d 435, 439 (2d Cir. 1989) (internal quotation marks omitted). This is not a rare case. There exist many rational bases for OSU's investigation of John Doe and his alleged conduct: (1) the U.S. Department of Education's interpretation of Title IX that requires universities to investigate allegations that may implicate Title IX as found in the U.S. Dep't of Educ., Office of Civil Rights Dear Colleague Letter, dated April 4, 2011, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; (2) the instruction to university boards to "regulate ... the conduct of the students ... so that ... the college or university may pursue its educational objectives and programs in an orderly manner" found in Ohio Revised Code § 3345.21 ; and (3) OSU's interest in providing a safe environment for all of its students, including taking seriously charges of sexual misconduct by one of its students.

Plaintiff has therefore failed to show an arbitrary deprivation of a constitutional right or a conscience-shocking government action and his claim for violation of his substantive due process rights must be dismissed.

### 3. Procedural Due Process

Plaintiff also alleges a § 1983 claim for violation of his procedural due process rights. The Sixth Circuit has explained that "[t]he Due Process Clause of the Fourteenth Amendment prohibits States from depriving 'any person of life, liberty, or property, without due process of law.' " *Jaber v. Wayne State Univ. Bd. of Governors* , 487 Fed.Appx. 995, 996 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1 ). To establish a procedural due process violation, a plaintiff must establish a constitutionally protected property or 1079*1079 liberty interest and show that the state deprived the plaintiff of such interest without appropriate procedures. *See Rogers* , 273 Fed.Appx. at 462 (citing *Midkiff v. Adams Cty. Reg'l Water Dist.* , 409 F.3d 758, 762 (6th 2005) ). "Property interests are not ... defined by the Constitution." *Roth* , 408 U.S. at 577, 92 S.Ct. 2701 ; *see also Horowitz* , 435 U.S. at 82, 98 S.Ct. 948. "Rather, they are created and defined by 'existing rules or understandings that stem from an independent source such as state law....' " *Roth* , 408 U.S. at 577, 92 S.Ct. 2701.

As set forth above, it is not entirely settled in the Sixth Circuit as to whether a student's continued enrollment at a state university is an interest protected by procedural due process. *Compare McGee* , 167 Fed.Appx. at 437 ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved.") *with Flaim* , 418 F.3d at 633 ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions."). Even if the Court assumes that Plaintiff possessed such a right, the Amended Complaint does not allege that Plaintiff received insufficient due process.

Notice and opportunity to be heard remain the most basic requirements for procedural due process. *Flaim* , 418 F.3d at 635 ; *see also Goss* , 419 U.S. at 579, 95 S.Ct. 729. In this case,

Plaintiff alleges that on November 20, 2014, he was informed that a complaint of sexual misconduct in violation of the Student Code of Conduct had been filed against him. (Doc. 36, Am. Compl. ¶ 70). He was subsequently notified via a letter from OSU's Office of Student Life. (*Id.* at ¶ 71, Ex. Q). The letter directed John Doe to schedule a meeting with Defendant Smith, who was investigating the case. On December 18, 2014, John Doe met with Defendant Smith and Brandon Gibbs, the Human Resources representative conducting the investigation on behalf of OSUWMC on December 18, 2014, and cooperated with the investigation into Jane Doe's allegations. (*Id.* at ¶ 76, Ex. T). On Friday, February 6, 2015, Defendant Smith sent John Doe a letter via e-mail notifying him of her determination that sufficient evidence existed to charge him under the Code of Student Conduct, and included a Charge & Process Form. (*Id.* at ¶ 83, Ex. V). The Charge & Process Form gave John Doe five days to decide to accept responsibility for the charges, or not accept responsibility and request a hearing before the University Hearing Officer or the University Conduct Board. (*Id.* at ¶ 84). On February 9, 2015, John Doe returned the Charge & Process Form choosing not to accept responsibility for the alleged violations and requesting a hearing before the University Conduct Board. (*Id.* at ¶ 84, Ex. V).

On February 19, 2015, OSU notified John Doe via email that his University Conduct Board Hearing would take place on Friday, March 6, 2015 at 8:00 a.m., and that Defendant Page would be the coordinator for the hearing. (*Id.* at ¶ 92, Ex. X). On February 27, 2015, he was notified that the hearing packet was available for review, that new evidence had been submitted since he last reviewed the file, and stated that he could schedule a time to review the file prior to the hearing. (*Id.* at ¶ 93, Ex. Y). John Doe reviewed the file and relevant text messages between Jane Doe and her friend were not in the file and Jane Doe's cell phone records were not in the file. (*Id.*

at ¶ 94). On March 5, 2015, John Doe requested a one-week continuation of the hearing because of difficulty obtaining electronic evidence necessary for his defense, including phone and text records to demonstrate that he and Jane Doe had been in contact between late fall 2014 through spring 2015. (*Id.* at ¶ 95). Defendant *1080 Smith denied the request as being untimely under Section 3335–23–09 of the Code of Student Conduct. On March 6, 2015, the University Conduct Board Hearing was conducted. (*Id.* at ¶ 96). John Doe's attorney was permitted to serve as his advisor, but was not permitted to "actively participate." (*Id.* (citing Doc. 36–2, Code of Student Conduct at 8)).

Plaintiff has raised a number of challenges regarding OSU's disciplinary process, including that the complaint filed against him was not timely (filed after the six month time limit for filing complaints); he was not provided a summary of the testimony of the witnesses to be used against him; that Jane Doe's friends offered hearsay testimony; permitted Jane Doe to present character witness testimony but denied the same to John Doe; and that OSU refused to submit John Doe's evidence as part of the file, which included photographs, text messages, and cards demonstrating the couple's ongoing relationship. (*Id.* at ¶¶ 74, 99–102).

Defendants argue, and the Court agrees, that "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood v. Strickland* , 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). It is the court's role to determine whether the student received sufficient notice and a hearing regarding the charges against him. "[I]n determining the amount of process due, courts are to look at three factors: (1) the nature of the private interest affected—that is, the seriousness of the charge and potential sanctions, (2) the danger of error and the benefit of additional or alternate procedures, and (3) the public or governmental burden were additional procedures mandated." *Flaim,* 418 F.3d at 635.

"A university is not a court of law, and it is neither practical nor desirable it be one." *Id.* at 635 n.1 (quoting *Gomes v. Univ. of Maine Sys.* , 365 F.Supp.2d 6, 16 (D. Me. 2005) ). "Before expelling a student for disciplinary reasons, a public institution must provide: 1) notice of the charges against the student; 2) an explanation of the evidence that authorities have against the student; and 3) an opportunity for the student to present his side of the story." *Ashiegbu v. Williams* , 129 F.3d 1263, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997) (table) (citing *Goss* , 419 U.S. at 581, 95 S.Ct. 729 ); *Newsome v. Batavia Local Sch. Dist.* , 842 F.2d 920, 927 (6th Cir 1988). The United States Supreme Court has held that the student is entitled to "some kind of notice" and "some kind of hearing." *Goss* , 419 U.S. at 579, 95 S.Ct. 729. Once the student has been provided notice and a hearing, but protests the school's decision, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe Cty. Bd. of Educ.* , 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

Plaintiff has not alleged that he did not receive sufficient notice of the hearing, or that the investigation and hearing were not adequate. Rather, Plaintiff summarized his procedural due process claims as follows:

1. Violated Section 3335–23–10 of OSU's Code of Student Conduct's ("COC") fairness requirement by allowing the "discipline of John Doe [to be] corrupted by gender based bias which resulted in his being denied a "fair and impartial" disciplinary proceeding...." *Doc.38,* p.2287, ¶ 88;

2. Deprived John Doe of a fair and impartial hearing by "prohibit[ing] John Doe from accessing information necessary for his defense and/or internal appeal."*Id,* p.2316, ¶ 195;

3. Allowed Smith to engage in a gender biased "investigation" which was "then

1081*1081

provided to the Hearing Panel." Id. p.2321, ¶ 2250(a);

4. Denied John Doe a "adequate, reliable, and impartial investigation" by ignoring Department of Justice ("DOJ") conflict of interest directives by allowing Smith to serve as "investigator, prosecutor, and judge" of John Doe. *Id.,* p.2286–87, ¶ 86–87;

5. Prejudiced John Doe by withholding a "summary of the testimony of witnesses to be used against him." Id. p.2290, ¶ 99;

6. "[P]ermitted the use of hearsay evidence at the Hearing without providing John Doe with the opportunity to effectively cross-examine witnesses." *Id.* p.2321, ¶ 225(b);[12]

7. Allowed the Hearing Panel to receive "an impact statement from [Jane Doe] before" determining if John Doe should be found responsible for violating OSU's COC. *Id.* , ¶ 225(c);

8. Failed to "apply [ ] OSU rules properly, including the definition of consent" set forth in the COC (and) not applying "the appropriate definitions of key legal terms." *Id.* pgs.2287, 2322, ¶¶ 89, 225(d);

9. Denied John Doe "effective assistance of an attorney or other advisor" because his "advisor was not permitted to [fully] participate" at his disciplinary hearing. Id. p.2322, ¶ 225(e);

10. Prohibited John Doe from raising "bias concerns regarding ... [OSU] employees that would sit on his Hearing Panel...." *Id,* p.2288, ¶ 90;

11. Failed to afford John Doe a presumption of innocence. Id. p.2322, ¶

225(f);

12. Infringed on "John Doe's protected property interest ... (and) right to pursue an education and future educational and employment opportunities and occupational liberty." *Id,* p.2315, ¶ 191;

13. Engaged in "ill will, bad faith, and/or an intent to injure John Doe ... [which amounts to] the arbitrary abuse of executive power so egregious that it shocks the conscience of the public." *Id,* p.2316, ¶ 197–98 (discussing publications addressing Constitutional violations similar to those Individual Defendants' inflicted on John Doe);

14. Denied "John Doe the 'fundamentally fair [disciplinary] procedures' required by United States Supreme Court decisions such as *Goss v. Lopez* , 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)." Id. p.2315, ¶ 190;

15. Unlawfully hindered "John Doe's right to pursue an education and future educational and employment opportunities and occupational liberty. *See e.g., Dixon v. Alabama State Board of Education* , 294 F.2d 150, cert. denied,

---

[12] "*See e.g., Brandeis,* 2016 U.S. Dist. Lexis 43499, *13–14 (discussing a lack of cross-examination in a university disciplinary hearing as follows: [h]ere, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence. The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding.")." Similarly, the Second

Circuit's *Winnick* decision noted: "if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing." *Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir. 1972). *See also, Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 636 (6th Cir. 2005) (citing *Winnick* for the proposition that "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases."). Therefore, John Doe requests this Court reject State Defendants' allegations that John Doe no right to question witnesses. Doc.37, p.2845–47 (containing State Defendants' arguments regarding same)." (Doc. 40, Pl.'s Resp. at 48, n. 42).

1082*1082

368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) (stating, '.... education is vital and, indeed, basic to civilized society ... [i]t is most unlikely that a public college would accept a student expelled from another public college....")." *Id.,* ¶ 191;

16. Denied John Doe his right to a "gender-neutral" disciplinary process by an "impartial decision maker." *Id.* p.2315, ¶ 193;

17. Eliminated John Doe's right to "a 'meaningful' opportunity to clear his name. *See e.g., Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (requiring disciplinary procedures that take place 'at a meaningful time and in a meaningful manner.')." *Id.* , ¶ 194;

18. ".... irreparably damaged John Doe's 'good name, reputation, honor, or integrity' with an unlawful disciplinary proceedings that will 'seriously damage [his] standing ... [and] interfere with later opportunities for higher education and employment.' *See, Goss v. Lopez* , 419 U.S. 565, 573–75, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)." Id. p.2305, ¶ 136;

19. Deprived "John Doe of his interests within the meaning of 'life, liberty, or property' contained in U.S. Const.... in part because Defendants violate[d] John Doe's property right to a transcript unmarred by Defendants' unlawful investigation and/or discipline of John Doe." *Id.,* p.2317, ¶ 205; and

20. Violated John Doe's rights under the Ohio Constitution and Ohio's Administrative Code. *See e.g., Id.* pgs.2320–21; ¶¶ 219–223.

(Doc. 40, Pl.'s Resp. at 47–49).

Although the Court finds all of Plaintiff's allegations concerning, he has not alleged that he did not receive notice or a hearing. He was further provided with the charges against him and potential sanctions. He also had the opportunity to review the hearing packet prior to the hearing and was allowed to participate in the hearing. Further, OSU's decision to not allow his attorney to act on his behalf has not been found to violate due process. *See Flaim* , 418 F.3d at 640–41 ("Full-scale adversarial hearings in school disciplinary proceedings have never been required by the Due Process Clause and conducting these types of hearings with professional counsel would entail significant expense and additional procedural complexity."). Plaintiff's allegation that OSU failed to follow its own procedural guidelines and that said failure resulted in an unfair disciplinary process is of some concern. (Doc. 40, Pl.'s Resp. at 63). However, in *Winnick v. Manning* , the Second Circuit held that "we are not inclined to hold that every deviation from a university's regulations constitutes a deprivation of due process." 460 F.2d 545, 550 (2d Cir. 1972). Just as the *Winnick* court didn't find that the alleged deviations rose to "constitutional proportions," this Court does not find Plaintiff's allegations to rise to that level. Accordingly, Plaintiff's procedural due process is hereby dismissed.

## 4. Equal Protection Clause

In Count Five, Plaintiff alleges a violation of the Fourteenth Amendment's Equal Protection Clause, pursuant to 42 U.S.C. § 1983, asserting generally that "gender discrimination caused the Individual Defendants to unlawfully find John Doe responsible for engaging in sexual misconduct with Jane Doe. Upon information and belief, female OSU students suffer no historical disadvantage regarding the discernment of consent to intimate physical relationships with male students which would allow Individual Defendants to validly discriminate against male students like John Doe." (Doc. 36, Am. Compl. ¶ 212–213). In order to state a claim for an equal protection

violation based upon gender discrimination, Plaintiff must demonstrate that he was treated differently *1083 —under the same facts and circumstances—than a member of the opposite gender. *Kuhn v. Washtenaw Cty.* , 709 F.3d 612, 624 (6th Cir. 2013). The Sixth Circuit has held that is an "absolute requirement" to state an equal protection claim that the plaintiff provide evidence "that a similarly situated person outside [his] category" was either not charged with misconduct or not dismissed from the university under the same set of operative facts. *Gardenhire v. Schubert* , 205 F.3d 303, 318 (6th Cir. 2000) ; *see also Harajli v. Huron Twp.* , 365 F 3d 501, 507 (6th Cir. 2004).

Defendants argue, and the Court concurs, that Plaintiff's Amended Complaint does not include an example of a female student who was accused by another student of sexual misconduct under the same facts, yet was either found not responsible or was not dismissed from OSU. Plaintiff therefore cannot maintain a claim for violation of the equal protection clause and Count 5 is hereby dismissed.

## 5. Qualified and Eleventh Amendment Immunity for the Individual Defendants

The individual Defendants also assert that they are entitled to qualified immunity on Plaintiff's claims against them in their individual capacities, and to Eleventh Amendment immunity for claims against them in their official capacities. Having found that all of the claims against the Individual Defendants as set forth in detail above are dismissed, the Court need not address the Individual Defendants' immunity arguments.

## C. Declaratory Judgment and Injunctive Relief

Plaintiff has also sought a request for declaratory judgment (Count 8) for violation of the due process provisions of the United States and Ohio Constitutions. (Doc. 36, Am. Compl. ¶ 66). The Court has already determined that Plaintiff has

failed to state a claim for relief under the due process clause. Without an actionable claim, there is no controversy to be settled. *See Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (declaratory judgment act does not create an independent cause of action); *Snyder Comput er Sys. v. Lahood*, No. 2:10–cv–161, 2010 WL 3167851, at *3–5 (S.D. Ohio Aug 10, 2010) (Sargus, J.) (dismissing plaintiff's request for declaratory judgment because underlying procedural due process claim failed). Plaintiff's request for a declaratory judgment for violation of the due process provisions is hereby dismissed.

Throughout the Amended Complaint, Plaintiff generally requests injunctive relief. Injunctive relief is a remedy, not a cause of action. *Reyes v. Wilson Mem. Hosp.*, 102 F.Supp.2d 798, 801 n. 1 (S.D. Ohio 1998) (Rice, J.). Plaintiff has not specifically sought injunctive relief with respect to Count 3, the remaining claim in this case and all other claims have been dismissed. Therefore, any request for injunctive relief is denied.

## IV. CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claim for erroneous outcome in violation of Title IX against OSU remains pending. All of Plaintiff's other claims are hereby dismissed. Defendants' Motion to Strike the Amended Declaration of Joshua Engel is **DENIED**.

The previously filed motions to dismiss and motion to strike with respect to the Second Amended Complaint, documents 23, 24, and 25 [1084]are hereby **DENIED as moot**. *1084 The Clerk of this Court shall remove Documents 23, 24, 25, 37, and 38 from the Court's pending motions list. The Clerk shall dismiss the Individual Defendants from this case as there are no remaining claims pending against each of them.

## IT IS SO ORDERED.

casetext
Part of Thomson Reuters

# Doe v. The Univ. of Chi.

*Decided Nov 7, 2022*

1:22-cv-06105

11-07-2022

JOHN DOE, Plaintiff, v. THE UNIVERSITY OF CHICAGO, Defendant.

---

HONORABLE EDMOND E. CHANG UNITED STATES DISTRICT JUDGE

**MEMORANDUM OPINION & ORDER**

HONORABLE EDMOND E. CHANG UNITED STATES DISTRICT JUDGE

A senior-year undergraduate student at the University of Chicago, Plaintiff John Doe,[1] filed this suit against the University. He presents claims under Title IX and the Fair Housing Act (FHA), as well as state-law claims.[2] R. 2, Compl. at 1.[3] John Doe concurrently moved for a temporary restraining order (TRO) to temporarily prevent the University from requiring him, as of November 7 at 3 p.m., to move out of his on-campus housing and from prohibiting him from entering any other residence halls and dining commons for the rest of the academic year 2022-23. R. 4, Mot. TRO. For the reasons detailed below, John Doe's TRO motion is granted for a 14-day period, from November 4, 2022, through November 18, 2022.

2  *2

---

[1] John Doe has filed a motion to proceed under a pseudonym and to label other case participants with pseudonyms. R. 5, Mot. Proceed Under Pseudonym. This motion is continued for the assigned judge's later

consideration, so pseudonyms remain in place for now and will be used in this Opinion and Order.

[2] This Court has subject matter jurisdiction over the Title IX and FHA claims under 28 U.S.C. §§ 1331, 1343, and over the state-law claims under 28 U.S.C. § 1367.

[3] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Legal Standard

The test for obtaining a TRO is the same as that for a preliminary injunction, with the added requirement that the movant's opponent cannot practicably be given a full opportunity to respond. Fed.R.Civ.P. 65(b)(1)(A). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). The moving party must show: "(1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) that an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (cleaned up).[4] If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

---

[4] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from

casetext

quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

## II. Analysis

John Doe's Complaint includes six counts: hostile educational environment, gender discrimination, and retaliation, all three under Title IX, 20 U.S.C. § 1681(a), violation of the FHA, 42 U.S.C. §§ 3601-3619, and two counts of state-law breach of contract. Compl. ¶¶ 65-117. For purposes of this TRO analysis, the Court focuses on Count 1, which alleges a hostile educational environment in violation of Title IX's *3 prohibition against sex discrimination. There is enough of a likelihood of success on Count 1 to justify entry of the TRO, so there is no need to analyze the other claims.

## A. Likelihood of Success

The first step in the TRO analysis requires John Doe to "demonstrate that his claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (cleaned up). In assessing the merits, the Court reviews the current record from a "neutral and objective viewpoint" without accepting John Doe's allegations as true nor drawing all reasonable inferences in his favor. *Id.* at 791-92. With that said, John Doe is the only side that has presented evidence (in the form of the Verified Complaint and exhibits), so naturally the evidence is stacked in his favor. Obviously, as the litigation moves past the initial TRO stage, the University will have an opportunity to submits its own evidence and this Opinion ought to be read in this early procedural context.

Marching on to the merits analysis, a Title IX sex discrimination claim requires that (1) the educational institution received federal funding, (2) the plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against the plaintiff based on sex,

which includes sexual orientation. *Id.* at 792; *see Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731, 1741 (2020) (holding in the Title VII context that "it *4 is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex").[5]

> [5] At least at this early stage of the case, the University does not appear to contest that sex discrimination under Title IX includes sex discrimination on the basis of sexual orientation.

When solely considering *injunctive* relief and not monetary damages, the Court does not take the extra step of requiring proof of notice of sex discrimination to an appropriate person with the authority to institute corrective measures who, in addition, was deliberately indifferent to the plaintiff's discrimination allegations.[6] *See C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022) ("In *Gebser v. Lago Vista Independent School District*, the Supreme Court held that a victim of such discrimination may recover *money damages* from her school only where an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.") (cleaned up) (emphasis added). Instead, the Court evaluates "the totality of the circumstances" to evaluate whether there is some likelihood of success on the merits, not merely a better than negligible chance, that John Doe *5 suffered sex discrimination by the University of Chicago. *See Doe v. Univ. of S. Indiana*, 43 F.4th at 792 (evaluating propriety of preliminary injunction without any analysis of notice to an appropriate person who was deliberately indifferent).

> [6] Even if it were necessary to consider whether John Doe gave notice of sex discrimination to a person with authority to institute corrective measures, John Doe did inform Jessica Beaver, Senior Assistant Director of Residence Life, on October 6,

2022, that on multiple occasions Student 1 had allegedly used egregiously offensive language in relation to John Doe's sexual orientation. R. 2-5, Oct. 6, 2022 Email. Beaver is most likely-along with the Resident Heads that John Doe spoke to on October 1, Compl. ¶ 42-44-an employee with Title IX mandatory reporting responsibilities under the University's policy. *See* R. 2-1, Title IX Policy at 20. So, John Doe likely did provide notice of sex discrimination to at least one, and maybe more, individuals within the University with authority (and responsibility) to institute corrective measures, like informing the Title IX office. What's more, there is no evidence that Beaver timely informed the Title IX office. This failure to act is enough evidence of deliberate indifference for the purpose of issuing temporary injunctive relief to preserve the status quo.

With the right test in place, the Court now turns to the three relevant elements to consider. First, the University of Chicago receives federal funding. Compl. ¶ 67. Second, absent an injunction, John Doe would be excluded from benefits of an educational program-he would be banned from on-campus housing, all residential halls, and dining commons for the rest of the academic year. R. 2-4, Outcome Letter; R. 28, Appeal Denial; R 2-9, Move Out Instructions. So, the third element of the Title IX sex discrimination test is the only one in dispute. And, with the evidence available, the Plaintiff has shown some likelihood that the University engaged in sex discrimination-at least enough so that a TRO is appropriate to preserve the status quo.

Specifically, based on the current record, the University seems to have failed to account for the alleged sexual-orientation harassment of John Doe by Student 1 when the University conducted its investigation into the accusations leveled by Student 1 against John Doe. The housing-disciplinary process got started when Student 1

complained to on-campus housing authorities that John Doe physically attacked Student 1 on the night of September 29-30. But John Doe avers that this false accusation was leveled only after John Doe and another student, Student 2, threated Student 1 with filing Title IX complaints against Student 1 for alleged homophobic *6 comments and behavior. Compl. ¶¶ 34-35.[7] Yet neither the October 24 Outcome Letter nor the October 31 appeal denial mention any *investigation* of Student 1's alleged discrimination against John Doe, which naturally would provide a motive to fabricate the physical-attack accusation. Outcome Letter; Appeal Denial; Oct. 6, 2022 Email. The Outcome Letter only mentioned that John Doe reported prior "issues" with Student 1 but dismissed these issues as "more related to language that [Student 1] used toward members of the LGBTQIA+ community," as distinct from the supposed violence of September 29-20. But it is not that easy to cabin the alleged sexual-orientation from the housing-discipline allegation, given the potential motive to fabricate and the alleged timing of Student 2 and John Doe's potential Title IX complaint against Student 1. Worse, the appeal denial was even more perfunctory; it affirmed the Outcome Letter with no actual explanation for why John Doe's contentions of procedural irregularity and missed evidence were insufficient grounds for the appeal. Appeal Denial. The appeal denial boils down to ipse dixit without articulated reasoning.

[7] John Doe averred to his "Verified Complaint," meaning that the Court can rely on the facts alleged as if they were contained in an affidavit. Generally, the Rules of Evidence do apply to preliminary-injunction hearings. *See* Fed.R.Evid. 1101 (no exception for preliminary-injunction hearings). But affidavits are admissible at such hearings because Federal Rule of Civil Procedure 65 hearings are summary in nature and less formal than trials. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir. 1997); *see also Dexia*

*Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010). Hearsay too is admissible. *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).

At the November 4, 2022 telephonic hearing held on John Doe's TRO motion, the University argued that John Doe's alleged attack of Student 1 should be considered entirely independently of John Doe's Title IX accusations against Student 1. To *7 the University's thinking, the punishment of John Doe was appropriate given the alleged physical attack on September 29-30, even without considering any alleged prior sex discrimination perpetrated by Student 1. But the University also acknowledged-as it must-that what happens *before* an alleged physical attack is relevant to determining whether the alleged attack is even true. In other words, it makes good sense that a person, like Student 1, who is threatened with a discrimination complaint might harbor some motivation to preempt his accuser with, for example, a false allegation. To be clear: the Court is most certainly *not* opining on the truthfulness of Student 1's accusations against John Doe. The accusations might very well be true, and if they are, then nothing at all would prohibit the University from implementing the housing-and-dining ban on John Doe. But the University's apparent total failure to consider the sex-discrimination motive on the part of Student 1 qualifies as ignoring the University's potential participation in Student 1's discrimination. (And, if needed to prevail for a TRO, qualifies as deliberate indifference to John Doe's claim of sex discrimination.)

Relatedly, at the November 4 hearing, the University explained that, for purposes of its investigation into John Doe's behavior, it did not interview the witness (Student 3) who John Doe identified to corroborate Doe's version of events on the night of the alleged attack. Apparently, the University only interviewed John Doe's corroborating witness, Student 3, as part of *another* student's disciplinary proceeding and not

at all before it made its decision to ban John Doe from on-campus housing and dining. The Outcome Letter and the appeal-denial letter also do not explain why *8 the University chose not to interview Student 3. Indeed, the letters do not *mention* Student 3 at all. Outcome Letter; Appeal Denial. The failures by the University to interview Student 3 and to provide any explanation for that decision constitute more circumstantial evidence favoring John Doe's sex-discrimination claim.

To emphasis again: it is not a federal court's role to supplant any genuine party-credibility or witness-credibility determinations made by the University. Indeed, the situation would be different if the record showed (and it might later in the case) that the University had weighed the totality of the evidence available-including Student 1's possible discriminatory motive and John Doe's corroborating witness. Instead, for reasons unexplained, it appears that the University undertook an incomplete investigation, without the benefit of learning about the past interactions between John Doe and Student 1 or the perspective of John Doe's identified witness. If there was a proper reason for this limited approach, the University does not provide it in the Outcome Letter or the appeal denial. And finally, in its investigation, the University also inexplicably did not advise John Doe of all the allegations that Student 1 levelled against him until after it issued its decision in the Outcome Letter. Compl. ¶¶ 46-49. Again, the University does not provide an explanation for this lack of transparency, which also counts in favor of John Doe's claim of discrimination. And so-again, based on the totality of the circumstances right now and without the benefit of full adversarial presentation at this stage-there is some likelihood of success on the sex-discrimination claim. *9

**B. Inadequate Remedy at Law and Irreparable Harm**

Next, the Court considers whether a TRO is necessary to prevent irreparable harm that cannot be "fully rectified by the final judgment after trial." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (cleaned up). "Not every conceivable injury entitles a litigant to a preliminary injunction," *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005), and "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (cleaned up); *see also E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("For example, speculative injuries do not justify this extraordinary remedy.").

John Doe argues that he would suffer irreparable harm by losing his on-campus housing, as well as access to all other residence halls and dining commons for the rest of the year. R. 4, Pl.'s Br. at 10-11. At the November 4 TRO hearing, John Doe testified that he is in the midst of completing several academic assignments due in the coming weeks-one of which is for his key recommender for graduate school-and also completing mathematics graduate-school applications, some of which are due in November and December. He also testified that finals for the term are upcoming. At the time of the November 4 TRO hearing, John Doe would have had one weekend to move out of his housing by November 7 at 3 p.m. Move Out Instructions. It is unclear whether John Doe enjoys the financial means to find an alternative home over a *10 weekend, or whether he would be left without a place to live; homelessness, even for a short while, would constitute irreparable harm. But even if John Deo could financially handle a quick move, he still faces imminent harm that could not be rectified with monetary damages. Specifically, John Doe testified to crucial and immediately upcoming academic and professional

deadlines in the form of important assignments, graduate school applications, and final examinations. The negative impact of failure on those upcoming assignments, applications, and tests because of a near-term eviction from on-campus housing and an inability to access social and study opportunities with students in other residence halls and dining commons is an irreparable harm for which no adequate remedy at law exists.[8] *11

___

[8] At the November 4 TRO hearing, the University cited cases in which plaintiffs were suspended or expelled from school to argue that John Doe will not suffer irreparable harm as a result of his removal and ban from on-campus residential and dining life. But the cases do not establish that proposition as a matter of law. Rather-aside from mostly being non-binding authority-the cases showcase particularized analyses of the facts, circumstances, and alleged harms specific to each case before rejecting irreparable harm. *See Doe v. Univ. of S. Indiana*, 43 F.4th (denying a preliminary injunction solely based on a lack of a likelihood of success on the merits, not because of irreparable harm); *Doe v. Bd. of Trustees of Univ. of Illinois*, 2017 WL 11593304 (C.D. Ill.Dec. 18, 2017) (denying a preliminary injunction based on the specific facts and circumstances that showed that plaintiff's harms were reparable by monetary judgment); *Medlock v. Trustees of Indiana Univ.*, 2011 WL 4068453 (S.D. Ind. Sept. 13, 2011) (same); *Montague v. Yale Univ.*, 2017 WL 4942772 (D. Conn. Mar. 8, 2017) (finding based on the vagueness and lack of immediacy of the plaintiff's supposed harms that the expulsion could be adequately remedied by money damages if the plaintiff was proven right). The University also cited a Second Circuit district court case, *Greer v. Mehiel*, which explains that in that Circuit evictions typically constitute irreparable harm when they also involve the risk of homelessness,

because otherwise they can be remedied later through monetary judgment. 2016 WL 828128 (S.D.N.Y. Feb. 24, 2016). Aside from being non-binding, this case does not help address the irreparable harm to John Doe's immediate academic and professional objectives.

## C. Balance of Harms and Public Interest

Having determined-at this stage and without full adversarial presentation- that John Doe has shown some likelihood of success on the merits and that he is likely to suffer irreparable harm, the Court, "sitting as would a chancellor in equity," now balances the risks of harm to the Plaintiff and Defendant, as well as the public interest (if any). The Court's goal in this is to "minimize the costs of being mistaken" by "weigh[ing] the competing considerations [to] mold appropriate relief." *Stuller*, 695 F.3d at 678 (cleaned up). The harms to John Doe have already been detailed: he will lose his on-campus housing and access to other student residences and dining halls, negatively affecting his near-term academic and professional work. The University of Chicago, on the other hand, of course has an interest in protecting its other students, namely, Student 1 who accused John Doe of a physical attack. Student 1's safety constitutes a serious and intense interest.

The University has already issued a no-contact directive prohibiting contact between John Doe and Student 1 at all University of Chicago locations. R. 2-3, NoContact Directive. John Doe asserts that the no-contact directive has worked until now, with neither of the two students having interacted since its issuance. Pl.'s Br. at 11. At the

TRO hearing, the University acknowledged that it was not aware of any violations. For the time being, then, the no-contact directive seems to be working as a reasonable compromise of the parties' competing interests. And nothing in this order prevents the University from strengthening the no-contact directive to minimize *12 inadvertent contact by, for example, examining each student's schedule to provide further direction to each about places and times to avoid.

Here, the public interest does not favor one or another party. And so, the current effectiveness of the no-contact directive, which can be strengthened further, tips the equitable scales in favor of allowing John Doe to temporarily remain in his on-campus housing with access to other residence halls and dinning commons.

## III. Conclusion

For the reasons discussed in this Opinion, John Doe's TRO motion is granted from November 4, 2022,[9] through November 18, 2022. The University is barred from enforcing the October 24 and October 31 directives to move out of the residence hall and barred from enforcing the October 24 and 31 ban from Housing and Residence Life halls and dining commons. This order binds the following persons with actual notice of the order: the University's officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with those listed categories of individuals.

[9] The Court posted a summary version of this Order on November 4, 2022. R. 17.

# Doe v. Univ. of Mich.

325 F. Supp. 3d 821 (E.D. Mich. 2018)

Decided Jul 6, 2018

Case No. 18-11776

07-06-2018

John DOE, Plaintiff, v. UNIVERSITY OF MICHIGAN, et al., Defendants.

Deborah L. Gordon, Deborah L. Gordon Assoc., Bloomfield Hills, MI, for Plaintiff. Brian M. Schwartz, Miller, Canfield, Paddock and Stone, P.L.C., Detroit, MI, Joshua W.B. Richards, Amy Lynn Piccola, Saul Ewing Arnstein & Lehr LLP, Philadelphia, PA, for Defendants.

Arthur J. Tarnow, United States District Judge

823 *823

Deborah L. Gordon, Deborah L. Gordon Assoc., Bloomfield Hills, MI, for Plaintiff.

Brian M. Schwartz, Miller, Canfield, Paddock and Stone, P.L.C., Detroit, MI, Joshua W.B. Richards, Amy Lynn Piccola, Saul Ewing Arnstein & Lehr LLP, Philadelphia, PA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [4]

Arthur J. Tarnow, United States District Judge

Plaintiff, John Doe, a student who has completed all of the requirements to receive his undergraduate degree at the University of Michigan, has been accused of sexual assault and faces a possible penalty of expulsion. In the midst of the University's investigation into his alleged conduct, Plaintiff commenced this 42 U.S.C. § 1983 action claiming, *inter alia* , that the University of Michigan's Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence ("Policy") deprives students of due process in violation of the Fourteenth Amendment.

Before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [4] filed on June 5, 2018. Plaintiff argues that due process requires that he be given a live hearing and the opportunity for cross-examination of his accuser.

For the reasons explained below, Plaintiff's Motion for TRO [4] is **GRANTED in part and DENIED in part** .

## FACTUAL BACKGROUND

## I. Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence

The Policy, enacted on February 7, 2018, governs claims of sexual assault on campus. Where a student reports sexual misconduct to the University's Office of Institutional 824 *824 Equity ("OIE"), the Policy sets forth two resolution processes: 1) formal resolution, involving an investigation, and where necessary, an appeal and sanctions; and 2) alternative resolution. The formal resolution process is challenged here.

casetext

Pursuant to the Policy, once a claimant files a report of an alleged violation, the OIE investigator meets privately with the claimant and conducts an interview. Thereafter, the accused is notified in writing of the start of an investigation. The investigator meets separately with the accused, who may have an attorney or advisor present. The investigator takes statements from both parties and asks them to identify possible witnesses.

After the interviews, the investigator provides the accused with a draft summary of his statement so he may comment and ensure its accuracy. The accused may submit suggested questions to the investigator to be asked of the claimant or other witnesses, but it remains within the investigator's discretion to determine whether and how to ask the questions.

The investigator is responsible for reviewing the information provided by the parties and determining its relevance and probative value. Once the parties have had the opportunity to comment on their statements, identify witnesses, and submit suggested questions, the investigator prepares a Preliminary Investigation Report. The Preliminary Investigation Report includes a summary of all witness interviews, but does not contain any findings. The parties are given a copy of the Report and may comment and offer feedback.

When the investigator has completed gathering evidence, she makes a determination, by a preponderance of the evidence, as to whether the accused has violated the Policy. No live hearing is held. The investigator drafts a final written report ("Final Report") summarizing her findings and rationale in support. The Final Report is reviewed by the Title IX Coordinator and the Office of General Counsel before it is given to the parties. The University strives to complete this entire process within sixty days.

Either party may appeal the investigator's findings. An external reviewer, reviews the Final Report and the parties' written submissions. If the external reviewer determines that there are no issues of concern, he may affirm the investigator's findings. Alternatively, if he identifies any issues of concern, he may remand or make necessary modifications to the report. The Policy authorizes the external reviewer to reverse an investigator's finding of no violation.

Where a student is found responsible for violating the Policy, the University imposes sanctions which may include: probation, suspension, expulsion, and revocation of the student's degree.

## II. Doe Investigation

In April 2014, John Doe enrolled at the University as an undergraduate student. Throughout his four-year tenure, Doe successfully completed the University's requirements for graduation in April 2018. During his senior year, Doe was a Residence Advisor. On February 26, 2018, he was accepted to the University's College of Engineering Master's Degree Program to begin in September 2018. He has since been accepted to out-of-state graduate engineering programs as well.

On March 20, 2018, a female student ("Claimant") filed a complaint with the OIE alleging that a non-consensual sexual encounter had occurred between her and Doe on November 11, 2017. No witnesses were present.

Doe and Claimant had known each other prior to the sexual encounter in November *825 2017. In the weeks that followed, they continued to speak to each other via text and in person. Doe maintains that Claimant asked to have sex again and he declined, telling her he just wanted to be friends.

Defendant Suzanne McFadden, the OIE investigator, commenced an investigation into the complaint. On March 29, 2018, she interviewed Claimant and took notes contemporaneously. The interview was not recorded.

On April 2, 2018, Doe received an email from the OIE stating that a report had been filed against him. The report alleged the following conduct: "unwanted oral, vaginal, and anal penetration without consent, at [ ] residence hall on November, 11, 2018 [sic]." The OIE informed Doe that it would investigate a potential policy violation of sexual assault and that he may retain a support person, such as an attorney.

On April 3, 2018, McFadden interviewed Doe. During the interview, she advised him of the allegations against him and asked him to identify witnesses and other evidence.

On April 11, 2018, McFadden provided Doe with a copy of his statement and an opportunity to submit comments. Doe made comments on the same day. He also provided McFadden with six additional witnesses and evidence.

McFadden interviewed three of Doe's witnesses.[1] She also interviewed two other witnesses, presumably at Claimant's request.

> [1] Of the six proposed witnesses, one declined to participate and two did not respond to McFadden's request.

On April 19, 2018, the University informed Doe that an administrative hold had been placed on his student account, rendering him unable to register for classes or receive a copy of his transcript.

On May 24, 2018, McFadden issued an Executive Summary (Preliminary Investigation Report). On May 29, 2018, Doe submitted 88-pages of feedback. On May 31, 2018 and June 4, 2018, McFadden spoke with Claimant, over the phone and via email, to ask additional questions. McFadden issued a Second Preliminary Report on June 21, 2018. She has not yet made findings with respect to whether Doe committed a Policy violation.

## III. Procedural History

On June 4, 2018, Doe, through counsel, commenced this action alleging that the Policy violates the Fourteenth Amendment, Title IX, and Michigan's Elliot-Larsen Civil Rights Act. On June 5, 2018, Doe filed the instant Motion for TRO [4] which asserts that the Policy deprives him of due process. On this basis, Plaintiff requests that the Court immediately enjoin Defendants from: 1) withholding his official transcript and degree; 2) continuing their investigation, sanctions, and appeals process; and 3) continuing to use the Policy and requiring Defendants to provide all students the protections set forth in the Statement of Student Rights and Responsibilities.

On June 11, 2018, the Court held a telephone conference at which defense counsel agreed to recommend to the University that it provide Doe with a copy of his official transcript, pending the conclusion of the investigation. On June 14, 2018, the Court issued an Order [19] granting in part Plaintiff's Motion for TRO to reflect the parties' agreement with respect to the *826 transcript.[2] Defendants filed a Response [21] to Plaintiff's Motion for TRO on June 15, 2018. Plaintiff filed a Reply [23] on June 19, 2018.

> [2] Plaintiff received a copy of his undergraduate transcript on June 12, 2018.

On June 28, 2018, the Court held a hearing at which it ordered the University to stay publication of its Final Report pending its ruling on Plaintiff's Motion for TRO.

## ANALYSIS

Plaintiff seeks a preliminary injunction immediately enjoining Defendants from continuing their investigation, sanctions, and appeals process under the Policy and requiring Defendants to provide all students accused of sexual assault the protections guaranteed in the University's Statement of Student Rights and Responsibilities.

## I. Plaintiff's case is ripe for review

As an initial matter, Defendants argue that Plaintiff's claims fail because they are not ripe for decision. According to Defendants, in the absence of a finding that Plaintiff violated the Policy or University-imposed sanctions, Plaintiff has no due process claim to be adjudicated.

"[T]he ripeness requirement prevents courts from hearing premature or abstract disagreements." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.* , 769 F.3d 447, 451 (6th Cir. 2014) (internal citations omitted). "Three factors guide the ripeness inquiry: (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Berry v. Schmitt* , 688 F.3d 290, 298 (6th Cir. 2012) (internal citation and quotation marks omitted).

All three factors support a finding that this case satisfies the ripeness requirement. First, Plaintiff, who may presently be without sufficient due process protections, is at immediate risk of expulsion. Moreover, he has already suffered injury—sexual assault allegations may " 'impugn [his] reputation and integrity, thus implicating a protected liberty interest.' " *Doe v. Univ. of Cincinnati* , 872 F.3d 393, 399 (6th Cir. 2017) (quoting *Doe v. Cummins* , 662 Fed.Appx. 437, 445 (6th Cir. 2016) ).

Second, additional facts are unnecessary to fairly adjudicate the merits of Plaintiff's claims. The Court, having examined the Policy and the relevant case law, is well-equipped to determine whether the Policy adequately protects Plaintiff's due process rights. Particularly for purposes of deciding this Motion, the record is sufficiently developed.

Finally, if the Court denies this Motion, but ultimately finds that the Policy violates due process, Plaintiff will have been forced to defend

himself against serious sexual assault allegations without adequate constitutional safeguards.

Defendants essentially ask the Court to sit back and wait for the investigator to issue findings against Plaintiff before intervening in this action. But, at this very moment, the University may be denying Plaintiff due process protections to which he is entitled. The Court cannot, and will not, simply standby as the fruit continues to rot on the tree. This case is ripe for adjudication.

## II. Plaintiff is entitled to a preliminary injunction

In evaluating a motion for a preliminary injunction, courts consider the following factors:

827 *827

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Bonnell v. Lorenzo* , 241 F.3d 800, 809 (6th Cir. 2001) (quoting *Rock & Roll Hall of Fame v. Gentile Prods.* , 134 F.3d 749, 753 (6th Cir. 1998) ). It is the plaintiff's burden to prove that the circumstances clearly demand injunctive relief. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't* , 305 F.3d 566, 573 (6th Cir. 2002).

## A. Likelihood of Success on the Merits

Plaintiff argues that he is likely to succeed on the merits of his claim that the Policy violates due process. Plaintiff submits that in cases such as this one, where the credibility of the parties is at stake, due process requires a live hearing and cross-examination.

casetext
Predictive research...

In the school disciplinary context, "[n]otice and an opportunity to be heard remain the most basic requirements of due process [but] [w]ithin this framework ... the additional procedures required will vary based on the circumstances and the three prongs of *Mathews [v. Eldridge* , 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).]" *Flaim v. Med. Coll. of Ohio* , 418 F.3d 629, 635 (6th Cir. 2005).

To determine "how much process is due," courts consider the following factors: 1) how the private interest will be affected by the official action; 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* , 424 U.S. at 334-35, 96 S.Ct. 893.

Additionally, the Sixth Circuit has explained that the accused must be given the opportunity to share his version of the events at some kind of hearing. *Doe v. Univ. of Cincinnati* , 872 F.3d at 399–400. The hearing need not be live, but must be meaningful and "provide the accused with the opportunity to respond, explain, and defend." *Flaim* , 418 F.3d at 635 (internal citation and quotation marks omitted).

## i. Private interest

Plaintiff's private interest at stake here is significant—he is at risk of expulsion and the revocation of his degree. Furthermore, in addition to its damaging effect on educational and employment opportunities, "[a] finding of responsibility for a sexual offense can have a lasting impact on [Plaintiff's] personal life" and reputation. *Doe v. Univ. of Cincinnati* , 872 F.3d at 400 (internal citation and quotation marks omitted).

## ii. Risk of an erroneous deprivation and value of additional procedural safeguards

Plaintiff argues that he is entitled to additional procedures safeguards which include the opportunity to cross-examine witnesses at a live hearing. In *Doe v. Univ. of Cincinnati* , the Sixth Circuit recently addressed the issue of what procedural safeguards may be necessary to adequately protect a student's right to due process in this context. In *Doe* , Jane Roe reported to the University of Cincinnati ("UC") that John Doe had sexually assaulted her. 872 F.3d at 401. Doe maintained that the sex was consensual; Roe claimed it was not. *Id.* Following the investigation and interviews, a live hearing was held at which a panel, *828 made up of students and faculty, heard the allegations, reviewed evidence, and questioned witnesses. *Id.*

Roe did not appear at the hearing, but the Chair read Roe's statement to the panel. *Id.* at 397. Because Roe was absent, neither Doe nor the panel had the opportunity to ask her questions. After the hearing and appeal, Doe was found responsible for violating UC's sexual assault policy. *Id.*

Doe moved for a preliminary injunction against UC, arguing that it could not constitutionally find him responsible for sexual assault without having had the opportunity to question or confront Roe. *Id.* at 398. The Sixth Circuit agreed, explaining that "[c]ross-examination is 'not only beneficial, but essential to due process' in a case that turns on credibility because it guarantees that the trier of fact makes this evaluation on both sides." *Id.* at 402 (quoting *Flaim* , 418 F.3d at 641 ).

Here, Plaintiff appropriately notes that *Doe* requires a form of cross-examination in cases, such as this one, which involve credibility determinations. But, the problem the Sixth Circuit identified in *Doe* was that the panel made a credibility determination without having assessed Roe's credibility. *Id.* at 402. Although the Sixth

Circuit stressed the importance of cross-examination, it did not strike down UC's policy of authorizing a "circumscribed form of cross-examination" that "involves submitting written questions to the [ ] panelists." *Id.* at 396-97.

While the Sixth Circuit has affirmed disciplinary procedures which provide for a hearing at which questions are asked of the claimant via panel, it has not ruled on whether a circumscribed form of cross-examination is constitutional in the absence of a live hearing. In fact, in this Circuit, nearly all other sexual misconduct policies that have been subject to judicial review provide the accused with the opportunity to appear at a live hearing. *See, e.g.* , *Doe v. Miami Univ.* , 882 F.3d 579, 587 (6th Cir. 2018) ; *Doe v. Univ. of Cincinnati* , 872 F.3d at 400 ; *Cummins* , 662 Fed.Appx. at 448 ; *Flaim* , 418 F.3d at 635 ; *Doe v. The Ohio State Univ.* , 136 F.Supp.3d 854, 862 (S.D. Ohio 2016).

Unlike the policies which the Sixth Circuit has upheld, this Policy deprives Plaintiff of a live hearing and the opportunity to face his accuser. Because of the University's method of private questioning through the investigator, Plaintiff has no way of knowing which questions are actually being asked of Claimant or her response to those questions. Without a live proceeding, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is significant. Additional procedural safeguards would both assist the truth-seeking process and help to ensure the protection of Plaintiff's constitutional rights.

### iii. Fiscal and administrative burden on the University

The University uses a bifurcated system to address student misconduct. The Policy challenged here, which does not provide the accused with the opportunity to face his accuser at a hearing, governs sexual misconduct. The University's Statement of Student Rights & Responsibilities, which does provide the accused the opportunity to appear at a hearing, governs non-sexual

misconduct. Because the University already conducts hearings for students accused of misconduct at which they may question witnesses, requiring the University to hold live hearings for students accused of sexual assault would be neither fiscally nor administratively burdensome.

### iv. Plaintiff is likely to succeed on the merits

829 Based on its assessment of the *Mathews* ' factors, and taking into considering the *829 relevant circumstances of this case, the Court concludes that Plaintiff is likely to succeed on the merits of his claim that the University's Policy, which affords neither a live hearing nor cross-examination, violates his right to due process.

### B. Irreparable Harm

To demonstrate irreparable harm, Plaintiff must show that the harm is actual and imminent, as opposed to speculative or unsubstantiated. *Abney v. Amgen, Inc.* , 443 F.3d 540, 552 (6th Cir. 2006). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by money damages." *Overstreet* , 305 F.3d at 573.

Where, as here, a plaintiff's constitutional right to due process is "threatened or impaired" the Court may presume irreparable injury. *Doe v. Univ. of Cincinnati* , 872 F.3d at 407. Plaintiff faces an immediate threat of expulsion, a penalty that could drastically curtail future educational and employment opportunities. *See Doe v. Middlebury Coll.* , No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015). Money damages cannot compensate Plaintiff for the reputational harm he has already suffered and will continue to suffer as a consequence of sexual assault allegations. Accordingly, this factor weighs in Plaintiff's favor.

### C. Harm to others

In considering the potential harm an injunction may impose on the University, the Court acknowledges the University's strong interest in maintaining campus safety and disciplining students who have committed sexual misconduct.

The Court also considers the emotional harm and trauma Claimant may suffer if the Court orders the University to provide a live hearing with questioning. "Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating the same hostile environment Title IX charges universities with eliminating." *Doe v. Univ. of Cincinnati* , 872 F.3d at 403 (internal citation and quotation marks omitted). The Court does not take lightly the potential implications for Claimant. Nonetheless, "[w]hile protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns." *Id.* at 404 (quoting *Doe v. Brandeis University* , 177 F.Supp.3d 561, 604-05 (D. Mass. 2016) ).

Consequently, in determining whether relief is warranted, the Court endeavors to strike the appropriate balance between guaranteeing due process and mitigating harassment of Claimant. *See Michigan v. Lucas* , 500 U.S. 145, 150, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991).

## D. Public Interest

"The final factor, the public interest, primarily addresses impact on non-parties." *Hunter v. Hamilton Cnty. Bd. of Elections* , 635 F.3d 219, 244 (6th Cir. 2011) (internal quotation marks omitted). Protecting a person's constitutional right to due process is always in the public interest. *See Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.* , 796 F.3d 636, 649 (6th Cir. 2015) ("[W]hen a constitutional violation is likely ... the public interest militates in favor of injunctive relief because it is always in the public

interest to prevent violation of a party's constitutional rights." (quoting *Miller v. City of Cincinnati* , 622 F.3d 524, 540 (6th Cir. 2010) ) ).

Although the public interest is served "by the robust enforcement of constitutional rights," it is also served by ensuring the safety and well-being of students on university campuses. *830 *Nokes v. Miami Univ.* , No. 1:17-CV-482, 2017 WL 3674910, at *14 (S.D. Ohio Aug. 25, 2017) (citing *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.* , 698 F.3d 885, 896 (6th Cir. 2012) ). This factor is neutral. *Doe v. Univ. of Cincinnati* , 872 F.3d at 407.

## CONCLUSION

On balance, the aforementioned factors favor an award of preliminary relief. Despite Plaintiff's request for campus-wide changes to the University's policies and procedures on sexual misconduct, the preliminary relief granted here will be limited to Plaintiff and the ongoing investigation into his alleged conduct. *See Sony/ATV Publ'g, LLC v. Marcos* , 651 Fed.Appx. 482, 487 (6th Cir. 2016) (internal citations omitted) ("A preliminary injunction must be no more burdensome than necessary to provide a plaintiff complete relief....").

As soon as practicable, the University is hereby ordered to provide Plaintiff with the opportunity for a live hearing in accordance with the procedures set forth in the Statement of Student Rights and Responsibilities. *See* Ex. A, Section VI. However, to the extent that the Statement authorizes Plaintiff to question Claimant directly, the Court revokes that authorization. At the hearing, Plaintiff may engage only in circumscribed cross-examination, a process through which he may submit questions to the Resolution Officer ("RO"), Resolution Coordinator ("RC"), or Student Resolution Panel to be asked of Claimant.[3]

3  This procedure has been recommended for the claimant's wellbeing by the Department of Education's Office for Civil Rights. *See Doe v. Univ. of Cincinnati* , 872 F.3d at 403.

--------

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [4] is **GRANTED in part and DENIED in part** .

**IT IS FURTHER ORDERED** that the University provide Plaintiff with the procedures set forth in its Statement of Student Rights and Responsibilities, excluding the provision in Stage 2, ¶ C, which authorizes the respondent to question the complainant directly. At the hearing, Plaintiff may question Claimant through the RO, RC, or Student Resolution Panel.

**SO ORDERED** .



# Dudley v. Boise State Univ.

Decided Dec 22, 2022

1:22-cv-00495-DCN

12-22-2022

CHELSEY DUDLEY, Plaintiff, v. BOISE STATE UNIVERSITY; TONY ROARK in his official and individual capacities; MANDY NELSON, in her official and individual capacities; KATE LAW, in her official and individual capacities; and DOES I-X, Defendants.

---

DAVID C. NYE, CHIEF U.S. DISTRICT COURT JUDGE.

**MEMORANDUM DECISION AND ORDER**

DAVID C. NYE, CHIEF U.S. DISTRICT COURT JUDGE.

## I. INTRODUCTION

On December 7, 2022, Plaintiff Chelsey Dudley filed the instant Complaint. Dkt. 1. Simultaneously, Dudley filed a Motion for Temporary Restraining Order and/or Preliminary Injunction ("TRO Motion"). Dkt. 2. In her TRO Motion, Dudley asked the Court for two things: first, to enjoin Defendants Boise State University, Tony Roark, Mandy Nelson, and Kate Law (collectively "Defendants") from conducting a Student Conduct Hearing scheduled for December 12, 2022; and second, to require Defendants to follow certain procedural safeguards during any rescheduled hearing.[1] *1

[1] Dudley also asked the Court to reinstate her degree pending the outcome of these proceedings. As will be explained below, the parties-and the Court-originally merged these two issues into one.

On December 9, 2022, the Court issued a decision granting, in part, Dudley's TRO Motion. Dkt. 4.[2] The Court's relevant findings were as follows:

[2] The Court's ruling was limited to the issue of a TRO. It said it would "consider Dudley's request for a preliminary injunction only after the Motion has been fully briefed and a hearing has been held." Dkt. 4, at 2.

Given the severity of the allegations and punishments Defendants seek to impose upon Dudley, it appears that procedural safeguards are required before Dudley can either be forced to defend herself at the Student Conduct Hearing, or before her apparent property right in her degree and reputation can be revoked. Moreover, requiring BSU to postpone the Student Conduct Hearing while it ensures Dudley receives the process to which she is due under the Constitution would not cause Defendants any injury. As a State Institution, BSU is required to comply with the Constitution, and unraveling the result of a constitutional violation, if any, would likely force BSU to incur far greater time and expense than would postponing the hearing while the preliminary injunction is adjudicated. Moreover, it appears that Dudley stands to lose her degree, her license, and her reputation as a result of rushing to a decision.

casetext

Thus, on the basis of the limited record the Court currently has before it, the Court finds that: (1) Dudley has established a likelihood of success on the merits; (2) Dudley is likely to suffer irreparable harm in the absence of a temporary restraining order; (3) the balance of the equities tips in Dudley's favor; and (4) a temporary restraining order is in the public interest.

Nevertheless, the Court is cognizant that it has only heard one side of the story. Defense counsel has not yet appeared, and Defendants have not had the opportunity to respond to the Motion. However, a TRO is necessary because the Student Conduct Hearing is two (weekend) days away. There is no time for Dudley to serve Defendants with this lawsuit and the Motion, or for Defendants to respond, prior to the Student Conduct Hearing. However, the Court is unwilling to either second guess BSU's Policy with a preliminary injunction, or to take the extreme step of ordering a mandatory injunction requiring certain process, without first hearing from the Defense. Accordingly, the Court will temporarily enjoin Defendants from holding the Student Conduct Hearing for a period of fourteen (14) days. Fed.R.Civ.P. 65(b)(2).

*Id.* at 8-10 (footnotes omitted). The Court noted that it does not normally grant TRO's without hearing from the adverse party, but, in light of the exigent circumstances and short *2 timetable, it would temporarily do so in this case. Dkt. 4, at 9 n.5.

In sum, the Court enjoined Defendants from conducting the hearing on December 12, 2022, required Dudley to serve Defendants, required Defendants to respond to Dudley's TRO Motion on or before December 19, 2022, and set a hearing (via Zoom) for December 20, 2022. *Id.* at 10-11.

Defendants dutifully filed their response (Dkt. 9) and the Court held a hearing (Dkt. 10).

Upon review, and for the reasons set forth below, the Court will not extend the TRO as it relates to the hearing, nor will it grant the TRO as it relates to Dudley's grade or degree.

## II. BACKGROUND

On May 7, 2022, Dudley graduated from Defendant Boise State University ("BSU") with a Bachelor of Arts in Social Work degree. As part of her degree, Dudley completed an internship with the Idaho Department of Health and Welfare ("IDHW"). Upon completion of the internship, Dudley received a passing grade and, in turn, her bachelor's degree in Social Work.

On July 14, 2022, Dudley took and passed her Social Work Licensing Exam through the Idaho Department of Occupational Licensing. On August 24, 2022, Dudley became a licensed social worker in the State of Idaho.

On November 2, 2022, Defendant Tony Roark sent Dudley a letter stating IDHW had conveyed to him the results of an "investigation establishing beyond doubt that [Dudley] accessed confidential client information within IDHW's database . . ." during her *3 time with them that she did not have authorization to view. Dkt. 2-2, at 8.[3]

> [3] Though its nature is not material to this analysis, the confidential information Dudley accessed was related to the father of her children-who she is no longer with-and the mother of his other child (i.e. her expartner and *his* new partner). The only reason this all came to light was because Dudley texted her expartner's new partner and said certain things she could only have known about had she accessed the confidential files at IDHW. That individual then contacted IDHW and BSU's Institutional Compliance and Ethics department and raised her concerns. IDHW performed an internal investigation and informed Defendants of their findings. This

background is only relevant because, and explained below, it shows that Dudley has been apprised of the allegations against her.

Roark then informed Dudley that, as a result of IDHW's allegations, her passing grade for her internship would be changed to a failing grade. *Id*. Roark then informed her that, as a result of the grade change, her transcript was invalid and that she would be contacted by the Office of the Registrar for further action. *Id*. He also explained that, pursuant to University Policy 3130, she could appeal his decision to change her grade. *Id*. Finally, Roark informed Dudley that the entire matter had been referred to the Dean of Students for possible disciplinary action under University Policy 2020. *Id*.

As Roark noted, Defendant Mandy Nelson from BSU's Office of the Registrar sent Dudley a letter the following day stating that, in light of the grade change, her degree was "rescinded" and her diploma was "no longer valid." Dkt. 2-2, at 10.

BSU subsequently sent the State of Idaho's Division of Occupational and Professional Licenses Board of Social Work Examiners a revised transcript showing that Dudley's bachelor's degree in Social Work had been removed from her official transcript.

On November 17, 2022, Defendant Kate Law, Assistant Dean of Students at BSU, sent Dudley an email entitled "Incident Report Notification." Dkt. 2-2, 12-13. It stated, among other things, that BSU had received information that Dudley had purportedly *4 violated the Student Code of Conduct, the National Academy of Social Work code of ethics, the BSU student Professional Conduct and Professional Standards, IDHW's expectations for employees and interns, and state and federal privacy laws. *Id*. The email said BSU was referring these allegations to the Conduct Hearing Board for review. *Id*. "[P]lease understand," Law wrote, "no decision has yet been made regarding this situation. Your input is important to the process and thus I am hopeful that

an open, honest discussion about this incident which [sic] may resolve it in a timely manner, both for you and the university." *Id*. BSU set a pre-hearing date for November 29, 2022, and a Student Conduct Board hearing date for December 12, 2022.

On November 22, 2022, Dudley received a letter from the Division of Occupational and Professional Licenses Board of Social Work Examiners stating: "We recently received a revised transcript by mail from [BSU], which shows that your bachelor's degree in Social Work has been removed from your official transcript ....Per Idaho Statute 54-3206, licensure in Idaho requires a degree in Social Work. Therefore, we are requesting further information on the circumstances surrounding this retraction." Dkt. 2-2, at 15.

Dudley hired attorneys and engaged in negotiations with counsel for BSU. The record does not contain an earlier email from BSU which appears to have explained the process and options Dudley could pursue regarding her grade change as well as the student conduct hearing. The record does, however, contain a December 5, 2022, email from Dudley's counsel to BSU in which they assert she will not engage in the appeal process for her grade change because she understood that the first appeal level was the professor who changed the grade in the first place and he would not be an "unbiased decision-maker." *5 Dkt. 2-2, at 5. In the same email, Dudley requested that BSU postpone the Student Conduct Hearing and reset it with adequate procedural safeguards that would give Dudley notice and an opportunity to be heard. *Id*. at 5-6.

On December 6, 2022, BSU's counsel responded. She first noted that University Policy 3130 required Dudley to meet with the original professor if she wished to appeal the decision to change her grade. Nevertheless, in light of Dudley's stated hesitation, BSU's counsel offered to move Dudley to subsequent steps in the appeal

process. The Court is not in possession of any follow-up emails but knows the appeal process did not occur. BSU's counsel then stated it was "declining to continue the Policy 2020 conduct hearing scheduled for Monday [December] 12, 2022, and declining your request that the hearing be conducted according to the conditions outlined in your email." *Id.*

On December 7, 2022, Dudley filed the instant lawsuit and motion for TRO.

As noted, the Court granted the TRO and enjoined Defendants from holding the conduct hearing for a period of 14 days. It did not rule, in any fashion, on Dudley's requests regarding her grade change.

The Court then held its own hearing on whether to extend the TRO on December 20, 2022, and took the issue under advisement.

### III. LEGAL STANDARD

The Court reviews whether to extend the TRO under the same standard it did initially. A plaintiff seeking a preliminary injunction, or a temporary restraining order ("TRO") must establish "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1114 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008*)); Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

A preliminary injunction and a TRO generally serve the same purpose of "preserv[ing] the status quo ante litem pending a determination of the action on the merits." *See* Fed.R.Civ.P. 65; *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

### IV. DISCUSSION

As noted, *see infra* note 1, there has been confusion about the nature and purpose of the various disciplinary proceedings at BSU. It appeared to the Court at first blush that the Student Conduct Hearing (originally scheduled for December 12, 2022) was related to Defendant Roark's decision to change Dudley's grade and Defendant Nelson's decision to rescind her degree. The Court was under the impression that the Student Conduct Hearing was intended to review the actions of those BSU decisionmakers, and so may have constituted some due process for Dudley. However, upon further review of the record and counsel's comments at oral argument, the Court believes there are some nuances it previously overlooked.

Both actions-the grade change / diploma recission and the disciplinary hearing- stem from Dudley's actions during her internship at IDHW. Critically, however, they were separate procedures. Roark changed Dudley's grade and, as a result, the registrar rescinded her diploma. That is the first bucket or category of adverse action Dudley seeks to enjoin. *7

Roark then "referred" the matter to the Office of the Dean of Students for possible discipline. This second bucket or category of adverse action is what precipitated the Student Conduct Hearing.

The distinction is critical because Dudley challenges Defendants' due process procedures in both circumstances. Again, these two "proceedings" work in tandem and are on essentially parallel tracks, but because they employed separate procedures, the Court will analyze them separately.

#### A. Procedural Due Process

The Fourteenth Amendment forbids the State from depriving "any person of life, liberty, or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975). To state a procedural due process claim, a plaintiff must allege: "(1) a liberty or property interest protected by the

Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). The Constitution does not define property interests protected by the Fourteenth Amendment; rather they are defined by independent sources, such as state statutes or rules entitling citizens to certain benefits. *See Goss*, 419 U.S. at 572-73 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that, though the Constitution does not define property rights, it does set forth specific procedures that must be followed before a property right can be taken)).

Reference to "an independent source such as state law" will determine whether a "legitimate claim of entitlement" to the benefit exists. *Roth*, 408 U.S. at 576-77. The Ninth Circuit has not recognized a generalized property interest in higher education. Instead, it \*8 makes a state-specific inquiry to determine whether a property interest exists once a plaintiff meets her burden of identifying a cognizable property interest based on a source of law independent of the Constitution. *See Doe v. White*, 859 Fed.Appx. 76, 77 (9th Cir. 2021) ("Because the Due Process Clause does not create freestanding property interests, a plaintiff must identify a cognizable property interest based on an independent source such as state law. We, therefore, examine California law to decide whether Doe had a clearly established property interest in her continued attendance at a state university.") (cleaned up); *Wynar v. Douglas County. Sch. Dist.*, 728 F.3d 1062, 1072 (9th Cir. 2013) (holding that, under Nevada law, plaintiff had a property interest in his public education and was, therefore, entitled to due process before he could be suspended.).

*1. Protected Property Interest*

First, the Court must address whether Dudley had a protected property interest entitling her to due process. Defendants contend Dudley fails, at the outset, to show she has a property interest in any of the items at issue (her grade, transcript, degree,

and enrollment) because the only cases she cites for that proposition come from outside the Ninth Circuit, not Idaho statutes as the Ninth Circuit requires.[4] At the hearing, Dudley countered that Idaho Code Sections 33-4005 and 33-3006 vest her with a property interest. The Court disagrees.

> [4] Notably, Dudley has not had a chance to respond to this allegation in writing.

These code sections relate to the management of state universities and the duties of their boards of trustees. They make no mention of property rights or due process. \*9

Interpreting them to vest students with a protected property interest in education, as Dudley asks the Court to do, would impermissibly stretch their plain meaning.

That said, the Court understands Dudley's predicament. Dudley did not cite any Idaho cases because it appears that none exist. The Court likewise cannot find any caselaw from Idaho state courts on this topic. It appears to be an open question.

Caselaw from the federal district courts is also scant. In 2006, District Judge Edward J. Lodge *implied* high school students had a property right in their education but did not cite any state law for that proposition and ultimately found the matter irrelevant because the school did not take any adverse action against the student at issue. *Howard v. Yakovac*, 2006 WL 1207615, at \*7 (D. Idaho May 2, 2006).

In 2017, District Judge B. Lynn Winmill dismissed a claim based upon the argument that the plaintiff had a property interest in his education at Idaho State University because the student could not "point to any state law creating a property interest in his education or scholarship." *Duffin v. Idaho State Univ.*, 2017 WL 6543873, at \*5 (D. Idaho Dec. 21, 2017).

casetext

In 2018, Magistrate Judge Candy W. Dale determined that students do have a property right in a public education and that the state "may not take away a student's property interest without meeting the requirements of due process." *B.W. through Wann v. Vallivue Sch. Dist. No. 139*, 2018 WL 2448448, at *9 (D. Idaho May 31, 2018). That case, however, dealt with a student's participation in interscholastic athletics and, ultimately, Judge Dale determined the school district followed correct procedures-including written notice and an opportunity to appeal-and did not violate the 10   student's due process rights. *10

None of these cases, however, deal directly with a university grade, transcript, or diploma/degree (Dudley's first area of concern), nor do they deal with university enrollment itself (Dudley's second area of concern).[5]

> [5] In *Goss,* 419 U.S. at 565, the United States Supreme Court held that due process requires, in connection with the suspension of a student from public school for disciplinary reasons, "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.,* at 581. That said, just because Due Process is required does not mean a property interest exists. *See, e.g., Ryan v. California Interscholastic Fed'n-San Diego Section,* 114 Cal.Rptr.2d 798, 811 (2001) ("An entitlement, like the state right to a free public education, does not necessarily create a property interest in each of its constituent parts."). In short, this area of law is difficult to parse, and the Court is not prepared to make a formal ruling at this time on the limited record before it regarding whether Dudley has a property interest in some, or all, of the aspects of her university education.

On the one hand, the Court is persuaded by Defendants' argument that Dudley has failed to show she has a protected property interest. There

is insufficient authority from the state courts and legislature for this Court to find conclusively that Dudley has a property interest in her grade, transcript, degree, or education. Federal caselaw *seems* to suggest that she does, but the question turns on state law. *See Roth,* 408 U.S. at 576-77.

On the other hand, BSU is in the contradictory position of arguing that there is no property interest at stake while simultaneously maintaining a handbook of policies and procedures designed to protect such an interest-whether couched as a "property" interest or otherwise. This paradox may be why Defendants assume *arguendo* that Dudley has a protected property interest and proceed to argue that the procedures they have in place are constitutionally adequate. The Court will take a similar approach today. Because a full analysis of this open question of state law would be necessarily speculative, the Court will assume, without formally deciding, that Dudley's interests 11   here are entitled to due process *11 protection.

*2. Adequate Process*

It is undisputed that BSU, a state instrumentality, has taken steps to deprive Dudley of her grade, degree, and opportunity to enroll in future classes. Thus, the next question is whether BSU has afforded Dudley the process due her under the Constitution. The Court will analyze the two categories of discipline separately.

a. *Grade / Degree*

Dudley argues Defendants violated University Policy 3180 when Roark changed her grade because he was not her professor.

The full text of University Policy 3180 is not in the record. From what it has been presented with, it appears Defendants *may* have circumvented certain provisions within the policy. The Court emphasizes may, however, because there could be other applicable sections within University Policy 3180, or other policy sections, that allow for the course of action Defendants took. The Court simply does not know.

Furthermore, even assuming Defendants violated their own policies or procedures, that would not necessarily mean that they violated Dudley's due process rights. *See, e.g., Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 82, 90 (1978) (holding that academic decisions require only a careful and deliberate review-and-appeal process). Regardless, these arguments are fodder for appeal within the University procedures. Dudley could raise this issue with Defendants and see where it leads. The problem is that she has thus far refused to engage in the process offered.

In his original email, Roark explained that Dudley could appeal the decision *12 regarding her grade change by following University Policy 3130. Dkt. 2-2, at 8. BSU's counsel reiterated as much. *Id.* at 5. Critically, when Dudley expressed concern with the appeal process because of who would hear the appeal, BSU's counsel said the University would allow her to essentially "jump over" that step. To date she has still refused.

The Court is not implying that Defendant's appeal process is a prerequisite to filing a lawsuit, that it is a quasi-exhaustion requirement, or that Dudley's case is not yet ripe. It is, however, concerned that Dudley is aggravating the problem she complains of. She asks the Court to find that she has been denied due process while simultaneously dodging BSU's efforts to initiate process of any kind. It is pure speculation at this point what would happen if Dudley actually appealed. Maybe a higher authority would reverse the grade change decision. Maybe not.[6] But the Court cannot say at this stage that Dudley has shown a likelihood of success on her due process claim as it relates to the grade change / diploma recission when the process is, frankly, ongoing. In short, Dudley wants the Court to summarily decide that what has already occurred violated her due process. But those decisions, by all accounts, are not final.

> [6] The Court wishes to make clear that it takes no position on what the outcome should be if Dudley chooses to appeal.

> Defendants are free to make decisions as they see fit, so long as appropriate due process is provided.

The Court recognizes the precarious position this places Dudley in. Presumably this is why she asked for the Court to reinstate her grade and degree until she is given her due process. The Court is sympathetic to Dudley's plight. However, for the reasons just explained, it will not grant her request. *13

To begin, Dudley's due process is ongoing. Second, Dudley is, in part, impeding her own case. It is still unknown at this point whether any changes to Roark's decision will be made. Had she appealed, the parties might not have even got to this point (or, if they did, at least it would be clear where everyone stood). What's more, even if a formal change isn't made, Defendants might be willing to hold matters in abeyance pending the Student Conduct Hearing. As it currently sits, however, Dudley is the one precluding any formal, or informal, resolution of this matter.[7]

> [7] Dudley's primary reason for wanting her degree reinstated is to head off other potentially adverse action by the Idaho Department of Occupational Licensing and her current employer. Again, the Court is sympathetic to her plight. But reinstating her degree while she goes though the process would seem to usurp the University's processes. Similar to when a person is terminated, though there may be circumstances where the decision is held in abeyance pending review, the review usually happens after the termination. If reversed (administratively or via litigation) the person would be entitled to damages. Such could be the case here. The Court understands the domino effect at play here that might not be at play in a generic termination, but the comparison is still appropriate. Additionally, regardless of the status of her degree, either of those other organizations *could* act against her based upon the fact that these issues have arisen

in the first place. As outlined below, however, the Court hopes to avoid all such scenarios by encouraging any other interested entity to wait to see how the process unfolds.

Further, these matters are ongoing. No formal decision has been reached. Prudence dictates that the other stakeholders, including the Idaho Department of Occupational Licensing and Dudley's current employer, wait until the administrative dispute is resolved before taking any action. The Court is aware that the Idaho Department of Occupational Licensing is not a party to this suit. Nor is Dudley's current employer. The Court cannot control what either entity choses to do. Nevertheless, the Court anticipates that they will wait to see how these matters play out within the University's administrative policies and procedures.[8] *14

14

> [8] Again, the Court *is not*, in any way, suggesting what action either organization should take. It is not even implying that the subject of this case requires action. It is simply counseling moderation to avoid the.

For the above reasons, the Court will not grant this portion of Dudley's TRO request. She should engage in the appeals process Defendants have offered. The Court can review later whether BSU's procedures complied with due process, but only once that process has actually taken place. The Court's initial assessment, however, is that these procedures do afford Dudley the "careful and deliberate review-and-appeal process" the Supreme Court deemed sufficient under the Fourteenth Amendment in *Horowitz*. 435 U.S. at 85.

### b. *Student Conduct Hearing*

Dudley alleges that Defendants are violating her Due Process rights in regard to the Student Conduct Hearing and made the following requests: (1) that the hearing be set for a new date; (2) that Defendants specifically identify the policies she is alleged to have violated; (3) allow her to question

witnesses; (4) require Defendants to present IDHW investigators as witnesses, and (5) allow an attorney to present her defense.

In Defendants' estimation, Dudley's requests are largely being met. Those requests not provided for under their current procedures, Defendants argue, exceed what the constitution requires.

First, the hearing has already been delayed at least two weeks as a function of the present TRO, which gave Dudley additional time to prepare.[9] Second, Defendants identified the policies Dudley is alleged to have violated in the information packet provided possibility of having to "undo" potentially drastic action and afford all parties the opportunity to move through the process in a timely and systematic manner. *15 to her on December 7, 2022, and provided her with the evidence they intended to rely upon.[10] Third, Dudley is allowed to question witnesses.

15

> [9] Additionally, BSU is currently on Christmas break. Counsel for Defendants has represented that a hearing will not take place until sometime into the new year. Thus, Dudley has, in essence, received additional time to prepare.

> [10] As the Court mentioned above, *see infra* note 3, the underlying facts of why Dudley was in trouble are not relevant to the Court's TRO decision today. But, the fact of the matter is, Defendants have now laid bare their plan for the Student Conduct Hearing. It appears much of this was already covered in the prehearing meeting, but Dudley is now in an even better position going into the hearing.

Defendants dispute, however, that they need to acquiesce to Dudley's fourth and fifth requests, arguing she has not provided any authority for the proposition that she can request the University bring certain witnesses or that she is entitled to have counsel speak on her behalf. Nevertheless, Defendants argue they have agreed to these demands: Dudley is allowed to call and question

her own witnesses (i.e. she can call IDHW personnel if they are willing to testify) and she is allowed to have an attorney that serves as her advisor during the hearing. On these final items, Defendants also contend that turning this administrative hearing into a quasi-legal hearing is not appropriate and that they would have to train members of the panel on the law if it became akin to the adversarial system Courts utilize.

The Court agrees, at least at this initial stage. It appears that BSU's process complies with the requirements of *Goss* that the student be given notice and an explanation of the evidence against her and also provides the careful and deliberate review process *Horowitz* requires. Accordingly, the Court will not extend the TRO. The student conduct hearing should go forward. And, hearkening back to the Court's comments about proceeding in an orderly fashion, it might be worth waiting to hold the Student Conduct *16 Hearing until the appeal process has run its course as it relates to the grade issue. The Court leaves the order in which to undertake these two tasks up to the parties.

## V. CONCLUSION

This case presents interesting and difficult questions. The Court's main concern, however, is that it is being asked to jump into the fray while the process is ongoing. The Court did not explicitly review the *Winter* factors above while analyzing Dudley's two areas of concern but summarizes those factors briefly here.

While the deprivation of a person's constitutional rights constitutes irreparable harm (factor 2) and protecting a party's constitutional rights is always in the public interest (factor 4), the Court is not

persuaded that Dudley has met her burden of establishing a likelihood of success on the merits of her due process claim (factor 1) and that the balance between her and Defendants tips in her favor (factor 3).

The Court reaches this conclusion based upon Dudley's failure to show-even assuming she has a property interest in the matters at issue-that she is being, or will be, deprived of her Fourteenth Amendment Due Process protections throughout this process; particularly in light of the fact that the process is ongoing. Once these matters reach their natural conclusion, the Court will be in a much better place to assess Dudley's due process claims.

In light of these findings, the Court will not grant Dudley's TRO as it applies to her grade or degree and it will not extend the TRO currently in place *17 as it relates to the Student Conduct Hearing. *17

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. The TRO will not be extended upon its expiration this Friday, December 23, 2022. Dudley should engage in the appeals process and Defendants should hold a Student Conduct Hearing. 2. Once the administrative processes have concluded, the parties should apprise the Court and a determination regarding briefing on the Preliminary Injunction can be made. 18

# John Doe v. Univ. of Cincinnati

872 F.3d 393 (6th Cir. 2017)
Decided Sep 25, 2017

No. 16-4693.

09-25-2017

John DOE, Plaintiff–Appellee, v. UNIVERSITY OF CINCINNATI; Aniesha Mitchell; Juan Guardia, Defendants–Appellants.

ARGUED: Evan T. Priestle, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellee. ON BRIEF: Evan T. Priestle, Doreen Canton, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellee.

GRIFFIN, Circuit Judge.

ARGUED: Evan T. Priestle, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellee. ON BRIEF: Evan T. Priestle, Doreen Canton, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellee.

Before: CLAY, GRIFFIN, and THAPAR, Circuit Judges.

396  *396  **OPINION**

GRIFFIN, Circuit Judge.

On September 6, 2015, University of Cincinnati students John Doe and Jane Roe[1] engaged in sex at John Doe's apartment. John contends that the sex was consensual; Jane claims it was not. No physical evidence supports either student's version.

> [1] We use aliases to protect the parties' privacy.

After considerable delay, defendant University of Cincinnati ("UC") held a disciplinary hearing on Jane Roe's sexual assault charges against graduate student John Doe. Despite Jane Roe's failure to appear at the hearing, the University found John Doe "responsible" for sexually assaulting Roe based upon her previous hearsay statements to investigators. Thereafter, UC suspended John Doe for two years—reduced to one year after an administrative appeal.

Plaintiff Doe appealed his suspension to the district court, arguing that the complete denial of his right to confront his accuser violated his due process right to a fair hearing. In granting a preliminary injunction against Doe's suspension, the district court found a strong likelihood that John Doe would prevail on his constitutional claim. So do we, and for the reasons stated herein, affirm the order of the district court.

The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. Here, the University's disciplinary committee necessarily made a credibility determination in finding John Doe responsible for sexually

assaulting Jane Roe given the exclusively "he said/she said" nature of the case. Defendants' failure to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair.

I.

John Doe met Jane Roe on Tinder, and after communicating for two or three weeks, met in person. Thereafter, Doe invited Roe back to his apartment, where the two engaged in sex. Three weeks later, Jane Roe reported to the University's Title IX Office that John Doe had sexually assaulted her that evening in his apartment. Five months later, UC cited Doe for violating the Student Code of Conduct, "most specifically," the University's policies against sex offenses, harassment, and discrimination.

UC resolves charges of non-academic misconduct through an Administrative Review Committee (ARC) hearing process. The process begins when "[a]ny person, department, organization or entity" files a complaint against a student, and the University informs the student of the allegations against him. If the claim involves a potential sexual offense, UC's Title IX Office investigates the matter, interviewing both parties and gathering the evidence. Defendant Aniesha Mitchell, the Director of UC's Office of Student Conduct and Community Standards, discloses the evidence to the accused student before the hearing.

During the hearing, the ARC panelists (a mix of faculty and students) hear the allegations, review the evidence, and question the participating witnesses. Accused students are entitled to present favorable evidence and explain their side of the story in their own words. They may also question witnesses through a "circumscribed form of cross-examination"—one that involves "submitting written questions" to the ARC panelists, "who then determine whether [the] questions are *397 relevant and *397 whether they will be posed to the witness." *Doe v. Cummins*, 662 Fed.Appx. 437, 439, 448 (6th Cir. 2016).

However, there is no guarantee that a witness will appear for questioning. "Witnesses are strongly encouraged to be present for hearings," but UC's Code of Conduct does not require them to be present, regardless of whether they are the accused, the accuser, or a bystander with relevant information. If a witness is "unable to attend," the Code permits him to submit a "notarized statement" to the Committee in lieu of an appearance. At the close of the hearing, the ARC deliberates and determines whether the accused student should be found "responsible" for violating the Code of Conduct.

Defendants planned to follow these procedures at Doe's June 27, 2016, hearing, but modified the process when Jane Roe failed to appear. The Committee Chair explained how the hearing would proceed in her absence:

> So, during the hearing, the Administrative Review Committee and both the respondent and complainant shall have the right to submit evidence and written questions to be asked of all adverse witnesses who testify in the matter. The hearing chair, in consultation with the ARC, has the right to review and determine which written questions will be asked. Questions will be asked in the order presented by the Chair. And all questions from the complainant and respondent must be submitted in writing for review by the ARC [C]hair.
>
> Again, there is no complainant here and we have no witnesses. So we likely won't have to do any of this.

John Doe claims, and defendants do not dispute, that he was not informed in advance that Jane Roe would not be attending the hearing.

The Chair recited the Code of Conduct violations leveled against Doe and invited him to enter an "understanding"—accepting or denying

responsibility for the allegations. Doe entered an understanding of not responsible.

The Chair then read a summary of the Title IX Office's report, which began with Jane Roe's account of the night in question, followed by Doe's account. Each party's account was based on his or her interview statements to the Title IX investigators and included remarks that would be hearsay if introduced in court. The Chair also read a summary of witness statements from four of Jane Roe's friends who were told of the alleged sexual assault through Roe. Once the Chair finished, he gave the Committee members the chance to ask questions regarding the report. They had none.

The Chair then asked whether John Doe had any questions:

> [The Chair]: Okay, so the complainant is not here. At this time I would have given Roe time to ask questions of the Title IX report. But again, they [sic] are not here. So we'll move on.
>
> So now, do you, as the respondent Mr. Doe, have any questions of the Title IX report?
>
> [Doe]: Well, since she's not here, I can't really ask anything of the report.
>
> Is this the time where I would enter in like a situation where like she said this and that never could have happened? Because that's just—
>
> [The Chair]: You'll have time here in just a little bit to direct those questions. Just—
>
> [Doe]: Then no, I don't have any questions for the report.

With that, the Chair concluded the "Title IX presentation" portion of the hearing. "And so now," the Chair explained that if Jane Roe had

been present, he would have asked her to "read into the record what happened and [provide] any additional information." "The ARC would then have time to ask clarifying questions" of Roe, followed by Doe's opportunity to ask her questions. "Again," however, the Chair noted Roe was not present and "move[d] onto the next step"—asking Doe to "summarize what happened." Doe challenged a number of Roe's statements, and responded to the Committee's questions. Following this exchange, the Chair read Jane Roe's written closing statement into the record and invited Doe to give a responsive closing statement.

After its deliberations, the Committee submitted its recommended findings to Daniel Cummins, UC's Assistant Dean of Students. It recommended that Cummins find Doe responsible for violating the Student Code of Conduct and issue a two-year suspension. On July 7, Cummins notified John Doe that he had accepted the recommendation.

Doe appealed the decision the next day. The University's Appeals Administrator rejected Doe's appeal of the finding of responsibility, but recommended that his sentence be reduced to a one-year suspension to begin at the end of the fall 2016 semester, and conclude at the end of the fall 2017 semester—meaning Doe could not attempt to re-enroll in his graduate program until January 2018. Defendant Juan Guardia, the Assistant Vice President and Dean of Students, accepted the Administrator's recommendation and informed plaintiff on September 23, 2016, that this was the University's final decision.

II.

Doe then filed this action against UC Administrators Guardia and Mitchell and the University in the district court. Plaintiff Doe claimed that defendants violated his due process rights under the United States and Ohio Constitutions and discriminated against him in violation of Title IX.

On the same day he filed his complaint, Doe moved for preliminary relief enjoining UC from enforcing his suspension. Plaintiff's motion focused solely on defendants' failure "to permit John Doe to confront his accuser." Doe maintained that UC could not constitutionally find him responsible for sexually assaulting Roe without "any opportunity to confront and question" her. The district court agreed.

"In this case," the court reasoned, "the ARC Hearing Committee was given the choice of believing either Jane Roe or Plaintiff, and therefore, cross-examination was essential to due process." *Doe v. Univ. of Cincinnati* , 223 F.Supp.3d 704, 711 (S.D. Ohio 2016). The fact that Doe could have submitted written questions to the Committee Chair, which the Chair could have put to Roe, had she appeared at the hearing, did not convince the district court otherwise. *Id.* at 712. And although UC's Code of Conduct permits absent witnesses who are "unable" to attend the hearing to provide notarized statements, the district court noted that Roe's closing statement was not notarized. Such a "significant and unfair departure[ ] from an institution's own procedures can," the court explained, "amount to a violation of due process." *Id.* (quoting *Furey v. Temple Univ.* , 730 F.Supp.2d 380, 396–97 (E.D. Pa. 2010) (brackets omitted)).

The district court ruled that plaintiff demonstrated a strong likelihood of success on the merits of his due process claim, and that the remaining preliminary injunction factors weighed in favor of granting preliminary relief. *Id.* at 712. Accordingly, the court entered an order enjoining UC 399 *399 from suspending plaintiff. *Id.* Defendants timely appealed.

III.

In reviewing a district court's decision to grant a preliminary injunction, "we evaluate the same four factors that the district court does": (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether he would

suffer irreparable injury without the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether issuing the injunction would serve the public interest. *Planet Aid v. City of St. Johns* , 782 F.3d 318, 323 (6th Cir. 2015) (internal quotation marks omitted). "We have often cautioned that these are factors to be balanced, not prerequisites to be met." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.* , 860 F.3d 844, 849 (6th Cir. 2017). "At the same time, however, we have also held that 'a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.' " *Id.* (brackets and citation omitted). And in the case of a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel* , 751 F.3d 427, 430 (6th Cir. 2014) (en banc, per curiam) (citation omitted).

We review a district court's legal conclusions de novo, its factual findings for clear error, and its ultimate decision to grant preliminary relief for abuse of discretion. *S. Glazer's* , 860 F.3d at 849. Practically speaking, this means "when we look at likelihood of success on the merits, we independently apply the Constitution, but we still defer to the district court's overall balancing of the four preliminary-injunction factors." *Planet Aid* , 782 F.3d at 323 (citation omitted).

IV.

State universities must afford students minimum due process protections before issuing significant disciplinary decisions. *See Flaim v. Med. Coll. of Ohio* , 418 F.3d 629, 633 (6th Cir. 2005) ; *see also Jaksa v. Regents of the Univ. of Michigan* , 597 F.Supp. 1245, 1248 (E.D. Mich. 1984), *aff'd* 787 F.2d 590 (6th Cir. 1986) (per curiam, unpublished) ("Whether plaintiff's interest is a 'liberty' interest, 'property' interest, or both, it is clear that he is entitled to the protection of the due process clause."). Suspension "clearly implicates" a protected property interest, and allegations of

sexual assault may "impugn [a student's] reputation and integrity, thus implicating a protected liberty interest." *Cummins* , 662 Fed.Appx. at 445 (citations omitted).

Because the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer* , 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "[T]he specific dictates of due process generally require [ ] consideration of three distinct factors": (1) the nature of the private interest subject to official action; (2) the risk of erroneous deprivation under the current procedures used, and the value of any additional or substitute procedural safeguards; and (3) the governmental interest, including the burden any additional or substitute procedures might entail. *Mathews v. Eldridge* , 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.' " *Cummins* , 662 Fed.Appx. at 446 (quoting *Mathews* , 424 U.S. at 333, 96 S.Ct. 893 ). While the exact outlines of process may vary, universities must "at least" provide notice of the charges, an explanation of the evidence *400 against the student, and an opportunity to present his side of the story before an unbiased decision maker. *Id.* (citing *Heyne v. Metro. Nashville Pub. Sch.* , 655 F.3d 556, 565–66 (6th Cir. 2011) ).

A student's opportunity to share his version of events must occur at "some kind of hearing," *Goss v. Lopez* , 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), though that hearing need not "take on ... [the] formalities" of a criminal trial. *Flaim* , 418 F.3d at 635. Education is a university's first priority; adjudication of student disputes is, at best, a distant second. *See Bd. of Curators of the Univ. of Missouri v. Horowitz* , 435 U.S. 78, 88, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). "Formalizing hearing requirements would divert both resources and attention from the educational process." *Jaksa* , 597 F.Supp. at 1250. Thus, UC is not required to

"transform its classrooms into courtrooms" in pursuit of a more reliable disciplinary outcome. *Id.* ; *see also Flaim* , 418 F.3d at 635 ("Courts have generally been unanimous ... in concluding that hearings need not be open to the public, that neither rules of evidence nor rules of civil or criminal procedure need be applied, and witnesses need not be placed under oath." (citations omitted)). Even in the case of a sexual assault accusation—where "[a] finding of responsibility will ... have a substantial and lasting impact" on the student, *see Cummins* , 662 Fed.Appx. at 446 —the protection afforded to him "need not reach the same level ... that would be present in a criminal prosecution." *Doe v. Univ. of Kentucky* , 860 F.3d 365, 370 (6th Cir. 2017). Review under *Mathews* asks only whether John Doe "had an opportunity to 'respond, explain, and defend,' " not whether a jury could constitutionally convict him using the same procedures. *Cummins* , 662 Fed.Appx. at 446 (quoting *Flaim* , 418 F.3d at 635 ).

A.

First, Doe contends, and UC does not dispute, that the private interest at stake in this case is significant. A finding of responsibility for a sexual offense can have a "lasting impact" on a student's personal life, in addition to his "educational and employment opportunities," especially when the disciplinary action involves a long-term suspension. *Id* . The "private interest that will be affected by the official action" is therefore compelling. *Mathews* , 424 U.S. at 335, 96 S.Ct. 893.

B.

Next, we consider the risk of erroneous deprivation of this interest under the University's current procedures and the value of any additional procedural safeguards plaintiff requests. *Id.* at 334–35, 96 S.Ct. 893. The only additional procedure Doe requests is one that UC, in theory,

already provides: the opportunity to confront and cross-examine Roe by posing questions to her through the Committee Chair.

"The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings." *Winnick* , 460 F.2d at 549. However, general rules have exceptions, and "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Goss* , 419 U.S. at 578, 95 S.Ct. 729 (citation and parenthetical omitted). The more serious the deprivation, the more demanding the process. And where the deprivation is based on disciplinary misconduct, rather than academic performance, "we conduct a more searching inquiry." *Flaim* , 418 F.3d at 634. "Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling *401 facts and the nature of the conduct under challenge are often disputed." *Goss* , 419 U.S. at 580, 95 S.Ct. 729. For the student, " [t]he risk of error is not at all trivial, and it should be guarded against ... without prohibitive cost or interference with the educational process." *Id.*

Accused students must have the right to cross-examine adverse witnesses "in the most serious of cases." *Flaim* , 418 F.3d at 636. We alluded to what "the most serious of cases" might entail in *Flaim* : If a case "resolve[s] itself into a problem of credibility, cross-examination of witnesses might ... be[ ] essential to a fair hearing." *Id.* at 641 (quoting *Winnick* , 460 F.2d at 549 ). We ultimately did not reach that answer, however. It was not essential to Sean Michael Flaim's hearing, because Flaim admitted to the misconduct that prompted the Medical College of Ohio to expel him—his felony drug conviction. *Id.* That "rather unique" fact justified the College's decision to deny his request to cross-examine his arresting officer during Flaim's expulsion hearing. *Id.* at 641, 643.

But the circumstances of the present case pose the credibility contest we contemplated in *Flaim* : John Doe maintains that their sex was consensual; Jane Roe claims that it was not. Importantly, the Committee's finding of responsibility necessarily credits Roe's version of events and her credibility. The Title IX Office proffered no other evidence "to sustain the University's findings and sanctions" apart from Roe's hearsay statements. *Cf. Plummer v. Univ. of Houston* , 860 F.3d 767, 775–76 (5th Cir. 2017) (cross-examination not required where the plaintiffs distributed videos and a photograph of the victim's "degrading and humiliating" assault online, and "[t]he University's case did not rely on testimonial evidence" from the victim).

Defendants insist that Roe's nonappearance did not impact the fairness of the proceedings because Doe still had an opportunity to be heard. The ARC panel invited him to "summarize what happened" in his own words, and Doe took advantage of that opportunity. He disputed Roe's overall interpretation of events and a number of her specific claims. Because plaintiff was able to draw attention to alleged inconsistencies in Roe's statements, defendants argue that cross-examination would have been futile. We disagree.

UC assumes cross-examination is of benefit only to Doe. In truth, the opportunity to question a witness and observe her demeanor while being questioned can be just as important to the trier of fact as it is to the accused. "A decision relating to the misconduct of a student requires a factual determination as to whether the conduct took place or not." *Horowitz* , 435 U.S. at 95 n.5, 98 S.Ct. 948 (Powell, J. concurring). "The accuracy of that determination can be safeguarded by the sorts of procedural protections traditionally imposed under the Due Process Clause." *Id.* Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, "cross-examination has always been considered a most effective way to ascertain truth." *Watkins v. Sowders* , 449 U.S. 341, 349, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (footnote

omitted); *see also Maryland v. Craig* , 497 U.S. 836, 846, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (cross-examination "ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings").

"The ability to cross-examine is most critical when the issue is the credibility of the accuser." *Doe v. Brande i s Univ.* , 177 F.Supp.3d 561, 605 (D. Mass. 2016). Cross-examination takes aim at credibility like no other procedural device. *Craig* , 497 U.S. at 846, 110 S.Ct. 3157 ; *402 *Watkins* , 449 U.S. at 349, 101 S.Ct. 654. A cross-examiner may "delve into the witness' story to test the witness' perceptions and memory." *Davis v. Alaska* , 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion ... thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Craig* , 497 U.S. at 847, 110 S.Ct. 3157 (citation and brackets omitted). He may "reveal[ ] possible biases, prejudices, or ulterior motives" that color the witness's testimony. *Davis* , 415 U.S. at 316, 94 S.Ct. 1105. His strategy may also backfire, provoking the kind of confident response that makes the witness appear more believable to the fact finder than he intended. *Watkins* , 449 U.S. at 345, 348–49, 101 S.Ct. 654 ; *cf. Davis* , 415 U.S. at 318, 94 S.Ct. 1105 ("On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness."). Whatever the outcome, "the greatest legal engine ever invented for the discovery of truth" will do what it is meant to: "permit[ ] the [fact finder] that is to decide the [litigant]'s fate to observe the demeanor of the witness in making his statement, thus aiding the [fact finder] in assessing his credibility." *Craig* ,

497 U.S. at 846, 110 S.Ct. 3157 (quoting in part *California v. Green* , 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) ).

Given the parties' competing claims, and the lack of corroborative evidence to support or refute Roe's allegations, the present case left the ARC panel with "a choice between believing an accuser and an accused." *Flaim* , 418 F.3d at 641. Yet, the panel resolved this "problem of credibility" without assessing Roe's credibility. *Id.* (citation omitted). In fact, it decided plaintiff's fate without seeing or hearing from Roe at all. That is disturbing and, in this case, a denial of due process.

Even in *Flaim* —where "cross-examination would have been a fruitless exercise" because the plaintiff student admitted the "critical fact[s]" against him—the trier of fact was still able to question the plaintiff's arresting officer, and the plaintiff was still "able to listen to and observe" the officer's testimony. *See id.* at 633, 641 (quoting in part *Winnick* , 460 F.2d at 550 ). More critically, *the trier of fact* was "able to listen to and observe" the officer's testimony. *Id.* at 633. Evaluation of a witness's credibility cannot be had without some form of presence, some method of compelling a witness "to stand face to face with the [fact finder] in order that it may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States* , 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Cross-examination is "not only beneficial, but essential to due process" in a case that turns on credibility because it guarantees that the trier of fact makes this evaluation on both sides. *Flaim* , 418 F.3d at 641. When it does, the hearing's result is most reliable.

Reaching the truth through fair procedures is an interest Doe and UC have in common. "The Due Process Clause will not shield [a student] from suspensions properly imposed, but it disserves both his interest and the interest of the State if his

suspension is in fact unwarranted." *Goss* , 419 U.S. at 579, 95 S.Ct. 729. UC, of course, also has a "well recognized" interest in maintaining a learning environment free of sex-based harassment and discrimination. *Bonnell v. Lorenzo* , 241 F.3d 800, 822 (6th Cir. 2001). To that end, "ensuring allegations of sexual assault on college campuses are taken seriously is of critical *403 importance, and there is no doubt that universities have an exceedingly difficult task in handling these issues." *Brandeis* , 177 F.Supp.3d at 602 (citation omitted).

But if a university's procedures are insufficient to make "issues of credibility and truthfulness ... clear to the decision makers," that institution risks removing the wrong students, while overlooking those it should be removing. *See Furey v. Temple Univ.* , 884 F.Supp.2d 223, 252 (E.D. Pa. 2012). "The concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case, and no one suggests that it is." *Goss* , 419 U.S. at 579–80, 95 S.Ct. 729. Cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested," can reduce the likelihood of a mistaken exclusion and help defendants better identify those who pose a risk of harm to their fellow students. *See Newsome v. Batavia Local Sch. Dist.* , 842 F.2d 920, 924 (6th Cir. 1988) (citation omitted).

We are equally mindful of Jane Roe's interest, and the extent to which it conflicts with John Doe's. Roe and other alleged victims have a right, and are entitled to expect, that they may attend UC without fear of sexual assault or harassment. *See* 20 U.S.C. § 1681(a). If they are assaulted, and report the assault consistent with the University's procedures, they can also expect that UC will promptly respond to their complaints. *Cf. Vance v. Spencer Cty. Pub. Sch. Dist.* , 231 F.3d 253, 261 (6th Cir. 2000) (citing *Wills v. Brown Univ.* , 184 F.3d 20, 25 (1st Cir. 1999) ). Setting aside the troubling fact that UC's Title IX Office waited a

month to interview Roe, another four months to notify Doe of her allegations, and *yet another four* months to convene the ARC hearing, the concern at this point is that UC's inadequate procedures left the ARC's decision vulnerable to a constitutional challenge.[2]

> [2] UC encourages victims to report alleged assaults "as soon as reasonably possible" "to ensure that the passage of time does not limit the University's ability to conduct an investigation or locate witnesses, as memory lapses and other time-sensitive factors may impair an investigation." *See* https://www.uc.edu/titleix/procedures.html (last visited Aug. 31, 2017). "[T]ime-sensitive factors" evidently did not motivate the University in the instant case.

Strengthening those procedures is not without consequence for victims. "Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating" the same hostile environment Title IX charges universities with eliminating. *Doe v. Regents of the Univ. of Cal.* , 5 Cal.App.5th 1055, 210 Cal.Rptr.3d 479, 505 (2016) (citation omitted). However, John Doe is not requesting an opportunity to question Jane Roe "directly." In this appeal, he does not challenge our determination in an unpublished decision that UC's "circumscribed form of cross-examination" is constitutional. *Cummins* , 662 Fed.Appx. at 448. Rather, plaintiff asks only to question Roe through the ARC panel—a procedure the Department of Education's Office for Civil Rights previously recommended for the victim's wellbeing. Catherine E. Lhamon, Assistant Secretary for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* , at 31, April 29, 2014, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (last visited Aug. 31, 2017). (The Department subsequently withdrew its April 29, 2014, letter, and replaced it with an interim letter. *See* Dep't of Educ., Office for Civil Rights, *Q&A on Campus Sexual Misconduct* , Sept. 22,

2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa
404 - *404 title-ix-201709.pdf (last visited Sept. 22, 2017)).

We acknowledge this procedure may not relieve Roe's potential emotional trauma. Still, a case that "resolve[s] itself into a problem of credibility" cannot itself be resolved without a mutual test of credibility, at least not where the stakes are this high. *Flaim* , 418 F.3d at 641 (quoting *Winnick* , 460 F.2d at 550 ); *but see Cummins* , 662 Fed.Appx. at 448 (a plaintiff subject to disciplinary probation may be entitled to less process than one subject to suspension). "While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns." *Brandeis* , 177 F.Supp.3d at 604–05. One-sided determinations are not known for their accuracy. Jane Roe deserves a reliable, accurate outcome as much as John Doe.

Ultimately, the ARC must decide whether Doe is responsible for violating UC's Code of Conduct: whether Roe's allegations against him are true. And in reaching this decision "[t]he value of cross-examination to the discovery of truth cannot be overemphasized." *Newsome* , 842 F.2d at 924. Allowing John Doe to confront and question Jane Roe through the panel would have undoubtedly aided the truth-seeking process and reduced the likelihood of an erroneous deprivation.

C.

UC has a strong interest both "in eliminating sexual assault on its campus and establishing a fair and constitutionally permissible disciplinary system." *Doe* , 860 F.3d at 370. And in defendants' favor, we have recognized that a constitutionally permissible disciplinary system need not follow the rules of evidence. *See Flaim* , 418 F.3d at 635. Cross-examination can "unnecessarily formalize school expulsion proceedings" precisely because it "impos[es] the additional burden on school

administrators of applying, to some extent, the rules of evidence." *Newsome* , 842 F.2d at 925 n.4. UC's administrators are "in the business of education, not judicial administration." *Flaim* , 418 F.3d at 640. "To saddle them with the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform." *Newsome* , 842 F.2d at 926.

These concerns informed our decision to approve UC's procedure in *Doe v. Cummins* , issued a week after the district court enjoined UC from suspending plaintiff. *See* 662 Fed.Appx. at 448. *Cummins* held that UC's practice of limiting cross-examination to preapproved written questions comported with due process even if the ARC panel "did not ask all of the questions [the accused students] submitted," and did not permit follow-up questions. *Id.* at 448. But that holding gets defendants only so far. Fear of "saddl[ing] school officials with the burden of overseeing ... cross-examination" convinced the *Cummins* court that this "circumscribed form of cross-examination" is sufficient when a student's accuser appears for the hearing. *See id.* (quoting *Newsome* , 842 F.2d at 926, brackets omitted). The court left open the possibility that UC's procedures may nonetheless violate due process as applied to a student whose accuser *fails to appear* for the hearing.[3] Sparing
405 the ARC panel from having *405 to navigate traditional cross-examination justifies the requirement for written preapproved questions, but it does not justify denying the opportunity to question an adverse witness altogether.

[3] The two *Cummins* plaintiffs also faced charges of sexual assault, but successfully appealed the results of their first ARC hearings to UC's Appeals Administrator. After a second round of hearings, UC found each student "responsible" for violating the Student Code of Conduct. It suspended one for a three-year period and placed the other on disciplinary probation.

*Cummins*, 662 Fed.Appx. at 438–43. The latter plaintiff argued UC violated his due process rights because his alleged victim did not attend his second ARC hearing, denying him the opportunity to question her through the panel. *Id.* at 448. We found no violation, however, because the accused student had an opportunity to conduct cross-examination at his first hearing, and because UC gave him a lesser punishment—disciplinary probation rather than suspension. *Id. Cummins* did not address whether a student facing suspension who is denied even this modified form of cross-examination suffers a violation of due process.

Defendants' better argument is that they cannot compel a witness (adverse or not) to attend the ARC hearing. UC's Student Code of Conduct does not require witnesses to attend the hearing, and even if it did, there is no guarantee the witness would show. Universities do not have subpoena power. What is more, UC refers to cross-examination as an alternative to hearsay evidence, suggesting that the latter cannot be introduced at a disciplinary hearing unless the accused student has an opportunity to conduct the former. While UC's concerns are not unfounded, both arguments lose sight of our limited holding in this case.

For one, defendants are not required to facilitate witness questioning at every nonacademic misconduct hearing. *Flaim* 's dictate is narrow: cross-examination is "essential to due process" only where the finder of fact must choose "between believing an accuser and an accused." 418 F.3d at 641. The ARC panel need not make this choice if the accused student admits the "critical fact[s]" against him. *Id.* Another relevant factor is that UC's allegations against Doe rested solely on Roe's statements to investigators. Cross-examination may be unnecessary where the University's case "d[oes] not rely on testimonial evidence" from the complainant. *See, e.g.* , *Plummer* , 860 F.3d at 775–76.

For another, nothing in our decision jeopardizes UC's ability to rely on hearsay statements. *See Crook v. Baker* , 813 F.2d 88, 99 (6th Cir. 1987) ("It is clear that admission of hearsay evidence [at a school disciplinary proceeding] is not a denial of procedural due process."). Hearsay and its exceptions are delineated in the Federal Rules of Evidence, *see* Fed. R. Evid. 801(c), but a university student has "no right to [the] use of formal rules of evidence" at his disciplinary hearing. *Flaim* , 418 F.3d at 635 (citing *Nash v. Auburn Univ.* , 812 F.2d 655, 665 (11th Cir. 1987) ). UC may still open the hearing with a Title IX report summary that includes the parties' "out-of-court" statements, and the ARC panel may still rely on those statements in deciding whether Doe is responsible for violating the Code of Conduct— it need not demand that Roe and Doe recite the evening's events from memory. We do not require schools to "transform [their] classrooms into courtrooms" to provide constitutionally adequate due process. *Jaksa* , 597 F.Supp. at 1250.

Plaintiff is likely to succeed on the merits of his due process claim not because defendants introduced hearsay evidence against him, but because the nature of that evidence posed a problem of credibility.[4] *See Flaim* , 418 F.3d at 641. Jane *406 Roe claimed that John Doe engaged in specific acts without her consent, and John Doe replied that he did not. Although hearsay and credibility disputes often go hand in hand, use of hearsay does not itself trigger the right to question an adverse witness. Were it otherwise, the Medical College of Ohio would have violated Flaim's rights by expelling him on the basis of his "certified record of a recent felony conviction" (i.e., a hearsay record) without permitting him to cross-examine his arresting officer. *See id.* at 643 ; *see also* Fed. R. Evid. 803(22) (excluding evidence of a judgment of conviction from the general prohibition against the admission of hearsay). That is not *Flaim* 's holding, and it is not our holding here.

4  In arguing against UC's use of Roe's hearsay statements, plaintiff assumes this evidence is necessarily harmful to his defense. Yet Doe's intended strategy is "to question Jane Roe about inconsistencies in her [prior] statements" in order to demonstrate her claimed lack of credibility. He cannot do that if her previous statements are not presented at the hearing.

That said, we acknowledge that witness questioning may be particularly relevant to disciplinary cases involving claims of alleged sexual assault or harassment. Perpetrators often act in private, leaving the decision maker little choice but to weigh the alleged victim's word against that of the accused. Credibility disputes might therefore be more common in this context than in others. Arranging for witness questioning might also pose unique challenges given a victim's potential reluctance to interact with the accused student. *See Regents of the Univ. of Cal.*, 210 Cal.Rptr.3d at 505. However, we emphasize that UC's obligations here are narrow: it must provide a means for the ARC panel to evaluate an alleged victim's credibility, not for the accused to physically confront his accuser.

The University has procedures in place to accommodate this requirement. A month before the ARC hearing, Mitchell informed Doe and Roe that they could "participate via Skype ... if they could not attend the hearing."[5] Doe did not object to Roe's participation by Skype, and he does not object to this practice on appeal. To the contrary, the record suggests that he or one or more of the ARC panelists in fact appeared at the hearing via Skype. What matters for credibility purposes is the ARC panel's ability to assess the demeanor of both the accused and his accuser. Indisputably, demeanor can be assessed by the trier of fact without physical presence, especially when facilitated by modern technology. *See Craig*, 497 U.S. at 849–50, 857, 110 S.Ct. 3157. That fact mitigates UC's administrative burden.

5  UC's Code of Conduct does not define the conditions under which a student might be "unable to attend" an ARC hearing. In any event, this is an individual determination best left to defendants. *See Horowitz*, 435 U.S. at 91, 98 S.Ct. 948 (the niceties of "public education ... [are] committed to the control of state and local authorities" (citation omitted)); *see also Goss*, 419 U.S. at 578, 95 S.Ct. 729. In the present case, there was no finding that Jane was unable to attend the hearing.

--------

D.

We are sensitive to the competing concerns of this case. "The goal of reducing sexual assault[ ] and providing appropriate discipline for offenders" is more than "laudable"; it is necessary. *Brandeis*, 177 F.Supp.3d at 572. But "[w]hether the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished—is a fair price to achieve that goal is another question altogether." *Id*.

Here, John Doe's private interest is substantial, and the risk of erroneous deprivation under the procedures UC followed at his ARC hearing is unacceptably high. Allowing defendants to pose questions to witnesses at certain disciplinary hearings may impose an administrative burden on UC. Yet on the facts here, that burden does not justify imposition of severe discipline without any credibility assessment of the accusing student. Accordingly, Doe has demonstrated a strong likelihood of success on the merits of his due process claim. *Planet Aid*, 782 F.3d at 323. This "often ... determinative" factor weighs in favor of preliminary relief. *Schimmel*, 751 F.3d at 430.

V.

The second factor in our preliminary-injunction inquiry asks whether the movant is likely to suffer irreparable harm in the absence of the injunction.

*S. Glazer's* , 860 F.3d at 852. In Doe's case, the district court found that he would.

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted* , 697 F.3d 423, 436 (6th Cir. 2012) ; *Overstreet v. Lexington–Fayette Urban Cty. Gov't* , 305 F.3d 566, 578 (6th Cir. 2002). Defendants' characterization of Doe's injury as "speculative or unsubstantiated" does not rebut that presumption. *Abney v. Amgen, Inc.* , 443 F.3d 540, 552 (6th Cir. 2006) (citation omitted). Were we to vacate the injunction, Doe would be suspended for a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief.

Defendants do not challenge the district court's findings regarding the third factor—that the preliminary injunction will not harm others.

But they do contest the fourth: the district court's finding that the preliminary injunction serves the "public good." *Doe* , 223 F.Supp.3d at 712. In rejecting UC's claim that it has an interest in regulating and maintaining the integrity of its disciplinary system, the district court merely reiterated that "part of Plaintiff's claim is that UC failed to follow the procedures outlined in its own disciplinary system"—namely, the requirement that Roe's statement to the ARC panel be notarized. *See id.* That UC did so is irrelevant.

A school's departure from its own hearing rules amounts to a due process violation only when the departure "results in a procedure which itself impinges on due process rights." *Flaim* , 418 F.3d at 640 (quoting *Bates v. Sponberg* , 547 F.2d 325, 329–30 (6th Cir. 1976) ). The Committee's review of Roe's non-notarized statement did not "result in a procedure which itself impinge[d]" upon plaintiff's right to a fair hearing. Plaintiff's rights are dictated by the Constitution, "not internal school rules or policies." *Cummins* , 662 Fed.Appx. at 445 n.2 (citing *Heyne* , 655 F.3d at 570, and *Hall v. Med. Coll. of Ohio* , 742 F.2d 299, 309 (6th Cir. 1984) ).

The district court may have been nodding to the principle that it is always in the public's interest to prevent a violation of an individual's constitutional rights, which, it is. *Dodds v. United States Dep't of Educ.* , 845 F.3d 217, 222 (6th Cir. 2016). At the same time, while the public has a competing interest in the enforcement of Title IX, that interest can never override individual constitutional rights. U.S. Const. art. VI, cl.2. This factor is, at most, neutral.

VI.

On balance, the preliminary injunction factors favor the grant of preliminary relief. Accordingly, we conclude that the district court did not abuse its discretion in enjoining John Doe's suspension. For these reasons, we affirm the order of the district court.



# Kerr v. U.S. Dist. Court

426 U.S. 394 (1976) · 96 S. Ct. 2119
Decided Jun 14, 1976

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 74-1023.

Argued November 11, 1975 Decided June 14, 1976

In a class action by California state prisoners on behalf of themselves and all present or future adult male felons in California state prisons or on parole, plaintiffs alleged constitutional violations in the manner in which the members of the California Adult Authority and other petitioners determine the length of detention and conditions of punishment for convicted offenders, and sought declaratory and injunctive relief. In the course of discovery pursuant to Fed. Rule Civ. Proc. 34 plaintiffs sought (1) Adult Authority files consisting, *inter alia*, of personnel files of all members and employees of the Adult Authority; and (2) prisoners' files, consisting of the files of every twentieth inmate in each state correctional institution. Petitioners, claiming that the Adult Authority files were irrelevant, confidential, and privileged, suggested that they should not be compelled to turn over the files without prior District Court *in camera* inspection. That court ordered the production of the documents without such review but limited the number of people associated with the plaintiffs who might examine the documents. Petitioners then filed a petition for mandamus to vacate the discovery order, which the Court of Appeals denied. Though recognizing a qualified governmental "official or state secrecy privilege," the court indicated that, contrary to the situation here, assertion of such a privilege had to be made with specificity by high-level Adult Authority officials. A somewhat similar course ensued with regard to the prisoners' files, ending with the Court of Appeals' denial of mandamus without opinion. *Held:* In the circumstances of this case — and particularly since less extreme alternatives for modification of the challenged discovery orders were available — issuance of the writ of mandamus is inappropriate. Pp. 402-406.

> (a) As a means of implementing the rule that mandamus will issue only in extraordinary circumstances, the party seeking this largely discretionary writ must show that there are no other adequate means to secure the desired relief. Pp. 402-403.

*395

> (b) Here adequate alternatives to mandamus existed. The Court of Appeals' opinion did not foreclose *in camera* review, but apparently left open the opportunity for petitioners through responsible officials to assert the privilege more specifically and have their request for *in camera* review reconsidered. They thus have an avenue far short of mandamus to achieve the relief they seek, and this approach affords an appropriate and useful method for achieving a balance between petitioners' claims of irrelevance and privilege and plaintiffs' asserted need for the documents. Pp. 404-406.

395

casetext
From Cox's document Set

(c) There is no reason to believe that by its order relating to the discovery of the prisoners' files the Court of Appeals meant to foreclose petitioners from availing themselves of the same opportunity of securing *in camera* review as is available in the case of the Adult Authority files. P. 406.

[511 F.2d 192](#), and order of Dec. 18, 1974 (unreported), affirmed.

MARSHALL, J., delivered the opinion of the Court, in which all Members joined except STEVENS, J., who took no part in the consideration or decision of the case.

*Karl S. Mayer*, Deputy Attorney General of California, argued the cause for petitioners. With him on the briefs were *Evelle J. Younger*, Attorney General, *Jack R. Winkler*, Chief Assistant Attorney General, *Derald E. Granberg, John T. Murphy, Jean M. Bordon*, Deputy Attorneys General, and *Edward P. O'Brien*, Assistant Attorney General.

*B. E. Bergesen III* argued the cause for respondents. With him on the brief was *Sidney M. Wolinsky*.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioners, defendants in a class action, sought issuance of writs of mandamus from the United States Court of Appeals for the Ninth Circuit to compel the District Court to vacate two discovery orders. The Court of Appeals refused to issue the writs. We hold that in the circumstances of this case — and particularly in light of *396 the availability of an alternative, less extreme, path to modification of the challenged discovery orders — issuance of the writ is inappropriate. We therefore affirm.

I

Seven prisoners in the custody of the Department of Corrections of the State of California filed a class action in the United States District Court for the Northern District of California on behalf of themselves and "on behalf of all adult male felons who now are, as well as all adult male felons who in the future will be, in the custody of the California Department of Corrections, whether confined in an institution operated by the Department or on parole." App. 370.[1] Among the defendants in the action are petitioners in this case: the individual members of the California Adult Authority, the Administrative Officer of the California Adult Authority, and the Director of Corrections of the State of California. Plaintiffs' complaint alleges substantial constitutional violations in the manner in which the California Adult Authority carries out its function of determining the length and conditions of punishment for convicted criminal offenders.

> [1] The seven prisoners and the class they represent will be referred to here as "plaintiffs."

In the course of discovery, plaintiffs submitted requests for the production of a number of documents pursuant to [Fed. Rule Civ. Proc. 34](#). Petitioners' subsequent two petitions for writs of mandamus were concerned with two classes of documents that were part of these requests. The first class, part of a series of requests first made in June 1973, and which will be referred to here as the "Adult Authority files," is generally composed of the personnel files of all members and employees of the Adult Authority, all Adult Authority *397 documents relating to its past, present, or future operation, and all memoranda written by the Chairman of the Adult Authority within the preceding five years.[2] The second class of documents with which we are concerned was first requested by plaintiffs in November 1973, *398 and will be referred to here as the "prisoners' files." Plaintiffs requested the opportunity to examine the files of every twentieth inmate at each California Department of Corrections institution,

App. 234; the class of documents, therefore, is composed of the correctional files of a sample of the prisoners in the custody of the California Department of Corrections.

2  The documents were specifically described in plaintiffs' requests numbered 7, 14, 15, 18, 20, 21, and 22:

"7. All files, including all personnel files, which are maintained by the Adult Authority or by the Department of Corrections, or by any officer or employee thereof, with respect to each member, each hearing representative, and the Executive Officer of the Adult Authority."

"14. Each report submitted by any member, hearing representative, Executive Officer, or any other employee or official of the Adult Authority . . . ."

"15. All written statements written or delivered by any member or hearing representative or the Executive Officer of the Adult Authority during the past 5 years favoring, opposing, or in any way commenting upon bills or other legislation or legislative proposal pending in the U.S. House of Representatives, the Senate of the United States, or the California Legislature."

"18. All written proposals for any change whatsoever in the organization or operation of, qualifications for, or substantive criteria and procedures to be employed by the Adult Authority . . . ."

"20. All memoranda written by the Chairman of the Adult Authority during the past 5 years, no matter to whom sent, including without limitation memoranda sent to other government organizations, agencies or officials, or to other members, hearing representatives, officials or employees of the Adult Authority."

"21. All documents in effect on November 15, 1972 which pertain to any Policy Statement or Resolution issued by the Adult Authority, including without limitation any file maintained on any

Resolution or Policy Statement and all such documents executed or issued subsequent to that date."

"22. All documents, however formal or informal, issued during the past calendar year, which concern the Adult Authority's adoption of new policies, procedures, criteria, and the like, to be followed by members, hearing representatives, officials and employees . . . ." App. 52-56.

When presented with the request for the Adult Authority files, petitioners objected, claiming that the files were irrelevant, confidential, and privileged, and suggesting that they should not be required to turn over the files to plaintiffs without prior *in camera* review by the District Court to evaluate the claims of privilege. Plaintiffs moved, pursuant to Fed. Rule Civ. Proc. 37, for an order compelling discovery. App. 76. The District Court referred the matter to a Magistrate for findings and recommendations, and the Magistrate recommended that the District Court order production of the Adult Authority files without undertaking an *in camera* inspection of the files. The District Court accepted the Magistrate's recommendations and ordered the production of the documents. Seeking to limit distribution of the personnel files of the Adult Authority members and their employees, however, the District Court issued a protective order limiting the number of people associated with the plaintiffs who could examine those documents:

"[N]o personnel file of any member of the Adult Authority, hearing representative or executive officer, nor any copy of any of its contents, shall be shown to any person except counsel of record for the plaintiffs and no more than a total of two investigators designated by such counsel, and then only to the extent necessary to the conduct of this action." Pet. for Cert. xvi.

*399

casetext

Case 3:24-cv-00440    Document 79    Filed 07/11/24    Page 154 of 191 PageID #: 1823    3

Dissatisfied with the District Court's ruling, petitioners filed a petition for a writ of mandamus under 28 U.S.C. § 1651 (a),[3] requesting the Court of Appeals for the Ninth Circuit to vacate the District Court's order granting plaintiffs' motion to compel discovery. The Court of Appeals denied the petition in an opinion filed on January 17, 1975. 511 F.2d 192. It concluded first that since "the question of relevancy `is to be more loosely construed at the discovery stage than at the trial,' 8 Wright Miller, Federal Practice and Procedure, § 2008 at 41 (1970)," issuance of the writ on the grounds of the asserted irrelevance of the documents in question was inappropriate. *Id.*, at 196. According to the Court of Appeals, discovery of the documents was part of "a proper line of attack" in the underlying lawsuit. *Ibid*. The court went on to observe that petitioners had no absolute privilege that would allow them to avoid production of the documents at issue. The court did recognize, however, the existence of a qualified common-law governmental privilege "encompassing and referred to sometimes as the official or state secret privilege," *id.*, at 198, that could conceivably cover the requested documents. But relying on this Court's decision in *United States* v. *Reynolds*, 345 U.S. 1 (1953), the Court of Appeals indicated that because the assertions of privilege were not personally made by high-level officials of the California Adult Authority and because the assertions of privilege were lacking in what it saw to be the requisite specificity, issuance of the writ on grounds of privilege was inappropriate:

[3] Title 28 U.S.C. § 1651 (a) provides:

"The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

"Neither the Chairman of the [Adult] Authority *400 nor the Director of Corrections nor any official of these agencies asserted, in person or writing, any privilege in the district court.

"The claiming official must `"have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced"' [ *United States* v. *Reynolds*, 345 U.S., at 8 n. 20, quoting from *Duncan* v. *Cammell, Laird Co.*, [1942] A. C. 624, 638,] and state with specificity the rationale of the claimed privilege. . . .

"In [this] suit, petitioners' counsel merely raised a blanket objection covering any and all documents in request numbers 7, 14, 15, 18, 20, 21 and 22. Formally claiming a privilege should involve specifying which documents or class of documents are privileged and for what reasons, especially where the nature of the requested documents does not reveal an obviously privileged matter. . . .

"In sum, the petition fails to show such an [ *sic*] usurpation by the district court that warrants the extraordinary remedy of writ of mandamus." 511 F.2d, at 198-199.

A similar course was followed with regard to the requests for the prisoners' files. When petitioners, asserting grounds of privilege, objected to the requests, plaintiffs filed a motion to compel production which the District Court referred for findings and recommendations to a Magistrate. The Magistrate recommended that petitioners be required to produce up to 200 prisoner files subject to a protective order "that would restrict examination and inspection of inmate files to attorneys for plaintiffs and for their use only in connection with this lawsuit." Pet. for Cert. xl. The District Court accepted the Magistrate's recommendation, but added to the recommended

401 *401 protective order a requirement that no prisoner's file be turned over for examination without the inmate's consent. *Id.*, at xxxi, xxxiii. Petitioners then filed a petition for mandamus which the Court of Appeals denied by order and without opinion on December 18, 1974. *Id.*, at xxiii.

Petitioners sought review in this Court of the denial of both petitions.[4] We granted certiorari.[5] 402 421 U.S. 987 (1975). *402

[4] While it has not yet come to trial, there have been additional developments in the underlying case during the pendency of the instant action before this Court. Since none of these developments are relevant to the resolution of the issue before us, we simply summarize them.

Subsequent to the filing of the petition for certiorari in the instant case, plaintiffs filed a second amended complaint in the underlying action in which they added allegations which led petitioners in turn to request the appointment of a three-judge District Court to hear the case. See 28 U.S.C. § 2281. The single judge then hearing the case certified it to the Chief Judge of the Court of Appeals for the Ninth Circuit as one appearing to require the convening of a three-judge court. The Chief Judge appointed the three members of the court on October 28, 1975, several days before oral argument was held in the instant case. But soon thereafter plaintiffs amended their complaint once again. This subsequent amendment made the convening of a three-judge court appear unnecessary and the three-judge court dissolved itself, remanding the entire case to the single judge originally assigned to the case. Thus, as the matter now stands, the underlying action is being heard by a single-judge District Court.

[5] Subsequent to our grant of certiorari but before oral argument, plaintiffs represented to this Court that they "no longer seek any

of the documents which are the subject of this appeal, because the trial of [the underlying] case in District Court will be completed before this Court is able to decide [the] issues before it." Memorandum of Respondents Concerning Mootness of Pending Matter 1-2. They therefore suggested that we hold this case moot. Plaintiffs never advised the District Court that they did not want the documents.

We deferred decision on the suggestion of mootness until after Page 402 oral argument. However, at oral argument counsel for plaintiffs stated that, because the trial date for the underlying action had been substantially delayed, they had changed their minds and did indeed want the documents. Tr. of Oral Arg. 38, 40-41. While no papers were filed here formally withdrawing the suggestion of mootness, plaintiffs' representations at oral argument, combined with the fact that the trial of the underlying action has not yet taken place, leave us with no indication that this case is moot.

## II

The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations. *Will* v. *United States*, 389 U.S. 90, 95 (1967); *Bankers Life Cas. Co.* v. *Holland*, 346 U.S. 379, 382-385 (1953); *Ex parte Fahey*, 332 U.S. 258, 259 (1947). As we have observed, the writ "has traditionally been used in the federal courts only 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.'" *Will* v. *United States, supra*, at 95, quoting *Roche* v. *Evaporated Milk Assn.*, 319 U.S. 21, 26 (1943). And, while we have not limited the use of mandamus by an unduly narrow and technical understanding of what constitutes a matter of "jurisdiction," *Will* v. *United States, supra*, at 95, the fact still remains

that "only exceptional circumstances amounting to a judicial `usurpation of power' will justify the invocation of this extraordinary remedy." *Ibid.*

Our treatment of mandamus within the federal court system as an extraordinary remedy is not without good reason. As we have recognized before, mandamus actions such as the one involved in the instant case "have the unfortunate consequence of making the [district court] judge a litigant, obliged to obtain personal counsel or to leave his defense to one of the litigants [appearing] before him" in the underlying case. *Bankers Life Cas. Co.* v. *Holland, supra,* at 384-385, *403 quoting *Ex parte Fahey, supra,* at 260. More importantly, particularly in an era of excessively crowded lower court dockets, it is in the interest of the fair and prompt administration of justice to discourage piecemeal litigation. It has been Congress' determination since the Judiciary Act of 1789 that as a general rule "appellate review should be postponed . . . until after final judgment has been rendered by the trial court." *Will* v. *United States, supra,* at 96; *Parr* v. *United States,* 351 U.S. 513, 520-521 (1956).[6] A judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation would run the real risk of defeating the very policies sought to be furthered by that judgment of Congress.

> [6] The use of extraordinary writs aside, it is only in narrowly defined circumstances, see 28 U.S.C. § 1292, that the appellate jurisdiction of the courts of appeals extends to interlocutory orders.

As a means of implementing the rule that the writ will issue only in extraordinary circumstances, we have set forth various conditions for its issuance. Among these are that the party seeking issuance of the writ have no other adequate means to attain the relief he desires, *Roche* v. *Evaporated Milk Assn., supra,* at 26, and that he satisfy "the burden of showing that [his] right to issuance of the writ is `clear and indisputable.'" *Bankers Life Cas. Co.* v.

*Holland, supra,* at 384, quoting *United States* v. *Duell,* 172 U.S. 576, 582 (1899); *Will* v. *United States, supra,* at 96. Moreover, it is important to remember that issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed. *Schlagenhauf* v. *Holder,* 379 U.S. 104, 112 n. 8 (1964); *Parr* v. *United States, supra,* at 520. See also *Technitrol, Inc.* v. *McManus,* 405 F.2d 84 (CA8 1968), cert. denied, 394 U.S. 997 (1969); *Pacific Car Foundry Co.* v. *Pence,* 403 F.2d 949 (CA9 1968). *404

When looked at in the framework of these factors, it would appear that the actions of the Court of Appeals in this case should be affirmed. What petitioners are seeking here is not a declaration that the documents in question are absolutely privileged and that plaintiffs can never have access to any of them. On the contrary, petitioners request only that "production of the confidential documents not be compelled without a prior informed determination by the district court that plaintiffs' need for them in the action below outweighs their confidentiality." Brief for Petitioners 77-78. Petitioners ask in essence only that the District Court review the challenged documents *in camera* before passing on whether each one individually should or should not be disclosed. But the Court of Appeals' opinion dealing with the Adult Authority files did not foreclose the possible necessity of such *in camera* review. Its denial of the writ was based largely on the grounds that the governmental privilege had not been asserted personally by anyone eligible to assert it, and that it had not been asserted with the requisite specificity. The court apparently left open the opportunity for petitioners to return to the District Court, assert the privilege more specifically and through responsible officials, and then have their request for an *in camera* review of the materials by the District Court reconsidered in a different light:

"Since there may be information in the requested documents which should be protected, the petitioners may assert a privilege to a particular document or class of documents, and perhaps seek *in camera* inspection, at the time the documents are discovered in the district court." 511 F.2d, at 198-199.

Petitioners contend that by denying the petition for mandamus the Court of Appeals has afforded them no remedy at all. To the contrary, we read the *405 above-quoted *405 language of the opinion as providing petitioners an avenue far short of mandamus to achieve precisely the relief they seek.

To the extent that the opinion below might be regarded as ambiguous, we are fortified in our reading of it by a recognition of the serious consequences which could flow from an unwarranted failure to grant petitioners the opportunity to have the documents reviewed by the trial judge *in camera* before being compelled to turn them over. Petitioners' claims of privilege rest in large part on the notion that turning over the requested documents would result in substantial injury to the State's prison-parole system by unnecessarily chilling the free and uninhibited exchange of ideas between staff members within the system, by causing the unwarranted disclosure and consequent drying up of confidential sources,[7] and in general by unjustifiably compromising the confidentiality of the system's records and personnel files.[8] In light of the potential seriousness of these considerations and in light of the fact that the weight to be accorded them will inevitably vary with the nature of the specific documents in question, it would seem that an *in camera* review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of irrelevance and privilege and plaintiffs' asserted need for the documents is 406 correctly struck.[9] Indeed, this Court has *406 long

held the view that *in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege. *E. g., United States* v. *Nixon,* 418 U.S. 683, 706 (1974); *United States* v. *Reynolds,* 345 U.S. 1 (1953).

[7]   See *Metros* v. *United States District Court for Dist. of Colo.,* 441 F.2d 313 (CA10 1971).

[8]   See *United States Board of Parole* v. *Merhige,* 487 F.2d 25 (CA4 1973), cert. denied, 417 U.S. 918 (1974).

[9]   Petitioners also assert, citing *Ford Co.* v. *Department of Treasury of Indiana,* 323 U.S. 459 (1945), and *Edelman* v. *Jordan,* 415 U.S. 651 (1974), that discovery of material which is actually the property of the State or its agencies is limited by the Eleventh Amendment. In view of our resolution of this case and the fact that petitioners did Page 406 not raise this issue either in the discovery proceedings in the District Court or in their petition for mandamus to the Court of Appeals we need not reach this issue.

Insofar as discovery of the prisoners' files is concerned, it is true that the Court of Appeals' order denying the petition for a writ of mandamus with regard to those files was issued without any statement of reasons for the denial. However, there is no reason to think that by its order the Court of Appeals meant to foreclose petitioners from following precisely the same avenue with regard to the prisoners' files as it gave them the opportunity to follow with regard to the Adult Authority files.

We are thus confident that the Court of Appeals did in fact intend to afford the petitioners the opportunity to apply for and, upon proper application, receive *in camera* review. Accordingly the orders of the Court of Appeals are affirmed.

*So ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

407

casetext
Part of Thomson Reuters

# Logan v. Zimmerman Brush Co.

455 U.S. 422 (1982) · 102 S. Ct. 1148

Decided Feb 24, 1982

APPEAL FROM THE SUPREME COURT OF ILLINOIS

No. 80-5950.

Argued October 14, 1981 Decided February 24, 1982

The Illinois Fair Employment Practices Act (FEPA) barred employment discrimination on the basis of physical handicap unrelated to ability. To obtain relief, a complainant had to bring a charge of unlawful conduct before the Illinois Fair Employment Practices Commission (Commission) within 180 days of the occurrence of such alleged conduct. The statute then gave the Commission 120 days within which to convene a factfinding conference to obtain evidence, ascertain the parties' positions, and explore the possibility of a settlement. Appellant, an employee of appellee, was discharged purportedly because his short left leg made it impossible for him to perform his duties as a shipping clerk. Appellant filed a timely charge alleging unlawful termination of his employment, but apparently through inadvertence the Commission scheduled the factfinding conference for a date 5 days after expiration of the 120-day statutory period. The Commission denied appellee's motion that the charge be dismissed for failure to hold a timely conference. On appeal, the Illinois Supreme Court held that the failure to comply with the 120-day convening requirement deprived the Commission of jurisdiction to consider appellant's charge, and rejected appellant's argument that his federal due process

and equal protection rights would be violated were the Commission's error allowed to extinguish his cause of action.

*Held:* The judgment is reversed, and the case is remanded.

82 Ill.2d 99, 411 N.E.2d 277, reversed and remanded.

JUSTICE BLACKMUN delivered the opinion of the Court, concluding that appellant was deprived of a protected property interest in violation of the Due Process Clause of the Fourteenth Amendment. Pp. 428-437.

(a) Appellant's right to use the FEPA's adjudicatory procedures is a species of property protected by the Due Process Clause. Cf. *Mullane* v. *Central Hanover Bank Trust Co.*, 339 U.S. 306. The hallmark of property is an individual entitlement grounded in state law, which cannot be removed except "for cause," and appellant's right shares this characteristic. The 120-day limitation is a procedural limitation on the claimant's ability to assert his rights, not a substantive element of the FEPA claim. Pp. 428-433.

(b) A consideration of the competing interests involved — the importance of the private interest and the length or finality of the deprivation, *423 the likelihood of governmental error, and the magnitude of the governmental interests — leads to the conclusion that appellant is entitled to have the Commission consider the merits of his charge, based upon the substantiality of the available evidence, before deciding whether to terminate his claim. The State's interest in refusing appellant's procedural request is, on the record, insubstantial. Pp. 433-435.

(c) The availability of a post-termination tort action does not provide appellant due process. It is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference; appellant is challenging not the Commission's error but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards. *Parratt* v. *Taylor*, 451 U.S. 527, distinguished. The Fourteenth Amendment requires "'an *opportunity* . . . granted at a meaningful time and in a meaningful manner' . . . `for [a] hearing appropriate to the nature of the case,'" *Boddie* v. *Connecticut*, 401 U.S. 371, 378, and here appellant was denied such an opportunity. Pp. 435-437.

JUSTICE BLACKMUN, in a separate opinion, joined by JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE O'CONNOR, concluded that under the "rational-basis" standard, the Illinois statute, as interpreted and applied by the Illinois Supreme Court to establish two categories — those processed within the prescribed 120 days and thus entitled to full consideration on the merits, and otherwise identical claims not processed within the prescribed time and thus terminated without a hearing — deprived appellant of his Fourteenth Amendment right to equal protection of the laws. Pp. 438-442.

JUSTICE POWELL, joined by JUSTICE REHNQUIST, while not joining all the broad pronouncements on the law of equal protection in JUSTICE BLACKMUN'S separate opinion, also concluded that the challenged classification, as construed and applied in this case, failed to be rationally related to a state interest that would justify it, and thus violated appellant's right to equal protection of the laws. Pp. 443-444.

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. BLACKMUN, J., also filed a separate opinion, in which BRENNAN, MARSHALL, and O'CONNOR, JJ., joined, *post*, p. 438. POWELL, J., filed an opinion concurring in the judgment, in which REHNQUIST, J., joined, *post*, p. 443.

*Gary H. Palm* argued the cause and filed briefs for appellant. *Tyrone C. Fahner*, Attorney General of Illinois, filed a *424 brief for the Illinois Human Rights Commission et al. as appellees under this Court's Rule 10.4 in support of appellants. With him on the brief were *Paul J. Bargiel* and *Russell C. Grimes, Jr.*, Assistant Attorneys General.

*Jay A. Canel* argued the cause and filed briefs for appellee Zimmerman Brush Co.–

Page 424 *James D. Weill* filed a brief for the Congress of Organizations of the Physically Handicapped et al. as *amici curiae* urging reversal.

---

JUSTICE BLACKMUN delivered the opinion of the Court.[fn †] [fn †]424JUSTICE O'CONNOR joins only the separate opinion, post, p. 438.

The issue in this case is whether a State may terminate a complainant's cause of action because a state official, for reasons beyond the complainant's control, failed to comply with a statutorily mandated procedure.

## I A

The Illinois Fair Employment Practices Act (FEPA or Act), Ill. Rev. Stat., ch. 48, ¶ 851 *et seq.* (1979), barred employment discrimination on the basis of "physical . . . handicap unrelated to ability." ¶ 853(a). It also established a comprehensive scheme for adjudicating allegations of discrimination. To begin the process, a complainant had to bring a charge of unlawful conduct before the Illinois Fair Employment Practices Commission (Commission) within 180 days of the occurrence of the allegedly discriminatory act. ¶ 858(a). The statute — in the provision directly at issue here — then gave the Commission 120 days within which to convene a factfinding conference designed to obtain evidence, ascertain the positions of the parties, and explore the possibility of a negotiated settlement. ¶ 858(b). If the Commission found "substantial evidence" of illegal conduct, it was to attempt to 425"eliminate the effect thereof . . . by means of *425 conference and conciliation," ¶ 858(c), and, if that proved impossible, to issue a formal complaint against the employer within 180 days after the expiration of the 120-day period. ¶ 858(d). A formal adversary hearing was then to be held before a commissioner or duly appointed adjudicator, who was to make findings and who was empowered to recommend reinstatement, backpay, and reasonable attorney's fees. ¶ 858.01.

If the commissioner or adjudicator did not find substantial evidence of discrimination, he was to recommend dismissal of the charge. *Ibid.*

The findings and recommended order were to be filed with the Commission. A complainant was entitled to obtain review by the full Commission of any of the possible dispositions of his charge, including an initial determination that the evidence did not justify a complaint. The Commission was to file a written order and decision. ¶ 858.02; Illinois Fair Employment Practices Commission, Rules and Regulations, § 4.5 (1979). If still not satisfied, the complainant could seek judicial 426review of any Commission order. ¶ 860.[1] *426

[1] After the inception of the present litigation, the Illinois Legislature repealed the FEPA, and put in its place the more comprehensive Illinois Human Rights Act. 1979 Ill. Laws, P. A. 81-1216, later amended by 1980 Ill. Laws, P. A. 81-1267. The new statute bars discrimination in real estate and financial transactions and in public accommodations, as well as in employment. It replaces the Fair Employment Practices Commission with two agencies: a Department of Human Rights, ¶ 7-101 *et seq.*, which is given the responsibility for investigating charges and issuing complaints upon a finding of substantial evidence, and a Human Rights Commission, ¶ 8-101 *et seq.*, which reviews the Department's findings and holds hearings upon issued complaints. The new Act modifies a number of the FEPA's procedural provisions; most important for present purposes, it commits to the Department's *discretion* the decision whether to hold a factfinding conference. ¶ 7-102(C)(3). These revisions have no effect on Logan's case, however, for the Illinois Supreme Court has ruled that the Human Rights Act is not to be applied retroactively. *Zimmerman Brush Co.* v. *Fair Employment Practices Comm'n,* 82 Ill.2d 99, 108-109, 411 N.E.2d 277, 282-283 (1980).

B

On November 9, 1979, appellant Laverne L. Logan, a probationary employee hired one month previously, was discharged by appellee Zimmerman Brush Company, purportedly because Logan's short left leg made it impossible for him to perform his duties as a shipping clerk. Five days later, Logan, acting *pro se*, filed a charge with the Commission alleging that his employment had been unlawfully terminated because of his physical handicap. App. 3. This triggered the Commission's statutory obligation under ¶ 858(b) to convene a factfinding conference within 120 days; in Logan's case, this meant by March 13, 1980. Apparently through inadvertence, the Commission's representative scheduled the conference for March 18, five days *after* expiration of the statutory period. Notice of the meeting, which was mailed to both parties in January 1980, specified the hearing's date and location and declared that attendance was "required." It, however, did not allude to the FEPA's 120-day time limit. App. 5. The Commission also asked the company to complete a short questionnaire concerning its employment practices, and directed that it submit its answers by March 10. *Ibid*. The company did this without objection.

When the conference date arrived, the company moved that Logan's charge be dismissed because the Commission had failed to hold the conference within the statutorily mandated 120-day period. *Id.*, at 12. This request was rejected. *Id.*, at 16. The company thereupon petitioned the Supreme Court of Illinois for an original writ of prohibition. That court stayed proceedings on Logan's complaint pending decision on the request for a writ. *Id.*, at 24. Logan meanwhile obtained counsel, and — because 180 days had not yet passed since the occurrence of the allegedly discriminatory act — filed a second charge with the Commission. *Id.*, at 26.

Before the Illinois Supreme Court, Logan argued that terminating his claim because of the Commission's failure to convene a timely conference — a matter beyond Logan's, or indeed the company's, control — would violate his federal rights to due process and equal protection of the laws. But the court noted that the statutory provision at issue, ¶ 858(b), declared: "Within 120 days of the proper filing of a charge, the Commission *shall* convene a fact finding conference. . . ." (Emphasis added.) The Illinois court found this legislative language to be mandatory, and accordingly it held that failure to comply deprived the Commission of jurisdiction to consider Logan's charge. *Zimmerman Brush Co*. v. *Fair Employment Practices Comm'n*, 82 Ill.2d 99, 411 N.E.2d 277 (1980).

427   *427

The court found controlling its decision in *Springfield-Sangamon County Regional Planning Comm'n* v. *Fair Employment Practices Comm'n*, 71 Ill.2d 61, 373 N.E.2d 1307 (1978),[2] where it had determined that ¶ 858(c)'s 180-day deadline for issuing a complaint was mandatory; since the state legislature wrote ¶ 858(b) after the *Springfield-Sangamon* decision, and used language similar to that employed in ¶ 858(c), it must have intended the 120-day time limit to be jurisdictional as well. This result, reasoned the court, comported with the statute's purposes by facilitating the "just and expeditious resolutions of employment disputes," 82 Ill.2d, at 107, 411 N.E.2d, at 282, while protecting employers "'from unfounded charges of discrimination,'" *id.*, at 106, 411 N.E.2d, at 281, quoting ¶ 851.

> [2] See also *Board of Governors* v. *Fair Employment Practices Comm'n*, 78 Ill.2d 143, 149, 399 N.E.2d 590, 593 (1979); *Wilson* v. *All-Steel, Inc.*, 87 Ill.2d 28, 428 N.E.2d 489 (1981).

The Illinois Supreme Court summarily rejected Logan's argument that his due process and equal protection rights would be violated were the Commission's error allowed to extinguish his

cause of action. The state legislature had established the right to redress for discriminatory employment practices, it was said, and "[t]he legislature could establish reasonable procedures to be followed upon a charge . . . ." *428 *Id.*, at 108, 411 N.E.2d, at 282. The court then went on to rule that Logan could not file a second charge with the Commission based upon the same act of alleged discrimination, for to allow the second complaint to proceed would circumvent the design of the Act and frustrate the public interest in an expeditious resolution of disputes.[3] *Id.*, at 108-109, 411 N.E.2d, at 282-283.

> [3] The Illinois court also refused to give retroactive application to the new Illinois Human Rights Act, which makes the convening of a factfinding conference discretionary. 82 Ill.2d, at 108-109, 411 N.E.2d, at 282-283. See n. 1, *supra*.

Logan appealed, bringing his federal claims to this Court. We noted probable jurisdiction. 450 U.S. 909 (1981).

## II A

Justice Jackson, writing for the Court in *Mullane* v. *Central Hanover Bank Trust Co.*, 339 U.S. 306 (1950), observed: "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.*, at 313. At the outset, then, we are faced with what has become a familiar two-part inquiry: we must determine whether Logan was deprived of a protected interest, and, if so, what process was his due.

The first question, we believe, was affirmatively settled by the *Mullane* case itself, where the Court held that a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.[4] There, the Court confronted a challenge to a state law that provided for the

settlement *429 of common trust fund accounts by fiduciaries, upon notice given through newspaper publication. The effect of the statute was to terminate "every right which beneficiaries would otherwise have against the trust company . . . for improper management of the common trust fund." *Id.*, at 311. This, the Court concluded, worked to deprive the beneficiaries of property by, among other things, "cut[ting] off their rights to have the trustee answer for negligent or illegal impairments of their interests." *Id.*, at 313. Such a result was impermissible unless constitutionally adequate notice and hearing procedures were established before the settlement process went into effect. *Id.*, at 315. Despite appellee Zimmerman Brush Company's arguments to the contrary, we see no meaningful distinction between the cause of action at issue in *Mullane* and Logan's right to use the FEPA's adjudicatory procedures.

> [4] Two years ago, in *Martinez* v. *California*, 444 U.S. 277, 281-282 (1980), the Court noted that "[a]rguably," a state tort claim is a "species of `property' protected by the Due Process Clause."

This conclusion is hardly a novel one. The Court traditionally has held that the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances. In *Societe Internationale* v. *Rogers*, 357 U.S. 197 (1958), for example — where a plaintiff's claim had been dismissed for failure to comply with a trial court's order — the Court read the "property" component of the Fifth Amendment's Due Process Clause to impose "constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Id.*, at 209. See also *Hammond Packing Co.* v. *Arkansas*, 212 U.S. 322, 349-351 (1909) (power to enter default judgment); *Hovey* v. *Elliott*, 167 U.S. 409 (1897) (same); *Windsor* v. *McVeigh*, 93 U.S. 274 (1876) (same). Cf. *Wolff* v.

*McDonnell*, 418 U.S. 539, 558 (1974). Similarly, the Fourteenth Amendment's Due Process Clause has been interpreted as preventing the States from denying potential litigants use of established 430 adjudicatory procedures, when such *430 an action would be "the equivalent of denying them an opportunity to be heard upon their claimed right[s]." *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971).[5]

---

[5] The Court's cases involving the right of access to courts provide an analogous method of analysis supporting our reasoning here. In *Boddie*, the Court established that, at least where interests of basic importance are involved, "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." 401 U.S., at 377. Thus, the State's imposition of substantial filing and other fees upon indigents seeking divorces was held to deny them due process. In *United States* v. *Kras*, 409 U.S. 434 (1973), we agreed that a due process right of access to the courts exists when fundamental interests are present and the State has exclusive control over "the adjustment of [the] legal relationship[s]" involved. *Id.*, at 445. The relationship between these opinions and the right to procedural due process at issue in the instant case is made clear in *Boddie*, which relied in large part on the analysis of *Mullane* v. *Central Hanover Bank Trust Co.*, 339 U.S. 306 (1950), and its guarantee "to all individuals [of] a meaningful opportunity to be heard." *Boddie*, 401 U.S., at 379; see also *id.*, at 377-378, 380, 382. Thus, while the right to seek a divorce may not be a property interest in the same sense as is a tort or a discrimination action, the theories of the cases are not very different: having made access to the courts an entitlement or a necessity, the State may

not deprive someone of that access unless the balance of state and private interests favors the government scheme.

In any event, the view that Logan's FEPA claim is a constitutionally protected one follows logically from the Court's more recent cases analyzing the nature of a property interest. The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except "for cause." *Memphis Light, Gas Water Div.* v. *Craft*, 436 U.S. 1, 11-12 (1978); *Goss* v. *Lopez*, 419 U.S. 565, 573-574 (1975); *Board of Regents* v. *Roth*, 408 U.S. 564, 576-578 (1972). Once that characteristic is found, the types of interests protected as "property" are varied and, as often as not, intangible, relating "to the whole domain of social and economic fact." *National Mutual Insurance Co.* v. *Tidewater Transfer Co.*, 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting); *Arnett* v. 431 *Kennedy*, 416 U.S. 134, *431 207-208, and n. 2 (1974) (MARSHALL, J., dissenting); *Board of Regents* v. *Roth*, 408 U.S., at 571-572, 576-577. See, *e. g., Barry* v. *Barchi*, 443 U.S. 55 (1979) (horse trainer's license protected); *Memphis Light, Gas Water Div.* v. *Craft, supra* (utility service); *Mathews* v. *Eldridge*, 424 U.S. 319 (1976) (disability benefits); *Goss* v. *Lopez, supra* (high school education); *Connell* v. *Higginbotham*, 403 U.S. 207 (1971) (government employment); *Bell* v. *Burson*, 402 U.S. 535 (1971) (driver's license); *Goldberg* v. *Kelly*, 397 U.S. 254 (1970) (welfare benefits).

The right to use the FEPA's adjudicatory procedures shares these characteristics. A claimant has more than an abstract desire or interest in redressing his grievance: his right to redress is guaranteed by the State, with the adequacy of his claim assessed under what is, in essence, a "for cause" standard, based upon the substantiality of the evidence. And an FEPA claim, which presumably can be surrendered for value, is at least as substantial as the right to an education labeled as property in *Goss* v. *Lopez, supra*.[6]

Certainly, it would require a remarkable reading of a "broad and majestic ter[m]," *Board of Regents* v. *Roth*, 408 U.S., at 571, to conclude that a horse trainer's license is a protected property interest under the Fourteenth Amendment, while a state-created right to redress discrimination is not.

> 6 An FEPA claim is therefore distinguishable from an enforcement action like those conducted by the National Labor Relations Board pursuant to the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* In such a proceeding, the prosecution is controlled by the NLRB's General Counsel, and the Counsel's refusal to issue a complaint is generally not reviewable either by the Board or by the courts. See *NLRB* v. *Sears, Roebuck Co.,* 421 U.S. 132, 138-139 (1975).

The Illinois Supreme Court nevertheless seemed to believe that no individual entitlement could come into being under the FEPA until the Commission took appropriate action within the statutory deadline. Because the entitlement arises from statute, the court reasoned, it was the legislature's *432 prerogative to establish the "procedures to be followed upon a charge." 82 Ill.2d, at 108, 411 N.E.2d, at 282. This analysis, we believe, misunderstands the nature of the Constitution's due process guarantee.

Each of our due process cases has recognized, either explicitly or implicitly, that because "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Vitek* v. *Jones,* 445 U.S. 480, 491 (1980). See *Arnett* v. *Kennedy,* 416 U.S., at 166-167 (POWELL, J., concurring in part); *id.,* at 211 (MARSHALL, J., dissenting). Indeed, any other conclusion would allow the State to destroy at will virtually any state-created property interest. The Court has considered and rejected such an approach: "`While the legislature may elect not to

confer a property interest, . . . it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. . . . [T]he adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms.'" *Vitek* v. *Jones,* 445 U.S., at 490-491, n. 6, quoting *Arnett* v. *Kennedy,* 416 U.S., at 167 (opinion concurring in part).

Of course, the State remains free to create substantive defenses or immunities for use in adjudication — or to eliminate its statutorily created causes of action altogether — just as it can amend or terminate its welfare or employment programs. The Court held as much in *Martinez* v. *California,* 444 U.S. 277 (1980), where it upheld a California statute granting officials immunity from certain types of state tort claims. We acknowledged that the grant of immunity arguably did deprive the plaintiffs of a protected property interest. But they were not thereby deprived of property without due process, just as a welfare recipient is not deprived of due process when the legislature adjusts benefit levels. Cf. *433 *U.S. Railroad Retirement Bd.* v. *Fritz,* 449 U.S. 166, 174 (1980); *Hisquierdo* v. *Hisquierdo,* 439 U.S. 572, 575 (1979); *Flemming* v. *Nestor,* 363 U.S. 603, 609-610 (1960); *Chase Securities Corp.* v. *Donaldson,* 325 U.S. 304, 312, n. 8, 315-316 (1945). In each case, the legislative determination provides all the process that is due, see *Bi-Metallic Investment Co.* v. *State Bd. of Equalization,* 239 U.S. 441, 445-446 (1915); it "remain[s] true that the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." *Martinez* v. *California,* 444 U.S., at 282. Indeed, as was acknowledged in *Martinez,* it may well be that a substantive "immunity defense, like an element of the tort claim itself, is merely one aspect of the

State's definition of that property interest." *Id.*, at 282, n. 5. Cf. *Ferri* v. *Ackerman*, 444 U.S. 193, 198 (1979).

The 120-day limitation in the FEPA, ¶ 858(b), of course, involves no such thing. It is a procedural limitation on the claimant's ability to assert his rights, not a substantive element of the FEPA claim. Because the state scheme has deprived Logan of a property right, then, we turn to the determination of what process is due him.

## B

As our decisions have emphasized time and again, the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged. Thus it has become a truism that " *some* form of hearing" is required before the owner is finally deprived of a protected property interest. *Board of Regents* v. *Roth*, 408 U.S., at 570-571, n. 8 (emphasis in original). And that is why the Court has stressed that, when a "statutory scheme makes liability an important factor in the State's determination . . ., the State may not, consistent with due process, eliminate consideration of that factor in its prior hearing." 434 *Bell* v. *Burson*, *434 402 U.S., at 541. To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement.[7] See *id.*, at 542.

[7] This is not to suggest, of course, that the State must consider the merits of the claim when the *claimant* fails to comply with a reasonable procedural requirement, or fails to file a timely charge. See *infra*, at 437.

On the other hand, the Court has acknowledged that the timing and nature of the required hearing[8] "will depend on appropriate accommodation of the competing interests involved." *Goss* v. *Lopez*, 419 U.S., at 579. These include the importance of the private interest and the length or finality of the deprivation, see *Memphis Light, Gas Water Div.* v. *Craft*, 436 U.S., at 19, and *Mathews* v. *Eldridge*,

424 U.S., at 334-335; the likelihood of governmental error, see *id.*, at 335; and the magnitude of the governmental interests involved, see *ibid.*, and *Wolff* v. *McDonnell*, 418 U.S., at 561-563.

[8] Here, of course, we are not concerned with the timing of the required review on the merits. The Commission must consider the merits before the case may proceed; it is not meaningful to discuss the possibility of a post-termination hearing, because the property interest here is destroyed when the case is terminated.

Each of these factors leads us to conclude that appellant Logan is entitled to have the Commission consider the merits of his charge, based upon the substantiality of the available evidence, before deciding whether to terminate his claim. Logan's interests in retaining his employment, in disproving his employer's charges of incompetence or inability, and — more intangibly — in redressing an instance of alleged discrimination, are all substantial. At the same time, the deprivation here is final; Logan, unlike a claimant whose charge is dismissed on the merits for lack of evidence, cannot obtain judicial review of the Commission action. A system or procedure that deprives persons of their claims in a random manner, as is apparently true of ¶ 858(b), 435 necessarily *435 presents an unjustifiably high risk that meritorious claims will be terminated. And the State's interest in refusing Logan's procedural request is, on this record, insubstantial.

There has been no suggestion that any great number of claimants are in Logan's position, or that directing the State to consider the merits of Logan's claim will be unduly burdensome. In any event, the State by statute has eliminated the mandatory hearing requirement, see n. 1, *supra*, demonstrating that it no longer has any appreciable interest in defending the procedure at issue.

Despite appellee Zimmerman Brush Company's arguments, the recent decision in *Parratt* v. *Taylor*, 451 U.S. 527 (1981), is not to the contrary. There, a state employee negligently lost a prisoner's hobby kit; while the Court concluded that the prisoner had suffered a deprivation of property within the meaning of the Fourteenth Amendment, it held that all the process due was provided by the State's tort claims procedure. In such a situation, the Court observed, "[i]t is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.*, at 541. The company suggests that Logan is complaining of the same type of essentially negligent deprivation, and that he therefore should be remitted to the tort remedies provided by the Illinois Court of Claims Act, Ill. Rev. Stat., ch. 37, ¶ 439.1 *et seq*. (1979). That statute allows an action "against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person." ¶ 439.8(d).[9]

[9] Logan might also have a remedy under the Equal Opportunities for the Handicapped Act (EOHA), Ill. Rev. Stat., ch. 38, ¶ 65-21 *et seq*. (1979), which provided an action for damages and "other relief" to those discriminated against on the basis of physical handicap. ¶ 65-29. While the EOHA also was repealed when the Illinois Human Rights Act was passed, see n. 1, *supra*, the latter statute does not disturb claims arising or accruing under the EOHA prior to July 1, 1980. ¶ 9-102(B)(2). It is not clear to us, however, that such an action is available to Logan; the Illinois Supreme Court concluded that allowing Logan to file a second FEPA claim would frustrate the design of the FEPA by prejudicing the employer's rights, 82 Ill.2d, at 109, 411 N.E.2d, at 283, and it might well apply a similar analysis to bar an EOHA claim here. We would hesitate to remit Logan to so speculative a remedy. In any event, our conclusion about the

inadequacy of any post-termination remedy here makes the availability of an EOHA suit irrelevant for present purposes.

This argument misses *Parratt*'s point. In *Parratt*, the Court emphasized that it was dealing with "a tortious loss of . . . property as a result of a random and unauthorized act by *436 a state employee . . . not a result of some established state procedure." 451 U.S., at 541. Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference — whether the Commission's action is taken through negligence, maliciousness, or otherwise. *Parratt* was not designed to reach such a situation. See *id.*, at 545 (second concurring opinion). Unlike the complainant in *Parratt*, Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards.

In any event, the Court's decisions suggest that, absent "the necessity of quick action by the State or the impracticality of providing any predeprivation process," a postdeprivation hearing here would be constitutionally inadequate. *Parratt*, 451 U.S., at 539. See *Memphis Light, Gas Water Div.* v. *Craft*, 436 U.S., at 19-20; *Board of Regents* v. *Roth*, 408 U.S., at 570, n. 7; *Bell* v. *Burson*, 402 U.S., at 542; *Boddie* v. *Connecticut*, 401 U.S., at 379. Cf. *Barry* v. *Barchi*, 443 U.S., at 64-65 (post-termination hearing permitted where the decision to terminate was based on a reliable pretermination finding); *Mathews* v. *Eldridge*, 424 U.S., at 343-347 (same). That is particularly true where, as here, the State's only post-termination process comes in the form of an independent tort action.[10] Seeking redress through a *437 tort suit is apt to be a lengthy and speculative process, which in a situation such as this one will never make the complainant entirely whole: the Illinois Court of Claims Act does not provide for reinstatement — as appellee Zimmerman Brush Company conceded at oral argument, Tr. of Oral Arg. 39 —

and even a successful suit will not vindicate entirely Logan's right to be free from discriminatory treatment.

10 In *Ingraham* v. *Wright*, 430 U.S. 651 (1977), the Court concluded that state tort remedies provided adequate process for students subjected to corporal punishment in school. In doing so, however, the Court emphasized that the state scheme "preserved what `has always been the law of the land,'" *id.*, at 679, quoting *United States* v. *Barnett*, 376 U.S. 681, 692 (1964), and that adding additional safeguards would be unduly burdensome. 430 U.S., at 680-682. Here, neither of those rationales is available. Terminating potentially meritorious claims in a random manner is hardly a practice in line with our common-law traditions. And the State's abandonment of the challenged practice makes it difficult to argue that requiring a determination on the merits will impose undue burdens on the state administrative process.

Obviously, nothing we have said entitles every civil litigant to a hearing on the merits in every case. The State may erect reasonable procedural requirements for triggering the right to an adjudication, be they statutes of limitations, cf. *Chase Securities Corp.* v. *Donaldson*, 325 U.S., at 314-316, or, in an appropriate case, filing fees. *United States* v. *Kras*, 409 U.S. 434 (1973). And the State certainly accords *due* process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule. *Hammond Packing Co.* v. *Arkansas*, 212 U.S., at 351; *Windsor* v. *McVeigh*, 93 U.S., at 278. What the Fourteenth Amendment does require, however, "is `an *opportunity* . . . granted at a meaningful time and in a meaningful manner,' *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965) (emphasis added), `for [a] hearing appropriate to the nature of the case,' *Mullane* v. *Central Hanover Tr. Co.*,

*supra*, at 313." *Boddie* v. *Connecticut*, 401 U.S., at 378. It is such an opportunity that Logan was denied. *438

438

## III

The judgment of the Supreme Court of Illinois, accordingly, is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE O'CONNOR join.

The Court's opinion, *ante*, considers appellant Logan's due process claim and decides that issue in his favor. As has been noted, Logan also raised an equal protection claim and that issue has been argued and briefed here. Although the Court considered that it was unnecessary to discuss and dispose of the equal protection claim when the due process issue was being decided in Logan's favor, I regard the equal protection issue as sufficiently important to require comment on my part,[1] particularly inasmuch as a majority of the Members of the Court are favorably inclined toward the claim, although, to be sure, that majority is not the one that constitutes the Court for the controlling opinion.

1 "It cannot be suggested that in cases where the author [in writing by assignment] is the mere instrument of the Court he must forego expression of his own convictions." *Wheeling Steel Corp.* v. *Glander*, 337 U.S. 562, 576 (1949) (separate opinion). See also *Abbate* v. *United States*, 359 U.S. 187, 196 (1959) (separate opinion); *Helvering* v. *Davis*, 301 U.S. 619, 639-640 (1937).

On its face, Logan's equal protection claim is an unconventional one. The Act's ¶ 858(b) establishes no explicit classifications and does not expressly distinguish between claimants, and the company therefore argues that Logan has no more been

deprived of equal protection than anyone would be who is injured by a random act of governmental misconduct. As the Illinois Supreme Court interpreted the statute, however, ¶ 858(b) unambiguously divides claims — and thus, necessarily, claimants — into two discrete groups that are accorded radically disparate treatment. Claims processed within 120 days are given full consideration on the merits, *439 and complainants bringing such charges are awarded the opportunity for full administrative and judicial review. In contrast, otherwise identical claims that do not receive a hearing within the statutory period are unceremoniously, and finally, terminated. Because the Illinois court recognized, in so many words, that the FEPA establishes two categories of claims, one may proceed to determine whether the classification drawn by the statute is consistent with the Fourteenth Amendment.

For over a century, the Court has engaged in a continuing and occasionally almost metaphysical effort to identify the precise nature of the Equal Protection Clause's guarantees.[2] At the minimum level, however, the Court "consistently has required that legislation classify the persons it affects in a manner rationally related to legitimate governmental objectives." *Schweiker* v. *Wilson*, 450 U.S. 221, 230 (1981). This is not a difficult standard for a State to meet when it is attempting to act sensibly and in good faith. But the "rational-basis standard is `not a toothless one,'" *id.*, at 234, quoting *Mathews* v. *Lucas*, 427 U.S. 495, 510 (1976), the classificatory scheme must "rationally advanc[e] a reasonable and identifiable governmental objective." *Schweiker* v. *Wilson*, 450 U.S., at 235. I see no need to explore the outer bounds of this test, for I find that the Illinois statute runs afoul of the lowest level of permissible equal protection scrutiny.

[2] "Members of the Court continue to hold divergent views on the clarity with which a legislative purpose must appear . . . and about the degree of deference afforded the

legislature in suiting means to ends . . . ." *Schweiker* v. *Wilson*, 450 U.S. 221, 243, n. 4 (1981) (dissenting opinion).

The FEPA itself has two express purposes: eliminating employment discrimination, and protecting employers and other potential defendants "from unfounded charges of discrimination." ¶ 851. It is evident at a glance that neither of these objectives is advanced by ¶ 858(b)'s deadline provision. Terminating potentially meritorious claims in a random manner obviously cannot serve to redress instances of discrimination. *440 And it cannot protect employers from unfounded charges, for the frivolousness of a claim is entirely unrelated to the length of time the Commission takes to process that claim. So far as this purpose is concerned, ¶ 858(b) stands on precisely the same footing as the state statute invalidated in *Lindsey* v. *Normet*, 405 U.S. 56 (1972). There, the Court struck down a provision requiring a tenant to post a double bond before appealing an adverse forcible entry judgment. "The claim that the double-bond requirement operates to screen out frivolous appeals is unpersuasive," the Court noted, "for it not only bars nonfrivolous appeals by those who are unable to post the bond but also allows meritless appeals by others who can afford the bond." *Id.*, at 78. Accord, *Rinaldi* v. *Yeager*, 384 U.S. 305, 310 (1966). Here, of course, the FEPA may operate to terminate meritorious claims without any hearing at all, while allowing frivolous complaints to proceed through the entire administrative and judicial review process. While it may well be true that "[n]o bright line divides the merely foolish from the arbitrary law," *Schweiker* v. *Wilson*, 450 U.S., at 243 (dissenting opinion), I have no doubt that ¶ 858(b) is patently irrational in the light of its stated purposes.

In its opinion, however, the Illinois Supreme Court recognized a third rationale for ¶ 858(b): that provision, according to the court, was designed to further the "just and expeditious resolutio[n]" of employment disputes. *Zimmerman Brush Co.* v.

*Fair Employment Practices Comm'n*, 82 Ill.2d 99, 107, 411 N.E.2d 277, 282 (1980). Insofar as the court meant to suggest that a factfinding conference may help settle controversies and frame issues for a more efficient future resolution, it was undoubtedly correct. But I cannot agree that terminating a claim that the State itself has misscheduled is a rational way of expediting the resolution of disputes.[3] *441

441

[3] The Illinois court concluded that the factfinding conference itself would help to resolve disputes expeditiously by encouraging settlement and "aid[ing] the Commission in setting up a procedural framework for the conciliatory process which follows." 82 Ill.2d, at 106, 411 N.E.2d, at 281. It is less clear to me that the court viewed the practice of terminating misscheduled claims as one that would aid the just and expeditious resolution of controversies. In light of my conclusions about the rationality of such a justification, however, it is irrelevant whether the Illinois Supreme Court intended to state that this was the actual or articulated rationale for ¶ 858(b)'s deadline proviso. I note that the rationales discussed in the text have not been expressed by the State's representatives; the Illinois Human Rights Commission, by the State's Attorney General, has filed a brief in this Court supporting Logan.

Most important, the procedure at issue does not serve generally to hasten the processing or ultimate termination of employment controversies. Once the Commission has scheduled a factfinding conference and issued a complaint, there are no statutory time limits at all on the length of time it can take to resolve the claim. And ¶ 858(b) does not serve to protect employers from stale charges, because it does not function as a statute of limitation; Logan does not and could not quarrel with the requirement that complainants file their charges in a timely fashion.

It is true, of course, that ¶ 858(b) serves to expedite the resolution of certain claims — those not processed within 120 days — in a most obvious way, and in that sense it furthers the purpose of terminating disputes expeditiously. But it is not enough, under the Equal Protection Clause, to say that the legislature sought to terminate certain claims and succeeded in doing so, for that is "a mere tautological recognition of the fact that [the legislature] did what it intended to do." *U.S. Railroad Retirement Bd*. v. *Fritz*, 449 U.S. 166, 180 (1980) (STEVENS, J., concurring in judgment). This Court still has an obligation to view the classificatory *system*, in an effort to determine whether the disparate treatment accorded the affected classes is arbitrary. *Rinaldi* v. *Yeager*, 384 U.S., at 308 ("The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes"). Cf. *U.S. Railroad Retirement Bd*. v. *Fritz*, 449 U.S., at 178. *442

442

Here, that inquiry yields an affirmative result. So far as the State's purpose is concerned, every FEPA claimant's charge, when filed with the Commission, stands on the same footing. Yet certain randomly selected claims, because processed too slowly by the State, are irrevocably terminated without review. In other words, the State converts similarly situated claims into dissimilarly situated ones, and then uses this distinction as the basis for its classification. This, I believe, is the very essence of arbitrary state action. "[T]he Equal Protection Clause `imposes a requirement of some rationality in the nature of the class singled out,'" *James* v. *Strange*, 407 U.S. 128, 140 (1972), quoting *Rinaldi*, 384 U.S., at 308-309, and that rationality is absent here. The Court faced an analogous situation in a case involving sex-based classifications, and its conclusion there is applicable to the case before us now: giving preference to a discrete class "merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary

casetext

legislative choice forbidden by the Equal Protection Clause . . . ." *Reed* v. *Reed*, 404 U.S. 71, 76 (1971).

Finally, it is possible that the Illinois Supreme Court meant to suggest that the deadline contained in ¶ 858(b) can be justified as a means of thinning out the Commission's caseload, with the aim of encouraging the Commission to convene timely hearings. This rationale, however, suffers from the defect outlined above: it draws an arbitrary line between otherwise identical claims. In any event, the State's method of furthering this purpose — if this was in fact the legislative end — has so speculative and attenuated a connection to its goal as to amount to arbitrary action. The State's rationale must be something more than the exercise of a strained imagination; while the connection between means and ends need not be precise, it, at the least, must have some objective basis. That is not so here.

I thus agree with appellant Logan that the Illinois scheme also deprives him of his Fourteenth Amendment right to the equal protection of the laws.

443 *443

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, concurring in the judgment.

As the challenged statute now has been amended, this is a case of little importance except to the litigants. The action commenced with an isolated example of bureaucratic oversight that resulted in the denial even of a hearing on appellant's claim of discrimination. One would have expected this sort of negligence by the State to toll the statutory period within which a hearing must be held. The Supreme Court of Illinois, however, read the statutory terms as mandatory and jurisdictional.

The issue presented, at least for me, is too simple and straightforward to justify broad pronouncements on the law of procedural due process or of equal protection. I am particularly

concerned by the potential implications of the Court's expansive due process analysis. In my view this is a case that should be decided narrowly on its unusual facts.–

> – It is necessary for this Court to decide cases during almost every Term on due process and equal protection grounds. Our opinions in these areas often are criticized, with justice, as lacking consistency and clarity. Because these issues arise in varied settings, and opinions are written by each of nine Justices, consistency of language is an ideal unlikely to be achieved. Yet I suppose we would all agree — at least in theory — that unnecessarily broad statements of doctrine frequently do more to confuse than to clarify our jurisprudence. I have not always adhered to this counsel of restraint in my own opinion writing, and therefore imply no criticism of others. But it does seem to me that this is a case that requires a minimum of exposition.

The decision of the Illinois Supreme Court effectively created two classes of claimants: those whose claims were, and those whose claims were not, processed within the prescribed 120 days by the Illinois Fair Employment Practices Commission. Under this classification, claimants with identical claims, despite equal diligence in presenting them, would be treated differently, depending on whether the Commission itself neglected to convene a hearing within the prescribed time. The question is whether this unusual classification is rationally related to a

444 state interest that would justify it. *444

The State no doubt has an interest in the timely disposition of claims. But the challenged classification failed to promote that end — or indeed any other — in a rational way. As claimants possessed no power to convene hearings, it is unfair and irrational to punish them for the Commission's failure to do so. The State also has asserted goals of redressing valid claims

casetext

of discrimination and of protecting employers from frivolous lawsuits. Yet the challenged classification, which bore no relationship to the merits of the underlying charges, is arbitrary and irrational when measured against either purpose.

This Court has held repeatedly that state-created classifications must bear a rational relationship to legitimate governmental objectives. See, *e. g., Schweiker* v. *Wilson*, 450 U.S. 221, 230 (1981); *Lindsey* v. *Normet*, 405 U.S. 56 (1972). Although I

do not join JUSTICE BLACKMUN's separate opinion, I agree that the challenged statute, as construed and applied in this case, failed to comport with this minimal standard. I am concerned by the broad sweep of the Court's opinion, but I do join its judgment.

445  *445



# Nokes v. Miami Univ.

Decided Aug 25, 2017

Case No. 1:17-cv-482

08-25-2017

JOHN NOKES, Plaintiff, v. MIAMI UNIVERSITY, et al., Defendants.

---

Judge Michael R. Barrett

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOC. 2)

This matter is before the Court on: (1) Plaintiff's July 16, 2017 Motion for Preliminary Injunction (Doc. 2), in which Plaintiff seeks an order "prohibiting [Defendant] Miami [University] from imposing . . . disciplinary sanctions against John [Nokes]"; and (2) Plaintiff's August 21, 2017 Motion to Strike Defendants' Response to Plaintiff's Notice of Supplemental Authority (Doc. 27). Consistent with Plaintiff's August 3, 2017 motion for a temporary restraining order (Doc. 14), Plaintiff also seeks an order preliminarily enjoining Defendants from releasing or otherwise publicly disclosing Plaintiff's name until this matter is resolved on the merits. Matters relating to the requested Rule 65 relief have been fully briefed, with each party also submitting post-hearing briefs (Doc. 23; Doc. 24) after the August 10, 2017 preliminary injunction hearing.[1]

[1] Defendants filed an additional memorandum (Doc. 26), triggering Plaintiff's pending Motion to Strike (Doc. 27), which is addressed in Section II.A *infra*.

## I. BACKGROUND

Plaintiff - known as John Nokes for purposes of this lawsuit - is an undergraduate student at Defendant Miami University who has completed four semesters of coursework. Defendant Miami University has suspended John Nokes for approximately two years for *2 allegedly engaging in sexual misconduct with another student, Jane Roe. Section 103A of Defendant Miami University's "Code of Student Conduct" defines sexual misconduct as "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent." (Doc. 1; PAGEID# 70). Under Section 103A of the Code, consent does not exist, *inter alia*, where sexual contact is initiated by force or while a participant is "severely intoxicated." (*Id*. at 70-71).

Plaintiff alleges that, after a procedurally defective disciplinary hearing, a hearing panel acting on behalf of Defendant Miami University found him responsible for sexual misconduct and informed Plaintiff that he was suspended from Defendant Miami University from April 6, 2017 through May 15, 2019. (Doc. 1; PAGEID# 28). On July 16, 2017, Plaintiff filed a Complaint for declaratory judgment, violation of 42 U.S.C. §1983, violation of Title IX, and injunctive relief against Defendants Miami University, Susan Vaughn, Steven Elliott, Jayne Brownell, and Michael Curme. (Doc. 1). Specifically, Plaintiff claims that his due process rights were violated because: (1) he was afforded inadequate notice of the nature of the allegations against him; and (2) he was deprived of his alleged right to confront adverse witnesses through cross-examination. The Parties acknowledge that this Court is not a "super

appeals" court reviewing the decision of the disciplinary panel; rather, the Court is determining issues relating to Constitutional due process in the context of university disciplinary proceedings. Accordingly, the background set forth below relates to both: (A) the process Plaintiff received from Defendant Miami University; and (B) the procedural posture of the instant lawsuit. *3

### A. Defendant Miami University's Disciplinary Proceeding against Plaintiff

It is undisputed that, in November 2016, Plaintiff and Jane Roe had sexual contact. Five months later, Jane Roe reported that she had been sexually assaulted by Plaintiff to Defendant Miami University's Office of Ethics and Student Conflict Resolution ("OESCR"). Thereafter, Defendant Miami University initiated a disciplinary proceeding against Plaintiff.

### 1. April 5, 2017 Notice of Violation

On April 5, 2017, the University provided Plaintiff with a Notice of Violation alleging that Plaintiff committed sexual assault by the use of force or threat of force, in violation of Section 103A (Sexual Assault). (*Id.* at 31) Specifically, the Notice of Violation stated as follows:

> "The [OESCR] is in receipt of a report from [Jane Roe]. Specifically, on November 17, 2016, you allegedly penetrated [Jane Roe] with your fingers and performed unwanted oral sex on her in an alleyway by Bishop Hall. You allegedly continued even when she showed resistance. Furthermore, [Jane Roe] reported that she had to use the restroom, and as she entered the restroom in Bishop Hall, you allegedly entered with her, holding her head down to perform oral sex on you.
>
> This incident is an alleged violation of the Student Conduct Regulation- **Section(s) 103A (Sexual Assault)- 2 Counts.**"

(Doc. 17-1; PAGEID# 544) (emphasis in original). The face of the Notice is silent on the issue of intoxication.

### 2. April 6, 2017 Summary Hearing

The next day, Defendant Miami University held a summary suspension hearing. (Doc. 11-1). The foregoing hearing did not address the merits of Jane Roe's accusation, and instead focused on whether Plaintiff would be permitted to remain on campus during the disciplinary *4 process. The Dean of Students presided, determined that Plaintiff presented no threat to the student body, and allowed Plaintiff to remain. (Doc. 11-1).

### 3. Receipt of Jane Roe's Statements/Hearing Packet

Plaintiff received Jane Roe's first written statement (Doc. 17-1; PAGEID# 546) on April 6, 2017. (Vaughn Decl. at ¶4). The statement reads as follows:

My name is [Jane Roe] and I am currently a sophomore at Miami University. I had a conference with [Miami employee] this afternoon and she suggested that I write this complaint as soon as possible because it is the end of the year.

I would like to report another student on campus, [John Nokes], for a sexual assault that occurred on Thursday November 17th transitioning to the morning of Friday November 17th, 2016. This event took place just outside of Bishop residence hall and also, inside Bishop as well which is his current residence hall. While we were both under the influence and I wish I could count this as a "drunken mistake," but his intent for the act was made even more clearly apparent as the months went on.

I have witnesses that can confirm that his intent was to have sex with me by the end of the night which he concluded could be done after at least buying me $28 in alcoholic beverages. He offered to walk me home and sent the other male away so he could walk me home himself. We were friends so I thought nothing of this at the time. We he [sic] asked if we could "hookup," I said no and made it clear that I was not interested in anything, but kissing. He puled [sic] me into the alleyway by Bishop, pulled up my dress and pulled down my panties. His form of making out consisted of him penetrating me with his fingers and him preforming [sic] unwanted oral sex on me. When I showed resistance he said, "come on it will be funny," and proceeded to continue against my hesitation. When I stumbled and almost fell on the sidewalk he decided that it was a good idea to try and have sex with me. I realized that I needed to use the restroom when he was already pulling to into his hall and taking me up to the second floor

single restroom. I remember my confusion because I thought he was trying to enter the women's restroom. Then I remember my head being held down as I preformed [sic] oral sex on him. I tried to pull back and found resistance. After he was done it was about 1am on that Friday. He insisted on walking me home to [residence hall] because I was too drunk. It was at that point that he started saying things like, "Was

*5

what we did wrong? Wow you're so drunk you need to walk straight. And the ultimate shocker, "You're not gonna sue me right?"

Let me know what other sort of information is needed and I can be contacted by email."

(Doc. 17-1; PAGEID# 546-547).

Plaintiff received Jane Roe's second written statement (Doc. 17-1: PAGEID# 600) on April 21, 2017, seven days before the hearing, along with the rest of the hearing packet. The second statement reads as follows:

"The night of November 17th, the group when [sic] to pitchers at 45 around 9:30pm. At that time [John Nokes] had bought me a pitcher of alcohol at the bar. I had most of the pitcher and was drinking from other pitchers. We went down to the hatch at about 10:00pm and continued drinking. [John] seemed to be drinking some as well. At about 11pn [sic] the group went to MIA after finishing the pitchers and [John] immediately offered to buy me a drink (Peach Bellini). In a relatively short period afterwards he bought me another one. [John] bought a Makers on the rocks and I drank some of that too. He made sure to get a seat next to me and even asked people to move so he could sit next to me. I drink part of my friend's [] beer. At that point I left the bar with [John Nokes] and [friend] at around 12:15. Walking towards Wells Hall, [John] sends [friend] away and I am left alone with him. [John] asks me if I want to hookup and suggests the single bathroom on his floor. I said, "No, I don't like to sleep around." I kissed him with the intention of not having sex. I was pulled into an alley to the side of Bishop visibly stumbling and slurring. He squatted down in the leaves attempting to preform [sic] oral sex on me even with my hesitation. He removed my underwear and said, "Come on it will be funny." He penetrated me with his fingers and his tongue while I struggled to stand. He kept commenting on how drunk I was. I said I needed to go to the restroom and he said, "Yeah that's where we are going," as he pulled me towards Bishop Hall. I remember asking to take the elevator because I was so exhausted. He walked in front of me to the bathroom and I remember my confusion when he opened the door. I thought he was trying to enter the women's restroom, but it was the single he previously talked about. I

felt uncomfortable using the restroom in front of him and I felt very nervous. He sat on the bathroom bench and motioned me over. We kissed and he undid his pants. I did not say yes or no, but felt

pressured to preform [sic] oral sex. When I tried to pull back I felt pressure on the back of my head. Once he was finished I yelled at him for I had not been able to breathe and was obviously shaken. I couldn't believe what had happened. I ran out of the bathroom and he chased after me catching the elevator door before it closed. He asked, "Was that okay? Was that bad what we did?" I was scared and ashamed so I said no. He kept pace with me making sure that I would get home because I was, "So drunk." I'm pretty sure I tried to sit down at one point and he kept me walking. Then he said, "You're not going to sue me right." At that point I was close to tears. He dropped me off at [residence hall] to which my roommate held me while I cried in our room. Minutes later he texted me at around lam which is attached with this packet of documents."

(Doc. 17-1; PAGEID# 600). Although the term "severely intoxicated" is never used, each statement discusses alcohol consumption.

### 4. April 28, 2017 Disciplinary Hearing

At the April 28, 2017 hearing, Defendant Susan Vaughn presided. She began with remarks relating to the nature of the accusations against Plaintiff, and asked him to formally "respond" to the accusations as stated in the Notice of Violation. (Doc. 11-2; PAGEID# 188-189). Specifically, the allegedly non-consensual conduct occurring outside Bishop Hall was treated as one charge of sexual misconduct, and the allegedly non-consensual conduct occurring inside Bishop Hall

was treated as a separate charge of sexual misconduct. (*Id.*). Plaintiff denied responsibility for both charges. (*Id.*).

Thereafter, Plaintiff was permitted to give an opening statement. In summary, Plaintiff stated that, on the night in question, he and several friends - including Jane Roe - made plans to meet at a bar in Oxford, Ohio. (*Id.*). They were going out, in part, to celebrate a friend's birthday. (*Id.*). According to Plaintiff, he planned to make it a relatively early night because he had a flight in the morning. (*Id.* at 193). At approximately 9:30 p.m., Plaintiff left his residence hall to walk to friends' dorms, and afterward the bar. (*Id.* at 189). Upon meeting with friends, *7 Jane Roe's friend (who later submitted a written statement on behalf of Jane Roe) allegedly "made a point to say, wow, doesn't [Jane] look great tonight." (*Id.* at 190). Plaintiff said he thought this was "odd" because he thought Jane Roe was dating Plaintiff's best friend (who later submitted a statement on behalf of Plaintiff, then attempted to recant it).[2] Plaintiff testified to drinking with friends at the bar, and buying Jane Roe a drink at her request. (*Id.* at 191). When group photographs were taken, Plaintiff said he was taken "off guard" when Jane Roe grabbed onto his shirt and "leaned over onto [his] shoulder." (*Id.* at 192).

> [2] See n. 5, *infra.*

Plaintiff testified that the group later changed locations to a second bar. (*Id.* at 193). Before going up to the bar to buy drinks, Plaintiff asked his friends if they wanted anything, and Jane Roe and others indicated that they did. (*Id.*). Plaintiff admitted to buying Jane Roe and others drinks that night. (*Id.*). Slightly after midnight, a friend in the group decided to leave and "all of us kind of realized that it was getting late[.]" (*Id.* at 194). Plaintiff allegedly announced that he was going to leave, and another friend stood up to leave with him; thereafter, "[Jane Roe] followed us outside the bar." (*Id.*). Plaintiff's friend split off at one of the intersections, but "[Jane Roe] followed along

and continued walking in [Plaintiff's] direction." (*Id.* at 195). Plaintiff testified that Jane Roe grabbed onto his hand. (*Id.*) They allegedly continued to hold hands, and Plaintiff and Jane Roe allegedly started talking about "hooking up" that night. (*Id.*). According to Plaintiff, Jane Roe said that she did not "want to have sex," but "we can do other things." (*Id.*). Plaintiff testified that he said, "okay, that sounds fine with me," so they "walked into a pair of bushes that were standing directly facing King Library" where they began kissing for three or four minutes. (*Id.*). Plaintiff admitted to performing oral sex on Jane Roe, but only after allegedly telling her he "would like to perform oral sex on her," which he did for about five *8 minutes with "no hesitation" from Jane Roe. (*Id.* at 196). Afterward, they continued to kiss and Jane Roe allegedly "grabbed the general area of [Plaintiff's] pants and began rubbing that area for about 30 seconds or so." (*Id.* at 197). He started to unzip his pants, but Jane Roe allegedly said "what are you doing" and pointed to a "window a foot above us" at King Library. (*Id.*). King Library was open and students were there studying. (*Id.*). Plaintiff allegedly told Jane Roe that his roommate was sleeping in his dorm room, but made the suggestion that they go to a private bathroom in his residence hall, to which she allegedly agreed. (*Id.*). Plaintiff testified that Plaintiff and Jane Roe walked past King Library to his residence hall. (*Id.*). When they entered the residence hall, they allegedly passed the women's restroom on the first floor in order to take the elevator to the second floor. (*Id.*). Jane Roe allegedly continued to kiss Plaintiff in the elevator. (*Id.* at 198).

According to Plaintiff, when they arrived in the second floor private bathroom, he sat on the handicap seat inside the large shower. (*Id.* at 199). Jane Roe allegedly followed him into the shower, set her things down, and "straddled" Plaintiff. (*Id.*).[3] They allegedly began kissing, she allegedly rubbed "the general area of [his] pants and began doing the exact same thing as she did outside." (*Id.*

at 199). According to Plaintiff, Plaintiff unzipped his pants, and he and Jane Roe discussed "whether [they] were going to have sex or not." (*Id.*). They allegedly agreed not to have sex because "neither of [them] had a condom." (*Id.*). At that point, Jane Roe allegedly "kind of put her hand on [Plaintiff's] shoulder so [he] could sit back down," and "under her own power, 100 percent sat there on her knees and began to perform oral sex on [Plaintiff]." (*Id.*). Plaintiff claims that for five minutes he had his hands behind his head, and he only ever "laid a *9 hand on her . . . [to] push her hair away from her face when we were having that conversation" about where she wanted him to "finish." (*Id.*).

> 3 Even though Jane Roe claimed that the conduct occurring outside the residence hall constituted sexual assault, Jane Roe admitted to later straddling Plaintiff when they arrived inside the private bathroom in the residence hall. (*Id.* at 353).

Afterward, Plaintiff walked Jane Roe home. (*Id.* at 200). The next day, Jane Roe - who admittedly was already "involved" with a mutual friend (*Id.* at 389) - sent Plaintiff a series of text messages expressing disgust at the behavior from the night before. (Doc. 17-1; PAGEID# 608). Plaintiff responded to the text messages, agreeing that their behavior was a "horrible decision." (*Id.* at 610).[4]

> 4 At the disciplinary hearing and later preliminary injunction hearing, Plaintiff was insistent that everything he and Jane Roe did was consensual, and that his responsive text messages to Jane Roe were not admissions that he had engaged in sexual misconduct. Instead, he testified that his text messages acknowledging his "horrible decision" related to concerns about jeopardizing relationships with mutual friends.

Several witnesses testified on behalf of Plaintiff.[5] Plaintiff's witnesses, including Plaintiff himself, were questioned extensively by the panel regarding alcohol consumption on the night in

question. At one point, two members of the hearing panel - including Defendant Vaughn - suggested that *any* alcohol consumption eliminated Jane Roe's ability to consent:

> 5 A witness who had previously provided a notarized witness statement to Plaintiff showed up at the hearing in order to urge the panel to *not* consider his notarized statement, because he supposedly did not understand that the statement may be used in a hearing and that he did want to be involved. The panel did not entertain Plaintiff's offer to play the witness' recorded interview (Doc. 11-2; PAGEID# 286), in which the witness supposedly describes a conversation with Jane Roe in which she offers a different version of the night in question to the witness. The panel does not follow any formal rules of evidence, so arguably the members could have used their discretion to listen to recording, but chose not to do so. It is thus not entirely accurate for Defendants to claim (Doc. 16: PAGEID# 520) that Plaintiff attempted to prevent the panel from hearing the reluctant witness' account. Furthermore, one of the issues in this case is the purported right of an *accused* student to confront *adverse* witnesses, so the Court is not persuaded by Defendants' argument that "Mr. Nokes should not be permitted to use provisions of the University's Code of Conduct [allowing use of written/recorded witness statement] where it benefits him, and then argue to this Court that his constitutional due process rights were violated by the same provision."

MR. SCOTT: Do you know what the training says about alcohol and consent?

*10

MR. [JOHN NOKES]: Which training?

MR. SCOTT: I think it's on this training that you've gone through.

MR. [JOHN NOKES]: It's on this training?

MR. SCOTT: What does it say about alcohol?

MR. [JOHN NOKES]: That an excess of alcohol is not -- an excess of alcohol does not -- you can't give consent if you have a large amount of alcohol.

MR. SCOTT: It's says large amount?

MR. [JOHN NOKES]: This is from my understanding, sure.

MR. SCOTT: It says alcohol. It does not say amount.

MR. [JOHN NOKES]: So with that definition -- I'm honestly just asking, but that definition if everybody on this campus who takes a drink of alcohol and kisses their boyfriend or girlfriend, is that nonconsensual?

MS. VAUGHN: Potentially, yes.

(Doc. 11-2; PAGEID# 318-319).

Later, Jane Roe testified. Plaintiff was permitted to direct questions of Jane Roe to the hearing panel, which in turn would ask the question to Jane Roe. No live witnesses testified on behalf of Jane Roe. Instead, she submitted three witness statements from friends who allegedly observed her behavior before or after her encounter with Plaintiff. For example, Jane Roe's roommate stated that Jane Roe came home that night "sobbing uncontrollably and slurring her words" and "unable to walk in a straight line." (Doc. 17-1; PAGEID# 604). Jane Roe allegedly told her

roommate that John Nokes "took her to his dorm, took her into the bathroom, and even though she resisted, he held her head down and forced her to give him oral sex." (*Id*.). Plaintiff had no opportunity to confront this witness, as well as two other adverse witnesses, who did not *11 attend the hearing. During the course of the hearing, Defendant Vaughn stated: "when [Jane Roe] had three witness statements, it truly disadvantages everyone if you can't ask questions. So if we can't ask questions, I have to take this as fact. That all is true." (*Id*. at 271).

In his closing remarks, Plaintiff stated that he did not "attack" Jane Roe and that everything she did was of her own free will. (*Id*. at 376). After the hearing, the panel deliberated and found Plaintiff "responsible" for both charges on the basis that Jane Roe was "severely intoxicated" on the night in question and thus unable to consent. For the sanctioning portion of the hearing, Plaintiff offered character witnesses. He was later informed of his two-year suspension.

**5. May 9, 2017 Appeal**

On May 9, 2017, John Doe submitted an appeal. After two layers of review, the findings and sanction imposed were affirmed by University officials. (Doc. 17-6). On June 16, 2017, the disciplinary decision became final. This litigation followed.

**B. Procedural Posture of the Instant Lawsuit**

**1. Plaintiff's July 16, 2017 Complaint (Doc. 1)**

On July 16, 2017, Plaintiff initiated this lawsuit. Plaintiff asserts that the disciplinary hearing was defective for two reasons.

First, Plaintiff argues that he was afforded inadequate notice of the nature of the allegations against him. Specifically, he argues that the Notice of Violation amounts to "no notice at all," because the April 28, 2017 hearing focused on Jane Roe's

alcohol consumption and alleged inability to consent—not use of force as alleged in the Notice of Violation. (Doc. 2; PAGEID # 122, 129). *12

Second, Plaintiff argues that he was never provided the opportunity to cross-examine three adverse witnesses who supplied written testimony to the hearing panel, and that he was disadvantaged by the presiding panel member who stated that if "we can't ask questions, I have to take this as fact. That all is true." (Doc. 1; PAGEID# 24).

In addition to compensatory damages and declaratory relief, Plaintiff seeks a permanent injunction "restoring John [Nokes] as a student and prohibiting further disciplinary proceedings in a manner that violates the contract between the parties." *(Id.* at 36).

## 2. Plaintiff's Motion for Preliminary Injunction (Doc. 3) and Motion for Temporary Restraining Order (Doc. 14)

Contemporaneously with his Complaint, Plaintiff moved for a preliminary injunction prohibiting Defendant Miami University from imposing disciplinary sanctions against him, in order to preserve the *status quo*, until this Court is able to determine the merits of his claims. Later, on August 3, 2017, Plaintiff filed an emergency motion seeking an order temporarily enjoining Defendants from releasing his name, or otherwise disclosing his identity, until the Court is able to rule on Plaintiff's motion for preliminary injunction. On August 9, 2017, the Court granted the temporary restraining order. (Doc. 9).

## 3. August 10, 2017 Preliminary Injunction Hearing

On August 10, 2017, Plaintiff testified, and the Court received into evidence the hearing transcripts from Defendant Miami University's disciplinary proceedings against Plaintiff. (Doc. 11). In lieu of closing remarks or oral argument on the pending motions, the parties elected to rest on the arguments in their papers. (Docs. 23; 24). The

Court instructed the Parties that, if they wished to file post-hearing briefs, they were to confer among themselves and thereafter alert the Court to their decision by end-of-day. Although the Parties initially declined, Defendants contacted the Court on August 11, 2017 requesting leave to submit a short post-hearing brief by *13 end-of-day, stating that they had no objection to Plaintiff filing his post-hearing brief on August 14, 2017. Defendants' request and proposed briefing schedule was acceptable to the Court. Although the Court granted Plaintiff until August 15, 2017 to file a post-hearing brief, Plaintiff filed his post-hearing brief early, on Sunday, August 13, 2017.

### 4. Post-Hearing Briefing

Post-hearing briefing closed after Plaintiff submitted his August 13, 2017 memorandum. Thereafter, on August 20, 2017, Plaintiff filed a short Notice of Supplemental Authority (Doc. 25) alerting the Court to a relevant August 18, 2017 opinion from the United States District Court from the Middle District of Pennsylvania. The foregoing Notice contained a case citation and short parenthetical. In response, Defendants filed a five-page memorandum (Doc. 26) attempting to distinguish Plaintiff's supplemental authority, and further arguing points from the Rule 65 briefing that closed on August 13, 2017. Defendants' response triggered Plaintiff's pending Motion to Strike (Doc. 27), which is addressed immediately below.

## II. ANALYSIS

### A. Plaintiff's August 21, 2017 Motion to Strike Defendants' Response to Plaintiff's Notice of Supplemental Authority (Doc. 27)

Plaintiff argues that Defendants' five-page "response" (Doc. 26) should be stricken because "Defendants have used the filling [sic] of the Notice [of Supplemental Authority] as an opportunity to improperly submit an additional [memorandum]" in violation of S. D. Ohio Local Rule 7.2(a)(2). (Doc. 27). Specifically, Plaintiff

argues that Defendants' "response" (Doc. 26) was an improper, transparent attempt to submit additional briefing without leave of Court:

> Not only does the [Defendants'] "Response" improperly contain argument attempting to distinguish the supplemental authority cited by Plaintiff, but the Defendants then proceed to spend three additional pages essentially replying to the authority cited by Plaintiff on the issue of "prejudice" in Plaintiff's Supplemental

14    \*14

> Memorandum. Defendants should not be permitted to take advantage of Plaintiff merely bringing an additional authority to the Court's attention to skirt the limitations on briefing established by Local Rule 7.2(a)(2).

(Doc 27; PAGEID# 733) (footnote omitted). However, Defendants argue that Plaintiff was the first to defy Local Rule 7.2, claiming that even though the Notice (Doc. 25) included no "developed" argument, "there is no reason why [Plaintiff] would submit such a notice unless he was trying to argue to the Court that the case he was 'supplementing' was supportive of his arguments." (Doc. 28; PAGEID# 735).

Local Rule 7.2(a)(2) provides that memoranda supporting in and in opposition to motions shall be limited to an initial memorandum, an opposition, and a reply. The Rule prohibits further memoranda without leave of Court: "No additional memoranda beyond those enumerated are permitted except upon leave of court for good cause shown." However, the local rules are silent on what constitutes a memorandum, and whether courts should "strike" non-enumerated memoranda filed without leave. Furthermore, the Court's local rules provide no instruction on the manner in which parties should bring supplemental authority to the attention of the Court. In other words, the local rules do not resolve whether Plaintiff's

Notice should be classified as a non-enumerated "memorandum," requiring leave under Local Rule 7.2.

The Court will not attempt to create a bright-line test for when a "notice" crosses the line into memorandum territory. Indeed, the Court needs no bright-line test in order to determine that Plaintiff's citation and short parenthetical did not open the door to Defendants' five-page memorandum, and especially did not open the door to three pages of additional briefing supporting the "prejudice" arguments contained in Defendants' post-hearing brief. Even if Defendants believed that Plaintiff should have requested leave to file his short notice, such a    \*15 belief does not absolve Defendants of their duty to seek leave before filing a five-page memorandum that includes arguments that relate back to a post-hearing brief. In such a motion seeking leave, Defendants could have raised with the Court their argument that Plaintiff's Notice violated Local Rule 7.2.[6]

15

> [6] Again, the Court is disinclined to create a bright-line test for when a notice of supplemental authority constitutes an additional memorandum requiring leave under Rule 7.2. The Court will note, however, that it is not persuaded by Defendants' arguments that Plaintiff's notice is a form of "argument" because it cites a case in which a district court granted a preliminary injunction. While the Notice mentions the district court's disposition, it otherwise neutrally describes the case as "supplemental authority to aid the Court in its consideration of the Motion for Preliminary Injunction." (Doc. 25). Thereafter, it provides a citation and short parenthetical for a case that had been decided the previous business day. In this instance, the Court does not believe that Plaintiff crossed the line into argument, or that it is a good idea to punish parties for bringing new authority to the attention of the Court, especially where the local rules are silent on the procedure for doing so.

Ultimately, the Court is firmly convinced that Defendants' memorandum violated Local Rule 7.2; however, the Court is less convinced that the proper course of action is to "strike" the document. Again, the local rules are silent on whether courts should "strike" non-enumerated memoranda filed without leave. Furthermore, the Federal Rules of Civil Procedure provide no mechanism for "striking" documents other than pleadings. Fed. R. Civ. P. 12(f). Even though parties (and sometimes even courts) frequently refer to all court filings as "pleadings," such usage is imprecise and incorrect.[7] The only documents that qualify as "pleadings" are enumerated in Fed. R. Civ. P. 7(a) (e.g., complaint, answer, crossclaim, etc.); memoranda are not listed. Thus, orders "striking" non-pleadings such as memoranda are not a proper usage of Rule 12(f). *Johnson v. Wolgemuth*, 257 F. Supp. 2d 1013, 1024 (S.D. Ohio Mar. 10, 2003) (Rice, J.) (declining to "strike" expert report at summary judgment phase; reasoning that Rule 12(f) only allows matters contained within the "pleadings" to be stricken, so "the remedy is not to strike *16 [the] affidavit; it is simply to ignore it"); *Maxum Indem. Co. v. Drive W. Ins. Servces*, No. 1:13-cv-191, 2014 U.S. Dist. LEXIS 196740, at *6 (S.D. Ohio June 13, 2014) (Bowman, M.J.) (denying motion to strike; agreeing with other courts in Sixth Circuit holding that "motions to strike are inapplicable" where a non-pleading is the subject of the motion to strike); *Dawson v. City of Kent*, 682 F.Supp. 920, 922 (N.D. Ohio 1988)("The federal rules make only one reference to a motion to strike in Rule 12(f). This rule relates only to pleadings and is inapplicable to other filings."); *Johnson v. Manitowoc Boom Trucks*, *Inc.*, 406 F. Supp. 2d 852, 864 (M.D. Tenn. Dec. 13, 2005) (declining to rule on motion to strike, because "[m]otions to strike relate only to 'pleadings,' a term which is narrowly defined by Rule 7(a) of the Federal Rules of Procedure").

[7] For example, Defendants misuse the term "pleadings." (Doc. 28; PAGEID# 735) ("Mr. Nokes admits that his Notice was outside of those pleadings[.]" )

Accordingly, the Court **DENIES** the Motion to Strike (Doc. 27). However, the Court will caution Defendants that: (1) further violations of Local Rule 7.2 will not be tolerated; (2) any such violation will be deemed a violation of an Order of this Court; and (3) even if "striking" non-compliant documents is not the proper remedy under Rule 12(f) or the local rules, the Court will fashion an appropriate remedy for future violations consistent with its inherent power to enforce compliance with its lawful orders. *Bds. of Trs. of Ohio Laborers' Fringe Benefit Programs v. Dixon Masonry, Inc.*, No. 2:09-cv-01013, 2010 U.S. Dist. LEXIS 140501, at *3 (S.D. Ohio Dec. 2, 2010) (citing *S.E.C. v. Dollar Gen. Corp.*, 378 Fed. Appx. 511, 516 (6th Cir. 2010); *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966)). This admonition may seem harsh for Defendants' first violation, but the Court deems it appropriate given how strongly the Court expressed its dislike for surprise at the preliminary injunction hearing. The Court was also clear that it wanted the parties to work together to determine the need for, and timing of, a fair process for post-hearing briefing. Plaintiff's Notice *17 (Doc. 25) containing a single case citation from the previous business day - with no argument - did not open the door for Defendants to file a five-page memorandum without leave.

## B.  Plaintiff's July 16, 2017 Motion for Preliminary Injunction (Doc. 2)

The purpose of a preliminary injunction is to preserve the *status quo. Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, the court considers four elements: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3)

whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emples. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam). "These four considerations are factors to be balanced, not prerequisites that must be met." *Kessler v. Hrivnak*, No. 3:11-cv-35, 2011 U.S. Dist. LEXIS 57689, at *8-9 (S. D. Ohio May 31, 2011). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id.*

### i. Likelihood of Success

With regard to this first element, the Court will begin by restating its earlier reservations about "resolving" hotly contested issues of law in any expedited Rule 65 proceeding. (Doc. 21; PAGEID# 692) ("[T]his Court's assessment of Plaintiff's likelihood of success on the merits is not based on an exhaustive analysis of the facts, law, or policy relevant or potentially relevant to the final resolution of this case."). Courts across this Circuit and the country for that matter are being asked to answer the difficult question of how much process was due any particular student, and whether that student's university at least met the minimum threshold required. At the same time, federal circuit courts have generally avoided issuing broad rulings, tacitly recognizing that *18 each university follows different disciplinary procedures and each student's path through the university disciplinary process is likewise different. *See, e.g.*, *Flaim v. Med. College of Ohio*, 418 F.3d 629, 636 (6th Cir. Ohio Aug. 17, 2005) ("*some* circumstances may require the opportunity to cross-examine witnesses"; "*some* circumstances . . . might [warrant disclosure of] the names of witnesses and a list of other evidence the school intends to present," etc.) (emphases added). *Accord*: *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 657 (S.D. Ohio Nov. 7, 2016) ("The Court uses the term 'generally' because due process is a flexible concept and may require more or less process depending on the situation."). Therefore,

given the complexity of the law, and that this matter is still before the Court in an expedited Rule 65 proceeding, the Court continues to assess Plaintiff's likelihood of success based on whether Plaintiff has "raised [factual or legal] questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." (Doc. 21; PAGEID# 699) (citing *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). *Accord*: *PartyLite Gifts*, *Inc. v. Swiss Colony Occasions*, 246 Fed. Appx. 969, 972, 2007 U.S. App. LEXIS 21589, *7-8 (6th Cir. Aug. 29, 2007) (citing *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1989)); *Ohio Republican Party v. Brunner*, 544 F.3d 711, 720-721, 2008 U.S. App. LEXIS 21573, *26 (6th Cir. Oct. 14, 2008) (*en banc*).

Ultimately, nothing about the preliminary injunction hearing or post-hearing briefing has changed this Court's initial conclusion that Plaintiff has raised sufficiently difficult and serious questions. The Court thus incorporates by reference its likelihood of success analysis included in the earlier temporary restraining order (Doc. 21), and makes the following, additional observations about issues that arose during the preliminary injunction hearing and in the post-hearing briefs: *19

### a. Prejudice

The Court is not persuaded by Defendants' new argument that Plaintiff is required to establish that - absent the alleged Constitutional violations - Defendant Miami University's hearing panel would have reached a different outcome. (Doc. 23; PAGEID# 708).

Plaintiff chiefly relies on a single Eastern District of Michigan case, which granted the defendants' motion for summary judgment because plaintiff could not show that plaintiff's "suspension occurred because of a failure of procedural due process" - thus, he was not "prejudiced by a lack of process." *Jahn v. Farnsworth*, 33 F. Supp. 3d

866, 874 (E.D. Mich. July 16, 2014) (citing *Graham v. Mukasey*, 519 F.3d 546, 549 (6th Cir. 2008)). In *Jahn*, however, the plaintiff had admitted "guilt" in advance of the hearing. *Id.* In theory, his suspension would have been proper with or without a hearing, weakening his claim that he was entitled to or "deprived of" a hearing. Here, there was no such admission of responsibility. *See* n. 2, *supra*.

Furthermore, *Graham* (which was cited in *Jahn*) is likewise inapposite. Plaintiff argues that - in holding that a plaintiff must show that the relevant tribunal would have reached a different outcome absent the due process violation - *Graham* relied on an "earlier Sixth Circuit decision dealing with immigration law" and that limited its holding to immigration hearings only. (Doc. 24; PAGEID# 719) (observing that *Graham* relied on *Warner v. Ashcroft*, 381 F.3d 534 (6th Cir. 2004), which held that "proof of prejudice is necessary to establish a due process violation *in an immigration hearing*") (emphasis added)). While the Court declines to resolve whether the Sixth Circuit intended to so limit its holding, the Court feels compelled to note that Defendants' "response" (Doc. 26) - which was the subject of Plaintiff's Motion to Strike (Doc. 27) - does not challenge Plaintiff's interpretation of *Graham* or *Warner*. Furthermore, Defendants' response cites additional authority from the Fourth Circuit, Fifth Circuit, Tenth *20 Circuit , and the District of Kansas (Doc. 26; PAGEID# 728)— however, no additional authority from the Sixth Circuit regarding the so-called prejudice requirement is cited.

20

Accordingly, this Court is not persuaded - based on the authority before the Court - that Sixth Circuit plaintiffs are required to show that the "outcome" of the hearing would have been different absent the alleged Constitutional violations. Just as this Court is unwilling to "second guess" the disciplinary panel's outcome, the Court is also unwilling to accept Defendants' invitation to use *Jahn* or *Graham* as a basis to speculate regarding the panel's outcome had the alleged Constitutional violations not occurred— especially where the disciplinary hearing turned on the credibility of the witnesses, many of which were absent for cross-examination (the lack of which is the alleged Constitutional violation of which Plaintiff complains). The Court cannot and will not guess at: (1) how those absent witnesses would have fared during questioning; and (2) how the panel would have weighed the absent witnesses' testimony.[8]

> [8] As shown below, the Court would still find a sufficient likelihood of success if it were to impose a required prejudice showing on Plaintiff.

**b. Notice**

In cases where the Sixth Circuit has found that the "school-disciplinary context" implicates due process, it requires that students receive the following: "(1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Doe v. Cummins*, 662 Fed. Appx. 437, 446 (6th Cir. 2016). *Accord: Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 709 (S.D. Ohio Nov. 30, 2016). "Notice satisfies due process if the student had sufficient notice of the charges against him and a *meaningful opportunity to prepare for the hearing*." *Flaim*, 418 F.3d at 638 (emphasis added). *21

21

It is not lost on the Court that, regardless of the language in the Notice of Violation, Jane Roe's pre-hearing written statements both discuss alcohol consumption. However, the Court is not - at this stage - prepared to find that Plaintiff is unlikely to prevail. On the issue of notice, the preliminary injunction hearing and the post-hearing briefing raised difficult and serious questions:

First, at the preliminary injunction hearing, Defendants questioned Plaintiff on Section 103A of the "Code of Student Conduct," which defines

sexual misconduct as "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent." (Doc. 1; PAGEID# 70). Defendants asked Plaintiff to admit that the foregoing section contemplates at least two different "situations" where a party cannot give consent. Plaintiff agreed that the Code contemplates a lack of consent where: (1) the person is "coerced or forced"; and (2) the person is "severely intoxicated." Defendants seem to believe that the Code's broad consent definition is a helpful fact for them (see also Doc. 23; PAGEID# 710, n. 2), seemingly based on the theory that Section 103A should have placed Plaintiff on notice that all forms of consent would be at issue, thus giving him an adequate opportunity to prepare for his defense against the accusation(s) that he forced Jane Roe, and/or coerced Jane Roe, and/or took advantage of Jane Roe while she was severely intoxicated, or some combination of the foregoing. Similar arguments have been rejected by other courts at the Rule 65 stage. See, e.g., Doe v. Univ. of Notre Dame, 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645, at *29 (N.D. Ind. May 8, 2017) (granting temporary restraining order and preliminary injunction, where the accused student was provided a "list of the four Standards of Conduct" he may have violated, and "access to the Investigative Summary Report ten days prior to the hearing"). *22

22

Second, regardless of whether directing a student to broad code section or the investigative report fulfills the notice requirement, Defendants have not adequately addressed this Court's initial concern (Doc. 21; PAGEID# 696) that the April 5, 2017 Notice of Violation used limiting language ("specifically") to narrow the Section 103A violations being investigated and pursued by the university. As the Court previously noted, the Notice of Violation "specifically" focuses on Plaintiff's alleged use of force, and fails to mention Jane Roe's alleged severe intoxication—or any alcohol consumption, for that matter. In

other words, once a university directs a student to a broad certain code section, but limits the "specific" conduct that is being investigated, can it credibly argue the student should still be on notice that it must defend all possible violations of that section?

The closest Defendants come to addressing this issue is its suggestion that, once a plaintiff receives "proper notice regarding the charge of assault and [is] expelled for the assault, [a plaintiff] would not be prejudiced by the [panel] justifying expulsion on additional grounds." (Doc. 23; PAGEID# 710) (citing Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1242 (10th Cir. 2001)). However, Watson is inapposite because plaintiff was found responsible for the noticed violation (assault), which alone was grounds for expulsion; the fact that additional violations were addressed at the hearing made little difference. Here, Plaintiff was not found responsible for the noticed violation, i.e., sexual misconduct by use of force. Even if the Court were to accept the legal principle embodied in Watson, the case is factually distinct.

Third, the Court is troubled by Defendants' attempt to diminish the importance of the specific language in the Notice of Violation, especially when the April 28, 2017 hearing transcript reflects that Plaintiff was required to essentially plead to each "charge" in the Notice of Violation at the beginning of the hearing. (Doc. 11-2; PAGEID# 188-189). *23

23

Fourth, the Court is not yet prepared to accept Defendants' argument that Jane Roe's "second statement" - which more extensively discusses alcohol consumption - should have placed Plaintiff on notice of the university's consent theory. Even if the Court accepts the "second statement" as the notice, "due process is not satisfied unless the noticed party has a meaningful opportunity to prepare for the hearing." Flaim, 418 F.3d at 638 (emphasis added). Defendants do not address Plaintiff's argument that, even if the "second

statement" qualifies as sufficient notice of the type of allegation, the notice was still legally inadequate because: "(1) the new theory of intoxication was provided to Nokes only one week before the hearing, which was not sufficient time to prepare a defense; and (2) John Nokes received 'notice' of this new theory of intoxication only after he had been required to submit a statement, other witness statements, and evidence of his own for inclusion in the hearing packet in response to the initial version of events." (Doc. 20; PAGEID# 680) (citing *Notre Dame*, 2017 U.S. Dist. LEXIS 69645, at *29). The Court is not holding as a matter of law that seven days constitutes inadequate time to prepare; rather, the Court is expressing that it not sufficiently satisfied - based on the current record - that Plaintiff had a meaningful opportunity to prepare; thus, a finding that he is unlikely to succeed would be inappropriate at this juncture.

Fifth, Defendants point to the fact that Plaintiff used the term "severely intoxicated" in his opening remarks as conclusive proof that he was on notice of the university's consent theory in advance of the hearing, and thus had a meaningful opportunity to prepare pre-hearing to defend against that particular theory of consent. (Doc. 23; PAGEID# 709) (citing Doc. 11-2; PAGEID# 193). Defendants ignore that Defendant Vaughn was the first person to discuss "severe intoxication" at the hearing. She stated - <u>before</u> Plaintiff's opening statement - that, "[b]y law a person cannot legally give consent no matter what they might say when 24 the person is *24 severely intoxicated due to alcohol or drugs; incapacitated or unconscious." (Doc. 11-2; PAGEID# 186). Plaintiff testified at the preliminary injunction hearing that he tried "his best" to adapt at the disciplinary hearing. Ultimately, the fact that Plaintiff used the term "severe intoxication" in his opening remarks, and otherwise discussed alcohol consumption, could mean that he was on notice of this consent theory prior to the hearing; or, it could mean that he was trying to adapt to a potential moving target

Defendant Vaughn presented to him at the disciplinary hearing based on her early mention of "severe intoxication."[9]

> [9] Plaintiff claims that no Miami official ever alerted him pre-hearing that "severe intoxication" was at issue. Defendant Vaughn was present at the preliminary injunction hearing, but did not take the stand to contradict Plaintiff's assertion or otherwise provide a contrary account of Plaintiff's pre-hearing notice.

Finally, even if the Court accepts Defendants' argument that notice is irrelevant unless Plaintiff can show he was prejudiced by the lack of notice, Plaintiff has pointed to additional evidence he would have used at the hearing had he been given adequate notice. Defendants attack the "new" evidence as having already been rejected on Plaintiff's internal appeal; however, Plaintiff persuasively argues that the fact that the fact that a University official "did not accept [Plaintiff's new] evidence on appeal should hardly be conclusive of the issue." Thus, the Court is unable to conclude - at this stage - that "[a]dditional notice would not have allowed [Plaintiff] to better defend the allegations." *Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (finding a lack of prejudice because "Mr. Watson candidly admitted his guilt, [so] Mr. Watson was not prejudiced by a lack of notice").

Based on the foregoing, and for the reasons stated in the Court's temporary restraining order (Doc. 21), Plaintiff has shown a sufficient likelihood of success and "raised questions going to the merits [which are] so serious, substantial, difficult, and 25 doubtful as to make them a *25 fair ground for litigation and thus for more deliberate investigation." *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012).

### c. Cross-Examination

In the university disciplinary context, the Sixth Circuit has observed that "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases." *Flaim*, 418 F.3d at 636. In *Flaim*, the Sixth Circuit made reference to Second Circuit language stating that - in university disciplinary proceedings hinging on "a choice between believing an accuser and an accused" - "cross-examination is not only beneficial, but essential to due process." *Flaim*, 418 F.3d at 641. *Accord: Doe v. Ohio State Univ.*, 219 F. Supp. 3d at 660 (analyzing *Flaim*, but recognizing that the foregoing language was *dictum*); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d at 710 (same). Furthermore, in *Doe v. Univ. of Cincinnati*, the undersigned recognized the general principle that the need for cross-examination in the university setting is greater than in other educational settings: "[i]n a university setting, the administrators do not have the same 'particularized knowledge' of a student's trustworthiness that exists in a high school with a smaller student population." 223 F. Supp. 3d at 711 (noting "total enrollment of UC during the 2016-2017 academic year is 44,338 undergraduate and graduate students").

Although not as large as the University of Cincinnati, Defendant Miami University cannot dispute that it is a large public university, with total enrollment (including regional campuses) exceeding 24,000. *See* http://miamioh.edu/about-miami/quick-facts/ (last visited August 24, 2017). Likewise, it cannot dispute that it allowed Jane Roe to offer the testimony of three witnesses via written statement only. (Doc. 17-1). For example, she offered the written statement of her roommate, who stated that Jane Roe was in tears after her encounter with ⁂26 Plaintiff. (Doc. 17-1; PAGEID# 604). John Nokes was never able to test the roommate's memory or credibility, including any improper motives for testifying as such. What's more, the hearing transcript clearly reflects that Defendant Vaughn stated: "when [Jane Roe] had three witness statements, it truly

disadvantages everyone if you can't ask questions. So if we can't ask questions, I have to take this as fact. That all is true." (Doc. 11-2; PAGEID# 271). Based on these facts, the Court stands by its earlier conclusion that, "[u]nder certain interpretations [of *Flaim*], [Plaintiff may] prevail, especially in light of one panel member's statement that she must accept certain written accounts as true." (Doc. 21).[10]

[10] In post-hearing briefing, Defendants argue that Plaintiff failed to establish at the preliminary injunction hearing how cross-examination of Jane Roe's three witnesses would have changed the "outcome." (Doc. 23; PAGEID# 711). As indicated above, this Court is not convinced by Defendants' cited authority that evidence of a "changed outcome" is required to prevail. Regardless, Defendants' argument that cross-examination could not have changed the outcome is unavailing. Specifically, in response to Plaintiff's argument that he would have challenged witness credibility had he been given the opportunity to cross-examine (i.e., lack of personal knowledge, memory, etc.), Defendants argue that Plaintiff "was able to do all of these things himself through his statements to the Hearing Panel." (Doc. 23; PAGEID 711). Defendants miss the point of cross examination, which allows the fact-finder to assess *witness demeanor and responses* in order to "assess the credibility of those who disclaim any improper motivations." *Hart v. Lew*, 973 F.Supp.2d 561, 574 (D. Md. 2013). If anything, Defendants' claim that no amount of cross-examination could have changed the minds of the hearing panel members arguably undercuts the fairness of the hearing Plaintiff received.

Based on the foregoing, and for the reasons stated in the Court's temporary restraining order (Doc. 21), Plaintiff has shown a sufficient likelihood of success and "raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for

litigation and thus for more deliberate investigation." *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012).

### ii. Irreparable Harm

In university discipline cases, this Court has previously found sufficient irreparable harm to warrant a preliminary injunction where suspension and damage to reputation are at issue. *Doe* *27 *v. Univ. of Cincinnati*, 223 F. Supp. 3d at 712. The Court acknowledges, however, a split in authority. (Doc. 21; PAGEID# 701). That is, some courts deem such harm compensable through monetary damages; others do not. As this Court stated in its temporary restraining order, however, the undersigned is disinclined to embrace a rule that suspension and harm to an individual's reputation cannot constitute irreparable harm as a matter of law. Furthermore, any argument that Plaintiff only claims speculative harm would be misplaced. At the preliminary injunction hearing, Plaintiff testified to the cyclical nature of job opportunities in his field, and other complications that will prevent him from applying for competitive internships necessary to advance due to his lack of enrollment. Plaintiff has thus made a sufficient showing of irreparable harm. *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d at 712; *Ritter v. Oklahoma*, 2016 U.S. Dist. LEXIS 60193, at *8 (W.D. Okla. May 6, 2016) ("The court concludes plaintiff has also demonstrated that he will suffer irreparable harm if the injunction is denied. The loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages."). *Accord: Doe v. Univ. of Notre Dame*, 2017 U.S. Dist. LEXIS 69645, *38 (N.D. Ind. May 8, 2017); *Doe v. Middlebury College*, No. 1:15-CV-192-JGM, 2015 U.S. Dist. LEXIS 124540 (D.Vt. Sept. 16, 2015); *King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, at *13 (S.D.Ind. Aug. 22, 2014).[11] *28

11  The Court feels compelled to at least note that Ohio's public universities often benefit from a presumption of irreparable harm in their business injunction cases. For example, in trademark cases, universities have benefitted from the rule that, due to a "trademark's unique role in protecting intangible assets, such as *reputation and goodwill*," injuries "that arise as a result of trademark infringement and public confusion are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, at 755-756 (S.D. Ohio Aug. 27, 2010) (emphasis added; internal citations omitted). Yet, when faced with a split in authority, Defendant Miami University would have this Court take the view that a damages such as "embarrassment, humiliation, and damage to an *individual's* reputation fall short of irreparable harm." (Doc. 16; PAGEID# 521) (emphasis added). In other words, damage to an entity's reputation based on a single act of trademark infringement may be irreparable; damage to a person's reputation - connecting that individual to something as universally reviled as sexual assault - is not irreparable. The Court is simply not persuaded.

Based on the foregoing, and for the reasons stated in the Court's temporary restraining order (Doc. 21), Plaintiff has made a sufficient showing of irreparable harm.

### iii. Injury to Third Parties and Public Interest

Each Party addresses the third and fourth preliminary injunction factors (i.e., injury to third parties and public interest, respectively) together.

Initially, the Court will note that Defendants' post-hearing briefing is silent on any harm the public or third-parties will suffer if the temporary restraining order enjoining the release of Plaintiff's name is extended. Specifically, this Court temporarily enjoined Defendants from releasing

Plaintiff's name in response to public records requests made under Ohio's Public Records Act. In the temporary restraining order, the Court was clear that it would revisit this issue if a longer injunction was sought; however, in the post-hearing briefing, Defendants have not brought to this Court's attention new developments suggesting that third parties or the public will suffer injury as a result of a longer injunction enjoining the release of Plaintiff's name.

Plaintiff's request to enjoin the imposition of discipline requires a somewhat different analysis. While universities have an interest in maintaining their disciplinary system and protecting victims, the public interest is likewise served "by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012). Here, Plaintiff was permitted to remain on campus during the disciplinary process, as Miami found after a summary suspension hearing 29 that Plaintiff did not *29 pose a direct threat to Jane Roe or the student body. Defendants have not brought to this Court's attention facts suggesting otherwise.

Therefore, on balance, all four preliminary injunction factors favor Plaintiff.

### III. CONCLUSION

For the foregoing reasons, the Court:

(1) **DENIES** Plaintiff's Motion to Strike (Doc. 27), but reminds Defendants of the Court's above admonitions; and

(2) **GRANTS** Plaintiff's Motion for Preliminary Injunction (Doc. 2). Therefore, pursuant to Fed. R. Civ. P. 65, it is **ORDERED** that:

a. Defendant Miami University, and all those acting in active concert with it, is preliminarily **ENJOINED** from imposing disciplinary sanctions against John Nokes, subject to the requirement that John Nokes have no contact with Jane Roe;

b. Defendants Miami University, Susan Vaughn, Steven Elliott, Jayne Brownell, and Michael Curme, and all those acting in active concert with them, are preliminarily **ENJOINED** from releasing or otherwise publicly disclosing Plaintiff's name;

c. This Order is effective upon its entry; and

d. There is no requirement of a bond.

**IT IS SO ORDERED.**

*s/ Michael R. Barrett*

HON. MICHAEL R. BARRETT

UNITED STATES DISTRICT JUDGE

